No. 25-5202

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

LEARNING RESOURCES, INC., and HAND2MIND, INC.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,

Defendants-Appellants.

———————————————

On Appeal from the United States District Court
for the District of Columbia

———————————————

**EMERGENCY MOTION FOR A STAY PENDING APPEAL**

———————————————

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

MARK R. FREEMAN
MICHAEL S. RAAB
BRAD HINSHELWOOD
DANIEL WINIK
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7245*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8849*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties and Amici

Plaintiffs are Learning Resources, Inc. and hand2mind, Inc. Defendants are Donald J. Trump, in his official capacity as President of the United States; Kristi Noem, in her official capacity as Secretary of Homeland Security; the U.S. Department of Homeland Security; Scott Bessent, in his official capacity as Secretary of the Treasury; the U.S. Department of the Treasury; Howard Lutnick, in his official capacity as Secretary of Commerce; the U.S. Department of Commerce; Pete R. Flores, in his official capacity as Acting Commissioner of Customs & Border Protection; U.S. Customs & Border Protection; Jamieson Greer, in his official capacity as U.S. Trade Representative; and the Office of the U.S. Trade Representative. America First Legal Foundation; Emily Ley Paper, Inc., doing business as Simplified; Kilo Brava LLC; Bambola LLC; Kim's Clothes and Fashion LLC; Rokland LLC; George F. Allen; Steven G. Calabresi; Joshua A. Claybourn; John C. Danforth; Richard A. Epstein; Charles T. Hagel; Harold Hongju Koh; Gerard N. Magliocca; Michael W. McConnell; Michael B. Mukasey; Alan O. Sykes; John Daniel Tinder; Peter J. Wallison; and Philip Zelikow participated before the district court as amici curiae.

**B.     Ruling Under Review**

The ruling under review is a memorandum opinion (Dkt. 37) and or-

der (Dkt. 35) issued by the district court on May 29, 2025, granting a prelim-

inary injunction.  The opinion and order are attached to this motion.

**C.     Related Cases**

This case has not previously been before this Court or any other court

other than the district court.  We are not aware of any related cases within

the meaning of the Court's Rule 28(a)(1)(C).  Challenges to the tariffs at issue

are pending before other courts, including the U.S. Court of Appeals for the

Federal Circuit (on appeal from the U.S. Court of International Trade).

MARK R. FREEMAN
MICHAEL S. RAAB
BRAD HINSHELWOOD

*/s/ Daniel Winik*
DANIEL WINIK
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7245*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 305-8849*

# TABLE OF CONTENTS

**Page**

STATEMENT ................................................................................. 4

    A.    Statutory Background ........................................................4

    B.    Factual Background ............................................................6

    C.    This Litigation ...................................................................9

ARGUMENT ............................................................................... 10

I.    The Government Is Likely To Prevail On The Merits ......................... 10

    A.    The District Court Lacked Jurisdiction .......................................10

    B.    IEEPA Clearly Authorizes Tariffs ..................................................14

II.    The Equitable Factors Favor A Stay ....................................................... 23

CONCLUSION ............................................................................ 26

CERTIFICATE OF COMPLIANCE

ADDENDUM

Congress has long delegated to the President broad powers to impose tariffs in a wide range of circumstances, including to address national emergencies under the International Emergency Economic Powers Act (IEEPA). In April 2025, President Trump declared that numerous acute emergencies, ranging from America's exploding trade deficit to the crisis of fentanyl importation, should be dealt with by imposing tariffs on the responsible foreign parties. No one in this litigation disputes—and no court has questioned—that the President validly declared these emergencies under IEEPA and the National Emergencies Act (NEA). The President deemed the tariffs necessary to correct decades of trade imbalances and asymmetrical tariffs against America; to eliminate the drain of trillions of dollars from America's economy; to reorient the global economy on a more equitable basis; to strengthen the United States's defense-industrial base to avoid compromising national-security functions; and to induce Mexico, Canada, and the People's Republic of China (PRC) to stem the deadly tide of fentanyl and other drugs into our country.

These tariffs have prompted dozens of countries to negotiate with the United States to realize historic trade deals. And the combination of tariffs and future trading agreements has also yielded collateral diplomatic benefits

for global crises—for instance, by facilitating President Trump's successful intercession in the burgeoning conflict between nuclear powers India and Pakistan. A55 (Commerce Secretary).[1]

Yet the district court issued a legally indefensible preliminary injunction, declaring that IEEPA does not authorize any tariffs at all—even though IEEPA incorporates the same language that Congress has used to authorize other broad tariffs. That interpretation contravenes IEEPA's text, structure, and history, as well as precedent. And it defies the separation of powers, overriding Congress's decision to delegate broad tariff authority to the President—as Congress has done since the dawn of the Republic—and hobbling IEEPA as an international diplomatic tool.

Worse, the district court plainly lacked jurisdiction to rule on these issues at all. The Court of International Trade (CIT) has "exclusive jurisdiction" over "any civil action commenced against" the federal government "that arises out of any law of the United States providing for … tariffs" or for "revenue from imports." 28 U.S.C. § 1581(i)(1), (i)(1)(A), (B). Five days ago, the CIT held that it had exclusive jurisdiction over a virtually identical

---

[1] A__ citations refer to the addendum.

challenge because "a challenge to a presidential action that imposes tariffs, duties, or other import restrictions is one that arises from a 'law providing for' those measures." *V.O.S. Selections, Inc. v. United States*, 2025 WL 1514124, at *7-8 (Ct. Int'l Trade May 28, 2025). And this Court has repeatedly held that the CIT, not district courts, must resolve jurisdictional disputes.

Although the district court limited its injunction to the parties and delayed enforcement until June 12, a further stay pending appeal is imperative. By holding the tariffs invalid, the district court's ruling usurps the President's authority and threatens to disrupt sensitive, ongoing negotiations with virtually every trading partner by undercutting the premise of those negotiations—that the tariffs are a credible threat. Those negotiations currently stand at a delicate juncture, as four Cabinet members' declarations underscore. Meanwhile, plaintiffs face no harm from a stay; they can fully remedy any harms by obtaining a refund of any tariffs ultimately held invalid.

To permit the Solicitor General to seek relief from the Supreme Court if necessary, the government respectfully requests that the Court grant at least an administrative stay by June 6—six days before the district court's stay will expire—and continue the administrative stay for seven days after

any denial of this motion. Plaintiffs have informed us that they oppose this motion and intend to file a response on whatever schedule the Court orders.

## STATEMENT

### A.    Statutory Background

1.    Congress has long delegated to the President broad authority to regulate importation during national emergencies. The 1917 Trading With the Enemy Act (TWEA), Pub. L. No. 65-91, 40 Stat. 411, authorized the President to "regulat[e]" "import[ation]" of foreign goods during wartime. *Id.* § 11, 40 Stat. at 422-423. Later, Congress amended TWEA to allow the President to "regulate ... importation" of foreign goods not just in wartime but "during any other period of national emergency" he declares. First War Powers Act, Pub. L. No. 77-354, tit. III, § 301, 55 Stat. 838, 839-840 (1941).

TWEA enabled President Nixon to impose a supplemental 10% tariff on eligible goods to address a balance-of-payments deficit. Pres. Proc. No. 4074, 85 Stat. 926 (1971). The Federal Circuit's predecessor upheld those tariffs. *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560 (C.C.P.A. 1975).

2.    In the 1970s, Congress revised the TWEA framework through two statutes. *First*, the National Emergencies Act (NEA), Pub. L. No. 94-412, 90 Stat. 1255 (1976), "authorize[s]" the President "to declare [a] national

emergency" for the purpose of all "Acts of Congress authorizing the exercise, during the period of a national emergency, of any special or extraordinary power."  50 U.S.C. § 1621(a).

The NEA does not substantively limit the grounds for emergency declarations.  Instead, Congress retained oversight of such determinations through its power to "terminate[]" a declared emergency through "a joint resolution," 50 U.S.C. § 1622(a)(1), on a set timetable, *id.* § 1622(b).  Otherwise, an emergency "terminate[s] on the anniversary of the declaration" absent a renewed Presidential determination.  *Id.* § 1622(d).

*Second*, Congress removed the President's peacetime emergency powers under TWEA, Pub. L. No. 95-223, § 101(a), 91 Stat. 1625, 1625 (1977), and replaced them with IEEPA, *id.* tit. II, §§ 201-208, 91 Stat. at 1626-1629. IEEPA's operative provision, "directly drawn" from TWEA, *Dames & Moore v. Regan*, 453 U.S. 654, 671-672 (1981), authorizes the President to "regulate … any … importation … of … any property in which any foreign country or a national thereof has any interest … or … any property[] subject to the jurisdiction of the United States."  50 U.S.C. § 1702(a)(1)(B).

Section 1702 confers "essentially the same" authority as TWEA, though IEEPA specifies somewhat "different" "conditions and procedures

for" exercising that authority. *Regan v. Wald*, 468 U.S. 222, 228 (1984). IEEPA provides that the President's § 1702 authority "may be exercised to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a).

### B.   Factual Background

1.    In January 2025, the President declared the flow of contraband drugs like fentanyl, and the resulting public-health crisis, to be a national emergency. Pres. Proc. 10,886, 90 Fed. Reg. 8,327 (Jan. 20, 2025). The President later "expand[ed] the scope of the national emergency" to include conduct by the PRC. Exec. Order No. 14,195, 90 Fed. Reg. 9,121 (Feb. 7, 2025). The President found that the PRC has supported the exportation of fentanyl and opioid precursors by chemical companies, that many such companies "go to great lengths to evade law enforcement"; and that "[t]he flow of contraband drugs like fentanyl to the United States through illicit distribution networks has created a national emergency." *Id.* at 9,121.

The President determined that the PRC's conduct "constitutes an unusual and extraordinary" foreign threat "to the national security, foreign

policy, and economy of the United States." *Id.* at 9,122. He accordingly imposed a 10% duty on most PRC imports, *id.* at 9,122-9,123, then increased the duty to 20% when he determined that "the PRC has not taken adequate steps to alleviate the illicit drug crisis," Exec. Order. No. 14,228, 90 Fed. Reg. 11,463, 11,463 (Mar. 7, 2025). The President later imposed duties on low-value PRC imports, finding that many PRC-based shippers "hide illicit substances and conceal the true contents of shipments sent to the United States," strategies that may "avoid detection" absent tariffs. Exec. Order. No. 14,256, 90 Fed. Reg. 14,899, 14,899 (Apr. 7, 2025).

2. The President declared an additional emergency in April, citing "a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits." Exec. Order No. 14,257, 90 Fed. Reg. 15,041, 15,041 (Apr. 2, 2025). The President determined that "large and persistent annual U.S. goods trade deficits have led to the hollowing out of our manufacturing base" and a litany of other serious harms—deficits "caused in substantial part by a lack of reciprocity in our bilateral trade relationships." *Id.* To deal with this threat, the President deemed it necessary

to impose a 10% tariff "on all imports from all trading partners," with certain exceptions.  *Id.* at 15,045.  The President then imposed additional country-specific tariffs.  *Id.*

Based on changed circumstances, the President later took additional actions he deemed necessary to address this emergency.  On April 9, citing many countries' steps toward remedying the emergency, the President suspended most country-specific tariffs for 90 days.  Exec. Order No. 14,266, 90 Fed. Reg. 15,625, 15,626 (Apr. 15, 2025).  The United States has since announced terms of a trade deal with the United Kingdom "that was negotiated in reliance on the President's emergency tariff authority," and is "participating in dozens of ongoing negotiations with foreign-trading partners" similarly reliant on that authority.  A52, A54.

But the President raised the tariff rate for PRC imports to respond to PRC retaliation.  *Id.*; *see* Exec. Order No. 14,259, 90 Fed. Reg. 15,509 (Apr. 14, 2025).  Later, the President suspended the additional PRC tariffs for 90 days, recognizing the PRC's "intentions" to "facilitate addressing the national emergency."  Exec. Order No. 14,298, 90 Fed. Reg. 21,831 (May 21, 2025).

## C.    This Litigation

Plaintiffs challenged the tariffs discussed above based on their claim to import goods from China and other countries affected by tariffs.  Dkt. 1 ¶¶ 61-63.  They sought preliminary injunctive and declaratory relief.  The government moved to transfer the case to the CIT because it possesses exclusive jurisdiction.

The district court denied transfer and granted a preliminary injunction.  A3-35.  It interpreted § 1581(i)(1) to condition jurisdiction over challenges to tariffs imposed under IEEPA on whether, on the merits, "IEEPA is a 'law … providing for' 'tariffs, duties, fees or other taxes on the importation of merchandise for reasons other than the raising of revenue.'"  A15.  The court then concluded that IEEPA does not allow *any* tariffs—directly contradicting the CIT's ruling the day before that IEEPA does authorize some tariffs.  A18-30.

On the equities, the court agreed with the government "that the public has a compelling interest in the 'President's conduct of foreign affairs and efforts to protect national security.'"  A34.  It concluded, however, that any harm to the government from an injunction in plaintiffs' favor would be

marginal because the harms articulated in the Cabinet members' declarations "will flow, if at all, from the … sweeping order" issued by the CIT. *Id.* The court set only a nominal $100 bond under Rule 65(c). A37.

**ARGUMENT**

Stays pending appeal turn on four factors: the movant's likelihood of success on appeal, whether the movant would be irreparably harmed absent a stay, the balance of equities, and the public interest. *Nken v. Holder*, 556 U.S. 418, 426 (2009). Here, those factors strongly favor the government.

## I. The Government Is Likely To Prevail On The Merits

### A. The District Court Lacked Jurisdiction

1. The CIT possesses "exclusive jurisdiction" over "any civil action commenced against" the federal government "that arises out of any law of the United States providing for … revenue from imports" or for "tariffs, duties, fees or other taxes on the importation of merchandise for reasons other than the raising of revenue," as well as any suit arising from "administration or enforcement" of such tariffs. 28 U.S.C. § 1581(i)(1), (i)(1)(A), (B), (D). District courts accordingly lack jurisdiction over such matters. *Id.* § 1337(c); *see, e.g.*, *K-Mart Corp. v. Cartier, Inc.*, 485 U.S. 176, 182-183 (1988).

The district court asserted jurisdiction through a litany of errors. It conflated jurisdiction with the merits, misreading the jurisdictional requirement of a law "providing for … tariffs" to require assessing whether IEEPA authorizes tariffs—then got that merits question wrong. A15-17. As the CIT just held, "a challenge to a presidential action that imposes tariffs, duties, or other import restrictions is one that arises from a 'law providing for' those measures," regardless of whether the law is ultimately held to authorize the particular tariffs in question. *V.O.S.*, 2025 WL 1514124, at *8. Indeed, the CIT asserted jurisdiction even as it erroneously held that IEEPA does not authorize these tariffs.

The CIT's exclusive jurisdiction reflects Congress's choice to consolidate tariff cases in a forum with "expertise in international trade and tariff matters," ensuring a "degree of uniformity and consistency." *Conoco, Inc. v. U.S. Foreign-Trade Zones Bd.*, 18 F.3d 1581, 1586 (Fed. Cir. 1994). The district court's interpretation would perversely deprive a CIT ruling holding tariffs valid of any nationally uniform effect, because a district court that disagreed with the CIT could simply declare that the CIT lacked jurisdiction and issue a contrary ruling. Nor could the government obtain a consolidated, nationally uniform appellate review of any ruling holding tariffs invalid. Rather,

the government might have to appeal similar district-court rulings in a host of other circuits—which might disagree as to the tariffs' validity.[2]

This Court has long deferred to the CIT's ability to decide for itself whether it has jurisdiction. In *SCM Corp. v. ITC*, 549 F.2d 812 (D.C. Cir. 1977), a manufacturer appealed the district court's determination that the Customs Court (the CIT's predecessor) had exclusive jurisdiction over a challenge to trade sanctions. This Court recognized that the plaintiff had raised "far from frivolous doubts concerning its ability to obtain review in the Customs Court," but given the "quite possible" arguments in favor of the Customs Court's jurisdiction, this Court concluded "that the Customs Court itself should be given the opportunity to … determine whether or not it ha[d] jurisdiction." *Id.* at 821. The Court reached a similar conclusion in *Miami Free Zone Corp. v. Foreign Trade Zones Bd.*, 22 F.3d 1110 (D.C. Cir. 1994): Citing "the value of uniformity in judicial review of" trade-related matters, this

---

[2] The district court noted that IEEPA actions are often litigated in district courts. A23, A25. But that is because IEEPA authorizes many different types of actions aside from "tariffs, duties, or other import restrictions," *V.O.S.*, 2025 WL 1514124, at *8. The litigation of such cases in district courts does not undermine the need to concentrate tariff cases in the CIT.

