

**U.S. Department of Justice**
Civil Division, Appellate Staff
950 Pennsylvania Ave. NW
Washington, DC 20530

Tel: (202) 305-8849

June 17, 2025

**Via CM/ECF**

Clifton Cislak, Clerk of Court
U.S. Court of Appeals for the District of Columbia Circuit
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue NW
Washington, D.C. 20001

     RE:  *Learning Resources, Inc. v. Trump*, No. 25-5202

Dear Mr. Cislak:

Plaintiffs have filed a motion to set a significantly expedited schedule for this case, with briefing to be completed in just over a month and argument in six and a half weeks. Plaintiffs based that request principally on their desire to "align[] the schedule for" this appeal with the schedule the en banc Federal Circuit has set for the government's appeal from a nationwide injunction issued by the Court of International Trade. Mot. 4. In response, the government noted that if one court issues a decision before the other, and if the Supreme Court sees the need to grant review in both this case and the Federal Circuit cases, the Supreme Court could grant certiorari before judgment.

I write to call to the Court's attention plaintiffs' filing of the attached petition for a writ of certiorari before judgment in this case. In the petition and an accompanying motion to expedite, plaintiffs contend that Supreme Court review is "inevitabl[e]" (Pet. 17) and urge the Supreme Court not to "await the normal appellate process" (Pet. 2).

Plaintiffs' petition eliminates any doubt that the Supreme Court will have a vehicle by which it could grant review—even if the timeframe

for briefing and argument in this Court is slightly behind that of the Federal Circuit—if it ultimately sees the need to hear this case alongside the Federal Circuit cases.

Sincerely,

*/s/ Daniel Winik*
Daniel Winik


cc:     All counsel (via CM/ECF)

No.

# In The
# Supreme Court of the United States

LEARNING RESOURCES, INC., ET AL.,

*Petitioners*,

v.

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES,
IN HIS OFFICIAL CAPACITY, ET AL.

*ON PETITION FOR A WRIT OF CERTIORARI BEFORE
JUDGMENT TO THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT*

## PETITION FOR A WRIT OF CERTIORARI
## BEFORE JUDGMENT

Pratik A. Shah
  *Counsel of Record*
James E. Tysse
Matthew R. Nicely
Daniel M. Witkowski
Kristen E. Loveland
AKIN GUMP STRAUSS
  HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
202-887-4000
pshah@akingump.com

*Counsel for Petitioners*

## QUESTION PRESENTED

The International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.* ("IEEPA") permits the President, upon a valid emergency declaration, to "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest[.]" *Id.* § 1702(a)(1)(B). Until now, no President in IEEPA's nearly 50-year history has ever invoked it to impose tariffs—let alone the sweeping worldwide tariffs imposed pursuant to the executive orders challenged here.

The question presented is:

Whether IEEPA authorizes the President to impose tariffs.

(i)

ii

## PARTIES TO THE PROCEEDINGS

Petitioners (Plaintiffs-Appellees below) are Learning Resources, Inc., and hand2mind, Inc.

Respondents (Defendants-Appellants below) are Donald J. Trump, President of the United States, in his official capacity; Kristi Noem, Secretary of the Department of Homeland Security, in her official capacity; United States Department of Homeland Security; Scott Bessent, Secretary of the Treasury, in his official capacity; United States Department of the Treasury; Howard W. Lutnick, Secretary of Commerce, in his official capacity; United States Department of Commerce; Pete Flores, Acting Commissioner of Customs & Border Protection, in his official capacity; United States Customs and Border Protection; Jamieson Greer, U.S. Trade Representative, in his official capacity; and Office of the United States Trade Representative.

iii

## RULE 29.6 STATEMENT

Petitioners Learning Resources, Inc. and hand2mind, Inc. are private, family-owned corporations. Learning Resources, Inc. and hand2mind, Inc. have no parent corporation or publicly held corporation that owns 10% or more of either entity's stock.

iv

# **TABLE OF CONTENTS**

QUESTION PRESENTED............................................i

PARTIES TO THE PROCEEDINGS........................ii

RULE 29.6 STATEMENT ........................................ iii

INTRODUCTION...................................................1

OPINIONS BELOW ..................................................2

JURISDICTION .........................................................2

RELEVANT CONSTITUTIONAL AND
    STATUTORY PROVISIONS .................................2

STATEMENT OF THE CASE ...................................3

    A.  Background ..................................................3

          *1.  The Constitution grants Congress the exclusive power to set tariff policy .....................................3*

          *2.  The International Emergency Economic Powers Act............................4*

          *3.  The President bypasses Congress to impose tariffs through IEEPA.........7*

          *4.  IEEPA tariffs will have major economic and political consequences ......................................10*

          *5.  IEEPA tariffs are putting Petitioners' businesses at risk............13*

    B.  Procedural History ...................................14

    C.  The Court of International Trade Actions .....................................................16

v

REASONS FOR GRANTING THE WRIT ............... 17

   I.   This Court Should Grant Review To Determine Whether IEEPA Authorizes Tariffs ............................................................ 18

   II.  This Court Should Grant Review Now To Decide An Issue Of Paramount Importance ...................................................... 26

CONCLUSION ....................................................... 33

APPENDIX

   Order Denying Defendants' Motion to Transfer Venue; Granting Plaintiffs' Motion for a Preliminary Injunction of the U.S. District Court for the District of Columbia (May 29, 2025) ...................................................... 1a

   Memorandum Opinion Denying Defendants' Motion to Transfer Venue; Granting Plaintiffs' Motion for a Preliminary Injunction of the U.S. District Court for the District of Columbia (May 29, 2025) .................... 3a

   Order Granting Defendants' Motion to Stay of the U.S. District Court for the District of Columbia (June 3, 2025) .................................... 44a

   50 U.S.C. § 1701 ................................................ 46a

   50 U.S.C. § 1702 ................................................ 47a

   Declaration of Richard Woldenberg in Support of Plaintiffs' Motion for a Preliminary Injunction filed in the U.S. District Court for the District of Columbia (April 24, 2025) .................................................... 52a

vi

Transcript of Motion Hearing Held Before the Honorable Rudolph Contreras United States District Judge (May 27, 2025) ................73a

vii

# TABLE OF AUTHORITIES

<u>C</u>ASES:

*A.L.A. Schechter Poultry & Panama*
  *Refining Co. v. Ryan,*
  293 U.S. 388 (1935) ............................................ 23

*Biden v. Nebraska,*
  600 U.S. 477 (2023) ............................... 17, 23, 27

*BP P.L.C. v. Mayor & City Council of*
  *Baltimore,*
  141 S. Ct. 1532 (2021) ....................................... 25

*Camreta v. Greene,*
  563 U.S. 692 (2011) ............................................ 32

*Cochise Consultancy, Inc. v. United States ex*
  *rel. Hunt,*
  587 U.S. 262 (2019) ............................................ 24

*Consumers Union of U.S., Inc. v. Kissinger,*
  506 F.2d 136 (D.C. Cir. 1974) ............................. 4

*Department of Com. v. New York,*
  588 U.S. 752 (2019) ............................................ 27

*Department of Educ. v. Brown,*
  600 U.S. 551 (2023) ............................................ 27

*Gibbons v. Ogden,*
  22 U.S. (9 Wheat) 1 (1824) ................................. 19

viii

*Industrial Union Dep't, AFL-CIO v.*
  *American Petroleum Inst.*,
    448 U.S. 607 (1980) .......................................... 23

*K Mart Corp. v. Cartier, Inc.*,
    485 U.S. 176 (1988) .......................................... 31

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024) .......................................... 23

*Mistretta v. United States*,
    488 U.S. 361 (1989) .......................................... 32

*National Fed'n of Indep. Bus. v. Department*
  *of Lab., Occupational Safety & Health*
  *Admin.*,
    595 U.S. 109 (2022) .......................................... 23

*National Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) ..................................... 20, 21

*United States v. Nixon*,
    418 U.S. 683 (1974) .......................................... 32

*United States v. Texas*,
    599 U.S. 670 (2023) .......................................... 27

*United States v. United Mine Workers of*
  *Am.*,
    330 U.S. 258 (1947) .......................................... 32

*United States v. Yoshida Int'l, Inc.*,
    526 F.2d 560 (C.C.P.A. 1975) .......... 16, 24, 25, 26

ix

*V.O.S. Selections, Inc. v. United States,*
 --- F. Supp. 3d ---, No. 25-00066, 2025
 WL 1514124 (Ct. Int'l Trade May 28,
 2025) ............................................................ 16, 17

*Whole Woman's Health v. Jackson,*
 595 U.S. 30 (2021) ............................................ 27

*Wilson v. Girard,*
 354 U.S. 524 (1957) .......................................... 32

*Yates v. United States,*
 574 U.S. 528 (2015) .......................................... 22

*Yoshida Int'l Inc. v. United States,*
 378 F. Supp. 1155 (Cust. Ct. 1974) .................. 24

*Youngstown Sheet & Tube Co. v. Sawyer,*
 343 U.S. 937 (1952) .......................................... 32

## CONSTITUTION AND STATUTES:

U.S. CONST.
 art. I, § 8, cl. 1 ............................................ 2, 3, 19
 art. I, § 8, cl. 3 ............................................ 2, 19
 art. I, § 9, cl. 5 ............................................ 24
 art. II, § 3 .................................................... 4

2 U.S.C.
 § 622(8)(B)(1) .................................................. 21

15 U.S.C.
 § 78k(a)(2) ...................................................... 20

x

16 U.S.C.
    § 460bbb-9(a) ................................................... 21

19 U.S.C.
    § 1338(a) ...................................................... 4
    § 1862 .......................................................... 4
    § 2132(a) ................................................ 4, 21
    § 2253 .......................................................... 4
    § 2411 .......................................................... 4
    § 2411(c) .................................................... 21
    § 2412 .......................................................... 4
    § 2413 .......................................................... 4
    § 2414 .......................................................... 4
    § 2415 .......................................................... 4
    § 2416 .......................................................... 4
    § 2417 .......................................................... 4
    § 2418 .......................................................... 4
    § 2419 .......................................................... 4

21 U.S.C.
    § 360bbb-2(a) ................................................. 20

28 U.S.C.
    § 1254(1) ................................................. 2, 32
    § 1292(a)(1) ................................................... 2
    § 1581(i)(1) .......................................... 14, 31
    § 2101(e) ................................................. 2, 32

49 U.S.C.
    § 40117(j) .................................................... 21

50 U.S.C.
    § 1701(a) ..................................................... 4
    § 1702(a)(1)(B) ................................... 5, 7, 22, 24

xi

Pub. L. No. 95-223 Title II, 91 Stat. 1626
(1977) ...................................................... 3

Securities Exchange Act of 1934, Pub. L. No.
73-291, § 11(a)(1), 48 Stat. 881, 891 ................ 20

### OTHER AUTHORITIES:

'A matter of survival': Small Businesses
Speak Out on Tariffs, U.S. CHAMBER OF
COM. (last updated: June 6, 2025) ................... 12

Berkowitz, Ben, The only trade certainty is
uncertainty, AXIOS (June 13, 2025) ............. 9, 12

Bharade, Aditi, Trump said he will set
unilateral 'take it or leave it' tariffs on
trading partners in the next 2 weeks ,
BUS. INSIDER (June 12, 2025)............................ 10

Boehm, Eric, Peter Navarro Says Tariffs
Will Be a $6 Trillion Tax Increase, but
Also a Tax Cut, REASON MAG. (Mar. 31,
2025) ................................................................ 11

CASEY, CHRISTOPHER A. ET AL., CONG. RSCH.
SERV., R45618, THE INTERNATIONAL
EMERGENCY ECONOMIC POWERS ACT:
ORIGINS, EVOLUTION, AND USE (2024)............... 22

Chang, Agnes, et al., How Much Are Tariffs
on Chinese Goods? It's Trickier Than You
Think, N.Y. TIMES (Apr. 12, 2025)..................... 9

xii

China Trade Summary, Off. Of The U.S. Trade Representative, (last visited June 11, 2025) .................................................. 10

Collins, Michael, *'Two Dolls Instead of 30': Trump Acknowledges Prices Will Force Consumers to Cut Back*, USA Today (Apr. 30, 2025) .................................................. 12

Eadicicco, Lisa, *Small businesses struggle under Trump's tariff whiplash: 'I'm so angry that my own government has done this to me'*, CNN (June 1, 2025) ........................ 29

Exec. Order No. 13,219, *Blocking Property of Persons Who Threaten International Stabilization Efforts in the Western Balkans*, 66 Fed. Reg. 34,777 (Jun. 26, 2001) .................................................... 6

Exec. Order No. 13,581, *Blocking Property of Transnational Criminal Organizations*, 76 Fed. Reg. 44,757 (Jul. 24, 2011).................... 6

Exec. Order No. 14,195, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,121 (Feb. 1, 2025)........................ 7

Exec. Order No. 14,228, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11,463 (Mar. 3, 2025) ...................................................... 7

xiii

Exec. Order No. 14,256, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China as Applied to Low-Value Imports*, 90 Fed. Reg. 14,899 (Apr. 2, 2025) ............................................................. 7

Exec. Order No. 14,257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 2, 2025) ............................................................. 8

Exec. Order No. 14,259, *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports From the People's Republic of China*, 90 Fed. Reg. 15,509 (Apr. 8, 2025) ........................................... 8

Exec. Order No. 14,266, *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*, 90 Fed. Reg. 15,625 (Apr. 9, 2025) ........................................................... 8, 9

Exec. Order No. 14,298, *Modifying Reciprocal Tariff Rates To Reflect Discussions With the People's Republic of China*, 90 Fed. Reg. 21,831 (May 12, 2025) ................................................................. 9

xiv

*Fact Sheet: President Donald J. Trump Restores Section 232 Tariffs*, THE WHITE HOUSE (Feb. 11, 2025) ...................................... 26

Goldman, David & Elisabeth Buchwald, *Trump's tariffs will probably plunge the global economy into recession this year, JPMorgan analysts says*, CNN (Apr. 2, 2025) ................................................. 27

Gressman, Eugene et al., *Supreme Court Practice* 87 (9th ed. 2007)................................. 32

H.R. REP. NO. 95-459 (1977) ................................. 25

IRWIN, DOUGLAS A., CLASHING OVER COMMERCE: A HISTORY OF U.S. TRADE POLICY (2017) .................................. 3, 4

*Memorandum on the Actions by the United States Related to the Section 301 Investigation*, 2018 DAILY COMP. PRES. Doc. 1 (Mar. 22, 2018) ...................................... 26

*OECD Economic Outlook, Volume 2025 Issue 1: United States*, OECD (June 3, 2025) ................................................. 13

Peck, Emily, *Midsize businesses struggle with high tariff costs*, AXIOS (June 12, 2025) ................................................. 12

xv

Picchi, Aimee, *Trump reveals these 2 new types of tariffs on what he calls "Liberation Day,"* CBS NEWS (Apr. 2, 2025) ........................................................... 10, 27

Proclamation No. 9704, 83 Fed. Reg. 11,619 (Mar. 8, 2018) ................................................... 26

Rappeport, Alan et al., *White House Revives Trade Spat With Fresh Attacks on China*, N.Y. TIMES (May 30, 2025) ................................. 9

Reddy, Sudeep, *Reality Check: What Trump's Supposed Retreat Really Means in a Historic Trade* War, POLITICO (Apr. 10, 2025) ........................................................... 27

*Regulate*, THE CONCISE OXFORD DICTIONARY OF CURRENT ENGLISH 943 (6th ed. 1976) .......... 20

Rubin, Richard, *Bessent Says Tariff Revenue Could Reach $600 Billion Annually*, WALL ST. J. (Apr. 4, 2025) ................................. 11

Schulz, Bailey, *Trump is rolling out more tariffs this month. Where does the tariff money go?*, USA TODAY (Apr. 4, 2025) .............. 11

*State of U.S. Tariffs: May 12, 2025*, THE BUDGET LAB (May 12, 2025) ............................ 12

SUP. CT. R. 11 .................................................. 17, 26

xvi

Swanson, Ana, *U.S. Trade Deficit Hit Record in 2024 as Imports Surged*, N.Y. TIMES (Feb. 5, 2025) .......................................... 10

*Tariff*, RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 1454 (1973) ....................... 20

U.S. Customs and Border Protection, *Trade Statistics* (last visited June 16, 2025) .............. 11

York, Erica & Alex Durante, *Trump Tariffs: Tracking The Economic Impact of the Trump Trade War*, THE TAX FOUND. (June 2, 2025) ....................................... 11, 12, 13

**INTRODUCTION**

Asserting authority under the International Emergency Economic Powers Act ("IEEPA"), the President with the stroke of a pen increased the Nation's effective tariff rate tenfold to the highest it has been in more than a century.  No President in IEEPA's history has relied on that law to issue *any* tariff.  Yet the current Administration has used it to impose sweeping tariffs to reshape the national economy and global trade policy, raising taxes on Americans by hundreds of billions of dollars.

IEEPA does not give the President such unilateral power.  Indeed, it does not give the President any tariffing power whatsoever, as every presidential administration until this one has understood.  Both courts to have adjudicated the merits—the federal district court below and a three-judge panel of the Court of International Trade ("CIT")—have now declared the IEEPA tariffs unlawful on two different grounds.  But as of last week, both lower court injunctions have been stayed pending appeal.  Even as these punishing tariffs cause American businesses and consumers to bleed billions of dollars each month, there will be no relief any time soon.

This case indisputably presents a question of paramount importance: whether IEEPA authorizes tariffs.  That pure question of law, implicating core separation-of-powers concerns, is in fact the only merits question that the government believes courts have the power to answer.  It will inevitably fall to this Court to resolve it definitively.

(1)

2

In light of the tariffs' massive impact on virtually every business and consumer across the Nation, and the unremitting whiplash caused by the unfettered tariffing power the President claims, challenges to the IEEPA tariffs cannot await the normal appellate process (even on an expedited timeline). There is ample reason for this Court to grant certiorari before judgment now so this case can be briefed over the summer and argued as soon as possible.

## OPINIONS BELOW

The opinion of the district court, App., *infra*, 3a-43a, is reported at 2025 WL 1525376. The district court's order staying its injunction, App., *infra*, 44a-45a, is unreported.

## JURISDICTION

The order of the district court was entered on May 29, 2025, and was immediately appealable pursuant to 28 U.S.C. § 1292(a)(1). App., *infra*, 1a-2a. Respondents noticed an appeal to the U.S. Court of Appeals for the D.C. Circuit on May 30, 2025, which was docketed the same day. The Court has jurisdiction under 28 U.S.C. §§ 1254(1) and 2101(e).

## RELEVANT CONSTITUTIONAL AND STATUTORY PROVISIONS

Article I, Section 8 of the United States Constitution states

> The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United

3

States; but all Duties, Imposts and Excises shall be uniform throughout the United States[.]

Cl. 1.

To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes[.]

Cl. 3.

The relevant provisions of IEEPA, Title II of Pub. L. No. 95-223, 91 Stat. 1626 (1977), are reproduced in the appendix to this petition. App., *infra*, 46a-51a.

## STATEMENT OF THE CASE

### A.  Background

#### 1.  *The Constitution grants Congress the exclusive power to set tariff policy*

The imposition of tariffs is a distinctly legislative power that the Constitution assigns to Congress.  U.S. CONST. art. I, § 8, cl. 1 (granting Congress the "[p]ower [t]o lay and collect Taxes, Duties, Imposts, and Excises").  Congress is thus "the principal venue in which trade policy is determined."  DOUGLAS A. IRWIN, CLASHING OVER COMMERCE: A HISTORY OF U.S. TRADE POLICY 2 (2017).  Presidents may "demand, protest, denounce, and complain all they want," but existing trade policy will not change absent a "majority in Congress."  *Id*.  Because the Constitution vests the power to impose duties with Congress, the President's ability to impose or alter tariffs is limited to circumstances where Congress provides specific authorization.

4

Congress has done so in a series of statutory enactments, all codified under Title 19 of the U.S. Code, which governs "Customs Duties" and carefully constrains the President's authority. *See* 19 U.S.C. §§ 1338(a), 1862, 2132(a), 2253, 2411-2419. For example, Section 122 of the Trade Act of 1974 authorizes the President to impose "duties" "not to exceed 15 percent ad valorem *** on articles imported into the United States" in order "to deal with large and serious United States balance-of-payments deficits," but those tariffs expire after 150 days unless Congress enacts legislation to extend them. 19 U.S.C. § 2132(a).

Those discrete and delimited statutory authorizations illustrate the President's circumscribed role with respect to tariffs. The President has no independent power under Article II of the Constitution to set tariffs, and Congress "retains ultimate authority over trade policy." IRWIN, *supra*, at 21. If Congress in a statute has lawfully authorized the President to make decisions regarding tariffs, he may exercise that power under his duty to "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3. But absent such an authorization, "the President could not increase or decrease tariffs." *Consumers Union of U.S., Inc. v. Kissinger*, 506 F.2d 136, 142-143 (D.C. Cir. 1974).

> 2.  *The International Emergency Economic Powers Act*

Under 50 U.S.C. § 1701(a), when the President declares a national emergency pursuant to the National Emergencies Act with respect to an "unusual and extraordinary threat" that has its source outside

5

the United States, the President may use the powers granted in § 1702 to "deal with" that threat. Section 1702 provides, in relevant part, that the President may

> investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States[.]

50 U.S.C. § 1702(a)(1)(B).

Since its enactment in 1977, Presidents have invoked IEEPA to address specific threats by specific countries and persons. To "deal with" those threats, Presidents have imposed different types of sanctions or remedies. Certain IEEPA-based executive orders have targeted the policies and actions of specific foreign governments and resulted in the imposition of comprehensive sanctions against countries or regions, which generally prohibit virtually all economic relations between U.S. persons and the targeted

6

jurisdiction. [1]     Presidents have also sanctioned categories of foreign "persons," which may include groups, political parties, terrorist organizations, corporations, and individuals. Some IEEPA actions have focused on persons in identified geographical areas (*e.g.*, the Western Balkans),[2] while others have focused on foreign persons engaged in activities creating emergency conditions regardless of nationality or geographic location.[3] Such sanctions have blocked access to assets for designated persons, prevented their utilization of U.S. financial systems or credit, denied visas to or excluded the designated persons from the United States, or prohibited U.S. persons from engaging in transactions with the designated persons.

Before February 1, 2025, however, no President had ever invoked IEEPA to impose a single tariff or duty on goods in the statute's nearly 50-year history.

---

[1] Currently, the Department of the Treasury's Office of Foreign Assets Control ("OFAC") maintains comprehensive sanctions, in part based on IEEPA, against Cuba, Iran, North Korea, Syria, and the Crimea, Donetsk, and Luhansk Regions of Ukraine.

[2] *E.g.*, Exec. Order No. 13,219, *Blocking Property of Persons Who Threaten International Stabilization Efforts in the Western Balkans*, 66 Fed. Reg. 34,777 (Jun. 26, 2001).

[3] *E.g.*, Exec. Order No. 13,581, *Blocking Property of Transnational Criminal Organizations*, 76 Fed. Reg. 44,757 (Jul. 24, 2011).

7

### 3. *The President bypasses Congress to impose tariffs through IEEPA*

President Trump, through a series of executive orders, has repeatedly bypassed Congress to impose tariffs unilaterally under IEEPA. With the stroke of a pen, he has dramatically changed United States tariff policy while all but admitting that none of the 4,732 sections in Title 19 of the U.S. Code—the title governing customs duties—allows him to do so.

The China Trafficking IEEPA Orders: On February 1, 2025, the President issued an executive order imposing 10% tariffs on China pursuant to "section 1702(a)(1)(B) of IEEPA." Exec. Order No. 14,195, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, § 1, 90 Fed. Reg. 9,121, 9,122 (Feb. 1, 2025). That order asserted that China had "fail[ed] to stem the ultimate source of many illicit drugs distributed in the United States." *Id.* at 9,121. Roughly one month later, the President raised the tariffs from 10% to 20% based on his determination that China "ha[d] not taken adequate steps to alleviate the illicit drug crisis through cooperative enforcement actions." Exec. Order No. 14,228, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, § 1, 90 Fed. Reg. 11,463, 11,463 (Mar. 3, 2025). Then, a month after that, he ordered the elimination of duty-free *de minimis* treatment for goods subject to these tariffs, ignoring a congressionally enacted statutory program that had permitted duty exemptions for imported goods valued at less than $800. Exec. Order No. 14,256, *Further*

8

*Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China as Applied to Low-Value Imports*, 90 Fed. Reg. 14,899 (Apr. 2, 2025).

