**[ORAL ARGUMENT NOT YET SCHEDULED]**

**No. 25-5202**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

LEARNING RESOURCES, INC., and HAND2MIND, INC.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**BRIEF FOR APPELLANTS**

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

MARK R. FREEMAN
MICHAEL S. RAAB
BRAD HINSHELWOOD
DANIEL WINIK
SOPHIA SHAMS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7245*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8849*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and Amici

Plaintiffs are Learning Resources, Inc. and hand2mind, Inc.  Defendants are Donald J. Trump, in his official capacity as President of the United States; Kristi Noem, in her official capacity as Secretary of Homeland Security; the U.S. Department of Homeland Security; Scott Bessent, in his official capacity as Secretary of the Treasury; the U.S. Department of the Treasury; Howard W. Lutnick, in his official capacity as Secretary of Commerce; the U.S. Department of Commerce; Rodney S. Scott, in his official capacity as Commissioner of Customs & Border Protection (having been substituted for Pete R. Flores, Acting Commissioner of Customs & Border Protection when the suit was brought); U.S. Customs & Border Protection; Jamieson Greer, in his official capacity as U.S. Trade Representative; and the Office of the U.S. Trade Representative.

America First Legal Foundation; Emily Ley Paper, Inc., doing business as Simplified; Kilo Brava LLC; Bambola LLC; Kim's Clothes and Fashion LLC; Rokland LLC; George F. Allen; Steven G. Calabresi; Joshua A. Claybourn; John C. Danforth; Richard A. Epstein; Charles T. Hagel; Harold Hongju Koh; Gerard N. Magliocca; Michael W. McConnell; Michael B.

Mukasey; Alan O. Sykes; John Daniel Tinder; Peter J. Wallison; and Philip Zelikow participated before the district court as amici curiae.  In addition, the Coalition for a Prosperous America, the Washington Legal Foundation, and Alexander "Sasha" Volokh, have expressed the intention to participate as amici curiae before this Court.

**B.    Ruling Under Review**

The ruling under review is a memorandum opinion (JA89) and order (JA87) issued by Judge Contreras on May 29, 2025, granting a preliminary injunction, and the associated order (JA122) setting a bond under Rule 65(c).

**C.    Related Cases**

This case has not previously been before this Court or any other court other than the district court.  We are not aware of any related cases within the meaning of the Court's Rule 28(a)(1)(C).  Challenges to the tariffs at issue are pending before other courts, including the U.S. Court of Appeals for the Federal Circuit (on appeal from the U.S. Court of International Trade).

*/s/ Daniel Winik*
Daniel Winik

# TABLE OF CONTENTS

**Page**

GLOSSARY ................................................................................. v

TABLE OF AUTHORITIES .......................................................... vi

INTRODUCTION ........................................................................ 1

STATEMENT OF JURISDICTION .............................................. 4

STATEMENT OF ISSUES .......................................................... 5

PERTINENT STATUTES AND REGULATIONS ............................ 5

STATEMENT OF THE CASE ...................................................... 5

    A.    Statutory Background ...................................................... 5

    B.    Factual Background ........................................................ 13

        1.    Trafficking-related tariffs ........................................ 13

        2.    Reciprocal tariffs .................................................... 16

        3.    Initial effects of tariffs ............................................ 18

    C.    Litigation ....................................................................... 19

SUMMARY OF ARGUMENT ...................................................... 22

STANDARD OF REVIEW ........................................................... 25

ARGUMENT ............................................................................... 26

I.    The District Court Lacked Jurisdiction .................................. 26

II.    IEEPA Clearly Authorizes The Challenged Tariffs ................. 35

III.    The District Court Erred In Entering Injunctive Relief ........................ 56

CONCLUSION ..................................................................................................... 61

CERTIFICATE OF COMPLIANCE

ADDENDUM

# GLOSSARY

| | |
|---|---|
| CIT | Court of International Trade |
| HTSUS | Harmonized Tariff Schedule of the United States |
| IEEPA | International Emergency Economic Powers Act |
| NEA | National Emergencies Act |
| PRC | People's Republic of China |
| TWEA | Trading With the Enemy Act |

# TABLE OF AUTHORITIES

**Cases:**                                                                                       **Page(s)**

*Al-Bihani v. Obama*,
  619 F.3d 1 (D.C. Cir. 2010) ................................................................. 47

*American International Group, Inc. v. Islamic Republic of Iran*,
  657 F.2d 430 (D.C. Cir. 1981) ............................................................. 43

*American Power & Light Co. v. SEC*,
  329 U.S. 90 (1946) ............................................................................... 52

*Arko Foods International, Inc. v. United States*,
  654 F.3d 1361 (Fed. Cir. 2011) ........................................................... 27

*B-West Imports, Inc. v. United States*,
  75 F.3d 633 (Fed. Cir. 1996) ........................................................ 47-48

*Babb v. Wilkie*,
  589 U.S. 399 (2020) ............................................................................. 44

*Biden v. Nebraska*,
  600 U.S. 477 (2023) ................................................................. 45, 46, 49

*Board of Trustees of the University of Illinois v. United States*,
  289 U.S. 48 (1933) ............................................................................... 39

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*,
  63 F.4th 25 (Fed. Cir. 2023) ......................................................... 36-37

*California v. Trump*,
  2025 WL 1569334 (N.D. Cal. June 2, 2025) ............................... 29, 30

*Cargo of Brig Aurora v. United States*,
  11 U.S. (7 Cranch) 382 (1813) .................................................... 48, 51

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) ............................................................ 59

*Clevinger v. Advocacy Holdings, Inc.*,
   134 F.4th 1230 (D.C. Cir. 2025)..................................................25

*Commodities Export Co. v. U.S. Customs Service*,
   957 F.2d 223 (6th Cir. 1992) .....................................................35

*Conoco, Inc. v. U.S. Foreign-Trade Zones Bd.*,
   18 F.3d 1581 (Fed. Cir. 1994) ...................................................30

*Dames & Moore v. Regan*,
   453 U.S. 654 (1981) ...............................................10, 12, 37, 48

*Department of Agriculture Rural Development Rural Housing Service v. Kirtz*,
   601 U.S. 42 (2024)....................................................................54

*Department of Education v. California*,
   145 S. Ct. 966 (2025)...............................................................58

*Department of the Navy v. Egan*,
   484 U.S. 518 (1988)............................................................47, 56

*DSE, Inc. v. United States*,
   169 F.3d 21 (D.C. Cir. 1999)....................................................59

*Emily Ley Paper, Inc. v. Trump*,
   2025 WL 1482771 (N.D. Fla. May 20, 2025).........................29, 30

*FCC v. Consumers' Research*,
   2025 WL 1773630 (U.S. June 27, 2025) .................................47, 52

*Federal Energy Admin. v. Algonquin SNG, Inc.*,
   426 U.S. 548 (1976)......................................23, 36, 37, 51

*Florida v. HHS*,
   19 F.4th 1271 (11th Cir. 2021)................................................49

*Garland v. Aleman Gonzalez*,
   596 U.S. 543 (2022).......................................23, 32, 33

*Georgia v. Public.Resource.Org, Inc.*,
   590 U.S. 255 (2020)......................................................38, 42

*Gibbons v. Ogden*,
    22 U.S. (9 Wheat.) 1 (1824) ................................................... 23-24, 36

*Gundy v. United States*,
    588 U.S. 128 (2019) ......................................................................51

*Haig v. Agee*,
    453 U.S. 280 (1981) ......................................................................47

*Holy Land Foundation v. Ashcroft*,
    333 F.3d 156 (D.C. Cir. 2003) ......................................................41

*J.W. Hampton, Jr., & Co. v. United States*,
    276 U.S. 394 (1928) .............................................................6, 51, 52

*Jennings v. Rodriguez*,
    583 U.S. 281 (2018) ......................................................................50

*K Mart Corp. v. Cartier, Inc.*,
    485 U.S. 176 (1988) ...............................................................26, 33

*Lorillard v. Pons*,
    434 U.S. 575 (1978) ......................................................................37

*Marshall Field & Co. v. Clark*,
    143 U.S. 649 (1892) ................................................................6, 51

*Mayes v. Biden*,
    67 F.4th 921 (9th Cir. 2023) .........................................................45

*Miami Free Zone Corp. v. Foreign Trade Zones Board*,
    22 F.3d 1110 (D.C. Cir. 1994) ................................................23, 34

*Michael Simon Design, Inc. v. United States*,
    609 F.3d 1335 (Fed. Cir. 2010) ...............................................27, 32

*NFIB v. Sebelius*,
    567 U.S. 519 (2012) ......................................................................38

*Nken v. Holder*,
    556 U.S. 418 (2009) ......................................................................56

*Pentax Corp. v. Myhra*,
   72 F.3d 708 (9th Cir. 1995) ...............................................................35

*PrimeSource Building Products, Inc. v. United States*,
   59 F.4th 1255 (Fed. Cir. 2023) ..........................................................31

*Regan v. Wald*,
   468 U.S. 222 (1984) ....................................................................10, 43

*Sale v. Haitian Centers Council, Inc.*,
   509 U.S. 155 (1993) ....................................................................47, 50

*SCM Corp. v. ITC*,
   549 F.2d 812 (D.C. Cir. 1977)...............................................23, 33, 34

*Seila Law LLC v. CFPB*,
   591 U.S. 197 (2020) ............................................................................45

*Solar Energy Industries Association v. United States*,
   86 F.4th 885 (Fed. Cir. 2023), *modified on reh'g*,
   111 F.4th 1349 (Fed. Cir. 2024) .........................................................31

*Sunpreme Inc. v. United States*,
   2017 WL 65421 (C.I.T. Jan. 5, 2017) .................................................59

*Transpacific Steel LLC v. United States*,
   4 F.4th 1306 (Fed. Cir. 2021) .............................................................31

*United States v. Curtiss-Wright Export Corp.*,
   299 U.S. 304 (1936) ............................................................................51

*United States v. Haggar Apparel Co.*,
   526 U.S. 380 (1999) ............................................................................30

*United States v. Shih*,
   73 F.4th 1077 (9th Cir. 2023) .............................................................53

*United States v. Yoshida International, Inc.*,
   526 F.2d 560 (C.C.P.A. 1975) ....................... 8, 24, 33, 37, 39, 40, 43, 44, 54, 55

*Utility Air Regulatory Grp. v. EPA*,
   573 U.S. 302 (2014) ................................................................46

*V.O.S. Selections, Inc. v. Trump*,
   2025 WL 1649290 (Fed. Cir. June 10, 2025) ...................................20

*V.O.S. Selections, Inc. v. United States*,
   2025 WL 1514124 (Ct. Int'l Trade May 28, 2025)............... 4, 19, 20, 22-23, 29

*Wayman v. Southard*,
   23 U.S. (10 Wheat.) 1 (1825) ..................................................52

*Webber v. DHS*,
   2025 WL 1207587 (D. Mont. Apr. 25, 2025)............................29, 30

*West Virginia v. EPA*,
   597 U.S. 697 (2022) ..........................................................45, 48

*Wisconsin Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985) ..................................................60

*Zemel v. Rusk*,
   381 U.S. 1 (1965) ...............................................................50

## U.S. Constitution:

Art. 1, § 8, cl. 1 ................................................................30

## Statutes:

Act of Mar. 2, 1799, ch. 22, § 61, 1 Stat. 627..........................................6

Act of May 28, 1926, ch. 411, 44 Stat. 669...........................................30

Customs Administration Act of 1890, ch. 407, 26 Stat. 131 ............................30

First War Powers Act,
   ch. 593, tit. III, § 301, 55 Stat. 838 (1941) .........................................8

International Emergency Economic Powers Act (IEEPA),
    Pub. L. No. 95-223, tit. II, 91 Stat. 1626 (1977)
    (codified as amended at 50 U.S.C. § 1701 *et seq.*) ............................................1
        50 U.S.C. § 1701(a) .................................................1, 11, 20, 49, 52
        50 U.S.C. § 1702(a)(1) ............................................................49
        50 U.S.C. § 1702(a)(1)(A)........................................................10
        50 U.S.C. § 1702(a)(1)(B) ............................. 1, 11, 19, 23, 35, 40, 41, 46, 52
        50 U.S.C. § 1702(a)(1)(C) ........................................................10
        50 U.S.C. § 1702(b)..........................................................38, 53
        50 U.S.C. § 1702(b)(3).............................................................11
        50 U.S.C. § 1702(b)(1)-(4) .......................................................11
        50 U.S.C. § 1703......................................................................53
        50 U.S.C. § 1703(a) .................................................................11
        50 U.S.C. § 1703(b)-(c) ......................................................11, 12
        50 U.S.C. § 1703(d).................................................................11

