**[ORAL ARGUMENT NOT YET SCHEDULED]**

**No. 25-5202**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————

LEARNING RESOURCES, INC., and HAND2MIND, INC.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**JOINT APPENDIX**

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

MARK R. FREEMAN
MICHAEL S. RAAB
BRAD HINSHELWOOD
DANIEL WINIK
SOPHIA SHAMS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7245*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8849*

# TABLE OF CONTENTS

Docket Report ........................................................................................... JA1

Complaint (Dkt. 1) ................................................................................. JA12

Declaration in Support of Motion for a Prelimnary
Injunction (Dkt. 9-1) ............................................................................ JA49

Delcarations in Support of Response in Opposition
to Motion for a Preliminary Injunction (Dkt. 34-1) ................................... JA66

Order Denying Motion to Transfer and Granting
Preliminary Injunction (Dkt. 35) ............................................................ JA87

Memorandum Opinion (Dkt. 37) ............................................................ JA89

Order Setting Preliminary Injunction Bond (Dkt. 38) ............................ JA122

Notice of Appeal (Dkt. 39) ................................................................... JA124

Order Granting Stay (Dkt. 41) .............................................................. JA126

APPEAL,STAYED,TYPE–D

## U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:25–cv–01248–RC

LEARNING RESOURCES, INC. et al v. TRUMP et al
Assigned to: Judge Rudolph Contreras
Case in other court:  USCA, 25–05202
Cause: 05:0706 Judicial Review of Agency Actions

Date Filed: 04/22/2025
Jury Demand: None
Nature of Suit: 890 Other Statutory
Actions
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**LEARNING RESOURCES, INC.**                    represented by **James Edward Tysse**
AKIN GUMP STRAUSS HAUER &
FELD LLP
DC Office
2001 K Street N.W.
Washington, DC 20006
202–887–4000
Email: jtysse@akingump.com
*ATTORNEY TO BE NOTICED*

**Kristen Loveland**
AKIN GUMP STRAUSS HAUER &
FELD LLP
2001 K Street, NW
Washington, DC 20006
202–887–4154
Email: kloveland@akingump.com
*ATTORNEY TO BE NOTICED*

**Matthew R. Nicely**
AKIN GUMP STRAUSS HAUER &
FELD LLP
2001 K Street, NW
Washington, DC 20006
202–887–4046
Email: mnicely@akingump.com
*ATTORNEY TO BE NOTICED*

**Pratik Shah**
AKIN GUMP STRAUSS HAUER &
FELD LLP
Robert S. Strauss Tower
2001 K Street, NW
Washington, DC 20006
(202) 887–4210
Fax: (202) 887–4288
Email: pshah@akingump.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**HAND2MIND, INC.**                    represented by **James Edward Tysse**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kristen Loveland**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew R. Nicely**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JA1**

**Pratik Shah**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DONALD J. TRUMP**
*President of the United States, in his official capacity*

represented by **Catherine M. Yang**
1100 L Street NW
Washington, DC 20005
202–514–4336
Email: catherine.m.yang@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin R Miller**
U.S. Department of Justice
International Trade Field Office
Civil Division, Commercial Litigation
Branch
26 Federal Plaza, Suite 346
New York, NY 10278
212–264–9241
Email: Justin.R.Miller@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brett A. Shumate**
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave. NW
Washington, DC 20530
202–514–2000
Email: brett.a.shumate@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**KRISTI NOEM**
*Secretary of the Department of Homeland Security, in her official capacity*

represented by **Catherine M. Yang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin R Miller**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brett A. Shumate**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DEPARTMENT OF HOMELAND SECURITY**

represented by **Catherine M. Yang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin R Miller**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JA2**

Brett A. Shumate
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**SCOTT BESSENT**
*Secretary of the Treasury, in his official capacity*

represented by    **Catherine M. Yang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin R Miller**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brett A. Shumate**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DEPARTMENT OF THE
TREASURY**

represented by    **Catherine M. Yang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin R Miller**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brett A. Shumate**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**HOWARD W. LUTNICK**
*Secretary of Commerce, in his official capacity*

represented by    **Catherine M. Yang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin R Miller**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brett A. Shumate**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES DEPARTMENT OF
COMMERCE**

represented by    **Catherine M. Yang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin R Miller**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brett A. Shumate**
(See above for address)

**JA3**

**Defendant**

| | | |
|---|---|---|
| **PETE R. FLORES**<br>*Acting Commissioner of Customs &*<br>*Border Protection, in his official capacity* | represented by | **Catherine M. Yang**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Justin R Miller**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Brett A. Shumate**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **U.S. CUSTOMS & BORDER PROTECTION** | represented by | **Catherine M. Yang**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Justin R Miller**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Brett A. Shumate**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **JAMIESON GREER**<br>*U.S. Trade Representative, in his official*<br>*capacity* | represented by | **Catherine M. Yang**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Justin R Miller**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Brett A. Shumate**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **OFFICE OF THE U.S. TRADE REPRESENTATIVE** | represented by | **Catherine M. Yang**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Justin R Miller**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Brett A. Shumate**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

JA4

**Amicus**

**AMERICA FIRST LEGAL FOUNDATION**
represented by **R. Trent McCotter**
BOYDEN GRAY PLLC
800 Connecticut Ave. NW
Suite 900
Washington, DC 20006
202–706–5488
Email: tmccotter@boydengray.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**GEORGE F. ALLEN**
represented by **Daniel W. Wolff**
CROWELL & MORING
1001 Pennsylvania Avenue, NW
Washington, DC 20004–2595
(202) 624–2500
Email: dwolff@crowell.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**STEVEN G. CALABRESI**
represented by **Daniel W. Wolff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**JOSHUA A. CLAYBOURN**
represented by **Daniel W. Wolff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**JOHN C. DANFORTH**
represented by **Daniel W. Wolff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**RICHARD A. EPSTEIN**
represented by **Daniel W. Wolff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**CHARLES T. HAGEL**
represented by **Daniel W. Wolff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**HAROLD HONGJU KOH**
represented by **Daniel W. Wolff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**GERRARD N. MAGLIOCCA**
represented by

**Daniel W. Wolff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**MICHAEL W. MCCONNELL**          represented by  **Daniel W. Wolff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**MICHAEL B. MUKASEY**          represented by  **Daniel W. Wolff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**ALAN O. SYKES**          represented by  **Daniel W. Wolff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**JOHN DANIEL TINDER**          represented by  **Daniel W. Wolff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**PETER J. WALLISON**          represented by  **Daniel W. Wolff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**PHILIP ZELIKOW**          represented by  **Daniel W. Wolff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**EMILY LEY PAPER, INC.**          represented by  **John Julian Vecchione**
*doing business as*                                                        NEW CIVIL LIBERTIES ALLIANCE
SIMPLIFIED                                                              4250 North Fairfax Dr.
Ste 300
Arlington, VA 22203
202–918–6902
Email: john.vecchione@ncla.legal
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**BAMBOLA LLC**          represented by  **John Julian Vecchione**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**KILO BRAVA LLC**                                    represented by   **John Julian Vecchione**
                                                                        (See above for address)
                                                                        *LEAD ATTORNEY*
                                                                        *ATTORNEY TO BE NOTICED*

**Amicus**

**KIM'S CLOTHES AND FASHION**                        represented by   **John Julian Vecchione**
**LLC**                                                                 (See above for address)
                                                                        *LEAD ATTORNEY*
                                                                        *ATTORNEY TO BE NOTICED*

**Amicus**

**ROKLAND LLC**                                      represented by   **John Julian Vecchione**
                                                                        (See above for address)
                                                                        *LEAD ATTORNEY*
                                                                        *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/22/2025 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405 receipt number ADCDC–11636355) filed by HAND2MIND, INC., LEARNING RESOURCES, INC.. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons, # 9 Summons, # 10 Summons, # 11 Summons, # 12 Summons, # 13 Summons, # 14 Summons)(Shah, Pratik) (Entered: 04/22/2025) |
| 04/22/2025 | 2 | NOTICE OF RELATED CASE by All Plaintiffs. Case related to Case No. 1:25–cv–00066; 4:25–cv–00026; 3:25–cv–03372; and 3:25–00464. (Shah, Pratik) (Entered: 04/22/2025) |
| 04/22/2025 | 3 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by HAND2MIND, INC., LEARNING RESOURCES, INC. (Shah, Pratik) (Entered: 04/22/2025) |
| 04/23/2025 | 4 | NOTICE of Appearance by Pratik Shah on behalf of HAND2MIND, INC., LEARNING RESOURCES, INC. (Shah, Pratik) (Entered: 04/23/2025) |
| 04/23/2025 | 5 | NOTICE of Appearance by James Edward Tysse on behalf of HAND2MIND, INC., LEARNING RESOURCES, INC. (Tysse, James) (Entered: 04/23/2025) |
| 04/23/2025 | 6 | NOTICE of Appearance by Kristen Loveland on behalf of HAND2MIND, INC., LEARNING RESOURCES, INC. (Loveland, Kristen) (Entered: 04/23/2025) |
| 04/23/2025 | | Case Assigned to Judge Rudolph Contreras. (zsl) (Entered: 04/23/2025) |
| 04/24/2025 | 7 | NOTICE of Appearance by Justin R Miller on behalf of All Defendants (Miller, Justin) (Entered: 04/24/2025) |
| 04/24/2025 | 8 | MOTION to Transfer Case *to the U.S. Court of International Trade* by SCOTT BESSENT, PETE R. FLORES, JAMIESON GREER, HOWARD LUTNICK, KRISTI NOEM, OFFICE OF THE U.S. TRADE REPRESENTATIVE, DONALD J. TRUMP, U.S. CUSTOMS & BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF THE TREASURY, UNITED STATES DEPARTMENT OF COMMERCE. (Miller, Justin) (Entered: 04/24/2025) |
| 04/24/2025 | 9 | MOTION for Preliminary Injunction by HAND2MIND, INC., LEARNING RESOURCES, INC.. (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Shah, Pratik) (Entered: 04/24/2025) |
| 04/25/2025 | 10 | NOTICE of Appearance by Matthew R. Nicely on behalf of HAND2MIND, INC., LEARNING RESOURCES, INC. (Nicely, Matthew) (Entered: 04/25/2025) |
| 04/25/2025 | 11 | Unopposed MOTION for Leave to File Amicus Brief by AMERICA FIRST LEGAL FOUNDATION. (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Text of Proposed Order)(McCotter, R. Trent) (Entered: 04/25/2025) |

| 04/25/2025 | 12 | NOTICE of Appearance by R. Trent McCotter on behalf of AMERICA FIRST LEGAL FOUNDATION (McCotter, R. Trent) (Entered: 04/25/2025) |
| 04/25/2025 | 13 | SUMMONS (13) Issued Electronically as to All Defendants, U.S. Attorney and U.S. Attorney General (Attachment: # 1 Notice and Consent)(zsl) (Entered: 04/25/2025) |
| 04/25/2025 | 22 | AMICUS BRIEF by AMERICA FIRST LEGAL FOUNDATION. (mg) (Entered: 05/13/2025) |
| 04/28/2025 | 14 | NOTICE of Appearance by Catherine M. Yang on behalf of All Defendants (Yang, Catherine) (Entered: 04/28/2025) |
| 04/28/2025 | 15 | MOTION for Scheduling Order by HAND2MIND, INC., LEARNING RESOURCES, INC.. (Attachments: # 1 Text of Proposed Order)(Shah, Pratik) (Entered: 04/28/2025) |
| 04/29/2025 | | MINUTE ORDER granting 15 Motion for Scheduling Order: Upon consideration of 15 the Motion for Scheduling Order, it is hereby ORDERED that Defendants' response to 9 the Motion for Preliminary Injunction shall be filed on or before May 1, 2025; Plaintiffs' reply in support of its Motion for Preliminary Injunction and Plaintiffs' response to 8 the Motion to Transfer Case shall be filed on or before May 7, 2025; and Defendants' reply in support of its Motion to Transfer Case shall be filed on or before May 12, 2025. It is FURTHER ORDERED that a hearing on 9 Plaintiffs' Motion for Preliminary Injunction and 8 Defendants' Motion to Transfer Case shall be scheduled for May 27, 2025, with the time to be confirmed by the Court. SO ORDERED. Signed by Judge Rudolph Contreras on 04/29/2025. (lcrc2) (Entered: 04/29/2025) |
| 04/30/2025 | | MINUTE ORDER: It is hereby ORDERED that the parties shall appear for a hearing on 9 Plaintiffs' Motion for Preliminary Injunction and 8 Defendants' Motion to Transfer Case on May 27, 2025 at 3:00 PM in Courtroom 23A before Judge Rudolph Contreras. SO ORDERED. Signed by Judge Rudolph Contreras on 04/30/2025. (lcrc2) (Entered: 04/30/2025) |
| 04/30/2025 | | Set/Reset Hearings: Motion Hearing set for 5/27/2025 at 03:00 PM in Courtroom 23A– In Person before Judge Rudolph Contreras. (tj) (Entered: 04/30/2025) |
| 04/30/2025 | | Set/Reset Deadlines: Responses due by 5/1/2025; Replies due by 5/7/2025; Reply in support due by 5/12/2025. (tj) (Entered: 04/30/2025) |
| 05/01/2025 | 16 | RESPONSE re 9 MOTION for Preliminary Injunction filed by SCOTT BESSENT, PETE R. FLORES, JAMIESON GREER, HOWARD LUTNICK, KRISTI NOEM, OFFICE OF THE U.S. TRADE REPRESENTATIVE, DONALD J. TRUMP, U.S. CUSTOMS & BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF THE TREASURY, UNITED STATES DEPARTMENT OF COMMERCE. (Yang, Catherine) (Entered: 05/01/2025) |
| 05/07/2025 | 17 | REPLY to opposition to motion re 9 Motion for Preliminary Injunction filed by HAND2MIND, INC., LEARNING RESOURCES, INC.. (Shah, Pratik) (Entered: 05/07/2025) |
| 05/07/2025 | 18 | RESPONSE re 8 MOTION to Transfer Case *to the U.S. Court of International Trade* filed by HAND2MIND, INC., LEARNING RESOURCES, INC.. (Shah, Pratik) (Entered: 05/07/2025) |
| 05/07/2025 | 19 | Unopposed MOTION for Leave to File Amicus Brief by GEORGE F. ALLEN, STEVEN G. CALABRESI, JOSHUA A. CLAYBOURN, JOHN C. DANFORTH, RICHARD A. EPSTEIN, CHARLES T. HAGEL, HAROLD HONGJU KOH, GERRARD N. MAGLIOCCA, MICHAEL W. MCCONNELL, MICHAEL B. MUKASEY, ALAN O. SYKES, JOHN DANIEL TINDER, PETER J. WALLISON, PHILIP ZELIKOW. (Attachments: # 1 Proposed Brief, # 2 Text of Proposed Order)(Wolff, Daniel) (Entered: 05/07/2025) |
| 05/07/2025 | 23 | AMICUS BRIEF by GEORGE F. ALLEN, STEVEN G. CALABRESI, JOSHUA A. CLAYBOURN, JOHN C. DANFORTH, RICHARD A. EPSTEIN, CHARLES T. HAGEL, HAROLD HONGJU KOH, GERRARD N. MAGLIOCCA, MICHAEL W. MCCONNELL, MICHAEL B. MUKASEY, ALAN O. SYKES, JOHN DANIEL TINDER, PETER J. WALLISON, PHILIP ZELIKOW. (mg) (Entered: 05/13/2025) |

| 05/08/2025 | | MINUTE ORDER granting 11 Unopposed Motion for Leave to File Amicus Brief: It is HEREBY ORDERED that America First Legal Center's motion for leave to file a brief as *amicus curiae* in support of Defendants' Motion to Transfer is GRANTED because America First has unique information or perspective that can help the Court beyond the help that the lawyers for the parties are able to provide. It is FURTHER ORDERED that the amicus brief be docketed as filed as of April 25, 2025. SO ORDERED. Signed by Judge Rudolph Contreras on 5/8/2025. (lcrc1) (Entered: 05/08/2025) |
|---|---|---|
| 05/08/2025 | | MINUTE ORDER granting 19 Unopposed Motion for Leave to File Amicus Brief: It is HEREBY ORDERED that George F. Allen, Steven G. Calebresi, Joshua A. Claybourn, John C. Danforth, Richard A. Epstein, Charles T. Hagel, Harold Hongju Koh, Gerard N. Magliocca, Michael W. McConnell, Michael B. Mukasey, Alan O. Sykes, Judge John Daniel Tinder, Peter J. Wallison, and Philip Zelikow's motion for leave to file a brief as *amicus curiae* in support of Plaintiffs' Motion for a Preliminary Injunction is GRANTED because these individuals have unique information or perspective that can help the Court beyond the help that the lawyers for the parties are able to provide. It is FURTHER ORDERED that the amicus brief be docketed as filed as of May 7, 2025. SO ORDERED. Signed by Judge Rudolph Contreras on 5/8/2025. (lcrc1) (Entered: 05/08/2025) |
| 05/08/2025 | 20 | MOTION for Leave to File Amicus Brief by Emily Ley Paper, Inc. d/b/a Simplified, Kilo Brava LLC, Bambola LLC, Kilo Brava LLC, Kim's Clothes and Fashion LLC, Rokland LLC. (Attachments: # 1 Text of Proposed Order Proposed Order, # 2 Memorandum in Support Amicus Brief For Plaintiffs)(Vecchione, John) Modified event on 5/9/2025 (znmw). (Entered: 05/08/2025) |
| 05/08/2025 | 24 | AMICUS BRIEF by BAMBOLA LLC, EMILY LEY PAPER, INC., KILO BRAVA LLC, KIM'S CLOTHES AND FASHION LLC, ROKLAND LLC. (mg) Modified docket text on 5/13/2025 (mg). (Entered: 05/13/2025) |
| 05/09/2025 | | MINUTE ORDER granting 20 Unopposed Motion for Leave to File Amicus Brief: It is HEREBY ORDERED that Emily Ley Paper, Inc. d/b/a Simplified, Kilo Brava LLC, Bambola LLC, Kilo Brava LLC, Kim's Clothes and Fashion LLC, and Rokland LLC's motion for leave to file a brief as *amicus curiae* in opposition to Defendants' Motion to Transfer is GRANTED because these businesses have unique information or perspective that can help the Court beyond the help that the lawyers for the parties are able to provide. It is FURTHER ORDERED that the amicus brief be docketed as filed as of May 8, 2025. SO ORDERED. Signed by Judge Rudolph Contreras on 5/9/2025. (lcrc1) (Entered: 05/09/2025) |
| 05/12/2025 | 21 | REPLY to opposition to motion re 8 Motion to Transfer Case, filed by SCOTT BESSENT, PETE R. FLORES, JAMIESON GREER, HOWARD LUTNICK, KRISTI NOEM, OFFICE OF THE U.S. TRADE REPRESENTATIVE, DONALD J. TRUMP, U.S. CUSTOMS & BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF THE TREASURY, UNITED STATES DEPARTMENT OF COMMERCE. (Yang, Catherine) (Entered: 05/12/2025) |
| 05/19/2025 | 25 | NOTICE OF SUPPLEMENTAL AUTHORITY by SCOTT BESSENT, PETE R. FLORES, JAMIESON GREER, HOWARD W. LUTNICK, KRISTI NOEM, OFFICE OF THE U.S. TRADE REPRESENTATIVE, DONALD J. TRUMP, U.S. CUSTOMS & BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF THE TREASURY, UNITED STATES DEPARTMENT OF COMMERCE (Attachments: # 1 Exhibit May 13, 2025 Hr'g Tr.)(Yang, Catherine) (Entered: 05/19/2025) |
| 05/22/2025 | 26 | NOTICE OF SUPPLEMENTAL AUTHORITY by SCOTT BESSENT, PETE R. FLORES, JAMIESON GREER, HOWARD W. LUTNICK, KRISTI NOEM, OFFICE OF THE U.S. TRADE REPRESENTATIVE, DONALD J. TRUMP, U.S. CUSTOMS & BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF THE TREASURY, UNITED STATES DEPARTMENT OF COMMERCE (Attachments: # 1 Exhibit N.D. Fla. Transfer Order)(Yang, Catherine) (Entered: 05/22/2025) |
| 05/22/2025 | 27 | RESPONSE re 26 NOTICE OF SUPPLEMENTAL AUTHORITY, filed by HAND2MIND, INC., LEARNING RESOURCES, INC.. (Shah, Pratik) (Entered: |

| | | |
|---|---|---|
| | | 05/22/2025) |
| 05/22/2025 | 28 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 5/5/2025. Answer due for ALL FEDERAL DEFENDANTS by 7/4/2025. (Loveland, Kristen) (Entered: 05/22/2025) |
| 05/22/2025 | 29 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 5/19/2025. (Loveland, Kristen) (Entered: 05/22/2025) |
| 05/22/2025 | 30 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. SCOTT BESSENT served on 5/6/2025; PETE R. FLORES served on 5/5/2025; JAMIESON GREER served on 5/9/2025; HOWARD W. LUTNICK served on 5/5/2025; KRISTI NOEM served on 5/5/2025; OFFICE OF THE U.S. TRADE REPRESENTATIVE served on 5/9/2025; DONALD J. TRUMP served on 5/9/2025; U.S. CUSTOMS & BORDER PROTECTION served on 5/5/2025; U.S. DEPARTMENT OF HOMELAND SECURITY served on 5/5/2025; U.S. DEPARTMENT OF THE TREASURY served on 5/6/2025; UNITED STATES DEPARTMENT OF COMMERCE served on 5/5/2025 (Loveland, Kristen) (Entered: 05/22/2025) |
| 05/23/2025 | 31 | NOTICE OF SUPPLEMENTAL AUTHORITY by SCOTT BESSENT, PETE R. FLORES, JAMIESON GREER, HOWARD W. LUTNICK, KRISTI NOEM, OFFICE OF THE U.S. TRADE REPRESENTATIVE, DONALD J. TRUMP, U.S. CUSTOMS & BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF THE TREASURY, UNITED STATES DEPARTMENT OF COMMERCE (Attachments: # 1 Exhibit Ct. Int'l Trade Order)(Yang, Catherine) (Entered: 05/23/2025) |
| 05/24/2025 | 32 | RESPONSE re 31 NOTICE OF SUPPLEMENTAL AUTHORITY, filed by HAND2MIND, INC., LEARNING RESOURCES, INC.. (Shah, Pratik) (Entered: 05/24/2025) |
| 05/27/2025 | 33 | NOTICE of Appearance by Brett A. Shumate on behalf of All Defendants (Shumate, Brett) (Entered: 05/27/2025) |
| 05/27/2025 | 34 | NOTICE of Additional Exhibits by SCOTT BESSENT, PETE R. FLORES, JAMIESON GREER, HOWARD W. LUTNICK, KRISTI NOEM, OFFICE OF THE U.S. TRADE REPRESENTATIVE, DONALD J. TRUMP, U.S. CUSTOMS & BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF THE TREASURY, UNITED STATES DEPARTMENT OF COMMERCE re 16 Response to motion, (Attachments: # 1 Exhibit Rubio, Bessent, Lutnick, Greer Declarations)(Yang, Catherine) (Entered: 05/27/2025) |
| 05/27/2025 | | MINUTE ORDER: The Court will connect the public–access telephone line for the motion hearing now scheduled for May 27, 2025 at 3:00 p.m. Any member of the public or media may access the public–access line by dialing (833) 990–9400, and using meeting ID 698780857. As a reminder, any use of the public–access telephone line requires adherence to the general prohibition against recording, livestreaming, and rebroadcasting of court proceedings (including those held by videoconference). Violation of these prohibitions may result in sanctions, including removal of court–issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. (So Ordered Judge Rudolph Contreras on 5/27/25) (tj) (Entered: 05/27/2025) |
| 05/27/2025 | | Minute Entry for proceedings held before Judge Rudolph Contreras: Motion Hearing held on 5/27/2025 re 9 MOTION for Preliminary Injunction filed by HAND2MIND, INC., LEARNING RESOURCES, INC., 8 MOTION to Transfer Case to the U.S. Court of International Trade filed by U.S. CUSTOMS & BORDER PROTECTION, DONALD J. TRUMP, HOWARD W. LUTNICK, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF THE TREASURY, KRISTI NOEM, UNITED STATES DEPARTMENT OF COMMERCE, PETE R. FLORES, JAMIESON GREER, OFFICE OF THE U.S. TRADE REPRESENTATIVE, SCOTT BESSENT. Oral argument heard, and the motions are taken under advisement. (Court Reporter: Tim Miller.) (tj) (Entered: 05/27/2025) |

| 05/29/2025 | 35 | ORDER denying Motion to Transfer Case 8 ; granting 9 Motion for Preliminary Injunction. See document for details. Signed by Judge Rudolph Contreras on 5/29/2025. (lcrc1) (Entered: 05/29/2025) |
|---|---|---|
| 05/29/2025 | 36 | TRANSCRIPT OF MOTION HEARING before Judge Rudolph Contreras held on 5–27–25; Page Numbers: 1–40; Date of Issuance: 5–29–25. Court Reporter/Transcriber Timothy R. Miller, Telephone number (202) 354–3111. Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 6/19/2025. Redacted Transcript Deadline set for 6/29/2025. Release of Transcript Restriction set for 8/27/2025.(Miller, Timothy) (Entered: 05/29/2025) |
| 05/29/2025 | 37 | MEMORANDUM AND OPINION denying 8 Motion to Transfer Case; granting 9 Motion for Preliminary Injunction. See document for details. Signed by Judge Rudolph Contreras on 5/29/2025. (lcrc1) (Entered: 05/29/2025) |
| 05/29/2025 | 38 | ORDER setting preliminary injunction bond under Federal Rule of Civil Procedure 65(c). See document for details. Signed by Judge Rudolph Contreras on 5/29/2025. (lcrc1) (Entered: 05/29/2025) |
| 05/29/2025 | 39 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 37 Order, 35 Order on Motion to Transfer Case, Order on Motion for Preliminary Injunction by U.S. DEPARTMENT OF THE TREASURY, PETE R. FLORES, U.S. CUSTOMS & BORDER PROTECTION, OFFICE OF THE U.S. TRADE REPRESENTATIVE, SCOTT BESSENT, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF COMMERCE, JAMIESON GREER, HOWARD W. LUTNICK, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY. Fee Status: No Fee Paid. Parties have been notified. (Yang, Catherine) (Entered: 05/29/2025) |
| 05/30/2025 | 40 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 39 Notice of Appeal to DC Circuit Court,. (znmw) (Entered: 05/30/2025) |
| 05/30/2025 |  | USCA Case Number 25–5202 for 39 Notice of Appeal to DC Circuit Court, filed by U.S. CUSTOMS & BORDER PROTECTION, DONALD J. TRUMP, HOWARD W. LUTNICK, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF THE TREASURY, KRISTI NOEM, UNITED STATES DEPARTMENT OF COMMERCE, PETE R. FLORES, JAMIESON GREER, OFFICE OF THE U.S. TRADE REPRESENTATIVE, SCOTT BESSENT. (mg) (Entered: 05/30/2025) |
| 06/02/2025 | 41 | MOTION to Stay re 37 Order, 35 Order on Motion to Transfer Case, Order on Motion for Preliminary Injunction *Pending Appeal* by SCOTT BESSENT, PETE R. FLORES, JAMIESON GREER, HOWARD W. LUTNICK, KRISTI NOEM, OFFICE OF THE U.S. TRADE REPRESENTATIVE, DONALD J. TRUMP, U.S. CUSTOMS & BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF THE TREASURY, UNITED STATES DEPARTMENT OF COMMERCE. (Attachments: # 1 Text of Proposed Order)(Yang, Catherine) (Entered: 06/02/2025) |
| 06/03/2025 | 42 | ORDER granting 41 Motion to Stay. See document for details. Signed by Judge Rudolph Contreras on 6/3/2025. (lcrc1) (Entered: 06/03/2025) |

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

LEARNING RESOURCES, INC.,
380 N. Fairway Dr., Vernon Hills, IL 60061;

and

HAND2MIND, INC.,
500 Greenview Court, Vernon Hills, IL 60061,

*Plaintiffs*,

v.

