IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

Learning Resources, Inc.; hand2mind, Inc.,

Plaintiffs - Appellees

v.

Donald J. Trump, President of the United States, in his official capacity;
Kristi Noem, Secretary of the Department of Homeland Security, in her
official capacity; United States Department of Homeland Security; Scott
Bessent, Secretary of the Treasury, in his official capacity; United
States Department of the Treasury; Howard W. Lutnick, Secretary of
Commerce, in his official capacity; United States Department of
Commerce; Pete Flores, Acting Commissioner of Customs & Border
Protection, in his official capacity; United States Customs and Border
Protection; Jamieson Greer, U.S. Trade Representative, in his official
capacity; Office of the United States Trade Representative,

Defendants – Appellants.

On Appeal from the United States District Court
for the District of Columbia

**BRIEF OF *AMICI CURIAE* AMERICA FIRST LEGAL
FOUNDATION AND COALITION FOR A PROSPEROUS
AMERICA IN SUPPORT OF DEFENDANTS-APPELLANTS**

DANIEL Z. EPSTEIN
AMERICA FIRST LEGAL
  FOUNDATION
611 Pennsylvania Ave. SE #231
Washington, DC 20003
202-964-3721
daniel.epstein@aflegal.org

R. TRENT MCCOTTER
  *Counsel of Record*
BOYDEN GRAY PLLC
800 Connecticut Ave. NW
Suite 900
Washington, DC 20006
(202) 706-5488
tmccotter@boydengray.com
*Counsel for Amici Curiae*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 29, *Amici* hereby submit this certificate.

## A. Parties and *Amici*

The parties and *amici* who have appeared before the Court are listed in Defendants-Appellants' D.C. Circuit Rule 28(a)(1) certificate.

## B. Rulings Under Review

The rulings under review are a memorandum opinion (JA89) and order (JA87) issued on May 29, 2025, granting a preliminary injunction, and the associated order (JA122) setting a bond under Rule 65(c).

## C. Related Cases

Related cases are listed in Defendants-Appellants' D.C. Circuit Rule 28(a)(1) certificate.

## DISCLOSURE STATEMENT

Per Federal Rules of Appellate Procedure 26.1 and 29(a), and D.C. Circuit Rule 26.1, *Amici* state that they have no parent companies, and no publicly-held company has a 10% or greater ownership interest in them.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ v

IDENTITY AND INTEREST OF *AMICI CURIAE* ................................. 1

SUMMARY OF ARGUMENT .................................................................. 2

ARGUMENT ............................................................................................ 3

    I.    The District Court Lacked Jurisdiction ...................................... 3

    II.   Precedent Dictates That IEEPA Authorizes Tariffs ................. 13

    III.  Use of IEEPA for Tariffs Does Not Violate the Major-Questions Doctrine .................................................................... 16

    IV.  IEEPA Does Not Violate the Nondelegation Doctrine.............. 19

    V.   The Court Cannot Second-Guess the President's Determinations Under IEEPA ................................................. 26

CONCLUSION ....................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Chang v. United States,*
859 F.2d 893 (Fed. Cir. 1988) ........................................... 27

*Dolan v. U.S. Postal Serv.,*
546 U.S. 481 (2006) ............................................................ 6

*Earth Island Inst. v. Christopher,*
6 F.3d 648 (9th Cir. 1993) ................................................ 11

*Emily Lay Paper, Inc. v. Trump,*
No. 3:25-cv-464 (N.D. Fla.) ............................................. 10

*\*Federal Energy Administration v. Algonquin SNG, Inc.,*
426 U.S. 548 (1976) .............................. 14, 15, 16, 18, 19, 20, 21, 25, 26

*Florsheim Shoe Co., Div. of Interco, Inc. v. United States,*
744 F.2d 787 (Fed. Cir. 1984) ........................................... 18

*Georgia v. Public.Resource.Org, Inc.,*
590 U.S. 255 (2020) .......................................................... 16

*Gundy v. United States,*
588 U.S. 128 (2019) ........................................................... 21

*Hertz Corp. v. Friend,*
559 U.S. 77 (2010) ...................................................... 4, 10

*Int'l Lab. Rts. Educ. & Rsch. Fund v. Bush,*
954 F.2d 745 (D.C. Cir. 1992) ......................................... 4, 9

*Int'l Lab. Rts. Fund v. Bush,*
357 F. Supp. 2d 204 (D.D.C. 2004) ................................... 10

*K Mart Corp. v. Cartier, Inc.,*
485 U.S. 176 (1988) ................................................... 3, 8, 12

*Kosak v. United States,*
465 U.S. 848 (1984) ............................................................ 6

*Marshall Field & Co. v. Clark,*
143 U.S. 649 (1892) .......................................................... 22

*Metz v. United States,*
788 F.2d 1528 (11th Cir. 1986) .................................. 6, 7, 8

*NFIB v. Sebelius,*
567 U.S. 519 (2012) ............................................... 15