Court deferred to the Federal Circuit's conclusion that the CIT possessed exclusive jurisdiction over a challenge to the creation of a foreign trade zone, even though this Court found "some support" for a contrary conclusion. *Id.* at 1113. Other circuits employ a similar approach. *See, e.g.*, *Pentax Corp. v. Myhra*, 72 F.3d 708, 711 (9th Cir. 1995); *Commodities Exp. Co. v. U.S. Customs Serv.*, 957 F.2d 223, 227 (6th Cir. 1992).

2. The CIT possesses jurisdiction over challenges to these tariffs—and the district court lacked jurisdiction—for an additional, independent reason: The challenged executive orders imposed tariffs by modifying the Harmonized Tariff Schedule of the United States (HTSUS). The HTSUS is a law of the United States that provides for tariffs, *see* 19 U.S.C. § 1202, and the President's modifications of the HTSUS are likewise "considered to be statutory provisions of law for all purposes," *id.* § 3004(c)(1)(C). This case thus "arises out of any law of the United States providing for … tariffs," 28 U.S.C. § 1581(i)(1)(B), regardless of whether IEEPA is itself such a law. The HTSUS plainly is. At a minimum, the HTSUS provides for "administration and enforcement with respect to" tariffs, *id.* § 1581(i)(1)(D). *See Miami Free Zone*, 22 F.3d at 1112 (subsection (i)(1)(D)'s "with respect to matters" language "is more expansive" than preceding paragraphs).

- 13 -

3.     This Court should therefore reverse the preliminary injunction because the district court lacked jurisdiction.  It should remand with instructions for the district court to transfer the case to the CIT, as two courts have done in similar challenges to these tariffs.  *Emily Ley Paper, Inc. v. Trump*, 2025 WL 1482771 (N.D. Fla. May 20, 2025); *Webber v. DHS*, 2025 WL 1207587 (D. Mont. Apr. 25, 2025), *appeal pending*, No. 25-2717 (9th Cir.).

## B.     IEEPA Clearly Authorizes Tariffs

Even if the district court were correct that its jurisdiction depended on the merits, the court significantly erred in evaluating the merits.  IEEPA's text, history, and precedent confirm that Congress empowered the President to impose tariffs to address declared emergencies.

1.     IEEPA authorizes the President to "regulate … any … importation … of … any property in which any foreign country or a national thereof has any interest … or … any property[] subject to the jurisdiction of the United States."  50 U.S.C. § 1702(a)(1)(B).  The authority to "regulate" imports includes the power to impose tariffs on imports.

That flows from the ordinary meaning of "regulate": to "fix, establish or control; to adjust by rule, method, or established mode; to direct by rule or restriction; to subject to governing principles or laws."  *Regulate*, Black's

Law Dictionary 1156 (5th ed. 1979); *see, e.g.*, *Regulate*, Webster's Third New International Dictionary (1976) ("to govern or direct according to rule; to bring under the control of law or constituted authority"). Imposing tariffs on imports is clearly a way of "control[ling]" imports (*Black's*); "govern[ing] or direct[ing] them according to rule" (*Webster's*); or, more generally, "subject[ing] them to governing principles or laws" (*Black's*).

The district court reasoned that "[t]o regulate is to establish rules governing conduct," while "to tariff is to raise revenue through taxes on imports or exports." A19. But that is a false dichotomy. The jurisdictional statute specifically distinguishes between "law[s] … providing for … revenue from imports" and those providing for "tariffs … for reasons other than the raising of revenue." 28 U.S.C. § 1581(i)(1). And more generally, tariffs and taxes are routinely used not just to raise revenue but to influence conduct. *See, e.g.*, *NFIB v. Sebelius*, 567 U.S. 519, 567 (2012) ("Some of our earliest federal taxes sought to deter the purchase of imported manufactured goods in order to foster the growth of domestic industry."); *Federal Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 559, 562, 571 (1976) (President's authority to "'adjust … imports'" under a different provision "extends to the imposition

of monetary exactions—*i.e.*, license fees and duties," as "a license fee as much as a quota has its initial and direct impact on imports").

The district court similarly erred in emphasizing the constitutional distinction between the power to tax and tariff and the power to regulate interstate commerce (A18). The Supreme Court has recognized that although "the taxing power is a distinct power and embraces the power to lay duties, it does not follow that duties may not be imposed in the exercise of the power to regulate commerce." *Board of Trs. of Univ. of Illinois v. United States*, 289 U.S. 48, 58 (1933).[3]

The court further erred in applying the *noscitur a sociis* canon to hold that the meaning of "'regulate'" is narrowed by neighboring verbs: "'investigate, block … , direct and compel, nullify, void, prevent or prohibit.'" A20 (quoting 50 U.S.C. § 1702(a)(1)(B)). The *noscitur* canon helps to identify which meaning of an ambiguous word applies in a given context—for example, to discern that Shakespeare meant a spear rather than a type of fish

---

[3] That agencies cannot "use [their] standard regulatory powers to raise revenue by imposing fees, tariffs, or taxes" (A23) is far afield. To say that EPA cannot impose taxes under its authority to "promulgate regulations establishing emissions standards," 42 U.S.C. § 7412—the district court's example—says little about whether the power to "regulate" imports includes the power to impose tariffs, a standard tool for governing imports.

when he listed "pike" alongside "sword," "knife," and "gun." Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 195 (2012). But here, the fact that none of the other verbs in § 1702(a)(1)(B) "deals with the power to raise revenue" does not mean the word "regulate" should be understood to exclude tariffs. It is hardly surprising for Congress to have given the President, in the same provision, multiple types of power over imports—both the power to "block" or "prevent" them and the power to tariff them. And even if the canon did imply that "regulate" should be understood not to authorize tariffs for the purpose of raising revenue, that is not the only purpose for which tariffs are imposed.

The district court also erred in inferring that IEEPA must not authorize tariffs because it does not "include language setting limits on any potential tariff-setting power." A20. IEEPA includes such language: Section 1702 applies only "[a]t the times and to the extent specified in" § 1701. Section 1701, in turn, specifies that the § 1702 power "may be exercised" only "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a

national emergency with respect to such threat." And the NEA itself imposes "procedural, substantive, and temporal limits" (A20) on emergency declarations. The district court brushed away those limits because the NEA power "is broad," A21 n.6, without acknowledging that the limits are nonetheless real. And a few pages later, the court itself invoked the "textual limits" on § 1702. A24.

The district court believed that the "comprehensive statutory limitations" on other tariff authorities "would be eviscerated if the President could invoke a virtually unrestricted tariffing power under IEEPA." A21. But the IEEPA authority is not "unrestricted" or "virtually" so; as noted, it requires specific findings, like a declaration of a particular type of emergency.

Regardless, the existence of other tariff authorities with different limits is no basis to arbitrarily cabin IEEPA. Courts "approach federal statutes touching on the same topic with a 'strong presumption' they can coexist harmoniously. Only by carrying a 'heavy burden' can a party" establish "that one statute 'displaces' a second." *Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 63 (2024). And here, IEEPA's emergency powers are "merely complementary," *id.*, to the powers in other statutes, which are

broader in some respects (not limited to declared emergencies) and narrower in others (addressing only certain types of concerns).

The district court's narrowing construction of IEEPA was particularly improper given that IEEPA operates in the domain of foreign policy and national security. *See, e.g.*, *Al-Bihani v. Obama*, 619 F.3d 1, 38-39 (D.C. Cir. 2010) (Kavanaugh, J., concurring). And Congress has regularly granted the President broad authority with respect to tariffs. *See Field v. Clark*, 143 U.S. 649, 683-694 (1892) (detailing history of broad delegations of tariff authority); *Algonquin*, 426 U.S. at 558-60; *see also, e.g.*, 19 U.S.C. § 1338 (Smoot-Hawley tariffs).

The district court suggested that construing "regulate" to authorize tariffs would "conflict with" the "textual limits" on § 1702—namely that the § 1702 authority "extend[s] only to 'any property in which any foreign country or a national thereof has any interest.'" A24. But just because "[t]ariffs are typically assessed after U.S.-based importers have taken legal possession of imported goods," *id.*, does not mean they are not a way of regulating "property in which any foreign country or a national thereof has any interest," 50 U.S.C. § 1702(a)(1)(B). This Court has emphasized that the statutory

reference to "'any interest'" broadly extends beyond possessory legal interests. *Holy Land Foundation v. Ashcroft*, 333 F.3d 156, 162-163 (D.C. Cir. 2003). Thus, this Court held that IEEPA allowed the government to block the assets of an organization that raised funds for Hamas, even though Hamas had no "legally protected" interest in the funds. *Id.* at 163. Foreign nationals who sell property to domestic importers likewise have an "interest" in the property regardless of whether they own it when tariffs are collected.

Finally, the district court incorrectly suggested that construing "regulate" to allow tariffs "could render IEEPA unconstitutional." A24. It reasoned that IEEPA authorizes the President to "'regulate … exportation'" as well as "'importation,'" and "[t]he Constitution prohibits export taxes." *Id.* But the constitutional bar against duties on exports does not mean the word "regulate" cannot encompass tariffs on imports. It simply means that, for constitutional reasons, only some of the President's statutory powers to "regulate" are available as to exports.

2. The judicial construction of substantively identical text in IEEPA's predecessor statute and Congress's subsequent incorporation of that language in IEEPA reinforce that IEEPA plainly authorizes the President to issue tariffs.

In *Yoshida*, the Federal Circuit's predecessor, reviewing tariffs imposed by President Nixon, definitively held that the power "to 'regulate importation'" under TWEA included the power to "impos[e] an import duty surcharge." 526 F.2d at 576; *see id.* at 575 (lower court correctly recognized that "to impose duties can be to 'regulate'"). The district court here stressed that President Nixon's proclamation imposing the tariffs did not refer to TWEA, but that proclamation specifically stated that its sources of statutory authority were "not limited to" the statutes it named, 85 Stat. 926, which is why both the Customs Court, *Yoshida Int'l, Inc. v. United States*, 378 F. Supp. 1155, 1168 (Cust. Ct. 1974), and the appellate court, 526 F.2d 560, assessed the legality of Nixon's tariffs under TWEA.

The district court dismissed the appellate opinion in *Yoshida* as unpersuasive.[4] A27. But not only did *Yoshida* correctly interpret the text; Congress subsequently ratified *Yoshida*'s construction of the "regulate … importation" language when (soon thereafter) it incorporated that same language in IEEPA. "Congress is presumed to be aware of an administrative or judicial interpretation of a statute," *Lorillard v. Pons*, 434 U.S. 575, 580 (1978), and

---

[4] *Yoshida* is binding on the Federal Circuit. *South Corp. v. United States*, 690 F.2d 1368, 1370 (Fed. Cir. 1982) (en banc).

"when Congress 'adopt[s] the language used in [an] earlier act,'" courts "presume that Congress 'adopted also the construction given'" to that language, *Georgia v. Public.Resource.Org*, 590 U.S. 255, 270 (2020). Indeed, the House Report on IEEPA cited *Yoshida* and explained its holding. H.R. Rep. No. 95-459, at 5.

The district court gave no reason for "disagree[ing]" (A28-29) with the clear import of Congress's choice to enact the same language interpreted in *Yoshida*. The court cited plaintiffs' argument "that courts only assume Congress adopts an earlier judicial construction of a phrase where there is 'settled precedent' on the interpretation of a statute" (A29)—but did not endorse that argument, presumably because it would be hard to doubt that the *Yoshida* court's decision was settled precedent.

Finally, the district court incorrectly characterized *Yoshida* as having "expressly rejected the premise that … TWEA enabled the President to 'impos[e] whatever tariff rates he deems desirable.'" A28. *Yoshida* simply declined to address the lower court's "unease" over that prospect, explaining that "presidential actions must be judged in the light of what the President actually did, not in the light of what he could have done." 526 F.2d at 577. Regardless, the government's interpretation does not embrace boundless

power, and the district court's mistaken construction of *Yoshida* does not support its holding that IEEPA allows no tariffs at all. That conclusion plainly conflicts with *Yoshida* and Congress's ratification of it.

## II. The Equitable Factors Favor A Stay

The remaining stay factors overwhelmingly favor the government.

1. Notwithstanding the injunction's limited scope, the denial of a stay would irreparably harm the United States. The injunction gravely offends the separation of powers by overriding Congress's choice to delegate broad tariff authority to the President and disabling the President from exercising that power at the most sensitive possible time. In declarations submitted to the district court before its ruling, four Cabinet members attested that an injunction against the tariffs would threaten the United States's economic and national security. The Commerce Secretary explained that the injunction "would undermine the United States-United Kingdom trade deal that was negotiated in reliance on the President's emergency tariff authority" and "would jeopardize the dozens of similar arrangements with foreign trading partners that" are being negotiated. A54. "Each of these negotiations," Secretary Lutnick explained, "is premised on the credible threat of enforcement of the IEEPA tariffs," and the injunction could compromise that

threat, so that "foreign counterparts will have reduced incentives to reach meaningful agreements[]." *Id.* That could "leave the American people exposed to predatory economic practices by foreign actors[] and threaten national security." A56.

The Secretaries of State and the Treasury and the U.S. Trade Representative similarly explained that the negotiations "currently ongoing … with dozens of countries" are "in a delicate state" and could be "shatter[ed]" by an injunction against the tariffs. A46-47 (Treasury); *see* A42 (State); A59 (Trade). Some negotiations, like those with the United Kingdom, have led to "framework agreements" subject to further "negotiat[ion] on details," while others "have not yet reached a framework agreement." A47 (Treasury); *see* A59 (Trade); A42 (State). Those negotiations "are premised on the ability of the President to impose tariffs under IEEPA." A42 (State). Worse, those Cabinet members projected, an injunction could lead trading partners to take retaliatory actions that the credible threat of further tariffs would otherwise have deterred. A47 (Treasury); A43 (State). The Trade Representative described that prospect as "a foreign policy disaster scenario," A60, and the Secretary of State observed that it "would cause significant and irreparable harm to U.S. foreign policy and national security," A41.

The district court brushed the declarations aside on the theory that the devastating harms they describe "will flow, if at all, from [the CIT's] sweeping order," not this more limited injunction. A34. But, as the declarations explain, any ruling that calls into question the President's ability to impose the challenged tariffs has significant detrimental effects on recent trade agreements and pending negotiations by undermining both the President's leverage and the premise of the negotiations. *See* A53 (Commerce) (discussing effect of a ruling "enjoining the implementation of these IEEPA tariffs *or* circumscribing the President's authority to act in this domain" (emphasis added)); *see* A42-43 (State) (similar). Regardless, the CIT's sweeping injunction is currently stayed. *V.O.S. Selections, Inc. v. Trump*, 2025 WL 1527040 (Fed. Cir. May 29, 2025).