The 20% trafficking tariff on goods from China, along with additional tariffs described below, remains in force.

The Reciprocal IEEPA Orders:  On April 2, 2025, the President took an even more dramatic step under IEEPA, imposing on virtually *all* trading partners "reciprocal" tariffs consisting of (i) a 10% universal tariff, and (ii) an additional and higher country-specific tariff ranging from 11% to 50%.  Exec. Order No. 14,257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 2, 2025). Then, on April 8, 2025, the President responded to retaliatory tariffs from China by raising the country-specific tariff rate on China by *50 percentage* points— from 34% to 84%.  Exec. Order No. 14,259, *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports From the People's Republic of China*, 90 Fed. Reg. 15,509 (Apr. 8, 2025).  The very next day, April 9, 2025, the President suspended for 90 days the additional country-specific tariff on all countries except for China, for which he raised the "reciprocal" tariff again, this time from 84% to 125%. Exec. Order No. 14,266, *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*, §§ 2, 3, 90 Fed. Reg. 15,625, 15,626 (Apr. 9, 2025).  Meanwhile, the 20% ad valorem tariff on

9

imports from China remained in place, such that most imports from China faced a minimum 145% IEEPA tariff.  *Id.*[4]

Starting May 14, 2025, President Trump paused the country-specific "reciprocal" tariff on China for a period of 90 days.   Exec. Order No. 14,298, *Modifying Reciprocal Tariff Rates To Reflect Discussions With the People's Republic of China*, 90 Fed. Reg. 21,831 (May 12, 2025).  The universal 10% tariff on China and 20% trafficking tariff on China were kept in place.  On May 30, 2025, President Trump suggested trade talks with China had broken down, posting on Truth Social that China "HAS TOTALLY VIOLATED ITS AGREEMENT WITH US" and "So much for being Mr. NICE GUY!"[5]  Then, just last week, the United States and China appeared to reach a new deal.  But within 12 hours of its announcement, its staying power was put into question by reports that China had agreed to approve its rare earth export licenses for just six months at a time.[6]  That same day, President Trump

---

[4] Agnes Chang, et al., *How Much Are Tariffs on Chinese Goods? It's Trickier Than You Think*, N.Y. TIMES (Apr. 12, 2025), https://www.nytimes.com/interactive/2025/04/12/business/economy/china-tariff-product-costs.html.

[5] Alan Rappeport et al., *White House Revives Trade Spat With Fresh Attacks on China*, N.Y. TIMES (May 30, 2025), https://www.nytimes.com/2025/05/30/us/politics/trump-china-trade.html.

[6] Ben Berkowitz, *The only trade certainty is uncertainty*, AXIOS (June 13, 2025), https://www.axios.com/2025/06/13/trump-tariffs-uncertainty.

10

also informed reporters of his plans to impose new tariffs on other trading partners.[7]

### 4. IEEPA tariffs have major economic and political consequences

As the President himself declared, his tariffs dramatically alter the trade and tariff policies developed by Congress over the last century. The President thus described the day he announced the IEEPA reciprocal tariffs orders as "one of the most important days in American history."[8]

The financial impact cannot be overstated. The United States imports trillions of dollars of goods every year.[9]  In 2024, the United States imported $439 billion in goods from China alone.[10]  Administration officials (including the President) and outside experts

---

[7] Aditi Bharade, *Trump said he will set unilateral 'take it or leave it' tariffs on trading partners in the next 2 weeks*, BUS. INSIDER (June 12, 2025), https://www.businessinsider.com/trump-unilateral-take-it-or-leave-it-tariffs-coming-soon-2025-6.

[8] Aimee Picchi, *Trump reveals these 2 new types of tariffs on what he calls "Liberation Day*," CBS NEWS (Apr. 2, 2025). https://www.cbsnews.com/news/liberation-day-trump-tariffs-explained/.

[9] Ana Swanson, *U.S. Trade Deficit Hit Record in 2024 as Imports Surged*, N.Y. TIMES (Feb. 5, 2025) (United States imported $4.1 trillion in goods and services in 2024), https://www.nytimes.com/2025/02/05/business/economy/us-trade-deficit-2024-record.html.

[10] China Trade Summary, OFF. OF THE U.S. TRADE REPRESENTATIVE, https://ustr.gov/countries-regions/china-mongolia-taiwan/peoples-republic-china (last visited June 11, 2025).

11

alike estimate the IEEPA tariffs will raise hundreds of billions (if not trillions) of dollars in revenue.[11]

The IEEPA tariffs increase many times over what the United States would expect to collect in tariffs in their absence. *See* U.S. Customs and Border Protection, *Trade Statistics* (in 2024, CBP collected $88 billion dollars in tariffs).[12]  This money is not paid by foreign governments; it is paid primarily by American businesses (and ultimately American consumers) and equates to the largest peacetime tax increase in U.S. history.[13]  All told, the newly imposed tariffs are projected to amount to an average tax

---

[11] Bailey Schulz, *Trump is rolling out more tariffs this month. Where does the tariff money go?*, USA TODAY (Apr. 4, 2025), https://www.usatoday.com/story/money/2025/04/03/trump-tariffs-where-will-money-go/82792578007/; Richard Rubin, *Bessent Says Tariff Revenue Could Reach $600 Billion Annually*, WALL ST. J. (Apr. 4, 2025), https://www.wsj.com/livecoverage/stock-market-tariffs-trade-war-04-04-2025/card/bessent-says-tariff-revenue-could-reach-600-billion-annually-QJfDGCPYDY1C72Ljg1pt; Erica York & Alex Durante, *Trump Tariffs: Tracking The Economic Impact of the Trump Trade War*, THE TAX FOUND. (June 2, 2025), https://taxfoundation.org/research/all/federal/trump-tariffs-trade-war/.

[12] https://perma.cc/D3HR-JD4Y (last visited June 16, 2025).

[13] Eric Boehm, *Peter Navarro Says Tariffs Will Be a $6 Trillion Tax Increase, but Also a Tax Cut*, REASON MAG. (Mar. 31, 2025), https://reason.com/2025/03/31/peter-navarro-says-tariffs-will-be-a-6-trillion-tax-increase-but-also-a-tax-cut/.

12

increase of $1,200-$2,800 per American household in 2025.[14]

The IEEPA tariffs are causing enormous uncertainty and financial distress for American businesses. "[W]ith trade policy living on three-to-six-month cycles[,] *** business planning [is] a nightmare."[15] "Indexes that measure trade policy uncertainty are almost literally off the charts, and surging again after a brief respite last month."[16] Middle market firms are seeing declines in gross revenue and net earnings, and a 20% drop in capital expenditures.[17] And smaller businesses are being pummeled to the brink of bankruptcy.[18]

Many products will become more expensive for everyday American consumers who are already struggling with the effects of high inflation. Other consumer products will simply disappear from shelves. *See* Michael Collins, *'Two Dolls Instead of 30': Trump Acknowledges Prices Will Force Consumers to*

---

[14] York & Durante, *supra* note 11; *State of U.S. Tariffs: May 12, 2025*, THE BUDGET LAB (May 12, 2025), https://budgetlab.yale.edu/research/state-us-tariffs-may-12-2025.

[15] Berkowitz, *supra* note 6.

[16] *Id.*

[17] Emily Peck, *Midsize businesses struggle with high tariff costs*, AXIOS (June 12, 2025), https://www.axios.com/2025/06/12/trump-tariffs-inflation-businesses.

[18] *E.g, 'A matter of survival': Small Businesses Speak Out on Tariffs*, U.S. CHAMBER OF COM. (last updated: June 6, 2025), https://www.uschamber.com/small-business/american-workers-businesses-consumers-trade-tariffs.

13

*Cut Back*, USA TODAY (Apr. 30, 2025)[19] (President: "You know, somebody said, 'Oh, the shelves are going to be open.'" "Well, maybe the children will have two dolls instead of 30 dolls" and "maybe the two dolls will cost a couple of bucks more than they would normally."). The IEEPA tariffs are projected to reduce GDP by 0.6 percent or more.[20]

Varying estimates aside, all agree that the President's IEEPA orders will fundamentally alter the American economic landscape.

### 5. IEEPA tariffs are putting Petitioners' businesses at risk

Petitioners are family-owned businesses, now in their fourth generation, that have created and sold over 2,000 hands-on educational toys and products for children. Their award-winning products are found in toy closets and classrooms across the country. With the mission to "bring learning to life," Petitioners seek to help younger children develop verbal, counting, and

---

[19] https://www.usatoday.com/story/news/politics/2025/04/30/trump-china-tariffs-toys/83372961007/.

[20] York & Durante, *supra* note 11; *OECD Economic Outlook, Volume 2025 Issue 1: United States*, OECD (June 3, 2025) (anticipating a slow in GDP growth from 2.8% to 1.5% in 2026 due in part to "the substantial increase in the effective tariff rate on imports and retaliation from some trading partners" and "high economic policy uncertainty"), https://www.oecd.org/en/publications/2025/06/oecd-economic-outlook-volume-2025-issue-1_1fd979a8/full-report/united-states_c69a8d2f.html#indicator-d1e10109-e43cfd16fc.

14

fine motor skills, and introduce older children to science, technology, engineering, and math.

Although distinct legal entities, Petitioners are under common control and share certain employees, a single line of credit, and a single supply chain department. App., *infra*, 53a. Today, Petitioners employ over 500 people in the United States, with offices in Vernon Hills, Illinois; Torrance, California; and Amherst, New York. *Id*. at 53a-54a. Petitioners develop their products in the United States and perform some manufacturing and assembly domestically, but outsource most manufacturing to factories in other countries, including (but not limited to) China, Taiwan, Korea, Vietnam, Thailand, and India. *Id*.

Because Petitioners import directly from China (as well as other countries affected by the challenged orders), the district court found the IEEPA tariffs "pose an existential threat to [Petitioners'] businesses." App., *infra*, 37a. The tariff rates "are so high as to effectively prevent importation" from China. *Id*. at 55a. Attempting to pay the tariffs in 2025 would cost Petitioners $100 million in cash expenditures, compared with just $2.3 million in 2024—a *44-fold increase. Id*. at 56a-57a. Unsurprisingly, Petitioners are bracing for large year-over-year sales declines. *Id*. at 58a-59a.

## B.   Procedural History

On April 22, 2025, Petitioners brought suit challenging the President's authority to issue the IEEPA tariffs. Respondents moved to transfer the case to the CIT pursuant to 28 U.S.C. § 1581(i)(1),

15

which gives that court exclusive jurisdiction over "any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for *** tariffs[.]" Petitioners moved for a preliminary injunction and opposed transfer on the ground that IEEPA is not a "law of the United States providing for *** tariffs."

On May 29, after full briefing and a hearing on both motions, the district court granted Petitioners a preliminary injunction, finding they had shown both a likelihood of success and irreparable harm. On the former, the district court held that IEEPA does not authorize the President "to unilaterally impose, revoke, pause, reinstate, and adjust tariffs to reorder the global economy," App., *infra*, 4a—meaning both that the district court had jurisdiction and the challenged IEEPA tariffs were unlawful. On the latter, the district court determined that not only were the tariffs irreparably harming Petitioners, but they posed "an existential threat to [Petitioners'] businesses." *Id.* at 37a. The court further found that the balance of harms and public interest weighed in Petitioners' favor, especially considering that Petitioners sought a tailored injunction applicable only to themselves. Finally, the court entered an administrative stay of 14 days to allow Respondents to seek further review. *Id.* at 43a.

On May 30, Respondents filed a notice of appeal. On June 2, Respondents filed motions to stay the preliminary injunction in both the district court and the D.C. Circuit. The following day, without seeking a response from Petitioners, the district court stayed its

16

injunction "pending disposition of the pending appeal before the United States Court of Appeals for the District of Columbia Circuit." App., *infra*, 45a. In the D.C. Circuit, Respondents then moved to withdraw their stay motion as moot (which the court granted), and Petitioners sought—over Respondents' objection—to align their appeal schedule with that set by the Federal Circuit in the parallel CIT cases discussed next. *See* Pet'rs Mot. to Govern 2, *Learning Resources, Inc. v. Trump*, No. 25-5202 (D.C. Cir. June 12, 2025). (The D.C. Circuit has not ruled as of this morning's printer deadline.)

## C.    The Court of International Trade Actions

As this litigation unfolded in district court, the CIT concurrently considered challenges to the IEEPA tariffs. The government insisted IEEPA was a "law of the United States providing for *** tariffs" because the Court of Customs and Patent Appeals ("CCPA")—a predecessor to the Federal Circuit—had concluded that language in the Trading with the Enemy Act ("TWEA"), later adopted in IEEPA, authorized tariffs. Defs' Mot. to Transfer 8, *Learning Resources, Inc. v. Trump*, No. 1:25-cv-01248-RC (D.D.C. Apr. 24, 2025), ECF No. 8; *see United States v. Yoshida Int'l, Inc.* (*Yoshida II*), 526 F.2d 560 (C.C.P.A. 1975).

The CIT issued a decision concluding the IEEPA tariffs are unlawful. *V.O.S. Selections, Inc. v. United States*, --- F. Supp. 3d ---, No. 25-00066, 2025 WL 1514124 (Ct. Int'l Trade May 28, 2025). Using *Yoshida II* as a guide, the CIT concluded that, assuming IEEPA authorizes some tariffs, it does not

17

authorize *these* tariffs. Specifically, the court reasoned that IEEPA does not authorize the President's reciprocal tariffs because IEEPA does not permit the imposition of tariffs to address balance-of-payments deficits outside the limits of Section 122 of the Trade Act, and that IEEPA does not authorize the President's trafficking tariffs because those tariffs do not directly address the problem identified and instead aim only to gain leverage over other countries. *Id.* at *15, *19-21.

On June 10, after an initial administrative stay, the Federal Circuit granted a stay pending appeal of the CIT's nationwide injunction.

## REASONS FOR GRANTING THE WRIT

This case presents a question of "imperative public importance": Whether IEEPA authorizes the President to impose tariffs—and thereby unilaterally reshape the national economy and global trade policy. SUP. CT. R. 11. This Court has recently granted certiorari before judgment in cases of similar national importance and "staggering" economic and political significance. *E.g.*, *Biden v. Nebraska*, 600 U.S. 477, 489, 502 (2023).

This Court should grant certiorari to decide that dispositive legal question *now*. It is the sole merits issue that the government contends courts can adjudicate in this litigation, and one that will inevitably fall to this Court to resolve definitively. The IEEPA tariffs are having a massive impact on virtually every business that relies on imports, many of whom (like Petitioners) are now facing an existential crisis. The tariffs are also subjecting

18

Americans to a tax hike in the hundreds of billions of dollars annually.  And with IEEPA tariffs added and subtracted at will, with virtually no notice, they are making it impossible for American businesses to plan amid paralyzing uncertainty throughout the American economy.  With the lower courts' injunctions stayed, these harms are only multiplying.

IEEPA does not give the President the vast power he has seized.  IEEPA does not mention the word "tariff" or "tax," and no other President in its nearly 50-year history has ever relied on it for tariffing power. Respondents locate the power to tariff in the phrase "regulate *** importation."  But the Constitution, this Court, Congress, and every Presidential administration until this one have all treated the power to regulate as categorically distinct from the power to tax or tariff.  Our country cannot wait any longer for this Court to resolve the vital question presented once and for all.

**I.   This Court Should Grant Review To Determine Whether IEEPA Authorizes Tariffs**

The district court below held the IEEPA tariffs are unlawful because IEEPA is not a statute that provides for tariffs.  That answer was the correct one, but it is this Court that must ultimately decide the issue.  Though it is one of imperative importance, the question involves straightforward statutory interpretation.

1.  There is no dispute that the only conceivable textual hook in IEEPA for the power to tariff is the power to "regulate *** importation."  App., *infra*, 22a.

19

The key question, then, is whether those words—in light of plain meaning, context, history, and constitutional principles—should be construed to encompass the power to tariff. As the district court held, the answer is no.

The Constitution separates the "[p]ower [t]o lay and collect Taxes, Duties, Imposts, and Excises" and the power to "regulate" foreign commerce into separate clauses. *See* U.S. CONST. art. I, § 8, cls. 1 and 3. Chief Justice Marshall early on confirmed the distinction between the powers to tax and regulate, describing the two grants as "not *** similar in their terms or their nature." *Gibbons v. Ogden*, 22 U.S. (9 Wheat) 1, 198-199 (1824). Hence, when Congress has delegated the power to impose tariffs to the Executive Branch, it always has done so expressly—as codified throughout Title 19 of the United States Code (governing "Customs Duties"). And when Congress has given the Executive Branch the generic power to "regulate" (including to regulate foreign commerce), it has never thereby delegated the power to tax. Tellingly, until now, no President has ever relied on a power to "regulate *** importation" to impose tariffs. All prior Presidents rightly understood that Congress does not hide vast tariffing power in language the Constitution, the Supreme Court, Congress, and longstanding Executive Branch practice have all considered definitionally distinct.

Plain meaning, consistent with the Constitution's express delineation, supports the distinction between "regulate" and "tariff." To regulate something means to "'[c]ontrol by rule' or 'subject to restrictions.'"

20

*Regulate*, THE CONCISE OXFORD DICTIONARY OF CURRENT ENGLISH 943 (6th ed. 1976). To tariff means to impose "duties or customs *** on imports or exports." *Tariff*, RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 1454 (1973). In other words, a tariff is a tax and "the essential feature of any tax" is that "[i]t produces at least some revenue[.]" *National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 564 (2012).

Respondents have not cited a single other statute where the power to "regulate" has been understood as authority to tax or tariff. The Securities and Exchange Commission has had the power to "regulate" certain "transactions on a national securities exchange" for nearly a century. 15 U.S.C. § 78k(a)(2); *see also* Securities Exchange Act of 1934, Pub. L. No. 73-291, § 11(a)(1), 48 Stat. 881, 891 ("The Commission shall prescribe *** rules and regulations *** to *regulate* or prevent floor trading by members of national securities exchanges." (emphasis added)). Yet the SEC has never thereby asserted a power to tax such transactions. Nor has the Food and Drug Administration claimed the power to tax any "drug, biological product, device, or *** combination product" based on that agency's authority to "regulate" such products. 21 U.S.C. § 360bbb-2(a). "When a statute authorizes an agency to promulgate regulations on a topic, the agency can implement rules or restrictions relating to that topic" but it cannot "use its standard regulatory powers to raise revenue by imposing fees, tariffs, or taxes." App., *infra*, 28a-29a.

21

It is no surprise that when Congress does seek to address the authority to regulate and the authority to tax in a single provision, it names the two as individually distinct powers. *See, e.g.*, 49 U.S.C. § 40117(j) (state actors may not "*tax*, *regulate*, *or prohibit* \*\*\* the imposition or collection of a passenger facility charge or the use of the revenue from the passenger facility charge" (emphasis added)); 16 U.S.C. § 460bbb-9(a) (specifying state still had power "to *tax* \*\*\* private property on the lands and waters included in the recreation area, or to *regulate* the private lands within the recreation area" (emphases added)); *see also* 2 U.S.C. § 622(8)(B)(1) ("government-sponsored enterprise" does not have "power to tax *or* to regulate interstate commerce" (emphasis added)).

When Congress has authorized the President or an agency to exercise tariff power, moreover, it has used unmistakable language to grant that authority (in Title 19). For example, Section 122 of the Trade Act of 1974 authorizes the President to impose an "import surcharge \*\*\* in the form of *duties* \*\*\* on articles imported into the United States" to "deal with large and serious United States balance-of-payments deficits." 19 U.S.C. § 2132(a) (emphasis added). And Section 301 of the Trade Act of 1974 authorizes the United States Trade Representative—who serves under the President—to "impose *duties* or other import restrictions on the goods of" a foreign country in specified circumstances. 19 U.S.C. § 2411(c) (emphasis added).

To be sure, the purpose of taxation can sometimes be viewed broadly as a "regulat[ory]" tool. *Cf. Sebelius*,

22

567 U.S. at 564 (individual mandate constitutional under power to tax but not regulate commerce). But for all the reasons explained, that does not change the fundamental character of tariffs as a tax—a power Congress must delegate more explicitly.

No such delegation exists in IEEPA. The power to "regulate *** importation" is best understood as giving the President the power to limit the quantity or quality of products through, for instance, licensing schemes or sanctions—*i.e.*, IEEPA's actual historical purview. *See* App., *infra*, 24a-25a; *see generally* CHRISTOPHER A. CASEY ET AL., CONG. RSCH. SERV., R45618, THE INTERNATIONAL EMERGENCY ECONOMIC POWERS ACT: ORIGINS, EVOLUTION, AND USE (2024). The verbs surrounding "regulate" in Section 1702(a)(1)(B)—"investigate," "direct," "compel," "nullify," "void," "prevent," and "prohibit"—confirm that Congress did not bury the power to raise revenue in the power to regulate. *See Yates v. United States*, 574 U.S. 528, 543 (2015) ("[W]e rely on the principle of *noscitur a sociis*—a word is known by the company it keeps—to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." (internal quotation marks omitted)); App., *infra*, 28a-29a. No power conferred in Section 1702 indicates Congress intended to delegate the power to tax in IEEPA.

Historical practice confirms IEEPA does not delegate the power to tariff. "In the five decades since IEEPA was enacted, no President until now has ever invoked the statute—or its predecessor, TWEA—to

23

impose tariffs." App., *infra*, 27a; *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) ("[T]he longstanding practice of [Defendants] *** can inform a court's determination of what the law is." (internal quotation marks and alteration omitted)). And "[e]very time Congress [has] delegated the President the authority to levy duties or tariffs in Title 19 of the U.S. Code, it established express procedural, substantive, and temporal limits on that authority." App., *infra*, 24a. Yet the President now claims "a virtually unrestricted tariffing power under IEEPA," *id.* at 26a, implicating a "major question," *Nebraska*, 600 U.S. at 504-506. "This lack of historical precedent, coupled with the breadth of authority that the [President] now claims, is a telling indication that the [tariffs] extend[] beyond the [President's] legitimate reach." *National Fed'n of Indep. Bus. v. Department of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 119 (2022) (internal quotation marks omitted).

Indeed, if Congress did delegate to the President unfettered and unreviewable discretion to remake the national and global economies by imposing tariffs of any size or reach (as Respondents argued below), there would be serious non-delegation concerns. *See, e.g.*, *Industrial Union Dep't, AFL-CIO v. American Petroleum Inst.*, 448 U.S. 607, 646 (1980) (plurality op.) (rejecting statutory construction that would "make such a sweeping delegation of legislative power that it might be unconstitutional under the Court's reasoning in" *A.L.A. Schechter Poultry & Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935) (internal quotation marks omitted)). And other constitutional problems would arise. Although the Constitution

24

prohibits export taxes, U.S. CONST. art. I, § 9, cl. 5, IEEPA gives the President the power to "regulate *** importation *or exportation*." App., *infra*, 30a (citing 50 U.S.C. § 1702(a)(1)(B) (emphasis added)). If "regulate" included the power to tariff, then IEEPA would be unconstitutional with respect to half that clause. *See Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262, 268 (2019) ("In all but the most unusual situations, a single use of a statutory phrase must have a fixed meaning."). This Court should construe IEEPA to avoid those constitutional concerns, *i.e.*, as excluding the power to levy tariffs.

2. Respondents' contrary arguments rely substantially on *Yoshida II*, a 1975 decision from the CCPA interpreting the President's authority under TWEA. That decades-old decision is unpersuasive and cannot justify any assertion of tariffing power under IEEPA.