National Emergencies Act (NEA),
    Pub. L. No. 94-412, 90 Stat. 1255 (1976) ............................................8

Reciprocal Trade Agreements Act of 1934, ch. 474,
    48 Stat. 943 (codified as amended at 19 U.S.C. § 1351) ..................7

Smoot-Hawley Tariff Act of 1930, ch. 497, § 338,
    46 Stat. 590 (codified as amended at 19 U.S.C. § 1338) ..................7

Trade Act of 1974, Pub. L. No. 93-618,
    88 Stat. 1978 (1975) (codified as amended at 19 U.S.C. § 2251 *et seq.*) .........7

Trade Expansion Act of 1962,
    Pub. L. No. 87-794, 76 Stat. 872
    (codified as amended at 19 U.S.C. § 1862)....................................7

Trading with the Enemy Act (TWEA),
    ch. 106, 40 Stat. 411 ................................................................7, 8

Pub. L. No. 95-223,
    § 101(a), 91 Stat. 1625 (1977)..................................................10

19 U.S.C. § 1202..................................................................................27

19 U.S.C. § 1338 .................................................................................55

19 U.S.C. § 1862(c)(1)(A)(ii) ...............................................................7

19 U.S.C. § 2132 .................................................................................55

19 U.S.C. § 3004(c)(1) .........................................................................27

19 U.S.C. § 3004(c)(1)(A) ....................................................................31

19 U.S.C. § 3004(c)(1)(C) ........................................................4, 22, 31

19 U.S.C. § 3007 .................................................................................27

28 U.S.C. § 1292(a)(1) ...........................................................................5

28 U.S.C. § 1337(c) .............................................................................26

28 U.S.C. § 1581 .................................................................................26

28 U.S.C. § 1581(i)(1) ..............................................3, 21, 22, 26, 28, 38

28 U.S.C. § 1581(i)(1)(B) ...........................................3, 22, 26, 27

28 U.S.C. § 1581(i)(1)(D) ...........................................3, 22, 26, 27

42 U.S.C. § 7412 .................................................................................39

50 U.S.C. § 1621(a) ...............................................................................9

50 U.S.C. § 1622(a)(1) ...........................................................................9

50 U.S.C. § 1622(b) ...............................................................................9

50 U.S.C. § 1622(c)(3) .........................................................................10

50 U.S.C. § 1622(d) .............................................................................10

50 U.S.C. § 4302 .................................................................................10

**Executive Branch Materials:**

Exec. Order No. 12,543,
    51 Fed. Reg. 875 (Jan. 9, 1986) ...........................................................12

Exec. Order No. 12,544,
    51 Fed. Reg. 1235 (Jan. 10, 1986) ......................................................12

Exec. Order No. 13,159,
    65 Fed. Reg. 39,279 (June 21, 2000)...................................................12

Exec. Order No. 13,222,
    66 Fed. Reg. 44,025 (Aug. 17, 2001)..................................................12

Exec. Order No. 14,105,
    88 Fed. Reg. 54,867 (Aug. 9, 2023).....................................................13

Exec. Order No. 14,144,
    90 Fed. Reg. 6755 (Jan. 16, 2025).......................................................13

Exec. Order No. 14,193,
    90 Fed. Reg. 9113 (Feb. 7, 2025) ........................................................14

Exec. Order No. 14,194,
    90 Fed. Reg. 9117 (Feb. 7, 2025) ........................................................14

Exec. Order No. 14,195,
    90 Fed. Reg. 9121 (Feb. 7, 2025) .............................................14, 15, 28

Exec. Order. No. 14,228,
    90 Fed. Reg. 11,463 (Mar. 7, 2025) ...................................................15

Exec. Order No. 14,256,
    90 Fed. Reg. 14,899 (Apr. 7, 2025) .....................................................16

Exec. Order No. 14,257,
    90 Fed. Reg. 15,041 (Apr. 7, 2025) ............................................2, 16, 17, 27

Exec. Order No. 14,259,
    90 Fed. Reg. 15,509 (Apr. 14, 2025) ...................................................17

Exec. Order No. 14,266,
  90 Fed. Reg. 15,625 (Apr. 15, 2025) ..................................................17, 18, 27

Exec. Order No. 14,298,
  90 Fed. Reg. 21,831 (May 21, 2025)........................................................17

Exec. Order No. 14,309,
  90 Fed. Reg. 26,419 (June 16, 2025)........................................................18

89 Fed. Reg. 66,187 (Aug. 13, 2024) ...........................................................12

89 Fed. Reg. 87,761 (Nov. 4, 2024) .............................................................12

89 Fed. Reg. 88,869 (Nov. 7, 2024) .............................................................13

90 Fed. Reg. 9113 (Feb. 7, 2025) .................................................................14

90 Fed. Reg. 9117 (Feb. 7, 2025) .................................................................14

Proclamation No. 4074,
  36 Fed. Reg. 15,724 (Aug. 17, 1971) ..........................................................8

Proclamation No. 10,886,
  90 Fed. Reg. 8327 (Jan. 29, 2025) .............................................................13

**Rule:**

Fed. R. App. P. 4(a)(1)(B)...........................................................................5

**Legislative Materials:**

H.R. Rep. No. 95-459 (1977) .......................................................................8

*National Emergencies Act: Hearings on H.R. 3884 Before the Subcomm.
  on Admin. Law & Gov't Relations of the S. Comm. on the Judiciary,*
  94th Cong. (1975).....................................................................................9

S. Rep. No. 96-466 (1979) ........................................................................30

**Other Authorities:**

International Trade Commission, *Harmonized Tariff Schedule*,
    https://hts.usitc.gov/ (last visited June 17, 2025) .......................................27

Joint Statement on U.S.-China Economic and Trade Meeting in
    Geneva (May 12, 2025), https://www.whitehouse.gov/
    briefings-statements/2025/05/joint-statement-on-u-s-china-economic-
    and-trade-meeting-in-geneva/ .......................................................19

*Regulate*, Black's Law Dictionary (5th ed. 1979) ...............................35

*Regulate*, Webster's Third New International Dictionary (1976)...................35

Antonin Scalia & Bryan A. Garner, *Reading Law:*
    *The Interpretation of Legal Texts* (2012)............................................40

11A Charles Alan Wright et al., *Federal Practice & Procedure*
    § 2954 (3d ed.), Westlaw (database updated May 21, 2025) .......................59

## INTRODUCTION

Congress has long delegated broad tariff authority to the President to supplement the President's Article II powers over foreign affairs. Presidents have exercised that authority across many administrations to impose tariffs that in their judgment will advance national security, foster economic prosperity, and facilitate negotiations with foreign counterparts. Consistent with that long tradition, the International Emergency Economic Powers Act (IEEPA), Pub. L. No. 95-223, tit. II, 91 Stat. 1626 (1977) (codified as amended at 50 U.S.C. § 1701 *et seq.*), authorizes the President to "regulate … importation" of foreign goods to "deal with any unusual and extraordinary threat" to "national security, foreign policy, or [the U.S.] economy," if the President finds that a national emergency exists. 50 U.S.C. §§ 1701(a), 1702(a)(1)(B).

President Trump has found that America's exploding trade deficit, the implications of that deficit for our economy and national security, and a fentanyl importation crisis that has claimed thousands of American lives constitute national emergencies. No court has questioned that the President validly declared these emergencies under the National Emergencies Act (NEA). To address the emergencies, President Trump invoked IEEPA to impose tariffs meant to prompt Canada, Mexico, and the People's Republic of China

(PRC) to stem the fentanyl crisis, and imposed further reciprocal tariffs on foreign imports to remedy "a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits." Exec. Order No. 14,257, 90 Fed. Reg. 15,041, 15,041 (Apr. 7, 2025).

The President imposed these tariffs, consistent with his obligations under the Constitution, because in his judgment they are necessary and appropriate to address what he has determined are grave threats to the United States's national security and economy: to strengthen the United States's defense industrial base to avoid compromising national security; to correct decades of trade imbalances and asymmetrical tariffs against American exports; to reverse the transfer of resources from domestic producers to foreign firms; to deliver billions of dollars in investments in U.S. companies and infrastructure; and to stem the deadly tide of fentanyl and other drugs into our country. Indeed, the President's plan to impose such tariffs, in order to restore fairness and reciprocity to the Nation's trade relationships and to protect national security and the economy from foreign threats, was a key component of his successful campaign for office. And the tariffs have already achieved

successes.  They have spurred ongoing negotiations on trade agreements with major trading partners and have already produced the general terms of a historic trade deal with the United Kingdom.  *See* JA78 (Secretary of Commerce).

Yet the district court preliminarily enjoined the tariffs on the ground that IEEPA does not authorize any tariffs at all—even though Congress chose to incorporate in IEEPA exactly the language that had previously been held to authorize tariffs.  The district court's ruling conflicts with IEEPA's text and with numerous bedrock principles of statutory interpretation.  And the preliminary injunction would significantly harm the United States if it were allowed to take effect.

Worse, the district court issued that ruling without jurisdiction.  The Court of International Trade (CIT) has "exclusive jurisdiction" over "any civil action commenced against" the federal government "that arises out of any law of the United States providing for … tariffs" or for "administration and enforcement with respect to" such tariffs.  28 U.S.C. § 1581(i)(1), (i)(1)(B), (D).  This action plainly falls within the CIT's jurisdiction because plaintiffs challenge modifications to the Harmonized Tariff Schedule of the United States (HTSUS).  The HTSUS is the governing law prescribing tariffs, and

modifications to it are expressly "considered to be statutory provisions of law for all purposes." 19 U.S.C. § 3004(c)(1)(C). The day before the district court issued its ruling here, the CIT correctly held that it had exclusive jurisdiction over a virtually identical challenge because "a challenge to a presidential action that imposes tariffs, duties, or other import restrictions is one that arises from a 'law providing for' those measures." *V.O.S. Selections, Inc. v. United States*, 2025 WL 1514124, at *7-8 (Ct. Int'l Trade May 28, 2025) (per curiam), *appeals pending*, Nos. 25-1812, -1813 (Fed. Cir.). Every other district court to have addressed the question has agreed with that jurisdictional conclusion. And this Court has repeatedly held that the CIT, not district courts, must resolve disputes over the scope of the CIT's exclusive jurisdiction.

This Court should accordingly vacate the preliminary injunction for lack of jurisdiction and remand with instructions for the district court to dismiss the case for lack of jurisdiction or, alternatively, transfer it to the CIT. If the Court concludes that the district court had jurisdiction, it should reverse the preliminary injunction on the merits.

## STATEMENT OF JURISDICTION

The district court issued a preliminary injunction on May 29, 2025. JA87-88. The government filed a timely notice of appeal that day. JA124; *see*

- 4 -

Fed. R. App. P. 4(a)(1)(B).  This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES

1.    Whether the district court lacked jurisdiction.

2.    Whether the district court erred in concluding that IEEPA does not authorize tariffs.

3.    Whether the district court otherwise abused its discretion in entering a preliminary injunction.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory Background

1.    The Constitution grants the President broad powers over foreign affairs and national security.  Congress has long supplemented these powers by delegating to the President the authority to manage tariffs or duties on foreign imports in response to dynamic international conditions.  In 1799, for instance, Congress authorized the President to "cause to be established fit and proper regulations for estimating the duties on goods, wares and

merchandise imported into the United States, in respect to which the original cost shall be exhibited in a depreciated currency." Act of Mar. 2, 1799, ch. 22, § 61, 1 Stat. 627, 673.

The Supreme Court has repeatedly upheld presidential exercises of such authority. In *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892), for example, the Court upheld the Tariff Act of 1890, which authorized the President to suspend an exemption for certain products from import duties "for such time as he shall deem just" when he determined that the exporting country was "impos[ing] duties or other exactions" on American products that he "deem[ed] to be reciprocally unequal and unreasonable," *id.* at 680 (quotation marks omitted). And in *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928), the Court upheld the Tariff Act of 1922, which empowered the President to raise import duties if he found that existing tariffs did not equalize the differences between foreign and domestic production costs, and to modify the tariffs "when he determine[d]" that "the differences in costs of production ha[d] changed," *id.* at 401-402.