DONALD J. TRUMP, President of the United
States, in his official capacity,
1600 Pennsylvania Avenue NW,
Washington, DC 20500;

KRISTI NOEM, Secretary of the Department of
Homeland Security, in her official capacity,
245 Murray Lane SW, Mail Stop 0485
Washington, DC 20528-0485;

U.S. DEPARTMENT OF HOMELAND
SECURITY,
245 Murray Lane SW, Mail Stop 0458
Washington, DC 20528-0485;

SCOTT BESSENT, Secretary of the Treasury, in
his official capacity,
1500 Pennsylvania Avenue NW
Washington, DC 20220;

U.S. DEPARTMENT OF THE TREASURY,
1500 Pennsylvania Avenue NW
Washington, DC 20220;

HOWARD LUTNICK, Secretary of Commerce,
in his official capacity,
1401 Constitution Avenue NW
Washington, DC 20230;

Case No.:

**JA12**

UNITED STATES DEPARTMENT OF
COMMERCE,
1401 Constitution Avenue NW
Washington, DC 20230;

PETE R. FLORES, Acting Commissioner of
Customs & Border Protection, in his official
capacity,
1300 Pennsylvania Avenue NW
Washington, DC 20229;

U.S. CUSTOMS & BORDER PROTECTION,
1300 Pennsylvania Avenue NW
Washington, DC 20229;

JAMIESON GREER, U.S. Trade Representative,
in his official capacity,
600 17th Street NW
Washington, DC 20508; and

THE OFFICE OF THE U.S. TRADE
REPRESENTATIVE,
600 17th Street NW
Washington, DC 20508,

                                    *Defendants*.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Learning Resources, Inc. and hand2mind, Inc. bring this civil action against

Defendants for declaratory and injunctive relief and allege as follows:

### INTRODUCTION

1.     This action challenges an extraordinary Executive Branch power grab. The

President has asserted the authority to impose tariffs (essentially, taxes) on imports from any

country, on any schedule, in any amount, and for any policy reason couched as an "emergency."

Neither the Constitution nor the International Emergency Economic Powers Act ("IEEPA") grants

the President tariff-levying authority at all, let alone of the limitless type asserted here. And

because these actions are irreparably harming Plaintiffs Learning Resources, Inc. and hand2mind,

JA13

Inc.—American family-owned businesses that develop educational products for schools and families—this Court should enjoin Defendants' actions before even more damage is done.

2.      The President unilaterally decided, through a series of unprecedented executive orders invoking IEEPA, to remake America's global trade policy. He began by increasing existing tariffs on America's three largest trading partners: a 10 percent increase on all goods imported from China, and even larger increases on goods imported from Mexico and Canada. In March, the President raised the tariffs on goods imported from China from 10 to 20 percent. In April, the President imposed a 10 percent tariff on nearly *all* goods from *all* countries indefinitely. He also imposed, then within a week paused for ninety days, additional "reciprocal" tariffs of up to 50 percent for all but a handful of our trading partners. Those tariffs included a 34 percent tariff on goods imported from China, and after China retaliated, President Trump increased the reciprocal tariff to 125 percent. The President did not suspend the reciprocal tariffs for China. Because the new rate imposed is added on top of long-existing duties, some tariffs on Chinese goods are now as high as *245 percent. Fact Sheet: President Donald J. Trump Ensures National Security and Economic Resilience Through Section 232 Actions on Processed Critical Minerals and Derivative Products*, THE WHITE HOUSE (Apr. 15, 2025).[1]

3.      Altogether, the President has imposed—through executive fiat—tariffs on trillions of dollars of economic activity. The money raised by these tariffs, which the government has estimated at $600 billion per year, will not be paid by foreign governments but by American businesses and consumers. That crushing burden is felt most immediately and acutely by this country's small and mid-size businesses, including Plaintiffs. Indeed, Plaintiffs are already

---

[1]      https://www.whitehouse.gov/fact-sheets/2025/04/fact-sheet-president-donald-j-trump-ensures-national-security-and-economic-resilience-through-section-232-actions-on-processed-critical-minerals-and-derivative-products/.

JA14

suffering dire impacts and irreparable harm to their businesses and customers.

4.    Plaintiffs are family-owned businesses, now in their fourth generation, that have created and sold over 2,000 hands-on educational toys and products for children. Their award-winning products are found in toy closets and classrooms across the country and range from Spike the Fine Motor Hedgehog to Peekaboo Learning Farm, from Pretend & Play Teaching Cash Register to Kanoodle (a caboodle of brain-teasing puzzles) and Mirror My Sound Phoneme Set. With the mission to "bring learning to life," they seek to help younger children develop verbal, counting, and fine motor skills, and introduce older children to science, technology, engineering, and math. Plaintiffs have faced and survived significant challenges in the past two decades, including the Great Recession and COVID-19 pandemic, but the President's unilateral tariffs are now posing the greatest challenge of their existence.

5.    No act of Congress comes close to vesting the President with the extraordinary power he asserts. The Constitution vests the power to impose tariffs exclusively in Congress. U.S. CONST. art. I, § 8, cl. 1. Any tariff action taken by the Executive Branch must therefore be authorized by statute and consistent with Congress's instructions. The executive orders at issue here (the "Challenged Orders")[2] and agency action implementing them fail on both fronts.

6.    IEEPA was enacted in 1977 to grant the President specified authority over economic transactions during a national emergency, such as the power to impose sanctions on foreign terrorists or hostile foreign nations responsible for unusual and extraordinary threats to American security. *See* 50 U.S.C. §§ 1701 *et seq*. The statute does not mention tariffs or duties,

---

[2] This Complaint refers to the orders imposing tariffs currently in operation as the "Challenged Orders." For the Court's convenience, the Challenged Orders are listed in Appendix A and grouped as the "China IEEPA Orders" and the "Universal and Reciprocal IEEPA Orders." The Appendix also provides a brief description, short-form citation, and full citation for each order.

and in the five decades and eight administrations since its enactment, no President besides President Trump has ever invoked IEEPA to impose a tariff or a duty. Instead, Congress has formulated—and Presidents have relied on—a plethora of other laws codified in Title 19 of the United States Code that authorize the Executive Branch to take tariff action in limited circumstances and in compliance with various congressionally imposed procedures. There is no textual or historical basis for imposing tariffs under IEEPA, let alone the kind of unmistakable statutory grounding that is required in a case involving executive actions of "vast economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 716 (2022). The President's novel claim that he may use IEEPA to impose tariffs of *any* amount, on *any* goods, imported from *any* country, and without *any* process is patently wrong.

7.      Even if IEEPA could be stretched to authorize tariffs, the tariffs adopted in the Challenged Orders violate the terms of the statute. In IEEPA, Congress specified that the statute's authority "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared . . . and may not be exercised for any other purpose." 50 U.S.C. § 1701(b). Here, however, the statute has been used to address longstanding issues that are the opposite of "unusual and extraordinary" (like decades-old trade deficits). It has been invoked to adopt tariffs that have no connection to the declared emergencies (like those imposed on goods from countries with whom the United States has a trade surplus). And it has been employed to accomplish goals that are entirely unrelated to any declared national emergency (like raising revenue for the federal government). Far from a limited emergency powers statute, IEEPA has become an all-purpose tool to achieve the President's long-term policy objectives.

8.      The President's novel assertion of power is foreclosed by IEEPA's text. But it should also be rejected because it would render IEEPA unconstitutional under the nondelegation

doctrine. Congress is not permitted to grant legislative authority to the Executive Branch without at least an intelligible principle to guide the Executive's discretion. Under the Challenged Orders' interpretation of IEEPA, however, there is none. The President would have authority to make major policy judgments about tariffs without any instruction from Congress on the amount, the country of origin, or the duration of the tariff, and there would be no need to demonstrate that the action taken has any reasonable relationship to an "unusual and extraordinary" threat. This Court should not adopt an interpretation that so blatantly violates our constitutional structure.

9.    For these reasons and more, the Challenged Orders and the agency actions modifying the Harmonized Tariff Schedule of the United States ("HTSUS") or otherwise implementing those orders are unlawful. This Court should declare as much and enjoin enforcement.

## PARTIES

10.    Plaintiffs Learning Resources, Inc. and hand2mind, Inc. are private, family-owned American companies, based in Illinois, that develop, market, and sell educational products, educational toys, and pet toys. Plaintiffs market products under brands including LEARNING RESOURCES, EDUCATIONAL INSIGHTS, HAND2MIND, and BRIGHTKINS, and are a world leader in the development of experiential, hands-on learning materials which are sold in more than 100 countries. Plaintiffs have more than 500 employees and full-time equivalents today, and have offices in Vernon Hills, Illinois; Torrance, California; and Amherst, New York. Plaintiffs develop their products (and perform some manufacturing and assembly) in the United States, but outsource most manufacturing to factories in other countries, including (but not limited to) China, Taiwan, Korea, Vietnam, Thailand, and India. Plaintiffs import directly from China and those other countries, and both companies thus pay duties and tariffs on such imports.

JA17

11.     Defendant Donald J. Trump, in his official capacity, is the President of the United States. He issued the Challenged Orders.

12.     Defendant Kristi Noem, in her official capacity, is the Secretary of Homeland Security. She is responsible for implementing the Challenged Orders. She is also responsible, through the Department of Homeland Security's component, U.S. Customs and Border Protection, for administering and collecting tariffs directed by all the Challenged Orders.

13.     Defendant Scott Bessent, in his official capacity, is the Secretary of the Treasury. He is responsible for consulting on implementation of tariffs directed by the Challenged Orders.

14.     Defendant United States Department of the Treasury is responsible for consulting on implementation of tariffs directed by the Challenged Orders.

15.     Defendant United States Department of Homeland Security is responsible for implementing the Challenged Orders. It is also responsible, through its component, U.S. Customs and Border Protection, for administering and collecting tariffs directed by all the Challenged Orders.

16.     Defendant Howard Lutnick, in his official capacity, is the Secretary of Commerce. He is responsible for implementing tariffs directed by the Universal and Reciprocal IEEPA Order.

17.     Defendant United States Department of Commerce is responsible for implementing tariffs directed by the Universal and Reciprocal IEEPA Order.

18.     Defendant Pete R. Flores, in his official capacity, is the senior official performing the duties of the Commissioner of Customs and Border Protection. He is responsible for administering and collecting tariffs directed by the Challenged Orders.

19.     Defendant United States Customs and Border Protection is responsible for administering and collecting tariffs directed by the Challenged Orders.

20.    Defendant Jamieson Greer, in his official capacity, is the United States Trade Representative. He is responsible for implementing tariffs directed by the Universal and Reciprocal IEEPA Order.

21.    Defendant the Office of the United States Trade Representative is responsible for implementing tariffs directed by the Universal and Reciprocal IEEPA Order.

### JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1346 because this civil action arises under the Constitution of the United States and federal statutes, and does not arise from a law authorizing the imposition of tariffs within the meaning of 28 U.S.C. § 1581(i)(1)(B). The Court is authorized to award the requested relief under 5 U.S.C. §§ 702, 705, 706, and 28 U.S.C. §§ 1361, 2201, 2202, and through the equitable powers of this Court.

23.    Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1) because an officer of the United States in his or her official capacity, or an agency of the United States, is a defendant, each defendant officer and agency resides in this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

### STANDING

24.    To establish Article III standing, a plaintiff must show injury in fact, causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992). Both Plaintiffs are harmed by the challenged tariff action because each directly imports goods from China and other countries subject to the Challenged Orders, and each thus must pay additional tariffs to the federal government because of the Challenged Orders and corresponding revisions to the HTSUS. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) ("If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article

III."); *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 599 (2007) ("being forced to pay" money to the government "causes a real and immediate economic injury"). Declaratory and injunctive relief will redress these injuries because Plaintiffs will no longer be required to pay the tariff or make harmful changes to their business operations to account for increased costs.

## BACKGROUND

**A.    The President Has Limited Tariff Authority Only As Delegated By Congress.**

25.    The Constitution vests "[a]ll legislative Powers herein granted . . . in a Congress of the United States," U.S. Const. art. I, § 1, including the power to "lay and collect . . . Duties," *id.* art. I, § 8, cl. 1. Because the Constitution vests the tariff power in Congress, Congress is "the principal venue in which trade policy is determined." Douglas A. Irwin, Clashing Over Commerce: A History of U.S. Trade Policy, 2 (2017) ("Clashing Over Commerce"). To the extent the President is involved in tariffs through a delegation of congressional authority, it is either to impose tariffs in defined circumstances under Title 19 of the United States Code or to negotiate trade agreements subject to Congress's approval. In either form, the President's power is necessarily circumscribed by the Constitution and limits enacted by Congress.

26.    On multiple occasions, Congress has delegated limited authority to the President or members of the Executive Branch to impose tariffs—including, under Section 232 of the Trade Expansion Act of 1962, for the explicit purpose of "[s]afeguarding national security." 19 U.S.C. § 1862. But where Congress has delegated this authority, it has done so expressly and has limited the President's or Executive Branch's authority to specific situations so that Congress retains its essential legislative function. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979) (Executive Branch may exercise delegated authority "subject to limitations which [Congress] imposes"); *see, e.g.*, 19 U.S.C. § 1338(a) (authorizing President to "declare new or additional duties" of up to 50 percent on imports from countries that have imposed "unreasonable" charges, exactions,

8

regulations, or limitations that are "not equally enforced upon the like articles of every foreign country" or "[d]iscriminat[ed] in fact against the commerce of the United States"); *id.* § 1862 (authorizing President to impose tariffs in response to a specific finding that certain imports impair national security, subject to numerous procedural requirements and limitations); *id.* § 2132(a) (authorizing President to impose "duties" "not to exceed 15 percent ad valorem . . . on articles imported into the United States" in order "to deal with large and serious United States balance-of-payments deficits," subject to a 150-day expiration unless Congress enacts legislation to extend them); *id.* §§ 2411-2419 (directing U.S. Trade Representative to "impose duties or other import restrictions on the goods of" a foreign country to remedy "unfair and inequitable" foreign trade practices, subject to numerous procedural requirements and limitations).

27.    Absent an authorization such as these, "the President [can] not increase or decrease tariffs, issue commands to the customs service to refuse or delay entry of goods into the country, or impose mandatory import quotas." *Consumers Union of U. S., Inc. v. Kissinger*, 506 F.2d 136, 142-143 (D.C. Cir. 1974). This ensures that Congress "retains ultimate authority over trade policy." IRWIN at 21, *supra* ¶ 25.

28.    With respect to trade negotiations, Congress enacted the Bipartisan Congressional Trade Priorities and Accountability Act of 2015, Pub. L. No. 114-26, 129 Stat. 319, 320 (codified at 19 U.S.C. § 4201 *et seq*.), which made clear that any trade agreements the President negotiated would have to be approved and implemented by Congress and set forth certain limitations and priorities for the President in such negotiations. Insofar as the President negotiates agreements outside of this framework, those agreements have no force of law unless and until enacted by Congress.

**B.      The International Emergency Economic Powers Act Does Not Grant The President Tariff-Levying Authority**

29.      Through IEEPA, Congress granted the President power to take specified emergency economic measures during a declared emergency. Congress did not authorize the President to impose tariffs.

30.      IEEPA became law in 1977. Both the House and Senate committee reports "expressed the view that past Presidents had abused the authority to regulate economic transactions in a national emergency" under a different statute—the Trading With the Enemy Act ("TWEA")—"by using it in circumstances far removed from those that originally gave rise to the declaration of national emergency." *Id.* at 7 n.51; H. REP. NO. 95-459 (1977); S. REP. NO. 95-466 (1977).

31.      Accordingly, IEEPA provides the President with authority to take specified actions "to deal with any unusual and extraordinary threat . . . to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. §1701(a).

32.      Specifically, the President may (1) "investigate, regulate, or prohibit" transactions in foreign exchange, certain transfers of credits or payments, and the importing or exporting of certain currencies or securities; (2) "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving" property in which a foreign country or national has an interest; and (3) confiscate property of foreign persons, organizations, or countries that have "planned, authorized, aided, or engaged in . . . [armed] hostilities or attacks against the United States." 50 U.S.C. § 1702(a)(1). Unlike every statute authorizing the President to impose or adjust tariffs, IEEPA does not mention "tariffs," "duties,"

or any other revenue-raising mechanism. *Compare* 19 U.S.C. § 1338(a) ("new or additional duties"); *id.* § 1862 ("duties or other import restrictions"); *id.* §2132(a) ("temporary import surcharge . . . in the form of duties"); *id.* §§ 2411-19 ("duties or other import restrictions").

33.    The President, moreover, is limited with respect to when he may use these emergency powers. IEEPA provides that the "[t]he authorities granted to the President . . . may *only* be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared . . . and *may not be exercised for any other purpose.*" 50 U.S.C. § 1701(b) (emphasis added).

34.    Consistent with these limits, no President has *ever* used IEEPA to impose tariffs before President Trump's recent orders. Since its enactment, past presidents have used IEEPA only to impose tailored sanctions against foreign nationals and governments to address specific and declared threats to American national security. *See id.* at 15. Unlike sanctions, which target threats outside the country, the Challenged Orders impose tariffs—causing massive upheaval and harm to American businesses and the U.S. economy.

### THE PRESIDENT'S IEEPA ORDERS

35.    Since taking office on January 20, 2025, President Trump has issued numerous executive orders that impose, suspend, or modify tariffs under the purported authority of IEEPA.[3]

---

[3] The Challenged Orders also cite three other provisions necessary to impose tariffs under IEEPA if IEEPA in fact authorized tariffs: the National Emergencies Act (50 U.S.C. § 1601 *et seq*.) (authorizing the President to declare a national emergency), section 604 of the Trade Act of 1974, as amended (19 U.S.C. § 2483) (authorizing the president "as appropriate" to "embody in the Harmonized Tariff Schedule of the United States the substance of the relevant provisions of this chapter, and of other Acts affecting import treatment, and actions thereunder, including removal, modification, continuance, or imposition of any rate of duty or other import restriction"), and 3 U.S.C. § 301 (authorizing the President to delegate functions to subordinates).

A.    **The China IEEPA Orders**

36.    On February 1, 2015, the President issued an executive order imposing tariffs on China. Exec. Order No. 14,195, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,121 (Feb. 1, 2025) ("February 1 China Order"). The Executive Order asserts that "the sustained influx of synthetic opioids has profound consequences on our Nation," and that China has not only "fail[ed] to stem the ultimate source of many illicit drugs distributed in the United States" but has actually "incentivized" Chinese "chemical companies to export fentanyl and related precursor chemicals that are used to produce synthetic opioids sold illicitly in the United States." *Id.* at 9,121. The Executive Order "expand[s] the scope of the national emergency" previously declared at the southern border (*i.e.*, with respect to Mexico) to "cover the failure of the [Chinese] government to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other TCOs, criminals at large, and drugs." *Id.* § 1, at 9,122. The Executive Order then invokes the President's authority under "section 1702(a)(1)(B) of IEEPA" to impose "an additional 10 percent ad valorem rate of duty" on "[a]ll articles that are products of [China]." *Id.* §§ 1-2.

37.    The 10 percent additional tariffs on Chinese goods took effect on February 4, 2025. February 1 China Order § 2(a), 90 Fed. Reg. at 9,122. The February 1 China Order states that, should China "retaliate against the United States," the President may "increase or expand in scope the duties imposed under this Executive Order to ensure the efficacy of this action." *Id.* § 2(c). The Order also makes unavailable drawbacks on duties imposed by the Order. *Id.* § 2(f), 90 Fed. Reg. at 9,123. The Order then directs the Secretary of Homeland Security to "determine the modifications necessary to the [HTSUS] in order to effectuate the objectives of this order consistent with law" and to "make such modifications to the HTSUS through notice in the Federal

JA24

Register." *Id.* § 2(d). The Order also directs the Secretary of Homeland Security, "in consultation with the Secretary of the Treasury, the Attorney General, and the Secretary of Commerce," to "take such actions, including adopting rules and regulations, and to employ all powers granted to the President by IEEPA as may be necessary to implement this order." *Id.* § 4.

38.    Merely a month after those 10 percent additional tariffs took effect, President Trump issued an executive order—again under IEEPA—that increased the ad valorem tariff imposed by the February 1 China Order from 10 percent to 20 percent. Exec. Order No. 14,228, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11,463 (Mar. 3, 2025) (the "March 3 China Amendment"). The Order explained that the increase was necessary because the President "determined that [China] has not taken adequate steps to alleviate the illicit drug crisis through cooperative enforcement actions." *Id.* § 1, 90 Fed. Reg. at 11,463.

39.    On April 2, 2025, the President issued an executive order eliminating duty-free *de minimis* treatment of goods subject to the February 1 China Order and the March 3 China Amendment. Exec. Order No. 14,256, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China as Applied to Low-Value Imports*, 90 Fed. Reg. 14,899 (Apr. 2, 2025) (the "April 2 China Amendment").

40.    The Department of Homeland Security and Customs and Border Protection have implemented these tariffs by modifying and revising the HTSUS. *See Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's February 1, 2025 Executive Order Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,038 (Feb. 5, 2025) (implementing 10 percent tariff from February 1 China Order); *Further Amended Notice of Implementation of Additional*

13

*Duties on Products of the People's Republic of China Pursuant to the President's Executive Order 14195, Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11,426 (Mar. 6, 2025) (implementing 20 percent tariff from March 3 China Amendment).[4]

**B.     The Universal and Reciprocal Tariff IEEPA Orders**

41.     On April 2, 2025, the President issued an executive order imposing a 10 percent universal tariff, as well as so-called "reciprocal" tariffs, on virtually all countries. Exec. Order No. 14,257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (April 2, 2025) (the "Universal and Reciprocal Tariff Order"). The express stated goal of these tariffs is "to rebalance global trade flows." *Id.* § 2, 90 Fed. Reg. at 15,045.

42.     The Universal and Reciprocal Tariff Order declares that the "large and persistent annual U.S. goods trade deficits" are a national emergency because they "constitute an unusual and extraordinary threat to the national security and economy of the United States." Universal and Reciprocal Tariff Order, 90 Fed. Reg. at 15,041; *see Fact Sheet: President Donald J. Trump Declares National Emergency to Increase our Competitive Edge, Protect our Sovereignty, and Strengthen our National and Economic Security*, The White House (April 2, 2025) ("President Trump is invoking his authority under [IEEPA] to address the national emergency posed by the

---

[4] On February 1, 2025, the President also issued two substantially similar executive orders imposing tariffs on all goods imported from Mexico and Canada, which each rely on IEEPA as the President's sole source of authority. *See Imposing Duties to Address the Situation at Our Southern Border*, 90 Fed. Reg. 9,117 (Feb. 1, 2025); *Imposing Duties to Address the Flow of Illicit Drugs Across our Northern Border*, 90 Fed. Reg. 9,113 (Feb. 1, 2025). The President subsequently paused, reinstated, and amended the scope of those tariff orders in ways not relevant here.

large and persistent trade deficit[.]").[5] The Order finds that these deficits are caused by "a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption." *Universal and Reciprocal Tariff Order*, 90 Fed. Reg. at 15,041. The Order asserts that "despite a commitment to the principle of reciprocity, the trading relationship between the United States and its trading partners has become highly unbalanced" because of supposed tariff and "non-tariff barriers [that] deprive U.S. manufacturers of reciprocal access to markets." *Id.* at 15,041-15,042. The Order concludes that "[l]arge and persistent annual U.S. goods trade deficits have led to the hollowing out of our manufacturing base; inhibited our ability to scale advanced domestic manufacturing capacity; undermined critical supply chains; and rendered our defense-industrial base dependent on foreign adversaries." *Id.* at 15,041.