*Nixon v. Fitzgerald,*
457 U.S. 731 (1982) ............................................... 17

*Panama Refining Co. v. Ryan,*
293 U.S. 388 (1935) ............................................... 21

*\*Regan v. Wald,*
468 U.S. 222 (1984) .................................... 8, 13, 26, 27

*Trump v. Hawaii,*
585 U.S. 667 (2018) ............................................... 28

*United States v. Curtiss-Wright Exp. Corp.,*
299 U.S. 304 (1936) ..................................... 17, 18, 22

*United States v. Gonzales,*
520 U.S. 1 (1997) .................................................. 6

*United States v. Mazurie,*
419 U.S. 544 (1975) ............................................... 21

*United States v. Rock Royal Co-Op.,*
307 U.S. 533 (1939) ............................................... 26

*United States v. Shearer,*
473 U.S. 52 (1985) ................................................. 7

*United States v. Spawr Optical Rsch., Inc.,*
685 F.2d 1076 (9th Cir. 1982) ................................... 27

*United States v. Universal Fruits & Vegetables Corp.,*
370 F.3d 829 (9th Cir. 2004) ..................................... 5

*United States v. Yoshida Int'l, Inc.,*
526 F.2d 560 (C.C.P.A. 1975) ........................... 13, 16, 28

*West Virginia v. EPA,*
597 U.S. 697 (2022) ....................................... 17, 18, 19

*Wilkins v. United States,*
598 U.S. 152 (2023) ............................................... 11

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
    576 U.S. 1 (2015) ............................................................ 18

**Constitution & Statutes**

U.S. Const. art. I, § 8 ............................................................ 24

28 U.S.C. § 1337 ................................................................... 12

28 U.S.C. § 1581 ............................................... 4, 5, 6, 7, 8, 9, 10, 11, 12

28 U.S.C. § 1585 ................................................................... 12

50 U.S.C. § 1701 ............................................................. 4, 8, 20

50 U.S.C. § 1702 .......................................................... 2, 3, 15, 16, 24

1 Stat. 372 ............................................................................ 24

**Other Authorities**

*Adjust*, Merriam-Webster Thesaurus, https://www.merriam-
    webster.com/thesaurus/adjust ........................................... 15

H.R. Rep. No. 95-459 (1977) .................................................. 16

Michael W. McConnell, *The President Who Would Not Be
    King: Executive Power Under the Constitution* (2020) ...................... 23

Paul Einzig, *The Control of the Purse: Progress and Decline
    of Parliament's Financial Control* (1959) ............................. 23

*Regulating Imports With a Reciprocal Tariff to Rectify Trade
    Practices That Contribute to Large and Persistent Annual
    United States Goods Trade Deficits*, Exec. Order No.
    14,257, 90 Fed. Reg. 15,041 (Apr. 7, 2025) ........................... 28

**IDENTITY AND INTEREST OF *AMICI CURIAE*[1]**

America First Legal Foundation is a nonprofit organization dedicated to promoting the rule of law in the United States and defending individual rights guaranteed under the Constitution and federal statutes. As part of *Amicus*'s commitment to the rule of law, it seeks to ensure that principles of jurisdiction are strictly enforced.

*Amicus curiae* the Coalition for a Prosperous America ("CPA") is a national organization focused on representing the tax and trade policy interests of domestic manufacturers, farmers, and workers. Founded in 2007, CPA seeks to promote domestic self-sufficiency, quality job opportunities, and the nation's security by advocating for policy that best supports those concerns.

---

[1] No person other than *amici curiae* and their counsel assisted with or made a monetary contribution for preparing or submitting this brief. All parties have consented to the filing of this brief.

# SUMMARY OF ARGUMENT

The District Court erred twice over. *First*, it should never have reached the merits because the Court of International Trade has exclusive jurisdiction over challenges arising from the International Emergency Economic Powers Act (IEEPA). *See* Part I, *infra*. In support of that conclusion, *Amici* proffer an alternative argument based on the plain text of the relevant jurisdictional provisions.

*Second*, on the merits, the district court held that IEEPA does not authorize tariffs, but that was also incorrect. IEEPA authorizes the President to (among other things) "regulate … importation … of … any property" under specified conditions. 50 U.S.C. § 1702(a)(1)(B). The primary merits question is whether this language authorizes the imposition of tariffs on such property. Under binding precedent, it does. *See* Part II, *infra*. Nor does that view violate—or require narrowing from—the major-questions or nondelegation doctrines. *See* Parts III & IV, *infra*. Moreover, the Court lacks authority to second-guess the President's determinations under IEEPA. *See* Part V, *infra*.

Accordingly, the Court should vacate the preliminary injunction and remand this case with instructions to dismiss or transfer.