Absent a stay, the district court's ruling thus risks compromising delicate, time-sensitive foreign negotiations. And the government will be further irreparably harmed by not receiving revenue that it would have received had the tariffs been in effect. *See Department of Educ. v. California*, 145 S. Ct. 966, 968-969 (2025) (per curiam). For that reason, the district court erred in fixing only a nominal bond. A37.

2.     Conversely, a stay would not harm plaintiffs, who can obtain re-

funds if any duties deposited during these appeals are ultimately held un-

lawful.  *See Sunpreme Inc. v. United States*, 2017 WL 65421, at *5 (C.I.T. Jan. 5,

2017) ("virtually no risk … that [plaintiff] would not be made whole should

it prevail").  The balance of harms is not close.

## CONCLUSION

This Court should stay the preliminary injunction pending appeal and

grant an immediate administrative stay.

Respectfully submitted,

YAAKOV M. ROTH
   *Acting Assistant Attorney General*

MARK R. FREEMAN
MICHAEL S. RAAB
BRAD HINSHELWOOD

  */s/ Daniel Winik*
DANIEL WINIK
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7245*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 305-8849*

**CERTIFICATE OF COMPLIANCE**

This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,177 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Book Antiqua, a proportionally spaced typeface.

*/s/ Daniel Winik*
Daniel Winik

# ADDENDUM

# TABLE OF CONTENTS

Order Denying Transfer, Granting Preliminary Injunction (Dkt. No. 35) .................................................................................... A1

Memorandum Opinion on Motion to Transfer and Motion for Preliminary Injunction (Dkt. No. 37) ..................................... A3

Order Setting Bond (Dkt. No. 38) ................................................ A36

Declarations in Opposition to Motion for a Preliminary Injunction (Dkt. No. 34) .......................................................... A38

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| LEARNING RESOURCES, INC., *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 25-1248 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 8, 9 |
| | : | | |
| DONALD J. TRUMP, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## ORDER

### DENYING DEFENDANTS' MOTION TO TRANSFER VENUE; GRANTING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

For the reasons stated in the Court's Memorandum Opinion separately and contemporaneously issued, Defendants' motion to transfer (ECF No. 8) is **DENIED**; and Plaintiffs' motion for a preliminary injunction (ECF No. 9) is **GRANTED**. It is hereby:

**DECLARED** that the tariffs deriving from Executive Order 14,195, *Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*; Executive Order 14,228, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*; Executive Order 14,257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Trade Deficits*; Executive Order 14,259, *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports from the People's Republic of China*; and Executive Order 14,266, *Modifying the Reciprocal Tariff Rates to Reflect Trading Parter Retaliation and Alignment*, are unlawful; and it is

**A1**

**FUTHER DECLARED** that the International Economic Emergency Economic Powers Act does not authorize the President to impose the tariffs set forth in the above-listed orders; and it is

**ORDERED** that Defendants are preliminarily enjoined from collecting any tariff deriving from the above-listed orders from Plaintiffs Learning Resources, Inc., and hand2mind, Inc., and it is

**FURTHER ORDERED** that the preliminary injunction ordered herein shall be **STAYED** for fourteen days so that the parties may seek review in the Court of Appeals.

**SO ORDERED**.

This is an immediately appealable order under 28 U.S.C. § 1292(a)(1).

Dated:  May 29, 2025                              RUDOLPH CONTRERAS
                                                 United States District Judge

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

LEARNING RESOURCES, INC., *et al.*,    :

                               :

      Plaintiffs,    :    Civil Action No.:    25-1248 (RC)

                               :

      v.    :    Re Document Nos.:    8, 9

                               :

DONALD J. TRUMP, *et al.*,    :

                               :

      Defendants.    :

## MEMORANDUM OPINION

**DENYING DEFENDANTS' MOTION TO TRANSFER VENUE; GRANTING PLAINTIFFS' MOTION FOR
A PRELIMINARY INJUNCTION**

## I. INTRODUCTION

Learning Resources, Inc. and hand2mind, Inc. ("Plaintiffs") are small businesses that
develop educational toys and products for children. They manufacture most of their products in
China, Taiwan, Korea, Vietnam, Thailand, and India. After President Donald Trump invoked
the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, to
impose sweeping tariffs on imports from those countries and others, the businesses initiated this
lawsuit against President Trump and other government officials and agencies (collectively,
"Defendants"). They claim that (1) IEEPA does not authorize the President to impose tariffs; (2)
even if it does, it does not authorize the challenged tariffs; (3) the agency actions implementing
the tariffs violate the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*; and (4) to the extent
that IEPPA can be interpreted to permit the President to impose the challenged tariffs, it violates
the nondelegation doctrine.

Defendants have moved to transfer this action to the United States Court of International Trade, arguing that that court has exclusive jurisdiction under 28 U.S.C. §§ 1581(i) and 1337(c). Plaintiffs disagree. They have also moved for a preliminary injunction.

This case is not about tariffs *qua* tariffs. It is about whether IEEPA enables the President to unilaterally impose, revoke, pause, reinstate, and adjust tariffs to reorder the global economy. The Court agrees with Plaintiffs that it does not. For the reasons discussed below, the Court denies Defendants' motion to transfer and grants Plaintiffs' motion for a preliminary injunction.

## II. BACKGROUND

Six months after the United States entered World War I, Congress passed the Trading with the Enemy Act of 1917 ("TWEA"), which gave the President a broad range of powers over international trade in times of war and, as amended in 1933, national emergencies. Pub. L. No. 65-91, 40 Stat. 411 (1917), codified as amended at 50 U.S.C. § 1 *et seq.*; *Regan v. Wald*, 468 U.S. 222, 226 n.2 (1984). The statute had "clear procedures for enhancing the authority of a President when an emergency arose," but no analogous procedures for withdrawing or winding down that power. *Regan*, 468 U.S. at 245 (Blackmun, J., dissenting). So, over time, TWEA came to operate as a "one-way ratchet to enhance greatly the President's discretionary authority over foreign policy." *Id.*

In 1977, Congress responded by limiting TWEA's application "solely to times of war." *Id.* at 227 (majority opinion); *see also* 50 U.S.C. § 4302. It also passed the International Emergency Economic Powers Act, Pub. L. No. 95-223, 91 Stat. 1626 *et seq.* (1977), to "counter the perceived abuse of emergency controls by presidents to . . . interfere with international trade in non-emergency, peacetime situations." *Sacks v. Off. of Foreign Assets Control*, 466 F.3d 764, 766 (9th Cir. 2006). IEEPA regulates the President's "exercise of emergency economic powers

in response to peacetime crises." *Regan*, 468 U.S. at 227–28 (majority opinion).  It established "a new set of authorities for use in time of national emergency which are both more limited in scope than those of [TWEA] and subject to various procedural limitations."  H.R. Rep. No. 95-459, "Trading With the Enemy Act Reform Legislation," at 2 (1977).

Section 1701 of IEEPA provides that President can use the statute "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States," if he declares a national emergency "with respect to such threat" pursuant to the National Emergencies Act, 50 U.S.C. §§ 1601–51.  50 U.S.C. § 1701(a).  The President's IEEPA powers "may not be exercised for any other purpose."  *Id.* § 1701(b).

When Section 1701's conditions are met, Section 1702(a)(1) establishes that the President may, "by means of instructions, licenses, or otherwise":

(A) investigate, regulate, or prohibit—

    i.   any transactions in foreign exchange,

    ii.  transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

    iii. the importing or exporting of currency or securities,

by any person, or with respect to any property, subject to the jurisdiction of the United States;

(B) investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States; and[]

(C) when the United States is engaged in armed hostilities or has been attacked by
a foreign country or foreign nationals, [take additional actions].

*Id.* § 1702(a)(1).

Beginning in February 2025, President Trump issued a series of executive orders invoking IEEPA to unilaterally impose tariffs on many foreign goods. The executive orders used three other statutory provisions to implement the tariffs: the National Emergencies Act; Section 604 of the Trade Act of 1974, which authorizes the President to edit the Harmonized Tariff Schedule of the United States ("HTSUS"); and 3 U.S.C. § 301, which enables the President to delegate functions to subordinates. Five of President Trump's executive orders are challenged in this lawsuit (collectively, the "Challenged Orders").

*The February 1 China Order*. On February 1, the President issued an executive order imposing 10 percent *ad valorem* tariffs on Chinese goods. Exec. Order No. 14,195, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9121 (Feb. 1, 2025) ("February 1 China Order"). The order was predicated on the influx of synthetic opioids into the United States through China, which exports fentanyl and "related precursor chemicals" to the U.S. *Id.* The order "expand[s] the scope of the national emergency" at the U.S.-Mexico border[1] to "cover the failure of the [Chinese] government to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other [transnational criminal organizations], criminals at large, and drugs." *Id.* § 1, 90 Fed. Reg. at 9122. In issuing the order, President Trump invoked "section 1702(a)(1)(B) of IEEPA." *Id.* § 2, 90 Fed. Reg. at 9122.

---

[1] *See* Proclamation No. 10,886, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8327 (Jan. 20, 2025); Exec. Order No. 14,157, *Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists*, 90 Fed. Reg. 8439 (Jan. 20, 2025).

*The March 3 China Amendment.*  Around one month later, President Trump raised the China tariffs to 20 percent based on his determination that China had "not taken adequate steps to alleviate the illicit drug crisis through cooperative enforcement actions."  Exec. Order No. 14,228, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11463 (Mar. 3, 2025) ("March 3 China Amendment"). Then he ordered the elimination of duty-free *de minimis* treatment for goods subject to the tariffs, contradicting a statutory program permitting duty exemptions for imported goods valued at less than $800.  Exec. Order No. 14,256, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China as Applied to Low-Value Imports*, 90 Fed. Reg. 14899 (Apr. 2, 2025).  The Department of Homeland Security ("DHS") and Customs and Border Patrol ("CBP") implemented the President's China orders by modifying the HTSUS. *See Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's February 1, 2025 Executive Order Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9038-01 (Feb. 5, 2025) (implementing 10 percent tariff from February 1 China order); *Further Amended Notice of Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's Executive Order 14195, Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11426-01 (Mar. 6, 2025) (implementing 20 percent tariff from March 3 China Amendment).

*Universal and Reciprocal Tariff Order.*  On April 2, President Trump announced sweeping tariffs on virtually every U.S. trading partner.[2]  Exec. Order No. 14,257, *Regulating*

---

[2] Exempt from the tariffs were Canada, Mexico, Russia, North Korea, Cuba, and Belarus. *See* Mot. Prelim. Inj. at 10, ECF No. 9.  Separate executive orders had imposed a 25 percent tariff on goods from Mexico and Canada.  *See* Exec. Order No. 14,194, *Imposing Duties to*

*Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 2, 2025) (the "Universal and Reciprocal Tariff Order").  These "Liberation Day" tariffs encompassed a 10 percent universal tariff plus additional country-specific tariffs ranging from 11 to 50 percent.  *Id.* at 15045, 15049–50.  The Universal and Reciprocal Tariff Order also announced a new national emergency "arising from conditions reflected in large and persistent annual U.S. goods trade deficits" that "have contributed to the atrophy of domestic production capacity, especially that of the U.S. manufacturing and defense-industrial base."  *Id.* at 15044; *see also* Defs.' PI Opp'n at 6 ("On April 2, 2025, the President declared a national emergency based on the trade deficit's effect on the country's economy and security.").  To the President, these trade asymmetries constitute an "unusual and extraordinary threat to the national security and economy of the United States," especially because of "the recent rise in armed conflicts abroad."  90 Fed. Reg. at 15041, 15044–45; *see also Fact Sheet: President Donald J. Trump Declares National Emergency to Increase Our Competitive Edge, Protect Our Sovereignty, and Strengthen Our National and Economic Security*, The White House (Apr. 2, 2025), available at https://www.whitehouse.gov/fact-sheets/2025/04/fact-sheet-president-donald-j-trump-declares-national-emergency-to-increase-our-competitive-edge-protect-our-sovereignty-and-strengthen-our-national-and-economic-security/ [https://perma.cc/UK3L-JDEV].  The 10 percent tariff went into effect on April 5; the reciprocal tariffs were originally set to take effect on April 9.  Mot. Prelim. Inj. at 11, ECF No. 9.

---

*Address the Situation at Our Southern Border*, 90 Fed. Reg. 9117 (Feb. 1, 2025); Exec. Order No. 14,193, *Imposing Duties to Address the Flow of Illicit Drugs Across our Northern Border*, 90 Fed. Reg. 9113 (Feb. 1, 2025).  The President later paused, reinstated, and amended the scope of those orders in ways not relevant here.

*April 8 Reciprocal China Amendment & April 9 Reciprocal Modification.*  But on April 8, President Trump responded to retaliatory tariffs from China by raising the reciprocal tariff rate for China from 34 percent to 84 percent.  Exec. Order No. 14,259, *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports From the People's Republic of China*, 90 Fed. Reg. 15,509 (Apr. 14, 2025) ("April 8 Reciprocal China Amendment").  Then, on April 9, President Trump suspended for 90 days the reciprocal tariffs listed in the Universal and Reciprocal Tariff Order for all countries but China.  Exec. Order No. 14,266, *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*, §§ 2, 3, 90 Fed. Reg. 15625 (Apr. 15, 2025) ("April 9 Reciprocal Modification").  The April 9 Reciprocal Modification also increased the China reciprocal tariff rate to 125 percent.  *Id.*  At the highest level, the total tariffs on most Chinese goods reached a minimum of 145 percent.  Ana Swanson & Alan Rappeport, *Tariff Truce With China Demonstrates the Limits of Trump's Aggression*, N.Y. Times (May 12, 2025), available at https://www.nytimes.com/2025/05/12/business/economy/trump-trade-china-tariffs.html [https://perma.cc/BKS4-NTGJ].  After trade talks in Geneva, the U.S. lowered the minimum tariffs on Chinese goods to 30 percent.  *Id.*  The ten percent universal tariffs from the Universal and Reciprocal Order are still in effect.  90 Fed. Reg. at 15626.

President Trump has stated that the tariffs originating in the Challenged Orders will raise "billions of dollars, even trillions of dollars" in revenue.  Mot. Prelim. Inj. at 13 (quoting Bailey Schulz, *Trump is Rolling Out More Tariffs This Month. Where Does the Tariff Money Go?*, USA Today (Apr. 4, 2025), https://www.usatoday.com/story/money/2025/04/03/trump-tariffs-where-will-money-go/82792578007/ [https://perma.cc/T5DN-73XL]).  Treasury Secretary Scott Bessent estimated that the tariffs will enable the United States to collect up to $600 billion

annually, paid mainly by U.S. businesses and consumers. *Id.* (citing Richard Rubin, *Bessent Says Tariff Revenue Could Reach $600 Billion Annually*, Wall St. J. (Apr. 4, 2025), available at https://www.wsj.com/livecoverage/stock-market-tariffs-trade-war-04-04-2025/card/bessent-says-tariff-revenue-could-reach-600-billion-annually-QJfDGCPYDY1C72Ljg1pt [https://perma.cc/R2RV-PNAW]**)**.

No other President has ever purported to impose tariffs under IEEPA. Joint Br. of Amici Curiae Former Senator and Governor George F. Allen, *et al.* ("Law Professors' Amicus Br.") at 7 (citing Christopher A. Casey *et al.*, Cong. Rsch. Serv., *The International Economic Emergency Powers Act: Origins, Evolution and Use*, R45618 at 27 (2024)), ECF No. 23; Mot. Prelim. Inj. at 1 ("For five decades and across eight presidential Administrations, no President had ever invoked IEEPA to impose a tariff or duty."). After President Trump issued the Challenged Orders, small businesses and other entities brought lawsuits in federal courts alleging that the tariffs are unlawful. *See, e.g.*, *Emily Ley Paper, Inc. v. Trump*, No. 3:25-cv-465 (N.D. Fla.) (transferred to the United States Court of International Trade); *Webber v. U.S. Dep't of Homeland Security*, No. 4:25-cv-26 (D. Mont.) (appeal pending); *California v. Trump*, No. 3:25-cv-3372 (N.D. Cal.); *V.O.S. Selections, Inc. v. Trump*, No. 25-00066 (Ct. Int'l Trade); *Princess Awesome, LLC v. U.S. Customs & Border Prot.*, No. 25-00078 (Ct. Int'l Trade); *Oregon v. Trump*, No. 25-00077 (Ct. Int'l Trade); *Barnes v. United States*, No. 25-0043 (Ct. Int'l Trade) (dismissed for lack of standing).