*Yoshida II* addressed President Nixon's imposition of a 10% surcharge on imported goods in the summer of 1971. 526 F.2d at 567. Although the President's proclamation did not cite it, the Department of Justice later relied on TWEA in defending a challenge to the surcharge. *Yoshida Int'l Inc. v. United States* (*Yoshida I*), 378 F. Supp. 1155, 1157 (Cust. Ct. 1974). In reversing a three-judge Customs Court panel holding that "regulate" did not empower the President to impose tariffs, *see id.* at 1172, the CCPA relied on now-outdated reasoning to conclude that "the primary implication of an emergency power is that it should be effective to deal with a national emergency successfully" and

25

"regulate" thus must encompass the power to tariff, 526 F.2d at 573. Rather than analyze TWEA's list of specific powers, the CCPA simply noted that the statute's grant of authority was "broad indeed." *Id.*

In 1977, Congress enacted IEEPA, which gave the President certain emergency powers in peacetime. Respondents have argued that Congress must have intended to ratify *Yoshida II* because Congress was aware of the decision when it carried some of TWEA's language—including "regulate *** importation"—into IEEPA. But the only passing reference to *Yoshida II* appears in a background section of a House Committee markup drawn from a memorandum drafted by the Department of Justice—a section that also cited *Yoshida I*'s contrary holding and the fact that President Nixon had never invoked TWEA. *See* H.R. REP. NO. 95-459, at 3 & n.6, 5 (1977). There is no indication that Congress intended to adopt *Yoshida II*'s holding, and a single decision by a lower court construing a statute that conflicts with the only other decision on the topic is not the type of "settled precedent" that gives rise to a presumption of ratification. *BP P.L.C. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532, 1541 (2021) ("It seems most unlikely to us that a smattering of lower court opinions could ever represent the sort of judicial consensus so broad and unquestioned that we must presume Congress *** endorsed it." (internal quotation marks omitted)).

Moreover, in the interim, Congress (at President Nixon's request) had enacted the Trade Act of 1974, including Section 122, which specifically authorized

26

the surcharges President Nixon imposed. *See* App., *infra*, 34a-35a. Even *Yoshida II* questioned the continued validity of its own reasoning in Section 122's wake. *See* 526 F.2d at 582 n.33. That superseding event puts to bed any argument that Congress ratified *Yoshida II*.

Every President accordingly has understood that IEEPA is not a source of tariff-imposing authority. Where Presidents (including, until recently, President Trump) have imposed tariffs, they have done so through laws other than IEEPA. For example, the President has repeatedly relied on other actual tariff laws to impose tariffs on China, steel, and aluminum, including in his second Term. *See, e.g.*, *Fact Sheet: President Donald J. Trump Restores Section 232 Tariffs*, THE WHITE HOUSE (Feb. 11, 2025) (relying on Section 232 of the Trade Expansion Act of 1962);[21] Proclamation No. 9704, 83 Fed. Reg. 11,619 (Mar. 8, 2018) (same); *Memorandum on the Actions by the United States Related to the Section 301 Investigation*, 2018 DAILY COMP. PRES. Doc. 1 (Mar. 22, 2018) (imposing tariffs on China under Section 301 of the Trade Act of 1974).[22]

## II. This Court Should Grant Review Now To Decide An Issue Of Paramount Importance

Whether the President has authority to impose tariffs under IEEPA is of such imperative importance that it warrants review *now*. SUP. CT. R. 11. The

---

[21]    https://www.whitehouse.gov/fact-sheets/2025/02/fact-sheet-president-donald-j-trump-restores-section-232-tariffs/.

[22] https://perma.cc/H2NS-QNPQ.

27

President announced the reciprocal IEEPA tariffs in the Rose Garden, calling it "one of the most important days in American history." [23] It was indeed a consequential one: According to an analysis by JP Morgan, that round of tariffs alone "would hike taxes on Americans by $660 billion a year, the largest tax increase in recent memory by a longshot," and "cause prices to surge" by "adding 2% to the Consumer Price Index."[24] Since the beginning of the year, the tariff onslaught has caused "the nation's overall average effective tariff rate" to jump from "2.5 percent" to "around 27 percent"—more than a *tenfold* increase, and "the highest for the U.S. in more than a century."[25] In recent terms, this Court has granted certiorari before judgment to allow prompt review in cases of similarly (or less) far-reaching political and economic importance. *See, e.g.*, *Department of Educ. v. Brown*, 600 U.S. 551, 556 (2023); *Nebraska*, 600 U.S. at 489; *United States v. Texas*, 599 U.S. 670, 675 (2023); *Whole Woman's Health v. Jackson*, 595 U.S. 30, 35 (2021); *Department of Com. v. New York*, 588 U.S. 752, 766 (2019).

---

[23] Picchi, *supra* note 8.

[24] David Goldman & Elisabeth Buchwald, *Trump's tariffs will probably plunge the global economy into recession this year*, *JPMorgan analysts says*, CNN (Apr. 2, 2025), https://www.cnn.com/business/live-news/tariffs-trump-news-04-02-25#cm90qyswp001x3b6nd1mkndo5.

[25] Sudeep Reddy, *Reality Check: What Trump's Supposed Retreat Really Means in a Historic Trade* War, POLITICO (Apr. 10, 2025), https://www.politico.com/news/magazine/2025/04/10/tariff-reality-check-trump-retreat-00285270.

28

Throughout this litigation, Respondents have emphasized the "significance of these issues." Defs' Mot. for Stay 4, *Learning Resources, Inc. v. Trump*, No. 1:25-cv-01248-RC (D.D.C. June 2, 2024), ECF No. 41. Respondents submitted to the district court declarations from no less than four Cabinet members—the Secretary of State, Secretary of the Treasury, Secretary of Commerce, and U.S. Trade Representative—to highlight the consequential nature of the question presented. App., *infra*, 41a-42a. And the Federal Circuit recognized that the related cases pending there "present issues of exceptional importance." Order 3, *V.O.S. Selections, Inc. v. United States*, No. 25-1812 (Fed. Cir. June 10, 2025), ECF No. 51. Only this Court can rule with the necessary authority to resolve them.

Petitioners also need swift and conclusive resolution. The district court recognized the significant "irreparable harm" that Petitioners face—indeed, the "existential threat to their businesses." App., *infra*, 37a; *see id.* at 38a-39a (rejecting government's argument that such "harms are speculative and conclusory"). "And because their financial recovery is limited to the value of any tariffs they wrongly pay, [Petitioners] will not be able to recover lost profits, lost customers, or the additional costs of finding replacements for high-tariff imports." *Id.* at 38a-39a (internal quotation marks, citation, and alteration omitted). Those are akin to the escalating harms suffered by small businesses around the

29

country.[26]  Because the lower courts' injunctions have been stayed, these nationwide harms will mount until this Court finally settles the matter.

The wide-ranging constellation of amici supporting challenges to the IEEPA tariffs underscores their exceptional and pressing nature. Those amici include a group of constitutional scholars and public servants from across the political spectrum, including Steven G. Calabresi, Richard A. Epstein, Harold Hongju Koh, Michael W. McConnell, Michael B. Mukasey, Peter J. Wallison, and Philip Zelikow.[27] They also include the CATO Institute;[28] the Institute for Policy Integrity at New York University School of

---

[26] Lisa Eadicicco, *Small businesses struggle under Trump's tariff whiplash: 'I'm so angry that my own government has done this to me'*, CNN (June 1, 2025), https://www.cnn.com/2025/06/01/business/small-businesses-struggle-under-trumps-tariffs.

[27] *Amici* Brief of Former Senators, Attorney General, Federal Judges, and Scholars, *Learning Resources, Inc. v. Trump*, No. 1:25-cv-01248-RC (D.D.C. May 7, 2025), ECF No. 19-1.

[28] *Amicus* Brief of the CATO Institute, *Emily Ley Paper, Inc. v. Trump*, No. 3:25-cv-00464-TKW-ZCB (N.D. Fla. May 12, 2025), ECF No. 27-1.

30

Law;[29] the Brennan Center for Justice;[30] and many members of the U.S. Senate and House.[31]

According to Respondents, the central question—whether IEEPA authorizes tariffs—is the only question courts have the power to decide. *Compare* App., *infra*, 97a-98a ("[W]e agree with the plaintiffs that the Court can review the threshold statutory question of whether IEEPA authorizes tariffs[.]"), *with* App., *infra*, 98a-99a (arguing political question doctrine precludes courts from reviewing whether the IEEPA tariffs address an "unusual and extraordinary threat" or are an appropriate means to their ends). That question is well ventilated in the district court's thorough opinion and the ample briefing to date across multiple cases.

Addressing that central question now has the added benefit of simultaneously resolving the principal merits issue and disposing of a jurisdictional question that has split the courts: whether the federal district courts have jurisdiction (because IEEPA does *not* provide for tariffs) or whether the CIT has

---

[29] *Amicus* Brief of the Institute for Policy Integrity at New York University School of Law, *V.O.S. Selections, Inc. v. Trump*, No. 1:25-cv-00066-GSK-TMR-JAR (Ct. Int'l Trade May 8, 2025), ECF No. 39-1.

[30] *Amicus* Brief of the Brennan Center for Justice, *California v. Trump*, No. 3:25-cv-03372-JSC (N.D. Cal. May 20, 2025), ECF No. 33-1.

[31] *Amici* Brief of 33 Members of the United States Senate, *V.O.S. Selections, Inc. v. Trump*, No. 25-1812 (Fed. Cir. June 9, 2025), ECF No. 49; *Amici* Brief of 148 Members of Congress, *Oregon v. Trump*, No. 1:25-cv-00077-GSK-TMR-JAR (Ct. Int'l Trade May 16, 2025), ECF No. 40.

31

jurisdiction (because IEEPA does provide for tariffs). *See* 28 U.S.C. § 1581(i)(1) (giving the CIT jurisdiction over "any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for *** tariffs"). This case is thus similar to *K Mart Corp. v. Cartier, Inc.*, where the Court granted certiorari in a case arising from the U.S. District Court for the District of Columbia in order to resolve "both the jurisdictional issue" under Section 1581(i) "and the merits," with this Court ultimately concluding jurisdiction lay in the district court rather than the CIT. 485 U.S. 176, 182 (1988). This Court should not delay clarifying jurisdiction any more than it should delay resolving the merits.

Respondents have in fact already conceded that, at some point, a writ of certiorari before judgment may be necessary. *See* Resp. Mot. to Govern 5, *Learning Resources, Inc. v. Trump*, No. 25-5202 (D.C. Cir. June 13, 2025). There is no reason to delay. The costs of waiting for full merits opinions from the D.C. Circuit or from the Federal Circuit in the CIT cases (where no appeal brief has yet been filed) far outweigh any benefits. Granting certiorari now will allow the Court to order briefing to be completed in advance of this Court's first argument session for the October 2025 Term—or even for a special early sitting in September.

Finally, the fact that Petitioners prevailed in the district court poses no bar to granting certiorari before judgment, either as a statutory or constitutional matter. This Court may review cases "in the courts of appeals" upon a petition for certiorari before judgment

32

by "*any party* to any civil or criminal case." 28 U.S.C. § 1254(1) (emphasis added); *see also* 28 U.S.C. § 2101(e) ("An application to the Supreme Court for a writ of certiorari to review a case before judgment has been rendered in the court of appeals may be made at any time before judgment."). That language "covers petitions brought by litigants who have prevailed, as well as those who have lost, in the court below." *Camreta v. Greene*, 563 U.S. 692, 700 (2011) (citing Eugene Gressman et al., *Supreme Court Practice* 87 (9th ed. 2007)).[32] Moreover, it is beyond doubt that this case presents a live case or controversy: Respondents' appeal seeking reversal is pending in the D.C. Circuit, and the serious harms the district court found Petitioners are suffering from the IEEPA tariffs remain acute and ongoing (particularly in light of the stay of the district court's injunction). There is thus no impediment to—and uniquely compelling reasons in favor of—this Court's immediate review.

---

[32] This Court has granted review of petitions filed by prevailing parties on numerous occasions. *See, e.g., Mistretta v. United States*, 488 U.S. 361, 371 (1989) (granting petitions of both Mistretta and United States where district court ruled in favor of United States on constitutionality of federal sentencing guidelines); *United States v. Nixon*, 418 U.S. 683, 689-690 (1974) (granting petition of United States where district court denied President Nixon's motions regarding subpoena issued by United States); *see also, e.g., Wilson v. Girard*, 354 U.S. 524, 526 (1957); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 937, 937 (1952) (per curiam); *United States v. United Mine Workers of Am.*, 330 U.S. 258, 269 (1947).

33

## CONCLUSION

The petition for a writ of certiorari before judgment should be granted.

Respectfully submitted.

Pratik A. Shah
  *Counsel of Record*
James E. Tysse
Matthew R. Nicely
Daniel M. Witkowski
Kristen E. Loveland
AKIN GUMP STRAUSS
  HAUER & FELD LLP

*Counsel for Petitioners*

June 17, 2025

**APPENDIX**

**APPENDIX TO
PETITION FOR A WRIT OF CERTIORARI
BEFORE JUDGMENT**

**TABLE OF CONTENTS**

Order Denying Defendants' Motion to Transfer Venue; Granting Plaintiffs' Motion for a Preliminary Injunction of the U.S. District Court for the District of Columbia (May 29, 2025)..........................................................................1a

Memorandum Opinion Denying Defendants' Motion to Transfer Venue; Granting Plaintiffs' Motion for a Preliminary Injunction of the U.S. District Court for the District of Columbia (May 29, 2025)....................................................................3a

Order Granting Defendants' Motion to Stay of the U.S. District Court for the District of Columbia (June 3, 2025) ........................................44a

50 U.S.C. § 1701 ....................................................46a

50 U.S.C. § 1702 ....................................................47a

Declaration of Richard Woldenberg in Support of Plaintiffs' Motion for a Preliminary Injunction filed in the U.S. District Court for the District of Columbia (April 24, 2025) ...............52a

Transcript of Motion Hearing Held Before the Honorable Rudolph Contreras United States District Judge (May 27, 2025)................................73a

1a

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| LEARNING RESOURCES, INC., *et al.*, | : : : : : : | |
| Plaintiffs, | : : | Civil Action No.:    25-1248 (RC) |
| | : : | |
| v. | : : | Re Document Nos.:    8, 9 |
| | : | |
| DONALD J. TRUMP, *et al.*, | : : | |
| Defendants. | : : | |

## ORDER

**DENYING DEFENDANTS' MOTION TO TRANSFER VENUE; GRANTING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

For the reasons stated in the Court's Memorandum Opinion separately and contemporaneously issued, Defendants' motion to transfer (ECF No. 8) is **DENIED**; and Plaintiffs' motion for a preliminary injunction (ECF No. 9) is **GRANTED**.  It is hereby:

**DECLARED** that the tariffs deriving from Executive Order 14,195, *Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*; Executive Order 14,228, *Further*

2a

*Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*; Executive Order 14,257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Trade Deficits*; Executive Order 14,259, *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports from the People's Republic of China*; and Executive Order 14,266, *Modifying the Reciprocal Tariff Rates to Reflect Trading Parter Retaliation and Alignment*, are unlawful; and it is

**FUTHER** **[sic]** **DECLARED** that the International Economic Emergency Economic Powers Act does not authorize the President to impose the tariffs set forth in the above-listed orders; and it is

**ORDERED** that Defendants are preliminarily enjoined from collecting any tariff deriving from the above-listed orders from Plaintiffs Learning Resources, Inc., and hand2mind, Inc., and it is

**FURTHER ORDERED** that the preliminary injunction ordered herein shall be **STAYED** for fourteen days so that the parties may seek review in the Court of Appeals.

**SO ORDERED**.

This is an immediately appealable order under 28 U.S.C. § 1292(a)(1).

Dated: May 29, 2025        RUDOLPH CONTRERAS
United States District Judge

3a

# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEARNING RESOURCES, INC., *et al.*, | : : : : : : |
| Plaintiffs, | : Civil Action: No.:  25-1248 (RC) |
| v. | : Re Document Nos.:  8, 9 |
| DONALD J. TRUMP, *et al.*, | : : |
| Defendants. | : |

## <u>MEMORANDUM OPINION</u>

### DENYING DEFENDANTS' MOTION TO TRANSFER VENUE; GRANTING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## I.  INTRODUCTION

Learning Resources, Inc. and hand2mind, Inc. ("Plaintiffs") are small businesses that develop educational toys and products for children.  They manufacture most of their products in China, Taiwan, Korea, Vietnam, Thailand, and India. After President Donald Trump invoked the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, to impose sweeping tariffs on imports from those countries and others, the businesses initiated this

4a

lawsuit against President Trump and other government officials and agencies (collectively, "Defendants"). They claim that (1) IEEPA does not authorize the President to impose tariffs; (2) even if it does, it does not authorize the challenged tariffs; (3) the agency actions implementing the tariffs violate the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*.; and (4) to the extent that IEPPA can be interpreted to permit the President to impose the challenged tariffs, it violates the nondelegation doctrine.

Defendants have moved to transfer this action to the United States Court of International Trade, arguing that that court has exclusive jurisdiction under 28 U.S.C. §§ 1581(i) and 1337(c). Plaintiffs disagree. They have also moved for a preliminary injunction.

This case is not about tariffs *qua* tariffs. It is about whether IEEPA enables the President to unilaterally impose, revoke, pause, reinstate, and adjust tariffs to reorder the global economy. The Court agrees with Plaintiffs that it does not. For the reasons discussed below, the Court denies Defendants' motion to transfer and grants Plaintiffs' motion for a preliminary injunction.

## II. BACKGROUND

Six months after the United States entered World War I, Congress passed the Trading with the Enemy Act of 1917 ("TWEA"), which gave the President a broad range of powers over international trade in times of war and, as amended in 1933, national emergencies. Pub. L. No. 65-91, 40 Stat. 411 (1917), codified as amended at 50 U.S.C. § 1 *et seq*.; *Regan v.*

5a

*Wald*, 468 U.S. 222, 226 n.2 (1984). The statute had "clear procedures for enhancing the authority of a President when an emergency arose," but no analogous procedures for withdrawing or winding down that power. *Regan*, 468 U.S. at 245 (Blackmun, J., dissenting). So, over time, TWEA came to operate as a "one-way ratchet to enhance greatly the President's discretionary authority over foreign policy." *Id.*

In 1977, Congress responded by limiting TWEA's application "solely to times of war." *Id.* at 227 (majority opinion); *see also* 50 U.S.C. § 4302. It also passed the International Emergency Economic Powers Act, Pub. L. No. 95-223, 91 Stat. 1626 *et seq.* (1977), to "counter the perceived abuse of emergency controls by presidents to . . . interfere with international trade in non-emergency, peacetime situations." *Sacks v. Off. of Foreign Assets Control*, 466 F.3d 764, 766 (9th Cir. 2006). IEEPA regulates the President's "exercise of emergency economic powers in response to peacetime crises." *Regan*, 468 U.S. at 227-28 (majority opinion). It established "a new set of authorities for use in time of national emergency which are both more limited in scope than those of [TWEA] and subject to various procedural limitations." H.R. Rep. No. 95-459, "Trading With the Enemy Act Reform Legislation," at 2 (1977).

Section 1701 of IEEPA provides that President can use the statute "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States," if he declares a national emergency

6a

"with respect to such threat" pursuant to the National Emergencies Act, 50 U.S.C. §§ 1601-51. 50 U.S.C. § 1701(a). The President's IEEPA powers "may not be exercised for any other purpose." *Id.* § 1701(b).

When Section 1701's conditions are met, Section 1702(a)(1) establishes that the President may, "by means of instructions, licenses, or otherwise":

(A) investigate, regulate, or prohibit—

    i.   any transactions in foreign exchange,

    ii.   transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

    iii.   the importing or exporting of currency or securities,

    by any person, or with respect to any property, subject to the jurisdiction of the United States;

(B) investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States; and[]

7a

(C) when the United States is engaged in armed hostilities or has been attacked by a foreign country or foreign nationals, [take additional actions].

*Id*. § 1702(a)(1).

Beginning in February 2025, President Trump issued a series of executive orders invoking IEEPA to unilaterally impose tariffs on many foreign goods. The executive orders used three other statutory provisions to implement the tariffs: the National Emergencies Act; Section 604 of the Trade Act of 1974, which authorizes the President to edit the Harmonized Tariff Schedule of the United States ("HTSUS"); and 3 U.S.C. § 301, which enables the President to delegate functions to subordinates. Five of President Trump's executive orders are challenged in this lawsuit (collectively, the "Challenged Orders").

*The February 1 China Order*. On February 1, the President issued an executive order imposing 10 percent *ad valorem* tariffs on Chinese goods. Exec. Order No. 14,195, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9121 (Feb. 1, 2025) ("February 1 China Order"). The order was predicated on the influx of synthetic opioids into the United States through China, which exports fentanyl and "related precursor chemicals" to the U.S. *Id*. The order "expand[s] the scope of the national emergency" at the U.S.-Mexico border[1] to "cover the failure of the

---

[1] *See* Proclamation No. 10,886, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8327 (Jan. 20, 2025); Exec. Order No. 14,157, *Designating*

8a

[Chinese] government to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other [transnational criminal organizations], criminals at large, and drugs." *Id.* § 1, 90 Fed. Reg. at 9122. In issuing the order, President Trump invoked "section 1702(a)(1)(B) of IEEPA." *Id.* § 2, 90 Fed. Reg. at 9122.

*The March 3 China Amendment.* Around one month later, President Trump raised the China tariffs to 20 percent based on his determination that China had "not taken adequate steps to alleviate the illicit drug crisis through cooperative enforcement actions." Exec. Order No. 14,228, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11463 (Mar. 3, 2025) ("March 3 China Amendment"). Then he ordered the elimination of duty-free *de minimis* treatment for goods subject to the tariffs, contradicting a statutory program permitting duty exemptions for imported goods valued at less than $800. Exec. Order No. 14,256, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China as Applied to Low-Value Imports*, 90 Fed. Reg. 14899 (Apr. 2, 2025). The Department of Homeland Security ("DHS") and Customs and Border Patrol ("CBP") implemented the President's China orders by modifying the HTSUS. *See Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's February 1, 2025 Executive Order Imposing Duties To*

---

*Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists*, 90 Fed. Reg. 8439 (Jan. 20, 2025).

9a

*Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9038-01 (Feb. 5, 2025) (implementing 10 percent tariff from February 1 China order); *Further Amended Notice of Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's Executive Order 14195, Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11426-01 (Mar. 6, 2025) (implementing 20 percent tariff from March 3 China Amendment).

*Universal and Reciprocal Tariff Order*. On April 2, President Trump announced sweeping tariffs on virtually every U.S. trading partner.[2] Exec. Order No. 14,257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 2, 2025) (the "Universal and Reciprocal Tariff Order"). These "Liberation Day" tariffs encompassed a 10 percent universal tariff plus additional country-specific tariffs ranging from 11 to 50 percent. *Id*. at 15045, 15049-50. The Universal and Reciprocal Tariff Order also announced a new national emergency "arising from conditions reflected in large

---

[2] Exempt from the tariffs were Canada, Mexico, Russia, North Korea, Cuba, and Belarus. *See* Mot. Prelim. Inj. at 10, ECF No. 9. Separate executive orders had imposed a 25 percent tariff on goods from Mexico and Canada. *See* Exec. Order No. 14,194, *Imposing Duties to Address the Situation at Our Southern Border*, 90 Fed. Reg. 9117 (Feb. 1, 2025); Exec. Order No. 14,193, *Imposing Duties to Address the Flow of Illicit Drugs Across our Northern Border*, 90 Fed. Reg. 9113 (Feb. 1, 2025). The President later paused, reinstated, and amended the scope of those orders in ways not relevant here.

10a

and persistent annual U.S. goods trade deficits" that "have contributed to the atrophy of domestic production capacity, especially that of the U.S. manufacturing and defense-industrial base." *Id.* at 15044; *see also* Defs.' PI Opp'n at 6 ("On April 2, 2025, the President declared a national emergency based on the trade deficit's effect on the country's economy and security."). To the President, these trade asymmetries constitute an "unusual and extraordinary threat to the national security and economy of the United States," especially because of "the recent rise in armed conflicts abroad." 90 Fed. Reg. at 15041, 15044-45; *see also Fact Sheet: President Donald J. Trump Declares National Emergency to Increase Our Competitive Edge, Protect Our Sovereignty, and Strengthen Our National and Economic Security*, The White House (Apr. 2, 2025), available at https://www.whitehouse.gov/fact-sheets/2025/04/fact-sheet-president-donald-j-trump-declares-national-emergency-to-increase-our-competitive-edge-protect-our-sovereignty-and-strengthen-our-national-and-economic-security/ [https://perma.cc/UK3L-JDEV]. The 10 percent tariff went into effect on April 5; the reciprocal tariffs were originally set to take effect on April 9. Mot. Prelim. Inj. at 11, ECF No. 9.