Congress has since enacted many other statutes authorizing the President to impose or modify tariffs or duties on imports. They include:

- Section 338 of the Smoot-Hawley Tariff Act of 1930, ch. 497, § 338, 46 Stat. 590, 704-706 (codified as amended at 19 U.S.C. § 1338), which authorizes tariffs of up to 50% to combat certain forms of trade discrimination against the United States;

- the Reciprocal Trade Agreements Act of 1934, ch. 474, 48 Stat. 943, 943-945 (codified as amended at 19 U.S.C. § 1351), which authorized the President to negotiate reductions to U.S. tariff rates through reciprocal trade agreements with other countries;

- Section 232 of the Trade Expansion Act of 1962, Pub. L. No. 87-794, 76 Stat. 872, 877 (codified as amended at 19 U.S.C. § 1862), which authorizes the President to "adjust the imports" of articles and their derivatives to address threats to national security, 19 U.S.C. § 1862(c)(1)(A)(ii);

- Title II of the Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1978, 2011-2041 (1975) (codified as amended at 19 U.S.C. § 2251 *et seq.*), which authorizes the President to impose duties of up to 50%, for up to four years (with extensions to eight years), to safeguard domestic industries; and

- Title III of the Trade Act of 1974, 88 Stat. at 2041-2056 (codified as amended at 19 U.S.C. § 2411 *et seq.*), which authorizes the President to impose duties for up to four years (with indefinite extensions) in response to measures that violate trade agreements or that are unreasonable or discriminatory and burden or restrict U.S. commerce.

In particular, Congress has long delegated to the President authority to regulate importation during national emergencies. In 1917, it enacted the Trading with the Enemy Act (TWEA), ch. 106, 40 Stat. 411, which authorized the President to specify foreign goods that may not be imported during wartime "except at such time or times, and under such regulations or orders …

as the President shall prescribe." *Id.* § 11, 40 Stat. at 422-423.  And in 1941, Congress extended that authority to peacetime, amending TWEA to allow the President to "regulate … importation" of foreign goods not just in wartime but "during any other period of national emergency" he declares.  First War Powers Act, ch. 593, tit. III, § 301, 55 Stat. 838, 839-840 (1941).

In 1971, President Nixon imposed peacetime tariffs similar to those at issue here.  *See* Proclamation No. 4074, 36 Fed. Reg. 15,724 (Aug. 17, 1971).  Finding that a "prolonged decline in the international monetary reserves" of the United States over a number of years had seriously threatened its "international competitive position" and potentially impaired its ability to assure national security, *id.* at 15,724, President Nixon "declared a national emergency with respect to the balance-of-payments crisis and under that emergency imposed a surcharge on imports," H.R. Rep. No. 95-459, at 5 (1977) (IEEPA House Report).  In *United States v. Yoshida International, Inc.*, 526 F.2d 560 (C.C.P.A. 1975), the Federal Circuit's predecessor held that TWEA authorized those tariffs.  *Id.* at 575-576.

2.    In 1976 and 1977, Congress modified TWEA through two new laws: the NEA, Pub. L. No. 94-412, 90 Stat. 1255 (1976), and IEEPA.

The NEA "authorize[s]" "the President" "to declare [a] national emergency" "[w]ith respect to Acts of Congress authorizing the exercise, during the period of a national emergency, of any special or extraordinary power." 50 U.S.C. § 1621(a). The NEA does not specify what sorts of conditions the President may declare to be an emergency, given the difficulty of "circumscrib[ing] with words with what conditions a President might be confronted." *National Emergencies Act: Hearings on H.R. 3884 Before the Subcomm. on Admin. Law & Gov't Relations of the S. Comm. on the Judiciary*, 94th Cong. 27 (1975) (statement of Sen. Mathias); *see id.* at 31 ("[W]e didn't attempt to define it specifically because we were afraid we would circumscribe the President's constitutional powers."); *id.* at 27 (statement of Sen. Church) (similar).

Congress retained for itself the power to "terminate[]" a declared emergency through "a joint resolution." 50 U.S.C. § 1622(a)(1). The NEA provides that Congress is directed to consider exercising that oversight power by convening in each House "to consider a vote on a joint resolution" terminating an emergency "[n]ot later than six months after a national emergency is declared, and not later than the end of each six-month period thereafter that such emergency continues." *Id.* § 1622(b). It provides a special fast-track procedure, directing that joint resolutions reported by committees

be "voted upon within three calendar days." *Id.* § 1622(c)(3). And it provides that any emergency not terminated by joint resolution "shall terminate on the anniversary of the declaration of that emergency if" the President does not timely notify Congress that the emergency "continue[s]." *Id.* § 1622(d).

Congress also separated the President's authority to act in wartime and peacetime. It amended TWEA to remove the President's peacetime emergency powers under that Act. Pub. L. No. 95-223, § 101(a), 91 Stat. 1625, 1625 (1977); *see* 50 U.S.C. § 4302. It then re-enacted in IEEPA "essentially the same" peacetime powers previously supplied by TWEA. *See Regan v. Wald*, 468 U.S. 222, 227-228 (1984). Indeed, IEEPA's operative language was "directly drawn" from TWEA. *Dames & Moore v. Regan*, 453 U.S. 654, 671 (1981).

IEEPA affords the President numerous powers with respect to foreign assets—including, for example, the power to "regulate[] or prohibit" certain foreign monetary transactions, 50 U.S.C. § 1702(a)(1)(A), and to "confiscate" certain property during "armed hostilities" or following an "attack[]," *id.* § 1702(a)(1)(C). The provision of IEEPA most relevant here authorizes the President to "prevent or prohibit" or "regulate … any … importation … of

… any property in which any foreign country or a national thereof has any interest." *Id.* § 1702(a)(1)(B).

IEEPA provides that "[a]ny authority granted to the President" by § 1702 "may be exercised to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a). There are narrow exceptions; for example, the President cannot "regulate or prohibit … the importation from any country … of any information or informational materials." *Id.* § 1702(b)(3). But none of those exceptions is implicated here. *See id.* § 1702(b)(1)-(4).

Congress gave itself oversight authority over exercises of IEEPA powers beyond that afforded by the NEA. *See id.* § 1703(d). For example, IEEPA directs the President to "consult regularly with the Congress so long as [IEEPA] authorities are exercised." *Id.* § 1703(a). The President also is directed to "immediately transmit to the Congress a report" on the national emergency, to be updated every six months. *Id.* § 1703(b)-(c). Even so, the Congress that enacted IEEPA recognized that its "new authorities should be sufficiently broad and flexible to enable the President to respond as

appropriate and necessary to unforeseen contingencies."  IEEPA House Report 10.  For instance, Congress rejected a proposal "that it place a definite time limit on the duration of any state of national emergency."  *Id.*

Presidents have invoked IEEPA's authorities numerous times over the years.  President Carter, for example, seized Iranian assets in response to the hostage crisis at the American Embassy in Tehran.  *See Dames & Moore*, 453 U.S. at 662.  That order has been renewed continuously since 1979.  *See* 89 Fed. Reg. 87,761 (Nov. 4, 2024) (most recent renewal).  President Reagan issued executive orders prohibiting commerce with Libya and freezing Libyan assets.  Exec. Order No. 12,543, 51 Fed. Reg. 875 (Jan. 9, 1986); Exec. Order No. 12,544, 51 Fed. Reg. 1235 (Jan. 10, 1986).  President Clinton blocked Russian assets related to the implementation of an agreement for the disposition of highly enriched uranium extracted from nuclear weapons.  Exec. Order No. 13,159, 65 Fed. Reg. 39,279 (June 21, 2000).  President George W. Bush invoked IEEPA to maintain the export control system previously established under a different statute; that order, too, has been maintained since its initial promulgation.  *See* Exec. Order No. 13,222, 66 Fed. Reg. 44,025 (Aug. 17, 2001); 89 Fed. Reg. 66,187 (Aug. 13, 2024) (most recent renewal).  And President Biden took numerous actions under IEEPA, on topics ranging from

cybersecurity, Exec. Order No. 14,144, 90 Fed. Reg. 6755 (Jan. 16, 2025); to sensitive military- and intelligence-related technologies, Exec. Order No. 14,105, 88 Fed. Reg. 54,867 (Aug. 9, 2023); to securities investments financing PRC companies, 89 Fed. Reg. 88,869 (Nov. 7, 2024).

### B.    Factual Background

Since taking office, President Trump has declared various national emergencies and imposed tariffs to address those emergencies. The tariffs challenged here address two types of emergencies identified by the President: the influx of contraband drugs into the United States from Mexico, Canada, and the PRC and conditions resulting from the exploding U.S. trade deficit and the lack of reciprocity in the United States's trading relationships. No one disputes that President Trump has followed the procedural requirements of the NEA and IEEPA to declare these emergencies or to issue the challenged orders.

#### 1.    Trafficking-related tariffs

a.    *Mexico and Canada.* In January 2025, the President declared the flow of contraband drugs like fentanyl through illicit distribution networks, and the public-health consequences, to be a national emergency. Proclamation No. 10,886, 90 Fed. Reg. 8327 (Jan. 29, 2025). The President then

"expand[ed] the scope of the national emergency declared in that [p]rocla-mation to cover" certain conduct by the governments of Canada and Mexico that, in the President's judgment, had contributed to the crisis. Exec. Order No. 14,193, 90 Fed. Reg. 9113, 9114 (Feb. 7, 2025); Exec. Order No. 14,194, 90 Fed. Reg. 9117, 9118 (Feb. 7, 2025). On the basis of that determination, the President invoked IEEPA to impose tariffs on many imported Canadian and Mexican products, concluding "that action under other authority to impose tariffs [was] inadequate to address this unusual and extraordinary threat." 90 Fed. Reg. at 9114; 90 Fed. Reg. at 9118.

b. *China*. After expanding it to include Canada and Mexico, the Pres-ident further "expand[ed] the scope of the national emergency declared in" the initial proclamation to include conduct by the PRC government. Exec. Order No. 14,195, 90 Fed. Reg. 9121, 9122 (Feb. 7, 2025). The President de-termined that the PRC government "has subsidized and otherwise incentiv-ized PRC chemical companies to export fentanyl and related precursor chemicals that are used to produce synthetic opioids sold illicitly in the United States"; that "the PRC provides support to and safe haven for PRC-origin transnational criminal organizations (TCOs) that launder the reve-nues from the production, shipment, and sale of illicit synthetic opioids";

that "[m]any PRC-based chemical companies … go to great lengths to evade law enforcement and hide illicit substances in the flow of legitimate commerce"; and that "[t]he flow of contraband drugs like fentanyl to the United States through illicit distribution networks has created a national emergency, including a public health crisis in the United States." *Id.* at 9121.

As with Canada and Mexico, the President determined that the PRC's conduct "constitutes an unusual and extraordinary threat, which has its source in substantial part outside the United States, to the national security, foreign policy, and economy of the United States." 90 Fed. Reg. at 9122. He accordingly invoked his power under IEEPA to impose an additional 10% duty on most PRC products. *Id.* at 9122-9123. The President subsequently increased the additional duty rate to 20% on the grounds that "the PRC has not taken adequate steps to alleviate the illicit drug crisis through cooperative enforcement actions[] and that the crisis described in Executive Order 14195 has not abated." Exec. Order. No. 14,228, 90 Fed. Reg. 11,463, 11,463 (Mar. 7, 2025). And the President suspended the de minimis duty exemption for covered low-value imports from the PRC, concluding that many PRC-based shippers "hide illicit substances and conceal the true contents of shipments sent to the United States through deceptive shipping practices" and

may "avoid detection" if low-value shipments are exempt from tariffs.  Exec. Order No. 14,256, 90 Fed. Reg. 14,899, 14,899 (Apr. 7, 2025).

### 2.    Reciprocal tariffs

The President declared an additional emergency in early April, determining that "a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits, constitute an unusual and extraordinary threat to the national security and economy of the United States" with "its source in whole or substantial part outside the United States."  90 Fed. Reg. at 15,041.  In declaring the emergency, the President explained his judgment that "[l]arge and persistent annual U.S. goods trade deficits have led to the hollowing out of our manufacturing base; inhibited our ability to scale advanced domestic manufacturing capacity; undermined critical supply chains; and rendered our defense-industrial base dependent on foreign adversaries."  *Id.*  These deficits, the President determined, "are caused in substantial part by a lack of reciprocity in our bilateral trade relationships."  *Id.*

- 16 -

The President accordingly acted "to rebalance global trade flows" by imposing an additional 10% tariff "on all imports from all trading partners," with certain exceptions enumerated in the executive order.  90 Fed. Reg. at 15,045.  This tariff took effect on April 5.  *Id.*  The President also imposed additional country-specific tariffs, which took effect April 9, on numerous countries.  *Id.*

The President has also taken subsequent actions that he determined were necessary and appropriate to address this national emergency.  On April 9, he suspended most country-specific tariffs for 90 days, on the ground that many countries had taken significant steps "toward remedying non-reciprocal trade arrangements and aligning sufficiently with the United States on economic and national security matters."  Exec. Order No. 14,266, 90 Fed. Reg. 15,625, 15,626 (Apr. 15, 2025).  But he raised the reciprocal tariff rate for PRC products, concluding that doing so was necessary to respond to retaliation by the PRC.  *Id.*; *see* Exec. Order No. 14,259, 90 Fed. Reg. 15,509 (Apr. 14, 2025).  More recently, the President suspended the additional PRC reciprocal tariffs for 90 days "[i]n recognition of the intentions of the PRC to facilitate addressing the national emergency."  Exec. Order No. 14,298, 90 Fed. Reg. 21,831, 21,832 (May 21, 2025).