43.    Based on the newly declared emergency "arising from conditions reflected in large persistent annual U.S. goods trade deficits," the Order imposes a universal tariff. *Universal and Reciprocal Tariff Order* § 1, 90 Fed. Reg. at 15,044. Specifically, it imposes "an additional ad valorem duty" of 10 percent "on all imports from all trading partners" except as expressly excluded. *Id.* § 2, 90 Fed. Reg. at 15,045. The Order modifies the HTSUS accordingly. *Id.* § 3(k), 90 Fed. Reg. at 15,047.

44.    The only countries exempted from these universal tariffs are Canada and Mexico, because goods from those countries are already subject to additional tariffs imposed under prior IEEPA orders, *Universal and Reciprocal Tariff Order* § 3(d), (e), 90 Fed. Reg. at 15,046, and Cuba, North Korea, Russia, and Belarus, because the United States lacks permanent normal trading

---

[5]    https://www.whitehouse.gov/fact-sheets/2025/04/fact-sheet-president-donald-j-trump-declares-national-emergency-to-increase-our-competitive-edge-protect-our-sovereignty-and-strengthen-our-national-and-economic-security/.

relations with these countries, *id.* § 3(b), 90 Fed. Reg. at 15,045-15,046. The Order exempts certain product categories from the universal tariffs on the basis that they are (or may soon be) subject to still other additional tariffs imposed under Section 232 of the Trade Expansion Act of 1962, including certain steel, aluminum, automobiles, and automotive parts, as well as products like copper, pharmaceuticals, semiconductors, lumber articles, certain critical minerals, and energy and energy products. *Id.* § 3(b), Annex II, 90 Fed. Reg. at 15,045, 15,049.

45.    The 10 percent universal tariffs took effect on April 5, 2025. Universal and Reciprocal Tariff Order § 3(a), (k), 90 Fed. Reg. at 15,045, 15,047.

46.    In addition to the universal 10 percent tariff, the Order also imposes a country-specific "reciprocal tariff" on 57 trading partners. Universal and Reciprocal Tariff Order § 2 & Annex I, 90 Fed. Reg. at 15,045, 15,049. The Order modifies the HTSUS accordingly. *Id.* at § 3(k), 90 Fed. Reg. at 15,047. This country-specific "reciprocal" tariff ranges from 11 percent for Cameroon and the Democratic Republic of the Congo to 50 percent for Lesotho. *Id.* at Annex I, 90 Fed. Reg. at 15,049. Key trading partners—including those with congressionally imposed "Most Favored Nation" status—to whom importers within the United States have sought to divert supply chains in recent years are subject to substantial reciprocal rates. *Id.* This includes, for example, Vietnam, which is subject to a 46 percent tariff. *Id.*

47.    Yet these "reciprocal" tariff amounts are not connected to the rates these countries charge the United States. For example, the European Union's total weighted average tariff rate was recently calculated at 2.7 percent, but the Executive Order sets the "reciprocal" rate for the European Union at 20 percent. World Trade Organization, *European Union* Summary.[6] This is

---

[6] https://www.wto.org/english/res_e/statis_e/daily_update_e/tariff_profiles/CE_e.pdf (last visited Apr. 21, 2025).

JA28

because the "reciprocal" tariff rates were calculated not by looking at the rates these countries charge the United States or by identifying any specific non-tariff barriers to trade. *See* Office of the U.S. Trade Representative, *Reciprocal Tariff Calculations*.[7] Rather, the "reciprocal" tariff for a specific country is calculated by dividing the United States's trade deficit with that country by total imports from that country, and then dividing by two. *Id.*; *see also* Peter Foster & Sam Fleming, *Donald Trump Baffles Economists with Tariff Formula*, FIN. TIMES (Apr. 3, 2025).[8] The result is an anomaly where the United States's "reciprocal" rate for a country's imports may be substantially higher than the rate the country imposes on the United States's exported goods.

48.    These "reciprocal" tariffs took effect on April 9, 2025. Universal and Reciprocal Tariff Order § 3(a), 90 Fed. Reg. at 15,045.

49.    The Order also directs the Secretary of Commerce and the United States Trade Representative "to employ all powers granted to the President by IEEPA as may be necessary to implement this order." Universal and Reciprocal Tariff Order § 5, 90 Fed. Reg. at 15,048.

50.    The only asserted authority for imposing tariffs under these orders is IEEPA.

51.    The Order also provides that the tariffs "shall apply until such time" as the President "determine[s] that the underlying conditions . . . are satisfied, resolved, or mitigated." Universal and Reciprocal Tariff Order § 2, 90 Fed. Reg. 15,045. At the same time, however, the President may, at his choosing, raise the tariffs even higher or broaden their scope: "Should any trading partner retaliate against the United States in response to this action through import duties on U.S. exports or other measures, I may further modify the HTSUS to increase or expand in scope the duties imposed under this order to ensure the efficacy of this action." *Id.* § 4(b), 90 Fed. Reg. at

---

[7] https://perma.cc/WB9J-WWNE (last visited Apr. 21, 2025).
[8] https://www.ft.com/content/85d73172-936a-41f6-9606-4f1e17cb74df.

15,047.

52.    Accordingly, when China responded to this order by imposing retaliatory tariffs, the President raised the "[r]eciprocal" tariff rate on China by 50 percentage points—from 34 percent to 84 percent. Exec. Order No. 14,259, *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports From the People's Republic of China*, 90 Fed. Reg. 15,509, 15,509 (Apr. 8, 2025) (the "April 8 Reciprocal China Amendment"). This placed the overall IEEPA tariffs on Chinese goods at 104 percent (84 percent per the April 8 Reciprocal China Amendment plus 20 percent per the February 1 China Order and March 3 China Amendment).

53.    The next day, April 9, 2025, the President suspended for 90 days the "reciprocal" tariffs on most countries—except for China, for which he raised the "reciprocal" tariff again, this time from 84 percent to 125 percent. Exec. Order No. 14,266, *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment* §§ 2, 3, 90 Fed. Reg. 15,625, 15,626 (Apr. 9, 2025) (the "April 9 Reciprocal Modification"). The 20 percent tariff pursuant to the February 1 China Order remains in place, meaning the current starting tariff on most imports from China is 145 percent, though some rates are as high as 245 percent.

54.    The suspension applies only to the "reciprocal" tariffs listed in Annex I to the Universal and Reciprocal Tariff Order. April 9 Reciprocal Modification § 3, 90 Fed. Reg. at 15,626. It does not apply to the 10 percent universal tariffs from that order. *Id.*

55.    On April 11, 2025, the President clarified that a variety of technological products related to computers, data processing, telecommunications, and electronic components were exempted from the universal and (suspended) reciprocal tariffs. Presidential Memorandum, *Clarification of Exceptions Under Executive Order 14257 of April 2, 2025, as Amended* (April 11,

2025).[9]

56.    Nevertheless, a 10 percent baseline tariff is being applied to most global imports, and products from China are subject to a minimum tariff of 145 percent.

## ECONOMIC IMPACT

57.    The Challenged Orders will increase the cost of trillions of dollars of goods and services imported to the United States every year. Ana Swanson, *U.S. Trade Deficit Hit Record in 2024 as Imports Surged*, N.Y. TIMES (Feb. 5, 2025) (United States imported $4.1 trillion in goods and services in 2024).[10]

58.    The President has stated that the tariffs will raise "billions of dollars, even trillions of dollars" in revenue. Bailey Schulz, *Trump is rolling out more tariffs this month. Where does the tariff money go?*, USA TODAY (April 3, 2025).[11] Treasury Secretary Scott Bessent estimates the United States will collect up to $600 billion in tariffs per year. Richard Rubin, *Bessent Says Tariff Revenue Could Reach $600 Billion Annually*, WALL ST. J. (April 4, 2025).[12] This money will not be paid by foreign governments; it will be paid primarily by American businesses and consumers. Six hundred billion dollars in annual tariffs would equate to the largest peacetime tax increase in U.S. history. Eric Boehm, *Peter Navarro Says Tariffs Will Be a $6 Trillion Tax Increase, but Also*

---

[9]    https://www.whitehouse.gov/presidential-actions/2025/04/clarification-of-exceptions-under-executive-order-14257-of-april-2-2025-as-amended/.

[10]    https://www.nytimes.com/2025/02/05/business/economy/us-trade-deficit-2024-record.html#:~:text=Data%20released%20Wednesday%20morning%20by,and%20food%20from%20other%20countries.

[11]    https://www.usatoday.com/story/money/2025/04/03/trump-tariffs-where-will-money-go/82792578007/.

[12]    https://www.wsj.com/livecoverage/stock-market-tariffs-trade-war-04-04-2025/card/bessent-says-tariff-revenue-could-reach-600-billion-annually-QJfDGCPYDY1C72Ljg1pt.

*a Tax Cut*, REASON MAG. (March 31, 2025).[13]

59.     Raising revenue from tariffs has substantial collateral consequences for the economy. By some estimates, the IEEPA tariffs on China alone will reduce GDP by 0.3 percent. Erica York & Alex Durante, *Trump Tariffs: The Economic Impact of the Trump Trade War*, THE TAX FOUND. (April 11, 2025).[14] The same estimates suggest retaliatory tariffs imposed by other countries will reduce U.S. GDP by at least another 0.2 percent. *Id.*

60.     The new tariffs will more than triple what the United States would expect to collect in tariffs under the status quo. *See* U.S. Customs and Border Protection, *Trade Statistics* (in 2024, CBP collected $88 billion dollars in tariffs).[15] All told, "the imposed tariffs" are projected to amount to an average tax increase of over $1,200 per American household in 2025. York & Durante, *supra* ¶ 59.

61.     The tariffs will severely and irreparably harm Plaintiffs Learning Resources and hand2mind. Because these companies directly import from China (as well as other countries affected by the Challenged Orders), they will be responsible for paying at least the 145 percent duty and tariffs on all products made in China, with certain products assessed total duties and tariffs of 170 percent or more. These rates are so high as to effectively prevent importation.

62.     Having previously planned for sales to increase by 8 percent, Plaintiffs are now planning for a 2025 sales decline of 25 percent to 50 percent year-over-year.

63.     Plaintiffs cannot continue to sell goods to their customers at the same prices prevailing before the challenged tariffs. Instead, Plaintiffs are already making and considering

---

[13]     https://reason.com/2025/03/31/peter-navarro-says-tariffs-will-be-a-6-trillion-tax-increase-but-also-a-tax-cut/.

[14] https://perma.cc/M3LK-SPE2.

[15] https://perma.cc/D3HR-JD4Y (last visited April 21, 2024).

JA32

further significant and costly changes to their businesses, while facing the prospect of (among other things) sharply raising prices, major supply disruptions, and having to revamp or eliminate entire product lines. Those changes will result in lost sales, lost profits, lost market share, loss of consumer goodwill—and potentially worse.

## CLAIMS FOR RELIEF

### COUNT I
### ULTRA VIRES ACTS IN VIOLATION OF THE INTERNATIONAL EMERGENCY ECONOMIC POWERS ACT, 50 U.S.C. § 1702

64.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

65.    "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). Accordingly, "[w]hen an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996). "Congress can and often does cabin the discretion it grants the President and it remains the responsibility of the judiciary to ensure that the President act within those limits." *American Forest Res. Council v. United States*, 77 F.4th 787, 797 (D.C. Cir. 2023); *see also Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002) ("Courts remain obligated to determine whether statutory restrictions have been violated.").

66.    The Challenged Orders are *ultra vires* because, even in the face of an actual national emergency, IEEPA does not authorize the President to impose tariffs.

67.    The power to lay and collect duties is "conferred upon the Congress." *United States v. Jacobs*, 306 U.S. 363, 370 (1939). As a result, the President has authority to impose or adjust tariffs only to the extent authorized by Congress. And because the exercise of tariff authority carries "vast economic and political significance"—especially here, where the President has

JA33

unilaterally imposed costly tariffs on virtually all goods coming from all countries in what would equate to the largest peacetime tax increase in U.S. history—that statutory authorization must be "clear." *West Virginia*, 597 U.S. at 716; *accord Biden v. Nebraska*, 600 U.S. 477, 505-506 (2023). It is not sufficient that the President's interpretation of the relevant statutory provision is "colorable." *West Virginia*, 597 U.S. at 722. That is doubly true where the "claim of expansive authority" is "unprecedented." *Alabama Ass'n of Realtors v. Department of Health & Hum. Servs.*, 594 U.S. 758, 765 (2021).

68.    The plain text of IEEPA does not clearly—or even colorably—authorize the President to impose tariffs at all, much less tariffs of any size, duration, and scope. The statute nowhere mentions "tariffs," "duties," or other revenue-raising mechanisms. And no President has used IEEPA to impose tariffs in the past. Instead, the statute grants the President other defined and limited powers—such as the powers to "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit" the "importation or exportation" of goods. 50 U.S.C. § 1702(a)(1)(B).

69.    The power to "regulate" imports and exports does not encompass the distinct power to raise revenue through tariffs or duties. The word "regulate," in the context of "nullify, void, prevent[], or prohibit," means to directly control the quantity or the quality of imports from one or more foreign countries causing the extraordinary emergency—not to impose tariffs on such imports.

70.    The distinction between *regulating* foreign imports and *imposing tariffs* on foreign imports dates back to our Founding. Article I, Section 8, Clause 1 of the Constitution vests Congress with the "[p]ower to lay and collect Taxes, Duties, Imposts, and Excises." By contrast, Article I, Section 8, Clause 3 empowers the Congress "[t]o regulate Commerce with foreign

Nations." If imposing tariffs was the same thing as regulating foreign commerce, there would be no need for the Constitution to specifically enumerate the power to impose tariffs in Clause 1. The Constitution treats these powers separately because they serve very different functions and are not substitutes for one another.

71.    Indeed, where Congress has granted the President power to impose tariffs and duties, it has done so through highly reticulated statutory schemes that are clear in their authorization and limited in their scope. Laws such as the Tariff Act of 1930 and the Trade Act of 1974 provide authority to the President to impose tariffs, but *no law* provides that authority by saying merely that the President may "regulate" imports and exports. Laws providing authority to impose tariffs instead provide that authority through language that expressly references tariffs and duties that raise revenue.

72.    Moreover, reading IEEPA's grant of authority to "regulate" imports and exports to include the distinct authority to impose tariffs would be inconsistent with other terms of the statute. For example, Section 1702(a)(1)(B) explicitly states that the President may only "regulate . . . importation or exportation of . . . property in which any foreign country or a national thereof has any interest." But at the time tariffs would be levied, most goods are the property of the U.S. persons that have imported them into the country (or whomever takes title when they cross the border), and not of any foreign persons. It is absurd to suggest that Congress intended to grant the President the authority to impose tariffs, yet in the same provision precluded the imposition of tariffs except in a minority of circumstances.

73.    For these reasons, this Court should declare that the Challenged Orders are *ultra vires* because they exceed the President's authority under IEEPA, and that the corresponding modifications to the HTSUS are unlawful.

74.     Because the Challenged Orders are *ultra vires*, and the corresponding modifications to the HTSUS are unlawful, they cannot be enforced by Defendants. This Court should accordingly enjoin Defendants (other than the President) in their official capacities as federal officers from enforcing them.

75.     If the Challenged Orders are not declared *ultra vires* and the HTSUS modifications are not declared unlawful, Plaintiffs will suffer substantial injury, including irreparable injury.

**COUNT II**<br>**ULTRA VIRES ACTS IN VIOLATION OF THE INTERNATIONAL**<br>**EMERGENCY ECONOMIC POWERS ACT (IEEPA), 50 U.S.C. § 1701(b)**

76.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

77.     As set forth in Count I, this Court may review *ultra vires* acts and provide equitable relief.

78.     Even if IEEPA authorized the President to impose tariffs, it would not authorize the tariffs directed in the Challenged Orders because they either (a) do not involve an "unusual or extraordinary threat" to the nation, (b) do not "deal with"—or in other words, reasonably relate— to the national emergencies that the President declared, or (c) have been employed to take on numerous, unrelated problems for which no national emergency has been declared in the first place. Had Congress intended to grant the President authority to impose tariffs as a matter of general economic policy—as the President has done here—rather than to combat an emergency, it would have said so clearly. But it did not.

79.     IEEPA grants the President authority to regulate various international economic transactions "to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared." 50 U.S.C. § 1701(b); *see also id.* § 1701(a) ("Any authority granted to the President by section 1702 of this title may be exercised to deal with any unusual and extraordinary threat.").

24

80.    IEEPA also expressly provides that the President's authority "may not be exercised for any other purpose" and that "[a]ny exercise of such authorities to deal with any new threat shall be based on a new declaration of national emergency which must be with respect to such threat." 50 U.S.C. § 1701(b). This requirement that IEEPA action be taken only to "deal with" the declared national emergency, and not for any other reason, is echoed in case law. When the government claims "unprecedented" power over a significant portion of the economy, *Alabama Ass'n of Realtors*, 594 U.S. at 765, its actions must be "[]tethered" to the underlying statutory scheme, *National Fed'n of Indep. Bus. v. Department of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 119 (2022); *see also United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 577 (C.C.P.A. 1975) (holding that tariffs under TWEA must be "reasonably related" to the emergency that the President declared).

81.    ***The Universal and Reciprocal IEEPA Orders***: The tariffs imposed in the Universal and Reciprocal IEEPA Orders do not concern any "emergency" that poses either an "unusual" or an "extraordinary" threat. The President admits as much in that order, as he describes the United States' "annual trade deficits" as "persistent" and rooted in (congressionally approved) trade agreements entered in the first half of the twentieth century. Universal and Reciprocal IEEPA Order, 90 Fed. Reg. at 15,041. If the words "unusual" or "extraordinary" are to bear any meaning, the fact that the United States has had a trade deficit for more than 50 years shows that the United States' current trade deficit does not fit within the IEEPA emergency definition. *See* Brian Reinbold & Yi Wen, *Historical U.S. Trade Deficit*, FED. RES. BANK OF ST. LOUIS (May 17, 2019).[16] Indeed, the United States' exceptional economic growth over the past 50 years affirmatively demonstrates that "the trade balance is a particularly bad measure of national well-

---

[16] https://www.stlouisfed.org/on-the-economy/2019/may/historical-u-s-trade-deficits.

being." Andrea Freytag & Phil Levy, *The Trade Balance and Winning at Trade*, THE CATO INST. (Oct. 3, 2024).[17] IEEPA requires that there be an "unusual and extraordinary threat," and neither the trade deficit, nor any of the circumstances that the President asserts cause this deficit, meet this standard. 50 U.S.C. § 1701(a).

82. Nor are the tariffs imposed by the Universal and Reciprocal IEEPA Order "reasonably related" to a national emergency. *Yoshida*, 526 F.2d at 577. The asserted national emergency for these tariffs is "the large and persistent annual U.S. goods trade deficits." Universal and Reciprocal Tariff Order § 1, 90 Fed. Reg. at 15,044. Even if the tariffs could address the trade deficit or the circumstances that cause it, the tariffs the President has imposed are incredibly overbroad, as they apply to countries with whom we run a trade surplus and to countries that do not charge tariffs on American goods.

83. ***The China IEEPA Orders***: The tariffs imposed by the China IEEPA Orders are likewise not reasonably related to the declared drug trafficking emergencies. Imposing tariffs on *legal* goods has no sufficient connection to combatting *illegal* narcotics. Most critically, the costs of tariffs on legal goods lawfully imported into the United States are primarily borne by *Americans*; there is no reason why such tariffs and the corresponding harm to American business will alter the behavior of the cartels, drug-smuggling rings, and other organizations that bring illegal substances into our country. Doing so is not "regulating importation . . . *by means appropriate* to the emergency involved." *Yoshida*, 526 F.2d at 584 (emphasis added).

84. The tariffs imposed by the China IEEPA Orders are also unlawful because the President is imposing them for purposes other than the illegal drug trafficking emergency he declared. The President has been clear that these tariffs are simply part of his economic agenda—

---

[17] https://www.cato.org/publications/trade-balance-winning-trade.

their predominant purpose is *not* to address the national fentanyl emergency invoked as the basis for imposing them. *See* Amie Williams et al., *Donald Trump Threatens to Ignite Era of Trade Wars with New Tariffs*, FIN. TIMES (Jan. 31, 2025) (quoting the President as stating, the day before imposing the tariffs, that "It's pure economic. We have big deficits with, as you know, with [China]")[18]; Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Feb. 2, 2025, 8:09 AM) ("The USA has major deficits with Canada, Mexico, and China (and almost all countries!), owes 36 Trillion Dollars, and we're not going to be the 'Stupid Country' any longer. MAKE YOUR PRODUCT IN THE USA AND THERE ARE NO TARIFFS! Why should the United States lose TRILLIONS OF DOLLARS IN SUBSIDIZING OTHER COUNTRIES, and why should these other countries pay a small fraction of the cost of what USA citizens pay for Drugs and Pharmaceuticals, as an example? THIS WILL BE THE GOLDEN AGE OF AMERICA!").[19]

85.    IEEPA is clear, however, that the President's authority "may only be exercised to deal with" a declared national emergency "and may not be exercised for *any other purpose*." 50 U.S.C. § 1701(b) (emphasis added). The President's multi-purpose approach renders IEEPA's text superfluous: If he can exercise powers under IEEPA not for the particular emergency declared but for any purpose he wishes, the textual limit set by Congress has no force.

86.    ***Other Deficiencies Across the Challenged Orders***: The Challenged Orders suffer from at least three other legal deficiencies. *First*, they violate IEEPA because the tariffs they impose apply to imported goods that the statute expressly excludes from coverage. Section 1702(a)(1)(B) permits the President to "regulate" only property "in which any foreign country or a national thereof has any interest." Accordingly, where a U.S. person has taken title to and holds

---

[18] https://www.ft.com/content/ff8116f0-b01f-4687-934a-a1b8a07bd5b0.
[19] https://truthsocial.com/@realDonaldTrump/posts/113934450227067577.

beneficial interest in the imported property, no tariff may be imposed. Despite this, the Challenged Orders impose tariffs on *all* imports from China and almost every other country, even if no foreign country or national retains any interest in the goods. Indeed, tariffs are paid by the "owner or purchaser" of the merchandise, which will be a United States person in most instances. *See* 19 U.S.C. § 1484(a)(2)(B).

87.     *Second*, the China IEEPA Orders disregard other statutory requirements. They provide that "[n]o drawback shall be available with respect to the duties imposed pursuant to this order." February 1 China Order § 2(f), 90 Fed. Reg. at 9,123. But 19 U.S.C. § 1313(a) provides that when goods "manufactured or produced in the United States with the use of imported merchandise" are exported or destroyed, the tariffs paid on the imported merchandise "shall be refunded as drawback." IEEPA provides no authority to supersede this provision, particularly in circumstances where no foreign country or national retains any interest in the drawback. Moreover, regulations implementing duty drawbacks cannot be withdrawn without notice and comment. *Modernized Drawback*, 83 Fed. Reg. 64,942, 64,997 (Dec. 18, 2018); *see Rotinsulu v. Mukasey*, 515 F.3d 68, 72 (1st Cir. 2008) ("An agency has an obligation to abide by its own regulations." (citing *Accardi v. Shaughnessy*, 347 U.S. 260, 265-267 (1954)); *Humane Soc'y of the United States v. United States Dep't of Agric.*, 41 F.4th 564, 569 (D.C. Cir. 2022) ("[O]nce an agency makes a rule—that is, once it makes a statement prescribing law with future effect—the APA requires the agency to provide notice and an opportunity for comment before repealing it.").

88.     *Third*, the Challenged Orders also limit duty-free *de minimis* treatment under 19 U.S.C. § 1321. *See, e.g.*, Universal and Reciprocal Tariff Order § 3(h), 90 Fed. Reg. at 15,047. Section 1321, however, states that the Secretary of the Treasury "shall prescribe" regulations admitting goods "free of duty" when their fair retail value does not exceed $800. IEEPA does not

28

JA40

authorize the President to suspend these statutory provisions. Nor can he repeal these regulations without notice and comment.

89.     For these reasons, this Court should declare that the Challenged Orders are *ultra vires* because they exceed the President's authority under IEEPA, and that the corresponding modifications to the HTSUS are unlawful.

90.     Because the Challenged Orders are *ultra vires*, and the corresponding modifications to the HTSUS are unlawful, they cannot be enforced by Defendants. This Court should accordingly enjoin Defendants (other than the President) in their official capacities as federal officers from enforcing them.

91.     If the Challenged Orders are not declared *ultra vires* and the HTSUS modifications are not declared unlawful, Plaintiffs will suffer substantial injury, including irreparable injury.

**COUNT III**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706**
**(IN EXCESS OF STATUTORY AUTHORITY)**

92.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

93.     The Administrative Procedure Act ("APA") provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The APA authorizes judicial review of "final" agency actions. *Id.* § 704. Courts must "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2).

94.     Defendants' agency actions implementing the Challenged Orders by modifying the HTSUS or otherwise implementing the Challenged Orders and collecting tariffs, as set forth in paragraphs 12-21, are "final" agency actions because they finally "determine" the "rights or

29

obligations" of parties and are backed by "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177-178 (1997).