**ARGUMENT**

## I. The District Court Lacked Jurisdiction.

The Court of International Trade has exclusive jurisdiction over cases arising from statutes that authorize certain tariffs, duties, embargoes, or other similar acts. This regime ensures that the nation's judiciary speaks with one voice on those important matters of international trade. *See K Mart Corp. v. Cartier, Inc.*, 485 U.S. 176, 187–88 (1988).

IEEPA does not expressly provide a cause of action[2] and thus does not state which court has jurisdiction over civil actions arising out of it. Even assuming a cause of action does exist for challenging the President's invocation of IEEPA, such a case would belong in the Court of International Trade because of a separate statutory provision addressing that Court's jurisdiction.

---

[2] One provision implies that IEEPA itself provides no such review. *See* 50 U.S.C. § 1702(c) ("This subsection does not confer or imply any right to judicial review.").

Section 1581(i) of Title 28—which Judge Henderson has labeled a "broad jurisdictional grant"[3]—says that the Court of International Trade "shall have exclusive jurisdiction" over "any civil action commenced against" the federal government where the action "arises out of any law of the United States providing for," *inter alia*, "embargoes … for reasons other than the protection of the public health or safety." 28 U.S.C. § 1581(i)(1), (i)(1)(C).

That imposes a form of categorical approach: if the civil action arises out of a statute providing for embargoes on certain bases, then the action can be heard only in the Court of International Trade—regardless of whether the particular suit actually implicates embargoes. That ensures jurisdiction can be determined quickly and without the merits and jurisdiction becoming entangled. *See Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010) ("[A]dministrative simplicity is a major virtue in a jurisdictional statute.").

IEEPA provides for (among many other things) embargoes to protect the "economy of the United States." 50 U.S.C. § 1701(a). Because

---

[3] *Int'l Lab. Rts. Educ. & Rsch. Fund v. Bush*, 954 F.2d 745, 747 (D.C. Cir. 1992) (Henderson, J., concurring).

that means IEEPA provides for embargoes for a reason other than public health and safety, and because Plaintiffs' civil action arises from IEEPA, each requirement of § 1581(i)(1) is satisfied, as explained below.

Even if there were a doubt, however, the Court should still transfer because any perceived "conflicts" between the Court of International Trade's "exclusive … jurisdiction and the broad jurisdiction of the district courts should be resolved by upholding the exclusivity of the [Court of International Trade's] jurisdiction." *United States v. Universal Fruits & Vegetables Corp.*, 370 F.3d 829, 833 n.7 (9th Cir. 2004).

***Civil Action Against the Federal Government.*** There can be no dispute this is a "civil action commenced against the United States, its agencies, or its officers." 28 U.S.C. § 1581(i)(1). Plaintiffs name President Trump and several other federal officials (in their official capacities) and agencies as Defendants.

***Arises Out of IEEPA.*** This civil action also "arises out of" IEEPA. *Id.* The district court expressly held as much in footnote 4 of its opinion. Section 1581(i) does not say that the "civil action" must be *provided for* or *authorized by* the relevant law (i.e., IEEPA). Rather, Congress used the broader term "arising out of" to indicate a looser causal connection.

The "Supreme Court … has indicated that the phrase 'arising out of' should be broadly construed" in the context of federal statutes. *Metz v. United States*, 788 F.2d 1528, 1533 (11th Cir. 1986). A natural meaning of "arising out of it" is that something is "associated in any way with" something else. *Id.* (quoting *Kosak v. United States*, 465 U.S. 848, 854 (1984)). At the very most, something can be said to arise out of specific "underlying governmental conduct" when the conduct is "'essential' to plaintiff's claim." *Id.* at 1534 (quoting *Block v. Neal*, 460 U.S. 289, 297 (1983)). Further, Congress twice used the word "any" in § 1581(i) (i.e., "any civil action" and "any law") to re-emphasize this broadness. *See United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("[T]he word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'").[4]

---

[4] Although cases like *Metz* and *Kosak* arose in the context of the Federal Tort Claims Act, the Supreme Court has made clear that its interpretation of the phrase "arising out of" in those cases did "not implicate the general rule that 'a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign.'" *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 491–92 (2006) (quoting *Lane v. Pena*, 518 U.S. 187, 192 (1996)). In other words, the Court held that the phrase "arising out of" is naturally broad, even without a thumb on the scale.

This action "aris[es] out of" IEEPA because that law is "associated in any way with" and is "essential" to this civil action, given that the Complaint is entirely premised on IEEPA, its scope, and its use by the President, which prompted this suit. *See Metz*, 788 F.2d at 1533–34. Indeed, the first two Counts of the Complaint are expressly labeled as forms of IEEPA challenges. It makes no difference that Plaintiffs' other claims are framed as violations of the Administrative Procedure Act or constitutional challenges. A plaintiff's choice of a particular cause of action cannot let it escape the broad language in § 1581(i)(1), or else the Court of International Trade's exclusive jurisdiction could be easily skirted. The Supreme Court has held, for example, that a plaintiff cannot evade a statutory bar on claims "*arising out of* assault or battery" simply "by framing her complaint in terms of negligent failure to prevent the assault and battery," because the statute "does not merely bar claims *for* assault or battery" but rather "in sweeping language it excludes any claim *arising out of* assault or battery." *United States v. Shearer*, 473 U.S. 52, 55 (1985) (emphases in original).