Among that group are Plaintiffs. Learning Resources and hand2mind are family-owned companies based in Illinois that sell award-winning toys that help young children develop verbal, counting, and fine motor skills, and that introduce older children to science, technology,

engineering, and math.[3]  Compl. ¶¶ 4, 10, ECF No. 1.  They have more than 500 employees and sell their products in over 100 countries.  *Id.*  Plaintiffs pay tariffs to the federal government pursuant to the Challenged Orders because they import most of their products from China and other countries subject to IEEPA tariffs.  *Id.* ¶ 24.  According to the companies' CEO, Richard Woldenberg, the new China tariff rates "are so high as to effectively prevent importation."  Decl. of Richard Woldenberg in Supp. of Pls.' Mot. for Prelim. Inj. ("Woldenberg Decl.") ¶ 6, ECF No. 9-1.  The "scale of the IEEPA tariff burden is unsustainable" for their businesses, which may be forced to raise prices by 70 percent or more "as a matter of pure survival."  *Id.* ¶¶ 6, 9.  Because Plaintiffs have "no realistic way" to cover the costs associated with the increased tariffs, "the tariffs act as an immediate ban on the products [they] import."  *Id.* ¶ 15.  They estimate that the tariffs will increase their annual costs over forty-fold.  Mot. Prelim. Inj. at 3.

Plaintiffs brought this lawsuit on April 22 against President Trump; Kristi Noem, Secretary of DHS; the Department of Homeland Security; Scott Bessent, Secretary of the Department of the Treasury; the Department of the Treasury; Howard Lutnick, Secretary of Commerce; the Department of Commerce; Pete R. Flores, Acting Commissioner of CBP; Customs and Border Patrol; Jamieson Greer, U.S. Trade Representative; and the Office of the U.S. Trade Representative (collectively, "Defendants").  *See* Compl.  Two days later, Defendants filed a motion to transfer this action to the United States Court of International Trade ("CIT").  Defs.' Mot. Transfer, ECF No. 8; Mem. of Law in Supp. of Defs.' Mot. Transfer ("Mot. Transfer"), ECF No. 8, and Plaintiffs filed a motion for a preliminary injunction.  Mot. Prelim. Inj.

---

[3] Although distinct legal entities, Plaintiffs are under common control and share over 100 employees, a single line of credit, and a single supply chain department.  Woldenberg Decl. ¶ 2.

The Court of International Trade is an Article III court that takes its current form from the Customs Court Act of 1980, Pub. L. 96-417, 94 Stat. 1727 (1980), and has "unique and specialized expertise in trade law." *Marmen Inc. v. United States*, 134 F.4th 1334, 1338 (Fed. Cir. 2025) (internal quotation omitted). Congress has given the CIT exclusive jurisdiction over "any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for," as relevant here, "tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue." 28 U.S.C. § 1581(i)(1). District courts do not have subject-matter jurisdiction over "any matter within the exclusive jurisdiction of the Court of International Trade." 28 U.S.C. § 1337(c).

Plaintiffs oppose the government's motion to transfer on the grounds that IEEPA is not a law providing for tariffs. *See* Pls.' Response to Mot. Transfer ("Pls.' Transfer Opp'n"), ECF No. 18. The government filed an opposition to Plaintiffs' preliminary injunction motion, Mem. of Law in Opp'n to Pls.' Mot. for Prelim. Inj. ("Defs.' PI Opp'n"), ECF No. 16, and Plaintiffs filed a reply, Pls.' Reply in Supp. of Mot. for Prelim. Inj. ("Pls.' PI Reply"), ECF No. 17. The government also filed a reply in support of its motion to transfer. Reply in Supp. of Defs.' Mot. Transfer ("Defs.' Transfer Reply"), ECF No. 21.

Three groups submitted amicus briefs. America First Legal Foundation ("America First") filed a brief in support of Defendants' motion to transfer. Br. of Amicus Curiae America First Legal Foundation in Supp. of Defs.' Mot. Transfer ("America First Amicus Br."), ECF No. 22. A group of law professors, former politicians, and legal experts filed a brief in support of Plaintiffs' motion for a preliminary injunction. Law Professors' Amicus Br. And finally, a group of small businesses affected by the Challenged Orders filed a brief in opposition to Defendants' motion to transfer. Joint Br. of Amici Curiae Emily Ley Paper, Inc., D/B/A

Simplified; Kilo Brava LLC; Kim's Clothes and Fashion LLC; and Rokland LLC in Opp'n to

Defs.' Mot. Transfer ("Small Business Amicus Br."), ECF No. 24.

 Defendants also submitted three notices of supplemental authority: a hearing transcript

from a similar case before the Court of International Trade, where a three-judge panel of the CIT

heard argument on a motion for a preliminary injunction and a motion for summary judgment; a

Florida district court's order granting the government's motion to transfer in a similar case; and a

CIT decision dismissing a similar case, brought by a *pro se* plaintiff, for lack of standing. *See*

Notice of Suppl. Authority, ECF Nos. 25, 25-1 (CIT hearing transcript); Notice of Suppl.

Authority, ECF Nos. 26, 26-1 (decision in the Northern District of Florida transferring *Emily Ley*

*Paper* to the CIT); Notice of Suppl. Authority, ECF Nos. 31, 31-1; (decision of the CIT

dismissing for lack of standing in *Barnes*).  Plaintiffs filed responses to the two court opinions.

*See* Response to Notice of Suppl. Authority, ECF No. 27; Response to Notice of Suppl.

Authority, ECF No. 32.  Defendants also submitted as "additional exhibits" in support of their

preliminary injunction opposition four declarations of U.S. government officials originally filed

in a case pending before the CIT.  Notice of Add'l Exs., ECF No. 34; *see also* Decls., ECF No.

34-1 (declarations of Secretary of State Marco Rubio ("Decl. of Marco Rubio"), Secretary of

Treasury Scott Bessent ("Decl. of Scott Bessent"); Secretary of Commerce Howard Lutnick

("Decl. of Howard Lutnick"); and United States Trade Representative Jamieson Lee Greer).

 The Court held a hearing on the motions to transfer and for a preliminary injunction on

May 27.  Both motions are now ripe for review.

### III. LEGAL STANDARDS

#### A. Motion to Transfer for Lack of Jurisdiction

Federal courts, as courts of limited jurisdiction, have an obligation to ensure that the actions they consider are "limited to those subjects encompassed within a statutory grant of jurisdiction." *Ins. Corp. of Ireland, Ltd. v. Compagnie Des Bauxites de Guinee*, 456 U.S. 694, 701 (1982). A plaintiff bears the burden of establishing a court's subject-matter jurisdiction. *Sweigert v. Perez*, 334 F. Supp. 3d 36, 40 (D.D.C. 2018). If a court where an action is filed finds "there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action . . . to any other such court . . . in which the action or appeal could have been brought at the time it was filed." 28 U.S.C. § 1631; *see also Jan's Helicopter Serv. Inc. v. Fed. Aviation Admin.*, 525 F.3d 1299, 1304 (Fed. Cir. 2008).

#### B. Preliminary Injunction

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the [movant] is entitled to such relief.'" *John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1131 (D.C. Cir. 2017) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "The last two factors 'merge when the Government is the opposing party.'" *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). "Of course, the movant carries the burden of persua[ding]" the Court that these factors merit preliminary relief, *Fla. EB5 Invs., LLC v. Wolf*, 443 F. Supp. 3d 7, 11 (D.D.C. 2020) (citing

*Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)), and must do so by making a "clear

showing," *Cobell*, 391 F.3d at 258.  A district court must generally consider each of these factors

in deciding whether to issue a preliminary injunction.  *See Sherley v. Sebelius*, 644 F.3d 388,

392–93 (D.C. Cir. 2011).

## IV.  ANALYSIS

### A.  Subject-Matter Jurisdiction & Likelihood of Success on the Merits

At the outset, Plaintiffs must establish that the Court has subject-matter jurisdiction over

their claims.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992).  The CIT has exclusive

jurisdiction over "any civil action commenced against the United States, its agencies, or its

officers, that arises out of any law of the United States providing for," in relevant part, "tariffs,

duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of

revenue."  28 U.S.C. § 1581(i)(1)(B).

This is undisputedly a civil action against agencies and officers of the United States that

"arises out of" IEEPA.  *See Kosak v. United States*, 465 U.S. 848, 854 (1984) (interpreting

"arising out of" to "include[] a claim resulting from"); *Int'l Lab. Rights Fund v. Bush*, 357 F.

Supp. 2d 204, 208 (D.D.C. 2004) (analyzing the CIT's jurisdiction based on "the substantive law

giving rise to [the plaintiffs'] claims").  So subject-matter jurisdiction turns on whether IEEPA is

a "law . . . providing for" "tariffs, duties, fees or other taxes on the importation of merchandise

for reasons other than the raising of revenue."  28 U.S.C. § 1581(i)(1).  If the answer is yes, then

the Court of International Trade has exclusive jurisdiction under 28 U.S.C. § 1581(i)(1).  If the

answer is no, then this Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346.  *See also K*

*Mart Corp. v. Cartier, Inc.*, 485 U.S. 176, 182–83 (1988).  The jurisdictional question is

tantamount to the principal merits question: whether IEEPA authorizes (or "provid[es] for") tariffs. *See* Pls.' Transfer Opp'n at 1.

Defendants argue that this Court must transfer the case to the CIT because "all of [P]laintiffs' arguments concern the imposition of tariffs." *E.g.*, Mot. Transfer at 1; *see also* Defs.' PI Opp'n at 10–20. They essentially take the position that all "tariff *cases*," "tariff *challenges*," and "tariff *matters*" must go to the CIT for that court to determine in the first instance whether it has jurisdiction. *See* Mot. Transfer at 9–10 (emphases added). That is not how the CIT's jurisdictional statute operates. The statute is categorical: the jurisdictional hook is the nature of the statute that a case arises out of, not the character of a plaintiff's claims. *See K Mart Corp.*, 485 U.S. at 188 ("Congress did not commit to the Court of International Trade's exclusive jurisdiction *every* suit against the Government challenging customs-related laws and regulations.") (emphasis in original); 28 U.S.C. § 1581(i)(1)(B); *Miami Free Zone Corp. v. Foreign Trade Zones Bd.*, 22 F.3d 1110, 1112 (D.C. Cir. 1994) (holding that "section 1581(i) grants the CIT exclusive jurisdiction over actions arising from laws *providing for*—not 'designed to deal with' or 'relating to'—revenue from imports") (emphasis in original). So the CIT has jurisdiction over this case if, and only if, IEEPA is a "law of the United States providing for . . . tariffs." [4] *See* 28 U.S.C. § 1581(i)(1)(B); Pls.' Transfer Opp'n at 2.

---

[4] Defendants argue in passing that the CIT has exclusive jurisdiction over this action under 28 U.S.C. § 1581(i)(1)(D), which applies to cases arising out of any law of the United States providing for the "administration and enforcement" of tariffs. *See* Mot. Transfer at 9, 11; Defs.' Transfer Reply at 5. They base this argument on the fact that the Challenged Orders modified the HTSUS, which is essentially a list of the applicable tariff rates for all goods imported into the United States. *See* Defs.' Transfer Reply at 5; 19 U.S.C. § 2483. This case "arises out of" the substantive law under which the President acted—IEEPA—not the HTSUS. *See Int'l Lab. Rights Fund*, 357 F. Supp. 2d at 208. So 28 U.S.C. § 1581(i)(1)(D) does not independently apply. *Cf. K Mart Corp.*, 485 U.S. at 190–91 (holding that the CIT's residual jurisdictional provision does not apply if the underlying substantive law is not one "providing for . . . administration and enforcement" of something that itself falls under the CIT's jurisdiction).

Defendants claim that this Court cannot consider whether IEEPA provides for tariffs because that necessarily involves deciding the underlying merits (or, at this stage of the litigation, whether Plaintiffs have shown a likelihood of success on the merits). But "courts always have jurisdiction to determine their jurisdiction," *Ilan-Gat Eng'rs, Ltd. v. Antigua Int'l Bank*, 659 F.2d 234, 239 (D.C. Cir. 1981), including in instances where the CIT may ultimately have exclusive jurisdiction. *K Mart Corp.*, 485 U.S. at 191 (resolving circuit split by rejecting Federal Circuit's position that the CIT had exclusive jurisdiction over certain actions under 28 U.S.C. § 1581(i)). And when the merits and jurisdiction are intertwined, like here, a court "can decide all of the merits issues in resolving a jurisdictional question, or vice versa." *Brownback v. King*, 592 U.S. 209, 217 (2021) (cleaned up). The Court will therefore consider both whether it has jurisdiction and whether Plaintiffs are likely to succeed on the merits by deciding whether IEEPA is a law providing for tariffs.

Since the Founding, the Constitution has vested the "Power to lay and collect Taxes, Duties, Imposts and Excises" with Congress. U.S. Const. art. I, § 8, cl. 1. The President has no independent discretion to impose or alter tariffs. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Any Presidential tariffing authority must be delegated by Congress. *See United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 572 (C.C.P.A. 1975) ("[N]o undelegated power to regulate commerce, or to set tariffs, inheres in the Presidency."); Law Professors' Amicus Br. at 3 (stating that Congress's power to control taxation is a "structural safeguard of democratic accountability"). *See generally* 19 U.S.C.

Because courts "must enforce plain and unambiguous statutory language according to its terms," the Court looks to IEEPA's text to determine whether it is a law providing for tariffs. *See Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010); 28 U.S.C.

§ 1581(i)(1)(B).  IEEPA does not use the words "tariffs" or "duties," their synonyms, or any other similar terms like "customs," "taxes," or "imposts."  It provides, as relevant here, that the President may, in times of declared national emergency, "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit" the "importation or exportation" of "property in which any foreign country or a national thereof has any interest."  50 U.S.C. § 1702(a)(1)(B).  There is no residual clause granting the President powers beyond those expressly listed.  The only activity in Section 1702(a)(1)(B) that could plausibly encompass the power to levy tariffs is that to "regulate . . . importation."  *See* Defs.' PI Opp'n at 11 (relying on those words to argue that IEEPA authorizes the imposition of tariffs).

The Court agrees with Plaintiffs that the power to regulate is not the power to tax.  *See* Mot. Prelim. Inj. at 18.  The Constitution recognizes and perpetuates this distinction.  Clause 1 of Article I, Section 8 provides Congress with the "Power To lay and collect Taxes, Duties, Imposts and Excises."  Clause 3 of Article I, Section 8 empowers Congress "To regulate Commerce with foreign Nations."  If imposing tariffs and duties were part of the power "[t]o regulate [c]ommerce with foreign [n]ations," then Clause 1 would have no independent effect.  As Chief Justice Marshall put it in an early leading case, "the power to regulate commerce is . . . entirely distinct from the right to levy taxes and imposts."  *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 201 (1824) (Marshall, C.J.).  The Constitution treats the power to regulate and the power to impose tariffs separately because they are not substitutes.  *See id.* at 198–99 (describing the power to tax and the power to regulate as "not . . . similar in their terms or their nature").