*April 8 Reciprocal China Amendment & April 9 Reciprocal Modification.* But on April 8, President Trump responded to retaliatory tariffs from China by raising the reciprocal tariff rate for China from 34 percent to 84 percent. Exec. Order No. 14,259, *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports From the People's Republic of China*, 90 Fed. Reg. 15,509 (Apr. 14, 2025)

11a

("April 8 Reciprocal China Amendment"). Then, on April 9, President Trump suspended for 90 days the reciprocal tariffs listed in the Universal and Reciprocal Tariff Order for all countries but China. Exec. Order No. 14,266, *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*, §§ 2, 3, 90 Fed. Reg. 15625 (Apr. 15, 2025) ("April 9 Reciprocal Modification"). The April 9 Reciprocal Modification also increased the China reciprocal tariff rate to 125 percent. *Id.* At the highest level, the total tariffs on most Chinese goods reached a minimum of 145 percent. Ana Swanson & Alan Rappeport, *Tariff Truce With China Demonstrates the Limits of Trump's Aggression*, N.Y. Times (May 12, 2025), available at https://www.nytimes.com/2025/05/12/business/econo my/trump-trade-china-tariffs.html [https://perma.cc/BKS4-NTGJ]. After trade talks in Geneva, the U.S. lowered the minimum tariffs on Chinese goods to 30 percent. *Id.* The ten percent universal tariffs from the Universal and Reciprocal Order are still in effect. 90 Fed. Reg. at 15626.

President Trump has stated that the tariffs originating in the Challenged Orders will raise "billions of dollars, even trillions of dollars" in revenue. Mot. Prelim. Inj. at 13 (quoting Bailey Schulz, *Trump is Rolling Out More Tariffs This Month. Where Does the Tariff Money Go?*, USA Today (Apr. 4, 2025), https://www.usatoday.com/story/money/2025/04/03/tr ump-tariffs-where-will-money-go/82792578007/ [https://perma.cc/T5DN-73XL]). Treasury Secretary Scott Bessent estimated that the tariffs will enable the United States to collect up to $600 billion annually,

12a

paid mainly by U.S. businesses and consumers. *Id.* (citing Richard Rubin, *Bessent Says Tariff Revenue Could Reach $600 Billion Annually*, Wall St. J. (Apr. 4, 2025), available at https://www.wsj.com/livecoverage/stock-market-tariffs-trade-war-04-04-2025/card/bessent-says-tariff-revenue-could-reach-600-billion-annually-QJfDGCPYDY1C72Ljg1pt [https://perma.cc/R2RV-PNAW]).

No other President has ever purported to impose tariffs under IEEPA. Joint Br. of Amici Curiae Former Senator and Governor George F. Allen, *et al.* ("Law Professors' Amicus Br.") at 7 (citing Christopher A. Casey *et al.*, Cong. Rsch. Serv., *The International Economic Emergency Powers Act: Origins, Evolution and Use*, R45618 at 27 (2024)), ECF No. 23; Mot. Prelim. Inj. at 1 ("For five decades and across eight presidential Administrations, no President had ever invoked IEEPA to impose a tariff or duty."). After President Trump issued the Challenged Orders, small businesses and other entities brought lawsuits in federal courts alleging that the tariffs are unlawful. *See, e.g., Emily Ley Paper, Inc. v. Trump*, No. 3:25-cv-465 (N.D. Fla.) (transferred to the United States Court of International Trade); *Webber v. U.S. Dep't of Homeland Security*, No. 4:25-cv-26 (D. Mont.) (appeal pending); *California v. Trump*, No. 3:25-cv-3372 (N.D. Cal.); *V.O.S. Selections, Inc. v. Trump*, No. 25-00066 (Ct. Int'l Trade); *Princess Awesome, LLC v. U.S. Customs & Border Prot.*, No. 25-00078 (Ct. Int'l Trade); *Oregon v. Trump*, No. 25-00077 (Ct. Int'l Trade); *Barnes v. United States*, No. 25-0043 (Ct. Int'l Trade) (dismissed for lack of standing).

13a

Among that group are Plaintiffs. Learning Resources and hand2mind are family-owned companies based in Illinois that sell award-winning toys that help young children develop verbal, counting, and fine motor skills, and that introduce older children to science, technology, engineering, and math. [3] Compl. ¶¶ 4, 10, ECF No. 1. They have more than 500 employees and sell their products in over 100 countries. *Id.* Plaintiffs pay tariffs to the federal government pursuant to the Challenged Orders because they import most of their products from China and other countries subject to IEEPA tariffs. *Id.* ¶ 24. According to the companies' CEO, Richard Woldenberg, the new China tariff rates "are so high as to effectively prevent importation." Decl. of Richard Woldenberg in Supp. of Pls.' Mot. for Prelim. Inj. ("Woldenberg Decl.") ¶ 6, ECF No. 9-1. The "scale of the IEEPA tariff burden is unsustainable" for their businesses, which may be forced to raise prices by 70 percent or more "as a matter of pure survival." *Id.* ¶¶ 6, 9. Because Plaintiffs have "no realistic way" to cover the costs associated with the increased tariffs, "the tariffs act as an immediate ban on the products [they] import." *Id.* ¶ 15. They estimate that the tariffs will increase their annual costs over forty-fold. Mot. Prelim. Inj. at 3.

Plaintiffs brought this lawsuit on April 22 against President Trump; Kristi Noem, Secretary of DHS; the Department of Homeland Security; Scott Bessent,

---

[3] Although distinct legal entities, Plaintiffs are under common control and share over 100 employees, a single line of credit, and a single supply chain department. Woldenberg Decl. ¶ 2.

14a

Secretary of the Department of the Treasury; the Department of the Treasury; Howard Lutnick, Secretary of Commerce; the Department of Commerce; Pete R. Flores, Acting Commissioner of CBP; Customs and Border Patrol; Jamieson Greer, U.S. Trade Representative; and the Office of the U.S. Trade Representative (collectively, "Defendants"). *See* Compl. Two days later, Defendants filed a motion to transfer this action to the United States Court of International Trade ("CIT"). Defs.' Mot. Transfer, ECF No. 8; Mem. of Law in Supp. of Defs.' Mot. Transfer ("Mot. Transfer"), ECF No. 8, and Plaintiffs filed a motion for a preliminary injunction. Mot. Prelim. Inj.

The Court of International Trade is an Article III court that takes its current form from the Customs Court Act of 1980, Pub. L. 96-417, 94 Stat. 1727 (1980), and has "unique and specialized expertise in trade law." *Marmen Inc. v. United States*, 134 F.4th 1334, 1338 (Fed. Cir. 2025) (internal quotation omitted). Congress has given the CIT exclusive jurisdiction over "any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for," as relevant here, "tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue." 28 U.S.C. § 1581(i)(1). District courts do not have subject-matter jurisdiction over "any matter within the exclusive jurisdiction of the Court of International Trade." 28 U.S.C. § 1337(c).

Plaintiffs oppose the government's motion to transfer on the grounds that IEEPA is not a law providing for tariffs. *See* Pls.' Response to Mot. Transfer ("Pls.' Transfer Opp'n"), ECF No. 18. The

15a

government filed an opposition to Plaintiffs'
preliminary injunction motion, Mem. of Law in Opp'n
to Pls.' Mot. for Prelim. Inj. ("Defs.' PI Opp'n"), ECF
No. 16, and Plaintiffs filed a reply, Pls.' Reply in Supp.
of Mot. for Prelim. Inj. ("Pls.' PI Reply"), ECF No. 17.
The government also filed a reply in support of its
motion to transfer. Reply in Supp. of Defs.' Mot.
Transfer ("Defs.' Transfer Reply"), ECF No. 21.

Three groups submitted amicus briefs. America
First Legal Foundation ("America First") filed a brief
in support of Defendants' motion to transfer. Br. of
Amicus Curiae America First Legal Foundation in
Supp. of Defs.' Mot. Transfer ("America First Amicus
Br."), ECF No. 22. A group of law professors, former
politicians, and legal experts filed a brief in support of
Plaintiffs' motion for a preliminary injunction. Law
Professors' Amicus Br. And finally, a group of small
businesses affected by the Challenged Orders filed a
brief in opposition to Defendants' motion to transfer.
Joint Br. of Amici Curiae Emily Ley Paper, Inc., D/B/A
Simplified; Kilo Brava LLC; Kim's Clothes and
Fashion LLC; and Rokland LLC in Opp'n to Defs.' Mot.
Transfer ("Small Business Amicus Br."), ECF No. 24.

Defendants also submitted three notices of
supplemental authority: a hearing transcript from a
similar case before the Court of International Trade,
where a three-judge panel of the CIT heard argument
on a motion for a preliminary injunction and a motion
for summary judgment; a Florida district court's order
granting the government's motion to transfer in a
similar case; and a CIT decision dismissing a similar
case, brought by a *pro se* plaintiff, for lack of standing.
*See* Notice of Suppl. Authority, ECF Nos. 25, 25-1 (CIT

16a

hearing transcript); Notice of Suppl. Authority, ECF Nos. 26, 26-1 (decision in the Northern District of Florida transferring *Emily Ley Paper* to the CIT); Notice of Suppl. Authority, ECF Nos. 31, 31-1; (decision of the CIT dismissing for lack of standing in *Barnes*). Plaintiffs filed responses to the two court opinions. *See* Response to Notice of Suppl. Authority, ECF No. 27; Response to Notice of Suppl. Authority, ECF No. 32. Defendants also submitted as "additional exhibits" in support of their preliminary injunction opposition four declarations of U.S. government officials originally filed in a case pending before the CIT. Notice of Add'l Exs., ECF No. 34; *see also* Decls., ECF No. 34-1 (declarations of Secretary of State Marco Rubio ("Decl. of Marco Rubio"), Secretary of Treasury Scott Bessent ("Decl. of Scott Bessent"); Secretary of Commerce Howard Lutnick ("Decl. of Howard Lutnick"); and United States Trade Representative Jamieson Lee Greer).

The Court held a hearing on the motions to transfer and for a preliminary injunction on May 27. Both motions are now ripe for review.

### III. LEGAL STANDARDS

### A. Motion to Transfer for Lack of Jurisdiction

Federal courts, as courts of limited jurisdiction, have an obligation to ensure that the actions they consider are "limited to those subjects encompassed within a statutory grant of jurisdiction." *Ins. Corp. of Ireland, Ltd. v. Compagnie Des Bauxites de Guinee*, 456 U.S. 694, 701 (1982). A plaintiff bears the burden of establishing a court's subject-matter jurisdiction. *Sweigert v. Perez*, 334 F. Supp. 3d 36, 40 (D.D.C.

17a

2018).  If a court where an action is filed finds "there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action . . . to any other such court . . . in which the action or appeal could have been brought at the time it was filed."  28 U.S.C. § 1631; *see also Jan's Helicopter Serv. Inc. v. Fed. Aviation Admin.*, 525 F.3d 1299, 1304 (Fed. Cir. 2008).

## B.  Preliminary Injunction

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the [movant] is entitled to such relief.'" *John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1131 (D.C. Cir. 2017) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20.  "The last two factors 'merge when the Government is the opposing party.'" *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  "Of course, the movant carries the burden of persua[ding]" the Court that these factors merit preliminary relief, *Fla. EB5 Invs., LLC v. Wolf*, 443 F. Supp. 3d 7, 11 (D.D.C. 2020) (citing *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)), and must do so by making a "clear showing," *Cobell*, 391 F.3d at 258.  A district court must generally consider each of these factors in deciding whether to issue a preliminary

18a

injunction.  *See Sherley v. Sebelius*, 644 F.3d 388, 392-93 (D.C. Cir. 2011).

## IV.  ANALYSIS

### A.  Subject-Matter Jurisdiction & Likelihood of Success on the Merits

At the outset, Plaintiffs must establish that the Court has subject-matter jurisdiction over their claims.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992).  The CIT has exclusive jurisdiction over "any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for," in relevant part, "tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue."  28 U.S.C. § 1581(i)(1)(B).

This is undisputably a civil action against agencies and officers of the United States that "arises out of" IEEPA.  *See Kosak v. United States*, 465 U.S. 848, 854 (1984) (interpreting "arising out of" to "include[] a claim resulting from"); *Int'l Lab. Rights Fund v. Bush*, 357 F. Supp. 2d 204, 208 (D.D.C. 2004) (analyzing the CIT's jurisdiction based on "the substantive law giving rise to [the plaintiffs'] claims").  So subject-matter jurisdiction turns on whether IEEPA is a "law . . . providing for" "tariffs, duties, fees or other taxes on the importation of merchandise for reasons other than the raising of revenue."  28 U.S.C. § 1581(i)(1).  If the answer is yes, then the Court of International Trade has exclusive jurisdiction under 28 U.S.C. § 1581(i)(1).  If the answer is no, then this Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346.  *See also K Mart Corp. v. Cartier, Inc.*, 485 U.S.

19a

176, 182-83 (1988). The jurisdictional question is tantamount to the principal merits question: whether IEEPA authorizes (or "provid[es] for") tariffs. *See* Pls.' Transfer Opp'n at 1.

Defendants argue that this Court must transfer the case to the CIT because "all of [P]laintiffs' arguments concern the imposition of tariffs." *E.g.*, Mot. Transfer at 1; *see also* Defs.' PI Opp'n at 10-20. They essentially take the position that all "tariff *cases*," "tariff *challenges*," and "tariff *matters*" must go to the CIT for that court to determine in the first instance whether it has jurisdiction. *See* Mot. Transfer at 9-10 (emphases added). That is not how the CIT's jurisdictional statute operates. The statute is categorical: the jurisdictional hook is the nature of the statute that a case arises out of, not the character of a plaintiff's claims. *See K Mart Corp.*, 485 U.S. at 188 ("Congress did not commit to the Court of International Trade's exclusive jurisdiction *every* suit against the Government challenging customs-related laws and regulations.") (emphasis in original); 28 U.S.C. § 1581(i)(1)(B); *Miami Free Zone Corp. v. Foreign Trade Zones Bd.*, 22 F.3d 1110, 1112 (D.C. Cir. 1994) (holding that "section 1581(i) grants the CIT exclusive jurisdiction over actions arising from laws *providing for*—not 'designed to deal with' or 'relating to'—revenue from imports") (emphasis in original). So the CIT has jurisdiction over this case if, and only if, IEEPA is a "law of the United States providing for . . .

20a

tariffs." [4] *See* 28 U.S.C. § 1581(i)(1)(B); Pls.' Transfer Opp'n at 2.

Defendants claim that this Court cannot consider whether IEEPA provides for tariffs because that necessarily involves deciding the underlying merits (or, at this stage of the litigation, whether Plaintiffs have shown a likelihood of success on the merits). But "courts always have jurisdiction to determine their jurisdiction," *Ilan-Gat Eng'rs, Ltd. v. Antigua Int'l Bank*, 659 F.2d 234, 239 (D.C. Cir. 1981), including in instances where the CIT may ultimately have exclusive jurisdiction. *K Mart Corp.*, 485 U.S. at 191 (resolving circuit split by rejecting Federal Circuit's position that the CIT had exclusive jurisdiction over certain actions under 28 U.S.C. § 1581(i)). And when the merits and jurisdiction are intertwined, like here, a court "can decide all of the merits issues in resolving a jurisdictional question, or vice versa." *Brownback v.*

---

[4] Defendants argue in passing that the CIT has exclusive jurisdiction over this action under 28 U.S.C. § 1581(i)(1)(D), which applies to cases arising out of any law of the United States providing for the "administration and enforcement" of tariffs. *See* Mot. Transfer at 9, 11; Defs.' Transfer Reply at 5. They base this argument on the fact that the Challenged Orders modified the HTSUS, which is essentially a list of the applicable tariff rates for all goods imported into the United States. *See* Defs.' Transfer Reply at 5; 19 U.S.C. § 2483. This case "arises out of" the substantive law under which the President acted—IEEPA—not the HTSUS. *See Int'l Lab. Rights Fund*, 357 F. Supp. 2d at 208. So 28 U.S.C. § 1581(i)(1)(D) does not independently apply. *Cf. K Mart Corp.*, 485 U.S. at 190–91 (holding that the CIT's residual jurisdictional provision does not apply if the underlying substantive law is not one "providing for . . . administration and enforcement" of something that itself falls under the CIT's jurisdiction).

21a

*King*, 592 U.S. 209, 217 (2021) (cleaned up). The Court will therefore consider both whether it has jurisdiction and whether Plaintiffs are likely to succeed on the merits by deciding whether IEEPA is a law providing for tariffs.

Since the Founding, the Constitution has vested the "Power to lay and collect Taxes, Duties, Imposts and Excises" with Congress. U.S. Const. art. I, § 8, cl. 1. The President has no independent discretion to impose or alter tariffs. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Any Presidential tariffing authority must be delegated by Congress. *See United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 572 (C.C.P.A. 1975) ("[N]o undelegated power to regulate commerce, or to set tariffs, inheres in the Presidency."); Law Professors' Amicus Br. at 3 (stating that Congress's power to control taxation is a "structural safeguard of democratic accountability"). *See generally* 19 U.S.C.

Because courts "must enforce plain and unambiguous statutory language according to its terms," the Court looks to IEEPA's text to determine whether it is a law providing for tariffs. *See Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010); 28 U.S.C. § 1581(i)(1)(B). IEEPA does not use the words "tariffs" or "duties," their synonyms, or any other similar terms like "customs," "taxes," or "imposts." It provides, as relevant here, that the President may, in times of declared national emergency, "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit" the "importation or exportation" of "property in which any foreign country

22a

or a national thereof has any interest." 50 U.S.C.
§ 1702(a)(1)(B). There is no residual clause granting
the President powers beyond those expressly listed.
The only activity in Section 1702(a)(1)(B) that could
plausibly encompass the power to levy tariffs is that to
"regulate . . . importation." *See* Defs.' PI Opp'n at 11
(relying on those words to argue that IEEPA
authorizes the imposition of tariffs).

The Court agrees with Plaintiffs that the power
to regulate is not the power to tax. *See* Mot. Prelim.
Inj. at 18. The Constitution recognizes and
perpetuates this distinction. Clause 1 of Article I,
Section 8 provides Congress with the "Power To lay
and collect Taxes, Duties, Imposts and Excises."
Clause 3 of Article I, Section 8 empowers Congress "To
regulate Commerce with foreign Nations." If imposing
tariffs and duties were part of the power "[t]o regulate
[c]ommerce with foreign [n]ations," then Clause 1
would have no independent effect. As Chief Justice
Marshall put it in an early leading case, "the power to
regulate commerce is . . . entirely distinct from the
right to levy taxes and imposts." *Gibbons v. Ogden*, 22
U.S. (9 Wheat.) 1, 201 (1824) (Marshall, C.J.). The
Constitution treats the power to regulate and the
power to impose tariffs separately because they are
not substitutes. *See id.* at 198-99 (describing the
power to tax and the power to regulate as "not . . .
similar in their terms or their nature").

"Tariff" and "regulate" also take different plain
meanings. To regulate something is to "[c]ontrol by
rule" or "subject to restrictions." *Regulate*, The
Concise Oxford Dictionary of Current English 943 (6th
ed. 1976); *see also Regulate*, New Webster's Dictionary

23a

of the English Language 1264 (1975) ("to govern by or subject to certain rules or restrictions"); *see also* Defs.' PI Opp'n at 11 (citing similar definitions). Tariffs are, by contrast, schedules of "duties or customs imposed by a government on imports or exports." *Tariff*, Random House Dictionary of the English Language 1454 (1973). To regulate is to establish rules governing conduct; to tariff is to raise revenue through taxes on imports or exports. Pls.' PI Reply at 3. Those are not the same.[5] *Cf.* Tom Campbell, *Presidential Authority to Impose Tariffs*, 83 La. L. Rev. 595 (2023) (arguing that "tariffs are economically different from quantitative import restraints"). If Congress had intended to delegate to the President the power of taxing ordinary commerce from any country at any rate for virtually any reason, it would have had to say so. *See Biden v. Nebraska*, 600 U.S. 477, 505-06 (2023) (requiring a clear statement from Congress when the interpretation of a provision would have a "question of 'deep economic and political significance' that is central to [the] statutory scheme") (alteration in original) (quoting *King v. Burwell*, 576 U.S. 473, 486 (2015)).

---

[5] Defendants point out that in *McGoldrick v. Gulf Oil Corporation*, 309 U.S. 414, 428 (1940), the Supreme Court described "[t]he laying of a duty on imports" as both "an exercise of the taxing power" and "an exercise of the power to regulate foreign commerce." Defs.' PI Opp'n at 15. Both of those powers belong to Congress, not the President. *See* U.S. Const. art. I, § 8, cls. 1, 3. *McGoldrick* does not stand for the proposition that the President's delegated power to "regulate . . . importation" includes the ability to unilaterally impose tariffs at any rate on any goods from any country.

24a

The other verbs in Section 1702(a)(1)(B) confirm that the President's power to "regulate . . . [the] importation or exportation" of property does not encompass the power to tariff. Per the principle of *noscitur a sociis*, "a word is given more precise content by the neighboring words with which it is associated." *E.g.*, *United States v. Williams*, 553 U.S. 285, 294 (2008). Even if *regulate* may take a broad meaning in other contexts, *see* Defs.' PI Opp'n at 12, the words immediately surrounding it "cabin the contextual meaning of that term" here, *see Yates v. United States*, 574 U.S. 528, 543 (2015). The President's IEEPA power to "regulate" is part of a list of verbs otherwise including "investigate, block during the pendency of an investigation, . . . direct and compel, nullify, void, prevent or prohibit." 50 U.S.C. § 1702(a)(1)(B). Not one of those words deals with the power to raise revenue. In the context of the words with which it is listed, "regulate" is appropriately read to refer to the President's power to issue economic sanctions, not to tariff. *See* Law Professors' Amicus Br. at 8, 13; Mot. Prelim. Inj. at 27.

Nor does IEEPA include language setting limits on any potential tariff-setting power. Every time Congress delegated the President the authority to levy duties or tariffs in Title 19 of the U.S. Code, it established express procedural, substantive, and temporal limits on that authority. *E.g.*, 19 U.S.C. § 2132. For one example, Section 122 of the Trade Act of 1974 authorizes the President to impose an "import surcharge . . . in the form of duties . . . on articles imported into the United States" to "deal with large and serious United States balance-of-payments

25a

deficits," but those tariffs are capped at 15 percent and
can last only 150 days without Congressional
approval. *Id.* § 2132(a). For another example, Section
338 of the Tariff Act of 1930 grants the President the
authority to "declare new or additional duties" of up to
50 percent on imports from countries that have
imposed "unreasonable" charges, exactions,
regulations, or limitations that are "not equally
enforced upon the like articles of every foreign
country," or that have "[d]iscriminate[d] in fact
against the commerce of the United States." 19 U.S.C.
§ 1338(a), (d), (e). Those tariffs cannot take effect for
thirty days. *Id.* § 1338(d), (e). For yet another
example, Section 301 of the Trade Act of 1974
authorizes an executive officer who serves under the
President to "impose duties or other import
restrictions on the goods of" a foreign country that has
been found, after notice and investigation, to have
committed unfair trade practices or violated trade
agreements with the United States. 19 U.S.C.
§ 2411(c). Unlike IEEPA, each of these statutes
provides specific limitations on when the President
may set or alter tariffs. *See also, e.g.*, 19 U.S.C. § 1862
(authorizing the President to impose tariffs only
against specific products, and only after the Secretary
of Commerce has conducted a predicate investigation
into national security risks); *cf. Fed. Energy Admin. v.
Algonquin SNG, Inc.*, 426 U.S. 548, 559-60, 571 (1976)
(interpreting the statutory phrase "adjust . . . imports"
to give the President the power to impose license fees,
but only after the Secretary of the Treasury
independently determines that an "article is being
imported into the United States in such quantities or
under such circumstances as to threaten to impair the

26a

national security," and other "clear preconditions to Presidential action").