### 3.    Initial effects of tariffs

The tariffs have prompted discussions with trading partners to facilitate solutions to economic and national-security crises found by the President. According to Executive Order 14,266, "more than 75 … foreign trading partners … have approached the United States to address the lack of trade reciprocity in our economic relationships and our resulting national and economic security concerns." 90 Fed. Reg. at 15,626. The Secretary of Commerce has likewise explained that after the April 2 announcement, "foreign-trading partners that have run trade deficits in goods for years, and helped hollow out the American manufacturing base, immediately came to the negotiating table." JA77-78; *see also* JA72 (Secretary of Treasury) ("The tariffs have proven to be well-tailored to bring trading partners to the table."); JA84-85 (U.S. Trade Representative) (similar). These negotiations have produced the general terms of a historic trade deal with the United Kingdom. JA78 (Secretary of Commerce); Exec. Order No. 14,309, 90 Fed. Reg. 26,419 (June 16, 2025) (starting to implement these terms). The subsequent 90-day pause likewise "has been a success," JA78, and the PRC tariff increase "applied additional pressure to" bring China "to the negotiating table," resulting in a "90-day agreement … to reduce China's tariffs on U.S. exports,"

- 18 -

JA78-79, and a recent framework to implement that deal, *see* Joint Statement on U.S.-China Economic and Trade Meeting in Geneva (May 12, 2025), https://www.whitehouse.gov/briefings-statements/2025/05/joint-statement-on-u-s-china-economic-and-trade-meeting-in-geneva/.

### C.    Litigation

1.     Plaintiffs are companies that claim to import goods from China and other countries affected by tariffs.  JA17; JA31-32.  They brought this suit to challenge the trafficking-related tariffs as applied to China (though not as to Mexico and Canada), as well as the reciprocal tariffs, and sought injunctive and declaratory relief.  JA1-5 & n.2.  The government moved to transfer the case to the CIT on the ground that it possesses exclusive jurisdiction. Plaintiffs moved for a preliminary injunction.

2.     On May 28, the CIT concluded that the reciprocal and trafficking-related tariffs are invalid, and permanently enjoined their enforcement, in *V.O.S. Selections, Inc. v. United States*, 2025 WL 1514124 (Ct. Int'l Trade May 28, 2025) (per curiam).  The CIT did not embrace the argument that the President's power to "regulate … importation" under IEEPA, 50 U.S.C. § 1702(a)(1)(B), does not allow him to impose tariffs.  Rather, the CIT concluded—on the basis of nondelegation concerns, the major-questions

doctrine, and broader separation-of-powers principles—that the reciprocal tariffs are too broad to fall within the IEEPA power.  2025 WL 1514124, at *10-13.  The CIT further determined that Section 122 of the Trade Act of 1974, which authorizes the President to impose tariffs in response to certain balance-of-payments issues, implicitly "removes the President's power to impose remedies in response to balance-of-payments deficits, and specifically trade deficits, from the broader powers granted to a president during a national emergency under IEEPA."  *Id.* at *14.  Finally, the CIT held that the trafficking-related tariffs are invalid because they do not "deal with" the declared trafficking emergencies in the manner required by 50 U.S.C. § 1701(a).  2025 WL 1514124, at *15-21.

The government appealed the CIT's ruling to the Federal Circuit and sought a stay pending appeal.  The en banc Federal Circuit granted a stay and set oral argument for July 31.  *V.O.S. Selections, Inc. v. Trump*, 2025 WL 1649290 (Fed. Cir. June 10, 2025).

3.    Shortly after the government filed its stay motion in the Federal Circuit, the district court denied transfer to the CIT and granted a preliminary injunction in this case as to plaintiffs only.  JA87-88.

The court interpreted § 1581(i)(1) to mean that jurisdiction over challenges to tariffs imposed under IEEPA "turns on whether," on the merits, "IEEPA is a 'law … providing for' 'tariffs … on the importation of merchandise for reasons other than the raising of revenue.'" JA101 (quoting 28 U.S.C. § 1581(i)(1)). The court answered that question in the negative, concluding (unlike the CIT) that IEEPA does not allow *any* tariffs. JA104; JA108-109; JA114; JA115. In doing so, the court expressly disagreed with the interpretation of IEEPA's predecessor statute adopted by the Federal Circuit's predecessor court in *Yoshida*, and further disagreed that Congress had ratified that interpretation by incorporating verbatim in IEEPA the operative language of the predecessor statute. JA111-115.

On the equities, the court agreed with the government "that the public has a compelling interest in the 'President's conduct of foreign affairs and efforts to protect national security.'" JA120. The court concluded, however, that any harm to the government from an injunction in the plaintiffs' favor would be marginal given that significant harm "will flow, if at all, from [the] … sweeping order" previously issued by the CIT. *Id.*

The government filed this appeal and moved in both the district court and this Court for a stay pending appeal.  The district court entered a stay, and the government withdrew the stay motion it had filed in this Court.

4.    Plaintiffs have filed a petition for a writ of certiorari before judgment in this case.  *Learning Resources, Inc. v. Trump*, No. 24-1287 (filed June 17, 2025).  The Supreme Court denied plaintiffs' motion to expedite consideration of that petition.

## SUMMARY OF ARGUMENT

I.    The district court lacked jurisdiction, so this Court should vacate the injunction and remand with instructions to dismiss this case or transfer it to the CIT.  The CIT's exclusive jurisdiction encompasses all cases against the government that "arise[] out of any law of the United States providing for … tariffs" or "for … administration and enforcement with respect to" tariffs.  28 U.S.C. § 1581(i)(1), (i)(1)(B), (i)(1)(D).  This is such a case because plaintiffs challenge executive orders modifying the HTSUS, and both the HTSUS and modifications to it are "considered to be statutory provisions of law for all purposes."  19 U.S.C. § 3004(c)(1)(C).  The CIT has accordingly concluded that it has exclusive jurisdiction over a materially identical suit, *V.O.S. Selections, Inc. v. United States*, 2025 WL 1514124, at *7-8 (Ct. Int'l Trade

May 28, 2025) (per curiam), and every other district court to consider the question has agreed that challenges to these tariffs fall within the CIT's exclusive jurisdiction.

The district court's contrary view—under which jurisdiction rises and falls with the merits of plaintiffs' claim that IEEPA does not authorize tariffs—not only undermines Congress's deliberate routing of such matters to a single forum, but also ignores the cardinal principle that jurisdictional statutes should not be read in a way that "would make a court's jurisdiction … dependent upon the merits of the claim." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 554 (2022). Moreover, it ignores this Court's repeated cautions that district courts should allow the CIT to determine its own jurisdiction. *SCM Corp. v. ITC*, 549 F.2d 812, 821 (D.C. Cir. 1977); *Miami Free Zone Corp. v. Foreign Trade Zones Bd.*, 22 F.3d 1110, 1113 (D.C. Cir. 1994).

II.    The district court further erred on the merits. IEEPA authorizes the President to "regulate … importation" of certain property. 50 U.S.C. § 1702(a)(1)(B). Tariffs are a way of controlling or adjusting imports and thus a way of "regulat[ing]" them, according to the plain meaning of that word. Supreme Court precedents bolster that conclusion. *See Federal Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 561 (1976); *Gibbons v. Ogden*, 22 U.S. (9

Wheat.) 1, 202 (1824).  The Federal Circuit's predecessor interpreted TWEA's identical language to include the power to "impos[e] an import duty surcharge." *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 576 (C.C.P.A. 1975). And Congress, knowing of that interpretation, ratified it by later incorporating in IEEPA exactly the language construed broadly in *Yoshida*.  IEEPA's text, history, and precedent thus all support the conclusion that it authorizes tariffs.

The district court reached its contrary conclusion only by misapplying numerous principles of statutory construction, dismissing the significance of Congress's ratification of *Yoshida*, and invoking several inapposite extrastatutory principles.  The major-questions doctrine is inapplicable here, both because IEEPA delegates power directly to the President and because there is no basis for skepticism that Congress meant for IEEPA to allow the challenged tariffs.  Ordinary nondelegation principles are likewise inapplicable in this foreign-affairs context, and to the extent the ordinary standard is applicable, IEEPA easily satisfies it.  And there is no basis to construe IEEPA's emergency authorities narrowly on the ground that Congress has elsewhere supplied the President with certain non-emergency tariff authorities.

III.    Finally, regardless of the merits, the district court abused its discretion in concluding that the equitable factors weighed in favor of a preliminary injunction barring collection of the tariffs at issue from the plaintiffs. The preliminary injunction would significantly harm the government if it were to take effect.  The harms that plaintiffs assert, by contrast, are either speculative or fully remediable in the event that plaintiffs ultimately prevail. And even if that were not so, plaintiffs' asserted harms pale in comparison to the government's.

## STANDARD OF REVIEW

This Court reviews de novo "a district court's legal conclusions" in a preliminary-injunction ruling, including any "legal conclusion about the likelihood of irreparable harm."  *Clevinger v. Advocacy Holdings, Inc.*, 134 F.4th 1230, 1233 (D.C. Cir. 2025).  It "review[s] any weighing of the preliminary injunction factors for abuse of discretion."  *Id.*  It "accept[s] a district court's factual findings unless they are clearly erroneous."  *Id.* at 1234.

## ARGUMENT

### I.    The District Court Lacked Jurisdiction

This Court should vacate the district court's preliminary injunction, and remand with instructions to dismiss the underlying litigation or transfer it to the CIT, because the district court lacks jurisdiction.

1.    Congress has granted the CIT exclusive jurisdiction over a host of different types of suits addressing international-trade matters.  28 U.S.C. § 1581.  District courts lack jurisdiction over such matters.  *See id.* § 1337(c); *K Mart Corp. v. Cartier, Inc.*, 485 U.S. 176, 182-183 (1988).  As relevant here, the CIT's exclusive jurisdiction encompasses "any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for … tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue" or "any law of the United States providing for … administration and enforcement with respect to" such tariffs.  28 U.S.C. § 1581(i)(1), (i)(1)(B), (D).

Plaintiffs' challenge here "arises out of" a "law of the United States providing for … tariffs" or for their "administration and enforcement"—specifically, the HTSUS and the President's modifications to it in the challenged executive orders.

a.      The HTSUS establishes the tariff rates for most merchandise imported into the United States.  *See* 19 U.S.C. § 1202; *Michael Simon Design, Inc. v. United States*, 609 F.3d 1335, 1336 (Fed. Cir. 2010).[1]  The statute establishing the HTSUS specifies that "[e]ach modification or change made to the Harmonized Tariff Schedule by the President under authority of law," as well as "[t]he provisions of the Harmonized Tariff Schedule … enacted by" Congress, "shall be considered to be statutory provisions of law for all purposes."  19 U.S.C. § 3004(c)(1).  The HTSUS, and modifications to it, are therefore both "law[s] of the United States providing for … tariffs" and "law[s] of the United States providing for … administration and enforcement with respect to" tariffs, 28 U.S.C. § 1581(i)(1)(B), (D).

The challenged executive orders modified the HTSUS — for example, by "inserting … new headings" providing for specific tariff rates applicable to goods from each country, 90 Fed. Reg. at 15,090, by "modifying the HTSUS to temporarily suspend" certain tariffs, 90 Fed. Reg. at 15,626, or by

---

[1] Although it is "codified at 19 U.S.C. § 1202," *Arko Foods Int'l, Inc. v. United States*, 654 F.3d 1361, 1363 (Fed. Cir. 2011), the HTSUS is not published in the U.S. Code; it is instead separately published by the International Trade Commission.  *See* 19 U.S.C. § 3007; Int'l Trade Comm'n, *Harmonized Tariff Schedule*, https://hts.usitc.gov/ (last visited June 17, 2025).

directing the Secretary of Homeland Security to alter the HTSUS to effectu-
ate the orders, 90 Fed. Reg. at 9123.  Plaintiffs' complaint repeatedly recog-
nizes as much, frequently noting that one of the challenged orders "modifies
the HTSUS" or otherwise acknowledging these changes.  JA27; JA28; *accord*
JA17; JA25; JA35-36; JA41-43; JA45.

      b.      Moreover, this case plainly "arises out of," 28 U.S.C. § 1581(i)(1),
the HTSUS and the executive orders modifying it.  The crux of plaintiffs'
claim is that, because of the executive orders and "corresponding revisions
to the HTSUS," they "must pay additional tariffs to the federal government"
for goods they import, rather than importing goods at the lower tariff that
previously prevailed.  JA19; *see* JA51-53 (declaration describing changes in
tariffs applicable to plaintiffs' imports).  And plaintiffs seek a declaration
that the "modifications to the HTSUS" occasioned by the challenged execu-
tive orders "are unlawful," as well as an injunction against their enforce-
ment, JA35-37; JA41; JA43, and an order "set[ting] aside" the modifications,
JA41; JA43; JA45.