95.    These actions implementing the Challenged Orders are "in excess of statutory jurisdiction, authority, [and] limitations" because Defendants lack statutory authority to implement, collect, or otherwise demand the payment of tariffs that have not been enacted into law by Congress, have not been duly promulgated pursuant to a lawful delegation from Congress, or have not been authorized by a lawful executive order or proclamation pursuant to a lawful delegation of Congress.

96.    The agency actions modifying the HTSUS explicitly state that they are implementing the Challenged Orders and cite no other authority—because there is no other authority—for these modifications.

97.    Accordingly, these actions fall within Defendants' statutory jurisdiction and authority only to the extent that the Challenged Orders are themselves lawful. But as discussed above and alleged in Counts I and II, the Challenged Orders are *ultra vires* and unlawful because they exceed the President's authority under IEEPA. And, as alleged in Count IV, to the extent IEEPA does authorize these tariffs, IEEPA is an unlawful delegation of legislative authority. The agency actions modifying the HSTUS or otherwise implementing the Challenged Orders are thus themselves unlawful.

98.    Defendants' agency actions are also "contrary to constitutional right, power, privilege or immunity," *id.* § 706(2)(B), because, as set forth in Count IV and incorporated by reference herein, their only purported source of authorization, IEEPA, violates Article I, § 1 of the U.S. Constitution.

99.     For these reasons, this Court should declare that Defendants' agency actions are "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C), and "contrary to constitutional right, power, privilege, or immunity," *id.* § 706(2)(B), set modifications to the HTSUS aside, and enjoin Defendants (other than the President) and their agents, employees, and all persons acting under their direction or control from taking any action to collect any tariffs announced in the Challenged Orders.

100.    If Defendants' agency actions are not declared unlawful, set aside, and enjoined, Plaintiffs will suffer substantial injury, including irreparable injury.

**COUNT IV**
**VIOLATION OF ARTICLE I, § 1 OF**
**THE U.S. CONSTITUTION AND SEPARATION OF POWERS**
**(NONDELEGATION DOCTRINE)**

101.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

102.    To the extent that IEEPA could be interpreted so broadly as to permit the President to impose the tariffs set forth in the Challenged Orders, it violates Article I of the Constitution and the separation of powers.

103.    The Constitution vests "[a]ll legislative Powers" in "Congress." U.S. CONST. art. I, § 1. This includes the power to "lay and collect . . . Duties." *Id.* art. 1, § 8, cl. 1.

104.    Congress "is not permitted to abdicate or to transfer to others the essential legislative functions with which it is . . . vested," whether that function is the imposition of tariffs or revenue raising. *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935); *see Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42-43 (1825). Under the nondelegation doctrine, Congress may assign modest administrative tasks to the Executive Branch with little or no guidance. Once the authority granted becomes more significant, Congress must more specifically supply both an object and a route to guide the Executive Branch's discretion. And when it comes

31

to the most important policy questions, Congress cannot delegate the hard choices at all; instead, it must answer those questions itself. *Cf. Marshall Field & Co. v. Clark*, 143 U.S. 649, 692-693 (1892) (explaining that "Congress itself prescribed, in advance, the duties to be levied, collected, and paid on [enumerated products]"); *see id.* at 680-681 (Congress spent 241 words delineating tariff amounts for specific products in the Tariff Act of October 1, 1890).

105.   As construed by the Challenged Orders, however, Congress did not do that in IEEPA. According to the Challenged Orders, the President has authority to make major policy judgments about tariffs without any guidance from Congress on the amount, the country of origin, the duration of the tariff, or the condition triggering its imposition, and there would be no need to demonstrate that the action taken has any reasonable relationship to the national emergency declared. Because (under the President's interpretation) IEEPA improperly delegates legislative powers to the President, the Challenged Orders are based on an unconstitutional delegation of power.

106.   Moreover, under existing Supreme Court precedent, a statutory delegation to the Executive Branch is constitutional only when "Congress 'lay[s]' down by legislative act an intelligible principle" to cabin the agency's discretion. *Gundy v. United States*, 588 U.S. 128, 135 (2019) (alteration in original) (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989)). If the interpretation of the statute reflected in the Challenged Orders is correct, however, IEEPA would not provide the "intelligible principle" for the reasons explained above.

107.   Additionally, the President's unconstrained exercise of Congress's power to impose tariffs means he may unilaterally and abruptly suspend and resume tariffs with the stroke of a pen. He has already done that multiple times. This "conception of Presidential authority smacks of the powers that English monarchs claimed prior to the 'Glorious Revolution' of 1688, namely, the

JA44

power to suspend the operation of existing statutes, and to grant dispensations from compliance with statutes." *United States v. Texas*, 599 U.S. 670, 732 (2023) (Alito, J., dissenting). That is not consistent with the U.S. Constitution.

108.    For these reasons, to the extent that IEEPA delegates to the President the authority to impose the tariffs set forth in the Challenged Orders, this Court should declare that IEEPA violates Article I, § 1, of the U.S. Constitution; declare that the Challenged Orders and Defendants' implementing actions are unlawful because they are based on an unconstitutional delegation of legislative power; and set Defendants' implementing actions aside and enjoin their enforcement.

109.    If the Challenged Orders and Defendants' implementing actions are not set aside, declared unlawful, and enjoined, Plaintiffs will suffer substantial injury, including irreparable injury.

**COUNT V**
**DECLARATORY RELIEF, 28 U.S.C. § 2201**

110.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

111.    With exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power "to declare the rights and other legal relations of any interested party seeking such a declaration." 28 U.S.C. § 2201(a).

112.    For the reasons stated in the previous counts, there is a real and actual controversy as to whether the tariffs imposed by the Challenged Orders are *ultra vires*, whether the agency action modifying the HTSUS violate the APA and IEEPA, and whether IEEPA violates Article I, § 1 of the U.S. Constitution and the separation of powers.

113.    This Court can and should exercise its equitable power to enter a declaratory judgment that the President's Challenged Orders announcing tariffs are unlawful, that the President's Challenged Orders have no legal effect, and that any actions by Defendants

implementing the President's Challenged Orders also have no legal effect.

114.    This Court should grant declaratory relief and any further necessary and proper relief as set forth below, pursuant to 28 U.S.C. §§ 2201-2202.

## PRAYER FOR RELIEF

Plaintiffs request an order and judgment:

A.  preliminarily and permanently enjoining Defendants (other than the President) and their agents, employees, and all persons acting under their direction or control from taking any action to collect any tariffs announced in the Challenged Orders;

B.  setting aside as unlawful all agency action implementing the Challenged Orders by modifying the Harmonized Tariff Schedule;

C.  postponing the effectiveness of agency action implementing the Challenged Orders pursuant to 5 U.S.C. § 705;

D.  declaring that the Challenged Orders are unlawful;

E.  declaring that IEEPA does not authorize the President to impose the tariffs set forth in the Challenged Orders;

F.  declaring that, to the extent IEEPA authorizes the President unilaterally to impose tariffs, that action violates the Constitution;

G.  setting aside as unlawful all agency action implementing the Challenged Orders;

H.  entering judgment in favor of Plaintiffs;

I.  awarding Plaintiffs their attorneys' fees and costs incurred in bringing this action under 28 U.S.C. § 2412 or other applicable law; and

J.  awarding Plaintiffs all other such relief as the Court deems just and proper.

Dated: April 22, 2025                    Respectfully submitted,

                                         /s/ Pratik A. Shah
                                         Pratik A. Shah
                                           D.C. Bar No. 497108
                                         James E. Tysse
                                           D.C. Bar No. 978722
                                         Daniel M. Witkowski (*admission pending*)
                                           D.C. Bar No. 1028791
                                         Kristen E. Loveland
                                           D.C. Bar No. 1684978
                                         AKIN GUMP STRAUSS HAUER
                                           & FELD LLP
                                         2001 K Street N.W.
                                         Washington, D.C. 20006
                                         Tel:  (202) 887-4000
                                         pshah@akingump.com

                                         *Counsel for Plaintiffs*

### Appendix A:  The "Challenged Orders"

| DATE | TITLE | SHORT-FORM | DESCRIPTION | SHORT-FORM |
|---|---|---|---|---|
| | **The "China IEEPA Orders"** | | | |
| 2/1/25 | *Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China* | February 1 China Order | Imposes 10% tariff on Chinese goods | E.O. 14,195; 90 Fed. Reg. 9,121 |
| 3/3/25 | *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China* | March 3 China Amendment | Increases tariff on Chinese goods from 10% to 20% | E.O. 14,228; 90 Fed. Reg. 11,463 |
| | **The "Universal and Reciprocal IEEPA Orders"** | | | |
| 4/2/25 | *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits* | Universal and Reciprocal Tariff Order | Imposes universal 10% tariff on nearly all trading partners; imposes country-specific "reciprocal" tariffs on 57 trading partners | E.O. 14,257; 90 Fed. Reg. 15,041 |
| 4/8/25 | *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports from the People's Republic of China* | April 8 Reciprocal China Amendment | Increases the "reciprocal" tariff on China from 34 percent to 84 percent | E.O. 14259; 90 Fed. Reg. 15,509 |
| 4/9/25 | *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment* | April 9 Reciprocal Modification | Pauses for 90 days the imposition of the "reciprocal" tariffs, except as to China, for which the "reciprocal" tariff is increased from 84 percent to 125 percent | E.O. 14,266; 90 Fed. Reg. 15,625 |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

LEARNING RESOURCES, INC. and
HAND2MIND, INC.,

*Plaintiffs,*

v.

DONALD J. TRUMP, President of the United
States, in his official capacity; KRISTI NOEM,
Secretary of the Department of Homeland Security,
in her official capacity; U.S. DEPARTMENT OF
HOMELAND SECURITY; SCOTT BESSENT,
Secretary of the Treasury, in his official capacity;
U.S. DEPARTMENT OF THE TREASURY;
HOWARD LUTNICK, Secretary of Commerce, in
his official capacity; UNITED STATES
DEPARTMENT OF COMMERCE; PETE R.
FLORES, Acting Commissioner of Customs &
Border Protection, in his official capacity; U.S.
CUSTOMS & BORDER PROTECTION;
JAMIESON GREER, U.S. Trade Representative;
and THE OFFICE OF THE U.S. TRADE
REPRESENTATIVE,

*Defendants.*

Case No.: 1:25-cv-01248

**DECLARATION OF RICHARD WOLDENBERG IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR A PRELIMINARY INJUNCTION**

I, Richard Woldenberg, declare as follows:

1.      My name is Richard Woldenberg, and I am the CEO of Learning Resources, Inc.

and hand2mind, Inc. (collectively, "LR/h2m" or the "Companies"). I am over the age of eighteen,

have personal knowledge of the subject matter, and am competent to testify concerning the matters

in this declaration.

2.      LR/h2m are part of a private, family-owned group of companies which develop,

market, and sell educational products, educational toys, and pet toys. We market our products

under brands such as LEARNING RESOURCES, EDUCATIONAL INSIGHTS, HAND2MIND and BRIGHTKINS. Learning Resources and hand2mind are related legal entities under common ownership, common control, and common management with various corporate functions managed as "shared services" for the benefit of both companies. The Companies share more than 100 employees, including certain senior officers and managers such as myself, share a single line of credit, and operate with a common supply chain department.

3.    Our family business is now in its fourth generation and dates back to a company purchased by my grandfather more than 100 years ago. LR/h2m is a world leader in the development of experiential, hands-on learning materials which are sold in more than 100 countries. We have more than 500 U.S. employees and full-time equivalents today. Our products are developed in the United States, but we outsource manufacturing to factories in other countries, including (but not limited to) China, Taiwan, Korea, Vietnam, Thailand, and India. We also perform some of our manufacturing and assembly in the United States. Our companies have offices around the country: in Vernon Hills, Illinois; Torrance, California; and Amherst, New York. We also have employees that work remotely in other states. We ship from our warehouses in Vernon Hills, Illinois.

4.    I am providing this declaration in support of Plaintiffs' motion to preliminarily enjoin and set aside the implementation and enforcement of recent Executive Orders that impose additional tariffs under the International Emergency Economic Powers Act (IEEPA) on goods imported from China, Taiwan, Korea, Vietnam, Thailand, India, and other countries from which we import.

5.    LR/h2m directly imports from these countries, and both companies pay duties and tariffs on imports directly. When we import, we purchase and take title to the products in the

foreign country and thus own the merchandise at the time of importation. Specifically, we manufacture toys and other products in China, Taiwan, Korea, Vietnam, Thailand, India, and other countries that we then import into the U.S. and sell to brick-and-mortar retailers, online marketplaces and web merchants, school suppliers and other resellers, schools, teachers, and consumers. We also export our products to customers in other countries.

6.      The scale of the IEEPA tariff burden is unsustainable and threatens our ability to continue those trade streams because we are not able to absorb the additional tariff costs without changing our pricing radically. Approximately 60% of the products we sell or consume as components (by cost) are manufactured in China, and "made-in-China" products represent a similar percentage of our revenue. The new 2025 tariffs are in addition to Section 301 China tariffs in effect since 2018. With the additional IEEPA China tariff of 10% effective February 4, 2025, and 20% effective March 4, 2025, and additional China universal 10% tariff effective April 5th which was later replaced with a reciprocal 34% duty, subsequently increased to 84% (items entered April 9th), and further increased to 125% (items entered April 10th and onward), we are now responsible to pay at least 145% duty and tariffs on all products made in China, with certain products being assessed total duties and tariffs of 170% or more taking into account the additional 25% Section 301 China tariff plus general rate of duty, if applicable. These rates are now so high as to effectively prevent importation.

7.      The Companies have collectively already paid over $1 million based on the new 2025 tariff rates, with both Companies having paid the 10% and 20% initial IEEPA tariffs on China as well as the initial universal "reciprocal" tariff of 10%. Those shipments left port before the increased 125% reciprocal tariff rate on China took effect. When that rate was announced with only a few hours advanced notice, we stopped as many shipments from China as possible to avoid

an unplanned extraordinary expense. However, on such short notice, we were not able to stop 19 shipments for the benefit of both Learning Resources and hand2mind arriving between April 24th and May 13th with more than 75% by value expected to be assessed at the 145% combined tariff rate. We did authorize one air shipment of a small amount of product with an entry date of April 20th subject to the 145% combined tariff rate. The Companies are currently evaluating how to manage the importation (entry) of these pending shipments, but both Companies have an intention to import at least some items subject to the 145% tariff rate from these shipments. We cannot presently estimate the tariff cost each Company will actually incur but the total estimated duties and tariffs on all of the merchandise in those twenty shipments is greater than $1 million and each Company expects to pay a portion of that sum, which constitutes an extraordinary and unplanned expense. For any merchandise within these shipments that we decide to re-export in order to avoid paying duties at a rate of at least 145%, we expect to incur additional losses for transportation charges to ship that merchandise away from the United States and special handling and transaction fees relating to these shipments.

8.      The tariff rates assessed on the countries from which we source our products have been changing frequently in 2025. Inclusive of the universal and reciprocal tariffs announced on April 2nd, 8th, 9th and 10th, but before taking into account the 90-day "pause" in the collection of certain tariffs announced on April 9th, which may affect a small percentage of our products (but not those from China), we currently believe that an "apples-apples" estimate for 2025 duties and tariffs based on our 2025 full-year budget (unadjusted for on-hand inventory or any possible economic downturn) would be more than $100 million in cash expenditures, versus 2024 actuals of $2.3 million in duties and tariffs paid. In other words, given the ever-changing situation with the IEEPA tariffs, considerable uncertainty about future economic conditions and trade rules, and

the as-yet-unknown decisions we will make to survive under these rapidly evolving conditions, I currently project that we would experience an almost 44x year-over-year increase in duties and tariffs using our 2025 plan as the base case. We currently estimate that more than 95% of these tariffs would derive from products made in China now, which is a tacit ban on manufacturing in China in practical effect. Additionally, we are incurring significant unrecoverable costs and expenses, not to mention time lost, dealing with ever-changing tariff rates and massive disruptions in our supply chain, business relations, and business operations.

9.     There is no way to fully offset the costs of current tariffs through vendor concessions or expense reduction—the number is too enormous and many times our projected annual income. LR/h2m may be forced to raise prices as much as 70% (or possibly more) as a matter of pure survival. Some of our customers with urgent programs requiring imports that cannot be delayed are already facing price increases of more than 100%. This level of price inflation is very destabilizing to our business relations and frankly is terrifying.

10.     These tariffs will severely and irreparably harm LR/h2m. Mid-year price increases from tariffs are expected to cause a market shock and an immediate and sustained decline in sales. As of April 21st, we have received cancellations and "stop shipment" instructions for direct import orders totaling more than $1 million because of the new tariffs. We have been notified by certain customers that they will not take any direct import shipments from China so they can avoid paying the tariffs, which places all financial risk on our companies. Customers have also contacted us about their fears of future shortages and price shocks and asked about our ability to keep them supplied. We believe some customers have moved up domestic orders with us to "grab" inventory while they can. Due to the lag time between the imposition of the tariffs and the pending gap in replenishment shipments, we are projecting outages beginning in a matter of weeks, which are

traceable to a halt in import shipments beginning on April 9th. For a company built on high service, the prospect of a looming sharp service decline is very threatening. At present, there is little we can do to stop the stock outage catastrophe from happening owing to supply chain chaos, an incredibly burdensome and constantly shifting tariff landscape, and a very high price to be paid for incorrect logistical judgments.

11.    After the first tariffs were announced in January, we pivoted from planning based on our 2025 budget scenario of sales up 8%, to a scenario with sales down 25%—and now believe the sales decline may be as great as 40% or even 50% year-over-year. Following the substantial tariff increases announced on products from China between April 2 and April 10, 2025, we effectively stopped importing nearly all of the roughly 2,400 products that we source from China. We expect that the IEEPA tariffs on other countries will also substantially harm our sales because of the same factors.

12.    This is a shocking turn of events for our companies, which have been growing faster than the overall toy industry in the period 2019-2024. In other words, I believe these tariffs have likely ended our record of exceptional growth and replaced it with an expectation of an imminent sharp decline in sales.

13.    To address the financial impact of the sudden, unbudgeted and massive tariff cost and to attempt to protect the market for our products, we have been working to cut our operating expenses by 10% since January and will need to cut those expenses even further because of the recently announced new tariffs. Our cost cutting focus has been on cash expenditures like advertising, CapEx, and hiring. We have also considered reducing service levels (such as by increasing delivery times) to lower costs, which would intentionally degrade our operational performance and hurt our brand reputation in a market that expects fast delivery. We are

JA54

scrambling to do everything in our power to save jobs. Both Companies have been named a Top Workplace by the Chicago Tribune in each of the last five years – losing our team would be a devastating loss.

14.    Our companies cannot possibly absorb the costs of these increased tariffs. By way of illustration using our 2025 business plan, if we cut **every** expense in our 2025 budget other than salary (*i.e.*, all expenses, including electricity, postage, health insurance benefits and rent), we would still not be able to cover the $100.2 million projected cost of the tariffs. Vendor concessions will also be ineffective at making up a meaningful portion of this loss. If we buy a product from China for $10, new inventory will now cost not less than $24.50 with tariffs before the costs of transport. For the old cost of $10 to be preserved in new inventory, the vendor would have to cut its price to $4.08. Our vendors struggle to give us even a 10% discount and they simply cannot give us a discount of almost 60%.

15.    We have no realistic way to cover these costs, which means the tariffs act as an immediate ban on the products we import. We cannot even risk putting our Chinese-made products on the water for fear of paying 145% tariffs on arrival, which means we are already suffering a major disruption in our replenishment orders from China that grows more urgent by the day. Even considering the very limited positive impact of vendor concessions and expense reductions, our only options to address this increase in costs caused by increased tariffs are (a) to pass the tariff cost to our customers in the form of much higher prices for our goods or (b) reducing the costs by making and selling cheaper, lower-quality products. Both options would cause LR/h2m substantial harm. Continuing to market goods subject to a 145% tariff is infeasible because our dealers and consumers will never pay those prices. We cannot pass along tariffs at rates like 46% (which was the country-specific reciprocal tariff announced for Vietnam) or even 25% (which was the country-

JA55

specific reciprocal tariff announced for South Korea) for fear of alienating dealers and consumers who are ill-prepared for the coming deluge of massive price increases. Reducing quality is an unthinkable option for premium brands like ours and is practically infeasible, as it would require us to change the design and/or production of more than 2,000 products at once. That process would take years and cost millions of dollars out of pocket. Alternatively, we must consider discontinuing the import and sale of certain educational products entirely in the U.S., and we have already been forced to pause certain orders and shipments. It is completely unrealistic to avoid the tariffs by shifting our supply chain for more than 2,000 products, which would also take years and cost millions of dollars that we cannot spare. For a company built on a high-service model, this erosion in our operating standards exposes our brands to an uncertain future and the prospect of declining sales and reputation as service levels worsen.

**Passing the tariff costs to our customers will cause the Companies to lose profits, lose sales, and damage their reputation.**

16.    If LR/h2m attempts to pass along all, or substantially all, of the cost of the tariffs to its customers in the form of increased prices, we will sell substantially fewer goods. This is because, when LR/h2m materially increases the price of goods it sells, consumers demand fewer of those goods. Consumers are price-sensitive and will not accept a massive price increase on toys and educational products after the current sustained period of modest inflation in the United States. School accounts are already showing a significant reluctance to order for back-to-school because of funding uncertainty and limited budgets, a factor certain to be exacerbated by large price increases. Our dealer partners which resell our products will be squeezed by a sudden price increase and are highly likely to resist price changes notwithstanding our urgent need to recoup these expenses. I expect that, after massive price increases, our dealers will drop, adjust, or reduce the product ranges they offer to preserve their limited capital, thus shrinking our market and

8

increasing the risk that our brands will be marginalized. We will also be exposed to credit losses

on receivables from our customers as their businesses struggle in difficult conditions related to the

tariffs, too.

17.     It is notable that more than 10% of LR/h2m's revenue is derived from sales to

customers located outside the U.S., but a substantial volume of orders is filled from our U.S.

warehouses. Inventory subject to the new tariffs will be completely uncompetitive in the world

market; we cannot bear an extra tariff expense of 46% or 145% in our cost of goods when

competing against products not subject to those costs in the international market. Certain tariffs

imposed against China pursuant to IEEPA are not recoverable through duty drawback procedures,

so our foreign customers will need to pay those costs if we fill orders with inventory which has

entered the U.S. Consequently, we are planning to avoid using U.S. inventory or U.S. infrastructure

(logistics, warehousing, labor) to service export orders, creating a major loss of profit for the

company. Sales to customers located outside the U.S. will need to be filled with inventory that

never crosses a U.S. border now. The expense of duplicating our infrastructure and avoiding use

of our efficient automated U.S. facilities will lead to further losses. Although one of the

Administration's stated goals was to bring manufacturing back to the U.S., the tariffs actually force

our companies to avoid bringing certain inventory into or using distribution facilities in the U.S.

to service our export customers. We believe this change creates an opening for foreign competitors

to attack our market share and capitalize on a competitive advantage springing from the new tariffs.

18.     I know that the tariff impact will be severe because previous price disruptions have

harmed the Companies. Mid-year price changes are rare in our business because they are received

so negatively by our dealers—they are always a last resort. We have issued unscheduled price

increases only a few times in the last decade or so, and each time we faced customer revolts. We

JA57

have seen examples of customers reconfiguring their buys when dealing with limited budgets. We have some customers who do not accept price increases easily. We have experienced certain key customers refusing to trade for weeks or months, sometimes not replying to our emails or even calling us back, because of price increases of less than 2%. Obviously, we would need to increase prices by a much greater amount than that in order to remain profitable while incurring tariffs at 145%. Some customers have dropped products to resist pricing or to address declining margins or sought substitutions from competitors. In my experience, toy consumers are particularly sensitive to price changes and will trim their buying based on economic conditions and prospects. While toys may be a "necessity" good, in the past consumers have migrated to lower price toys when money is tight as in inflationary periods or during a recession.

19.    When customers demand fewer goods, it lowers the Companies' total profits. Based on my experience, even if LR/h2m were to receive a retroactive duty refund from the federal government for the unlawful tariffs it had to remit, the lost profits from decreased demand for its imported goods will exceed that refund, leaving LR/h2m in a substantially worse financial position than if the challenged tariffs were never imposed. Given the massive scale of the increase in duties and tariffs, the Companies may also face a major cash squeeze. To meet holiday season demand and to preserve our high-service model, we must build up our inventory over a period of months in advance. This creates a situation where we would incur extraordinarily large duty and tariff expenses on imports months before we expect to sell the inventory to recoup those expenses. We pay our bills (such as import duties and tariffs) by borrowing under our revolving line of credit, and we repay our line of credit from receivables collected later from our customers. The cash-to-cash cycle of our business can be six months or longer and the huge new tariffs may lead to far greater peaks in our loan balances. Rising loan balances will raise our interest costs and could

make obtaining financing much more difficult. The Companies' ability to renegotiate its line of credit cannot be evaluated because of the unique circumstances of the new tariffs and the resulting economic uncertainty.

20.    Separately, if LR/h2m raises prices on goods to pass along the cost of the challenged tariffs, it will harm the goodwill and brand reputation that it has built with its dealers, schools, teachers, and consumers over decades. Our brands are considered "premium" brands with a strong reputation for excellent quality, content, and value pricing. Since our products are intended as educational tools, we have always priced our products to be good values and accessible to all children and all families. Sharply higher prices would be perceived as a breach of our brand promise by many consumers. Some customers may stop purchasing from LR/h2m in favor of substitutes or alternatives if our prices rise suddenly or if we stop selling cherished products. Even if the challenged tariffs are ultimately declared unlawful, customers who have already left may not return to buy from the Companies.