Likewise here, all that matters for this element is whether, under the statute's "sweeping language," this civil action arises out of IEEPA.

*Id.* It does, as explained above, because this entire suit is premised on IEEPA and the President's invocation of that law. *See Metz*, 788 F.2d at 1533–34.

**IEEPA Provides for Embargoes on Non-Public-Health-and-Safety Grounds.** The only remaining inquiry is whether IEEPA provides for "embargoes … for reasons other than the protection of the public health or safety." 28 U.S.C. § 1581(i)(1)(C).

IEEPA has long been recognized as providing for embargoes. *See, e.g.*, *Regan v. Wald*, 468 U.S. 222, 225–28 (1984) (holding that IEEPA and the Trading with the Enemy Act both gave the President "essentially the same" powers, including "broad authority to impose comprehensive embargoes on foreign countries").[5] And that embargo power can be triggered on the grounds of protecting the "economy of the United States." 50 U.S.C. § 1701(a). That is certainly not a "public health and safety" ground. *See K Mart*, 485 U.S. at 184 (distinguishing embargoes based on

---

[5] The Supreme Court has held that § 1581(i) uses "the ordinary meaning of the word 'embargoes,'" which are "government order[s] prohibiting commercial trade with individuals or businesses of other nations," or "a policy which prevents goods from entering a nation and which may be imposed on a product or on an individual country." *K Mart*, 485 U.S. at 184 (cleaned up).

"trade policy" from embargoes based on "public health" or "safety" grounds, which addressed things like adulterated foods or vehicles that do not conform to federal safety standards).

Taken together, this means IEEPA provides for embargoes for reasons other than the protection of the public health and safety—and thus satisfies the final requirement under § 1581(i)(1).

To be clear, § 1581(i)(1)(C) does not say that the relevant law must provide for embargoes *exclusively* "for reasons other than the protection of the public health or safety." Rather, so long as IEEPA affirmatively authorizes an embargo for *any reason* other than public health and safety, that is sufficient. And IEEPA undoubtedly does. It is irrelevant whether IEEPA might *also* provide for embargoes on *other* grounds, like public health and safety. *See Int'l Lab. Rts. Educ. & Rsch. Fund*, 954 F.2d at 747 (Henderson, J., concurring) ("The phrase 'providing for' [in § 1581] has a broader meaning than the simple verb 'provide' and can be construed to mean 'relating to,' as the Supreme Court has done in considering this very provision."). The district court therefore erred by concluding that the use of IEEPA for health-and-safety reasons defeats jurisdiction in the Court of International Trade. Order 27 n.12.

Also note that this element of § 1581(i) does not ask what kind of claim the plaintiff brings, or how the relevant law was invoked in this particular challenge. The statute imposes a form of categorical approach: if IEEPA provides for certain types of embargoes (and it does), then it satisfies this requirement. Thus, as other courts have held, the inquiry is "whether that law (rather than the specific claims set forth by the plaintiff) provides for an embargo." *Int'l Lab. Rts. Fund v. Bush*, 357 F. Supp. 2d 204, 209 n.3 (D.D.C. 2004).

That is by design to ensure that the question of jurisdiction is straightforward and largely based on the nature of the statute at issue, rather than disputed parsing of specific claims or arguments. "[A]dministrative simplicity is a major virtue in a jurisdictional statute." *Hertz*, 559 U.S. at 94.

The district court seemed to suggest this approach is incorrect because prior civil suits arising out of IEEPA were not uniformly brought in the Court of International Trade. *See* Order 27 n.12. Of course, recent district courts have—with the exception of the decision below—uniformly transferred these tariff challenges to the Court of International Trade. *See Emily Lay Paper, Inc. v. Trump*, No. 3:25-cv-464 (N.D. Fla.); *Webber*

*v. U.S. Dep't of Homeland Security*, No. 4:25-cv-26 (D. Mont.); *California v. Trump*, No. 3:25-cv-3372 (N.D. Cal.). As to older cases, it appears none addressed how § 1581(i)(1) applies to IEEPA, so there is not even a "drive-by jurisdictional ruling" on the matter. *Wilkins v. United States*, 598 U.S. 152, 160 (2023) (cleaned up).

The district court reasoned that sending all IEEPA cases to the Court of International Trade would mean it is no longer a court of specialized jurisdiction, Order 27 n.12, but that is wrong for two reasons: (1) cases arising under IEEPA are still a specialized and limited set; and (2) § 1581(i) was added in 1980 to "*expand*[] the jurisdiction of the CIT beyond that of the earlier Customs Court," and thereby send more embargo- and tariff-related cases to that court, *Earth Island Inst. v. Christopher*, 6 F.3d 648, 651 (9th Cir. 1993) (emphasis added).