"Tariff" and "regulate" also take different plain meanings.  To regulate something is to "[c]ontrol by rule" or "subject to restrictions."  *Regulate*, The Concise Oxford Dictionary of Current English 943 (6th ed. 1976); *see also Regulate*, New Webster's Dictionary of the English

Language 1264 (1975) ("to govern by or subject to certain rules or restrictions"); *see also* Defs.'

PI Opp'n at 11 (citing similar definitions). Tariffs are, by contrast, schedules of "duties or

customs imposed by a government on imports or exports." *Tariff*, Random House Dictionary of

the English Language 1454 (1973). To regulate is to establish rules governing conduct; to tariff

is to raise revenue through taxes on imports or exports. Pls.' PI Reply at 3. Those are not the

same.[5] *Cf.* Tom Campbell, *Presidential Authority to Impose Tariffs*, 83 La. L. Rev. 595 (2023)

(arguing that "tariffs are economically different from quantitative import restraints"). If

Congress had intended to delegate to the President the power of taxing ordinary commerce from

any country at any rate for virtually any reason, it would have had to say so. *See Biden v.*

*Nebraska*, 600 U.S. 477, 505–06 (2023) (requiring a clear statement from Congress when the

interpretation of a provision would have a "question of 'deep economic and political

significance' that is central to [the] statutory scheme") (alteration in original) (quoting *King v.*

*Burwell*, 576 U.S. 473, 486 (2015)).

The other verbs in Section 1702(a)(1)(B) confirm that the President's power to

"regulate . . . [the] importation or exportation" of property does not encompass the power to

tariff. Per the principle of *noscitur a sociis*, "a word is given more precise content by the

neighboring words with which it is associated." *E.g.*, *United States v. Williams*, 553 U.S. 285,

294 (2008). Even if *regulate* may take a broad meaning in other contexts, *see* Defs.' PI Opp'n at

12, the words immediately surrounding it "cabin the contextual meaning of that term" here, *see*

---

[5] Defendants point out that in *McGoldrick v. Gulf Oil Corporation*, 309 U.S. 414, 428
(1940), the Supreme Court described "[t]he laying of a duty on imports" as both "an exercise of
the taxing power" and "an exercise of the power to regulate foreign commerce." Defs.' PI Opp'n
at 15. Both of those powers belong to Congress, not the President. *See* U.S. Const. art. I, § 8,
cls. 1, 3. *McGoldrick* does not stand for the proposition that the President's delegated power to
"regulate . . . importation" includes the ability to unilaterally impose tariffs at any rate on any
goods from any country.

*Yates v. United States*, 574 U.S. 528, 543 (2015).  The President's IEEPA power to "regulate" is part of a list of verbs otherwise including "investigate, block during the pendency of an investigation, . . . direct and compel, nullify, void, prevent or prohibit."  50 U.S.C. § 1702(a)(1)(B).  Not one of those words deals with the power to raise revenue.  In the context of the words with which it is listed, "regulate" is appropriately read to refer to the President's power to issue economic sanctions, not to tariff.  *See* Law Professors' Amicus Br. at 8, 13; Mot. Prelim. Inj. at 27.

Nor does IEEPA include language setting limits on any potential tariff-setting power. Every time Congress delegated the President the authority to levy duties or tariffs in Title 19 of the U.S. Code, it established express procedural, substantive, and temporal limits on that authority.  *E.g.*, 19 U.S.C. § 2132.  For one example, Section 122 of the Trade Act of 1974 authorizes the President to impose an "import surcharge . . . in the form of duties . . . on articles imported into the United States" to "deal with large and serious United States balance-of-payments deficits," but those tariffs are capped at 15 percent and can last only 150 days without Congressional approval.  *Id.* § 2132(a).  For another example, Section 338 of the Tariff Act of 1930 grants the President the authority to "declare new or additional duties" of up to 50 percent on imports from countries that have imposed "unreasonable" charges, exactions, regulations, or limitations that are "not equally enforced upon the like articles of every foreign country," or that have "[d]iscriminate[d] in fact against the commerce of the United States."  19 U.S.C. § 1338(a), (d), (e).  Those tariffs cannot take effect for thirty days.  *Id.* § 1338(d), (e).  For yet another example, Section 301 of the Trade Act of 1974 authorizes an executive officer who serves under the President to "impose duties or other import restrictions on the goods of" a foreign country that has been found, after notice and investigation, to have committed unfair trade practices or

violated trade agreements with the United States.  19 U.S.C. § 2411(c).  Unlike IEEPA, each of

these statutes provides specific limitations on when the President may set or alter tariffs.  *See*

*also, e.g.*, 19 U.S.C. § 1862 (authorizing the President to impose tariffs only against specific

products, and only after the Secretary of Commerce has conducted a predicate investigation into

national security risks); *cf. Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 559–60,

571 (1976) (interpreting the statutory phrase "adjust . . . imports" to give the President the power

to impose license fees, but only after the Secretary of the Treasury independently determines that

an "article is being imported into the United States in such quantities or under such

circumstances as to threaten to impair the national security," and other "clear preconditions to

Presidential action").

    Those comprehensive statutory limitations would be eviscerated if the President could

invoke a virtually unrestricted tariffing power under IEEPA.[6]  *See* Law Professors' Amicus Br.

at 9 ("If IEEPA meant what the government says it means, it would enable the President to

impose, revoke, or change tariffs for essentially any reason he describes as an emergency,

without complying with any of the limitations that Congress attached to every statute delegating

tariff authority."), *cf. Morton v. Mancari*, 417 U.S. 535, 550–51 (1974) (discussing the principle

that in statutory interpretation, the specific prevails over the general); *Guidry v. Sheet Metal

Workers Nat'l Pension Fund*, 493 U.S. 365, 375 (1990) (same).  The Court will not assume that,

---

[6] Of course the necessary predicate for the exercise of any authority under IEEPA is the
President's declaration of a national emergency.  50 U.S.C. § 1701.  But the President's power to
declare a national emergency under the National Emergencies Act is broad, and Defendants take
the position that courts cannot review presidential declarations of emergencies because they
constitute nonjusticiable political questions.  Defs.' PI Opp'n at 1, 31–36; *see also Ctr. for
Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 31 (D.D.C. 2020) (noting that "*no court* has
ever reviewed the merits of such a declaration") (emphasis in original); *Yoshida*, 526 F.2d at 581
n.32 ("[C]ourts will not review the bona fides of a declaration of an emergency by the
President.").

in enacting IEEPA, Congress repealed by implication every extant limitation on the President's tariffing authority. *See Posadas v. Nat'l City Bank*, 296 U.S. 497, 503 (1936) ("The cardinal rule is that repeals by implication are not favored."). "Congress has enacted a comprehensive scheme" detailing the conditions where the President may impose tariffs. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 519 (1996) (Thomas, J., dissenting)). "It would be anomalous," to say the least, "for Congress to have so painstakingly described the [President's] limited authority" on tariffs in other statutes, "but to have given him, just by implication," nearly unlimited tariffing authority in IEEPA. *See Gonzales v. Oregon*, 546 U.S. 243, 262 (2006).

Historical practice further indicates that IEEPA does not encompass the power to levy tariffs. In the five decades since IEEPA was enacted, no President until now has ever invoked the statute—or its predecessor, TWEA—to impose tariffs. *See* Mot. Prelim. Inj. at 21, 27; Christopher A. Casey *et al.*, Cong. Rsch. Serv., R45618, *The International Emergency Economic Powers Act: Origins, Evolution and Use*, R45618 at 25–26, 58–62 (2024). IEEPA has been consistently understood by the Executive to authorize targeted economic sanctions on the person[7] or state responsible for the underlying threat to U.S. national security. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) ("[T]he longstanding practice of the government . . . can inform a court's determination of what the law is.") (cleaned up) (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014)); Mot. Prelim. Inj. at 21–27. "This lack of historical precedent, coupled with the breadth of authority that the [President] now claims, is a telling

---

[7] The Court means "person" in the broad legal sense. *See* 1 U.S.C. § 1 (defining "person" to include "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals"); *see also* 50 U.S.C. §§ 1708(d)(6), 1709(g)(8) (defining "person" as "an individual or entity").

indication that the [tariffs] extend[] beyond the [President's] legitimate reach." *See Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin*, 595 U.S. 109, 119 (2022) (per curiam) (internal quotation marks omitted). Nor have IEEPA cases traditionally been filed in the CIT. Hundreds of district court cases cite IEEPA Sections 1701 and 1702, but excluding the cases recently filed challenging President Trump's IEEPA tariffs, not one CIT case cites either provision. *See* Pls.' Transfer Opp'n at 10. This makes sense because the mine run IEEPA case has nothing to do with the CIT's "unique and specialized expertise in trade law." *See, e.g.*, *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156 (D.C. Cir. 2003) (IEEPA case seeking to vacate Office of Foreign Asset Controls designations); *OKKO Bus. PE v. Lew*, 133 F. Supp. 3d 17 (D.D.C. 2015) (IEEPA case seeking to unblock a wire transfer); *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92 (D.D.C. 2020) (IEEPA case seeking to enjoin ban on social media application).

General administrative practice also illustrates—and demands—a distinction between the power to regulate and the power to tax. When a statute authorizes an agency to promulgate regulations on a topic, the agency can implement rules or restrictions relating to that topic. *See, e.g.*, 42 U.S.C. § 7412 (authorizing the Environmental Protection Agency to "promulgate regulations establishing emissions standards"). The agency cannot, however, use its standard regulatory powers to raise revenue by imposing fees, tariffs, or taxes. *See* Pls.' PI Reply at 4–5; *cf. Diginet, Inc. v. Western Union ATS, Inc.*, 958 F.2d 1388, 1399 (7th Cir. 1992) ("The legal power to regulate is not necessarily the legal power to tax."). Congress speaks clearly when it delegates to an agency the authority to impose fees on regulated entities. *See* 49 U.S.C. § 40117(j) (listing the powers to tax and to regulate separately); 16 U.S.C. § 460bbb-9(a) (same); 2 U.S.C. § 622(8)(B)(i) (same). The statutory term "regulate," on its own, is not so capacious.

That is true whether the power to regulate is delegated to an administrative agency or to the President.

Defendants' counterarguments cannot and do no overcome IEEPA's plain meaning.  For one thing, their proposed interpretation of Section 1702(a)(1)(B) conflicts with the provision's textual limits.  The President's IEEPA powers extend only to "any property in which any foreign country or a national thereof has any interest."  50 U.S.C. § 1702(a)(1)(B); *see Real v. Simon*, 510 F.2d 557, 562 (5th Cir. 1975).  Tariffs are typically assessed after U.S.-based importers have taken legal possession of imported goods.  *See* 19 U.S.C. § 1484(a)(2)(B) (generally authorizing the "owner or purchaser" of goods to be the importer of record); U.S. Customs & Border Protection, *Entry Summary and Post Release Processes* (last modified Apr. 10, 2025), https://www.cbp.gov/trade/programs-administration/entry-summary [https://perma.cc/4U4F-7U6H] ("Within 10 days of the release of the cargo, the importer must pay the estimated duties on their imported goods.").  Property wholly owned by U.S. nationals falls outside of IEEPA's scope.  *See* 50 U.S.C. § 1702(a)(1)(B); *see also* Law Professors' Amicus Br. at 8–9 (describing how all the "permitted presidential actions" in IEEPA "have their effects abroad," while tariffs are "taxes paid by Americans").

And as Plaintiffs pointed out at oral argument, Defendants' interpretation could render IEEPA unconstitutional.  IEEPA provides that the President may "regulate . . . importation or exportation."  50 U.S.C. § 1702(a)(1)(B).  The Constitution prohibits export taxes.  *See* U.S. Const. art. I, § 9, cl. 5 ("No Tax or Duty shall be laid on Articles exported from any State.").  If the term "regulate" were construed to encompass the power to impose tariffs, it would necessarily empower the President to tariff exports, too.  The Court cannot interpret a statute as

unconstitutional when any other reasonable construction is available. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 563 (2012).

Defendants' interpretation would also create a jurisdictional split between IEEPA actions initiated by the government, which are not "commenced against the United States, its agencies, or its officers," and would fall under the jurisdiction of the district courts; and IEEPA actions initiated against the government, which would go to the CIT. *See* 28 U.S.C. § 1581(i)(1); 50 U.S.C. § 1705(a)–(c) (establishing civil and criminal penalties for violations of IEEPA); *see, e.g.*, *United States v. Three Sums Totaling $612,168.23 in Seized U.S. Currency*, 55 F.4th 932, 935–36 (D.C. Cir. 2022) (IEEPA claim filed by the government in federal district court). That would totally warp the principles of consistency and expertise that Defendants invoke to support their claim that the CIT has exclusive jurisdiction over this action. *See* Mot. Transfer at 9–10.

Defendants lean heavily on *United States v. Yoshida International, Inc.* ("*Yoshida*"), 526 F.2d 560, a 1975 decision from the Court of Customs and Patent Appeals, the Federal Circuit's predecessor, but that case is not binding on this Court. *See* Defs.' PI Opp'n at 2, 4, 12, 14, 16–19, 23, 26–28, 32, 35; *see also Coal. to Preserve the Integrity of Am. Trademarks v. United States*, 790 F.2d 903, 905–07 (D.C. Cir. 1986), *aff'd in part sub nom. K Mart Corp.*, 485 U.S. at 190–91 (rejecting Federal Circuit's jurisdictional analysis). Nor does the Court find it persuasive.[8]

---

[8] Two other district courts have, in cases materially similar to this one, granted the government's motion to transfer to the CIT largely in reliance upon *Yoshida*. *See Webber v. U.S. Dep't of Homeland Sec.*, 2025 WL 1207587 (D. Mont. Apr. 25, 2025); *Emily Ley Paper v. Trump*, 2025 WL 1482771 (N.D. Fla. May 20, 2025). This Court respectfully disagrees with their analyses. And the Court finds it even less persuasive that the CIT, which is bound by *Yoshida*, is exercising jurisdiction over lawsuits raising similar claims.

The facts of *Yoshida* are as follows. During the summer of 1971, the United States faced "an economic crisis" arising out of a balance of payments deficit. *Yoshida*, 526 F.2d at 567. President Nixon responded by issuing a proclamation that, among other things, imposed a 10 percent surcharge on imported goods. *Id.*; *see also* Proclamation No. 4074, 36 Fed. Reg. 15724 (Aug. 17, 1971). The tariffs were known as the "Nixon shock," *see* Defs.' PI Opp'n at 17, and were withdrawn in less than five months, Law Professors' Amicus Br. at 11. A zipper importer, Yoshida International, challenged the tariffs' legality in a refund suit. *Yoshida*, 526 F.2d at 566. At the time Section 5(b) of the TWEA allowed the President to, in emergencies, "regulate . . . [the] importation . . . of . . . any property in which any foreign country or a national thereof has any interest."[9] *Id.* at 570. Although President Nixon had not invoked TWEA,[10] the Customs Court[11] analyzed whether that statute authorized the tariffs and concluded that it did not. *Yoshida Int'l, Inc. v. United States* ("*Yoshida I*"), 378 F. Supp. 1155, 1171 (Cust. Ct. 1974), *rev'd*, *Yoshida*, 526 F.2d at 576 (C.C.P.A. 1975) ("It cannot be said that the investiture of a power to 'regulate' necessarily includes, per se, the power to levy duties."); *see also id.* at 1172 ("If the words 'regulate . . . importation' were given the construction contended by the defendant, the President by the declaration of a national emergency could determine and fix rates of duty at will, without regard to statutory rates prescribed by the Congress and without the

---

[9] The same language appears in IEEPA.