Those comprehensive statutory limitations would be eviscerated if the President could invoke a virtually unrestricted tariffing power under IEEPA.[6]  *See* Law Professors' Amicus Br. at 9 ("If IEEPA meant what the government says it means, it would enable the President to impose, revoke, or change tariffs for essentially any reason he describes as an emergency, without complying with any of the limitations that Congress attached to every statute delegating tariff authority."), *cf. Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) (discussing the principle that in statutory interpretation, the specific prevails over the general); *Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 493 U.S. 365, 375 (1990) (same).  The Court will not assume that, in enacting IEEPA, Congress repealed by implication every extant limitation on the President's tariffing authority.  *See Posadas v. Nat'l City Bank*, 296 U.S. 497, 503 (1936) ("The cardinal rule is that repeals by implication are not favored.").  "Congress has enacted a comprehensive scheme" detailing the

---

[6] Of course the necessary predicate for the exercise of any authority under IEEPA is the President's declaration of a national emergency.  50 U.S.C. § 1701.  But the President's power to declare a national emergency under the National Emergencies Act is broad, and Defendants take the position that courts cannot review presidential declarations of emergencies because they constitute nonjusticiable political questions.  Defs.' PI Opp'n at 1, 31–36; *see also Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 31 (D.D.C. 2020) (noting that "*no court* has ever reviewed the merits of such a declaration") (emphasis in original); *Yoshida*, 526 F.2d at 581 n.32 ("[C]ourts will not review the bona fides of a declaration of an emergency by the President.").

27a

conditions where the President may impose tariffs. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 519 (1996) (Thomas, J., dissenting)). "It would be anomalous," to say the least, "for Congress to have so painstakingly described the [President's] limited authority" on tariffs in other statutes, "but to have given him, just by implication," nearly unlimited tariffing authority in IEEPA. *See Gonzales v. Oregon*, 546 U.S. 243, 262 (2006).

Historical practice further indicates that IEEPA does not encompass the power to levy tariffs. In the five decades since IEEPA was enacted, no President until now has ever invoked the statute—or its predecessor, TWEA—to impose tariffs. *See* Mot. Prelim. Inj. at 21, 27; Christopher A. Casey *et al.*, Cong. Rsch. Serv., R45618, *The International Emergency Economic Powers Act: Origins, Evolution and Use*, R45618 at 25-26, 58-62 (2024). IEEPA has been consistently understood by the Executive to authorize targeted economic sanctions on the person[7] or state responsible for the underlying threat to U.S. national security. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) ("[T]he longstanding practice of the government . . . can inform a court's determination of what the law is.") (cleaned up) (quoting *NLRB v. Noel Canning*, 573 U.S.

---

[7] The Court means "person" in the broad legal sense. *See* 1 U.S.C. § 1 (defining "person" to include "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals"); *see also* 50 U.S.C. §§ 1708(d)(6), 1709(g)(8) (defining "person" as "an individual or entity").

28a

513, 525 (2014)); Mot. Prelim. Inj. at 21-27. "This lack of historical precedent, coupled with the breadth of authority that the [President] now claims, is a telling indication that the [tariffs] extend[] beyond the [President's] legitimate reach." *See Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin*, 595 U.S. 109, 119 (2022) (per curiam) (internal quotation marks omitted). Nor have IEEPA cases traditionally been filed in the CIT. Hundreds of district court cases cite IEEPA Sections 1701 and 1702, but excluding the cases recently filed challenging President Trump's IEEPA tariffs, not one CIT case cites either provision. *See* Pls.' Transfer Opp'n at 10. This makes sense because the mine run IEEPA case has nothing to do with the CIT's "unique and specialized expertise in trade law." *See, e.g., Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156 (D.C. Cir. 2003) (IEEPA case seeking to vacate Office of Foreign Asset Controls designations); *OKKO Bus. PE v. Lew*, 133 F. Supp. 3d 17 (D.D.C. 2015) (IEEPA case seeking to unblock a wire transfer); *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92 (D.D.C. 2020) (IEEPA case seeking to enjoin ban on social media application).

General administrative practice also illustrates—and demands—a distinction between the power to regulate and the power to tax. When a statute authorizes an agency to promulgate regulations on a topic, the agency can implement rules or restrictions relating to that topic. *See, e.g.*, 42 U.S.C. § 7412 (authorizing the Environmental Protection Agency to "promulgate regulations establishing emissions standards"). The agency

29a

cannot, however, use its standard regulatory powers to raise revenue by imposing fees, tariffs, or taxes. *See* Pls.' PI Reply at 4-5; *cf. Diginet, Inc. v. Western Union ATS, Inc.*, 958 F.2d 1388, 1399 (7th Cir. 1992) ("The legal power to regulate is not necessarily the legal power to tax."). Congress speaks clearly when it delegates to an agency the authority to impose fees on regulated entities. *See* 49 U.S.C. § 40117(j) (listing the powers to tax and to regulate separately); 16 U.S.C. § 460bbb-9(a) (same); 2 U.S.C. § 622(8)(B)(i) (same). The statutory term "regulate," on its own, is not so capacious. That is true whether the power to regulate is delegated to an administrative agency or to the President.

Defendants' counterarguments cannot and do no [sic] overcome IEEPA's plain meaning. For one thing, their proposed interpretation of Section 1702(a)(1)(B) conflicts with the provision's textual limits. The President's IEEPA powers extend only to "any property in which any foreign country or a national thereof has any interest." 50 U.S.C. § 1702(a)(1)(B); *see Real v. Simon*, 510 F.2d 557, 562 (5th Cir. 1975). Tariffs are typically assessed after U.S.-based importers have taken legal possession of imported goods. *See* 19 U.S.C. § 1484(a)(2)(B) (generally authorizing the "owner or purchaser" of goods to be the importer of record); U.S. Customs & Border Protection, *Entry Summary and Post Release Processes* (last modified Apr. 10, 2025), https://www.cbp.gov/trade/programs-administration/entry-summary [https://perma.cc/4U4F-7U6H] ("Within 10 days of the release of the cargo, the importer must pay the

30a

estimated duties on their imported goods."). Property wholly owned by U.S. nationals falls outside of IEEPA's scope. *See* 50 U.S.C. § 1702(a)(1)(B); *see also* Law Professors' Amicus Br. at 8-9 (describing how all the "permitted presidential actions" in IEEPA "have their effects abroad," while tariffs are "taxes paid by Americans").

And as Plaintiffs pointed out at oral argument, Defendants' interpretation could render IEEPA unconstitutional. IEEPA provides that the President may "regulate . . . importation or exportation." 50 U.S.C. § 1702(a)(1)(B). The Constitution prohibits export taxes. *See* U.S. Const. art. I, § 9, cl. 5 ("No Tax or Duty shall be laid on Articles exported from any State."). If the term "regulate" were construed to encompass the power to impose tariffs, it would necessarily empower the President to tariff exports, too. The Court cannot interpret a statute as unconstitutional when any other reasonable construction is available. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 563 (2012).

Defendants' interpretation would also create a jurisdictional split between IEEPA actions initiated by the government, which are not "commenced against the United States, its agencies, or its officers," and would fall under the jurisdiction of the district courts; and IEEPA actions initiated against the government, which would go to the CIT. *See* 28 U.S.C. § 1581(i)(1); 50 U.S.C. § 1705(a)-(c) (establishing civil and criminal penalties for violations of IEEPA); *see, e.g., United States v. Three Sums Totaling $612,168.23 in Seized U.S. Currency*, 55 F.4th 932, 935-36 (D.C. Cir. 2022) (IEEPA claim filed by the government in federal

31a

district court). That would totally warp the principles of consistency and expertise that Defendants invoke to support their claim that the CIT has exclusive jurisdiction over this action. *See* Mot. Transfer at 9-10.

Defendants lean heavily on *United States v. Yoshida International, Inc. ("Yoshida")*, 526 F.2d 560, a 1975 decision from the Court of Customs and Patent Appeals, the Federal Circuit's predecessor, but that case is not binding on this Court. *See* Defs.' PI Opp'n at 2, 4, 12, 14, 16-19, 23, 26-28, 32, 35; *see also Coal. to Preserve the Integrity of Am. Trademarks v. United States*, 790 F.2d 903, 905-07 (D.C. Cir. 1986), *aff'd in part sub nom. K Mart. Corp.*, 485 U.S. at 190-91 (rejecting Federal Circuit's jurisdictional analysis). Nor does the Court find it persuasive. [8]

The facts of *Yoshida* are as follows. During the summer of 1971, the United States faced "an economic crisis" arising out of a balance of payments deficit. *Yoshida*, 526 F.2d at 567. President Nixon responded by issuing a proclamation that, among other things, imposed a 10 percent surcharge on imported goods. *Id.*; *see also* Proclamation No. 4074, 36 Fed. Reg. 15724 (Aug. 17, 1971). The tariffs were known as the "Nixon

---

[8] Two other district courts have, in cases materially similar to this one, granted the government's motion to transfer to the CIT largely in reliance upon *Yoshida*. *See Webber v. U.S. Dep't of Homeland Sec.*, 2025 WL 1207587 (D. Mont. Apr. 25, 2025); *Emily Ley Paper v. Trump*, 2025 WL 1482771 (N.D. Fla. May 20, 2025). This Court respectfully disagrees with their analyses. And the Court finds it even less persuasive that the CIT, which is bound by *Yoshida*, is exercising jurisdiction over lawsuits raising similar claims.

32a

shock," *see* Defs.' PI Opp'n at 17, and were withdrawn in less than five months, Law Professors' Amicus Br. at 11. A zipper importer, Yoshida International, challenged the tariffs' legality in a refund suit. *Yoshida*, 526 F.2d at 566. At the time Section 5(b) of the TWEA allowed the President to, in emergencies, "regulate . . . [the] importation . . . of . . . any property in which any foreign country or a national thereof has any interest."[9] *Id*. at 570. Although President Nixon had not invoked TWEA,[10] the Customs Court[11] analyzed whether that statute authorized the tariffs and concluded that it did not. *Yoshida Int'l, Inc. v. United States ("Yoshida I")*, 378 F. Supp. 1155, 1171 (Cust. Ct. 1974), *rev'd, Yoshida*, 526 F.2d at 576 (C.C.P.A. 1975) ("It cannot be said that the investiture of a power to 'regulate' necessarily includes, per se, the power to levy duties."); *see also id*. at 1172 ("If the words 'regulate . . . importation' were given the construction contended by the defendant, the President by the declaration of a national emergency could determine and fix rates of duty at will, without regard to statutory rates prescribed by the Congress

---

[9] The same language appears in IEEPA.

[10] In issuing Proclamation 4074, President Nixon instead invoked the Tariff Act of 1930 and the Trade Expansion Act of 1962. 36 Fed. Reg. at 15724; *Yoshida*, 526 F.2d at 569; H.R. Rep. No. 95-459, at 5 (1977) ("[TWEA] was not among the statutes cited in the President's proclamation as authority for the surcharge."); *see also* Pls.' PI Reply at 9–10. TWEA was first cited "later by the Government in response to a suit brought in Customs Court by Yoshida International"—*i.e.*, in *Yoshida*. H.R. Rep. No. 95-459, at 5.

[11] The Customs Court is the CIT's predecessor. *See* Customs Courts Act of 1980, Pub. L. No. 96-417, § 702, 94 Stat. 1727, 1748 (1980).

33a

and without the benefit of standards or guidelines which must accompany any valid delegation of a constitutional power by the Congress." (alteration in original)).

The Court of Customs and Patent Appeals reversed based on "the intent of Congress" and "the broad purposes of the [TWEA]." *Yoshida*, 526 F.2d at 583; *see also id.* at 573 (emphasizing that "the primary implication of an emergency power is that it should be effective to deal with a national emergency successfully"). That is no longer how courts approach statutory interpretation. *See Am. Fed. of Gov. Empls., Nat'l Council of HUD Locals Council 222, AFL-CIO v. FLRA*, 99 F.4th 585, 590 (D.C. Cir. 2024) (discussing how purposivism was, by the end of the twentieth century, "largely rejected in favor of a stricter focus on a statute's text" (citing John F. Manning, *Textualism and the Equity of the Statute*, 101 Colum. L. Rev. 1, 6-7 (2001))); *Loper Bright*, 603 U.S. at 443 n.6 (Gorsuch, J., concurring) (describing how in 1984 "there were many judges who abhorred plain meaning and preferred instead to elevate legislative history and their own curated accounts of a law's purposes over enacted statutory text," but now courts have "a more faithful adherence to the written law" (cleaned up)). The Supreme Court could not be more clear that courts must focus on a statute's text. *E.g., Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009) ("As with any question of statutory interpretation, our analysis begins with the plain language of the statute."); *see also Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) ("It is well established that 'when the statute's language is plain, the sole function of the courts—at

34a

least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000))).   So *Yoshida's* reasoning is not compelling on its own terms.

And in deciding that case, the Court of Customs and Patent Appeals acknowledged that "nothing in the TWEA or in its history . . . specifically either authorizes or prohibits the imposition of a surcharge," and that "Congress did not specify that the President could use a surcharge in a national emergency." *Yoshida*, 526 F.2d at 572-73, 576.   *Yoshida* also expressly rejected the premise that the TWEA enabled the President to "impos[e] whatever tariff rates he deems desirable," *id.* at 578, which is the power President Trump has claimed in issuing the Challenged Orders.     *Yoshida* is further distinguishable because the tariffs at issue there applied only to goods already subject to tariff reductions, and at rates that did not exceed the original statutory maximum set out by Congress. *See* Law Professors' Amicus Br. at 12 n.2.

As Plaintiffs point out, other events confirm that Congress did not intend for the language "regulate . . . importation" to delegate the authority to impose tariffs.   *See* Pls.' PI Reply at 11-12.   Just before enacting IEEPA, Congress passed Section 122 of the Trade Act of 1974. Pub. L. No. 93-618, 88 Stat. 1978 (1975).   That statute specifically authorized the tariffs President Nixon had imposed in Proclamation 4074 by providing that the President may impose an "import surcharge . . . in the form of duties . . . on articles

35a

imported into the United States" to "deal with large and serious United States balance-of-payments deficits." 19 U.S.C. § 2132(a); *see also id.* § 2411(c)(1)(B). Section 122 would have been pointless if Congress understood TWEA (and later, IEEPA) to allow that same tariffing authority. And in reaching its holding, the *Yoshida* court expressly relied on the fact that there was then no specific statute "'providing procedures' for dealing with a national emergency involving a balance of payments problem such as that which existed in 1971." *Yoshida*, 526 F.2d at 578; *see also id.* at 582 n.33 (expressly declining to determine what effect "the specific grant of the surcharge authority spelled out in the Trade Act of 1974" had on the President's TWEA powers in 1971). That is no longer true.

Finally, the President's IEEPA powers were designed to be "more limited in scope than those of [TWEA]." H.R. Rep. No. 95-459, at 2 (1977). The Court disagrees with Defendants that, by adopting the TWEA's language in IEEPA, Congress endorsed *Yoshida's* holding. *See* Pls.' PI Reply at 13 (arguing that courts only assume Congress adopts an earlier judicial construction of a phrase where there is "settled precedent" on the interpretation of a statute, and that conflicting lower court decisions do not constitute settled precedent (quoting *United States v. Collazo*, 984 F.3d 1308, 1328 (9th Cir. 2021))). *Contra* Defs.' PI Opp'n at 4, 12, 14. *Yoshida* is not a reason for this Court to reject IEEPA's plain meaning.

\* \* \*

Two conclusions follow from the Court's analysis. First, because IEEPA is not a "law . . . providing for

36a

tariffs," this Court, not the CIT, has jurisdiction over this lawsuit.[12] The statutory phrase "regulate . . . importation," as used in IEEPA, does not encompass the power to tariff. The plain meaning of "regulate" is not "to tax." And historical practice, as well as Congress's actions in response to the "Nixon shock" tariffs, confirm that the statute is not so capacious. Second, because IEEPA does not authorize the President to impose tariffs, the tariffs that derive from the Challenged Orders are *ultra vires*. Plaintiffs have therefore shown that they are likely to succeed on the merits of their claim that the President, in issuing the Challenged Orders, acted *ultra vires*, and that the agency defendants, in implementing them, violated the Administrative Procedure Act. The Court does not reach Plaintiffs' alternative arguments that IEEPA does not authorize these specific tariffs or that, if it

---

[12] Although Defendants do not raise this argument, Amicus America First takes the position that the CIT has exclusive jurisdiction over all IEEPA actions because it is a law "providing for . . . embargoes . . . for reasons other than protections of the public health or safety." *See* America First Amicus Br.; 28 U.S.C. § 1581(i)(1)(C). That would be a sea change in IEEPA practice, as district courts have exercised jurisdiction over hundreds of IEEPA cases brought against the government. *See* Pls.' Transfer Opp'n at 10. Such a jurisdictional shift would also run counter to the CIT's role as a "specialized court of limited jurisdiction." *See Horizon Lines, LLC. v. United States*, 414 F. Supp. 2d 46, 52 (D.D.C. 2006). Further, Presidents have used IEEPA to respond to threats to public health and safety. For example, the February 1 China Order challenged in this case expressly imposed IEEPA sanctions to address the illegal flow of fentanyl into the U.S. 90 Fed. Reg. at 9121. If IEEPA provides for embargoes, those embargoes could be to protect the public health or safety. That brings IEEPA outside the scope of Section 1581(i)(1)(C), so America First's jurisdictional argument fails.

37a

does authorize these tariffs, it violates the nondelegation doctrine.

## B. Irreparable Harm

Plaintiffs have established that they will likely suffer irreparable harm absent a preliminary injunction because the tariffs originating in the Challenged Orders pose an existential threat to their businesses. *See, e.g.*, Woldenberg Decl. ¶ 28; Mot. Prelim. Inj. at 41; *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8-9 (D.C. Cir. 2016) (reiterating that "a preliminary injunction requires only a likelihood of irreparable injury"). They cannot offset the highest IEEPA tariffs without raising prices 70 percent or more "as a matter of pure survival," Woldenberg Decl. ¶ 9; their customers have already canceled over $1 million in orders, *id.* ¶ 10; and they face an immediate 40 or 50 percent decline in sales, year-over-year, *id.* ¶ 11. The companies "cannot possibly absorb the costs of the increased tariffs" without "changing [their] pricing radically." *Id.* ¶¶ 6, 14. But they cannot pass price increases onto their customers without selling substantially fewer products. *Id.* ¶¶ 16, 18. Plaintiffs are not "massive entities that can withstand such losses in their core business[es]." *See Everglades Harvesting & Hauling, Inc. v. Scalia*, 427 F. Supp. 3d 101, 116 (D.D.C. 2019). Nor can they reduce the quality of their products to support lower prices: reducing quality is "unthinkable" for "premium brands" like Plaintiffs, and is practically unworkable because it would require them to "change the design and/or production of more than 2,000 products at once." *Id.* ¶ 15.

38a

Without an injunction, Plaintiffs may have to refinance loans on unfavorable terms; significantly scale back operations and product offerings; close facilities; lay off employees; or possibly sell their businesses. Mot. Prelim. Inj. at 41. Granted, financial losses typically do not constitute irreparable harm. *E.g., Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). But that is not the case when "the loss threatens the very existence of the movant's business." *Id.*

The government argues that Plaintiffs' harms are speculative and conclusory. *See* Defs.' PI Opp'n at 37-39. The Court disagrees. *See* Pls.' PI Reply at 20-21 (detailing, to the extent possible, the specific costs that Plaintiffs have incurred because of the Challenged Orders). How could Plaintiffs possibly describe the exact costs they will face from paying tariffs that the President imposes, pauses, adjusts, and reimposes at will? *See* Woldenberg Decl. ¶¶ 7-8 (describing the "ever-changing situation with the IEEPA tariffs" and "considerable uncertainty about future economic conditions and trade rules"). The instability and unpredictability of the changing tariff rates cause "massive disruptions in [their] supply chain, business relations, and business operations." *Id.* ¶ 8; *see Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 242 (D.D.C. 2014). Without preliminary relief, Plaintiffs will be subjected to ongoing "supply chain chaos, an incredibly burdensome and constantly shifting tariff landscape, and a very high price to be paid for incorrect logistical judgments." Woldenberg Decl. ¶ 10. And because their financial recovery is limited to the value of any tariffs they wrongly pay, *see* 19

39a

U.S.C. § 1505(a)-(b), Plaintiffs will not be able to recover lost profits, lost customers, or the "additional cost[s]" of finding "replacement[s]" for high-tariff imports. *See Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009) ("[T]he inability to supply a full line of products may irreparably harm a merchant by shifting purchasers to other suppliers."); *Nalco Co. v. EPA*, 786 F. Supp. 2d 177, 188 (D.D.C. 2011) (holding that agency action that would make it "difficult for [the plaintiff] to attract new customers" is "at least some degree of irreparable injury").

As Plaintiffs stated at oral argument, to the extent the tariffs cause them not to import goods in the first instance, they cannot recover the value of the resulting lost sales, business opportunities, market share, or customer goodwill. *See* Mot. Prelim. Inj. at 38-39. In this context, those harms qualify as irreparable. *See, e.g., Patriot, Inc. v. U.S. Dep't of Housing & Urban Dev.*, 963 F. Supp. 1, 5 (D.D.C. 1997) ("damage to [a company's] business reputation" can be "irreparable harm"); *Nalco Co.*, 786 F. Supp. 2d at 188 (finding irreparable harm where petitioner would "suffer the loss of '[l]ong-standing clients . . . [that may be] unwilling, or unable, to do business'" with them absent an injunction (alterations in original) (quoting *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 50-51 (D.D.C. 2008))). *Contra* Defs.' PI Opp'n at 38 (stating, without support, that Plaintiffs' "loss of business opportunities and goodwill" could be "indirectly" redressed through refunds). The Court is therefore satisfied that Plaintiffs have demonstrated irreparable harm.

40a

## C. Balance of Equities & Public Interest

Finally, the Court considers whether the balance of equities and the public interest favor a preliminary injunction. When the government is the party to be enjoined, these two factors merge. *See Nken*, 556 U.S. at 435. The Supreme Court has instructed that "[a]n injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Winter*, 555 U.S. at 32. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of an injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (citing *R.R. Comm'n v. Pullman Co.*, 312 U.S. 496, 500 (1941)).

Without a preliminary injunction, Plaintiffs will sustain significant and unrecoverable losses. They take the position that if the Court grants their motion, the government will face a pause of the IEEPA tariffs only as directed to two small businesses whose imports are relatively inconsequential to the national economy. *See* Mot. Prelim. Inj. at 43 (requesting that the Court "enjoin the agency Defendants and their agents, employees, and all persons acting under their direction and control, from taking any action to collect tariffs from *Plaintiffs* under the Challenged Orders") (emphasis added). And "[t]he public interest is served when the legislation that Congress has enacted," like IEEPA, "is complied with." *American Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 262 (D.D.C. 2003); *see also League of Women Voters*, 838 F.3d at 12 (holding that is there generally no public interest in unlawful agency action).

41a

On the government's side, four Cabinet officials submitted declarations outlining the "catastrophic harm to American foreign policy and national security that would ensue from granting the relief requested in [P]laintiffs' motion." Notice of Add'l Exs. at 1; *see also* Decl. of Howard Luntick ¶ 19 ("All told, an invalidation of President Trump's ability to use IEEPA would dismantle a cornerstone of President Trump's national security architecture, irreparably harm the government's ability to respond to evolving foreign threats, . . . jeopardize vital trade agreements, collapse ongoing negotiations, allow for Chinese aggression during a period of strategic competition, leave the American people exposed to predatory economic practices by foreign actors, and threaten national security."). Secretary of State Marco Rubio stated that an order enjoining the tariffs "would cause significant and irreparable harm to U.S. foreign policy and national security" because negotiations with trading partners are "in a delicate state." Decl. of Marco Rubio ¶¶ 3, 9. "These negotiations could address the urgent threats of mass migration at our northern and southern borders, the flow of fentanyl into our country, and the erosion of our domestic production capacity," *id.* ¶ 8, and constitute "one of the country's top foreign policy priorities." *Id.* ¶ 10. According to Secretary Rubio, "much of U.S. global diplomacy has been focused on these negotiations." *Id.* ¶ 10; *see also* Decl. of Scott Bessent ¶ 9. Every ongoing negotiation is "premised on the ability of the President to impose tariffs under IEEPA." Decl. of Marco Rubio ¶ 11.