      The CIT has accordingly explained that it has exclusive jurisdiction
over challenges to the tariffs at issue here.  The CIT observed that the chal-
lenged executive orders "made amendments to the HTSUS," which "is the

law of the United States setting tariffs." *V.O.S. Selections, Inc. v. United States*, 2025 WL 1514124, at *7 (Ct. Int'l Trade May 28, 2025) (per curiam). And after the district court's decision here, the CIT reiterated (in a ruling addressing the government's motions to stay the injunction the CIT had issued) that it had jurisdiction because the challenged executive orders "effect changes to the [HTSUS]" and are thus "laws" within the meaning of § 1581(i)(1), in that they "they modify a statute" and "bind Customs to collect duties at the rates they prescribe." *V.O.S. Selections, Inc. v. United States*, No. 25-cv-66, Dkt. 63, at 3 (Ct. Int'l Trade June 3, 2025) (*V.O.S.* Stay Order). Three other district courts facing challenges to the same tariffs have likewise recognized that suits of this type belong exclusively in the CIT. *See California v. Trump*, 2025 WL 1569334, at *4 (N.D. Cal. June 2, 2025), *appeal pending*, No. 25-3493 (9th Cir.); *Webber v. DHS*, 2025 WL 1207587 (D. Mont. Apr. 25, 2025), *appeal pending*, No. 25-2717 (9th Cir.); *Emily Ley Paper, Inc. v. Trump*, 2025 WL 1482771 (N.D. Fla. May 20, 2025).

Congress's choice to consolidate tariff challenges in the CIT, with appellate review in the Federal Circuit, reflects its longstanding view of the importance of national uniformity in this specialized domain. For more than a century, Congress has vested a single national court with exclusive

jurisdiction over tariff cases, *see* Customs Administration Act of 1890, ch. 407, 26 Stat. 131 (establishing Board of Appraisers); Act of May 28, 1926, ch. 411, 44 Stat. 669 (establishing Customs Court), ensuring "uniformity and consistency" by designating a single forum with "expertise in international trade and tariff matters," *Conoco, Inc. v. U.S. Foreign-Trade Zones Bd.*, 18 F.3d 1581, 1586 (Fed. Cir. 1994); *see, e.g.*, *United States v. Haggar Apparel Co.*, 526 U.S. 380, 394 (1999) (CIT's "expertise … guides it in making complex determinations in a specialized area of the law"); *California*, 2025 WL 1569334, at *5-6; *Webber*, 2025 WL 1207587, at *7; *Emily Ley Paper*, 2025 WL 1482771, at *8. That choice reflects the importance, in the international-trade arena, of "eliminat[ing] the possibility of conflicting decision[s]" from different courts and ensuring "expeditious decisions in matters which are important both to our country and to our trading partners."  S. Rep. No. 96-466, at 3-4 (1979). Providing a single forum for such matters is particularly appropriate in light of the constitutional requirement that "all Duties, Imposts and Excises shall be uniform throughout the United States."  U.S. Const. art. 1, § 8, cl. 1.

2.     The district court addressed the effect of the executive orders' modification of the HTSUS only in a footnote, stating that "[t]his case 'arises out of' the substantive law under which the President acted—IEEPA—not

the HTSUS." JA102 n.4. The district court did not reconcile that claim with the statutory text defining the HTSUS itself, and "[e]ach modification or change made" to the HTSUS by the President, as "statutory provisions of law for all purposes." 19 U.S.C. § 3004(c)(1)(A), (C). Plaintiffs' claim is that the challenged tariffs, which are prescribed in the HTSUS, are unlawful. That sort of challenge to the legality of particular tariffs is in the heartland of the CIT's exclusive jurisdiction. The district court cited no case in which a district court has entertained a challenge from a party asserting that it is being subject to unlawful tariffs set forth in the HTSUS, and we are aware of none. The CIT and the Federal Circuit, by contrast, hear such challenges routinely. *See, e.g.*, *Solar Energy Indus. Ass'n v. United States*, 86 F.4th 885 (Fed. Cir. 2023), *modified on reh'g*, 111 F.4th 1349 (Fed. Cir. 2024); *PrimeSource Bldg. Prods., Inc. v. United States*, 59 F.4th 1255 (Fed. Cir. 2023); *Transpacific Steel LLC v. United States*, 4 F.4th 1306 (Fed. Cir. 2021).

The district court instead believed that the CIT would have jurisdiction only if IEEPA actually authorized the tariffs at issue here, and thus treated the merits of plaintiffs' IEEPA claim and the jurisdictional issue as a single inquiry. JA102-103. But the Supreme Court has cautioned against reading jurisdictional statutes in a way that "would make a court's jurisdiction …

- 31 -

dependent upon the merits of the claim." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 554 (2022). For good reason: As the Federal Circuit has elsewhere explained, where Congress has provided for review of a class of cases in a particular court, "it would be nonsensical to say that the jurisdiction of the reviewing body is limited to instances in which the underlying decision construes and applies the statute correctly." *Michael Simon Design*, 609 F.3d at 1341. The CIT's exclusive jurisdiction therefore cannot be evaded simply by asserting that a particular statute does not authorize tariffs. Otherwise, any plaintiff could thwart Congress's goal of consolidating tariff matters in a specialized court by artful pleading, and any district court could eliminate the benefits of a specialized national court of exclusive jurisdiction by simply declaring that the CIT lacked jurisdiction and issuing a contrary ruling. The CIT, by contrast, would have jurisdiction to grant judgment in the government's favor but would be required to dismiss for lack of jurisdiction without granting relief whenever it concluded that tariffs were in fact not authorized by the relevant statute. In either instance, Congress's goal of national uniformity in the administration of tariff matters would be thwarted.

The CIT's jurisdiction has never been treated in this nonsensical fashion. The CIT's predecessor, for example, granted judgment to plaintiffs on

the merits after holding that tariffs imposed under TWEA were not author-ized by statute, before being reversed by the Federal Circuit's predecessor. *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560 (C.C.P.A. 1975). The CIT thus quite properly emphasized, in the parallel challenge to the tariffs at issue here, that its jurisdiction "does not hinge on whether IEEPA authorizes tar-iffs as a categorical matter." *V.O.S.* Stay Order at 3. Otherwise, the CIT ob-served, it would "have exclusive jurisdiction to hear only *un*successful claims of *ultra vires* presidential tariff orders," which "would accomplish the opposite of 'remedy[ing] the confusion over the division of jurisdiction be-tween … the [CIT] … and the district courts and … ensur[ing] uniformity in the judicial decisionmaking process.'" *Id.* at 3 n.2 (quoting *K Mart*, 485 U.S. at 188). The CIT's approach is consistent with the Supreme Court's refusal to read a jurisdictional statute to mean that, "if [a] court ultimately rejected the claim on the merits, that holding would mean that the court never had jurisdiction." *Aleman Gonzalez*, 596 U.S. at 554.

The district court's cavalier approach to rejecting the CIT's jurisdiction is all the more remarkable because it disregarded this Court's deferential ap-proach to the CIT's (and the Federal Circuit's) determination of jurisdiction over such cases. In *SCM Corp. v. ITC*, 549 F.2d 812 (D.C. Cir. 1977), a

manufacturer appealed the district court's determination that the Customs Court (the CIT's predecessor) had exclusive jurisdiction over a challenge to trade sanctions. This Court recognized that the plaintiff had raised "far from frivolous doubts concerning its ability to obtain review in the Customs Court," but given the "quite possible" arguments in favor of the Customs Court's jurisdiction, this Court concluded "that the Customs Court itself should be given the opportunity to … determine whether or not it ha[d] jurisdiction." *Id.* at 821. The Court reached a similar conclusion in *Miami Free Zone Corp. v. Foreign Trade Zones Bd.*, 22 F.3d 1110 (D.C. Cir. 1994): Citing "the value of uniformity in judicial review of" trade-related matters, this Court deferred to the Federal Circuit's conclusion that the CIT possessed exclusive jurisdiction over a challenge to the creation of a foreign trade zone, even though this Court found "some support" for a contrary conclusion. *Id.* at 1113. The district court here gave no consideration to the prudential course this Court has established to respect Congress's allocation of exclusive jurisdiction to the CIT. To the extent the court had any doubt about the correctness of the CIT's prior jurisdictional ruling, "the prudent thing to do" would have been to "transfer the case to the CIT so that the CIT [could] determine the question of its own jurisdiction," rather than introducing

uncertainty into this area through conflicting rulings.  *Pentax Corp. v. Myhra*, 72 F.3d 708, 711 (9th Cir. 1995); *see Commodities Exp. Co. v. U.S. Customs Serv.*, 957 F.2d 223, 227 (6th Cir. 1992) (granting preclusive effect to CIT's determination of its own jurisdiction because "the CIT has the power to decide its own jurisdiction").

## II. IEEPA Clearly Authorizes The Challenged Tariffs

The district court further erred on the merits:  IEEPA's text, history, and precedent confirm that it clearly empowers the President to impose tariffs to address declared emergencies.

1.    IEEPA authorizes the President to "regulate … any … importation … of … any property in which any foreign country or a national thereof has any interest."  50 U.S.C. § 1702(a)(1)(B).  The authority to "regulate" imports includes the power to impose tariffs on imports.

That follows from the ordinary meaning of "regulate": to "fix, establish or control; to adjust by rule, method, or established mode; to direct by rule or restriction; to subject to governing principles or laws."  *Regulate*, Black's Law Dictionary 1156 (5th ed. 1979); *see, e.g.*, *Regulate*, Webster's Third New International Dictionary 1913 (1976) ("to govern or direct according to rule"; "to bring under the control of law or constituted authority").  Imposing

tariffs on imports is clearly a way of "control[ling]" imports (*Black's*); "gov-ern[ing] or direct[ing]" them "according to rule" (*Webster's*); "adjust[ing]" them "by rule, method, or established mode" (*Black's*); or, more generally, "subject[ing]" them "to governing principles or laws" (*Black's*).

Precedent bolsters that conclusion. As far back as *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1 (1824), Chief Justice Marshall referred to "[t]he right to reg-ulate commerce … by the imposition of duties." *Id.* at 202; *see id.* (duties "often are[] imposed … with a view to the regulation of commerce"). More recently, the Supreme Court has held that a statute authorizing the President "'to adjust the imports'" of a product allowed not just "quantitative meth-ods" for determining import quantities—that is, "quotas"—but also "mone-tary methods," such as "license fees," for "effecting such adjustments." *Fed-eral Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 561 (1976). Such fees, the Court explained, have an "initial and direct impact on imports" "as much as a quota" would. *Id.* at 571. Exactly the same is true of *ad valorem* tariffs like those at issue here (that is, tariffs proportional to the value of the imports in question). Like the license fees in *Algonquin*—a fee for each barrel of oil imported—these tariffs are a "monetary method" for "adjusting" imports, and thus a means of "regulating" imports. *See Borusan Mannesmann Boru*

*Sanayi ve Ticaret A.S. v. United States*, 63 F.4th 25, 34 (Fed. Cir. 2023) (holding that "quotas" and "duties" are alternative means of "'adjust[ing] imports'" (quoting *Algonquin*, 426 U.S. at 561)).

A year before *Algonquin*, moreover, the Federal Circuit's predecessor reached the same conclusion, as to the very statutory language at issue here, in *Yoshida*.  It construed the President's power "to 'regulate importation'" under TWEA as encompassing the power to "impos[e] an import duty surcharge."  526 F.2d at 576; *see id.* at 575.