21.    Because of the tariffs, we have already had to cancel shipments and delay production in China. At present tariff rates, I cannot foresee bringing in more product from China because the cost is now prohibitive. Our company depends on Christmas sales to survive. We do not have enough on-hand inventory to carry us through the holiday season unscathed and are already projecting stock outages beginning in a matter of just weeks. Without the practical ability to restock our goods made in China this year or instantly go into production on hundreds or thousands of products at competitive prices elsewhere, our Christmas season will likely be significantly impaired or possibly even ruined, leading to spectacular losses. Since the Christmas season is a time of celebration for the American public, it is foreseeable that Christmas will be ruined for many families and countless children, too, and of course, we are not alone in having this

problem. Empty store shelves at Christmas time mean economic disaster for everyone, retailers and suppliers both, and for our economy.

**Off-setting increased costs from the challenged tariffs by using cheaper alternatives will harm the Companies' profits, sales, and brand reputation, and there is no available domestic "reshoring" manufacturing option.**

22.    To fully offset the increased costs caused by the tariffs, I have considered whether LR/h2m could reduce quality, eliminate product features or sell products with fewer components. These less-expensive alternatives, however, would substantially harm LR/h2m's reputation because the quality of the products would disappoint our customers and breach the brand promise. Lower quality products will result in fewer sales as well as substantial harm to customer goodwill and to our corporate reputation. Our industry is subject to strict regulation for toy safety, so in many cases, a downgrade in product quality is not even an option. In any event, we have no practical ability to redesign our many products overnight and relocate production to destinations unknown without it taking years and costing millions of dollars.

23.    I am absolutely certain that LR/h2m cannot source or manufacture its products domestically as a practical matter. Despite strong market and financial incentives to find local manufacturing for our products, our resourcing efforts to date (over several years) have failed to yield even one qualified and willing U.S. vendor capable of making our non-print products. There are many reasons for this: (a) our products are typically made in short runs (production runs of small quantities or durations of only a few days), which is too inefficient for U.S. manufacturers operating in expensive facilities using scarce, high-priced labor; (b) our products typically require assembly and complex packaging, which is very labor-intensive (again, labor is expensive and in short supply); (c) we require a very high finish and many of our products require many different manufacturing functions that are not often found in the United States; (d) the U.S. market is ill-equipped to make our thousands of different products requiring specialized facilities, equipment,

and fixtures; and (e) a geographically concentrated manufacturing hub does not exist to serve the myriad needs and inputs required for efficient manufacturing of our products in the U.S. Despite our years-long experience with sophisticated operational software systems and automated material handling equipment (including warehouse robots), we have searched for and failed to identify any viable automation or technology option to solve the cost problem posed by domestic manufacturing. There is simply no manufacturing market anywhere that can replace China for everyone all at once—at least without years of advance notice. Consequently, the effects of the tariffs on global supply chains will devastate small and medium-sized businesses like ours.

24.      Our Companies have for several years investigated and invested in frontier manufacturing markets to reduce our dependence on our Chinese supply chain. After a lot of effort and roughly $2 million in out-of-pocket costs, we have only been able to move or resource about 16% of our manufacturing from China to other countries (principally, India or Vietnam). The challenges in moving items out of China are myriad: (a) costs are often higher and labor is in short supply; (b) factories have limited capacity and limited manufacturing experience suited to U.S. market needs; (c) factory quality control is often unsophisticated; (d) timelines are often unreliable; (e) critical components may not be available locally or be of unacceptable quality; (f) production is often slow and inefficient, including mold making; (g) certain critical skills may be missing; (h) commitment to cleanliness or other measures of modern factory management may be missing or inadequate; (i) ethical manufacturing standards imposed by our industry require extra surveillance in frontier markets; and (j) experience dealing with key retailers like Walmart and Target may be limited or required certifications have not been obtained. Training new factories to meet the needs and expectations of the U.S. market takes a long time, often years. There is no well-developed, high capacity, high caliber manufacturing hub anywhere standing idle waiting to make

JA61

our many products. Moreover, even if we were able to switch our sourcing to countries other than China, the President has imposed IEEPA tariffs on almost every other country. We therefore would not only incur millions of dollars in expenses to shift our production, but we would still face millions more in duty and tariff costs than we experienced previously, even if we could find alternative suppliers in other countries.

25.    It is also worth noting that the process of resourcing from China to other markets can have the effect of destabilizing our Chinese supply chain, which is very dangerous and threatening to our business. We must be very methodical and careful in shifting our production while at the same time preserving the financial health of our factories. It's a delicate process. Triggering a bankruptcy by a key supplier would be financially devastating to our companies, not to mention a catastrophic organizational failure as these factories are often close friends and longtime allies of our companies.

26.    We are also expecting to face massive downstream cost increases because of the tariffs. For instance, we source many low volume Chinese-made products from domestic suppliers focused on other markets (such as paper products supply or food service supply) for use in school science kits. We don't consume enough of these components to tool up and import them directly. We are therefore dependent on the domestic distributors to manage the tariff costs. Those items are facing price hikes reflecting the current 145% tariffs on Chinese goods. Because we are not the importer for these products, even if the tariffs are eventually set aside and importers are provided refunds, we will not be the recipient of refunds for these products. Our ability to meet strained school budgets with much more expensive basic supplies is limited. It is entirely possible that some basic school supplies will cease to be available on the U.S. market.

27.    Other anticipated negative consequences for our Companies directly traceable to the tariffs include: (a) potential widespread job losses if we are unable to make a profit with a transformed business model; (b) an impaired ability to plan and run our business efficiently in an ever-changing environment of oscillating tariffs and changing terms for international trade; (c) a destabilized manufacturing base may force many suppliers into bankruptcy leaving us without critical suppliers or essential manufacturing capacity for a long period of time, thereby triggering further losses; (d) a synchronized bankruptcy crisis faced by many factories simultaneously may cause a "rush for the door" by U.S. importers, leading to manufacturing gridlock lasting years because of the limited ability of alternative markets to absorb the new demand; (e) mounting port congestion resulting from orders cancelled over tariffs could lead to a major spike in ocean freight rates as happened in the pandemic; (f) a combination of these problems could lead to a chain reaction that cannot be stopped causing massive economic damage that cannot be recouped or addressed for many years (such as synchronized bankruptcies of many factories and their U.S. importer customers at the same time); (g) supply chain disruptions could lead to massive business interruption claims on insurance policies and widespread defaults under lines of credit issued by American banks; (h) relief from tariffs may never come from much-hyped rising domestic manufacturing (reshoring) if companies fear that the tariff regime might later be reversed thereby rendering their big reshoring investments obsolete; (i) capital destruction from extraordinary expenses and loss of business is likely permanent and not recoverable; and (j) foreign markets may reduce access to products or services sold by American companies, whether made in the U.S. or not, leading to further business contraction and profit loss.

JA63

**The Companies cannot absorb the tariffs pending the outcome of this litigation and a subsequent refund action.**

28.     It is not an option for LR/h2m to sell manufactured goods to its customers at the same price prevailing before the challenged tariffs. If LR/h2m were to maintain its prices, then it would quickly be unable to service its bank debt and mortgages and fall into default. The Companies cannot absorb losses during the pendency of this litigation and will be forced to take drastic steps like: sharply raising prices and sharply reducing spending; refinancing loans on unfavorable terms; significantly scaling back operations and product offerings; closing facilities; laying off employees; or even selling the company after more than 100 years of family ownership. These are all enormously harmful to the Companies' long-term financial and corporate health—indeed, its very existence. We are trying to avoid as many of these measures as possible for as long as possible, but each day that the tariffs remain in place is causing further irreparable harm to the Companies and brings us closer to having to adopt such drastic measures. If tariffs are kept at current levels without relief, we face an increasingly grim future, like all other similarly situated small and medium-sized companies who depend on foreign manufacturing hubs.

* * *

29.     If Plaintiffs obtain a preliminary injunction against collection of the IEEPA tariffs, then these irreparable harms will not occur.

JA64

I, Richard Woldenberg, declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dated: April 24, 2025.

_____
Richard Woldenberg

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE GARY S. KATZMANN, JUDGE
           THE HONORABLE TIMOTHY M. REIF, JUDGE
           THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| PRINCESS AWESOME, LLC; STONEMAIER, LLC; 300 BELOW, INC.; UPWARD GLANCE, LLC d/b/a QUENT CORDAIR FINE ART; KINGSEAL CORPORATION D/B/A WESCO ENTERPRISES, INC.; MISCHIEF, LLC d/b/a MISCHIEF TOY STORE; SPIELCRAFT GAMES, LLC; ROOKIE MAGE GAMES, LLC; XYZ GAME LABS, INC.; TINKERHOUSE, INC.; RECLAMATION STUDIO, LLC d/b/a WITSEND MOSAIC, <br><br>     Plaintiffs, <br><br>         v. <br><br> UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES, Acting Commissioner for U.S. Customs and Border Protection; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, Secretary of the Department of Homeland Security; UNITED STATES INTERNATIONAL TRADE COMMISSION; DONALD J. TRUMP, President of the United States; EXECUTIVE OFFICE OF THE PRESIDENT; and the UNITED STATES OF AMERICA, <br><br>     Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Court No. 25-00078 |

## DECLARATION OF SECRETARY OF STATE MARCO RUBIO

I, Marco Rubio, hereby state as follows:

1.  I am the Secretary of State of the United States and head of the United States Department

of State, an Executive Department of the United States. *See* 22 U.S.C. § 2651. As

Secretary of State, I am the President's chief foreign affairs advisor. I carry out the

JA66

President's foreign policy through the State Department and the Foreign Service of the United States. *See* 22 U.S.C. § 2651a.

2. The statements made herein are based on my personal knowledge, on information provided to me in my official capacity, reasonable inquiry, and information obtained from various records, systems, databases, State Department employees, and information portals maintained and relied upon by the United States Government in the regular course of business, and on my evaluation of that information.

3. The purpose of this Declaration is to confirm, in my capacity as Secretary of State and head of the Department of State, that a ruling for the plaintiffs in this case would cause significant and irreparable harm to U.S. foreign policy and national security. Such a ruling would derail critical ongoing negotiations with our foreign trading partners and threaten broader U.S. strategic interests internationally.

4. In the International Emergency Economic Powers Act (IEEPA), *see* 50 U.S.C. § 1701 *et seq.*, Congress granted to the President dynamic, flexible authority to respond to crises on a global scale. President Trump has exercised that authority to impose tariffs in response to crises threatening America's national security.

5. In particular, the President found in Executive Orders 14,193 and 14,194 that the failure of the governments of Mexico and Canada to stop the influx of illegal drugs and illegal aliens across our southern and northern borders is an emergency for the United States and its citizens.

6. Likewise, the President found in Executive Order 14,195 that the encouragement by the People's Republic of China (PRC) of PRC businesses to export illegal drugs and precursors

JA67

for manufacturing those drugs in the United States is an emergency for the United States and its citizens.

7. Last, the President found in Executive Order 14,257 that our trade partners' non-reciprocal trading practices, including both tariff and non-tariff barriers, and resulting large and persistent annual U.S. goods trade deficits have given rise to acute national security threats driven by our hollowed-out manufacturing base, lack of advanced domestic manufacturing capacity, vulnerable supply chains, a defense-industrial base that depends on foreign adversaries, and the sensitive geopolitical environment.

8. The United States is presently pursuing potential trade deals with Mexico, Canada, PRC, and dozens of other countries. These negotiations could address the urgent threats of mass migration at our northern and southern borders, the flow of fentanyl into our country, and the erosion of our domestic production capacity caused in substantial part by the large and persistent annual U.S. goods trade deficient stemming from our trade partners' non-reciprocal trading practices.

9. The negotiations are currently in a delicate state, with discussions ongoing and final deals not yet reached. In some cases, we have reached frameworks with our trading partners, while we continue to negotiate on details. In other cases, we have not yet reached a framework agreement or arrangement.

10. These negotiations have been one of the country's top foreign policy priorities since the reciprocal tariffs were announced on April 2. Reflecting the urgency of the emergency, much of U.S. global diplomacy in the last six weeks has been focused on these negotiations.

11. In each case, the negotiations are premised on the ability of the President to impose tariffs under IEEPA. If the President is enjoined or limited from exercising his authority under

3

IEEPA to impose tariffs to address these urgent threats, that would cause irreparable harm to our efforts to secure the U.S. production and manufacturing base through our ongoing negotiations and other diplomatic efforts.

12. For example, if the Court were to enjoin the President from imposing tariffs, our trade partners would likely believe that the President lacks power under IEEPA to promptly respond to their actions during the ongoing negotiations. They may also perceive such a ruling as a vulnerability and encourage them to retaliate against the United States for attempting to impose tariffs and negotiate agreements to protect our national security. *See* Executive Order 14,266, § 3. Notably, other countries declined to retaliate against the United States after the President made clear he would exercise his authority under IEEPA to impose additional tariffs, as he did with PRC.

13. The political branches, not the courts, are appropriately situated to handle and intervene in matters of foreign policy and national security. This case and the real-world diplomacy inherent in it exemplify why the courts must not interfere in such foreign affairs. U.S. foreign policy has an exceptional need for consistent implementation of the decision the President has already made under IEEPA. A conflicting pronouncement by this Court on the same issue would lead to embarrassment of the United States on a global stage.

14. Beyond diplomatic embarrassment, which itself is dangerous as it emboldens allies and adversaries alike, the Court's interference would perpetuate the United States' industrial decline and unsustainable trade deficits. The President found in Executive Order 14,257 that the United States' large and persistent trade deficits are a structural imbalance in the global trading system that has hollowed out a number of critical industries. Without robust domestic production capacity, the United States will not be able to produce the weapons

and other resources necessary to defend itself or support the critical industries necessary to avoid being held hostage by foreign adversaries. That weakened position will have a direct impact on the President's ability to conduct foreign policy and advance the United States' interests.

15. Congress has reserved for itself the power to review the President's exercise of his powers under IEEPA. Exercising that role, Congress considered whether to terminate the President's emergency declaration, and it has appropriately declined to do so, recognizing the appropriateness of the President's exercise of powers and the delicate, ongoing international diplomacy that is unfolding as a result.

16. It is critical to the foreign policy and national security of the United States for the Court to decline to enjoin or restrain the President from exercising his power under IEEPA to impose tariffs in recognition of the unusual and extraordinary threats at issue in this litigation.


I declare, under penalty of perjury, that the foregoing is true and correct.


Executed on this 23rd day of May, 2025.


Marco Rubio
Secretary of State

5

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:      THE HONORABLE GARY S. KATZMANN, JUDGE
             THE HONORABLE TIMOTHY M. REIF, JUDGE
             THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| PRINCESS AWESOME, LLC; STONEMAIER, LLC; 300 BELOW, INC.; UPWARD GLANCE, LLC d/b/a QUENT CORDAIR FINE ART; KINGSEAL CORPORATION D/B/A WESCO ENTERPRISES, INC.; MISCHIEF, LLC d/b/a MISCHIEF TOY STORE; SPIELCRAFT GAMES, LLC; ROOKIE MAGE GAMES, LLC; XYZ GAME LABS, INC.; TINKERHOUSE, INC.; RECLAMATION STUDIO, LLC d/b/a WITSEND MOSAIC, ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, ) ) ) | Court No. 25-00078 |
| v. ) ) ) | |
| UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES, Acting Commissioner for U.S. Customs and Border Protection; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, Secretary of the Department of Homeland Security; UNITED STATES INTERNATIONAL TRADE COMMISSION; DONALD J. TRUMP, President of the United States; EXECUTIVE OFFICE OF THE PRESIDENT; and the UNITED STATES OF AMERICA, ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. ) ) | |

## **DECLARATION**

I, Scott K. H. Bessent, hereby state as follows:

1.  I am the Secretary of the Treasury.  I have been the Secretary of the Treasury since January 28, 2025.

2. President Trump has exercised his IEEPA authority to impose tariffs in response to crises threatening America's national security and economy.

3. In particular, the President found in Executive Orders 14,193 and 14,194 that the failure of the governments of Mexico and Canada to stop the influx of illegal drugs and illegal immigrants across our southern and northern borders is an emergency for the Nation and its citizens.

4. The President also found in Executive Order 14,257 that our trading partners' non-reciprocal trading practices, including both tariff and non-tariff barriers, have given rise to a presently acute national security threat of large and persistent annual U.S. goods trade deficits, which have led to the hollowing out of our manufacturing base, lack of advanced domestic manufacturing capacity, vulnerable supply chains, and a defense-industrial base that depends on foreign adversaries.

5. Tariffs are a crucial tool for protecting America's national security and advancing American foreign policy by addressing the unusual and extraordinary threats the President has identified.

6. The tariffs have proven to be well-tailored to bring trading partners to the table to address these urgent threats. The United States is presently negotiating agreements with Mexico, Canada, PRC, and many of our key trading partners, in order to address the urgent threats at our northern and southern borders, posed by illegal drugs, and to our domestic production capacity caused in substantial part by the large and persistent annual U.S. goods trade deficient stemming from our trade partners' non-reciprocal trading practices.

7. There are currently ongoing negotiations to address this emergency with dozens of countries. Those negotiations are presently in a delicate state, with discussions ongoing

and formal, final deals not yet reached. In some cases, we have reached framework agreements with our trading partners, while we continue to negotiate on details. In other cases, we have not yet reached a framework agreement.

8. For example, on May 8, 2025, the United States and the United Kingdom announced a framework agreement as a result of such negotiations. The U.S.-UK framework agreement will bolster U.S. economic and national security by enhancing market access for American exporters and lowering tariff and non-tariff barriers.

9. These negotiations have been one of the country's top foreign policy priorities since the reciprocal tariffs were announced on April 2.

10. In each case, those ongoing, delicate negotiations are premised on the President's tariffs at issue in this case. If the President is enjoined from imposing these tariffs, it could shatter our negotiations with dozens of countries.

11. If the Court were to enjoin the President from imposing tariffs, our trading partners may feel a renewed boldness to take advantage of that new vulnerability by retaliating against the United States for attempting to impose tariffs and negotiate agreements to protect our national security.

12. In short, the maintenance of the tariffs is crucial to the President's ability to conduct real-world diplomacy and his ability to protect the national security and economy of the United States.

13. Congress considered whether to terminate the President's emergency declaration, and declined to do so. *See* H.J.Res. 72 (2025); H.J.Res.73 (2025). It is critical to the national security and economy of the United States for the Court to decline to block the President from imposing these tariffs as well.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on this day of May 23, 2025.

/s/_____

Scott K. H. Bessent
Secretary
Department of the Treasury

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE GARY S. KATZMANN, JUDGE
                  THE HONORABLE TIMOTHY M. REIF, JUDGE
                  THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| PRINCESS AWESOME, LLC; STONEMAIER, LLC; 300 BELOW, INC.; UPWARD GLANCE, LLC d/b/a QUENT CORDAIR FINE ART; KINGSEAL CORPORATION D/B/A WESCO ENTERPRISES, INC.; MISCHIEF, LLC d/b/a MISCHIEF TOY STORE; SPIELCRAFT GAMES, LLC; ROOKIE MAGE GAMES, LLC; XYZ GAME LABS, INC.; TINKERHOUSE, INC.; RECLAMATION STUDIO, LLC d/b/a WITSEND MOSAIC, <br><br>     Plaintiffs, <br><br>     v. <br><br> UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES, Acting Commissioner for U.S. Customs and Border Protection; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, Secretary of the Department of Homeland Security; UNITED STATES INTERNATIONAL TRADE COMMISSION; DONALD J. TRUMP, President of the United States; EXECUTIVE OFFICE OF THE PRESIDENT; and the UNITED STATES OF AMERICA, <br><br>     Defendants. | Court No. 25-00078 |

## DECLARATION OF HOWARD W. LUTNICK, UNITED STATES SECRETARY OF COMMERCE

I, HOWARD W. LUTNICK, hereby state and declare as follows:

1.  I am the Secretary of Commerce for the United States and the head of the United States

    Department of Commerce, an Executive Department of the United States. *See* 5 U.S.C.

    § 101. The purpose of this declaration is to assert, in my official capacity and opinion, the

1

irreparable harm that a ruling for plaintiffs in this case will have on President Donald J. Trump's constitutional power to conduct foreign affairs. Such a ruling will fundamentally impede President Trump's foreign-policymaking abilities to address national emergencies that threaten the national-security and economic-security interests of the United States and the American people. The statements made herein are based on my personal knowledge and on information provided to me in my official capacity as Secretary of Commerce.

2. I have been tasked by President Trump to lead his tariff and trade agenda. *See* Statement by President-elect Donald J. Trump Announcing the Nomination of Howard Lutnick as Secretary of Commerce, The American Presidency Project, https://www.presidency.ucsb.edu/node/375586. As part of my duties as Secretary of Commerce, I have strategized with President Trump and members of his cabinet, including United States Trade Representative Jamieson Greer, on policies to conduct trade diplomacy and address grave national emergencies. Many of these national emergencies, ranging from the hollowing out of our defense-industrial and manufacturing base to the illicit flow of narcotics and the national-security threats posed by authoritarian regimes, are caused by our foreign-trading partners.

3. For example, on February 1, 2025, President Trump found in Executive Orders 14,193 and 14,194 that the failure of the governments of Mexico and Canada to stop the influx of illegal drugs and illegal immigrants across our southern and northern borders is a national emergency, threatening the lives of our citizens.

4. Likewise, on the same day, President Trump found in Executive Order 14,195 that the People's Republic of China has encouraged Chinese businesses to export illegal drugs and

precursors for manufacturing those drugs to the United States, which constitutes a national emergency that threatens the lives of our citizens.

5. Then, on April 2, 2025, President Trump found in Executive Order 14,257 that our foreign-trading partners' non-reciprocal trading practices, including both tariff and non-tariff barriers, have produced persistent annual U.S. goods trade deficits, which has hollowed out our domestic manufacturing and defense-industrial base and has resulted in a lack of advanced domestic manufacturing capacity, a defense-industrial base dependent on inputs from foreign adversaries, vulnerable domestic supply chains, and a sensitive geopolitical environment. President Trump found the persistent annual U.S. goods trade deficits have resulted in a national emergency, threatening our national and economic security.

6. President Trump determined that it was in the foreign-policy interests of the United States to levy a 10 percent tariff for all trading partners. In addition, depending on the significance of the trade imbalances with foreign-trading partners, President Trump determined that some trading partners would receive higher duties.

7. Following President Trump's April 2, 2025, announcement, scores of countries immediately reached out to the Department of Commerce and the Office of the United States Trade Representative. President Trump's 10 percent tariffs for all trading partners went into effect at 12:01 a.m. on April 5, 2025—over two days after President Trump announced them. The country-specific tariff rates went into effect at 12:01 a.m. on April 9, 2025—nearly a week after they were announced. The vast majority of these countries saw it in their own national interests not to retaliate against the United States, as a matter of their own foreign-policy objectives. In short, the preliminary U.S. foreign-policy objectives of the tariffs worked—foreign-trading partners that have run trade deficits in

goods for years, and helped hollow out the American manufacturing base, immediately came to the negotiating table.

8.  On April 9, 2025, after consultation with me and other members of his cabinet, President Trump announced a 90-day pause and lowered the country-specific tariffs on most countries to a temporary flat rate of 10 percent. *See* Exec. Order No. 14,266, 90 Fed. Reg. 15625. In that same announcement, President Trump declared that the tariff rate on China would increase to 125 percent. In doing this, President Trump furthered the foreign-policy objectives of the United States in two important ways.

9.  *First*, countries that had approached his administration, including the Department of Commerce, without retaliating received the benefit of a pause designed to allow for substantive negotiations to remedy the national emergency. The pause has been a success.

10. On May 8, 2025, President Trump and Prime Minister Keir Starmer of the United Kingdom announced the terms of the first trade deal—a deal that had been illusory for years—which directly benefits the U.S. manufacturing base. These terms—which I helped construct— reflect extensive diplomatic effort to align United States and allied supply chains and eliminate foreign dependencies in sensitive sectors. The deal would not have happened but for the International Emergency Economic Powers Act tariffs.

11. Further, because of the IEEPA tariffs and the 90-day pause, I am, together with Ambassador Greer, participating in dozens of ongoing negotiations with foreign-trading partners. Again, such negotiations would not have happened but for the IEEPA tariffs.

12. *Second*, the increased tariff rate against China applied additional pressure to achieve the foreign-policy objective of bringing China—the greatest contributor to the national emergency and a well-known strategic adversary—to the negotiating table. In 2024 alone,

4

the United States had a trade deficit of $295 billion with China, and China's total trade surplus of nearly $1 trillion created excess export capacity that flooded the United States through other countries, as well. Yet, because of the IEEPA tariffs, the United States and China reached a 90-day agreement on May 12, 2025, to reduce China's tariffs on U.S. exports while the Trump administration works to address longstanding disputes with China. Under that asymmetrical agreement, reached because of the pressures of the IEEPA tariffs, China lowered its universal tariff rate on U.S. goods to 10 percent, while the United States maintained a higher rate of 30 percent.

13. An adverse ruling by this Court, enjoining the implementation of these IEEPA tariffs or circumscribing the President's authority to act in this domain, threatens all of these foreign-policy accomplishments and objectives. IEEPA gives the President of the United States a pivotal tool to express his foreign policy promptly and decisively to address national emergencies that manifest through economic and commercial channels. An adverse ruling would take away one of the most important tools the President possesses that is broad, immediate, and adaptable enough to counter emergency threats in real time.