Channeling such suits to the Court of International Trade makes perfect sense: it ensures a single trial-level court hears challenges to civil suits arising out of statutes related to certain trade actions that are national—really, international—in effect. Rather than a multitude of challenges brought in different district courts whenever the President invokes such a law, with each court potentially reaching contradictory

determinations, there will instead be a single court reaching a single determination. That concern is not hypothetical. There were multiple suits filed in different district courts challenging the President's invocation of IEEPA, and all—except this one—have been transferred to the Court of International Trade, as noted above.

The Supreme Court itself has recognized that Congress "enacted the jurisdictional provision" at § 1581 "first and foremost, to remedy the confusion over the division of jurisdiction between the Customs Court (now the Court of International Trade) and the district courts and to '*ensure ... uniformity in the judicial decisionmaking process.*'" *K Mart*, 485 U.S. at 187–88 (emphasis added). Further, the Court of International Trade is more than capable of resolving such disputes, as Congress has given it the same powers in law and equity as a U.S. District Court. 28 U.S.C. § 1585.

Because all requirements of § 1581(i)(1) are met, the Court of International Trade has "exclusive jurisdiction" over Plaintiffs' challenge. 28 U.S.C. § 1581(i); *see also* 28 U.S.C. § 1337(c) (U.S. District Courts lack jurisdiction over all cases in the province of the Court of International Trade). The Court of International Trade and its parent

court, the Federal Circuit, are already entertaining numerous other suits challenging tariffs issued under IEEPA. *See V.O.S. Selections, Inc. v. Trump*, Nos. 25-1812, 25-1813 (Fed. Cir.) (*en banc*); *Princess Awesome, LLC v. United States Customs and Border Protection*, No. 1:25-cv-00078 (Ct. Int'l Trade). This case should be transferred to join them.

## II.  Precedent Dictates That IEEPA Authorizes Tariffs.

The district court also erred on the merits question of whether IEEPA authorizes tariffs.

The Federal Circuit has already answered the question of whether the statutory phrase "regulating importation" includes the power to impose a monetary charge like a tariff. In construing identical language in the Trading With the Enemy Act (TWEA), the Federal Circuit's predecessor for customs matters held the President was authorized to "impos[e] an import duty surcharge" because "impos[ing] duties can be to 'regulate'" the importation of the items on which duties are imposed. *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 575–76 (C.C.P.A. 1975). The Supreme Court has held that IEEPA and the TWEA gave the President "essentially the same" powers. *Regan v. Wald*, 468 U.S. 222, 225–28 (1984).

Supreme Court caselaw on other trade statutes supports the view that IEEPA authorizes tariffs. Most notably, in *Federal Energy Administration v. Algonquin SNG, Inc.*, 426 U.S. 548 (1976)—a decision cited only in passing below—the Supreme Court interpreted the Trade Expansion Act of 1962, as amended by the Trade Act of 1974, where the relevant statutory language authorized the President to "take such action" as he deemed necessary "to adjust the imports of" specified articles. *Id.* at 550. The Court held there was "no support in the language of the statute for [the] contention that the authorization to the President to 'adjust' imports should be read to encompass only quantitative methods, i.e., quotas as opposed to monetary methods, i.e., license fees of effecting such adjustments." *Id.* at 561. In that case, the President had imposed increasing "license fees" on certain petroleum imports, and the Supreme Court held that he clearly had that authority as a form of "action … to adjust imports." *Id.* at 550.

That relevant statutory language in *Algonquin* did not specify license fees or tariffs, yet the Court held the President had the power to impose such "monetary methods." "[L]imiting the President to the use of quotas would effectively and artificially prohibit him from directly

dealing with some of the very problems against which [the statute] is directed." *Id.* at 561–62.

IEEPA similarly allows the President to "regulate … import[s]." 50 U.S.C. § 1702(a)(1)(B). "Regulate" is a synonym for "adjust" (i.e., the word at issue in *Algonquin*). *See Adjust*, Merriam-Webster Thesaurus, https://www.merriam-webster.com/thesaurus/adjust (last visited May 19, 2025). In fact, the Supreme Court has elsewhere held that "'to *regulate*' meant 'to *adjust* by rule or method.'" *NFIB v. Sebelius*, 567 U.S. 519, 550 n.4 (2012) (cleaned up) (emphases added). That closeness in meaning is especially strong because both IEEPA and the statute in *Algonquin* addressed actions taken by the President with respect to imports.

That provides an easy syllogism: the Supreme Court has held that "adjusting imports" allows for charges like tariffs and that "adjusting" means the same as "regulating," and IEEPA authorizes "regulating imports." Taken together, that means Supreme Court precedent dictates that IEEPA authorizes tariffs.