[10] In issuing Proclamation 4074, President Nixon instead invoked the Tariff Act of 1930 and the Trade Expansion Act of 1962. 36 Fed. Reg. at 15724; *Yoshida*, 526 F.2d at 569; H.R. Rep. No. 95-459, at 5 (1977) ("[TWEA] was not among the statutes cited in the President's proclamation as authority for the surcharge."); *see also* Pls.' PI Reply at 9–10. TWEA was first cited "later by the Government in response to a suit brought in Customs Court by Yoshida International"—*i.e.*, in *Yoshida*. H.R. Rep. No. 95-459, at 5.

[11] The Customs Court is the CIT's predecessor. *See* Customs Courts Act of 1980, Pub. L. No. 96-417, § 702, 94 Stat. 1727, 1748 (1980).

benefit of standards or guidelines which must accompany any valid delegation of a constitutional power by the Congress." (alteration in original)).

The Court of Customs and Patent Appeals reversed based on "the intent of Congress" and "the broad purposes of the [TWEA]." *Yoshida*, 526 F.2d at 583; *see also id.* at 573 (emphasizing that "the primary implication of an emergency power is that it should be effective to deal with a national emergency successfully"). That is no longer how courts approach statutory interpretation. *See Am. Fed. of Gov. Empls., Nat'l Council of HUD Locals Council 222, AFL-CIO v. FLRA*, 99 F.4th 585, 590 (D.C. Cir. 2024) (discussing how purposivism was, by the end of the twentieth century, "largely rejected in favor of a stricter focus on a statute's text" (citing John F. Manning, *Textualism and the Equity of the Statute*, 101 Colum. L. Rev. 1, 6–7 (2001))); *Loper Bright*, 603 U.S. at 443 n.6 (Gorsuch, J., concurring) (describing how in 1984 "there were many judges who abhorred plain meaning and preferred instead to elevate legislative history and their own curated accounts of a law's purposes over enacted statutory text," but now courts have "a more faithful adherence to the written law" (cleaned up)). The Supreme Court could not be more clear that courts must focus on a statute's text. *E.g.*, *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009) ("As with any question of statutory interpretation, our analysis begins with the plain language of the statute."); *see also Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) ("It is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)). So *Yoshida*'s reasoning is not compelling on its own terms.

And in deciding that case, the Court of Customs and Patent Appeals acknowledged that "nothing in the TWEA or in its history . . . specifically either authorizes or prohibits the

imposition of a surcharge," and that "Congress did not specify that the President could use a surcharge in a national emergency." *Yoshida*, 526 F.2d at 572–73, 576. *Yoshida* also expressly rejected the premise that the TWEA enabled the President to "impos[e] whatever tariff rates he deems desirable," *id.* at 578, which is the power President Trump has claimed in issuing the Challenged Orders. *Yoshida* is further distinguishable because the tariffs at issue there applied only to goods already subject to tariff reductions, and at rates that did not exceed the original statutory maximum set out by Congress. *See* Law Professors' Amicus Br. at 12 n.2.

As Plaintiffs point out, other events confirm that Congress did not intend for the language "regulate . . . importation" to delegate the authority to impose tariffs. *See* Pls.' PI Reply at 11–12. Just before enacting IEEPA, Congress passed Section 122 of the Trade Act of 1974. Pub. L. No. 93-618, 88 Stat. 1978 (1975). That statute specifically authorized the tariffs President Nixon had imposed in Proclamation 4074 by providing that the President may impose an "import surcharge . . . in the form of duties . . . on articles imported into the United States" to "deal with large and serious United States balance-of-payments deficits." 19 U.S.C. § 2132(a); *see also id.* § 2411(c)(1)(B). Section 122 would have been pointless if Congress understood TWEA (and later, IEEPA) to allow that same tariffing authority. And in reaching its holding, the *Yoshida* court expressly relied on the fact that there was then no specific statute "'providing procedures' for dealing with a national emergency involving a balance of payments problem such as that which existed in 1971." *Yoshida*, 526 F.2d at 578; *see also id.* at 582 n.33 (expressly declining to determine what effect "the specific grant of the surcharge authority spelled out in the Trade Act of 1974" had on the President's TWEA powers in 1971). That is no longer true.

Finally, the President's IEEPA powers were designed to be "more limited in scope than those of [TWEA]." H.R. Rep. No. 95-459, at 2 (1977). The Court disagrees with Defendants

that, by adopting the TWEA's language in IEEPA, Congress endorsed *Yoshida*'s holding.  *See* Pls.' PI Reply at 13 (arguing that courts only assume Congress adopts an earlier judicial construction of a phrase where there is "settled precedent" on the interpretation of a statute, and that conflicting lower court decisions do not constitute settled precedent (quoting *United States v. Collazo*, 984 F.3d 1308, 1328 (9th Cir. 2021))).  *Contra* Defs.' PI Opp'n at 4, 12, 14.  *Yoshida* is not a reason for this Court to reject IEEPA's plain meaning.

* * *

Two conclusions follow from the Court's analysis.  First, because IEEPA is not a "law . . . providing for tariffs," this Court, not the CIT, has jurisdiction over this lawsuit.[12]  The statutory phrase "regulate . . . importation," as used in IEEPA, does not encompass the power to tariff.  The plain meaning of "regulate" is not "to tax."  And historical practice, as well as Congress's actions in response to the "Nixon shock" tariffs, confirm that the statute is not so capacious.  Second, because IEEPA does not authorize the President to impose tariffs, the tariffs that derive from the Challenged Orders are *ultra vires*.  Plaintiffs have therefore shown that they are likely to succeed on the merits of their claim that the President, in issuing the Challenged Orders, acted *ultra vires*, and that the agency defendants, in implementing them, violated the

---

[12] Although Defendants do not raise this argument, Amicus America First takes the position that the CIT has exclusive jurisdiction over all IEEPA actions because it is a law "providing for . . . embargoes . . . for reasons other than protections of the public health or safety."  *See* America First Amicus Br.; 28 U.S.C. § 1581(i)(1)(C).  That would be a sea change in IEEPA practice, as district courts have exercised jurisdiction over hundreds of IEEPA cases brought against the government.  *See* Pls.' Transfer Opp'n at 10.  Such a jurisdictional shift would also run counter to the CIT's role as a "specialized court of limited jurisdiction."  *See Horizon Lines, LLC. v. United States*, 414 F. Supp. 2d 46, 52 (D.D.C. 2006).  Further, Presidents have used IEEPA to respond to threats to public health and safety.  For example, the February 1 China Order challenged in this case expressly imposed IEEPA sanctions to address the illegal flow of fentanyl into the U.S.  90 Fed. Reg. at 9121.  If IEEPA provides for embargoes, those embargoes could be to protect the public health or safety.  That brings IEEPA outside the scope of Section 1581(i)(1)(C), so America First's jurisdictional argument fails.

Administrative Procedure Act.  The Court does not reach Plaintiffs' alternative arguments that IEEPA does not authorize these specific tariffs or that, if it does authorize these tariffs, it violates the nondelegation doctrine.

### B.  Irreparable Harm

Plaintiffs have established that they will likely suffer irreparable harm absent a preliminary injunction because the tariffs originating in the Challenged Orders pose an existential threat to their businesses.  *See, e.g.*, Woldenberg Decl. ¶ 28; Mot. Prelim. Inj. at 41; *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8–9 (D.C. Cir. 2016) (reiterating that "a preliminary injunction requires only a likelihood of irreparable injury").  They cannot offset the highest IEEPA tariffs without raising prices 70 percent or more "as a matter of pure survival," Woldenberg Decl. ¶ 9; their customers have already canceled over $1 million in orders, *id.* ¶ 10; and they face an immediate 40 or 50 percent decline in sales, year-over-year, *id.* ¶ 11.  The companies "cannot possibly absorb the costs of the increased tariffs" without "changing [their] pricing radically."  *Id.* ¶¶ 6, 14.  But they cannot pass price increases onto their customers without selling substantially fewer products.  *Id.* ¶¶ 16, 18.  Plaintiffs are not "massive entities that can withstand such losses in their core business[es]."  *See Everglades Harvesting & Hauling, Inc. v. Scalia*, 427 F. Supp. 3d 101, 116 (D.D.C. 2019).  Nor can they reduce the quality of their products to support lower prices: reducing quality is "unthinkable" for "premium brands" like Plaintiffs, and is practically unworkable because it would require them to "change the design and/or production of more than 2,000 products at once."  *Id.* ¶ 15.

Without an injunction, Plaintiffs may have to refinance loans on unfavorable terms; significantly scale back operations and product offerings; close facilities; lay off employees; or possibly sell their businesses.  Mot. Prelim. Inj. at 41.  Granted, financial losses typically do not

constitute irreparable harm. *E.g.*, *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

But that is not the case when "the loss threatens the very existence of the movant's business." *Id.*

The government argues that Plaintiffs' harms are speculative and conclusory. *See* Defs.'

PI Opp'n at 37–39. The Court disagrees. *See* Pls.' PI Reply at 20–21 (detailing, to the extent

possible, the specific costs that Plaintiffs have incurred because of the Challenged Orders). How

could Plaintiffs possibly describe the exact costs they will face from paying tariffs that the

President imposes, pauses, adjusts, and reimposes at will? *See* Woldenberg Decl. ¶¶ 7–8

(describing the "ever-changing situation with the IEEPA tariffs" and "considerable uncertainty

about future economic conditions and trade rules"). The instability and unpredictability of the

changing tariff rates cause "massive disruptions in [their] supply chain, business relations, and

business operations." *Id.* ¶ 8; *see Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 242

(D.D.C. 2014). Without preliminary relief, Plaintiffs will be subjected to ongoing "supply chain

chaos, an incredibly burdensome and constantly shifting tariff landscape, and a very high price to

be paid for incorrect logistical judgments." Woldenberg Decl. ¶ 10. And because their financial

recovery is limited to the value of any tariffs they wrongly pay, *see* 19 U.S.C. § 1505(a)–(b),

Plaintiffs will not be able to recover lost profits, lost customers, or the "additional cost[s]" of

finding "replacement[s]" for high-tariff imports. *See Vaqueria Tres Monjitas, Inc. v. Irizarry*,

587 F.3d 464, 485 (1st Cir. 2009) ("[T]he inability to supply a full line of products may

irreparably harm a merchant by shifting purchasers to other suppliers."); *Nalco Co. v. EPA*, 786

F. Supp. 2d 177, 188 (D.D.C. 2011) (holding that agency action that would make it "difficult for

[the plaintiff] to attract new customers" is "at least some degree of irreparable injury").

As Plaintiffs stated at oral argument, to the extent the tariffs cause them not to import

goods in the first instance, they cannot recover the value of the resulting lost sales, business

opportunities, market share, or customer goodwill.  *See* Mot. Prelim. Inj. at 38–39.  In this context, those harms qualify as irreparable.  *See, e.g.*, *Patriot, Inc. v. U.S. Dep't of Housing & Urban Dev.*, 963 F. Supp. 1, 5 (D.D.C. 1997) ("damage to [a company's] business reputation" can be "irreparable harm"); *Nalco Co.*, 786 F. Supp. 2d at 188 (finding irreparable harm where petitioner would "suffer the loss of '[l]ong-standing clients . . . [that may be] unwilling, or unable, to do business'" with them absent an injunction (alterations in original) (quoting *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 50–51 (D.D.C. 2008)).  *Contra* Defs.' PI Opp'n at 38 (stating, without support, that Plaintiffs' "loss of business opportunities and goodwill" could be "indirectly" redressed through refunds).  The Court is therefore satisfied that Plaintiffs have demonstrated irreparable harm.

## C.  Balance of Equities & Public Interest

Finally, the Court considers whether the balance of equities and the public interest favor a preliminary injunction.  When the government is the party to be enjoined, these two factors merge.  *See Nken*, 556 U.S. at 435.  The Supreme Court has instructed that "[a]n injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course."  *Winter*, 555 U.S. at 32.  "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of an injunction."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (citing *R.R. Comm'n v. Pullman Co.*, 312 U.S. 496, 500 (1941)).

Without a preliminary injunction, Plaintiffs will sustain significant and unrecoverable losses.  They take the position that if the Court grants their motion, the government will face a pause of the IEEPA tariffs only as directed to two small businesses whose imports are relatively inconsequential to the national economy.  *See* Mot. Prelim. Inj. at 43 (requesting that the Court

"enjoin the agency Defendants and their agents, employees, and all persons acting under their direction and control, from taking any action to collect tariffs from *Plaintiffs* under the Challenged Orders") (emphasis added).  And "[t]he public interest is served when the legislation that Congress has enacted," like IEEPA, "is complied with."  *American Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 262 (D.D.C. 2003); *see also League of Women Voters*, 838 F.3d at 12 (holding that is there generally no public interest in unlawful agency action).

On the government's side, four Cabinet officials submitted declarations outlining the "catastrophic harm to American foreign policy and national security that would ensue from granting the relief requested in [P]laintiffs' motion."  Notice of Add'l Exs. at 1; *see also* Decl. of Howard Luntick ¶ 19 ("All told, an invalidation of President Trump's ability to use IEEPA would dismantle a cornerstone of President Trump's national security architecture, irreparably harm the government's ability to respond to evolving foreign threats, . . . jeopardize vital trade agreements, collapse ongoing negotiations, allow for Chinese aggression during a period of strategic competition, leave the American people exposed to predatory economic practices by foreign actors, and threaten national security.").  Secretary of State Marco Rubio stated that an order enjoining the tariffs "would cause significant and irreparable harm to U.S. foreign policy and national security" because negotiations with trading partners are "in a delicate state."  Decl. of Marco Rubio ¶¶ 3, 9.  "These negotiations could address the urgent threats of mass migration at our northern and southern borders, the flow of fentanyl into our country, and the erosion of our domestic production capacity," *id.* ¶ 8, and constitute "one of the country's top foreign policy priorities."  *Id.* ¶ 10.  According to Secretary Rubio, "much of U.S. global diplomacy has been focused on these negotiations."  *Id.* ¶ 10; *see also* Decl. of Scott Bessent ¶ 9.  Every ongoing

negotiation is "premised on the ability of the President to impose tariffs under IEEPA."  Decl. of Marco Rubio ¶ 11.

The Cabinet officials claim that were a court to enjoin the tariffs announced in the Challenged Orders, U.S. trading partners could retaliate against the tariffs.; the U.S. would be embarrassed on the global stage; and the U.S.'s manufacturing position may be so weakened that the country may "not be able to produce the weapons and other resources necessary to defend itself."  *Id.* ¶¶ 12–14.  These consequences go to "critical" foreign policy and national security interests.  *Id.* ¶ 16; *see also* Decl. of Howard Lutnick ¶¶ 4–4 (describing that the national emergencies underlying the Challenged Orders "threaten[] the lives of [U.S.] citizens").   The Court agrees with Defendants that the public has a compelling interest in the "President's conduct of foreign affairs and efforts to protect national security."  *See* Defs.' PI Opp'n at 41; *see also Winter*, 555 U.S. at 24.

But on May 28, a three-judge panel of the CIT issued an order permanently enjoining the IEEPA tariffs.  *See* Opinion, *V.O.S. Selections, Inc. v. Trump*, No. 25-00066, at 48–49 (Ct. Int'l Trade May 28, 2025).  The consequences described by the government officials in their declarations will flow, if at all, from that court's sweeping order.  Under the circumstances, enjoining the application of the Challenged Orders to two family-owned toy companies will have virtually no effect on the government.  *Contra* Defs.' PI Opp'n at 41–42 (arguing that "[P]laintiffs' proposed injunction would be an enormous intrusion on the President's conduct of foreign affairs and efforts to protect national security under IEEPA and the Constitution").  It will, however, protect those companies from irreparable injury should the CIT order be stayed or reversed.  The Court concludes that the balance of equities and the public interest therefore favor Plaintiffs.  Besides, "[i]t is emphatically the province and duty of the judicial department to say

what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803) (Marshall, C.J.). The President cannot act unlawfully and then use the effects of having that action declared unlawful as a putative shield from judicial review.