The Cabinet officials claim that were a court to enjoin the tariffs announced in the Challenged Orders,

42a

U.S. trading partners could retaliate against the tariffs.; the U.S. would be embarrassed on the global stage; and the U.S.'s manufacturing position may be so weakened that the country may "not be able to produce the weapons and other resources necessary to defend itself." *Id.* ¶¶ 12-14. These consequences go to "critical" foreign policy and national security interests. *Id.* ¶ 16; *see also* Decl. of Howard Lutnick ¶¶ 4-4 (describing that the national emergencies underlying the Challenged Orders "threaten[] the lives of [U.S.] citizens"). The Court agrees with Defendants that the public has a compelling interest in the "President's conduct of foreign affairs and efforts to protect national security." *See* Defs.' PI Opp'n at 41; *see also Winter*, 555 U.S. at 24.

But on May 28, a three-judge panel of the CIT issued an order permanently enjoining the IEEPA tariffs. *See* Opinion, *V.O.S. Selections, Inc. v. Trump*, No. 25-00066, at 48-49 (Ct. Int'l Trade May 28, 2025). The consequences described by the government officials in their declarations will flow, if at all, from that court's sweeping order. Under the circumstances, enjoining the application of the Challenged Orders to two family-owned toy companies will have virtually no effect on the government. *Contra* Defs.' PI Opp'n at 41-42 (arguing that "[P]laintiffs' proposed injunction would be an enormous intrusion on the President's conduct of foreign affairs and efforts to protect national security under IEEPA and the Constitution"). It will, however, protect those companies from irreparable injury should the CIT order be stayed or reversed. The Court concludes that the balance of equities and the public interest therefore favor

43a

Plaintiffs.  Besides, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803) (Marshall, C.J.).  The President cannot act unlawfully and then use the effects of having that action declared unlawful as a putative shield from judicial review.

## V.  CONCLUSION

Because IEEPA is not a law providing for tariffs and because Plaintiffs have satisfied the preliminary injunction factors, Defendants' motion to transfer venue is DENIED; and Plaintiffs' motion for a preliminary injunction is GRANTED.  The Court will stay operation of the preliminary injunction for 14 days.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: May 29, 2025        RUDOLPH CONTRERAS
                           United    States    District
                           Judge

44a

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEARNING RESOURCES, INC., *et al.*, | : : : : : : : |
| Plaintiffs, | : Civil Action No.: 25-1248 (RC) : |
| v. | : Re Document Nos.: 8, 9 |
| DONALD J. TRUMP, *et al.*, | : : |
| Defendants. | : |

## <u>ORDER</u>

### GRANTING DEFENDANTS' MOTION TO STAY

Upon consideration of Defendants' motion to stay (ECF No. 41) enforcement of the Court's order entered May 29, 2025 preliminarily enjoining the United States from collecting tariffs from Plaintiffs pursuant to Executive Orders 14,195; 14,228; 14,257; 14,259; and 14,266 (ECF No. 35); it is hereby

**ORDERED** that Defendants' motion is **GRANTED**. In issuing the preliminary injunction, the Court specifically referenced the related permanent injunction granted by the Court of International Trade. *See* Mem. Op. Denying Defs.' Mot. Transfer Venue; Granting Pls.' Mot. for Prelim. Inj. at 32-33,

45a

ECF No. 37. The Court acknowledged the national security and foreign policy concerns raised by Defendants but determined that those consequences would flow, if at all, from the CIT's more sweeping order. *Id.* That order has now been stayed by the Court of Appeals for the Federal Circuit. A stay in this action is therefore appropriate to protect the President's ability to identify and respond to threats to the U.S. economy and national security; and it is

**FURTHER ORDERED** that the effects of this Court's order granting Plaintiffs' motion for a preliminary injunction (ECF No. 35) and the accompanying memorandum opinion (ECF No. 37) are hereby stayed pending disposition of the pending appeal before the United States Court of Appeals for the District of Columbia Circuit.

**SO ORDERED**.

Dated: June 3, 2025          RUDOLPH CONTRERAS
                            United States District
                            Judge

46a

**United States Code Annotated**

**Title 50. War and National Defense**

**Chapter 35. International Emergency Economic Powers**

**§ 1701. Unusual and extraordinary threat; declaration of national emergency; exercise of Presidential Authority**

**(a)** Any authority granted to the President by section 1702 of this title may be exercised to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat.

**(b)** The authorities granted to the President by section 1702 of this title may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose. Any exercise of such authorities to deal with any new threat shall be based on a new declaration of national emergency which must be with respect to such threat.

47a

**United States Code Annotated**

**Title 50. War and National Defense**

**Chapter 35. International Emergency Economic Powers**

**§ 1702. Presidential authorities**

**(a) In general**

**(1)** At the times and to the extent specified in section 1701 of this title, the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise—

> **(A)** investigate, regulate, or prohibit--
>
>> **(i)** any transactions in foreign exchange,
>>
>> **(ii)** transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,
>>
>> **(iii)** the importing or exporting of currency or securities,
>>
>> by any person, or with respect to any property, subject to the jurisdiction of the United States;
>
> **(B)** investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national

48a

thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States; and. [1]

**(C)** when the United States is engaged in armed hostilities or has been attacked by a foreign country or foreign nationals, confiscate any property, subject to the jurisdiction of the United States, of any foreign person, foreign organization, or foreign country that he determines has planned, authorized, aided, or engaged in such hostilities or attacks against the United States; and all right, title, and interest in any property so confiscated shall vest, when, as, and upon the terms directed by the President, in such agency or person as the President may designate from time to time, and upon such terms and conditions as the President may prescribe, such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States, and such designated agency or person may perform any and all acts incident to the accomplishment or furtherance of these purposes.

**(2)** In exercising the authorities granted by paragraph (1), the President may require any person to keep a full record of, and to furnish under oath, in the form of reports or otherwise, complete information relative to any act or transaction referred to in paragraph (1) either before, during, or after the completion thereof, or relative to any interest in foreign property, or relative to any property in which any foreign country or any national thereof has or has had any interest, or

---

[1] So in original. The period probably should not appear.

49a

as may be otherwise necessary to enforce the provisions of such paragraph.  In any case in which a report by a person could be required under this paragraph, the President may require the production of any books of account, records, contracts, letters, memoranda, or other papers, in the custody or control of such person.

**(3)** Compliance with any regulation, instruction, or direction issued under this chapter shall to the extent thereof be a full acquittance and discharge for all purposes of the obligation of the person making the same.  No person shall be held liable in any court for or with respect to anything done or omitted in good faith in connection with the administration of, or pursuant to and in reliance on, this chapter, or any regulation, instruction, or direction issued under this chapter.

**(b) Exceptions to grant of authority**

The authority granted to the President by this section does not include the authority to regulate or prohibit, directly or indirectly--

**(1)** any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value;

**(2)** donations, by persons subject to the jurisdiction of the United States, of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering, except to the extent that the President determines that such donations (A) would seriously impair his ability to deal with any national emergency declared under section 1701 of this title, (B) are in response to coercion against the

50a

proposed recipient or donor, or (C) would endanger Armed Forces of the United States which are engaged in hostilities or are in a situation where imminent involvement in hostilities is clearly indicated by the circumstances; or

**(3)** the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds. The exports exempted from regulation or prohibition by this paragraph do not include those which are otherwise controlled for export under section 46043 of this title, or under section 46053 of this title to the extent that such controls promote the nonproliferation or antiterrorism policies of the United States, or with respect to which acts are prohibited by chapter 37 of Title 18;

**(4)** any transactions ordinarily incident to travel to or from any country, including importation of accompanied baggage for personal use, maintenance within any country including payment of living expenses and acquisition of goods or services for personal use, and arrangement or facilitation of such travel including nonscheduled air, sea, or land voyages.

**(c) Classified information**.--In any judicial review of a determination made under this section, if the determination was based on classified information (as defined in section 1(a) of the Classified Information

51a

Procedures Act) such information may be submitted to the reviewing court ex parte and in camera. This subsection does not confer or imply any right to judicial review.

52a

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LEARNING RESOURCES, INC. and HAND2MIND, INC., | |
| *Plaintiffs*, | Case No.: 1:25-cv-01248 |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity; KRISTI NOEM, Secretary of the Department of Homeland Security, in her official capacity; U.S. DEPARTMENT OF HOMELAND SECURITY; SCOTT BESSENT, Secretary of the Treasury, in his official capacity; U.S. DEPARTMENT OF THE TREASURY; HOWARD LUTNICK, Secretary of Commerce, in his official capacity; UNITED STATES DEPARTMENT OF COMMERCE; PETE R. FLORES, Acting Commissioner of Customs & Border Protection, in his official capacity; U.S. CUSTOMS & BORDER PROTECTION; JAMIESON GREER, U.S. Trade | |

53a

Representative; and THE
OFFICE OF THE U.S. TRADE
REPRESENTATIVE,

*Defendants.*

### DECLARATION OF RICHARD WOLDENBERG IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

I, Richard Woldenberg, declare as follows:

1.      My name is Richard Woldenberg, and I am the CEO of Learning Resources, Inc. and hand2mind, Inc. (collectively, "LR/h2m" or the "Companies"). I am over the age of eighteen, have personal knowledge of the subject matter, and am competent to testify concerning the matters in this declaration.

2.      LR/h2m are part of a private, family-owned group of companies which develop, market, and sell educational products, educational toys, and pet toys. We market our products under brands such as LEARNING RESOURCES, EDUCATIONAL INSIGHTS, HAND2MIND and BRIGHTKINS. Learning Resources and hand2mind are related legal entities under common ownership, common control, and common management with various corporate functions managed as "shared services" for the benefit of both companies. The Companies share more than 100 employees, including certain senior officers and managers such as myself, share a single line of credit, and operate with a common supply chain department.

3.      Our family business is now in its fourth generation and dates back to a company purchased by

54a

my grandfather more than 100 years ago.  LR/h2m is a world leader in the development of experiential, hands-on learning materials which are sold in more than 100 countries.  We have more than 500 U.S. employees and full-time equivalents today.  Our products are developed in the United States, but we outsource manufacturing to factories in other countries, including (but not limited to) China, Taiwan, Korea, Vietnam, Thailand, and India. We also perform some of our manufacturing and assembly in the United States.  Our companies have offices around the country: in Vernon Hills, Illinois; Torrance, California; and Amherst, New York.  We also have employees that work remotely in other states.  We ship from our warehouses in Vernon Hills, Illinois.

4.    I am providing this declaration in support of Plaintiffs' motion to preliminarily enjoin and set aside the implementation and enforcement of recent Executive Orders that impose additional tariffs under the International Emergency Economic Powers Act (IEEPA) on goods imported from China, Taiwan, Korea, Vietnam, Thailand, India, and other countries from which we import.

5.    LR/h2m directly imports from these countries, and both companies pay duties and tariffs on imports directly.  When we import, we purchase and take title to the products in the foreign country and thus own the merchandise at the time of importation.  Specifically, we manufacture toys and other products in China, Taiwan, Korea, Vietnam, Thailand, India, and other countries that we then import into the U.S. and sell to brick-and-mortar retailers, online marketplaces and web merchants,

55a

school suppliers and other resellers, schools, teachers, and consumers. We also export our products to customers in other countries.

6. The scale of the IEEPA tariff burden is unsustainable and threatens our ability to continue those trade streams because we are not able to absorb the additional tariff costs without changing our pricing radically. Approximately 60% of the products we sell or consume as components (by cost) are manufactured in China, and "made-in-China" products represent a similar percentage of our revenue. The new 2025 tariffs are in addition to Section 301 China tariffs in effect since 2018. With the additional IEEPA China tariff of 10% effective February 4, 2025, and 20% effective March 4, 2025, and additional China universal 10% tariff effective April 5th which was later replaced with a reciprocal 34% duty, subsequently increased to 84% (items entered April 9th), and further increased to 125% (items entered April 10th and onward), we are now responsible to pay at least 145% duty and tariffs on all products made in China, with certain products being assessed total duties and tariffs of 170% or more taking into account the additional 25% Section 301 China tariff plus general rate of duty, if applicable. These rates are now so high as to effectively prevent importation.

7. The Companies have collectively already paid over $1 million based on the new 2025 tariff rates, with both Companies having paid the 10% and 20% initial IEEPA tariffs on China as well as the initial universal "reciprocal" tariff of 10%. Those shipments left port before the increased 125% reciprocal tariff

56a

rate on China took effect. When that rate was announced with only a few hours advanced notice, we stopped as many shipments from China as possible to avoid an unplanned extraordinary expense. However, on such short notice, we were not able to stop 19 shipments for the benefit of both Learning Resources and hand2mind arriving between April 24th and May 13th with more than 75% by value expected to be assessed at the 145% combined tariff rate. We did authorize one air shipment of a small amount of product with an entry date of April 20th subject to the 145% combined tariff rate. The Companies are currently evaluating how to manage the importation (entry) of these pending shipments, but both Companies have an intention to import at least some items subject to the 145% tariff rate from these shipments. We cannot presently estimate the tariff cost each Company will actually incur but the total estimated duties and tariffs on all of the merchandise in those twenty shipments is greater than $1 million and each Company expects to pay a portion of that sum, which constitutes an extraordinary and unplanned expense. For any merchandise within these shipments that we decide to re-export in order to avoid paying duties at a rate of at least 145%, we expect to incur additional losses for transportation charges to ship that merchandise away from the United States and special handling and transaction fees relating to these shipments.

8. The tariff rates assessed on the countries from which we source our products have been changing frequently in 2025. Inclusive of the universal and reciprocal tariffs announced on April

57a

2nd, 8th, 9th and 10th, but before taking into account the 90-day "pause" in the collection of certain tariffs announced on April 9th, which may affect a small percentage of our products (but not those from China), we currently believe that an "apples-apples" estimate for 2025 duties and tariffs based on our 2025 full-year budget (unadjusted for on-hand inventory or any possible economic downturn) would be more than $100 million in cash expenditures, versus 2024 actuals of $2.3 million in duties and tariffs paid. In other words, given the ever-changing situation with the IEEPA tariffs, considerable uncertainty about future economic conditions and trade rules, and the as-yet-unknown decisions we will make to survive under these rapidly evolving conditions, I currently project that we would experience an almost 44x year-over-year increase in duties and tariffs using our 2025 plan as the base case. We currently estimate that more than 95% of these tariffs would derive from products made in China now, which is a tacit ban on manufacturing in China in practical effect. Additionally, we are incurring significant unrecoverable costs and expenses, not to mention time lost, dealing with ever-changing tariff rates and massive disruptions in our supply chain, business relations, and business operations.

9.     There is no way to fully offset the costs of current tariffs through vendor concessions or expense reduction—the number is too enormous and many times our projected annual income. LR/h2m may be forced to raise prices as much as 70% (or possibly more) as a matter of pure survival. Some of our customers with urgent programs requiring imports

58a

that cannot be delayed are already facing price increases of more than 100%. This level of price inflation is very destabilizing to our business relations and frankly is terrifying.

10.    These tariffs will severely and irreparably harm LR/h2m. Mid-year price increases from tariffs are expected to cause a market shock and an immediate and sustained decline in sales. As of April 21st, we have received cancellations and "stop shipment" instructions for direct import orders totaling more than $1 million because of the new tariffs. We have been notified by certain customers that they will not take any direct import shipments from China so they can avoid paying the tariffs, which places all financial risk on our companies. Customers have also contacted us about their fears of future shortages and price shocks and asked about our ability to keep them supplied. We believe some customers have moved up domestic orders with us to "grab" inventory while they can. Due to the lag time between the imposition of the tariffs and the pending gap in replenishment shipments, we are projecting outages beginning in a matter of weeks, which are traceable to a halt in import shipments beginning on April 9th. For a company built on high service, the prospect of a looming sharp service decline is very threatening. At present, there is little we can do to stop the stock outage catastrophe from happening owing to supply chain chaos, an incredibly burdensome and constantly shifting tariff landscape, and a very high price to be paid for incorrect logistical judgments.

11.    After the first tariffs were announced in January, we pivoted from planning based on our 2025

59a

budget scenario of sales up 8%, to a scenario with sales down 25%—and now believe the sales decline may be as great as 40% or even 50% year-over-year. Following the substantial tariff increases announced on products from China between April 2 and April 10, 2025, we effectively stopped importing nearly all of the roughly 2,400 products that we source from China. We expect that the IEEPA tariffs on other countries will also substantially harm our sales because of the same factors.

12.    This is a shocking turn of events for our companies, which have been growing faster than the overall toy industry in the period 2019-2024. In other words, I believe these tariffs have likely ended our record of exceptional growth and replaced it with an expectation of an imminent sharp decline in sales.

13.    To address the financial impact of the sudden, unbudgeted and massive tariff cost and to attempt to protect the market for our products, we have been working to cut our operating expenses by 10% since January and will need to cut those expenses even further because of the recently announced new tariffs. Our cost cutting focus has been on cash expenditures like advertising, CapEx, and hiring. We have also considered reducing service levels (such as by increasing delivery times) to lower costs, which would intentionally degrade our operational performance and hurt our brand reputation in a market that expects fast delivery. We are scrambling to do everything in our power to save jobs. Both Companies have been named a Top Workplace by the Chicago Tribune in each of the last five years — losing our team would be a devastating loss.

60a

14.    Our companies cannot possibly absorb the costs of these increased tariffs.  By way of illustration using our 2025 business plan, if we cut **every** expense in our 2025 budget other than salary (*i.e.*, all expenses, including electricity, postage, health insurance benefits and rent), we would still not be able to cover the $100.2 million projected cost of the tariffs.  Vendor concessions will also be ineffective at making up a meaningful portion of this loss.  If we buy a product from China for $10, new inventory will now cost not less than $24.50 with tariffs before the costs of transport.  For the old cost of $10 to be preserved in new inventory, the vendor would have to cut its price to $4.08.  Our vendors struggle to give us even a 10% discount and they simply cannot give us a discount of almost 60%.

15.    We have no realistic way to cover these costs, which means the tariffs act as an immediate ban on the products we import.  We cannot even risk putting our Chinese-made products on the water for fear of paying 145% tariffs on arrival, which means we are already suffering a major disruption in our replenishment orders from China that grows more urgent by the day.  Even considering the very limited positive impact of vendor concessions and expense reductions, our only options to address this increase in costs caused by increased tariffs are (a) to pass the tariff cost to our customers in the form of much higher prices for our goods or (b) reducing the costs by making and selling cheaper, lower-quality products.  Both options would cause LR/h2m substantial harm.  Continuing to market goods subject to a 145% tariff is infeasible because our dealers and consumers will

61a

never pay those prices. We cannot pass along tariffs at rates like 46% (which was the country-specific reciprocal tariff announced for Vietnam) or even 25% (which was the country-specific reciprocal tariff announced for South Korea) for fear of alienating dealers and consumers who are ill-prepared for the coming deluge of massive price increases. Reducing quality is an unthinkable option for premium brands like ours and is practically infeasible, as it would require us to change the design and/or production of more than 2,000 products at once. That process would take years and cost millions of dollars out of pocket. Alternatively, we must consider discontinuing the import and sale of certain educational products entirely in the U.S., and we have already been forced to pause certain orders and shipments. It is completely unrealistic to avoid the tariffs by shifting our supply chain for more than 2,000 products, which would also take years and cost millions of dollars that we cannot spare. For a company built on a high-service model, this erosion in our operating standards exposes our brands to an uncertain future and the prospect of declining sales and reputation as service levels worsen.

**Passing the tariff costs to our customers will cause the Companies to lose profits, lose sales, and damage their reputation.**

16.    If LR/h2m attempts to pass along all, or substantially all, of the cost of the tariffs to its customers in the form of increased prices, we will sell substantially fewer goods. This is because, when LR/h2m materially increases the price of goods it sells, consumers demand fewer of those goods. Consumers

62a

are price-sensitive and will not accept a massive price increase on toys and educational products after the current sustained period of modest inflation in the United States. School accounts are already showing a significant reluctance to order for back-to-school because of funding uncertainty and limited budgets, a factor certain to be exacerbated by large price increases. Our dealer partners which resell our products will be squeezed by a sudden price increase and are highly likely to resist price changes notwithstanding our urgent need to recoup these expenses. I expect that, after massive price increases, our dealers will drop, adjust, or reduce the product ranges they offer to preserve their limited capital, thus shrinking our market and increasing the risk that our brands will be marginalized. We will also be exposed to credit losses on receivables from our customers as their businesses struggle in difficult conditions related to the tariffs, too.

17.   It is notable that more than 10% of LR/h2m's revenue is derived from sales to customers located outside the U.S., but a substantial volume of orders is filled from our U.S. warehouses. Inventory subject to the new tariffs will be completely uncompetitive in the world market; we cannot bear an extra tariff expense of 46% or 145% in our cost of goods when competing against products not subject to those costs in the international market. Certain tariffs imposed against China pursuant to IEEPA are not recoverable through duty drawback procedures, so our foreign customers will need to pay those costs if we fill orders with inventory which has entered the U.S. Consequently, we are planning to avoid using U.S.

63a

inventory or U.S. infrastructure (logistics, warehousing, labor) to service export orders, creating a major loss of profit for the company. Sales to customers located outside the U.S. will need to be filled with inventory that never crosses a U.S. border now. The expense of duplicating our infrastructure and avoiding use of our efficient automated U.S. facilities will lead to further losses. Although one of the Administration's stated goals was to bring manufacturing back to the U.S., the tariffs actually force our companies to avoid bringing certain inventory into or using distribution facilities in the U.S. to service our export customers. We believe this change creates an opening for foreign competitors to attack our market share and capitalize on a competitive advantage springing from the new tariffs.

18.    I know that the tariff impact will be severe because previous price disruptions have harmed the Companies. Mid-year price changes are rare in our business because they are received so negatively by our dealers—they are always a last resort. We have issued unscheduled price increases only a few times in the last decade or so, and each time we faced customer revolts. We have seen examples of customers reconfiguring their buys when dealing with limited budgets. We have some customers who do not accept price increases easily. We have experienced certain key customers refusing to trade for weeks or months, sometimes not replying to our emails or even calling us back, because of price increases of less than 2%. Obviously, we would need to increase prices by a much greater amount than that in order to remain profitable while incurring tariffs at 145%. Some customers have

64a

dropped products to resist pricing or to address declining margins or sought substitutions from competitors. In my experience, toy consumers are particularly sensitive to price changes and will trim their buying based on economic conditions and prospects. While toys may be a "necessity" good, in the past consumers have migrated to lower price toys when money is tight as in inflationary periods or during a recession.

19. When customers demand fewer goods, it lowers the Companies' total profits. Based on my experience, even if LR/h2m were to receive a retroactive duty refund from the federal government for the unlawful tariffs it had to remit, the lost profits from decreased demand for its imported goods will exceed that refund, leaving LR/h2m in a substantially worse financial position than if the challenged tariffs were never imposed. Given the massive scale of the increase in duties and tariffs, the Companies may also face a major cash squeeze. To meet holiday season demand and to preserve our high-service model, we must build up our inventory over a period of months in advance. This creates a situation where we would incur extraordinarily large duty and tariff expenses on imports months before we expect to sell the inventory to recoup those expenses. We pay our bills (such as import duties and tariffs) by borrowing under our revolving line of credit, and we repay our line of credit from receivables collected later from our customers. The cash-to-cash cycle of our business can be six months or longer and the huge new tariffs may lead to far greater peaks in our loan balances. Rising loan balances will raise our interest costs and could make

65a

obtaining financing much more difficult. The Companies' ability to renegotiate its line of credit cannot be evaluated because of the unique circumstances of the new tariffs and the resulting economic uncertainty.

20.     Separately, if LR/h2m raises prices on goods to pass along the cost of the challenged tariffs, it will harm the goodwill and brand reputation that it has built with its dealers, schools, teachers, and consumers over decades. Our brands are considered "premium" brands with a strong reputation for excellent quality, content, and value pricing. Since our products are intended as educational tools, we have always priced our products to be good values and accessible to all children and all families. Sharply higher prices would be perceived as a breach of our brand promise by many consumers. Some customers may stop purchasing from LR/h2m in favor of substitutes or alternatives if our prices rise suddenly or if we stop selling cherished products. Even if the challenged tariffs are ultimately declared unlawful, customers who have already left may not return to buy from the Companies.