Finally, if any doubt remained on this point, it would be eliminated by Congress's choice to "draw[]" IEEPA's language "directly" from TWEA, *Dames & Moore v. Regan*, 453 U.S. 654, 671 (1981), after *Yoshida* had interpreted it to authorize tariffs.  "Congress is presumed to be aware of an administrative or judicial interpretation of a statute[.]"  *Lorillard v. Pons*, 434 U.S. 575, 580 (1978).  Here, there is not just a presumption but direct evidence that Congress knew of *Yoshida*:  The House Report on IEEPA cited *Yoshida* and approvingly discussed its holding.  IEEPA House Report 5.  Congress's awareness of *Yoshida* is unsurprising:  The tariffs upheld in *Yoshida* were a matter of sufficiently widespread public attention that, as the district court noted here, they became "known as the 'Nixon shock.'"  JA112.  And "when

Congress 'adopt[s] the language used in [an] earlier act,'" courts "presume that Congress 'adopted also the construction given'" to that language. *Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255, 270 (2020). Here, while Congress knew that TWEA had been interpreted to allow the imposition of tariffs, Congress chose to use the same language that conferred that authority in IEEPA. Congress created certain exceptions to the President's authority under IEEPA, but none of those exceptions removes tariffs from the scope of the President's power. *See* 50 U.S.C. § 1702(b).

    2.    The district court's contrary conclusion lacks merit.

    a.    The district court offered no persuasive rationale for its construction of the statutory text. The court reasoned that "[t]o regulate is to establish rules governing conduct," while "to tariff is to raise revenue through taxes on imports or exports." JA105. But that is a false dichotomy. The jurisdictional statute specifically distinguishes between "law[s] … providing for … revenue from imports" and those providing for "tariffs … for reasons other than the raising of revenue." 28 U.S.C. § 1581(i)(1). And more generally, tariffs and taxes are routinely used not just to raise revenue but to influence conduct. *See, e.g.*, *NFIB v. Sebelius*, 567 U.S. 519, 567 (2012) ("Some of our

earliest federal taxes sought to deter the purchase of imported manufactured goods in order to foster the growth of domestic industry.").

The district court similarly erred in emphasizing the constitutional distinction between the power to tax and tariff and the power to regulate interstate commerce (JA104-105). The Supreme Court has recognized that although "the taxing power is a distinct power and embraces the power to lay duties, it does not follow that duties may not be imposed in the exercise of the power to regulate commerce." *Board of Trs. of Univ. of Ill. v. United States*, 289 U.S. 48, 58 (1933); *accord, e.g.*, *Yoshida*, 526 F.2d at 575 n.20 ("it is well established that" the power to "lay duties upon imports" "can be employed in the exercise" of "the power to regulate commerce" (collecting cases)). The fact that agencies cannot "use [their] standard regulatory powers to raise revenue by imposing fees, tariffs, or taxes" (JA109) is far afield. To say that EPA cannot impose taxes under its authority to "promulgate regulations establishing emissions standards," 42 U.S.C. § 7412—an example the district court gave—says little about whether the power to "regulate … importation" includes the power to impose tariffs, a standard tool for governing imports.

The district court further erred in applying the *noscitur a sociis* canon to conclude that the meaning of "'regulate'" is narrowed by neighboring verbs: "'investigate, block … , direct and compel, nullify, void, prevent or prohibit.'"  JA105-106 (quoting 50 U.S.C. § 1702(a)(1)(B)).  The *noscitur* canon helps to identify which meaning of an ambiguous word applies in a given context—for example, to discern that Shakespeare meant a spear rather than a type of fish when he listed "pike" alongside "sword," "knife," and "gun."  Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 195 (2012) (quotation marks omitted).  But here, the fact that none of the other verbs in § 1702(a)(1)(B) "deals with the power to raise revenue" does not mean the word "regulate" should be understood to exclude tariffs.  It is hardly surprising for Congress to have given the President, in the same provision, multiple types of power over imports—both the power to "block" or "prevent" them and the power to impose tariffs on them.  After all, the IEEPA power must be "broad and extensive" in order for the President "to have, within constitutional boundaries, the flexibility required to meet problems surrounding a national emergency with the success desired by Congress."  *Yoshida*, 526 F.2d at 573.  And even if the canon did imply that

"regulate" should be understood not to authorize tariffs for the purpose of raising revenue, that is not the only purpose for which tariffs are imposed.

The district court suggested that construing "regulate" to authorize tariffs would "conflict[] with" the "textual limits" on § 1702—namely that the § 1702 authority "extend[s] only to 'any property in which any foreign country or a national thereof has any interest.'" JA110. But the fact that "[t]ariffs are typically assessed after U.S.-based importers have taken legal possession of imported goods," JA110, does not mean they are not a way of regulating "property in which any foreign country or a national thereof has any interest," 50 U.S.C. § 1702(a)(1)(B). This Court has emphasized that the statutory reference to "'any interest'" broadly extends beyond possessory legal interests. *Holy Land Found. v. Ashcroft*, 333 F.3d 156, 162-163 (D.C. Cir. 2003). Thus, this Court held that IEEPA allowed the government to block the assets of an organization that raised funds for Hamas, even though Hamas had no "legally protected" interest in the funds. *Id.* at 163. Foreign nationals who sell property to domestic importers likewise have an "interest" in the property regardless of whether they own it when tariffs are collected.

The district court also erred in minimizing the importance of Congress's decision to incorporate in IEEPA the same language that the Federal Circuit's predecessor had construed broadly in *Yoshida*. The court gave no reason for "disagree[ing]" (JA111 n.8) with the general rule that, "when Congress 'adopt[s] the language used in [an] earlier act,'" as it did here, courts should "presume that Congress 'adopted also the construction given'" to that language. *Public.Resource.Org*, 590 U.S. at 270. The court cited plaintiffs' argument "that courts only assume Congress adopts an earlier judicial construction of a phrase where there is 'settled precedent' on the interpretation of a statute" (JA115), but the court did not endorse that argument, presumably because it would be hard to doubt that *Yoshida*—a decision issued by the appellate court with nationwide jurisdiction over international-trade issues—was settled precedent.

The district court further erred in suggesting that Congress meant for IEEPA "to be 'more limited in scope than'" TWEA. JA114. To the extent Congress limited the President's authority in IEEPA, it did so by enumerating exceptions to the President's power in § 1702(b), not by restricting the general grant of authority in § 1702(a), which uses the same language as TWEA. That is why the Supreme Court recognized that IEEPA supplies

"essentially the same" peacetime powers previously supplied by TWEA. *Regan v. Wald*, 468 U.S. 222, 227-228 (1984); *see also American Int'l Grp., Inc. v. Islamic Republic of Iran*, 657 F.2d 430, 440 (D.C. Cir. 1981) ("The House Report accompanying [IEEPA] states that the language in question 'basically parallels' section 5(b) of [TWEA]." (citing IEEPA House Report 14-15)).

The district court criticized *Yoshida*'s approach to statutory interpretation, concluding it conflicts with "how courts approach statutory interpretation" today. JA113. Whether or not that is true, it is irrelevant: What matters is that Congress, fully aware of *Yoshida*, chose to incorporate in IEEPA the same language construed in *Yoshida*. The implication of that choice does not depend on whether *Yoshida* was persuasive. For the same reason, it is irrelevant that President Nixon did not expressly cite TWEA in his proclamation imposing tariffs. JA112 & n.10. As *Yoshida* explained, "TWEA was not cited in Proclamation 4074 by name … because it would be inappropriate in a proclamation affecting 'friendly' or 'neutral' nations," and it was impliedly "incorporated" as an authority for the proclamation because the proclamation invoked statutory powers "'not limited to'" those that it expressly cited. 526 F.2d at 575 n.22. And in any event, *Yoshida* plainly relied on TWEA as

authority for the Nixon tariffs, and Congress knew of *Yoshida*'s settled interpretation of TWEA when it incorporated the same language in IEEPA.

Finally, the district court incorrectly characterized *Yoshida* as having "expressly rejected the premise that … TWEA enabled the President to 'impos[e] whatever tariff rates he deems desirable.'"  JA114.  *Yoshida* simply declined to address the lower court's "unease" over that prospect, explaining that "presidential actions must be judged in the light of what the President actually did, not in the light of what he could have done."  526 F.2d at 577. In any event, the government's interpretation does not embrace the boundless power the district court posited, and the district court's mistaken construction of *Yoshida* does not support its holding that IEEPA allows no tariffs at all.  That conclusion plainly conflicts with *Yoshida* and Congress's ratification of it.

b.    The district court also invoked a number of extrastatutory principles of interpretation.  Those rationales are no more compelling.  As an initial matter, such considerations cannot overcome a statute's plain text: "where, as here, the words of [a] statute are unambiguous, the judicial inquiry is complete." *Babb v. Wilkie*, 589 U.S. 399, 413 (2020) (quotation marks omitted).  For the reasons discussed above, there is no genuine ambiguity as

to whether IEEPA's plain text authorizes the imposition of tariffs. Any further analysis is therefore inappropriate. And even if relevant, the district court's extrastatutory rationales are unpersuasive.

i. The district court appeared to invoke the major-questions doctrine, citing *Biden v. Nebraska*, 600 U.S. 477, 505-506 (2023), for the proposition that Congress would have needed to speak more clearly to authorize the President to impose tariffs under IEEPA. *See* JA105. But that doctrine addresses the "particular and recurring problem" of "*agencies* asserting highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (emphasis added). Those concerns dissipate when, as here, Congress delegates authority directly to the President—"the most democratic and politically accountable official in Government," *Seila Law LLC* v. *CFPB*, 591 U.S. 197, 224 (2020). *See, e.g.*, *Mayes v. Biden*, 67 F.4th 921, 933 (9th Cir.), *vacated as moot*, 89 F.4th 1186 (9th Cir. 2023).

In any event, the concerns animating the doctrine are inapplicable here. The doctrine reflects a "presum[ption] that 'Congress intends to make major policy decisions itself'" rather than "'leav[ing] those decisions to agencies.'" *West Virginia*, 597 U.S. at 723. It therefore counsels judicial

"skepticism" where "an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,'" *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014), particularly where there is an apparent "'mismatch[]'" between the breadth of the asserted power and the "narrow[ness]" of the statute in which the agency claims to have discovered it, *Nebraska*, 600 U.S. at 517-518 (Barrett, J., concurring), and where the asserted power falls outside the agency's "wheelhouse," *id.* at 518-519.  Those are the sorts of cases in which it seems most unlikely that Congress actually meant for the agency to make the relevant type of decision.  None of those grounds for skepticism is present here.

First, the President's power over international trade under IEEPA is not some "unheralded" invocation of an apparently "narrow" statute.  Quite the opposite:  IEEPA expressly authorizes actions to address national emergencies, including actions (like "prohibit[ing]" imports from certain countries, 50 U.S.C. § 1702(a)(1)(B)) that are far more significant than the ones at issue here.  In other words, IEEPA is on its face *all about* giving the President major powers to address major concerns.  It would be perverse to apply the major-questions doctrine to curtail Congress's conscious efforts to give the President broad and flexible tools to address the most major of questions.

Second, it is particularly inappropriate to construe narrowly a delegation of power in the arena of foreign affairs and national security—areas that implicate the President's expertise and independent constitutional authority, *see, e.g.*, *Department of the Navy v. Egan*, 484 U.S. 518, 529-530 (1988); *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 188 (1993). Exactly the opposite is true: "[U]nless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." *Egan*, 484 U.S. at 530; *see also, e.g.*, *Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention."); *FCC v. Consumers' Research*, 2025 WL 1773630, at *23 (U.S. June 27, 2025) (Kavanaugh, J., concurring) (noting that "the major questions canon has not been applied by [the Supreme] Court in the national security or foreign policy contexts, because … the usual understanding is that Congress intends to give the President substantial authority and flexibility"); *Al-Bihani v. Obama*, 619 F.3d 1, 38-39 (D.C. Cir. 2010) (Kavanaugh, J., concurring in the denial of rehearing en banc) (discussing the "deeply rooted tradition of judicial restraint when the President is executing national security or foreign affairs statutes pursuant to a broad congressional authorization"); *B-West*

*Imports, Inc. v. United States*, 75 F.3d 633, 636 (Fed. Cir. 1996) (courts "broadly construe[]" "statutes granting the President authority to act in matters touching on foreign affairs").

Finally, the President's imposition of tariffs in the exercise of broad authority delegated by Congress is nothing novel and certainly nothing outside the "wheelhouse" of the Nation's Chief Executive.  Trade measures, of which tariffs are an essential component, have long been used in international diplomacy and even warfare, in episodes ranging from the Non-Intercourse Act, designed in part to punish Britain and France, *see Cargo of Brig Aurora v. United States*, 11 U.S. (7 Cranch) 382, 384 (1813), to the freezing of Iranian assets in response to the seizing of American hostages at the American Embassy in Tehran, *see Dames & Moore*, 453 U.S. at 662.  As discussed above, Presidents have exercised such powers since the Founding, and courts have repeatedly and consistently upheld them.

In any event, even if the major-questions doctrine were applicable, it would be immaterial to the analysis because IEEPA provides "clear congressional authorization for the power" exercised here, *West Virginia*, 597 U.S. at 723.  The major-questions doctrine does not require "an 'unequivocal declaration' from Congress authorizing the *precise* agency action under review."