14. IEEPA is a necessary tool given to the President to broadly and swiftly respond to national emergencies caused by the economic and commercial machinations of our foreign-trading partners. Other tools afforded to the President are not designed for national emergencies. For example, while Section 232 of the Trade Expansion Act of 1962 and Section 301 of the Trade Act of 1974 are indispensable tools of U.S. trade law, they are procedurally time-consuming and do not allow for immediate action, as IEEPA does. Under Section 232, the Department of Commerce has up to 270 days to conduct an investigation and submit a report to the President, who then has up to 90 additional days to decide whether to act, and

up to 15 additional days to implement that action.    19 U.S.C. §§ 1862(b)(3)(A), (c)(1)(B).  Similarly, under Section 301, the United States Trade Representative must complete an investigation within 12 months, with additional time to implement any retaliatory action.    19 U.S.C. §§ 2414(a)(2)(B), 2415(a)(1).    IEEPA is different and authorizes the President to take immediate action to protect national interests where all of IEEPA's conditions are satisfied.  Without this tool, the President's foreign-policymaking abilities would be severely constrained and our national security would be threatened.

15. Beyond the practical effects that enjoining or circumscribing the President's IEEPA authority would have on addressing ongoing national emergencies, the real-world foreign-policy effects on this set of IEEPA tariffs would be monumental.  For one, an adverse ruling would undermine the United States-United Kingdom trade deal that was negotiated in reliance on the President's emergency tariff authority.  In addition, an adverse ruling would jeopardize the dozens of similar arrangements with foreign-trading partners that I am negotiating.  Each of these negotiations is premised on the credible threat of enforcement of the IEEPA tariffs.  If this Court limits that authority, foreign counterparts will have reduced incentives to reach meaningful agreements—resulting in the status quo that led to the national emergency.  It would destroy the carefully crafted China trade agreement, which is asymmetric in America's favor, in order to address the emergency of our persistent goods trade deficit.

16. What's more, an adverse ruling by this Court also will affect President Trump's authority to invoke IEEPA to address other national emergencies of significant concern.  For example, on February 1, 2025, President Trump invoked IEEPA to impose tariffs on China, Mexico, and Canada, respectively, due to the national emergency caused by "the sustained

influx of synthetic opioids," which "kill[] approximately two hundred Americans per day." Exec. Order No. 14,195, 90 Fed. Reg. 9121; Exec. Order No. 14,194, 90 Fed. Reg. 9117; Exec. Order No. 14,193, 90 Fed. Reg. 9113. And, on March 24, 2025, President Trump invoked IEEPA to place "secondary" tariffs on countries that purchase oil from the Maduro regime in Venezuela, given the threat that the regime's policies pose to U.S. national security. Exec. Order No. 14,245, 90 Fed. Reg. 13829. Without IEEPA, the President could not quickly and effectively address grave national emergencies—caused by foreign actors—that directly threaten the lives of Americans.

17. The imposition of IEEPA tariffs signals to foreign governments that certain conduct—whether economic predation, trade manipulation, or narcotics trafficking—will incur serious consequences. Diluting this authority would not only unravel the current IEEPA actions but also would undermine future deterrence. Allies and adversaries alike monitor U.S. courts for signs of constraint on presidential power. A ruling that narrows IEEPA would have ripple effects across every domain in which economic instruments are used for strategic effect.

18. For example, India and Pakistan—two nuclear powers engaged in combat operations just 13 days ago—reached a tenuous ceasefire on May 10, 2025. This ceasefire was only achieved after President Trump interceded and offered both nations trading access with the United States to avert a full-scale war. An adverse ruling that constrains presidential power in this case could lead India and Pakistan to question the validity of President Trump's offer, threatening the security of an entire region and the lives of millions.

19. All told, an invalidation of President Trump's ability to use IEEPA would dismantle a cornerstone of President Trump's national security architecture, irreparably harm the

7

government's ability to respond to evolving foreign threats, and severely disrupt the Department of Commerce's coordination of foreign policy-related economic actions on behalf of the President. It would jeopardize vital trade agreements, collapse ongoing negotiations, allow for Chinese aggression during a period of strategic competition, leave the American people exposed to predatory economic practices by foreign actors, and threaten national security. It also would come after the democratically elected United States Senate failed to garner the necessary votes to revoke President Trump's IEEPA emergency declaration on April 30, 2025.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 23 day of May, 2025, in the City of Washington, District of Columbia.

_____
Howard W. Lutnick
41st United States Secretary of Commerce

8

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:     THE HONORABLE GARY S. KATZMANN, JUDGE
            THE HONORABLE TIMOTHY M. REIF, JUDGE
            THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| PRINCESS AWESOME, LLC; STONEMAIER, LLC; 300 BELOW, INC.; UPWARD GLANCE, LLC d/b/a QUENT CORDAIR FINE ART; KINGSEAL CORPORATION D/B/A WESCO ENTERPRISES, INC.; MISCHIEF, LLC d/b/a MISCHIEF TOY STORE; SPIELCRAFT GAMES, LLC; ROOKIE MAGE GAMES, LLC; XYZ GAME LABS, INC.; TINKERHOUSE, INC.; RECLAMATION STUDIO, LLC d/b/a WITSEND MOSAIC, ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, ) ) | Court No. 25-00078 |
| v. ) ) ) | |
| UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES, Acting Commissioner for U.S. Customs and Border Protection; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, Secretary of the Department of Homeland Security; UNITED STATES INTERNATIONAL TRADE COMMISSION; DONALD J. TRUMP, President of the United States; EXECUTIVE OFFICE OF THE PRESIDENT; and the UNITED STATES OF AMERICA, ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. ) ) ) | |

## <u>DECLARATION</u>

I, Ambassador Jamieson Lee Greer, hereby state as follows:

1.  I am the United States Trade Representative.  I have been the United States Trade

    Representative since February 26, 2025.  In this capacity, I serve as the principal advisor

to the President on international trade policy and the chief representative for the United States in international trade negotiations. *See* 19 U.S.C. § 2171(c)(1)(B)(C).

2. In IEEPA, Congress granted to the President dynamic, flexible authority to respond to crises on a global scale.

3. President Trump has exercised that authority to impose tariffs in response to crises threatening America's national security and the economy.

4. The President found in Executive Order 14,257 that our trade partners' non-reciprocal trading practices, including both tariff and non-tariff barriers, have been an important driver of large and persistent annual U.S. goods trade deficits, which have grown over 40 percent in the past five years, and created a presently acute threat to national security and the economy.  The President found that structural asymmetries in our bilateral trade relationships significantly constrain U.S. exports and artificially incentivize foreign production.  The President found further that these conditions have led to a hollowing out of the U.S. manufacturing and defense-industrial base, leaving the United States dependent upon foreign supply chains for national-security-sensitive products and with insufficient domestic manufacturing capacity to remain competitive in the global economy.

5. Tariffs imposed under IEEPA are a crucial tool for protecting America's national security and advancing American foreign policy by addressing the unusual and extraordinary threats the President has identified.

6. This case does not present an abstract question of law. The Court's ruling will have a concrete and immediate effect on United States national security and foreign policy.

2

7. The tariffs have proven to be well tailored to address these urgent threats. The United States is presently negotiating with Mexico, Canada, and the PRC in order to address the urgent threats at our northern and southern borders.

8. Furthermore, on April 9, the President issued a 90-day pause of the country-specific reciprocal tariffs so that he might negotiate with trading partners who are willing to take significant steps to remedy their non-reciprocal trading practices and align with the United States on national and economic security matters.

9. The United States is currently negotiating with dozens of countries regarding the terms of that alignment. Those negotiations are presently in a delicate state, with discussions ongoing and final deals not yet reached. For example, on May 8, President Trump and United Kingdom (UK) Prime Minister Keir Starmer announced the general terms of an agreement that will provide U.S. companies with more than US$5 billion in expanded access to the UK market while bolstering United States national security. Similarly, on May 12, President Trump reached an agreement with China to reduce retaliatory tariffs and non-tariff barriers imposed after his April 2 Executive Order and set a path for future discussions to open the Chinese market to more U.S. exports. In many other cases, the United States continues to negotiate agreements in principle to structure final deals.

10. These negotiations have been one of the country's top foreign policy priorities since the tariffs were announced on April 2. Reflecting the urgency of the emergency, much of U.S. global diplomacy in the last six weeks has been focused on these negotiations.

11. In each case, those ongoing, delicate negotiations are premised on the ability of the President to impose tariffs under IEEPA. If the President is enjoined from exercising his

JA85

authority under IEEPA to impose tariffs to address these urgent threats, the premise of these important negotiations will be eliminated.

12. A decision enjoining the President from imposing tariffs under IEEPA would create a foreign policy disaster scenario.

13. If the Court disrupts U.S. trade policy imperatives by enjoining the President from imposing tariffs, the United States' ability to address national and economic security matters would suffer serious damage.

14. If the Court were to enjoin the President from imposing tariffs, it will signal to our trading partners that the President *lacks* power to promptly respond to future emergencies under IEEPA, and they may feel emboldened to further distort the conditions of competition for U.S. exporters.

15. It is critical to the national security of the United States for the Court to decline to enjoin the President from exercising his power under IEEPA to impose tariffs in recognition of the unusual and extraordinary threats at issue in this litigation.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on this 23rd day of May, 2025.

/s/ _____

Ambassador Jamieson Lee Greer
United States Trade Representative

4

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

LEARNING RESOURCES, INC., *et al.*,     :
     :
     Plaintiffs,     :     Civil Action No.:    25-1248 (RC)
     :
     v.     :     Re Document Nos.:   8, 9
     :
DONALD J. TRUMP, *et al.*,     :
     :
     Defendants.     :

## ORDER

### DENYING DEFENDANTS' MOTION TO TRANSFER VENUE; GRANTING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

For the reasons stated in the Court's Memorandum Opinion separately and contemporaneously issued, Defendants' motion to transfer (ECF No. 8) is **DENIED**; and Plaintiffs' motion for a preliminary injunction (ECF No. 9) is **GRANTED**.  It is hereby:

**DECLARED** that the tariffs deriving from Executive Order 14,195, *Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*; Executive Order 14,228, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*; Executive Order 14,257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Trade Deficits*; Executive Order 14,259, *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports from the People's Republic of China*; and Executive Order 14,266, *Modifying the Reciprocal Tariff Rates to Reflect Trading Parter Retaliation and Alignment*, are unlawful; and it is

**FUTHER DECLARED** that the International Economic Emergency Economic Powers Act does not authorize the President to impose the tariffs set forth in the above-listed orders; and it is

**ORDERED** that Defendants are preliminarily enjoined from collecting any tariff deriving from the above-listed orders from Plaintiffs Learning Resources, Inc., and hand2mind, Inc., and it is

**FURTHER ORDERED** that the preliminary injunction ordered herein shall be **STAYED** for fourteen days so that the parties may seek review in the Court of Appeals.

**SO ORDERED**.

This is an immediately appealable order under 28 U.S.C. § 1292(a)(1).

Dated:  May 29, 2025                                     RUDOLPH CONTRERAS
                                                        United States District Judge

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LEARNING RESOURCES, INC., *et al.*,           :
                                              :
          Plaintiffs,                         :        Civil Action No.:    25-1248 (RC)
                                              :
          v.                                  :        Re Document Nos.:    8, 9
                                              :
DONALD J. TRUMP, *et al.*,                    :
                                              :
          Defendants.                         :

## MEMORANDUM OPINION

### Denying Defendants' Motion to Transfer Venue; Granting Plaintiffs' Motion for a Preliminary Injunction

## I. INTRODUCTION

Learning Resources, Inc. and hand2mind, Inc. ("Plaintiffs") are small businesses that develop educational toys and products for children. They manufacture most of their products in China, Taiwan, Korea, Vietnam, Thailand, and India. After President Donald Trump invoked the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, to impose sweeping tariffs on imports from those countries and others, the businesses initiated this lawsuit against President Trump and other government officials and agencies (collectively, "Defendants"). They claim that (1) IEEPA does not authorize the President to impose tariffs; (2) even if it does, it does not authorize the challenged tariffs; (3) the agency actions implementing the tariffs violate the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*; and (4) to the extent that IEPPA can be interpreted to permit the President to impose the challenged tariffs, it violates the nondelegation doctrine.

Defendants have moved to transfer this action to the United States Court of International Trade, arguing that that court has exclusive jurisdiction under 28 U.S.C. §§ 1581(i) and 1337(c). Plaintiffs disagree. They have also moved for a preliminary injunction.

This case is not about tariffs *qua* tariffs. It is about whether IEEPA enables the President to unilaterally impose, revoke, pause, reinstate, and adjust tariffs to reorder the global economy. The Court agrees with Plaintiffs that it does not. For the reasons discussed below, the Court denies Defendants' motion to transfer and grants Plaintiffs' motion for a preliminary injunction.

## II.  BACKGROUND

Six months after the United States entered World War I, Congress passed the Trading with the Enemy Act of 1917 ("TWEA"), which gave the President a broad range of powers over international trade in times of war and, as amended in 1933, national emergencies. Pub. L. No. 65-91, 40 Stat. 411 (1917), codified as amended at 50 U.S.C. § 1 *et seq.*; *Regan v. Wald*, 468 U.S. 222, 226 n.2 (1984). The statute had "clear procedures for enhancing the authority of a President when an emergency arose," but no analogous procedures for withdrawing or winding down that power. *Regan*, 468 U.S. at 245 (Blackmun, J., dissenting). So, over time, TWEA came to operate as a "one-way ratchet to enhance greatly the President's discretionary authority over foreign policy." *Id.*

In 1977, Congress responded by limiting TWEA's application "solely to times of war." *Id.* at 227 (majority opinion); *see also* 50 U.S.C. § 4302. It also passed the International Emergency Economic Powers Act, Pub. L. No. 95-223, 91 Stat. 1626 *et seq.* (1977), to "counter the perceived abuse of emergency controls by presidents to . . . interfere with international trade in non-emergency, peacetime situations." *Sacks v. Off. of Foreign Assets Control*, 466 F.3d 764, 766 (9th Cir. 2006). IEEPA regulates the President's "exercise of emergency economic powers

JA90

in response to peacetime crises." *Regan*, 468 U.S. at 227–28 (majority opinion). It established "a new set of authorities for use in time of national emergency which are both more limited in scope than those of [TWEA] and subject to various procedural limitations." H.R. Rep. No. 95-459, "Trading With the Enemy Act Reform Legislation," at 2 (1977).

Section 1701 of IEEPA provides that President can use the statute "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States," if he declares a national emergency "with respect to such threat" pursuant to the National Emergencies Act, 50 U.S.C. §§ 1601–51. 50 U.S.C. § 1701(a). The President's IEEPA powers "may not be exercised for any other purpose." *Id.* § 1701(b).

When Section 1701's conditions are met, Section 1702(a)(1) establishes that the President may, "by means of instructions, licenses, or otherwise":

(A) investigate, regulate, or prohibit—

    i.  any transactions in foreign exchange,

    ii.  transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

    iii.  the importing or exporting of currency or securities,

by any person, or with respect to any property, subject to the jurisdiction of the United States;

(B) investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States; and[]

(C) when the United States is engaged in armed hostilities or has been attacked by
a foreign country or foreign nationals, [take additional actions].

*Id.* § 1702(a)(1).

Beginning in February 2025, President Trump issued a series of executive orders invoking IEEPA to unilaterally impose tariffs on many foreign goods. The executive orders used three other statutory provisions to implement the tariffs: the National Emergencies Act; Section 604 of the Trade Act of 1974, which authorizes the President to edit the Harmonized Tariff Schedule of the United States ("HTSUS"); and 3 U.S.C. § 301, which enables the President to delegate functions to subordinates. Five of President Trump's executive orders are challenged in this lawsuit (collectively, the "Challenged Orders").

*The February 1 China Order.* On February 1, the President issued an executive order imposing 10 percent *ad valorem* tariffs on Chinese goods. Exec. Order No. 14,195, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9121 (Feb. 1, 2025) ("February 1 China Order"). The order was predicated on the influx of synthetic opioids into the United States through China, which exports fentanyl and "related precursor chemicals" to the U.S. *Id.* The order "expand[s] the scope of the national emergency" at the U.S.-Mexico border[1] to "cover the failure of the [Chinese] government to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other [transnational criminal organizations], criminals at large, and drugs." *Id.* § 1, 90 Fed. Reg. at 9122. In issuing the order, President Trump invoked "section 1702(a)(1)(B) of IEEPA." *Id.* § 2, 90 Fed. Reg. at 9122.

---

[1] *See* Proclamation No. 10,886, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8327 (Jan. 20, 2025); Exec. Order No. 14,157, *Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists*, 90 Fed. Reg. 8439 (Jan. 20, 2025).

*The March 3 China Amendment.*  Around one month later, President Trump raised the China tariffs to 20 percent based on his determination that China had "not taken adequate steps to alleviate the illicit drug crisis through cooperative enforcement actions."  Exec. Order No. 14,228, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11463 (Mar. 3, 2025) ("March 3 China Amendment"). Then he ordered the elimination of duty-free *de minimis* treatment for goods subject to the tariffs, contradicting a statutory program permitting duty exemptions for imported goods valued at less than $800.  Exec. Order No. 14,256, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China as Applied to Low-Value Imports*, 90 Fed. Reg. 14899 (Apr. 2, 2025).  The Department of Homeland Security ("DHS") and Customs and Border Patrol ("CBP") implemented the President's China orders by modifying the HTSUS. *See Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's February 1, 2025 Executive Order Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9038-01 (Feb. 5, 2025) (implementing 10 percent tariff from February 1 China order); *Further Amended Notice of Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's Executive Order 14195, Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11426-01 (Mar. 6, 2025) (implementing 20 percent tariff from March 3 China Amendment).

*Universal and Reciprocal Tariff Order.*  On April 2, President Trump announced sweeping tariffs on virtually every U.S. trading partner.[2]  Exec. Order No. 14,257, *Regulating*

---

[2] Exempt from the tariffs were Canada, Mexico, Russia, North Korea, Cuba, and Belarus. *See* Mot. Prelim. Inj. at 10, ECF No. 9.  Separate executive orders had imposed a 25 percent tariff on goods from Mexico and Canada.  *See* Exec. Order No. 14,194, *Imposing Duties to*

*Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 2, 2025) (the "Universal and Reciprocal Tariff Order"). These "Liberation Day" tariffs encompassed a 10 percent universal tariff plus additional country-specific tariffs ranging from 11 to 50 percent. *Id.* at 15045, 15049–50. The Universal and Reciprocal Tariff Order also announced a new national emergency "arising from conditions reflected in large and persistent annual U.S. goods trade deficits" that "have contributed to the atrophy of domestic production capacity, especially that of the U.S. manufacturing and defense-industrial base." *Id.* at 15044; *see also* Defs.' PI Opp'n at 6 ("On April 2, 2025, the President declared a national emergency based on the trade deficit's effect on the country's economy and security."). To the President, these trade asymmetries constitute an "unusual and extraordinary threat to the national security and economy of the United States," especially because of "the recent rise in armed conflicts abroad." 90 Fed. Reg. at 15041, 15044–45; *see also Fact Sheet: President Donald J. Trump Declares National Emergency to Increase Our Competitive Edge, Protect Our Sovereignty, and Strengthen Our National and Economic Security*, The White House (Apr. 2, 2025), available at https://www.whitehouse.gov/fact-sheets/2025/04/fact-sheet-president-donald-j-trump-declares-national-emergency-to-increase-our-competitive-edge-protect-our-sovereignty-and-strengthen-our-national-and-economic-security/ [https://perma.cc/UK3L-JDEV]. The 10 percent tariff went into effect on April 5; the reciprocal tariffs were originally set to take effect on April 9. Mot. Prelim. Inj. at 11, ECF No. 9.

---

*Address the Situation at Our Southern Border*, 90 Fed. Reg. 9117 (Feb. 1, 2025); Exec. Order No. 14,193, *Imposing Duties to Address the Flow of Illicit Drugs Across our Northern Border*, 90 Fed. Reg. 9113 (Feb. 1, 2025). The President later paused, reinstated, and amended the scope of those orders in ways not relevant here.

*April 8 Reciprocal China Amendment & April 9 Reciprocal Modification*.  But on

April 8, President Trump responded to retaliatory tariffs from China by raising the reciprocal

tariff rate for China from 34 percent to 84 percent.  Exec. Order No. 14,259, *Amendment to*

*Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports From the People's*

*Republic of China*, 90 Fed. Reg. 15,509 (Apr. 14, 2025) ("April 8 Reciprocal China

Amendment").  Then, on April 9, President Trump suspended for 90 days the reciprocal tariffs

listed in the Universal and Reciprocal Tariff Order for all countries but China.  Exec. Order

No. 14,266, *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and*

*Alignment*, §§ 2, 3, 90 Fed. Reg. 15625 (Apr. 15, 2025) ("April 9 Reciprocal Modification").

The April 9 Reciprocal Modification also increased the China reciprocal tariff rate to 125

percent.  *Id.*  At the highest level, the total tariffs on most Chinese goods reached a minimum of

145 percent.  Ana Swanson & Alan Rappeport, *Tariff Truce With China Demonstrates the Limits*

*of Trump's Aggression*, N.Y. Times (May 12, 2025), available at

https://www.nytimes.com/2025/05/12/business/economy/trump-trade-china-tariffs.html

[https://perma.cc/BKS4-NTGJ].  After trade talks in Geneva, the U.S. lowered the minimum

tariffs on Chinese goods to 30 percent.  *Id.*  The ten percent universal tariffs from the Universal

and Reciprocal Order are still in effect.  90 Fed. Reg. at 15626.

President Trump has stated that the tariffs originating in the Challenged Orders will raise

"billions of dollars, even trillions of dollars" in revenue.  Mot. Prelim. Inj. at 13 (quoting Bailey

Schulz, *Trump is Rolling Out More Tariffs This Month. Where Does the Tariff Money Go?*, USA

Today (Apr. 4, 2025), https://www.usatoday.com/story/money/2025/04/03/trump-tariffs-where-

will-money-go/82792578007/ [https://perma.cc/T5DN-73XL]).  Treasury Secretary Scott

Bessent estimated that the tariffs will enable the United States to collect up to $600 billion

annually, paid mainly by U.S. businesses and consumers.  *Id.* (citing Richard Rubin, *Bessent*

*Says Tariff Revenue Could Reach $600 Billion Annually*, Wall St. J. (Apr. 4, 2025), available at

https://www.wsj.com/livecoverage/stock-market-tariffs-trade-war-04-04-2025/card/bessent-says-

tariff-revenue-could-reach-600-billion-annually-QJfDGCPYDY1C72Ljg1pt

[https://perma.cc/R2RV-PNAW]**)**.

No other President has ever purported to impose tariffs under IEEPA.  Joint Br. of Amici

Curiae Former Senator and Governor George F. Allen, *et al.* ("Law Professors' Amicus Br.")

at 7 (citing Christopher A. Casey *et al.*, Cong. Rsch. Serv., *The International Economic*

*Emergency Powers Act: Origins, Evolution and Use*, R45618 at 27 (2024)), ECF No. 23; Mot.

Prelim. Inj. at 1 ("For five decades and across eight presidential Administrations, no President

had ever invoked IEEPA to impose a tariff or duty.").  After President Trump issued the

Challenged Orders, small businesses and other entities brought lawsuits in federal courts alleging

that the tariffs are unlawful.  *See, e.g.*, *Emily Ley Paper, Inc. v. Trump*, No. 3:25-cv-465 (N.D.

Fla.) (transferred to the United States Court of International Trade); *Webber v. U.S. Dep't of*

*Homeland Security*, No. 4:25-cv-26 (D. Mont.) (appeal pending); *California v. Trump*, No. 3:25-

cv-3372 (N.D. Cal.); *V.O.S. Selections, Inc. v. Trump*, No. 25-00066 (Ct. Int'l Trade); *Princess*

*Awesome, LLC v. U.S. Customs & Border Prot.*, No. 25-00078 (Ct. Int'l Trade); *Oregon v.*

*Trump*, No. 25-00077 (Ct. Int'l Trade); *Barnes v. United States*, No. 25-0043 (Ct. Int'l Trade)

(dismissed for lack of standing).

Among that group are Plaintiffs.  Learning Resources and hand2mind are family-owned

companies based in Illinois that sell award-winning toys that help young children develop verbal,

counting, and fine motor skills, and that introduce older children to science, technology,

engineering, and math.[3]  Compl. ¶¶ 4, 10, ECF No. 1.  They have more than 500 employees and

sell their products in over 100 countries.  *Id.*  Plaintiffs pay tariffs to the federal government

pursuant to the Challenged Orders because they import most of their products from China and

other countries subject to IEEPA tariffs.  *Id.* ¶ 24.  According to the companies' CEO, Richard

Woldenberg, the new China tariff rates "are so high as to effectively prevent importation."  Decl.

of Richard Woldenberg in Supp. of Pls.' Mot. for Prelim. Inj. ("Woldenberg Decl.") ¶ 6, ECF

No. 9-1.  The "scale of the IEEPA tariff burden is unsustainable" for their businesses, which may

be forced to raise prices by 70 percent or more "as a matter of pure survival."  *Id.* ¶¶ 6, 9.

Because Plaintiffs have "no realistic way" to cover the costs associated with the increased tariffs,

"the tariffs act as an immediate ban on the products [they] import."  *Id.* ¶ 15.  They estimate that

the tariffs will increase their annual costs over forty-fold.  Mot. Prelim. Inj. at 3.

     Plaintiffs brought this lawsuit on April 22 against President Trump; Kristi Noem,

Secretary of DHS; the Department of Homeland Security; Scott Bessent, Secretary of the

Department of the Treasury; the Department of the Treasury; Howard Lutnick, Secretary of

Commerce; the Department of Commerce; Pete R. Flores, Acting Commissioner of CBP;

Customs and Border Patrol; Jamieson Greer, U.S. Trade Representative; and the Office of the

U.S. Trade Representative (collectively, "Defendants").  *See* Compl.  Two days later, Defendants

filed a motion to transfer this action to the United States Court of International Trade ("CIT").