If anything, the contextual statutory language in IEEPA is even more broadly worded than the statute in *Algonquin*, as IEEPA authorizes

the President not only to "regulate" imports, but also to investigate, block, void, nullify, prevent, and prohibit them, along with a wide array of other covered actions, as well. 50 U.S.C. § 1702(a)(1)(B). It would make little sense to conclude that the language in *Algonquin* authorized monetary charges, yet the broader language in IEEPA does not.

Further, Congress enacted IEEPA under the backdrop of the TWEA and the Federal Circuit's decision holding that TWEA authorized the President to impose an "import duty surcharge." *Yoshida*, 526 F.2d at 576; *see* H.R. Rep. No. 95-459, at 5 (1977) (citing *Yoshida* expressly). And, far from changing the relevant statutory text in light of *Yoshida*, Congress copy-pasted it over to IEEPA. "[W]hen Congress 'adopt[s] the language used in [an] earlier act,'" courts "presume that Congress 'adopted also the construction given'" to that language. *Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255, 270 (2020).

For all these reasons, IEEPA authorizes tariffs.

## III. Use of IEEPA for Tariffs Does Not Violate the Major-Questions Doctrine.

The major-questions doctrine primarily reflects courts' skepticism that Congress would provide administrative agencies with great power *without* clearly saying so. Indeed, the Supreme Court's leading case on

the issue indicates a threshold requirement that "the statute at issue …

confers authority upon *an administrative agency*." *West Virginia v. EPA*,

597 U.S. 697, 721 (2022) (emphasis added).

There is good reason to doubt that the same skepticism applies to

statutory grants of power directly to the President, given that he is a

branch of government unto himself, rather than an unelected agency

bureaucrat, as in the *West Virginia* case. "The President occupies a

unique position in the constitutional scheme," and that "unique status

under the Constitution distinguishes him from other executive officials."

*Nixon v. Fitzgerald*, 457 U.S. 731, 749–50 (1982). Unlike when dealing

with agency bureaucrats, it should come as no surprise that Congress

would grant broad powers to the President himself, and thus no inherent

skepticism is warranted for statutes that appear to do so.

At the very least, there is serious cause to doubt that the major-

questions doctrine applies to a statute that gives the President broad

authorities related to his inherent Article II foreign-relations powers, in

particular. "The President is the sole organ of the nation in its external

relations, and its sole representative with foreign nations." *United States

v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319 (1936) (quoting 10 Annals

of Cong. 613 (1800) (statement of John Marshall)); *see also Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 13, 20–21 (2015). When it comes to foreign affairs, "broad grants by Congress of discretion to the Executive are common." *Florsheim Shoe Co., Div. of Interco, Inc. v. United States*, 744 F.2d 787, 795 (Fed. Cir. 1984). "[C]ongressional legislation which is to be made effective through negotiation and inquiry within the international field must often accord to the President a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved." *Curtiss-Wright*, 299 U.S. at 320.

Thus, there is little reason to "hesitate," *West Virginia*, 597 U.S. at 721 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)), before concluding that Congress would grant the President broad authority in a realm where he already possesses significant constitutional powers—and thus the premise of the major-questions doctrine makes little sense in the context of statutes dealing with the President and international relations.

Even if the major-questions doctrine did apply, however, IEEPA satisfies it. As noted above, the Supreme Court in *Algonquin* addressed

quite similar statutory text and held that it authorized monetary charges on imports, and the Federal Circuit agreed decades ago that TWEA authorized similar charges. That means (1) imposing tariffs pursuant to statutory language both similar and identical to that in IEEPA is not the exercise of an "unheralded power," *West Virginia*, 597 U.S. at 724, but rather a use that courts have long approved; and (2) the relevant statutory text provides sufficiently "clear congressional authorization" for such actions, *id.* at 732. Just as importantly, at every turn, the text of IEEPA embodies broadness, not "modest[y]," *id.* at 723–24. Its natural reading authorizes the President to take an extraordinarily wide range of actions, with respect to an extraordinarily wide range of products and transactions. That interpretation was by design—it is not some *post hoc*, overly clever interpretation espoused by an agency trying to circumvent Congress.

## IV. IEEPA Does Not Violate the Nondelegation Doctrine.

Although the district court did not reach the issue, some parties below argued that the nondelegation doctrine should influence the court's interpretation of IEEPA. Again, the *Algonquin* decision resolves this matter. There, the Supreme Court expressly rejected a nondelegation

challenge to the statute in that case, which (as discussed above) broadly granted the President power to "take such action … to adjust the imports of" specified articles, if the article's importation "threaten[s] to impair the national security." *Algonquin*, 426 U.S. at 550.

The Court's nondelegation analysis admittedly is not lengthy, but it squarely held that the statute satisfies existing nondelegation requirements because it "establishes clear preconditions to Presidential action," including a finding that the article "'is being imported into the United States in such quantities or under such circumstances as to threaten to impair the *national security*,'" and "[a]rticulates a series of specific factors to be considered by the President in exercising his authority." *Id.* at 559 (emphasis added).