## V.  CONCLUSION

Because IEEPA is not a law providing for tariffs and because Plaintiffs have satisfied the preliminary injunction factors, Defendants' motion to transfer venue is DENIED; and Plaintiffs' motion for a preliminary injunction is GRANTED. The Court will stay operation of the preliminary injunction for 14 days. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  May 29, 2025                                        RUDOLPH CONTRERAS
                                                            United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| LEARNING RESOURCES, INC., *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 25-1248 (RC) |
| | : | | |
| v. | : | Re Document No.: | 9 |
| | : | | |
| DONALD J. TRUMP, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## <u>ORDER</u>

Under Federal Rule of Civil Procedure 65(c), courts may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The rule "has been read to vest broad discretion in the district court to determine the appropriate amount of an injunction bond." *DSE, Inc., v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999).

Defendants request that the Court order Plaintiffs to post a bond in the amount of the tariffs they would pay but for the preliminary injunction. Mem. of Law in Opp'n to Pls.' Mot. for Prelim. Inj. at 43, ECF No. 16. Specifically, they want the Plaintiffs to "identify the entries, by entry number, importer name, and importer number, that would be covered" by a preliminary injunction, and to "post Single Transaction Bonds for all such identified entries during the pendency of any injunctive order in an amount equal to the total entered value, plus all applicable duties, taxes, and fees, including the duties that would otherwise have been deposited pursuant to the executive orders." *Id.*

The Court agrees with Plaintiffs that such a remedy would effectively defeat the purpose of the preliminary relief. *See* Pls.' Reply in Supp. of Mot. for Prelim. Inj. at 23–24, ECF No. 17; *see also Nat. Res. Def. Council, Inc., v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (holding

**A36**

that a bond "is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review"). Rule 65(c) has been interpreted to allow district courts to require no bond at all or only a nominal bond. *See, e.g.*, *Nat'l Council of Nonprofits v. OMB*, No. 25-cv-239, 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025) (no bond); *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (same); *Nat'l Res. Def. Council*, 337 F. Supp. at 169 (nominal bond). Because "[i]t would be a mistake to treat a revenue loss to the Government the same as pecuniary damage to a private party," the Court believes a nominal bond of $100.00 is appropriate. *See Nat'l Res. Def. Council*, 337 F. Supp. at 169.

Plaintiffs are **HEREBY ORDERED** to post bond under Rule 65(c) in the amount of $100.00.

**SO ORDERED**.

Dated:  May 29, 2025                                      RUDOLPH CONTRERAS
                                                         United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| LEARNING RESOURCES, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:25-cv-01248-RC |
| | ) | |
| DONALD J. TRUMP, President of the United | ) | |
| States, in his official capacity, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**NOTICE OF ADDITIONAL EXHIBITS**

Defendants respectfully submit the attached declarations in support of their response in opposition to plaintiffs' motion for a preliminary injunction. The declarations were filed Friday evening, May 23, 2025, in *Princess Awesome, LLC v. U.S. Customs & Border Protec.*, No. 25-cv-00078 (Ct. Int'l Trade), in support of defendants' opposition to the plaintiffs' request for permanent injunctive relief in that case. They are pertinent here because they also establish the unavailability of preliminary injunctive relief, which, like a request for permanent injunctive relief, requires showings on both the balance of the equities and public interest.

The declarations were made by four members of the President's cabinet: Marco Rubio, Secretary of State; Scott K. H. Bessent, Secretary of the Treasury; Howard W. Lutnick, Secretary of Commerce; and Jamieson Lee Greer, United States Trade Representative. They provide up-to-date information on sensitive negotiations with trading partners and describe the catastrophic harm to American foreign policy and national security that would ensue from granting the relief requested in plaintiffs' motion.

DATED: May 27, 2025

OF COUNSEL:

ALEXANDER K. HAAS
Director

STEPHEN M. ELLIOTT
Assistant Director
U.S. Department of Justice
Civil Division
Federal Programs Branch

SOSUN BAE
Senior Trial Counsel
LUKE MATHERS
BLAKE W. COWMAN
COLLIN T. MATHIAS
Trial Attorneys
U.S. Department of Justice
Civil Division
Commercial Litigation Branch

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Claudia Burke
CLAUDIA BURKE
Deputy Director

/s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Catherine M. Yang
CATHERINE M. YANG
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
PO Box 480, Ben Franklin Station
Washington, DC 20044
(202) 514-4336
catherine.m.yang@usdoj.gov
*Attorneys for Defendants*

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE GARY S. KATZMANN, JUDGE
                THE HONORABLE TIMOTHY M. REIF, JUDGE
                THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| PRINCESS AWESOME, LLC; STONEMAIER, LLC; 300 BELOW, INC.; UPWARD GLANCE, LLC d/b/a QUENT CORDAIR FINE ART; KINGSEAL CORPORATION D/B/A WESCO ENTERPRISES, INC.; MISCHIEF, LLC d/b/a MISCHIEF TOY STORE; SPIELCRAFT GAMES, LLC; ROOKIE MAGE GAMES, LLC; XYZ GAME LABS, INC.; TINKERHOUSE, INC.; RECLAMATION STUDIO, LLC d/b/a WITSEND MOSAIC,<br><br>      Plaintiffs,<br><br>        v.<br><br>UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES, Acting Commissioner for U.S. Customs and Border Protection; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, Secretary of the Department of Homeland Security; UNITED STATES INTERNATIONAL TRADE COMMISSION; DONALD J. TRUMP, President of the United States; EXECUTIVE OFFICE OF THE PRESIDENT; and the UNITED STATES OF AMERICA,<br><br>      Defendants. | Court No. 25-00078 |

## DECLARATION OF SECRETARY OF STATE MARCO RUBIO

I, Marco Rubio, hereby state as follows:

1. I am the Secretary of State of the United States and head of the United States Department

    of State, an Executive Department of the United States. *See* 22 U.S.C. § 2651. As

    Secretary of State, I am the President's chief foreign affairs advisor. I carry out the

President's foreign policy through the State Department and the Foreign Service of the United States. *See* 22 U.S.C. § 2651a.

2.  The statements made herein are based on my personal knowledge, on information provided to me in my official capacity, reasonable inquiry, and information obtained from various records, systems, databases, State Department employees, and information portals maintained and relied upon by the United States Government in the regular course of business, and on my evaluation of that information.

3.  The purpose of this Declaration is to confirm, in my capacity as Secretary of State and head of the Department of State, that a ruling for the plaintiffs in this case would cause significant and irreparable harm to U.S. foreign policy and national security. Such a ruling would derail critical ongoing negotiations with our foreign trading partners and threaten broader U.S. strategic interests internationally.

4.  In the International Emergency Economic Powers Act (IEEPA), *see* 50 U.S.C. § 1701 *et seq.*, Congress granted to the President dynamic, flexible authority to respond to crises on a global scale. President Trump has exercised that authority to impose tariffs in response to crises threatening America's national security.

5.  In particular, the President found in Executive Orders 14,193 and 14,194 that the failure of the governments of Mexico and Canada to stop the influx of illegal drugs and illegal aliens across our southern and northern borders is an emergency for the United States and its citizens.

6.  Likewise, the President found in Executive Order 14,195 that the encouragement by the People's Republic of China (PRC) of PRC businesses to export illegal drugs and precursors

for manufacturing those drugs in the United States is an emergency for the United States and its citizens.

7.  Last, the President found in Executive Order 14,257 that our trade partners' non-reciprocal trading practices, including both tariff and non-tariff barriers, and resulting large and persistent annual U.S. goods trade deficits have given rise to acute national security threats driven by our hollowed-out manufacturing base, lack of advanced domestic manufacturing capacity, vulnerable supply chains, a defense-industrial base that depends on foreign adversaries, and the sensitive geopolitical environment.

8.  The United States is presently pursuing potential trade deals with Mexico, Canada, PRC, and dozens of other countries. These negotiations could address the urgent threats of mass migration at our northern and southern borders, the flow of fentanyl into our country, and the erosion of our domestic production capacity caused in substantial part by the large and persistent annual U.S. goods trade deficient stemming from our trade partners' non-reciprocal trading practices.

9.  The negotiations are currently in a delicate state, with discussions ongoing and final deals not yet reached. In some cases, we have reached frameworks with our trading partners, while we continue to negotiate on details. In other cases, we have not yet reached a framework agreement or arrangement.

10. These negotiations have been one of the country's top foreign policy priorities since the reciprocal tariffs were announced on April 2. Reflecting the urgency of the emergency, much of U.S. global diplomacy in the last six weeks has been focused on these negotiations.

11. In each case, the negotiations are premised on the ability of the President to impose tariffs under IEEPA. If the President is enjoined or limited from exercising his authority under

IEEPA to impose tariffs to address these urgent threats, that would cause irreparable harm to our efforts to secure the U.S. production and manufacturing base through our ongoing negotiations and other diplomatic efforts.

12. For example, if the Court were to enjoin the President from imposing tariffs, our trade partners would likely believe that the President lacks power under IEEPA to promptly respond to their actions during the ongoing negotiations. They may also perceive such a ruling as a vulnerability and encourage them to retaliate against the United States for attempting to impose tariffs and negotiate agreements to protect our national security. *See* Executive Order 14,266, § 3. Notably, other countries declined to retaliate against the United States after the President made clear he would exercise his authority under IEEPA to impose additional tariffs, as he did with PRC.

13. The political branches, not the courts, are appropriately situated to handle and intervene in matters of foreign policy and national security. This case and the real-world diplomacy inherent in it exemplify why the courts must not interfere in such foreign affairs. U.S. foreign policy has an exceptional need for consistent implementation of the decision the President has already made under IEEPA. A conflicting pronouncement by this Court on the same issue would lead to embarrassment of the United States on a global stage.

14. Beyond diplomatic embarrassment, which itself is dangerous as it emboldens allies and adversaries alike, the Court's interference would perpetuate the United States' industrial decline and unsustainable trade deficits. The President found in Executive Order 14,257 that the United States' large and persistent trade deficits are a structural imbalance in the global trading system that has hollowed out a number of critical industries. Without robust domestic production capacity, the United States will not be able to produce the weapons

and other resources necessary to defend itself or support the critical industries necessary to avoid being held hostage by foreign adversaries. That weakened position will have a direct impact on the President's ability to conduct foreign policy and advance the United States' interests.

15. Congress has reserved for itself the power to review the President's exercise of his powers under IEEPA. Exercising that role, Congress considered whether to terminate the President's emergency declaration, and it has appropriately declined to do so, recognizing the appropriateness of the President's exercise of powers and the delicate, ongoing international diplomacy that is unfolding as a result.

16. It is critical to the foreign policy and national security of the United States for the Court to decline to enjoin or restrain the President from exercising his power under IEEPA to impose tariffs in recognition of the unusual and extraordinary threats at issue in this litigation.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on this 23rd day of May, 2025.

Marco Rubio
Secretary of State

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE GARY S. KATZMANN, JUDGE
THE HONORABLE TIMOTHY M. REIF, JUDGE
THE HONORABLE JANE A. RESTANI, JUDGE

PRINCESS AWESOME, LLC; STONEMAIER, )
LLC; 300 BELOW, INC.; UPWARD GLANCE, )
LLC d/b/a QUENT CORDAIR FINE ART; )
KINGSEAL CORPORATION D/B/A WESCO )
ENTERPRISES, INC.; MISCHIEF, LLC d/b/a )
MISCHIEF TOY STORE; SPIELCRAFT )
GAMES, LLC; ROOKIE MAGE GAMES, )
LLC; XYZ GAME LABS, INC.; TINKERHOUSE, )
INC.; RECLAMATION STUDIO, LLC )
d/b/a WITSEND MOSAIC, )
                                                        )    Court No. 25-00078
        Plaintiffs, )
                                                        )
        v. )
                                                        )
UNITED STATES CUSTOMS AND BORDER )
PROTECTION; PETE R. FLORES, Acting )
Commissioner for U.S. Customs and )
Border Protection; DEPARTMENT OF )
HOMELAND SECURITY; KRISTI NOEM, )
Secretary of the Department of Homeland )
Security; UNITED STATES INTERNATIONAL )
TRADE COMMISSION; DONALD J. TRUMP, )
President of the United States; EXECUTIVE )
OFFICE OF THE PRESIDENT; and the )
UNITED STATES OF AMERICA, )
                                                        )
        Defendants. )

## **DECLARATION**

I, Scott K. H. Bessent, hereby state as follows:

1.  I am the Secretary of the Treasury.  I have been the Secretary of the Treasury since January 28, 2025.

2. President Trump has exercised his IEEPA authority to impose tariffs in response to crises threatening America's national security and economy.

3. In particular, the President found in Executive Orders 14,193 and 14,194 that the failure of the governments of Mexico and Canada to stop the influx of illegal drugs and illegal immigrants across our southern and northern borders is an emergency for the Nation and its citizens.

4. The President also found in Executive Order 14,257 that our trading partners' non-reciprocal trading practices, including both tariff and non-tariff barriers, have given rise to a presently acute national security threat of large and persistent annual U.S. goods trade deficits, which have led to the hollowing out of our manufacturing base, lack of advanced domestic manufacturing capacity, vulnerable supply chains, and a defense-industrial base that depends on foreign adversaries.

5. Tariffs are a crucial tool for protecting America's national security and advancing American foreign policy by addressing the unusual and extraordinary threats the President has identified.

6. The tariffs have proven to be well-tailored to bring trading partners to the table to address these urgent threats. The United States is presently negotiating agreements with Mexico, Canada, PRC, and many of our key trading partners, in order to address the urgent threats at our northern and southern borders, posed by illegal drugs, and to our domestic production capacity caused in substantial part by the large and persistent annual U.S. goods trade deficient stemming from our trade partners' non-reciprocal trading practices.

7. There are currently ongoing negotiations to address this emergency with dozens of countries. Those negotiations are presently in a delicate state, with discussions ongoing

and formal, final deals not yet reached. In some cases, we have reached framework agreements with our trading partners, while we continue to negotiate on details. In other cases, we have not yet reached a framework agreement.

8. For example, on May 8, 2025, the United States and the United Kingdom announced a framework agreement as a result of such negotiations. The U.S.-UK framework agreement will bolster U.S. economic and national security by enhancing market access for American exporters and lowering tariff and non-tariff barriers.

9. These negotiations have been one of the country's top foreign policy priorities since the reciprocal tariffs were announced on April 2.

10. In each case, those ongoing, delicate negotiations are premised on the President's tariffs at issue in this case. If the President is enjoined from imposing these tariffs, it could shatter our negotiations with dozens of countries.

11. If the Court were to enjoin the President from imposing tariffs, our trading partners may feel a renewed boldness to take advantage of that new vulnerability by retaliating against the United States for attempting to impose tariffs and negotiate agreements to protect our national security.

12. In short, the maintenance of the tariffs is crucial to the President's ability to conduct real-world diplomacy and his ability to protect the national security and economy of the United States.

13. Congress considered whether to terminate the President's emergency declaration, and declined to do so. *See* H.J.Res. 72 (2025); H.J.Res.73 (2025). It is critical to the national security and economy of the United States for the Court to decline to block the President from imposing these tariffs as well.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on this day of May 23, 2025.