21.     Because of the tariffs, we have already had to cancel shipments and delay production in China. At present tariff rates, I cannot foresee bringing in more product from China because the cost is now prohibitive. Our company depends on Christmas sales to survive. We do not have enough on-hand inventory to carry us through the holiday season unscathed and are already projecting stock outages beginning in a matter of just weeks. Without the practical ability to restock our goods made in China this year or instantly

66a

go into production on hundreds or thousands of products at competitive prices elsewhere, our Christmas season will likely be significantly impaired or possibly even ruined, leading to spectacular losses. Since the Christmas season is a time of celebration for the American public, it is foreseeable that Christmas will be ruined for many families and countless children, too, and of course, we are not alone in having this problem. Empty store shelves at Christmas time mean economic disaster for everyone, retailers and suppliers both, and for our economy.

**Off-setting increased costs from the challenged tariffs by using cheaper alternatives will harm the Companies' profits, sales, and brand reputation, and there is no available domestic "reshoring" manufacturing option.**

22. To fully offset the increased costs caused by the tariffs, I have considered whether LR/h2m could reduce quality, eliminate product features or sell products with fewer components. These less-expensive alternatives, however, would substantially harm LR/h2m's reputation because the quality of the products would disappoint our customers and breach the brand promise. Lower quality products will result in fewer sales as well as substantial harm to customer goodwill and to our corporate reputation. Our industry is subject to strict regulation for toy safety, so in many cases, a downgrade in product quality is not even an option. In any event, we have no practical ability to redesign our many products overnight and relocate production to destinations unknown without it taking years and costing millions of dollars.

67a

23.    I am absolutely certain that LR/h2m
cannot source or manufacture its products
domestically as a practical matter. Despite strong
market and financial incentives to find local
manufacturing for our products, our resourcing efforts
to date (over several years) have failed to yield even
one qualified and willing U.S. vendor capable of
making our non-print products. There are many
reasons for this: (a) our products are typically made in
short runs (production runs of small quantities or
durations of only a few days), which is too inefficient
for U.S. manufacturers operating in expensive
facilities using scarce, high-priced labor; (b) our
products typically require assembly and complex
packaging, which is very labor-intensive (again, labor
is expensive and in short supply); (c) we require a very
high finish and many of our products require many
different manufacturing functions that are not often
found in the United States; (d) the U.S. market is ill-
equipped to make our thousands of different products
requiring specialized facilities, equipment, and
fixtures; and (e) a geographically concentrated
manufacturing hub does not exist to serve the myriad
needs and inputs required for efficient manufacturing
of our products in the U.S. Despite our years-long
experience with sophisticated operational software
systems and automated material handling equipment
(including warehouse robots), we have searched for
and failed to identify any viable automation or
technology option to solve the cost problem posed by
domestic manufacturing. T here is simply no
manufacturing market anywhere that can replace
China for everyone all at once—at least without years
of advance notice. Consequently, the effects of the

68a

tariffs on global supply chains will devastate small and medium-sized businesses like ours.

24. Our Companies have for several years investigated and invested in frontier manufacturing markets to reduce our dependence on our Chinese supply chain. After a lot of effort and roughly $2 million in out-of-pocket costs, we have only been able to move or resource about 16% of our manufacturing from China to other countries (principally, India or Vietnam). The challenges in moving items out of China are myriad: (a) costs are often higher and labor is in short supply; (b) factories have limited capacity and limited manufacturing experience suited to U.S. market needs; (c) factory quality control is often unsophisticated; (d) timelines are often unreliable; (e) critical components may not be available locally or be of unacceptable quality; (f) production is often slow and inefficient, including mold making; (g) certain critical skills may be missing; (h) commitment to cleanliness or other measures of modern factory management may be missing or inadequate; (i) ethical manufacturing standards imposed by our industry require extra surveillance in frontier markets; and (j) experience dealing with key retailers like Walmart and Target may be limited or required certifications have not been obtained. Training new factories to meet the needs and expectations of the U.S. market takes a long time, often years. There is no well-developed, high capacity, high caliber manufacturing hub anywhere standing idle waiting to make our many products. Moreover, even if we were able to switch our sourcing to countries other than China, the President has imposed IEEPA tariffs on almost every other

69a

country.  We therefore would not only incur millions of dollars in expenses to shift our production, but we would still face millions more in duty and tariff costs than we experienced previously, even if we could find alternative suppliers in other countries.

25.     It is also worth noting that the process of resourcing from China to other markets can have the effect of destabilizing our Chinese supply chain, which is very dangerous and threatening to our business.  We must be very methodical and careful in shifting our production while at the same time preserving the financial health of our factories.  It's a delicate process.  Triggering a bankruptcy by a key supplier would be financially devastating to our companies, not to mention a catastrophic organizational failure as these factories are often close friends and longtime allies of our companies.

26.     We are also expecting to face massive downstream cost increases because of the tariffs.  For instance, we source many low volume Chinese-made products from domestic suppliers focused on other markets (such as paper products supply or food service supply) for use in school science kits.  We don't consume enough of these components to tool up and import them directly.  We are therefore dependent on the domestic distributors to manage the tariff costs.  Those items are facing price hikes reflecting the current 145% tariffs on Chinese goods.  Because we are not the importer for these products, even if the tariffs are eventually set aside and importers are provided refunds, we will not be the recipient of refunds for these products.  Our ability to meet strained school budgets with much more expensive

70a

basic supplies is limited.  It is entirely possible that some basic school supplies will cease to be available on the U.S. market.

27.    Other anticipated negative consequences for our Companies directly traceable to the tariffs include: (a) potential widespread job losses if we are unable to make a profit with a transformed business model; (b) an impaired ability to plan and run our business efficiently in an ever-changing environment of oscillating tariffs and changing terms for international trade; (c) a destabilized manufacturing base may force many suppliers into bankruptcy leaving us without critical suppliers or essential manufacturing capacity for a long period of time, thereby triggering further losses; (d) a synchronized bankruptcy crisis faced by many factories simultaneously may cause a "rush for the door" by U.S. importers, leading to manufacturing gridlock lasting years because of the limited ability of alternative markets to absorb the new demand; (e) mounting port congestion resulting from orders cancelled over tariffs could lead to a major spike in ocean freight rates as happened in the pandemic; (f) a combination of these problems could lead to a chain reaction that cannot be stopped causing massive economic damage that cannot be recouped or addressed for many years (such as synchronized bankruptcies of many factories and their U.S. importer customers at the same time); (g) supply chain disruptions could lead to massive business interruption claims on insurance policies and widespread defaults under lines of credit issued by American banks; (h) relief from tariffs may never come from much-hyped rising domestic manufacturing

71a

(reshoring) if companies fear that the tariff regime might later be reversed thereby rendering their big reshoring investments obsolete; (i) capital destruction from extraordinary expenses and loss of business is likely permanent and not recoverable; and (j) foreign markets may reduce access to products or services sold by American companies, whether made in the U.S. or not, leading to further business contraction and profit loss.

**The Companies cannot absorb the tariffs pending the outcome of this litigation and a subsequent refund action.**

28.    It is not an option for LR/h2m to sell manufactured goods to its customers at the same price prevailing before the challenged tariffs.  If LR/h2m were to maintain its prices, then it would quickly be unable to service its bank debt and mortgages and fall into default.  The Companies cannot absorb losses during the pendency of this litigation and will be forced to take drastic steps like: sharply raising prices and sharply reducing spending; refinancing loans on unfavorable terms; significantly scaling back operations and product offerings; closing facilities; laying off employees; or even selling the company after more than 100 years of family ownership.  These are all enormously harmful to the Companies' long-term financial and corporate health—indeed, its very existence.  We are trying to avoid as many of these measures as possible for as long as possible, but each day that the tariffs remain in place is causing further irreparable harm to the Companies and brings us closer to having to adopt such drastic measures.  If tariffs are kept at current levels without relief, we face

72a

an increasingly grim future, like all other similarly situated small and medium-sized companies who depend on foreign manufacturing hubs.

\* \* \*

29. If Plaintiffs obtain a preliminary injunction against collection of the IEEPA tariffs, then these irreparable harms will not occur.

I, Richard Woldenberg, declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dated: April 24, 2025.

<u>/s/ Richard Woldenberg</u>
Richard Woldenberg

73a

[1](Caption)

[2](In open court; case called)

THE COURT:  Good afternoon.

All right.  There's been a lot of paper filed in this court and others, and I've read everything.  So don't feel you have to repeat everything that's in the papers—I've read it all—but make the strongest points you think I need to get reinforced and I'll rule as promptly as possible.

So it's the plaintiffs' motion.  So why don't you go first.

MR. SHAH:  Thank you, Your Honor.

If I may start, maybe, with a procedural point to kick things off, the Court has before it, as you know, two motions:  one on jurisdiction and one on the merits that ultimately rise and fall together on an overlapping [3] question.  That question is whether IEEPA is a law providing for tariffs.  That is a pure legal question and, as briefing has confirmed here and in the other cases, there are no material disputes of fact.  Indeed, all have agreed in those parallel CIT cases to treat the preliminary injunction motions as summary judgment motions, and this Court can do the same here to resolve the merits in a final judgment under Rule 65(a)(2).  If this Court agrees that IEEPA does not authorize the president to levy tariffs, including the unprecedented revamping of our nation's global tariff policy in the challenged executive orders at issue, then this Court should deny transfer and grant judgment on that dispositive basis and it doesn't have to reach the secondary arguments.

74a

Now, as to jurisdiction specifically, the Government asks—

THE COURT: Mr. Shah, can you slow down just a little. I suspect, at some point along the line, someone else will look at this transcript and I think it should be as clear as possible.

MR. SHAH: Sure. Of course.

As to jurisdiction, the Government asks this Court to punt to the CIT, which has never exercised jurisdiction over an IEEPA case until now, rather than fulfill its unflagging obligation to determine its own jurisdiction. In doing so, the Government avoids the text of CIT's [4] jurisdictional statute which confers exclusive jurisdiction over cases, quote, "arising out of laws providing for tariffs or for the administration and enforcement of tariffs." Because this action arises out of IEEPA—that is the law—jurisdiction here turns on whether IEEPA provides for tariffs. The answer to that question is no. The Constitution confers tariffing power exclusively on Congress, and IEEPA's statutory text both on its face and in context doesn't delegate that power to the president to wield as he sees fit. Indeed, every other time Congress has delegated tariff authority, as the numerous statutes and Title 19 show, it has done so in more explicit terms with explicit limitations and explicit safeguards, not using the generic and distinct term "regulate." Presumably, that is why no president had ever invoked IEEPA or even the preceding TWEA statute to impose tariffs. The Government relies on President Nixon's 1971 proclamation, but even he never invoked TWEA. Instead, he actually invoked two tariff-specific statutes. Yoshida—the appellate decision in Yoshida,

75a

which was wrong then as to TWEA and is certainly wrong now as to IEEPA, cannot salvage the Government's position.

And if I can take a moment to take a step back, because I think, essentially, on the statutory text point, this is going to come down to whether you think the phrase [5] "regulate imports" in IEEPA encompasses the tariff power.  And I think, to help answer that question, it's helpful to start with the constitutional structure, history, and text which, I think, will inform and show that the taxing power is a distinct power such that Congress has to speak with some measure of clarity before delegating it, and I think a good place to start is the text of the Constitution which separates out the power to levy, impose duties.  That's in Article I, Section 8, Clause 1.  It separates that out from the power to regulate foreign commerce which is in Article I, Section 8, Clause 3.   All three branches have taken that distinction seriously.

Just to start with the Supreme Court in Gibbons—this is just a few decades after the framing—Chief Justice Marshall, this is what he wrote:  "We must first determine whether the act of laying duties or imposts on imports or exports is considered in the Constitution as a branch of the taxing power or the power to regulate commerce.  We think it is very clear that it is considered as a branch of the taxing power."

"In a separate clause of the enumeration, the power to regulate commerce is given, as being entirely distinct from the right to levy taxes and imposts and as being a new power, not before conferred.  The

76a

Constitution, then, considers these powers as substantive, and distinct [6] from each other, and so places them in" enumeration in different clauses.

That's the Supreme Court speaking, again, a few decades after the framing.

Then we have Congress, the second branch, coming in. Every single time it has sought to implement that Article I, Section 8, Clause 1 power to impose tariffs, it has done through—through specific languages referencing taxes, duties, customs, tariffs, and the like. That's every single statute that does it in Title 19, including the Trade Act of 1974 which came shortly after President Nixon's invocation—not his invocation—but his proclamation invoking other tariff statutes. And, as a juxtaposition of that, every time Congress has done—delegated the tariff authority, it's made it explicit. In contrast, when it's used the word "regulate" in statutes, and also, intended to give the taxing power, it has said both terms. It says "regulate and tax" or "regulate and impose duties," and we've cited those statutes on Pages 4 and 5 of our reply brief on the preliminary injunction motion. To date, the Government has still not cited a single statute in the history of the United States Code where "regulate" has—standing alone, has been construed to levy tariffs except for the outlier Yoshida decision. So that's the second branch.

[7] The third branch, the president. The president, in the history of this country, under either TWEA or IEEPA, has never invoked that language to impose tariffs. It has never done it; right? President Nixon didn't do it, and certainly no president since IEEPA was passed 50 years ago. Eight presidential

77a

administrations—four from each party—no one has ever invoked it until now to impose tariffs.

So you have all three branches taking seriously the Constitution's distinction between "regulate" foreign commerce and "impose tariffs and taxes." Now, with that backdrop, we can turn to the actual text of IEEPA. And if we look at IEEPA, Section 1702, it has a bunch of terms in there; right? It uses a lot of verbs. The verbs are "prohibit," "prevent," "nullify," and "void"; right? All of those speak to essentially cutting off or banning all transactions with a foreign entity. Under the noscitur canon, typical statutory construction, you interpret other terms in a phrase along—in a common way with those terms that I just mentioned. So when you're construing "regulate" in light of "prohibit," "prevent," "nullify," and "void," none of which have anything to do with raising revenue or collecting money, it's sensible to construe "regulate" in its literal meaning; that is, to restrict the flow, to regulate the flow of commerce, to limit it short of a ban [8] which gives it independent context. That definition—that natural construction is actually consistent with the history. If you look at that first Yoshida decision which the three-judge customs court issued, it actually goes through extensive history on what the term "regulate" means, and throughout the history of TWEA—and this has continued under IEEPA—the primary mode of regulation that presidents have used short of the banning of transactions is through licensing restrictions; right? And there's a whole export administration regulation that we cite in our brief. And, again, the Yoshida 1 does an extensive look at the history. That is what

78a

"regulate" means there, restrict the flow of, typically through licensing.  Never before has it ever been used to mean "taxing" or "tariffing" which, for all the reasons I talked about before, is completely different in kind.

The other textual point I would make, Your Honor—and this one is actually made in the congressional amicus brief that was filed in the Oregon CIT case.  It wasn't filed in our case because briefing had already closed, but it's on Page 24 of that brief and it's at peace with the arguments I'm making.  What it points out is Section 1702 says "regulate importation or exportation," but we know from the Constitution, Article I, Section 9, Clause 5, that it's unconstitutional to tariff exports.  "Regulate" [9] has to have the same meaning with respect to importation or exportation in 1702.  So if it can't mean tariffing exports because we know the Constitution prohibits that, it doesn't make sense to construe the term to mean tariffing power there.  Under the canon of constitutional avoidance, one would construe it in a way that gives full effect to the term and not assume that Congress delegated an unconstitutional power to the president.

So for all of those textual reasons, consistent with the constitutional history and all three branches, you should not interpret lightly "regulate" to encompass the tariff power.  I haven't even gotten to the major questions doctrine.  I don't think you need to rely on it.

THE COURT:  Tell me, again, where that amicus brief by a Congress—

MR. SHAH:  Yes.

79a

THE COURT:—that has that argument in it—

MR. SHAH:  It—

THE COURT:—exists.

MR. SHAH:  Right.  It's on Page 24 of the congressional members' amicus brief, and that was filed in the Oregon case in the CIT docket.

THE COURT:  Okay.

MR. SHAH:  And, again, so all of that—I haven't even mentioned major questions doctrine yet because I think [10] this can be decided on straightforward statutory interpretation for all the reasons I've said, but whether you want to view this as a major questions case or just ordinary statute interpretation, the Supreme Court—the modern Supreme Court—has been very clear that it is cautioning courts before you assume vast delegations of significant Article I powers.  That should be especially true for something as special as the tariffing and taxing power.  The Government tries to argue, "But, hey, here, we're in a foreign affairs/national security context.  You should ignore 'major questions.'  You should assume Congress is delegating."  But this is not an Article II power.  The tariffing and taxing power is dedicated Article I power.  If anything, it should be stronger with respect to that power.

If you adopted the Government's construction such that "regulate," "importation," and "exportation" here included the tariff power, that would also tend to swallow the very carefully reticulated regime that Congress has done in all those other statutes:  201, 301, 232, 122, 338.  All of those statutes that appear in

80a

Title 19, you wouldn't—you could set aside all of those limitations and procedures because the president, in declaring any national emergency—which the Government says is non-reviewable—can do any of the tariff actions it wants.    And, remember, the Government says on Page 20 of its opposition brief to [11] the preliminary injunction there are no textual limits on the rate of tariffs, on the number of countries to—it can be imposed upon, upon the duration of the tariffs.  No limit.  So that also runs into non-delegation concerns.  The major questions doctrine also has a flavor of non-delegation.  So again, all of those things reinforce what, I think, is the plain-text construction here of "regulate" in light of all of that constitutional history.

The last argument I'll affirmatively make—and, obviously, I want to answer your questions, Your Honor—is the Government relies on this notion of ratification:  "Well, Congress passed IEEPA after Yoshida was decided and it didn't change the operative language, and so it must have meant to afford tariff power."  That is way too thin of a reed to overcome all of those statutory principles.  The Supreme Court has said over and over again that ratification is about as weak a reed as you have in interpretation.  Most recently in the BP case at 593 U.S. 230, it says when you're not dealing with settled precedent—settled Supreme Court precedent or at least a uniform settled body of lower court precedent, you should not assume that Congress is adopting a lower court interpretation. That is doubly true here where you have the Trade Act of 1974—that same Congress passed the Trade Act of 1974 just before IEEPA, and that Trade Act of 1974

81a

goes directly to the issue in Yoshida. It passed [12] Section 122 which put caps, limits on the balance-of-payment-type tariffs that you could do in response to the situation in Yoshida. And you even have Footnote 33 in the Yoshida opinion that the Government relies on. Footnote 33 says, "Look, after the tariff"—"after the Trade Act of 1974, we're not exactly sure what's going on here," and it says, "We're not going to opine on whether the president still has this sort of tariff authority, given that Congress has parceled it off"; right? So even Yoshida—the out-of-Circuit, 50-year-old precedent that conflicted with the three-judge panel opinion that found no tariffing authority—even if you read that, Footnote 33 suggests that it's not going all the way in light of the Trade Act of 1974.

So I think when you look at all of those signals and you look at the history of how we got here under IEEPA, how every presidential administration in our nation's history has interpreted it, how the founders have interpreted it, how the Supreme Court, Congress has, I don't think there is a way, certainly, under modern Supreme Court jurisprudence that you should read the general delegation of regulatory authority to contain the specific authority to impose tariffs.

THE COURT: All right. In your brief, you asked that I collapse the merits and the PI standard and rule on [13] the merits. And you, I believe, said that I can ignore irreparable harm in that context. I'm not sure that's right.

MR. SHAH: Yeah. It—so yeah. Let me amend that. So on the—I think it largely falls away because we're not asking for a nationwide injunction here. So if you were to rule on the merits and agree with us that

82a

IEEPA does not authorize tariffs, right, that would—that's a pure legal question. That would, obviously, allow you to enter judgment in our favor on that ground. T hen the question is, what relief do you have besides a declaratory judgment? All we're seeking is an injunction against the tariffs to be collected against our client. I'm not aware of any case in the history where a court has found final judgment that an order or law is unlawful and not accorded relief to at least the party bringing it. I think where that—and there shouldn't be any question that the irreparable harm that our client is suffering compared to the Government's ability simply not to collect from that one entity would somehow weigh in the Government's favor. So I think you do technically have to consider the irreparable harm, but it should be about the easiest balancing that you've ever done because it would be in the final judgment context.

What I take from the declarations that the [14] Government just submitted this morning from various cabinet officials is what they say is an adverse ruling would have adverse impacts. Well, that's a question of law that this Court has to decide one way or another. The fact that you would order them not to collect the tariffs from my one client isn't going to cause any great harm to the government. It's a pure legal question. So I think, on that question, you can enter final judgment, summary judgment, and then simply enjoin the collection of tariffs against our client. That's all we're asking for, and I think there's ample basis to do that here.

83a

THE COURT: All right. I know those declarations were filed this morning. So is there anything else you wanted to say in response to those?

MR. SHAH: Yeah. I mean, what I would say is— I mean, you just read them, you know? Ostensibly, they were filed about the preliminary injunction, but the declarations are much broader. I mean, here's what it says. This is Paragraph 3 from the Rubio declaration: "A ruling for the plaintiffs in this case would cause significant and irreparable harm to U.S. foreign policy and national security." Well, a ruling in this case is going to turn on pure legal question of whether IEEPA provides for tariffs. If it doesn't lawfully provide for tariffs, this Court has to hold that. We—the fact that the president invoked an [15] unlawful and illegal basis to do it can't be a shield against any consequences that flow from an Article III court declaring it unlawful. In fact, during the CIT hearing last week, counsel for the Government said the one issue that the Court can clearly resolve is the pure question of law of whether IEEPA authorizes tariffs. They said everything else is off the table. It's a political question. I'm only asking you to decide that one legal issue. So this—

THE COURT: Which I have to do anyway to determine venue.

MR. SHAH: That's right. To determine jurisdiction, because it is overlapping, you do have to do it. And, maybe, I'll add just one thing on that. I think the Government's argument on that is that you don't have to decide jurisdiction. You could just send it to the CIT. That contradicts a mountain of Supreme Court and D.C. Circuit precedent that says this court

84a

has to decide its own jurisdiction, and then the Government falls back on the point that says, "Well, when it's arguably within the jurisdiction of a court with exclusive jurisdiction, then you should punt," but we have a Supreme Court case on point, K Mart, which is a case that both sides discuss. That was exactly what happened there. The CIT and the Federal Circuit said, "Exclusive jurisdiction"—that was a different statute, not IEEPA—said, "Exclusive jurisdiction [16] in the CIT." This court and the D.C. Circuit said, "No, jurisdiction in this court," and the Supreme Court granted cert because of the conflict. That's how we get Circuit conflicts. Federal Circuit said, "Exclusive jurisdiction in CIT"; D.C. Circuit said, "Jurisdiction in this court"; and the Supreme Court sided in favor of jurisdiction in this court. It said, "We accept the D.C. Circuit's finding over the Federal Circuit's finding". There, in fact, was not exclusive jurisdiction. That was Section 526(a) of a trade act. Different issue. But under 1581(i), the same jurisdictional provision that we're talking about.

So I think K Mart defeats any notion that this court should not do its own work and decide its own jurisdiction. So I think you're exactly right, Your Honor. You do have to decide the question of whether IEEPA authorizes tariffs both for jurisdiction—and I think that's the only question you need to decide on the merits, because if you conclude—hopefully, you don't—if you do conclude that it does provide for tariffs, then, obviously, there's no jurisdiction and this case should be dismissed, but if you conclude that it does not provide for tariffs, well, then that means there's both jurisdiction in this court and you can enter

85a

final judgment on that basis, because nobody here contends—everyone contends that if [17] IEEPA does not authorize tariffs, the Government loses.

THE COURT:  All right.  I think those are all my questions for now.

MR. SHAH:  Thank you, Your Honor.

THE COURT:  Mr. Shumate?

MR. SHUMATE:  May it please the Court.

The president acted well within his authority under IEEPA when he imposed these tariffs, but the Court need not decide that merits question to grant the Government's transfer motion.  Instead, the Court should defer to the Court of International Trade which has exclusive jurisdiction over this case, is actively considering multiple challenges to the president's IEEPA tariffs, and has already denied an importer's request for a TRO based on a lack of irreparable harm. If the Court were to conclude otherwise, granting an injunction would kneecap the president on the world stage, cripple his ability to negotiate trade deals, and imperil the government's ability to respond to these and future national emergencies.  As the four secretaries explain in their declarations, granting any form of relief against the president's IEEPA tariffs would be catastrophic for our national security and foreign policy.