*Nebraska*, 600 U.S. at 511 (Barrett, J., concurring); *see Florida v. HHS*, 19 F.4th 1271, 1288 (11th Cir. 2021) ("a broad grant of authority" that "plainly encompasses" the action in question "does not require an indication that specific activities are permitted"). IEEPA's text and history and the relevant precedents make clear that it authorizes the President to impose the challenged tariffs to address a declared national emergency.

ii.  The district court further erred in inferring that IEEPA must not authorize tariffs because it does not "include language setting limits on any potential tariff-setting power." JA106.

As an initial matter, IEEPA includes such language: Section 1702 applies only "[a]t the times and to the extent specified in" § 1701. 50 U.S.C. § 1702(a)(1). Section 1701, in turn, specifies that the § 1702 power "may be exercised" only "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." *Id.* § 1701(a). And the NEA itself imposes "procedural" and "temporal limits" (JA106) on emergency declarations. The district court dismissed the relevance of those limits because the NEA power "is broad," JA107 n.6, without

acknowledging that the limits are nonetheless meaningful. And a few pages later, the court itself invoked the "textual limits" that IEEPA itself imposes. JA110.

In any event, the district court failed to explain why the supposed absence of "limits" on the President's power under § 1702 would mean that provision does not authorize tariffs. To the extent the court was referring to the nondelegation doctrine as a potential basis for a limiting construction of § 1702, that was incorrect—both because the constitutional-avoidance canon "'comes into play only when, after the application of ordinary textual analysis,'" a statute is "'susceptible of more than one construction,'" which is not the case here, and because IEEPA raises no "'serious'" nondelegation concern. *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018). The Supreme Court has recognized that when Congress delegates "authority over matters of foreign affairs," it "must of necessity paint with a brush broader than that it customarily wields in domestic areas." *Zemel v. Rusk*, 381 U.S. 1, 17 (1965). That is because "the President has unique responsibility" in the field of "foreign … affairs," *Haitian Ctrs. Council*, 509 U.S. at 188, such that when Congress enacts "legislation which is to be made effective through negotiation and inquiry within the international field," it must afford the President "a degree of

discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved," *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936).

The Supreme Court observed nearly a century ago that "[p]ractically every volume of the United States Statutes contains one or more acts or joint resolutions of Congress authorizing action by the President in respect of subjects affecting foreign relations, which either leave the exercise of the power to his unrestricted judgment, or provide a standard far more general than that which has always been considered requisite with regard to domestic affairs." *Curtiss-Wright*, 299 U.S. at 324. And the Court has long approved such broad delegations to the President—particularly delegations of authority to regulate international trade, including through tariffs. *E.g.*, *Algonquin*, 426 U.S. at 558-560; *J.W. Hampton, Jr., & Co. v. United States*, 276 U. S. 394, 406, 409 (1928); *Marshall Field & Co. v. Clark*, 143 U.S. 649, 680 (1892); *Brig Aurora*, 11 U.S. at 384-388; *see Gundy v. United States*, 588 U.S. 128, 158-159 (2019) (Gorsuch, J., dissenting). Thus, Justice Kavanaugh recently observed that "in the national security and foreign policy realms, the nondelegation doctrine (whatever its scope with respect to domestic legislation) appropriately has played an even more limited role in light of the President's constitutional

responsibilities and independent Article II authority." *Consumers' Research*, 2025 WL 1773630, at *22 (Kavanaugh, J., concurring).

In any event, even if the nondelegation doctrine in its ordinary form were applicable to this foreign-affairs context, IEEPA would pass muster. Congress of course cannot delegate legislative power to another branch or grant an agency unbounded discretion to regulate private parties. But Congress "may commit something to the discretion" of the Executive, *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 46 (1825), as long as it sets forth "an intelligible principle to which the person or body authorized to [act] is directed to conform," *Hampton*, 276 U.S. at 409. That is not a toothless requirement: Congress must delineate both "the general policy" and "the boundaries of th[e] delegated authority." *American Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946). But IEEPA easily satisfies it.

IEEPA's general policy is obvious: "to deal with any unusual and extraordinary [foreign] threat … to the national security, foreign policy, or economy of the United States" during a "national emergency" by authorizing the President to, among other things, "regulate … importation" of property. 50 U.S.C. §§ 1701(a), 1702(a)(1)(B). And its boundaries are likewise plain: The President cannot invoke IEEPA "for any … purpose" "other"

than the one described above, *id.* § 1701(b), and cannot "regulate or prohibit, directly or indirectly," the items set forth in a list of exceptions to his power, *id.* § 1702(b).  Moreover, Congress oversees both the President's exercise of his IEEPA powers, *id.* § 1703, and his declaration of national emergencies as a predicate to invoking IEEPA, *see supra* pp. 9-10.  Every court of appeals to have considered the question has thus upheld IEEPA against nondelegation challenges.  *See United States v. Shih*, 73 F.4th 1077, 1092 (9th Cir. 2023) (collecting four other circuit-court decisions), *cert. denied*, 144 S. Ct. 820 (2024).

iii.    The district court also suggested that the "comprehensive statutory limitations" on other tariff authorities "would be eviscerated if the President could invoke a virtually unrestricted tariffing power under IEEPA." JA107.  But as discussed above, the IEEPA authority is not "unrestricted" or "virtually" so.  And in any event, the existence of non-emergency tariff authorities with different limits is no basis for a narrow construction of IEEPA's emergency authorities.

IEEPA, and the other provisions on which the district court relied, provide independent sources of authority to impose tariffs.  The President's choice to exercise his authority under one does not compel him to comply with the terms of the others.  Courts "approach federal statutes touching on

the same topic with a 'strong presumption' they can coexist harmoniously. Only by carrying a 'heavy burden' can a party" establish "that one statute 'displaces' a second." *Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 63 (2024). And here, IEEPA's emergency powers are "merely complementary," *id.*, to the powers in other statutes, which are broader in some respects (not limited to declared emergencies) and narrower in others (addressing only certain types of concerns).

It is unsurprising that Congress would provide the President with certain limited authorities to address specific harms in non-emergency contexts, while also supplying broader authorities, in IEEPA, when those harms become severe enough to constitute an emergency. Indeed, *Yoshida* expressly adopted that understanding of the relationship between IEEPA's predecessor and one particular non-emergency provision. There, the court explained that "Congress has said what may be done with respect to *foreseeable* events" in a range of statutes, including "the Trade Act of 1974," "and has said what may be done with respect to *unforeseeable* events in the TWEA." 526 F.2d at 578 (emphases added). The court expressly rejected the view that when "delegating broad powers to the President for periodic use during national emergencies," Congress nonetheless "intend[ed] that the President, when

faced with such an emergency, must follow limiting procedures prescribed in other acts designed for continuing use during normal times." *Id.*

And more generally, it is common for Congress to enact overlapping tariff authorities. For example, one provision allows the President to impose "new or additional duties" against products from countries that discriminate against U.S. goods. 19 U.S.C. § 1338. Discriminatory trade practices of that nature could be the root cause of "balance-of-payments" concerns, which provide a basis to impose tariffs under Section 122 of the Trade Act of 1974, 19 U.S.C. § 2132, but no one thinks that Section 122 displaces the provision for tariffs in response to discriminatory trade practices, or vice versa. The provisions coexist.

iv.   Finally, the district court incorrectly suggested that construing "regulate" to allow tariffs "could render IEEPA unconstitutional." JA110. It reasoned that IEEPA authorizes the President to "'regulate … exportation'" as well as "'importation,'" and "[t]he Constitution prohibits export taxes." JA110. But the constitutional bar against duties on exports does not mean the word "regulate" cannot encompass tariffs on imports. It simply means that, for constitutional reasons, only some of the President's statutory powers to "regulate" are available as to exports.

\*        \*        \*

For all these reasons, jurisdictional and substantive, plaintiffs have failed to show a likelihood of success on the merits.

## III.    The District Court Erred In Entering Injunctive Relief

The district court also abused its discretion in concluding that the equitable factors weighed in favor of a preliminary injunction barring collection of the tariffs at issue from the plaintiffs.  The district court's analysis fundamentally misapprehends the foreign-policy and separation-of-powers injuries to the government from injunctive relief, while plaintiffs face no irreparable harm from the payment of tariffs that could be refunded if they prevail.

1.    The district court's injunction interferes with the President's conduct of foreign policy and harms both the government and the public, whose interests "merge" here.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  It is well-established that foreign affairs and national security are "'the province and responsibility of the Executive.'"  *Egan*, 484 U.S. at 529.  The injunction disables the President from exercising that power at the most sensitive possible time.  Multiple members of the President's Cabinet attested that an injunction would harm the economic and national security of the United States,

jeopardizing ongoing negotiations with foreign trading partners "premised on the credible threat of enforcement of the IEEPA tariffs," JA80, leaving "foreign counterparts" with "reduced incentives to reach meaningful agreements[]," and leaving "the American people exposed to predatory economic practices by foreign actors[] and threaten[ing] national security." JA82; *see* JA69, JA73, JA80-81. Trading partners may also "feel emboldened to further distort the conditions of competition for U.S. exporters" if they believe "that the President *lacks* power to promptly respond to future emergencies." JA86. Consequently, an injunction could lead trading partners to take retaliatory actions that the credible threat of further tariffs would otherwise have deterred. JA69, JA73. The Trade Representative described that prospect as "a foreign policy disaster scenario," JA86, and the Secretary of State observed that it "would cause significant and irreparable harm to U.S. foreign policy and national security," JA67.

The district court recognized that "the public has a compelling interest in the 'President's conduct of foreign affairs and efforts to protect national security.'" JA120. And the court acknowledged the significance of those harms in staying its own preliminary injunction—explaining that a stay was warranted "to protect the President's ability to identify and respond to

threats to the U.S. economy and national security" — after the Federal Circuit stayed a broader injunction issued by the CIT. JA126. Those same considerations underscore why injunctive relief was inappropriate from the outset; as the declarations explain, any ruling that calls into question the President's ability to impose the challenged tariffs threatens to undermine recent trade agreements and pending negotiations by diminishing the President's leverage and negating the premise of the negotiations. *See* JA79 (Secretary of Commerce) (discussing effect of a ruling "enjoining the implementation of these IEEPA tariffs or circumscribing the President's authority to act in this domain"); *see* JA68-69 (Secretary of State) (similar). The district court's theory that its injunction would "have virtually no effect on the government" because the CIT had separately "issued an order permanently enjoining the IEEPA tariffs," JA120, ignores these principles.

Finally, the government faces further harm from the preliminary injunction insofar as it may be unable to recover revenue it would have received had the tariffs been in effect. *See Department of Educ. v. California*, 145 S. Ct. 966, 968-969 (2025) (per curiam). At a minimum, this point underscores why the district court erred in fixing only a nominal bond. JA122-123. A central purpose of the bond requirement is to "enable a restrained or

enjoined party to secure indemnification for …. any damages that are sustained during the period in which a wrongfully issued equitable order remains in effect," 11A Charles Alan Wright et al., *Federal Practice & Procedure* § 2954 (3d ed.), Westlaw (database updated May 21, 2025) (footnote omitted), and the district court made no finding that the $100 bond it set would remotely approximate the government's damages, much less that plaintiffs would be unable to post a greater bond, *see DSE, Inc. v. United States*, 169 F.3d 21, 33-34 (D.C. Cir. 1999).

2.    Plaintiffs, by contrast, assert harm in the form of paying tariffs they assert are unlawful. *See* JA49-65. But those injuries are not irreparable: Should plaintiffs ultimately prevail, they can obtain refunds if any duties deposited during these appeals are ultimately held unlawful. *See Sunpreme Inc. v. United States*, 2017 WL 65421, at *5 (C.I.T. Jan. 5, 2017) ("virtually no risk … that [plaintiff] would not be made whole should it prevail"); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297-298 (D.C. Cir. 2006) (availability of later remedy "'weighs heavily against a claim of irreparable harm'").

More generally, plaintiffs assert that they face reduced sales, lost customers, and damaged reputation if the tariffs remain in effect during this

litigation.  JA56-63.  But it is "well settled that economic loss does not, in and of itself, constitute irreparable harm."  *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).  The district court's conclusion that plaintiffs' harms are not fully remediable because they "will not be able to recover lost profits, lost customers, or the 'additional cost[s]' of finding 're-placement[s]' for high-tariff imports" (JA117) would, if adopted, effectively require a finding of irreparable harm to every plaintiff challenging a policy with potential effects on their business.  Moreover, such claims of harm nec-essarily rest on speculation.  For instance, plaintiffs' assertion that the tariffs will increase prices and irreparably harm customer relations and consumer demand (JA57-58) is based on projections relying on previous price changes in other contexts.  *See Wisconsin Gas*, 758 F.2d at 676 ("To ask this court to find that wide swings in [consumer] demand will injure the petitioners, without any evidence to support such a finding, is to ask this court to act on pure conjecture.").  And finally, even assuming such projections show irrep-arable harm, the balance of harms is still not close:  Those injuries pale in comparison to the significant harms an injunction would pose to the govern-ment.