Defs.' Mot. Transfer, ECF No. 8; Mem. of Law in Supp. of Defs.' Mot. Transfer ("Mot.

Transfer"), ECF No. 8, and Plaintiffs filed a motion for a preliminary injunction.  Mot. Prelim.

Inj.

---

[3] Although distinct legal entities, Plaintiffs are under common control and share over 100
employees, a single line of credit, and a single supply chain department.  Woldenberg Decl. ¶ 2.

The Court of International Trade is an Article III court that takes its current form from the Customs Court Act of 1980, Pub. L. 96-417, 94 Stat. 1727 (1980), and has "unique and specialized expertise in trade law." *Marmen Inc. v. United States*, 134 F.4th 1334, 1338 (Fed. Cir. 2025) (internal quotation omitted). Congress has given the CIT exclusive jurisdiction over "any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for," as relevant here, "tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue." 28 U.S.C. § 1581(i)(1). District courts do not have subject-matter jurisdiction over "any matter within the exclusive jurisdiction of the Court of International Trade." 28 U.S.C. § 1337(c).

Plaintiffs oppose the government's motion to transfer on the grounds that IEEPA is not a law providing for tariffs. *See* Pls.' Response to Mot. Transfer ("Pls.' Transfer Opp'n"), ECF No. 18. The government filed an opposition to Plaintiffs' preliminary injunction motion, Mem. of Law in Opp'n to Pls.' Mot. for Prelim. Inj. ("Defs.' PI Opp'n"), ECF No. 16, and Plaintiffs filed a reply, Pls.' Reply in Supp. of Mot. for Prelim. Inj. ("Pls.' PI Reply"), ECF No. 17. The government also filed a reply in support of its motion to transfer. Reply in Supp. of Defs.' Mot. Transfer ("Defs.' Transfer Reply"), ECF No. 21.

Three groups submitted amicus briefs. America First Legal Foundation ("America First") filed a brief in support of Defendants' motion to transfer. Br. of Amicus Curiae America First Legal Foundation in Supp. of Defs.' Mot. Transfer ("America First Amicus Br."), ECF No. 22. A group of law professors, former politicians, and legal experts filed a brief in support of Plaintiffs' motion for a preliminary injunction. Law Professors' Amicus Br. And finally, a group of small businesses affected by the Challenged Orders filed a brief in opposition to Defendants' motion to transfer. Joint Br. of Amici Curiae Emily Ley Paper, Inc., D/B/A

Simplified; Kilo Brava LLC; Kim's Clothes and Fashion LLC; and Rokland LLC in Opp'n to

Defs.' Mot. Transfer ("Small Business Amicus Br."), ECF No. 24.

Defendants also submitted three notices of supplemental authority: a hearing transcript

from a similar case before the Court of International Trade, where a three-judge panel of the CIT

heard argument on a motion for a preliminary injunction and a motion for summary judgment; a

Florida district court's order granting the government's motion to transfer in a similar case; and a

CIT decision dismissing a similar case, brought by a *pro se* plaintiff, for lack of standing.  *See*

Notice of Suppl. Authority, ECF Nos. 25, 25-1 (CIT hearing transcript); Notice of Suppl.

Authority, ECF Nos. 26, 26-1 (decision in the Northern District of Florida transferring *Emily Ley*

*Paper* to the CIT); Notice of Suppl. Authority, ECF Nos. 31, 31-1; (decision of the CIT

dismissing for lack of standing in *Barnes*).  Plaintiffs filed responses to the two court opinions.

*See* Response to Notice of Suppl. Authority, ECF No. 27; Response to Notice of Suppl.

Authority, ECF No. 32.  Defendants also submitted as "additional exhibits" in support of their

preliminary injunction opposition four declarations of U.S. government officials originally filed

in a case pending before the CIT.  Notice of Add'l Exs., ECF No. 34; *see also* Decls., ECF No.

34-1 (declarations of Secretary of State Marco Rubio ("Decl. of Marco Rubio"), Secretary of

Treasury Scott Bessent ("Decl. of Scott Bessent"); Secretary of Commerce Howard Lutnick

("Decl. of Howard Lutnick"); and United States Trade Representative Jamieson Lee Greer).

The Court held a hearing on the motions to transfer and for a preliminary injunction on

May 27.  Both motions are now ripe for review.

### III.  LEGAL STANDARDS

#### A.  Motion to Transfer for Lack of Jurisdiction

Federal courts, as courts of limited jurisdiction, have an obligation to ensure that the actions they consider are "limited to those subjects encompassed within a statutory grant of jurisdiction." *Ins. Corp. of Ireland, Ltd. v. Compagnie Des Bauxites de Guinee*, 456 U.S. 694, 701 (1982).  A plaintiff bears the burden of establishing a court's subject-matter jurisdiction. *Sweigert v. Perez*, 334 F. Supp. 3d 36, 40 (D.D.C. 2018).  If a court where an action is filed finds "there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action . . . to any other such court . . . in which the action or appeal could have been brought at the time it was filed."  28 U.S.C. § 1631; *see also Jan's Helicopter Serv. Inc. v. Fed. Aviation Admin.*, 525 F.3d 1299, 1304 (Fed. Cir. 2008).

#### B.  Preliminary Injunction

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the [movant] is entitled to such relief.'"  *John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1131 (D.C. Cir. 2017) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *Winter*, 555 U.S. at 20.  "The last two factors 'merge when the Government is the opposing party.'"  *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  "Of course, the movant carries the burden of persua[ding]" the Court that these factors merit preliminary relief, *Fla. EB5 Invs., LLC v. Wolf*, 443 F. Supp. 3d 7, 11 (D.D.C. 2020) (citing

*Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)), and must do so by making a "clear showing," *Cobell*, 391 F.3d at 258. A district court must generally consider each of these factors in deciding whether to issue a preliminary injunction. *See Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011).

## IV.  ANALYSIS

### A.  Subject-Matter Jurisdiction & Likelihood of Success on the Merits

At the outset, Plaintiffs must establish that the Court has subject-matter jurisdiction over their claims. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992). The CIT has exclusive jurisdiction over "any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for," in relevant part, "tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue." 28 U.S.C. § 1581(i)(1)(B).

This is undisputably a civil action against agencies and officers of the United States that "arises out of" IEEPA. *See Kosak v. United States*, 465 U.S. 848, 854 (1984) (interpreting "arising out of" to "include[] a claim resulting from"); *Int'l Lab. Rights Fund v. Bush*, 357 F. Supp. 2d 204, 208 (D.D.C. 2004) (analyzing the CIT's jurisdiction based on "the substantive law giving rise to [the plaintiffs'] claims"). So subject-matter jurisdiction turns on whether IEEPA is a "law . . . providing for" "tariffs, duties, fees or other taxes on the importation of merchandise for reasons other than the raising of revenue." 28 U.S.C. § 1581(i)(1). If the answer is yes, then the Court of International Trade has exclusive jurisdiction under 28 U.S.C. § 1581(i)(1). If the answer is no, then this Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346. *See also K Mart Corp. v. Cartier, Inc.*, 485 U.S. 176, 182–83 (1988). The jurisdictional question is

tantamount to the principal merits question: whether IEEPA authorizes (or "provid[es] for")

tariffs. *See* Pls.' Transfer Opp'n at 1.

Defendants argue that this Court must transfer the case to the CIT because "all of

[P]laintiffs' arguments concern the imposition of tariffs." *E.g.*, Mot. Transfer at 1; *see also*

Defs.' PI Opp'n at 10–20. They essentially take the position that all "tariff *cases*," "tariff

*challenges*," and "tariff *matters*" must go to the CIT for that court to determine in the first

instance whether it has jurisdiction. *See* Mot. Transfer at 9–10 (emphases added). That is not

how the CIT's jurisdictional statute operates. The statute is categorical: the jurisdictional hook is

the nature of the statute that a case arises out of, not the character of a plaintiff's claims. *See K*

*Mart Corp.*, 485 U.S. at 188 ("Congress did not commit to the Court of International Trade's

exclusive jurisdiction *every* suit against the Government challenging customs-related laws and

regulations.") (emphasis in original); 28 U.S.C. § 1581(i)(1)(B); *Miami Free Zone Corp. v.*

*Foreign Trade Zones Bd.*, 22 F.3d 1110, 1112 (D.C. Cir. 1994) (holding that "section 1581(i)

grants the CIT exclusive jurisdiction over actions arising from laws *providing for*—not 'designed

to deal with' or 'relating to'—revenue from imports") (emphasis in original). So the CIT has

jurisdiction over this case if, and only if, IEEPA is a "law of the United States providing for . . .

tariffs." [4] *See* 28 U.S.C. § 1581(i)(1)(B); Pls.' Transfer Opp'n at 2.

---

[4] Defendants argue in passing that the CIT has exclusive jurisdiction over this action
under 28 U.S.C. § 1581(i)(1)(D), which applies to cases arising out of any law of the United
States providing for the "administration and enforcement" of tariffs. *See* Mot. Transfer at 9, 11;
Defs.' Transfer Reply at 5. They base this argument on the fact that the Challenged Orders
modified the HTSUS, which is essentially a list of the applicable tariff rates for all goods
imported into the United States. *See* Defs.' Transfer Reply at 5; 19 U.S.C. § 2483. This case
"arises out of" the substantive law under which the President acted—IEEPA—not the HTSUS.
*See Int'l Lab. Rights Fund*, 357 F. Supp. 2d at 208. So 28 U.S.C. § 1581(i)(1)(D) does not
independently apply. *Cf. K Mart Corp.*, 485 U.S. at 190–91 (holding that the CIT's residual
jurisdictional provision does not apply if the underlying substantive law is not one "providing for
. . . administration and enforcement" of something that itself falls under the CIT's jurisdiction).

Defendants claim that this Court cannot consider whether IEEPA provides for tariffs because that necessarily involves deciding the underlying merits (or, at this stage of the litigation, whether Plaintiffs have shown a likelihood of success on the merits). But "courts always have jurisdiction to determine their jurisdiction," *Ilan-Gat Eng'rs, Ltd. v. Antigua Int'l Bank*, 659 F.2d 234, 239 (D.C. Cir. 1981), including in instances where the CIT may ultimately have exclusive jurisdiction. *K Mart Corp.*, 485 U.S. at 191 (resolving circuit split by rejecting Federal Circuit's position that the CIT had exclusive jurisdiction over certain actions under 28 U.S.C. § 1581(i)). And when the merits and jurisdiction are intertwined, like here, a court "can decide all of the merits issues in resolving a jurisdictional question, or vice versa." *Brownback v. King*, 592 U.S. 209, 217 (2021) (cleaned up). The Court will therefore consider both whether it has jurisdiction and whether Plaintiffs are likely to succeed on the merits by deciding whether IEEPA is a law providing for tariffs.

Since the Founding, the Constitution has vested the "Power to lay and collect Taxes, Duties, Imposts and Excises" with Congress. U.S. Const. art. I, § 8, cl. 1. The President has no independent discretion to impose or alter tariffs. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Any Presidential tariffing authority must be delegated by Congress. *See United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 572 (C.C.P.A. 1975) ("[N]o undelegated power to regulate commerce, or to set tariffs, inheres in the Presidency."); Law Professors' Amicus Br. at 3 (stating that Congress's power to control taxation is a "structural safeguard of democratic accountability"). *See generally* 19 U.S.C.

Because courts "must enforce plain and unambiguous statutory language according to its terms," the Court looks to IEEPA's text to determine whether it is a law providing for tariffs. *See Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010); 28 U.S.C.

§ 1581(i)(1)(B).  IEEPA does not use the words "tariffs" or "duties," their synonyms, or any other similar terms like "customs," "taxes," or "imposts."  It provides, as relevant here, that the President may, in times of declared national emergency, "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit" the "importation or exportation" of "property in which any foreign country or a national thereof has any interest."  50 U.S.C. § 1702(a)(1)(B).  There is no residual clause granting the President powers beyond those expressly listed.  The only activity in Section 1702(a)(1)(B) that could plausibly encompass the power to levy tariffs is that to "regulate . . . importation."  *See* Defs.' PI Opp'n at 11 (relying on those words to argue that IEEPA authorizes the imposition of tariffs).

The Court agrees with Plaintiffs that the power to regulate is not the power to tax.  *See* Mot. Prelim. Inj. at 18.  The Constitution recognizes and perpetuates this distinction.  Clause 1 of Article I, Section 8 provides Congress with the "Power To lay and collect Taxes, Duties, Imposts and Excises."  Clause 3 of Article I, Section 8 empowers Congress "To regulate Commerce with foreign Nations."  If imposing tariffs and duties were part of the power "[t]o regulate [c]ommerce with foreign [n]ations," then Clause 1 would have no independent effect.  As Chief Justice Marshall put it in an early leading case, "the power to regulate commerce is . . . entirely distinct from the right to levy taxes and imposts."  *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 201 (1824) (Marshall, C.J.).  The Constitution treats the power to regulate and the power to impose tariffs separately because they are not substitutes.  *See id.* at 198–99 (describing the power to tax and the power to regulate as "not . . . similar in their terms or their nature").

"Tariff" and "regulate" also take different plain meanings.  To regulate something is to "[c]ontrol by rule" or "subject to restrictions."  *Regulate*, The Concise Oxford Dictionary of Current English 943 (6th ed. 1976); *see also Regulate*, New Webster's Dictionary of the English

Language 1264 (1975) ("to govern by or subject to certain rules or restrictions"); *see also* Defs.' PI Opp'n at 11 (citing similar definitions). Tariffs are, by contrast, schedules of "duties or customs imposed by a government on imports or exports." *Tariff*, Random House Dictionary of the English Language 1454 (1973). To regulate is to establish rules governing conduct; to tariff is to raise revenue through taxes on imports or exports. Pls.' PI Reply at 3. Those are not the same.[5] *Cf.* Tom Campbell, *Presidential Authority to Impose Tariffs*, 83 La. L. Rev. 595 (2023) (arguing that "tariffs are economically different from quantitative import restraints"). If Congress had intended to delegate to the President the power of taxing ordinary commerce from any country at any rate for virtually any reason, it would have had to say so. *See Biden v. Nebraska*, 600 U.S. 477, 505–06 (2023) (requiring a clear statement from Congress when the interpretation of a provision would have a "question of 'deep economic and political significance' that is central to [the] statutory scheme") (alteration in original) (quoting *King v. Burwell*, 576 U.S. 473, 486 (2015)).

The other verbs in Section 1702(a)(1)(B) confirm that the President's power to "regulate . . . [the] importation or exportation" of property does not encompass the power to tariff. Per the principle of *noscitur a sociis*, "a word is given more precise content by the neighboring words with which it is associated." *E.g.*, *United States v. Williams*, 553 U.S. 285, 294 (2008). Even if *regulate* may take a broad meaning in other contexts, *see* Defs.' PI Opp'n at 12, the words immediately surrounding it "cabin the contextual meaning of that term" here, *see*

---

[5] Defendants point out that in *McGoldrick v. Gulf Oil Corporation*, 309 U.S. 414, 428 (1940), the Supreme Court described "[t]he laying of a duty on imports" as both "an exercise of the taxing power" and "an exercise of the power to regulate foreign commerce." Defs.' PI Opp'n at 15. Both of those powers belong to Congress, not the President. *See* U.S. Const. art. I, § 8, cls. 1, 3. *McGoldrick* does not stand for the proposition that the President's delegated power to "regulate . . . importation" includes the ability to unilaterally impose tariffs at any rate on any goods from any country.

*Yates v. United States*, 574 U.S. 528, 543 (2015). The President's IEEPA power to "regulate" is part of a list of verbs otherwise including "investigate, block during the pendency of an investigation, . . . direct and compel, nullify, void, prevent or prohibit." 50 U.S.C. § 1702(a)(1)(B). Not one of those words deals with the power to raise revenue. In the context of the words with which it is listed, "regulate" is appropriately read to refer to the President's power to issue economic sanctions, not to tariff. *See* Law Professors' Amicus Br. at 8, 13; Mot. Prelim. Inj. at 27.

Nor does IEEPA include language setting limits on any potential tariff-setting power. Every time Congress delegated the President the authority to levy duties or tariffs in Title 19 of the U.S. Code, it established express procedural, substantive, and temporal limits on that authority. *E.g.*, 19 U.S.C. § 2132. For one example, Section 122 of the Trade Act of 1974 authorizes the President to impose an "import surcharge . . . in the form of duties . . . on articles imported into the United States" to "deal with large and serious United States balance-of-payments deficits," but those tariffs are capped at 15 percent and can last only 150 days without Congressional approval. *Id.* § 2132(a). For another example, Section 338 of the Tariff Act of 1930 grants the President the authority to "declare new or additional duties" of up to 50 percent on imports from countries that have imposed "unreasonable" charges, exactions, regulations, or limitations that are "not equally enforced upon the like articles of every foreign country," or that have "[d]iscriminate[d] in fact against the commerce of the United States." 19 U.S.C. § 1338(a), (d), (e). Those tariffs cannot take effect for thirty days. *Id.* § 1338(d), (e). For yet another example, Section 301 of the Trade Act of 1974 authorizes an executive officer who serves under the President to "impose duties or other import restrictions on the goods of" a foreign country that has been found, after notice and investigation, to have committed unfair trade practices or

violated trade agreements with the United States.  19 U.S.C. § 2411(c).  Unlike IEEPA, each of

these statutes provides specific limitations on when the President may set or alter tariffs.  *See*

*also, e.g.*, 19 U.S.C. § 1862 (authorizing the President to impose tariffs only against specific

products, and only after the Secretary of Commerce has conducted a predicate investigation into

national security risks); *cf. Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 559–60,

571 (1976) (interpreting the statutory phrase "adjust . . . imports" to give the President the power

to impose license fees, but only after the Secretary of the Treasury independently determines that

an "article is being imported into the United States in such quantities or under such

circumstances as to threaten to impair the national security," and other "clear preconditions to

Presidential action").

　　Those comprehensive statutory limitations would be eviscerated if the President could

invoke a virtually unrestricted tariffing power under IEEPA.[6]  *See* Law Professors' Amicus Br.

at 9 ("If IEEPA meant what the government says it means, it would enable the President to

impose, revoke, or change tariffs for essentially any reason he describes as an emergency,

without complying with any of the limitations that Congress attached to every statute delegating

tariff authority."), *cf. Morton v. Mancari*, 417 U.S. 535, 550–51 (1974) (discussing the principle

that in statutory interpretation, the specific prevails over the general); *Guidry v. Sheet Metal*

*Workers Nat'l Pension Fund*, 493 U.S. 365, 375 (1990) (same).  The Court will not assume that,

---

[6] Of course the necessary predicate for the exercise of any authority under IEEPA is the
President's declaration of a national emergency.  50 U.S.C. § 1701.  But the President's power to
declare a national emergency under the National Emergencies Act is broad, and Defendants take
the position that courts cannot review presidential declarations of emergencies because they
constitute nonjusticiable political questions.  Defs.' PI Opp'n at 1, 31–36; *see also Ctr. for*
*Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 31 (D.D.C. 2020) (noting that "*no court* has
ever reviewed the merits of such a declaration") (emphasis in original); *Yoshida*, 526 F.2d at 581
n.32 ("[C]ourts will not review the bona fides of a declaration of an emergency by the
President.").

in enacting IEEPA, Congress repealed by implication every extant limitation on the President's

tariffing authority. *See Posadas v. Nat'l City Bank*, 296 U.S. 497, 503 (1936) ("The cardinal rule

is that repeals by implication are not favored."). "Congress has enacted a comprehensive

scheme" detailing the conditions where the President may impose tariffs. *See RadLAX Gateway

Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (quoting *Varity Corp. v. Howe*, 516

U.S. 489, 519 (1996) (Thomas, J., dissenting)). "It would be anomalous," to say the least, "for

Congress to have so painstakingly described the [President's] limited authority" on tariffs in

other statutes, "but to have given him, just by implication," nearly unlimited tariffing authority in

IEEPA. *See Gonzales v. Oregon*, 546 U.S. 243, 262 (2006).

Historical practice further indicates that IEEPA does not encompass the power to levy

tariffs. In the five decades since IEEPA was enacted, no President until now has ever invoked

the statute—or its predecessor, TWEA—to impose tariffs. *See* Mot. Prelim. Inj. at 21, 27;

Christopher A. Casey *et al.*, Cong. Rsch. Serv., R45618, *The International Emergency Economic

Powers Act: Origins, Evolution and Use*, R45618 at 25–26, 58–62 (2024). IEEPA has been

consistently understood by the Executive to authorize targeted economic sanctions on the

person[7] or state responsible for the underlying threat to U.S. national security. *See Loper Bright

Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) ("[T]he longstanding practice of the government

. . . can inform a court's determination of what the law is.") (cleaned up) (quoting *NLRB v. Noel

Canning*, 573 U.S. 513, 525 (2014)); Mot. Prelim. Inj. at 21–27. "This lack of historical

precedent, coupled with the breadth of authority that the [President] now claims, is a telling

---

[7] The Court means "person" in the broad legal sense. *See* 1 U.S.C. § 1 (defining "person" to include "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals"); *see also* 50 U.S.C. §§ 1708(d)(6), 1709(g)(8) (defining "person" as "an individual or entity").

indication that the [tariffs] extend[] beyond the [President's] legitimate reach." *See Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin*, 595 U.S. 109, 119 (2022) (per curiam) (internal quotation marks omitted). Nor have IEEPA cases traditionally been filed in the CIT. Hundreds of district court cases cite IEEPA Sections 1701 and 1702, but excluding the cases recently filed challenging President Trump's IEEPA tariffs, not one CIT case cites either provision. *See* Pls.' Transfer Opp'n at 10. This makes sense because the mine run IEEPA case has nothing to do with the CIT's "unique and specialized expertise in trade law." *See, e.g.*, *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156 (D.C. Cir. 2003) (IEEPA case seeking to vacate Office of Foreign Asset Controls designations); *OKKO Bus. PE v. Lew*, 133 F. Supp. 3d 17 (D.D.C. 2015) (IEEPA case seeking to unblock a wire transfer); *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92 (D.D.C. 2020) (IEEPA case seeking to enjoin ban on social media application).

General administrative practice also illustrates—and demands—a distinction between the power to regulate and the power to tax. When a statute authorizes an agency to promulgate regulations on a topic, the agency can implement rules or restrictions relating to that topic. *See, e.g.*, 42 U.S.C. § 7412 (authorizing the Environmental Protection Agency to "promulgate regulations establishing emissions standards"). The agency cannot, however, use its standard regulatory powers to raise revenue by imposing fees, tariffs, or taxes. *See* Pls.' PI Reply at 4–5; *cf. Diginet, Inc. v. Western Union ATS, Inc.*, 958 F.2d 1388, 1399 (7th Cir. 1992) ("The legal power to regulate is not necessarily the legal power to tax."). Congress speaks clearly when it delegates to an agency the authority to impose fees on regulated entities. *See* 49 U.S.C. § 40117(j) (listing the powers to tax and to regulate separately); 16 U.S.C. § 460bbb-9(a) (same); 2 U.S.C. § 622(8)(B)(i) (same). The statutory term "regulate," on its own, is not so capacious.

That is true whether the power to regulate is delegated to an administrative agency or to the President.

Defendants' counterarguments cannot and do no overcome IEEPA's plain meaning. For one thing, their proposed interpretation of Section 1702(a)(1)(B) conflicts with the provision's textual limits. The President's IEEPA powers extend only to "any property in which any foreign country or a national thereof has any interest." 50 U.S.C. § 1702(a)(1)(B); *see Real v. Simon*, 510 F.2d 557, 562 (5th Cir. 1975). Tariffs are typically assessed after U.S.-based importers have taken legal possession of imported goods. *See* 19 U.S.C. § 1484(a)(2)(B) (generally authorizing the "owner or purchaser" of goods to be the importer of record); U.S. Customs & Border Protection, *Entry Summary and Post Release Processes* (last modified Apr. 10, 2025), https://www.cbp.gov/trade/programs-administration/entry-summary [https://perma.cc/4U4F-7U6H] ("Within 10 days of the release of the cargo, the importer must pay the estimated duties on their imported goods."). Property wholly owned by U.S. nationals falls outside of IEEPA's scope. *See* 50 U.S.C. § 1702(a)(1)(B); *see also* Law Professors' Amicus Br. at 8–9 (describing how all the "permitted presidential actions" in IEEPA "have their effects abroad," while tariffs are "taxes paid by Americans").

And as Plaintiffs pointed out at oral argument, Defendants' interpretation could render IEEPA unconstitutional. IEEPA provides that the President may "regulate . . . importation or exportation." 50 U.S.C. § 1702(a)(1)(B). The Constitution prohibits export taxes. *See* U.S. Const. art. I, § 9, cl. 5 ("No Tax or Duty shall be laid on Articles exported from any State."). If the term "regulate" were construed to encompass the power to impose tariffs, it would necessarily empower the President to tariff exports, too. The Court cannot interpret a statute as

unconstitutional when any other reasonable construction is available.  *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 563 (2012).

Defendants' interpretation would also create a jurisdictional split between IEEPA actions initiated by the government, which are not "commenced against the United States, its agencies, or its officers," and would fall under the jurisdiction of the district courts; and IEEPA actions initiated against the government, which would go to the CIT.  *See* 28 U.S.C. § 1581(i)(1); 50 U.S.C. § 1705(a)–(c) (establishing civil and criminal penalties for violations of IEEPA); *see, e.g.*, *United States v. Three Sums Totaling $612,168.23 in Seized U.S. Currency*, 55 F.4th 932, 935–36 (D.C. Cir. 2022) (IEEPA claim filed by the government in federal district court).  That would totally warp the principles of consistency and expertise that Defendants invoke to support their claim that the CIT has exclusive jurisdiction over this action.  *See* Mot. Transfer at 9–10.