IEEPA likewise requires a finding of an "unusual and *extraordinary threat*, which has its source in whole or substantial part outside the United States, to the *national security*, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a) (emphases added).

*Algonquin* also expressly "reject[ed] [the] suggestion that we must construe [the statutory text] narrowly in order to avoid 'a serious question of unconstitutional delegation of legislative power.'" *Algonquin*,

426 U.S. at 558–59. In other words, *Algonquin* also forecloses using constitutional avoidance to narrowly construe IEEPA.

Even as an originalist matter, there is a good argument that IEEPA would pass nondelegation muster. The Supreme Court has long held that nondelegation "limitations are … less stringent in cases where the entity exercising the delegated authority itself possesses independent authority over the subject matter." *United States v. Mazurie*, 419 U.S. 544, 556–57 (1975). Foremost among this class are statutes "confid[ing] to the President … an authority which was cognate to the conduct by him of the foreign relations of the government," *Panama Refining Co. v. Ryan*, 293 U.S. 388, 422 (1935), as "many foreign affairs powers are constitutionally vested in the president under Article II," *Gundy v. United States*, 588 U.S. 128, 159 (2019) (Gorsuch, J., dissenting). Indeed, the Supreme Court's first foray into the nondelegation thicket was a challenge to the embargo authorized by the 1809 Non-Intercourse Act, which permitted the President to decide whether to lift an embargo on Great Britain. There, the Court blessed a broad delegation to the President in such matters and explained it saw "no sufficient reason[] why the legislature should not exercise its discretion in reviving the [Non-Intercourse Act],

either expressly or conditionally, as their judgment should direct." *The Aurora*, 11 U.S. 382, 388 (1813).

Thus, "statutes relating to trade and commerce with other nations," *Marshall Field & Co. v. Clark*, 143 U.S. 649, 691 (1892), including "embargoes" and "suspending commercial intercourse with [certain countries]," *id.* at 684–85, arguably need not require the same specificity to pass nondelegation as would domestic revenue-raising statutes, given that foreign relations are already "cognate" to the President, *Curtiss-Wright*, 299 U.S. at 327. As Justice Thomas has explained, delegation of powers regarding embargoes and tariffs "arguably did not involve an exercise of core legislative power" and thus would not necessarily trigger the same nondelegation scrutiny as something like domestic taxation. *DOT v. Ass'n of Am. R.R.s*, 575 U.S. 43, 80 (2015) (Thomas, J., concurring in the judgment).

Professor Michael McConnell has explained that this approach "provide[s] a superior grounding for *Field v. Clark*, where Congress gave the President a bargaining chip to use in foreign negotiations, and *Curtiss-Wright*, which recognized a broader range of legitimate delegation in the foreign affairs arena than in domestic law," and it "may

also explain why stronger nondelegation norms survive in the context of power that is especially central to the legislative branch, such as domestic taxation." Michael W. McConnell, *The President Who Would Not Be King: Executive Power Under the Constitution* 334 (2020).

This would also track English practice, where (post-Glorious-Revolution) Parliaments imposed strict controls on domestic taxation, down to the penny or percentage, but the King's "role in protecting shipping engaged in overseas trade" meant that Parliament could grant customs powers on terms "much more liberal[]" than it could for domestic taxation. Paul Einzig, *The Control of the Purse: Progress and Decline of Parliament's Financial Control* 65–66 (1959). Accordingly, Kings often had broad powers to issue a new "book of rates" for duties, something that would have been unthinkable for domestic taxation. *Id.* at 69.

This all means that because tariffs and duties implicate foreign relations, a core Article II authority, Congress could legislate with less specificity and leave more policy decisions for the President to decide in the first instance.

Another area of overlapping congressional and presidential powers—and thus similarly subject to lessened nondelegation scrutiny—

is the realm of national defense, which IEEPA also implicates. The Constitution empowers Congress "[t]o … provide for the common Defence and general Welfare of the United States," U.S. Const. art. I, § 8, cl. 1, and the Framers understood that safeguarding the common defense required *executive* flexibility in responding to national emergencies. Alexander Hamilton explained that the powers essential to the common defense "ought to exist without limitation" because "it is impossible to foresee or define the extent and variety of national exigencies, or the correspondent extent and variety of the means which may be necessary to satisfy them." The Federalist No. 23 (1787) (Alexander Hamilton).

Early congressional practice confirmed this understanding: in 1794, just a few years after ratification, Congress authorized President George Washington to "lay, regulate and revoke Embargoes" whenever "in his opinion, the public safety shall so require." Ch. 41, 1 Stat. 372. This 1794 Act, like IEEPA, gave the President flexibility, under emergency circumstances, to broadly regulate imports. *Compare id.* ("[T]he President … is authorized … to lay an embargo … under such regulations as the circumstances of the case may require"), *with* 50 U.S.C.