/s/ _____

Scott K. H. Bessent
Secretary
Department of the Treasury

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:    THE HONORABLE GARY S. KATZMANN, JUDGE
                 THE HONORABLE TIMOTHY M. REIF, JUDGE
                 THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| PRINCESS AWESOME, LLC; STONEMAIER, LLC; 300 BELOW, INC.; UPWARD GLANCE, LLC d/b/a QUENT CORDAIR FINE ART; KINGSEAL CORPORATION D/B/A WESCO ENTERPRISES, INC.; MISCHIEF, LLC d/b/a MISCHIEF TOY STORE; SPIELCRAFT GAMES, LLC; ROOKIE MAGE GAMES, LLC; XYZ GAME LABS, INC.; TINKERHOUSE, INC.; RECLAMATION STUDIO, LLC d/b/a WITSEND MOSAIC,<br><br>     Plaintiffs,<br><br>     v.<br><br>UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES, Acting Commissioner for U.S. Customs and Border Protection; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, Secretary of the Department of Homeland Security; UNITED STATES INTERNATIONAL TRADE COMMISSION; DONALD J. TRUMP, President of the United States; EXECUTIVE OFFICE OF THE PRESIDENT; and the UNITED STATES OF AMERICA,<br><br>     Defendants. | Court No. 25-00078 |

**<u>DECLARATION OF HOWARD W. LUTNICK,</u>**
**<u>UNITED STATES SECRETARY OF COMMERCE</u>**

I, HOWARD W. LUTNICK, hereby state and declare as follows:

1.  I am the Secretary of Commerce for the United States and the head of the United States

    Department of Commerce, an Executive Department of the United States.  *See* 5 U.S.C.

    § 101.  The purpose of this declaration is to assert, in my official capacity and opinion, the

1

irreparable harm that a ruling for plaintiffs in this case will have on President Donald J. Trump's constitutional power to conduct foreign affairs. Such a ruling will fundamentally impede President Trump's foreign-policymaking abilities to address national emergencies that threaten the national-security and economic-security interests of the United States and the American people. The statements made herein are based on my personal knowledge and on information provided to me in my official capacity as Secretary of Commerce.

2. I have been tasked by President Trump to lead his tariff and trade agenda. *See* Statement by President-elect Donald J. Trump Announcing the Nomination of Howard Lutnick as Secretary of Commerce, The American Presidency Project, https://www.presidency.ucsb.edu/node/375586. As part of my duties as Secretary of Commerce, I have strategized with President Trump and members of his cabinet, including United States Trade Representative Jamieson Greer, on policies to conduct trade diplomacy and address grave national emergencies. Many of these national emergencies, ranging from the hollowing out of our defense-industrial and manufacturing base to the illicit flow of narcotics and the national-security threats posed by authoritarian regimes, are caused by our foreign-trading partners.

3. For example, on February 1, 2025, President Trump found in Executive Orders 14,193 and 14,194 that the failure of the governments of Mexico and Canada to stop the influx of illegal drugs and illegal immigrants across our southern and northern borders is a national emergency, threatening the lives of our citizens.

4. Likewise, on the same day, President Trump found in Executive Order 14,195 that the People's Republic of China has encouraged Chinese businesses to export illegal drugs and

precursors for manufacturing those drugs to the United States, which constitutes a national emergency that threatens the lives of our citizens.

5.  Then, on April 2, 2025, President Trump found in Executive Order 14,257 that our foreign-trading partners' non-reciprocal trading practices, including both tariff and non-tariff barriers, have produced persistent annual U.S. goods trade deficits, which has hollowed out our domestic manufacturing and defense-industrial base and has resulted in a lack of advanced domestic manufacturing capacity, a defense-industrial base dependent on inputs from foreign adversaries, vulnerable domestic supply chains, and a sensitive geopolitical environment. President Trump found the persistent annual U.S. goods trade deficits have resulted in a national emergency, threatening our national and economic security.

6.  President Trump determined that it was in the foreign-policy interests of the United States to levy a 10 percent tariff for all trading partners. In addition, depending on the significance of the trade imbalances with foreign-trading partners, President Trump determined that some trading partners would receive higher duties.

7.  Following President Trump's April 2, 2025, announcement, scores of countries immediately reached out to the Department of Commerce and the Office of the United States Trade Representative. President Trump's 10 percent tariffs for all trading partners went into effect at 12:01 a.m. on April 5, 2025—over two days after President Trump announced them. The country-specific tariff rates went into effect at 12:01 a.m. on April 9, 2025—nearly a week after they were announced. The vast majority of these countries saw it in their own national interests not to retaliate against the United States, as a matter of their own foreign-policy objectives. In short, the preliminary U.S. foreign-policy objectives of the tariffs worked—foreign-trading partners that have run trade deficits in

3

**A51**

goods for years, and helped hollow out the American manufacturing base, immediately came to the negotiating table.

8. On April 9, 2025, after consultation with me and other members of his cabinet, President Trump announced a 90-day pause and lowered the country-specific tariffs on most countries to a temporary flat rate of 10 percent. *See* Exec. Order No. 14,266, 90 Fed. Reg. 15625. In that same announcement, President Trump declared that the tariff rate on China would increase to 125 percent. In doing this, President Trump furthered the foreign-policy objectives of the United States in two important ways.

9. *First*, countries that had approached his administration, including the Department of Commerce, without retaliating received the benefit of a pause designed to allow for substantive negotiations to remedy the national emergency. The pause has been a success.

10. On May 8, 2025, President Trump and Prime Minister Keir Starmer of the United Kingdom announced the terms of the first trade deal—a deal that had been illusory for years—which directly benefits the U.S. manufacturing base. These terms—which I helped construct—reflect extensive diplomatic effort to align United States and allied supply chains and eliminate foreign dependencies in sensitive sectors. The deal would not have happened but for the International Emergency Economic Powers Act tariffs.

11. Further, because of the IEEPA tariffs and the 90-day pause, I am, together with Ambassador Greer, participating in dozens of ongoing negotiations with foreign-trading partners. Again, such negotiations would not have happened but for the IEEPA tariffs.

12. *Second*, the increased tariff rate against China applied additional pressure to achieve the foreign-policy objective of bringing China—the greatest contributor to the national emergency and a well-known strategic adversary—to the negotiating table. In 2024 alone,

the United States had a trade deficit of $295 billion with China, and China's total trade surplus of nearly $1 trillion created excess export capacity that flooded the United States through other countries, as well. Yet, because of the IEEPA tariffs, the United States and China reached a 90-day agreement on May 12, 2025, to reduce China's tariffs on U.S. exports while the Trump administration works to address longstanding disputes with China. Under that asymmetrical agreement, reached because of the pressures of the IEEPA tariffs, China lowered its universal tariff rate on U.S. goods to 10 percent, while the United States maintained a higher rate of 30 percent.

13. An adverse ruling by this Court, enjoining the implementation of these IEEPA tariffs or circumscribing the President's authority to act in this domain, threatens all of these foreign-policy accomplishments and objectives. IEEPA gives the President of the United States a pivotal tool to express his foreign policy promptly and decisively to address national emergencies that manifest through economic and commercial channels. An adverse ruling would take away one of the most important tools the President possesses that is broad, immediate, and adaptable enough to counter emergency threats in real time.

14. IEEPA is a necessary tool given to the President to broadly and swiftly respond to national emergencies caused by the economic and commercial machinations of our foreign-trading partners. Other tools afforded to the President are not designed for national emergencies. For example, while Section 232 of the Trade Expansion Act of 1962 and Section 301 of the Trade Act of 1974 are indispensable tools of U.S. trade law, they are procedurally time-consuming and do not allow for immediate action, as IEEPA does. Under Section 232, the Department of Commerce has up to 270 days to conduct an investigation and submit a report to the President, who then has up to 90 additional days to decide whether to act, and

up to 15 additional days to implement that action.    19 U.S.C. §§ 1862(b)(3)(A), (c)(1)(B).    Similarly, under Section 301, the United States Trade Representative must complete an investigation within 12 months, with additional time to implement any retaliatory action.    19 U.S.C. §§ 2414(a)(2)(B), 2415(a)(1).    IEEPA is different and authorizes the President to take immediate action to protect national interests where all of IEEPA's conditions are satisfied.    Without this tool, the President's foreign-policymaking abilities would be severely constrained and our national security would be threatened.

15. Beyond the practical effects that enjoining or circumscribing the President's IEEPA authority would have on addressing ongoing national emergencies, the real-world foreign-policy effects on this set of IEEPA tariffs would be monumental.    For one, an adverse ruling would undermine the United States-United Kingdom trade deal that was negotiated in reliance on the President's emergency tariff authority.    In addition, an adverse ruling would jeopardize the dozens of similar arrangements with foreign-trading partners that I am negotiating.    Each of these negotiations is premised on the credible threat of enforcement of the IEEPA tariffs.    If this Court limits that authority, foreign counterparts will have reduced incentives to reach meaningful agreements—resulting in the status quo that led to the national emergency.    It would destroy the carefully crafted China trade agreement, which is asymmetric in America's favor, in order to address the emergency of our persistent goods trade deficit.

16. What's more, an adverse ruling by this Court also will affect President Trump's authority to invoke IEEPA to address other national emergencies of significant concern.    For example, on February 1, 2025, President Trump invoked IEEPA to impose tariffs on China, Mexico, and Canada, respectively, due to the national emergency caused by "the sustained

influx of synthetic opioids," which "kill[] approximately two hundred Americans per day." Exec. Order No. 14,195, 90 Fed. Reg. 9121; Exec. Order No. 14,194, 90 Fed. Reg. 9117; Exec. Order No. 14,193, 90 Fed. Reg. 9113. And, on March 24, 2025, President Trump invoked IEEPA to place "secondary" tariffs on countries that purchase oil from the Maduro regime in Venezuela, given the threat that the regime's policies pose to U.S. national security. Exec. Order No. 14,245, 90 Fed. Reg. 13829. Without IEEPA, the President could not quickly and effectively address grave national emergencies—caused by foreign actors—that directly threaten the lives of Americans.

17. The imposition of IEEPA tariffs signals to foreign governments that certain conduct—whether economic predation, trade manipulation, or narcotics trafficking—will incur serious consequences. Diluting this authority would not only unravel the current IEEPA actions but also would undermine future deterrence. Allies and adversaries alike monitor U.S. courts for signs of constraint on presidential power. A ruling that narrows IEEPA would have ripple effects across every domain in which economic instruments are used for strategic effect.

18. For example, India and Pakistan—two nuclear powers engaged in combat operations just 13 days ago—reached a tenuous ceasefire on May 10, 2025. This ceasefire was only achieved after President Trump interceded and offered both nations trading access with the United States to avert a full-scale war. An adverse ruling that constrains presidential power in this case could lead India and Pakistan to question the validity of President Trump's offer, threatening the security of an entire region and the lives of millions.

19. All told, an invalidation of President Trump's ability to use IEEPA would dismantle a cornerstone of President Trump's national security architecture, irreparably harm the

government's ability to respond to evolving foreign threats, and severely disrupt the Department of Commerce's coordination of foreign policy-related economic actions on behalf of the President.  It would jeopardize vital trade agreements, collapse ongoing negotiations, allow for Chinese aggression during a period of strategic competition, leave the American people exposed to predatory economic practices by foreign actors, and threaten national security.  It also would come after the democratically elected United States Senate failed to garner the necessary votes to revoke President Trump's IEEPA emergency declaration on April 30, 2025.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 23 day of May, 2025, in the City of Washington, District of Columbia.

_____
Howard W. Lutnick
41st United States Secretary of Commerce

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE GARY S. KATZMANN, JUDGE
THE HONORABLE TIMOTHY M. REIF, JUDGE
THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| PRINCESS AWESOME, LLC; STONEMAIER, LLC; 300 BELOW, INC.; UPWARD GLANCE, LLC d/b/a QUENT CORDAIR FINE ART; KINGSEAL CORPORATION D/B/A WESCO ENTERPRISES, INC.; MISCHIEF, LLC d/b/a MISCHIEF TOY STORE; SPIELCRAFT GAMES, LLC; ROOKIE MAGE GAMES, LLC; XYZ GAME LABS, INC.; TINKERHOUSE, INC.; RECLAMATION STUDIO, LLC d/b/a WITSEND MOSAIC,<br><br>     Plaintiffs,<br><br>     v.<br><br>UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES, Acting Commissioner for U.S. Customs and Border Protection; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, Secretary of the Department of Homeland Security; UNITED STATES INTERNATIONAL TRADE COMMISSION; DONALD J. TRUMP, President of the United States; EXECUTIVE OFFICE OF THE PRESIDENT; and the UNITED STATES OF AMERICA,<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Court No. 25-00078<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## **DECLARATION**

I, Ambassador Jamieson Lee Greer, hereby state as follows:

1. I am the United States Trade Representative.  I have been the United States Trade

Representative since February 26, 2025.  In this capacity, I serve as the principal advisor

to the President on international trade policy and the chief representative for the United States in international trade negotiations. *See* 19 U.S.C. § 2171(c)(1)(B)(C).

2. In IEEPA, Congress granted to the President dynamic, flexible authority to respond to crises on a global scale.

3. President Trump has exercised that authority to impose tariffs in response to crises threatening America's national security and the economy.

4. The President found in Executive Order 14,257 that our trade partners' non-reciprocal trading practices, including both tariff and non-tariff barriers, have been an important driver of large and persistent annual U.S. goods trade deficits, which have grown over 40 percent in the past five years, and created a presently acute threat to national security and the economy. The President found that structural asymmetries in our bilateral trade relationships significantly constrain U.S. exports and artificially incentivize foreign production. The President found further that these conditions have led to a hollowing out of the U.S. manufacturing and defense-industrial base, leaving the United States dependent upon foreign supply chains for national-security-sensitive products and with insufficient domestic manufacturing capacity to remain competitive in the global economy.

5. Tariffs imposed under IEEPA are a crucial tool for protecting America's national security and advancing American foreign policy by addressing the unusual and extraordinary threats the President has identified.

6. This case does not present an abstract question of law. The Court's ruling will have a concrete and immediate effect on United States national security and foreign policy.

7. The tariffs have proven to be well tailored to address these urgent threats. The United States is presently negotiating with Mexico, Canada, and the PRC in order to address the urgent threats at our northern and southern borders.

8. Furthermore, on April 9, the President issued a 90-day pause of the country-specific reciprocal tariffs so that he might negotiate with trading partners who are willing to take significant steps to remedy their non-reciprocal trading practices and align with the United States on national and economic security matters.

9. The United States is currently negotiating with dozens of countries regarding the terms of that alignment. Those negotiations are presently in a delicate state, with discussions ongoing and final deals not yet reached. For example, on May 8, President Trump and United Kingdom (UK) Prime Minister Keir Starmer announced the general terms of an agreement that will provide U.S. companies with more than US$5 billion in expanded access to the UK market while bolstering United States national security. Similarly, on May 12, President Trump reached an agreement with China to reduce retaliatory tariffs and non-tariff barriers imposed after his April 2 Executive Order and set a path for future discussions to open the Chinese market to more U.S. exports. In many other cases, the United States continues to negotiate agreements in principle to structure final deals.

10. These negotiations have been one of the country's top foreign policy priorities since the tariffs were announced on April 2. Reflecting the urgency of the emergency, much of U.S. global diplomacy in the last six weeks has been focused on these negotiations.

11. In each case, those ongoing, delicate negotiations are premised on the ability of the President to impose tariffs under IEEPA. If the President is enjoined from exercising his

authority under IEEPA to impose tariffs to address these urgent threats, the premise of these important negotiations will be eliminated.

12. A decision enjoining the President from imposing tariffs under IEEPA would create a foreign policy disaster scenario.

13. If the Court disrupts U.S. trade policy imperatives by enjoining the President from imposing tariffs, the United States' ability to address national and economic security matters would suffer serious damage.

14. If the Court were to enjoin the President from imposing tariffs, it will signal to our trading partners that the President *lacks* power to promptly respond to future emergencies under IEEPA, and they may feel emboldened to further distort the conditions of competition for U.S. exporters.

15. It is critical to the national security of the United States for the Court to decline to enjoin the President from exercising his power under IEEPA to impose tariffs in recognition of the unusual and extraordinary threats at issue in this litigation.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on this 22d day of May, 2025.

/s/ _____

Ambassador Jamieson Lee Greer
United States Trade Representative

A60