THE COURT:  Even declaratory relief?

MR. SHUMATE:  Well, they've asked for an [18] injunction.  And, again, I think we've been clear in our notice.  We've only asked the Court to consider the declarations for purposes of the balance of the equities.

86a

Going to irreparable harm, that's a point I'd like to address today.

But to avoid these types of catastrophic harms to the government, I'd like to emphasize three points, if I may. First, the Court should transfer the case because the CIT has exclusive jurisdiction. Second, even if you retain jurisdiction, the Court should deny the PI motion because the plaintiffs have failed to demonstrate irreparable harm. And, third, even if the Court reaches the merits—and the Court need not do so—IEEPA authorizes these tariffs.

If I may, let me first turn to jurisdiction and explain why the Court should transfer the case. Multiple courts, as the Court knows, have already concluded that the CIT has exclusive jurisdiction to consider challenges to the president's IEEPA tariffs. The CIT has already reached that conclusion in the Barnes case, the Montana district court in Webber, the Florida district court in Emily Ley, and the CIT three-judge panel last week stated on the record that they believe they have jurisdiction and they're considering the merits of the tariffs.

Now, plaintiffs have tried to cleverly bait the Court into reaching the merits by conflating both [19] jurisdiction and the merits, but you don't need to decide the merits to decide your jurisdiction. The D.C. Circuit's approach is to defer to the CIT's assessment of its own jurisdiction. Cases like SMC [ph], Miami Free Zone, Furniture Brands [ph], Henry Pollak, even when there's a close question about jurisdiction, the D.C. Circuit and district courts in this Circuit have said, "We defer to the CIT. They're the experts." Otherwise, it would destroy the entire exclusivity

87a

regime that Congress set up if multiple district courts reached their own conclusions on both jurisdiction and the merits. Instead, the appropriate course is to defer to the CIT, and there's no doubt what the CIT will conclude. The CIT, in Barnes, has already concluded that they have jurisdiction. The plaintiffs here will not be without a forum in which to press their arguments. They can press their arguments in the CIT, as many other importers are doing.

I think Webber and Barnes are the best example of how the Court can address the jurisdictional question without even touching the merits of whether IEEPA authorizes these tariffs. The CIT, in Barnes, again, said it has jurisdiction to review the tariffs. And the Yoshida case is binding precedent in the Federal Circuit on the CIT. It concluded that the precise language that the president relied on in IEEPA from the predecessor statute—the [20] Trading With the Enemy Act—regulate importation, authorizes tariffs. On that basis, the president relied on IEEPA. The CIT has exclusive jurisdiction to determine whether that statute authorizes the tariffs. I think the fundamental problem that the plaintiffs have with their argument is that they are interpreting the phrase "providing for" to mean "statutorily authorized by." That's not what the statute says. The statute says "provided by"—or "providing for," and in K Mart the Supreme Court says that phrase means "related to." And there is no doubt that the IEEPA is a law relating to tariffs. The president has relied on that statute to promulgate these tariffs; therefore, IEEPA provides for these tariffs regardless of whether or not IEEPA statutorily authorizes the tariffs. That's a

88a

question that the CIT can address.  The Court need not address that merits question to conclude that this is a law related to tariffs and the CIT is the one that decides whether or not these tariffs are lawful.

Even if you have any doubt about IEEPA, there's also the harmonized tariff schedule which comes from a statute.  It's 20—19 U.S.C. 2483. The IEEPA tariffs modify the harmonized tariff schedule.  That's a big thick book that lists all the tariffs that importers have to pay when they import their goods.  At a minimum, the harmonized tariff schedule is a law providing for tariffs, and that is [21] something that the CIT panel focused on at the hearing last week that provides for their jurisdiction.

And even if you have any doubts about any of that, we've also relied on 1581(i)(A)(1)(D) [sic] which provides for jurisdiction in the CIT for the administration and enforcement of tariffs. Undoubtedly, this is a matter that involves the administration and enforcement of tariffs.  Again, the IEEPA tariffs modify the harmonized tariff schedule; therefore, the CIT has exclusive jurisdiction to consider whether the tariffs are valid.

And if the Court otherwise were to accept jurisdiction, I think there are two fundamental problems.  Number one, you could potentially create a conflict with the CIT on both its jurisdiction on the— and on the merits which would be contrary to exactly what both the Constitution sets up, which is a scheme of uniformity with respect to tariffs and duties, and Congress's desire to give the CIT exclusive jurisdiction over tariff matters.  And, second, I think it's very likely that the court would be flooded with potentially

89a

thousands of other importers filing tariff lawsuits in this court. That's what happened in the 301 tariff cases which initially there was one case in the CIT challenging the 301 tariffs. Eventually, there were over 4,000 tariff cases. So if the Court accepts jurisdiction in this case, given that national venue is [22] proper in this court, I think it's very likely you would see a flood of other importers file in this court for the very reason I think the plaintiffs filed in this court which is to avoid the controlling precedent in the Federal Circuit which is the Yoshida precedent.

The second point I'd like to cover, Your Honor, is the preliminary injunction and lack of irreparable harm. So even if you—

THE COURT: Before we get to that point—

MR. SHUMATE: Sure.

THE COURT:—what is your position in response to the plaintiffs' request that I collapse the merits and the PI?

MR. SHUMATE: We object to that, Your Honor. They had moved for a preliminary injunction. They have to show irreparable harm. Under Rule 65, the defendants are entitled to notice if the Court's going to convert the motion into a final judgment. We haven't had that notice. We would have had more time to brief the case if this were not a PI motion. We would have developed our arguments further. We may have built the record out even further. And I would just say even if the plaintiffs—I commend them for not seeking a nationwide injunction, but they are still seeking injunctive relief. Whether at the PI stage or at the permanent stage, they still have to demonstrate [23]

90a

irreparable harm, and they can't make that showing on this record.  If I can make that point, I'd like to make that point.

So first of all, as I mentioned earlier, the CIT has already denied a TRO and the three-judge panel in the CIT has already explained the importer in that case couldn't demonstrate irreparable harm.  Same here. I think the fundamental reason why the—none of these importers can demonstrate irreparable harm is that a refund remedy will be available at the end of the case should the plaintiffs ultimately prevail.    This is something the CIT often does.  The Federal Circuit has precedent on whether—when and whether refunds are available.  It's one of the rare cases where a plaintiff who prevails in a challenge to government action can get a monetary award as a remedy.    So if these plaintiffs, you know—if they incur costs due to the tariffs and they pay import duties as a result of the IEEPA tariffs, a refund remedy will be available to them at the end of the case and, as you know, if harm is able to be remedied by a court at the end of the case, there is no irreparable harm.

THE COURT:  But if the tariffs are so high that the party can't import at all, then there's no tariffs paid and so there's no remedy; is that right?

MR. SHUMATE:  I don't think that's the case here. [24] I think what the plaintiffs are arguing to try to get around that, kind of, direct financial injury is to argue there are other indirect consequences and costs attributable to the tariffs, but those are, you know, ordinarily—ordinary economic harms which are traditionally not cognizable as irreparable harm in the D.C. Circuit. As you know, the D.C. Circuit has a very

91a

high standard of irreparable harm. Typically, economic harm is not a type of irreparable harm in the D.C. Circuit. And just think. The practical consequences is if the plaintiffs can complain that they're suffering ordinary business harm as a result of the IEEPA tariffs, then every plaintiff—any importer or any purchaser could come to this court and ask for a TRO or an injunction based not just on the fact that they may have to pay the duties as an importer, but also as a purchaser. "Oh, my, you know"—"the cost of goods are going up, you know? Other businesses are raising costs as a result of the tariffs." All of that harm would likely be something that plaintiffs would argue before you that would be—amount to irreparable harm which just has never been cognizable in the D.C. Circuit as irreparable harm.

So I think, fundamentally, any harm that the plaintiffs suffer as a result of the tariffs by having to pay them will be compensated to them at the end of the case, should they prevail. By contrast, granting an injunction [25] would cause catastrophic harm to the government, to our national security, and to our foreign policy, as explained in the four cabinet secretary declarations. If I could just walk through a couple brief points in those declarations.

First, they explain that the Government is currently negotiating trade deals with other countries to address urgent threats to our national security and economy. That's at Paragraphs 8 through 10 of Secretary Rubio's declaration. They also explain that the ongoing trade negotiations with other countries are premised on the IEEPA tariffs. That's Paragraph 11 of Secretary Rubio's declaration. All four

92a

declarations explain if those tariffs are enjoined, the Court would cause diplomatic embarrassment to the government, the negotiations with trading partners would collapse, and other countries would retaliate against our country. They explain finally that maintaining the tariffs is necessary to protect the national security and the economy of the United States. So—

THE COURT: So what exactly are they saying will cause that damage? The ability to collect the tariffs from this small company—or small companies or invalidating the whole scheme?

MR. SHUMATE: I think any type—we've only submitted these declarations on the balance of the equities and on the remedy. So the point that we want the Court to [26] consider is any type of injunctive relief that enjoins the tariffs, whether it's nationwide or as to particular plaintiffs, would cause devastating harm to our national security and foreign policy because other countries would interpret that injunction, even if the Court attempts to narrow it, as a judgment from a U.S. court that the president cannot continue to enforce those tariffs. And, as I mentioned earlier, even that limited relief to these plaintiffs would likely be a magnet for thousands of other plaintiffs who also want relief from these tariffs. Not just importers, but also purchasers.

THE COURT: So if I were to conclude, one, that I have jurisdiction, but, two, that the IEEPA does not provide for tariffs and state as much but decide on the balancing Prongs 3 and 4 that collapse because it's the government that the things set forth in the declarations are troubling enough that the

93a

government's interests outweigh the small companies' interests, would that create the parade of horribles set forth in the declarations?

MR. SHUMATE:  I think it could—potentially could, because it would still be reported that a U.S. court has struck down the tariffs.  And, again, you—again, you would have multiple—potentially thousands of other plaintiffs that flood into this court and seek the same relief.  So you know, the last point I wanted to make is [27] if—

THE COURT:  But if that's what I conclude, what, am I supposed to stay mute if I deny the motion based on the third and fourth prongs but conclude that they have a substantial likelihood of prevailing on the merits?

MR. SHUMATE:  In that situation, I think you would deny an injunction because the plaintiffs haven't demonstrated either irreparable harm or the balance of the equities favors the Government.  In that situation, just grant a declaratory judgment and the Government could appeal in the ordinary course without having to be faced with potentially emergency appeals to the Circuit and potentially to the Supreme Court.  So I don't want to pre-judge what the SG may decide in any particular case, but it's really—the purpose of those declarations is to emphasize the harms from injunctive relief of any kind.

THE COURT:  Okay.

MR. SHUMATE:  So the last point I wanted to cover today was the merits.  And, again, you don't need to decide the merits for purposes of jurisdiction or for their PI motion, because you can just deny the PI

94a

motion for lack of irreparable harm.  But to the extent the Court decides to address the merits—

THE COURT:   I mean, I understand your argument that the plaintiffs' harm is somewhat speculative.  But [28] given how much shifting there is in the policy itself, how are they supposed to provide proof of harm that's not speculative to a certain extent?

MR. SHUMATE:  Well, I think the only type of harm that is certainly impending is harm from having to pay the import duties, and even that may not be certainly impending if the duties are rescinded or modified.  I think the amount is questionable.  I think all of that goes to a failure on their part to demonstrate irreparable harm that warrants the Court's immediate relief at the preliminary injunction stage. I think all of these harms are speculative, particularly the harms about, kind of, consequences to their business; about, you know, inability to make decisions because of the uncertainty of the tariffs.  If that were the standard for irreparable harm, then any business could come into court seeking a PI or a TRO whenever any agency issues any type of regulation that affects any type of business.  That's never been the law in this Circuit, and it shouldn't be the law with respect to this case in particular involving national security and foreign policy.

So last but not least, to address the merits, again, the Court doesn't need to address it, but to the extent you decide to address the merits, I wanted to address—make a couple of points.  The first is that the president's reliance on emergency authority for tariffs is [29] not novel.  Again, President Nixon relied upon

95a

the Trading With the Enemy Act way back in the 1970s.  He relied on the exact same language—

THE COURT:  Did he?  They argue that he didn't; that that was the lawyers later on.

MR. SHUMATE:   Well, it was upheld by the Circuit.  T he Circuit held that—the appellate court, excuse me, held that the Trading With the Enemy Act upheld—authorized President Nixon to issue those tariffs in 1971 based on the language in that statute that said "regulate imports."  The—in response to that ruling, Congress enacted IEEPA.  On the backdrop of Yoshida—

THE COURT:  But did President Nixon, when he imposed  the  tariffs,  invoke  the  predecessor  to— Trading With the Enemies Act?

MR.  SHUMATE:   I  don't  recall  whether  he specifically  invoked  that  in  the  presidential proclamation, but the case was litigated on that basis.  And  on  that  basis,  the  appellate  court  upheld President Nixon's tariffs, and then subsequent to Yoshida the Congress enacted IEEPA knowing full well about Yoshida and what President Nixon had done  in  that  case  and  used  the  same  statutory language, "regulate importation of property," and that is the same statute that the president has relied upon here.    That  is  controlling  in  the  Federal  Circuit. That's, I think, why—[30] explains why the plaintiffs have  tried  to  file  in  this  court  improperly.    And plaintiffs  have  also  said  that  every  other  statute authorizing tariffs uses the word "tariffs."  That's not the case. Section 232 has long been interpreted as authorizing tariffs.  The Supreme Court's decision on

96a

that is called Algonquin. 232 says "adjust imports" and it's long been interpreted to authorize the agencies in the executive branch to issue—to—import duties or tariffs to adjust imports. The same goes here. The president is using IEEPA as a means to regulate importation. Yoshida's controlling in the Federal Circuit. It should be persuasive precedent here.

THE COURT: What do you make of this argument that—I haven't looked at that congressional amicus brief in the Oregon case yet. But what do you make of that argument?

MR. SHUMATE: So our—I think it's a mischaracterization of our argument. Our argument is not that the word "regulate" authorized tariffs. Our argument is that the phrase "regulate importation of property" authorizes tariffs. It's the same language in the Trading With the Enemy Act. Now, exportation is different. "Regulate importation" may have a different meaning, and under IEEPA—as, I think, you know, Your Honor; you've had IEEPA cases—export controls might be something that fall [31] within the phrase "regulate exportation." It wouldn't authorize, you know—import a, you know—tariff duties from, you know—imports from states, for example—or exports from states. So I think that's the response, is that our argument doesn't hinge just on the word "regulate," but it's "regulate importation" which Congress knew had a particularized meaning in light of Yoshida. And so that is the exact same language that the president relied on here.

And I think another point to make is, you know, what is the standard of review by which the Court should review the statute? And, again, we agree with

97a

the plaintiffs that the Court can review the threshold statutory question of whether IEEPA authorizes tariffs, assuming you have jurisdiction. The plaintiffs are arguing the major questions doctrine should apply, but that's the wrong lens and framework by which to look at this case. Those cases—all of the Supreme Court's cases in that line—that doctrine—that doctrinal line of cases involve agencies filling gaps in statutes; right? The old Chevron framework would apply. Is the agency reasonably interpreting the statute? Well, the major questions doctrine says, "Well, when an agency is deciding a really big question, we expect Congress to speak clearly and provide the agency with a clear delegation of authority." That's not the right framework here because Congress expressly delegated [32] authority to the president in an area of national security and foreign policy, and in that context the Supreme Court has been very deferential and so has the Federal Circuit in cases like Trump v. Hawaii, B-West, Florsheim, Yoshida, Maple Leaf. These are also trade and tariff cases, as well. In that context, courts are extremely deferential to the executive branch in an area of foreign policy and national security. In fact, the standard that we've argued applies and controls in the CIT is what's called the Maple Leaf clear misconstruction standard. Did the president clearly misconstrue the statute? Here, he did not, because there was the Yoshida precedent that clearly recognized the president's authority to regulate importation through tariffs—that's exactly what the president did here—and that action was clearly authorized by IEEPA.

98a

The plaintiffs have also raised a non-delegation challenge to the statute, even though no court has ever found a non-delegation problem with IEEPA. Just a couple points on that, Your Honor.  The statute contains procedural limits, requires the executive to consult with Congress, requires reporting—detailed reporting to Congress about what the president did, what the emergency is, and there's also a reporting obligation subsequent to the initial report.  There are also temporal limits on IEEPA. As you know, emergency declarations are supposed to last for one [33] year.  They can be extended, but presumptively they only last one year.

And finally, there's a number of substantive limits in IEEPA that constrain the president's authority under that statute.  First, there has to be an emergency finding.  As Yoshida explains, that is a political check on the executive.  The statute also articulates a heightened standard and describes what the type of emergency is that is necessary to trigger IEEPA.  It has to be an unusual and extraordinary threat.  It has to also originate from outside the United States.  And it also has to be a threat to our foreign policy, national security, or economy.  And Congress also specified the means by which the president is authorized to address the threat, everything from investigate to prohibit importation altogether.  But within that delegation, Congress authorized the president to act broadly and provided broad delegation to the president to address the means by—to address the threat—by whatever means he felt is appropriate to address the threat.

99a

The last point I'd like to make is just the president—the Court can't review the president's compliance with IEEPA. Now, we focused today mainly on what the statute means, but in their briefing the plaintiffs have also raised arguments about, "Well, this isn't an unusual and extraordinary threat," or they quibble with the [34] president's factual findings to say that this is not something that was appropriate for the president to do, the means don't justify the ends, that sort of argument. I think all of that is out the window because of the political question doctrine. Your Honor, you had an opinion, the Tett [ph] case earlier this year, that, I think, there's—there are very similar arguments that the plaintiffs are making here that you rejected in that case. These are all political questions. Congress set up a scheme to review the emergency declarations and the president's actions under IEEPA. It's not for the Court to review the—whether the president has complied with IEEPA. That is for Congress to decide.

So in sum, we'd ask the Court to transfer this case to the Court of International Trade without even addressing the merits.

THE COURT: All right. Thank you.

All right. Mr. Shah, you get the last word.

MR. SHAH: Thank you, Your Honor. If I could start with a few points on jurisdiction.

THE COURT: Mm-hmm.

MR. SHAH: The Government still doesn't have any response to K Mart. That was a 1581(i) case. CIT and Federal Circuit said they had exclusive

100a

jurisdiction in a separate line of cases. This court and the D.C. Circuit [35] determined it had jurisdiction. The Supreme Court sided with this court after a Circuit conflict. That is on point Supreme Court authority that disavows the Government's position that you should simply kick this over to the CIT. The argument that they made—on Friday, they submitted the Barnes decision. This is the first decision in the history of the CIT to ever exercise jurisdiction over an IEEPA case. If you look at the jurisdictional analysis, if that's what the Government has in mind of what the CIT is doing in its jurisdictional analysis, that is the poster child for why this Court should not defer and kick things over to the CIT. It does zero independent analysis of whether IEEPA, the law under which this case arises, provides for tariff. Instead, it cites Alcan. Alcan is a follow-on case to Yoshida and Alcan found jurisdiction in the CIT. If you look at the pages in Alcan—and we cite this in our two-page response to their supplemental filing of Barnes—if you look at Alcan, it rested jurisdiction on 1581(a). That is not at issue in this case. That comes in to protest and refund cases. This is a 1581(i) case. So the case on which the CIT rested its jurisdiction without doing any independent analysis of whether IEEPA actually provides for tariffs doesn't even apply in this case. So that, I think, strongly supports us, not the Government.

The only other argument I heard from the [36] Government today—which is not in their transfer motion—is that, maybe, somehow, as one of the judges raised at the CIT argument, that this case arises out of the HTSUS. The HTSUS is a tariff schedule. Our

101a

case doesn't arise out of the tariff schedule.  It arises out of IEEPA.  That is the substantive law under which the president acted.  If there is any doubt about that, they cite on Page 6 of their transfer reply a case called International Labor.  That's a D.D.C. case.  That was a 1581(i) case.  And what this court said is, in determining under what law something arises, I look at the substantive legal theory.  And there, it said, "Oh, because the substantive legal theory in that case is Section 307 of the trade act, then it arises under that act, not under the APA or under the tariff schedule or anything like that."  So this argument—which, again, that's not the argument in Barnes that the CIT gives for jurisdiction; that's not the argument in the Montana court that they cite; that's not the argument in the Florida case they cite.  They are grasping for straws at a jurisdictional theory to avoid resolving the question here.    This Court should reject that invitation.

If I can move on to the preliminary injunction versus summary judgment, I have not heard any reason why the Government would be prejudiced by just deciding this pure question of law as a pure question of law.  They agreed to [37] it in the Court of International Trade.  The briefs are not any different in the Court of International Trade versus the briefs they filed here.  It's a pure question of law.  It would be entirely duplicative to enter a preliminary injunction, then have cross-motions for summary judgment on the exact same question.  We're not asking for a likelihood of success.  We want success.  We are right on the statutory interpretation question.  This Court should enter final judgment.

102a

When you asked my friend on the other side about, "Well, what is the harm that the government is going to suffer from an adverse ruling; that is, an entry of summary judgment versus also enforcing"— "stopping collection of duties from this client," they have no answer; right?  The Rubio declaration that they submit—and I think I read it to you earlier—it's talking about an adverse ruling.  They don't want an adverse ruling.  Well, I don't want an adverse ruling either, but it's the Court's job to decide the question of law.  If it decides the question of law, it enters final judgment.  I think, at the end, they even conceded you could enter declaratory judgment.  Well, once you enter declaratory judgment, I think enforcing application of the collection with respect to our clients, the balance of harms is not even close at that point.  As you pointed out, the flaw in the Government's "lack of [38] irreparable harm" theory is that our clients cannot continue importing under the tariffs.  So there are no refunds to get at the end of the day.  Instead, what do they have?  If they can't import their tariffs [sic] under a 145 percent tariff or a 30 percent tariff or whatever president decides tomorrow to make the tariffs, well, then there is nothing to collect on refunds.  Instead, all they are accumulating are the lost sales from products they can't sale [sic].  That is not recoverable, and that is putting the business in jeopardy.  This is an easy case on balance of harms when it comes to our client.

Now, the third part of this is the merits.  And I don't think there's any question you have to get to the merits at this point.  They start, again—and this is quite stunning to me that they continue to say that

103a

President Nixon invoked TWEA or they're not sure.
They said that in their opening brief.  We cited the
proclamation and the House report in our response to
the PI that shows conclusively he did not do it.  You
can just read the proclamation and read the House
report that says he invoked two trade statutes, not the
proclamation.  They say it again in their reply brief on
PI reply that President Nixon invoked TWEA.
Incorrect.  They say it again at argument and say they
don't know.   It is in black and white in the
proclamation.  The proclamation is not wrong.  It's not
—[39] it's cited on Page 22 of our PI reply brief.  You
can read it.  And for good measure, the House report
says Section 5(b) of TWEA was not among the statutes
cited in the president's proclamation as authority of
the surcharge but was so cited later by the
Government in response.  It was DOJ lawyers who
brought the case and brought it.  The Yoshida 1
opinion from the customs court also lays this out.
There is no excuse.  There is no ambiguity here.  No
president—and let me just be very clear about this—
no president in the history of our country has ever
invoked tariff power under TWEA or IEEPA.  That
counts for something, whether you want to consider
this a major questions case or just a simple case of
statutory interpretation.

Against all of that—against all of that
constitutional history, the text of the Constitution,
Congress, Supreme Court, the president, all they have
is this ratification argument which is eviscerated by
the fact that Congress acted in between President
Nixon's proclamation and the passage in the Trade Act
of 1974 and conferred the very authority.  Nixon, in

104a

fact, asked Congress to pass the Trade Act of 1974 so he would have the authority to do what he did in that proclamation, because he did not invoke TWEA there.

The last point I'll make, Your Honor, is they [40] invoke Federal Circuit precedent about clear misconstruction. That's why they want to be in the Federal Circuit. Obviously, the D.C. Circuit does not have some special heightened standard. When the president violates law, as he did here, it's this Court's job to decide whether it was a violation or not. That's all we're asking this Court to do.

THE COURT: All right.

MR. SHAH: Thank you, Your Honor.

THE COURT: Thank you. I'll take the matter under advisement. I will move as quickly as possible and I'll get you on to the next level. Thank you. You're excused.

(Adjourned)