# CONCLUSION

The district court's preliminary injunction should be vacated, and this case remanded with instructions to dismiss it or transfer it to the CIT, for lack of jurisdiction.  Alternatively, the preliminary injunction should be reversed on the merits.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

MARK R. FREEMAN
MICHAEL S. RAAB
BRAD HINSHELWOOD

 */s/ Daniel Winik*
DANIEL WINIK
SOPHIA SHAMS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7245*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8849*
  *Daniel.L.Winik@usdoj.gov*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,513 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Book Antiqua, a proportionally spaced typeface.

*/s/ Daniel Winik*
Daniel Winik

**ADDENDUM**

# TABLE OF CONTENTS

19 U.S.C. § 2132.................................................................................................. A1

28 U.S.C. § 1581.................................................................................................. A2

50 U.S.C. § 1621.................................................................................................. A2

50 U.S.C. § 1622.................................................................................................. A3

50 U.S.C. § 1701.................................................................................................. A5

50 U.S.C. § 1702.................................................................................................. A6

50 U.S.C. § 1703.................................................................................................. A8

**19 U.S.C. § 2132**

**§ 2132. Balance-of-payments authority**

(a) Presidential proclamations of temporary import surcharges and temporary limitations on imports through quotas in situations of fundamental international payments problems

Whenever fundamental international payments problems require special import measures to restrict imports—

(1) to deal with large and serious United States balance-of-payments deficits.

(2) to prevent an imminent and significant depreciation of the dollar in foreign exchange markets, or

(3) to cooperate with other countries in correcting an international balance-of-payments disequilibrium,

the President shall proclaim, for a period not exceeding 150 days (unless such period is extended by Act of Congress)—

(A) a temporary import surcharge, not to exceed 15 percent ad valorem, in the form of duties (in addition to those already imposed, if any) on articles imported into the United States;

(B) temporary limitations through the use of quotas on the importation of articles into the United States; or

(C) both a temporary import surcharge described in subparagraph (A) and temporary limitations described in subparagraph (B).

The authority delegated under subparagraph (B) (and so much of subparagraph (C) as relates to subparagraph (B)) may be exercised (i) only if international trade or monetary agreements to which the United States is a party permit the imposition of quotas as a balance-of-payments measure, and (ii) only to the extent that the fundamental imbalance cannot be dealt with effectively by a surcharge proclaimed pursuant to subparagraph (A) or (C). Any temporary import surcharge proclaimed pursuant to subparagraph (A) or (C) shall be treated as a regular customs duty.

…

**28 U.S.C. § 1581**

**§ 1581. Civil actions against the United States and agencies and officers thereof**

…

(i)(1) In addition to the jurisdiction conferred upon the Court of International Trade by subsections (a)-(h) of this section and subject to the exception set forth in subsection (j) of this section, the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for--

(A) revenue from imports or tonnage;

(B) tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue;

(C) embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety; or

(D) administration and enforcement with respect to the matters referred to in subparagraphs (A) through (C) of this paragraph and subsections (a)-(h) of this section.

…

**50 U.S.C. § 1621**

**§ 1621. Declaration of national emergency by President; publication in Federal Register; effect on other laws; superseding legislation**

(a) With respect to Acts of Congress authorizing the exercise, during the period of a national emergency, of any special or extraordinary power, the President is authorized to declare such national emergency. Such proclamation shall immediately be transmitted to the Congress and published in the Federal Register.

(b) Any provisions of law conferring powers and authorities to be exercised during a national emergency shall be effective and remain in effect (1) only when the President (in accordance with subsection (a) of this section),

specifically declares a national emergency, and (2) only in accordance with this chapter. No law enacted after September 14, 1976, shall supersede this subchapter unless it does so in specific terms, referring to this subchapter, and declaring that the new law supersedes the provisions of this subchapter.

## 50 U.S.C. § 1622

### § 1622. National emergencies

(a) Termination methods

Any national emergency declared by the President in accordance with this subchapter shall terminate if —

(1) there is enacted into law a joint resolution terminating the emergency; or

(2) the President issues a proclamation terminating the emergency.

Any national emergency declared by the President shall be terminated on the date specified in any joint resolution referred to in clause (1) or on the date specified in a proclamation by the President terminating the emergency as provided in clause (2) of this subsection, whichever date is earlier, and any powers or authorities exercised by reason of said emergency shall cease to be exercised after such specified date, except that such termination shall not affect —

(A) any action taken or proceeding pending not finally concluded or determined on such date;

(B) any action or proceeding based on any act committed prior to such date; or

(C) any rights or duties that matured or penalties that were incurred prior to such date.

(b) Termination review of national emergencies by Congress

Not later than six months after a national emergency is declared, and not later than the end of each six-month period thereafter that such emergency continues, each House of Congress shall meet to consider a vote on a joint resolution to determine whether that emergency shall be terminated.

- A3 -

(c) Joint resolution; referral to Congressional committees; conference committee in event of disagreement; filing of report; termination procedure deemed part of rules of House and Senate

(1) A joint resolution to terminate a national emergency declared by the President shall be referred to the appropriate committee of the House of Representatives or the Senate, as the case may be.  One such joint resolution shall be reported out by such committee together with its recommendations within fifteen calendar days after the day on which such resolution is referred to such committee, unless such House shall otherwise determine by the yeas and nays.

(2) Any joint resolution so reported shall become the pending business of the House in question (in the case of the Senate the time for debate shall be equally divided between the proponents and the opponents) and shall be voted on within three calendar days after the day on which such resolution is reported, unless such House shall otherwise determine by yeas and nays.

(3) Such a joint resolution passed by one House shall be referred to the appropriate committee of the other House and shall be reported out by such committee together with its recommendations within fifteen calendar days after the day on which such resolution is referred to such committee and shall thereupon become the pending business of such House and shall be voted upon within three calendar days after the day on which such resolution is reported, unless such House shall otherwise determine by yeas and nays.

(4) In the case of any disagreement between the two Houses of Congress with respect to a joint resolution passed by both Houses, conferees shall be promptly appointed and the committee of conference shall make and file a report with respect to such joint resolution within six calendar days after the day on which managers on the part of the Senate and the House have been appointed. Notwithstanding any rule in either House concerning the printing of conference reports or concerning any delay in the consideration of such reports, such report shall be acted on by both Houses not later than six calendar days after the conference report is filed in the House in which such report is filed first.  In the event the conferees are unable to agree

within forty-eight hours, they shall report back to their respective Houses in disagreement.

(5) Paragraphs (1)-(4) of this subsection, subsection (b) of this section, and section 1651(b) of this title are enacted by Congress--

(A) as an exercise of the rulemaking power of the Senate and the House of Representatives, respectively, and as such they are deemed a part of the rules of each House, respectively, but applicable only with respect to the procedure to be followed in the House in the case of resolutions described by this subsection; and they supersede other rules only to the extent that they are inconsistent therewith; and

(B) with full recognition of the constitutional right of either House to change the rules (so far as relating to the procedure of that House) at any time, in the same manner, and to the same extent as in the case of any other rule of that House.

(d) Automatic termination of national emergency; continuation notice from President to Congress; publication in Federal Register

Any national emergency declared by the President in accordance with this subchapter, and not otherwise previously terminated, shall terminate on the anniversary of the declaration of that emergency if, within the ninety-day period prior to each anniversary date, the President does not publish in the Federal Register and transmit to the Congress a notice stating that such emergency is to continue in effect after such anniversary.


**50 U.S.C. § 1701**

**§ 1701. Unusual and extraordinary threat; declaration of national emergency; exercise of Presidential authorities**

(a) Any authority granted to the President by section 1702 of this title may be exercised to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat.

(b) The authorities granted to the President by section 1702 of this title may only be exercised to deal with an unusual and extraordinary threat with

respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose. Any exercise of such authorities to deal with any new threat shall be based on a new declaration of national emergency which must be with respect to such threat.

## 50 U.S.C. § 1702

### § 1702. Presidential authorities

(a) In general

(1) At the times and to the extent specified in section 1701 of this title, the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise—

(A) investigate, regulate, or prohibit—

(i) any transactions in foreign exchange,

(ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

(iii) the importing or exporting of currency or securities,

by any person, or with respect to any property, subject to the jurisdiction of the United States;

(B) investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States; and

(C) when the United States is engaged in armed hostilities or has been attacked by a foreign country or foreign nationals, confiscate any property, subject to the jurisdiction of the United States, of any foreign person, foreign organization, or foreign country that he determines has planned, authorized, aided, or engaged in such hostilities or attacks against the United States; and all right, title, and interest in any property so confiscated shall

vest, when, as, and upon the terms directed by the President, in such agency or person as the President may designate from time to time, and upon such terms and conditions as the President may prescribe, such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States, and such designated agency or person may perform any and all acts incident to the accomplishment or furtherance of these purposes.

(2) In exercising the authorities granted by paragraph (1), the President may require any person to keep a full record of, and to furnish under oath, in the form of reports or otherwise, complete information relative to any act or transaction referred to in paragraph (1) either before, during, or after the completion thereof, or relative to any interest in foreign property, or relative to any property in which any foreign country or any national thereof has or has had any interest, or as may be otherwise necessary to enforce the provisions of such paragraph. In any case in which a report by a person could be required under this paragraph, the President may require the production of any books of account, records, contracts, letters, memoranda, or other papers, in the custody or control of such person.

(3) Compliance with any regulation, instruction, or direction issued under this chapter shall to the extent thereof be a full acquittance and discharge for all purposes of the obligation of the person making the same. No person shall be held liable in any court for or with respect to anything done or omitted in good faith in connection with the administration of, or pursuant to and in reliance on, this chapter, or any regulation, instruction, or direction issued under this chapter.

(b) Exceptions to grant of authority

The authority granted to the President by this section does not include the authority to regulate or prohibit, directly or indirectly—

(1) any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value;

(2) donations, by persons subject to the jurisdiction of the United States, of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering, except to the extent that the President determines that such donations (A) would seriously impair his ability to deal with any

national emergency declared under section 1701 of this title, (B) are in response to coercion against the proposed recipient or donor, or (C) would endanger Armed Forces of the United States which are engaged in hostilities or are in a situation where imminent involvement in hostilities is clearly indicated by the circumstances; or

(3) the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds. The exports exempted from regulation or prohibition by this paragraph do not include those which are otherwise controlled for export under section 46043 of this title, or under section 46053 of this title to the extent that such controls promote the nonproliferation or antiterrorism policies of the United States, or with respect to which acts are prohibited by chapter 37 of Title 18;

(4) any transactions ordinarily incident to travel to or from any country, including importation of accompanied baggage for personal use, maintenance within any country including payment of living expenses and acquisition of goods or services for personal use, and arrangement or facilitation of such travel including nonscheduled air, sea, or land voyages.

(c) Classified information.—In any judicial review of a determination made under this section, if the determination was based on classified information (as defined in section 1(a) of the Classified Information Procedures Act) such information may be submitted to the reviewing court ex parte and in camera. This subsection does not confer or imply any right to judicial review.


**50 U.S.C. § 1703**

**§ 1703. Consultation and reports**

(a) Consultation with Congress

The President, in every possible instance, shall consult with the Congress before exercising any of the authorities granted by this chapter and shall consult regularly with the Congress so long as such authorities are exercised.

(b) Report to Congress upon exercise of Presidential authorities

Whenever the President exercises any of the authorities granted by this chapter, he shall immediately transmit to the Congress a report specifying—

(1) the circumstances which necessitate such exercise of authority;

(2) why the President believes those circumstances constitute an unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States;

(3) the authorities to be exercised and the actions to be taken in the exercise of those authorities to deal with those circumstances;

(4) why the President believes such actions are necessary to deal with those circumstances; and

(5) any foreign countries with respect to which such actions are to be taken and why such actions are to be taken with respect to those countries.

(c) Periodic follow-up reports

At least once during each succeeding six-month period after transmitting a report pursuant to subsection (b) with respect to an exercise of authorities under this chapter, the President shall report to the Congress with respect to the actions taken, since the last such report, in the exercise of such authorities, and with respect to any changes which have occurred concerning any information previously furnished pursuant to paragraphs (1) through (5) of subsection (b).

(d) Supplemental requirements

The requirements of this section are supplemental to those contained in title IV of the National Emergencies Act.