Defendants lean heavily on *United States v. Yoshida International, Inc.* ("*Yoshida*"), 526 F.2d 560, a 1975 decision from the Court of Customs and Patent Appeals, the Federal Circuit's predecessor, but that case is not binding on this Court.  *See* Defs.' PI Opp'n at 2, 4, 12, 14, 16–19, 23, 26–28, 32, 35; *see also Coal. to Preserve the Integrity of Am. Trademarks v. United States*, 790 F.2d 903, 905–07 (D.C. Cir. 1986), *aff'd in part sub nom. K Mart. Corp.*, 485 U.S. at 190–91 (rejecting Federal Circuit's jurisdictional analysis).  Nor does the Court find it persuasive.[8]

---

[8] Two other district courts have, in cases materially similar to this one, granted the government's motion to transfer to the CIT largely in reliance upon *Yoshida*.  *See Webber v. U.S. Dep't of Homeland Sec.*, 2025 WL 1207587 (D. Mont. Apr. 25, 2025); *Emily Ley Paper v. Trump*, 2025 WL 1482771 (N.D. Fla. May 20, 2025).  This Court respectfully disagrees with their analyses.  And the Court finds it even less persuasive that the CIT, which is bound by *Yoshida*, is exercising jurisdiction over lawsuits raising similar claims.

The facts of *Yoshida* are as follows.  During the summer of 1971, the United States faced "an economic crisis" arising out of a balance of payments deficit.  *Yoshida*, 526 F.2d at 567. President Nixon responded by issuing a proclamation that, among other things, imposed a 10 percent surcharge on imported goods.  *Id.*; *see also* Proclamation No. 4074, 36 Fed. Reg. 15724 (Aug. 17, 1971).  The tariffs were known as the "Nixon shock," *see* Defs.' PI Opp'n at 17, and were withdrawn in less than five months, Law Professors' Amicus Br. at 11.  A zipper importer, Yoshida International, challenged the tariffs' legality in a refund suit.  *Yoshida*, 526 F.2d at 566. At the time Section 5(b) of the TWEA allowed the President to, in emergencies, "regulate . . . [the] importation . . . of . . . any property in which any foreign country or a national thereof has any interest."[9]  *Id.* at 570.  Although President Nixon had not invoked TWEA,[10] the Customs Court[11] analyzed whether that statute authorized the tariffs and concluded that it did not. *Yoshida Int'l, Inc. v. United States* ("*Yoshida I*"), 378 F. Supp. 1155, 1171 (Cust. Ct. 1974), *rev'd*, *Yoshida*, 526 F.2d at 576 (C.C.P.A. 1975) ("It cannot be said that the investiture of a power to 'regulate' necessarily includes, per se, the power to levy duties."); *see also id.* at 1172 ("If the words 'regulate . . . importation' were given the construction contended by the defendant, the President by the declaration of a national emergency could determine and fix rates of duty at will, without regard to statutory rates prescribed by the Congress and without the

---

[9] The same language appears in IEEPA.

[10] In issuing Proclamation 4074, President Nixon instead invoked the Tariff Act of 1930 and the Trade Expansion Act of 1962.  36 Fed. Reg. at 15724; *Yoshida*, 526 F.2d at 569; H.R. Rep. No. 95-459, at 5 (1977) ("[TWEA] was not among the statutes cited in the President's proclamation as authority for the surcharge."); *see also* Pls.' PI Reply at 9–10.  TWEA was first cited "later by the Government in response to a suit brought in Customs Court by Yoshida International"—*i.e.*, in *Yoshida*.  H.R. Rep. No. 95-459, at 5.

[11] The Customs Court is the CIT's predecessor.  *See* Customs Courts Act of 1980, Pub. L. No. 96-417, § 702, 94 Stat. 1727, 1748 (1980).

benefit of standards or guidelines which must accompany any valid delegation of a constitutional

power by the Congress." (alteration in original)).

The Court of Customs and Patent Appeals reversed based on "the intent of Congress" and

"the broad purposes of the [TWEA]."  *Yoshida*, 526 F.2d at 583; *see also id.* at 573 (emphasizing

that "the primary implication of an emergency power is that it should be effective to deal with a

national emergency successfully").  That is no longer how courts approach statutory

interpretation.  *See Am. Fed. of Gov. Empls., Nat'l Council of HUD Locals Council 222, AFL-

CIO v. FLRA*, 99 F.4th 585, 590 (D.C. Cir. 2024) (discussing how purposivism was, by the end

of the twentieth century, "largely rejected in favor of a stricter focus on a statute's text" (citing

John F. Manning, *Textualism and the Equity of the Statute*, 101 Colum. L. Rev. 1, 6–7 (2001)));

*Loper Bright*, 603 U.S. at 443 n.6 (Gorsuch, J., concurring) (describing how in 1984 "there were

many judges who abhorred plain meaning and preferred instead to elevate legislative history and

their own curated accounts of a law's purposes over enacted statutory text," but now courts have

"a more faithful adherence to the written law" (cleaned up)).  The Supreme Court could not be

more clear that courts must focus on a statute's text.  *E.g.*, *Jimenez v. Quarterman*, 555 U.S. 113,

118 (2009) ("As with any question of statutory interpretation, our analysis begins with the plain

language of the statute."); *see also Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) ("It is well

established that 'when the statute's language is plain, the sole function of the courts—at least

where the disposition required by the text is not absurd—is to enforce it according to its terms.'"

(quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)).  So

*Yoshida*'s reasoning is not compelling on its own terms.

And in deciding that case, the Court of Customs and Patent Appeals acknowledged that

"nothing in the TWEA or in its history . . . specifically either authorizes or prohibits the

imposition of a surcharge," and that "Congress did not specify that the President could use a surcharge in a national emergency." *Yoshida*, 526 F.2d at 572–73, 576. *Yoshida* also expressly rejected the premise that the TWEA enabled the President to "impos[e] whatever tariff rates he deems desirable," *id.* at 578, which is the power President Trump has claimed in issuing the Challenged Orders. *Yoshida* is further distinguishable because the tariffs at issue there applied only to goods already subject to tariff reductions, and at rates that did not exceed the original statutory maximum set out by Congress. *See* Law Professors' Amicus Br. at 12 n.2.

As Plaintiffs point out, other events confirm that Congress did not intend for the language "regulate . . . importation" to delegate the authority to impose tariffs. *See* Pls.' PI Reply at 11–12. Just before enacting IEEPA, Congress passed Section 122 of the Trade Act of 1974. Pub. L. No. 93-618, 88 Stat. 1978 (1975). That statute specifically authorized the tariffs President Nixon had imposed in Proclamation 4074 by providing that the President may impose an "import surcharge . . . in the form of duties . . . on articles imported into the United States" to "deal with large and serious United States balance-of-payments deficits." 19 U.S.C. § 2132(a); *see also id.* § 2411(c)(1)(B). Section 122 would have been pointless if Congress understood TWEA (and later, IEEPA) to allow that same tariffing authority. And in reaching its holding, the *Yoshida* court expressly relied on the fact that there was then no specific statute "'providing procedures' for dealing with a national emergency involving a balance of payments problem such as that which existed in 1971." *Yoshida*, 526 F.2d at 578; *see also id.* at 582 n.33 (expressly declining to determine what effect "the specific grant of the surcharge authority spelled out in the Trade Act of 1974" had on the President's TWEA powers in 1971). That is no longer true.

Finally, the President's IEEPA powers were designed to be "more limited in scope than those of [TWEA]." H.R. Rep. No. 95-459, at 2 (1977). The Court disagrees with Defendants

that, by adopting the TWEA's language in IEEPA, Congress endorsed *Yoshida*'s holding.  *See*
Pls.' PI Reply at 13 (arguing that courts only assume Congress adopts an earlier judicial
construction of a phrase where there is "settled precedent" on the interpretation of a statute, and
that conflicting lower court decisions do not constitute settled precedent (quoting *United States v.*
*Collazo*, 984 F.3d 1308, 1328 (9th Cir. 2021))).  *Contra* Defs.' PI Opp'n at 4, 12, 14.  *Yoshida* is
not a reason for this Court to reject IEEPA's plain meaning.

* * *

Two conclusions follow from the Court's analysis.  First, because IEEPA is not a "law
. . . providing for tariffs," this Court, not the CIT, has jurisdiction over this lawsuit. [12]  The
statutory phrase "regulate . . . importation," as used in IEEPA, does not encompass the power to
tariff.  The plain meaning of "regulate" is not "to tax."  And historical practice, as well as
Congress's actions in response to the "Nixon shock" tariffs, confirm that the statute is not so
capacious.  Second, because IEEPA does not authorize the President to impose tariffs, the tariffs
that derive from the Challenged Orders are *ultra vires*.  Plaintiffs have therefore shown that they
are likely to succeed on the merits of their claim that the President, in issuing the Challenged
Orders, acted *ultra vires*, and that the agency defendants, in implementing them, violated the

---

[12] Although Defendants do not raise this argument, Amicus America First takes the
position that the CIT has exclusive jurisdiction over all IEEPA actions because it is a law
"providing for . . . embargoes . . . for reasons other than protections of the public health or
safety."  *See* America First Amicus Br.; 28 U.S.C. § 1581(i)(1)(C).  That would be a sea change
in IEEPA practice, as district courts have exercised jurisdiction over hundreds of IEEPA cases
brought against the government.  *See* Pls.' Transfer Opp'n at 10.  Such a jurisdictional shift
would also run counter to the CIT's role as a "specialized court of limited jurisdiction."  *See*
*Horizon Lines, LLC. v. United States*, 414 F. Supp. 2d 46, 52 (D.D.C. 2006).  Further, Presidents
have used IEEPA to respond to threats to public health and safety.  For example, the February 1
China Order challenged in this case expressly imposed IEEPA sanctions to address the illegal
flow of fentanyl into the U.S.  90 Fed. Reg. at 9121.  If IEEPA provides for embargoes, those
embargoes could be to protect the public health or safety.  That brings IEEPA outside the scope
of Section 1581(i)(1)(C), so America First's jurisdictional argument fails.

Administrative Procedure Act.  The Court does not reach Plaintiffs' alternative arguments that IEEPA does not authorize these specific tariffs or that, if it does authorize these tariffs, it violates the nondelegation doctrine.

### B.  Irreparable Harm

Plaintiffs have established that they will likely suffer irreparable harm absent a preliminary injunction because the tariffs originating in the Challenged Orders pose an existential threat to their businesses.  *See, e.g.*, Woldenberg Decl. ¶ 28; Mot. Prelim. Inj. at 41; *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8–9 (D.C. Cir. 2016) (reiterating that "a preliminary injunction requires only a likelihood of irreparable injury").  They cannot offset the highest IEEPA tariffs without raising prices 70 percent or more "as a matter of pure survival," Woldenberg Decl. ¶ 9; their customers have already canceled over $1 million in orders, *id.* ¶ 10; and they face an immediate 40 or 50 percent decline in sales, year-over-year, *id.* ¶ 11.  The companies "cannot possibly absorb the costs of the increased tariffs" without "changing [their] pricing radically."  *Id.* ¶¶ 6, 14.  But they cannot pass price increases onto their customers without selling substantially fewer products.  *Id.* ¶¶ 16, 18.  Plaintiffs are not "massive entities that can withstand such losses in their core business[es]."  *See Everglades Harvesting & Hauling, Inc. v. Scalia*, 427 F. Supp. 3d 101, 116 (D.D.C. 2019).  Nor can they reduce the quality of their products to support lower prices: reducing quality is "unthinkable" for "premium brands" like Plaintiffs, and is practically unworkable because it would require them to "change the design and/or production of more than 2,000 products at once."  *Id.* ¶ 15.

Without an injunction, Plaintiffs may have to refinance loans on unfavorable terms; significantly scale back operations and product offerings; close facilities; lay off employees; or possibly sell their businesses.  Mot. Prelim. Inj. at 41.  Granted, financial losses typically do not

constitute irreparable harm.  *E.g.*, *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

But that is not the case when "the loss threatens the very existence of the movant's business."  *Id.*

The government argues that Plaintiffs' harms are speculative and conclusory.  *See* Defs.'

PI Opp'n at 37–39.  The Court disagrees.  *See* Pls.' PI Reply at 20–21 (detailing, to the extent

possible, the specific costs that Plaintiffs have incurred because of the Challenged Orders).  How

could Plaintiffs possibly describe the exact costs they will face from paying tariffs that the

President imposes, pauses, adjusts, and reimposes at will?  *See* Woldenberg Decl. ¶¶ 7–8

(describing the "ever-changing situation with the IEEPA tariffs" and "considerable uncertainty

about future economic conditions and trade rules").  The instability and unpredictability of the

changing tariff rates cause "massive disruptions in [their] supply chain, business relations, and

business operations."  *Id.* ¶ 8; *see Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 242

(D.D.C. 2014).  Without preliminary relief, Plaintiffs will be subjected to ongoing "supply chain

chaos, an incredibly burdensome and constantly shifting tariff landscape, and a very high price to

be paid for incorrect logistical judgments."  Woldenberg Decl. ¶ 10.  And because their financial

recovery is limited to the value of any tariffs they wrongly pay, *see* 19 U.S.C. § 1505(a)–(b),

Plaintiffs will not be able to recover lost profits, lost customers, or the "additional cost[s]" of

finding "replacement[s]" for high-tariff imports.  *See Vaqueria Tres Monjitas, Inc. v. Irizarry*,

587 F.3d 464, 485 (1st Cir. 2009) ("[T]he inability to supply a full line of products may

irreparably harm a merchant by shifting purchasers to other suppliers."); *Nalco Co. v. EPA*, 786

F. Supp. 2d 177, 188 (D.D.C. 2011) (holding that agency action that would make it "difficult for

[the plaintiff] to attract new customers" is "at least some degree of irreparable injury").

As Plaintiffs stated at oral argument, to the extent the tariffs cause them not to import

goods in the first instance, they cannot recover the value of the resulting lost sales, business

opportunities, market share, or customer goodwill.  *See* Mot. Prelim. Inj. at 38–39.  In this context, those harms qualify as irreparable.  *See, e.g.*, *Patriot, Inc. v. U.S. Dep't of Housing & Urban Dev.*, 963 F. Supp. 1, 5 (D.D.C. 1997) ("damage to [a company's] business reputation" can be "irreparable harm"); *Nalco Co.*, 786 F. Supp. 2d at 188 (finding irreparable harm where petitioner would "suffer the loss of '[l]ong-standing clients . . . [that may be] unwilling, or unable, to do business'" with them absent an injunction (alterations in original) (quoting *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 50–51 (D.D.C. 2008)).  *Contra* Defs.' PI Opp'n at 38 (stating, without support, that Plaintiffs' "loss of business opportunities and goodwill" could be "indirectly" redressed through refunds).  The Court is therefore satisfied that Plaintiffs have demonstrated irreparable harm.

### C.  Balance of Equities & Public Interest

Finally, the Court considers whether the balance of equities and the public interest favor a preliminary injunction.  When the government is the party to be enjoined, these two factors merge.  *See Nken*, 556 U.S. at 435.  The Supreme Court has instructed that "[a]n injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course."  *Winter*, 555 U.S. at 32.  "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of an injunction."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (citing *R.R. Comm'n v. Pullman Co.*, 312 U.S. 496, 500 (1941)).

Without a preliminary injunction, Plaintiffs will sustain significant and unrecoverable losses.  They take the position that if the Court grants their motion, the government will face a pause of the IEEPA tariffs only as directed to two small businesses whose imports are relatively inconsequential to the national economy.  *See* Mot. Prelim. Inj. at 43 (requesting that the Court

"enjoin the agency Defendants and their agents, employees, and all persons acting under their direction and control, from taking any action to collect tariffs from *Plaintiffs* under the Challenged Orders") (emphasis added). And "[t]he public interest is served when the legislation that Congress has enacted," like IEEPA, "is complied with." *American Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 262 (D.D.C. 2003); *see also League of Women Voters*, 838 F.3d at 12 (holding that is there generally no public interest in unlawful agency action).

On the government's side, four Cabinet officials submitted declarations outlining the "catastrophic harm to American foreign policy and national security that would ensue from granting the relief requested in [P]laintiffs' motion." Notice of Add'l Exs. at 1; *see also* Decl. of Howard Luntick ¶ 19 ("All told, an invalidation of President Trump's ability to use IEEPA would dismantle a cornerstone of President Trump's national security architecture, irreparably harm the government's ability to respond to evolving foreign threats, . . . jeopardize vital trade agreements, collapse ongoing negotiations, allow for Chinese aggression during a period of strategic competition, leave the American people exposed to predatory economic practices by foreign actors, and threaten national security."). Secretary of State Marco Rubio stated that an order enjoining the tariffs "would cause significant and irreparable harm to U.S. foreign policy and national security" because negotiations with trading partners are "in a delicate state." Decl. of Marco Rubio ¶¶ 3, 9. "These negotiations could address the urgent threats of mass migration at our northern and southern borders, the flow of fentanyl into our country, and the erosion of our domestic production capacity," *id.* ¶ 8, and constitute "one of the country's top foreign policy priorities." *Id.* ¶ 10. According to Secretary Rubio, "much of U.S. global diplomacy has been focused on these negotiations." *Id.* ¶ 10; *see also* Decl. of Scott Bessent ¶ 9. Every ongoing

negotiation is "premised on the ability of the President to impose tariffs under IEEPA." Decl. of Marco Rubio ¶ 11.

The Cabinet officials claim that were a court to enjoin the tariffs announced in the Challenged Orders, U.S. trading partners could retaliate against the tariffs.; the U.S. would be embarrassed on the global stage; and the U.S.'s manufacturing position may be so weakened that the country may "not be able to produce the weapons and other resources necessary to defend itself." *Id.* ¶¶ 12–14. These consequences go to "critical" foreign policy and national security interests. *Id.* ¶ 16; *see also* Decl. of Howard Lutnick ¶¶ 4–4 (describing that the national emergencies underlying the Challenged Orders "threaten[] the lives of [U.S.] citizens"). The Court agrees with Defendants that the public has a compelling interest in the "President's conduct of foreign affairs and efforts to protect national security." *See* Defs.' PI Opp'n at 41; *see also Winter*, 555 U.S. at 24.

But on May 28, a three-judge panel of the CIT issued an order permanently enjoining the IEEPA tariffs. *See* Opinion, *V.O.S. Selections, Inc. v. Trump*, No. 25-00066, at 48–49 (Ct. Int'l Trade May 28, 2025). The consequences described by the government officials in their declarations will flow, if at all, from that court's sweeping order. Under the circumstances, enjoining the application of the Challenged Orders to two family-owned toy companies will have virtually no effect on the government. *Contra* Defs.' PI Opp'n at 41–42 (arguing that "[P]laintiffs' proposed injunction would be an enormous intrusion on the President's conduct of foreign affairs and efforts to protect national security under IEEPA and the Constitution"). It will, however, protect those companies from irreparable injury should the CIT order be stayed or reversed. The Court concludes that the balance of equities and the public interest therefore favor Plaintiffs. Besides, "[i]t is emphatically the province and duty of the judicial department to say

what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803) (Marshall, C.J.).  The President

cannot act unlawfully and then use the effects of having that action declared unlawful as a

putative shield from judicial review.

## V.  CONCLUSION

Because IEEPA is not a law providing for tariffs and because Plaintiffs have satisfied the

preliminary injunction factors, Defendants' motion to transfer venue is DENIED; and Plaintiffs'

motion for a preliminary injunction is GRANTED.  The Court will stay operation of the

preliminary injunction for 14 days.  An order consistent with this Memorandum Opinion is

separately and contemporaneously issued.


Dated:  May 29, 2025                                    RUDOLPH CONTRERAS
                                                       United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

LEARNING RESOURCES, INC., *et al.*,    :
                                       :
        Plaintiffs,                    :    Civil Action No.:    25-1248 (RC)
                                       :
        v.                             :    Re Document No.:    9
                                       :
DONALD J. TRUMP, *et al.*,             :
                                       :
        Defendants.                    :

**<u>ORDER</u>**

Under Federal Rule of Civil Procedure 65(c), courts may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The rule "has been read to vest broad discretion in the district court to determine the appropriate amount of an injunction bond." *DSE, Inc., v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999).

Defendants request that the Court order Plaintiffs to post a bond in the amount of the tariffs they would pay but for the preliminary injunction. Mem. of Law in Opp'n to Pls.' Mot. for Prelim. Inj. at 43, ECF No. 16. Specifically, they want the Plaintiffs to "identify the entries, by entry number, importer name, and importer number, that would be covered" by a preliminary injunction, and to "post Single Transaction Bonds for all such identified entries during the pendency of any injunctive order in an amount equal to the total entered value, plus all applicable duties, taxes, and fees, including the duties that would otherwise have been deposited pursuant to the executive orders." *Id.*

The Court agrees with Plaintiffs that such a remedy would effectively defeat the purpose of the preliminary relief. *See* Pls.' Reply in Supp. of Mot. for Prelim. Inj. at 23–24, ECF No. 17; *see also Nat. Res. Def. Council, Inc., v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (holding

that a bond "is not necessary where requiring [one] would have the effect of denying the

plaintiffs their right to judicial review").  Rule 65(c) has been interpreted to allow district courts

to require no bond at all or only a nominal bond.  *See, e.g.*, *Nat'l Council of Nonprofits v. OMB*,

No. 25-cv-239, 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025) (no bond); *P.J.E.S. ex rel.*

*Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (same); *Nat'l Res. Def.*

*Council*, 337 F. Supp. at 169 (nominal bond).  Because "[i]t would be a mistake to treat a

revenue loss to the Government the same as pecuniary damage to a private party," the Court

believes a nominal bond of $100.00 is appropriate.  *See Nat'l Res. Def. Council*, 337 F. Supp. at

169.

Plaintiffs are **HEREBY ORDERED** to post bond under Rule 65(c) in the amount of

$100.00.

**SO ORDERED**.

Dated:  May 29, 2025                                    RUDOLPH CONTRERAS
                                                       United States District Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEARNING RESOURCES, INC., et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 1:25-cv-01248-RC |
| | ) |
| DONALD J. TRUMP, President of the United | ) |
| States, in his official capacity, et al., | ) |
| | ) |
| Defendants. | ) |

## NOTICE OF APPEAL

Pursuant to Federal Rule of Appellate Procedure 3(a), all defendants hereby appeal, to the

U.S. Court of Appeals for the D.C. Circuit, the Court's May 29, 2025 order granting plaintiffs'

motion for a preliminary injunction, and accompanying opinion, ECF Nos. 35, 37.


DATED: May 29, 2025                    Respectfully submitted,

OF COUNSEL:                            YAAKOV M. ROTH
                                       Acting Assistant Attorney General
ALEXANDER K. HAAS
Director                               ERIC J. HAMILTON
                                       Deputy Assistant Attorney General
STEPHEN M. ELLIOTT
Assistant Director                     PATRICIA M. McCARTHY
U.S. Department of Justice             Director
Civil Division
Federal Programs Branch                /s/ Claudia Burke
                                       CLAUDIA BURKE
                                       Deputy Director
SOSUN BAE
Senior Trial Counsel
LUKE MATHERS                           /s/ Justin R. Miller
BLAKE W. COWMAN                        JUSTIN R. MILLER
COLLIN T. MATHIAS                      Attorney-In-Charge
Trial Attorneys                        International Trade Field Office
U.S. Department of Justice
Civil Division                         /s/ Catherine M. Yang
Commercial Litigation Branch           CATHERINE M. YANG

Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
PO Box 480, Ben Franklin Station
Washington, DC 20044
(202) 514-4336
catherine.m.yang@usdoj.gov
*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| LEARNING RESOURCES, INC., *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 25-1248 (RC) |
| | : | | |
| v. | : | Re Document No.: | 41 |
| | : | | |
| DONALD J. TRUMP, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

**ORDER**

**GRANTING DEFENDANTS' MOTION TO STAY**

Upon consideration of Defendants' motion to stay (ECF No. 41) enforcement of the

Court's order entered May 29, 2025 preliminarily enjoining the United States from collecting

tariffs from Plaintiffs pursuant to Executive Orders 14,195; 14,228; 14,257; 14,259; and 14,266

(ECF No. 35); it is hereby

**ORDERED** that Defendants' motion is **GRANTED**.  In issuing the preliminary

injunction, the Court specifically referenced the related permanent injunction granted by the

Court of International Trade.  *See* Mem. Op. Denying Defs.' Mot. Transfer Venue; Granting Pls.'

Mot. for Prelim. Inj. at 32–33, ECF No. 37.  The Court acknowledged the national security and

foreign policy concerns raised by Defendants but determined that those consequences would

flow, if at all, from the CIT's more sweeping order.  *Id.*  That order has now been stayed by the

Court of Appeals for the Federal Circuit.  A stay in this action is therefore appropriate to protect

the President's ability to identify and respond to threats to the U.S. economy and national

security; and it is

**FURTHER ORDERED** that the effects of this Court's order granting Plaintiffs' motion

for a preliminary injunction (ECF No. 35) and the accompanying memorandum opinion (ECF

No. 37) are hereby stayed pending disposition of the pending appeal before the United States

Court of Appeals for the District of Columbia Circuit.

**SO ORDERED**.

Dated:  June 3, 2025                                          RUDOLPH CONTRERAS
                                                             United States District Judge