§ 1702(a)(1)(B) ("[T]he President may, under such regulations as he may prescribe … regulate … importation … of … property").

IEEPA thus lies at the heart of international relations *and* national defense, two areas where Congress has its widest latitude from a nondelegation perspective.

Some *amici* supporting Plaintiffs argued below that the President lacks inherent constitutional authority to impose tariffs. But the question here is not whether the President has inherent Article II authority to impose tariffs *absent* any pre-authorization by Congress. Rather, the questions here are whether Congress authorized tariffs in IEEPA and (if so) whether that authorization is sufficiently specific to conform to nondelegation principles. As explained above, IEEPA does authorize tariffs, and *Algonquin* dictates that a nondelegation challenge to that language should fail.

Finally, the same *amici* suggested below, and the district court seemed to agree, *see* Order 19, that *Algonquin* was different because the statute there required complex procedural requirements to be satisfied before the President could impose monetary charges. But those procedural hurdles are irrelevant from a nondelegation perspective. *See*

*United States v. Rock Royal Co-Op.*, 307 U.S. 533, 576 (1939) ("[P]rocedural safeguards cannot validate an unconstitutional delegation."). For the nondelegation inquiry, the statute either imposes sufficient substantive limitations, or not. And under *Algonquin*, IEEPA passes muster.[6]

## V. The Court Cannot Second-Guess the President's Determinations Under IEEPA.

Nor can courts review or second-guess the President's findings and determinations to trigger IEEPA. In the related context of TWEA, the Supreme Court has held that "[m]atters relating 'to the conduct of foreign relations … are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" *Regan*, 468 U.S. at 242 (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952)).

---

[6] Nor must the nondelegation test be the same for domestic taxes and tariffs simply because both are in Article I, Section 8. The Framers used different terms for these concepts, indicating that they have different meanings; moreover, Section 8 includes such disparate powers as regulating naturalization and creating lower federal courts, yet presumably Congress could not authorize the President to create lower federal courts under the same types of broad and open-ended statutory language routinely used and approved in the immigration context.

In *Regan*, the challengers "argue[d] that there is no 'emergency' at the present time," but the Court declined to challenge the President's contrary view. *Id.* "[C]ourts have not normally reviewed 'the essentially political questions surrounding the declaration or continuance of a national emergency,'" as the "statute contained no standards by which to determine whether a national emergency existed or continued; in fact, Congress had delegated to the President the authority to define all of the terms in that subsection of the TWEA including 'national emergency,' as long as the definitions were consistent with the purposes of the TWEA." *United States v. Spawr Optical Rsch., Inc.*, 685 F.2d 1076, 1080 (9th Cir. 1982).

The Federal Circuit has likewise noted—specifically in the IEEPA context—that "to the extent that the plaintiffs' inquiry into the 'true facts' of the [declared] crisis would seek to examine the President's motives and justifications for declaring a national emergency, such an inquiry would likely present a nonjusticiable political question." *Chang v. United States*, 859 F.2d 893, 896 n.3 (Fed. Cir. 1988).

But even if some minimal judicial review were available, it would be extraordinarily deferential, lest the courts risk substituting their own

judgment for the President's in matters of international relations and national defense. The Supreme Court recently reaffirmed "the deference traditionally accorded the President" on such matters. *Trump v. Hawaii*, 585 U.S. 667, 686 (2018). Here, the President declared the necessary emergency in part because the nation's "military readiness" and "national security posture" have been "compromised" due to decreased "domestic production capacity." *Regulating Imports With a Reciprocal Tariff to Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, Exec. Order No. 14,257, 90 Fed. Reg. 15,041, 15,044–45 (Apr. 7, 2025). That relationship is not just logical but one already recognized by the Federal Circuit. *See Yoshida*, 526 F.2d at 580. It accordingly passes any minimal scrutiny.

## CONCLUSION

The Court should vacate the preliminary injunction and remand this case with instructions to dismiss or transfer it.

June 30, 2025

Respectfully submitted,

/s/ R. Trent McCotter
R. TRENT MCCOTTER
BOYDEN GRAY PLLC
800 Connecticut Ave. NW, Suite 900
Washington, DC 20006
(202) 706-5488
tmccotter@boydengray.com

DANIEL Z. EPSTEIN
AMERICA FIRST LEGAL
   FOUNDATION
611 Pennsylvania Ave. SE #231
Washington, DC 20003
202-964-3721
daniel.epstein@aflegal.org

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the typeface and type style requirements of Federal Rules of Appellate Procedure 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook and 14- point font. There is no word limitation that specifically applies to an amicus brief at the emergency-motion stage. This brief contains 5394 words, excluding the exempt portions.

*/s/ R. Trent McCotter*
R. Trent McCotter

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing document with the Clerk of this Court by using the CM/ECF system, which will serve all parties automatically.

*/s/ R. Trent McCotter*
R. Trent McCotter