ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 30, 2025

No. 25-5202

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

LEARNING RESOURCES, INC.; HAND2MIND, INC.,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, IN HIS OFFICIAL
CAPACITY; KRISTI NOEM, SECRETARY OF THE DEPARTMENT OF HOMELAND
SECURITY, IN HER OFFICIAL CAPACITY; UNITED STATES DEPARTMENT
OF HOMELAND SECURITY; SCOTT BESSENT, SECRETARY OF THE
TREASURY, IN HIS OFFICIAL CAPACITY; UNITED STATES DEPARTMENT
OF THE TREASURY; HOWARD W. LUTNICK, SECRETARY OF
COMMERCE, IN HIS OFFICIAL CAPACITY; UNITED STATES DEPARTMENT
OF COMMERCE; RODNEY S. SCOTT, COMMISSIONER OF CUSTOMS &
BORDER PROTECTION, IN HIS OFFICIAL CAPACITY; UNITED STATES
CUSTOMS AND BORDER PROTECTION; JAMIESON GREER, U.S.
TRADE REPRESENTATIVE, IN HIS OFFICIAL CAPACITY; OFFICE OF THE
UNITED STATES TRADE REPRESENTATIVE,

*Defendants-Appellants*.

On Appeal from the United States District Court for the District of
Columbia, No. 25-cv-01248-RC

**RESPONSE BRIEF FOR PLAINTIFFS-APPELLEES
LEARNING RESOURCES, INC. AND HAND2MIND, INC.**

Pratik A. Shah
James E. Tysse
Matthew R. Nicely
Daniel M. Witkowski
Kristen E. Loveland
AKIN GUMP STRAUSS
 HAUER & FELD LLP
2001 K Street, N.W.
Washington, D.C. 20006
(202) 887-4000
pshah@akingump.com

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1)(A)-(B), Learning Resources, Inc. and hand2mind inc. submit this certificate.

**A.    Parties and Amici:**  The following provides the current parties and amici in this action:

*Plaintiffs-Appellees*:    Learning Resources, Inc.; and hand2mind, inc.

*Defendants-Appellants*:    Donald J. Trump, President of the United States, in his official capacity; Kristi Noem, Secretary of the Department of Homeland Security, in her official capacity; United States Department of Homeland Security; Scott Bessent, Secretary of the Treasury, in his official capacity; United States Department of the Treasury; Howard W. Lutnick, Secretary of Commerce, in his official capacity; United States Department of Commerce; Rodney S. Scott, Commissioner of Customs & Border Protection, in his official capacity; United States Customs and Border Protection; Jamieson Greer, U.S. Trade Representative, in his official capacity; and Office of the United States Trade Representative.

*Amici*:    Before the district court, America First Legal Foundation; Emily Ley Paper, Inc., doing business as Simplified; Kilo Brava LLC; Bambola LLC; Kim's Clothes and Fashion LLC; Rokland LLC; George F. Allen; Steven G. Calabresi; Joshua A. Claybourn; John C. Danforth; Richard A. Epstein; Charles T. Hagel; Harold Hongju Koh; Gerard N. Magliocca; Michael W. McConnell; Michael

i

B. Mukasey; Alan O. Sykes; John Daniel Tinder; Peter J. Wallison; and Philip Zelikow participated as amici curiae. Before this Court, America First Legal Foundation and the Coalition for a Prosperous America have participated as amici curiae; and the Washington Legal Foundation; George F. Allen; Joshua A. Claybourn; John C. Danforth; Richard A. Epstein; Charles T. Hagel; Harold Hongju Koh; Gerard N. Magliocca; Michael B. Mukasey; Alan O. Sykes; John Daniel Tinder; Alexander Volokh; Peter J. Wallison; Philip Zelikow; Consumer Watchdog; the Brennan Center for Justice at New York University School of Law; and the Institute for Policy Integrity at New York University School of Law have filed notices of intent to participate as amici curiae.

**B.    Rulings Under Review:**

The rulings under review are the (1) Order Denying Defendants' Motion to Transfer Venue; Granting Plaintiffs' Motion for a Preliminary Injunction, dated May 29, 2025 (JA87); (2) Memorandum Opinion Denying Defendants' Motion to Transfer Venue; Granting Plaintiffs' Motion for a Preliminary Injunction, dated May 29, 2025 (JA89); and (3) Order Setting Preliminary Injunction Bond, dated May 29, 2025 (JA122), by the Honorable Rudolph Contreras, United States District Judge.

**C.    Related Cases:**

This case has not previously been before this Court or any other court other than the district court. A Petition for Writ of Certiorari Before Judgment is currently

pending in the Supreme Court of the United States.  *See Learning Resources, Inc., et al. v. Donald Trump, President of the United States, et al.*, No. 24-1287 (U.S.). We are not aware of any other related cases within the meaning of the Court's Rule 28(a)(1)(C).

/s/ Pratik A. Shah
Pratik A. Shah

**TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES.................i

TABLE OF AUTHORITIES.........................................................................vi

GLOSSARY .......................................................................................... xvii

STATEMENT OF ISSUES .........................................................................1

STATUTES AND REGULATIONS ..............................................................1

INTRODUCTION .....................................................................................1

STATEMENT OF THE CASE......................................................................4

      A.   The Constitution Grants Congress The Exclusive Power
          To Set Tariff Policy ...................................................................4

      B.   The International Emergency Economic Powers Act.................5

      C.   The President Bypasses Congress To Impose Tariffs
          Through IEEPA .........................................................................6

           1.   *The China Trafficking Orders*.............................................6

           2.   *The Reciprocal Tariff Orders* .............................................7

      D.   IEEPA Tariffs Have Major Economic And Political
          Consequences............................................................................9

      E.   IEEPA Tariffs Are Severely Harming Plaintiffs......................13

      F.   Procedural History ..................................................................14

      G.   The Court Of International Trade Actions ...............................15

SUMMARY OF ARGUMENT....................................................................16

STANDARD OF REVIEW .......................................................................18

ARGUMENT .........................................................................................19

    I.   THE DISTRICT COURT PROPERLY EXERCISED
       JURISDICTION...............................................................................19

      A.   Plaintiffs' Action Arises Out Of IEEPA, Which Is Not A
          "Law *** Providing For Tariffs" .............................................19

      B.   Plaintiffs' Action Does Not Arise Out Of The HTSUS Or
          Modifications Thereto..............................................................24

      C.   The CIT Is Owed No Deference On The Jurisdictional
          Question ..................................................................................29

II.     IEEPA DOES NOT PROVIDE FOR TARIFFS...................................30

        A.     IEEPA's Text And Structure Show That Congress Did
               Not Authorize Tariffs .................................................................31

               1.     *The Power To Tariff Or Tax Is Fundamentally
                      Different From The Power To Regulate* .........................31

               2.     *Statutory Context Confirms The Power To
                      "Regulate" Does Not Encompass The Power To
                      "Tariff"* ...........................................................................38

        B.     Historical Practice Confirms That IEEPA Does Not
               Authorize Tariffs ........................................................................42

               1.     *Trading With The Enemy Act And Trade Act Of
                      1974* ..................................................................................42

               2.     *Congress Enacts IEEPA To Limit Emergency
                      Authority* ..........................................................................45

        C.     Constitutional Principles Reinforce That IEEPA Does
               Not Authorize Tariffs. ................................................................46

III.    THE DISTRICT COURT DID NOT ABUSE ITS
        DISCRETION IN ISSUING A PRELIMINARY INJUNCTION
        LIMITED TO PLAINTIFFS ................................................................52

CONCLUSION .............................................................................................56

ADDENDUM

     28 U.S.C. § 1581.............................................................................Add. 1

     50 U.S.C. § 1701.............................................................................Add. 4

     50 U.S.C. § 1702.............................................................................Add. 5

     U.S. Const. art. I, § 8, cl. 1 ...........................................................Add. 8

     U.S. Const. art. I, § 8, cl. 3 ...........................................................Add. 9

     U.S. Const. art. I, § 9, cl. 5 .........................................................Add. 10

# TABLE OF AUTHORITIES

<u>CASES</u>:

*Alabama Ass'n of Realtors v. DHS*,
  594 U.S. 758 (2021)........................................................................48

*American Air Parcel Forwarding Co. v. United States*,
  515 F. Supp. 47 (Ct. Int'l Trade 1981) ............................................20

*American Fed'n of Gov't Emps., Nat'l Council of HUD Locs. Council
  222, AFL-CIO v. Federal Lab. Rels. Auth.*,
  99 F.4th 585 (D.C. Cir. 2024)...........................................................41

*Armour & Co. v. Freeman*,
  304 F.2d 404 (D.C. Cir. 1962)..........................................................53

*Association for Women in Sci. v. Califano*,
  566 F.2d 339 (D.C. Cir. 1977)..........................................................27

*Biden v. Nebraska*,
  600 U.S. 477 (2023)..............................................................37, 47, 48

*Bolivarian Republic of Venez. v. Helmerich & Payne Int'l Drilling
  Co.*,
  581 U.S. 170 (2017).....................................................................22, 23

*BP P.L.C. v. Mayor & City Council of Baltimore*,
  141 S. Ct. 1532 (2021)......................................................................46

*Brownback v. King*,
  592 U.S. 209 (2021).....................................................................22, 23

*Chen v. I.N.S.*,
  95 F.3d 801 (9th Cir. 1996) ..............................................................27

*Coalition to Pres. the Integrity of Am. Trademarks v. United States*,
  790 F.2d 903 (D.C. Cir. 1986)..........................................................29

*Cochise Consultancy, Inc. v. United States ex rel. Hunt*,
  587 U.S. 262 (2019)..........................................................................34

*Consumers Union of U.S., Inc. v. Kissinger*,
  506 F.2d 136 (D.C. Cir. 1974)............................................................5

*Corus Staal BV v. United States*,
  493 F. Supp. 2d 1276 (Ct. Int'l Trade 2007) .....................................20

*Diginet, Inc. v. Western Union ATS, Inc.*,
  958 F.2d 1388 (7th Cir. 1992) ...........................................................33

*Dreyfus v. Von Finck*,
  534 F.2d 24 (2d Cir. 1976) ................................................................26

*DSE, Inc., v. United States*,
  169 F.3d 21 (D.C. Cir. 1999)............................................................55

*Emily Ley Paper, Inc. v. Trump*,
  2025 WL 1482771 (N.D. Fla. May 20, 2025) ...................................26

*FCC v. Consumers' Rsch.*,
  Nos. 24-354, 24-442, 2025 WL 1773630 (U.S. June 27,
  2025) ........................................................................32, 36, 37, 49, 51

*Federal Energy Admin. v. Algonquin SNG, Inc.*,
  426 U.S. 548 (1976)................................................................40, 41, 42

*Garland v. Aleman Gonzalez*,
  596 U.S. 543 (2022).................................................................22, 23, 24

*Georgia v. President of the U.S.*,
  46 F.4th 1283 (11th Cir. 2022) .........................................................49

*Gibbons v. Ogden*,
  22 U.S. (9 Wheat) 1 (1824)..........................................................31, 32

*Gonzalez v. United States*,
  553 U.S. 242 (2008)............................................................................46

*Greenblatt v. Delta Plumbing & Heating Corp.*,
  68 F.3d 561 (2d Cir. 1995) ................................................................21

*Gunn v. Minton*,
  568 U.S. 251 (2013)............................................................................20

*Hanson v. District of Columbia*,
   120 F.4th 223 (D.C. Cir. 2024)..........................................................19

*Hansson v. Norton*,
   411 F.3d 231 (D.C. Cir. 2005)...........................................................20

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
   333 F.3d 156 (D.C. Cir. 2003)...........................................................40

*International Lab. Rights Fund v. Bush*,
   357 F. Supp. 2d 204 (D.D.C. 2004).....................................................20

*J.W. Hampton, Jr., & Co. v. United States*,
   276 U.S. 394 (1928)........................................................................51

*K Mart Corp. v. Cartier, Inc.*,
   485 U.S. 176 (1988)...........................................................28, 29, 30

*Kentucky v. Biden*,
   23 F.4th 585 (6th Cir. 2022) .............................................................49

*Lackey v. Stinnie*,
   145 S. Ct. 659 (2025).......................................................................40

*League of Women Voters of United States v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016)........................................................52, 54

*Local 1498, Am. Fed'n of Gov't Emp. v. American Fed'n of Gov't Emps.*,
   522 F.2d 486 (3d Cir. 1975) ..............................................................27

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024)...................................................................42, 47

*Louisiana v. Biden*,
   55 F.4th 1017 (5th Cir. 2022) ...........................................................49

*Lovitky v. Trump*,
   949 F.3d 753 (D.C. Cir. 2020)...........................................................22

*McCulloch v. State*,
   17 U.S. (4 Wheat) 316 (1819) ...........................................................37

*Miami Free Zone Corp. v. Foreign Trade Zones Bd.*,
  22 F.3d 1110 (D.C. Cir. 1994)...............................................................28, 29, 30

*Nalco Co. v. U.S. E.P.A.*,
  786 F. Supp. 2d 177 (D.D.C. 2011)....................................................................53

*National Fed'n of Indep. Bus. v. Department of Lab., Occupational
  Safety & Health Admin.*,
  595 U.S. 109 (2022)............................................................................................47

*National Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012)............................................................................................32

*National Wildlife Fed'n v. Babbitt*,
  No. 88-cv-0301, 1993 WL 304008 (D.D.C. July 30, 1993)..............................27

*Natural Res. Def. Council, Inc. v. Morton*,
  337 F. Supp. 167 (D.D.C. 1971).........................................................................55

*Nebraska v. Su*,
  121 F.4th 1 (9th Cir. 2024) .................................................................................49

*Real v. Simon*,
  510 F.2d 557 (5th Cir. 1975) ..............................................................................39

*Schaper Mfg. Co., a Div. of Kusan. Inc. v. Regan*,
  566 F. Supp. 894 (Ct. Int'l Trade 1983) ...........................................................20

*SCM Corp. v. U.S. Int'l Trade Comm'n*,
  549 F.2d 812 (D.C. Cir. 1977)......................................................................29, 30

*Shekoyan v. Sibley Int'l Corp.*,
  217 F. Supp. 2d 59 (D.D.C. 2002)......................................................................27

*Sierra Club v. United States Dep't of Energy*,
  134 F.4th 568 (D.C. Cir. 2025)...........................................................................27

*TikTok Inc. v. Garland*,
  122 F.4th 930 (D.C. Cir. 2024)...........................................................................22
  145 S. Ct. 57 (2025)............................................................................................22

*United States v. Hillie*,
  14 F.4th 677 (D.C. Cir. 2021).............................................................................39

ix

*United States v. Yoshida Int'l, Inc.*,
    526 F.2d 560 (C.C.P.A. 1975) ..........................................................24, 44, 45, 46

*Utility Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014)...........................................................................................48

*V.O.S. Selections, Inc. v. United States*,
    772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025) ................................................15, 26

*Van Loon v. Department of the Treasury*,
    122 F.4th 549 (5th Cir. 2024) ...........................................................................22

*Webber v. DHS*,
    2025 WL 1207587 (D. Mont. Apr. 25, 2025)....................................................26

*West Virginia v. Env't Prot. Agency*,
    597 U.S. 697 (2022).................................................................................38, 48, 49

*Whitman v. American Trucking Ass'ns*,
    531 U.S. 457 (2001)...........................................................................................51

*Wisconsin Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985)...........................................................................53

*Yates v. United States*,
    574 U.S. 528 (2015)...........................................................................................38

*Yoshida Int'l, Inc. v. United States,*
    378 F. Supp. 1155 (Cust. Ct. 1974) ..................................................................44

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)...........................................................................................50

*Ysleta del Sur Pueblo v. Texas*,
    596 U.S. 685 (2022)...........................................................................................32

*Zukerman v. United States Postal Serv.*,
    961 F.3d 431 (D.C. Cir. 2020)...........................................................................29

**C**ONSTITUTION AND **S**TATUTES:

U.S. C**ONST**.
 art. I, § 8, cl. 1 ................................................................4, 31
 art. I, § 8, cl. 3 ...................................................................31
 art. I, § 9, cl. 5 .................................................2, 17, 34, 41

2 U.S.C.
 § 622(8)(B)(1) ...................................................................36

12 U.S.C.
 § 5491(a) ............................................................................35

15 U.S.C.
 § 78k(a)(2) .........................................................................35

16 U.S.C.
 § 460bbb-9(a) ....................................................................36

19 U.S.C.
 § 1323 ...................................................................................4
 § 1332a(b) .............................................................................4
 § 1336 ...................................................................................4
 § 1338 ...................................................................................4
 § 1484(a)(2)(B) ..................................................................39
 § 1671 ...................................................................................4
 § 1671a .................................................................................4
 § 1671b .................................................................................4
 § 1671c .................................................................................4
 § 1671d .................................................................................4
 § 1671e .................................................................................4
 § 1671f .................................................................................4
 § 1673 ...................................................................................4
 § 1673a .................................................................................4
 § 1673b .................................................................................4
 § 1673c .................................................................................4
 § 1673d .................................................................................4
 § 1673e .................................................................................4
 § 1673f .................................................................................4

19 U.S.C. (cont.)

§ 1673g...................................................................................................4
§ 1673h...................................................................................................4
§ 1675.....................................................................................................4
§ 1821.....................................................................................................4
§ 1862(a).........................................................................................4, 41
§ 1862(c)..............................................................................................41
§ 1981.....................................................................................................4
§ 2111.....................................................................................................4
§ 2114d...................................................................................................4
§ 2132(a).....................................................................................4, 37, 43
§ 2134.....................................................................................................4
§ 2135.....................................................................................................4
§ 2251.....................................................................................................4
§ 2252.....................................................................................................4
§ 2253.....................................................................................................4
§ 2254.....................................................................................................4
§ 2411.....................................................................................................4
§ 2412.....................................................................................................4
§ 2413.....................................................................................................4
§ 2414.....................................................................................................4
§ 2415.....................................................................................................4
§ 2416.....................................................................................................4
§ 2417.....................................................................................................4
§ 2418.....................................................................................................4
§ 2419.....................................................................................................4
§ 2492.....................................................................................................4
§ 2902.....................................................................................................4
§ 3004(c)...............................................................................................25
§ 3004(c)(1)..........................................................................................26
§ 3521.....................................................................................................4
§ 3803.....................................................................................................4
§ 4031.....................................................................................................4
§ 4032.....................................................................................................4
§ 4063.....................................................................................................4
§ 4082.....................................................................................................4
§ 4513.....................................................................................................4

28 U.S.C.

§ 1331......................................................................................19, 20, 21

§ 1346.................................................................................................19

§ 1581(i) ................................................ 19, 20, 21, 24, 26, 28

§ 1581(i)(1)..............................................................................14, 19

§ 1581(i)(1)(B)........................................................................16, 19

§ 1582(a).............................................................................................24

§ 1582(a) (1970) ...............................................................................24

47 U.S.C.

§ 201(b)...............................................................................................36

§ 254(b)(5)..........................................................................................36

§ 254(d)...............................................................................................36

§ 254(e)...............................................................................................36

49 U.S.C.

§ 40117(j)............................................................................................36

50 U.S.C.

§ 1701.................................................................................................22

§ 1701(a) ..............................................................................................5

§ 1702..............................................................................................5, 22

§ 1702(a)............................................................................................33

§ 1702(a)(1)(A)..................................................................................34

§ 1702(a)(1)(B) ................................... 5, 6, 17, 34, 38, 39, 45

§ 1702(a)(2)........................................................................................40

Pub. L. No. 93-618, 88 Stat. 1978 (1975)................................43

**O**THER **A**UTHORITIES:

*'A matter of survival': Small Businesses Speak Out on Tariffs,* U.S.
C HAMBER OF C OM. (last updated: July 15, 2025), ................................12

Berkowitz, Ben, *The only trade certainty is uncertainty,* A XIOS (June
13, 2025) ..........................................................................................12

Boehm, Eric, *Peter Navarro Says Tariffs Will Be a $6 Trillion Tax
Increase, but Also a Tax Cut,* R EASON M AG. (Mar. 31, 2025)...........11

Breuninger, Kevin, *Trump's 50% Brazil tariff stretches emergency
powers already facing court challenge,* CNBC (Jul. 10, 2025)...........9

CASEY, CHRISTOPHER A. & PAUL K. KERR, R46814, CONG. RSCH.
SERV., THE U.S. EXPORT CONTROL SYSTEM AND THE EXPORT
CONTROL REFORM ACT OF 2018 (2021) ............................................................33

CASEY, CHRISTOPHER A., CONG. RSCH. SERV., IF11030, U.S. TARIFF
POLICY: OVERVIEW (2025)..................................................................................32

Chang, Agnes, et al., *How Much Are Tariffs on Chinese Goods? It's
Trickier Than You Think*, N.Y. TIMES (Apr. 12, 2025) .......................................8

*China Trade Summary*, OFF. OF THE U.S. TRADE REPRESENTATIVE
(last visited July 22, 2025)...............................................................................10

Collins, Michael, '*Two Dolls Instead of 30': Trump Acknowledges
Prices Will Force Consumers to Cut Back*, USA TODAY (Apr. 30,
2025) .................................................................................................................12

Exec. Order No. 13,219, *Blocking Property of Persons Who Threaten
International Stabilization Efforts in the Western Balkans*, 66 Fed.
Reg. 34,777 (Jun. 26, 2001)................................................................................6

Exec. Order No. 13,581, *Blocking Property of Transnational Criminal
Organizations*, 76 Fed. Reg. 44,757 (Jul. 24, 2011) ...........................................6

Exec. Order No. 14,195, *Imposing Duties to Address the Synthetic
Opioid Supply Chain in the People's Republic of China*, 90 Fed.
Reg. 9,121 (Feb. 1, 2025) ................................................................................6, 7

Exec. Order No. 14,228, *Further Amendment to Duties Addressing the
Synthetic Opioid Supply Chain in the People's Republic of China*,
90 Fed. Reg. 11,463 (Mar. 3, 2025)....................................................................7

Exec. Order No. 14,256, *Further Amendment to Duties Addressing the
Synthetic Opioid Supply Chain in the People's Republic of China
as Applied to Low-Value Imports*, 90 Fed. Reg. 14,899 (Apr. 2,
2025) ...................................................................................................................7

Exec. Order No. 14,257, *Regulating Imports with a Reciprocal Tariff
to Rectify Trade Practices that Contribute to Large and Persistent
Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041
(Apr. 2, 2025)......................................................................................................7

xiv

Exec. Order No. 14,259, *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports From the People's Republic of China*, 90 Fed. Reg. 15,509 (Apr. 8, 2025)........................8

Exec. Order No. 14,266, *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*, 90 Fed. Reg. 15,625, 15,626 (Apr. 9, 2025)............................................................8

Exec. Order No. 14,298, *Modifying Reciprocal Tariff Rates To Reflect Discussions With the People's Republic of China*, 90 Fed. Reg. 21,831 (May 12, 2025) ..........................................................8

FED. R. CIV. P. 65(c).............................................................55

H.R. 6394, 96th Cong. § 201(a) 2d Sess. 1980.........................28

H.R. REP. NO. 95-459 (1977)...........................................45, 46

Interview with Howard Lutnick, Secretary of Commerce, Fox News (June 1, 2025)....................................................................55

IRWIN, DOUGLAS A., CLASHING OVER COMMERCE: A HISTORY OF U.S. TRADE POLICY (2017) ................................................................4

Lawder, David, *US customs duties top $100 billion for first time in a fiscal year*, REUTERS (Jul. 11, 2025)................................11

Peck, Emily, *Midsize businesses struggle with high tariff costs*, AXIOS (June 12, 2025).....................................................................12

Picchi, Aimee, *Trump reveals these 2 new types of tariffs on what he calls "Liberation Day,"* CBS NEWS (Apr. 2, 2025).........................10

Proclamation No. 4074, 36 Fed. Reg. 15,724, 15,724 (Aug. 17, 1971).................43

Reddy, Sudeep, *Reality Check: What Trump's Supposed Retreat Really Means in a Historic Trade* War, POLITICO (Apr. 10, 2025) ....................11

*Regulate*, THE CONCISE OXFORD DICTIONARY OF CURRENT ENGLISH (6th ed. 1976)........................................................................31

*Regulate*, WEBSTER'S THIRD INTERNATIONAL DICTIONARY (1986) ........................32

xv

Roberts, Ken, *2024 Trade Tops $5 Trillion, Exports Top $2 Trillion, Imports Above $3 Trillion*, FORBES (Feb. 5, 2025), ...........................................10

Rubin, Richard, *Bessent Says Tariff Revenue Could Reach $600 Billion Annually*, WALL ST. J. (Apr. 4, 2025).....................................................10

S. REP. NO. 95-466 (1977) ................................................................................45

Schulz, Bailey, *Trump is rolling out more tariffs this month. Where does the tariff money go?*, USA TODAY (Apr. 4, 2025) ....................................10

Smith, Colby, *U.S. Inflation Accelerated in June as Trump's Tariffs Pushed Up Prices*, N.Y. TIMES (July 15, 2025) ....................................12

Special Message to the Congress Congress Proposing Trade Reform Legislation, 1973 PUB. PAPERS 258 (Apr. 10, 1973)..........................................43

*State of U.S. Tariffs: May 12, 2025*, THE BUDGET LAB (May 12, 2025)................12

Swanson, Ana, *U.S. Trade Deficit Hit Record in 2024 as Imports Surged*, N.Y. TIMES (Feb. 5, 2025).......................................................10

*Tariff*, RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 1454 (1973).........................................................................................................32

THE FEDERALIST NO. 58 (James Madison) .............................................................37

U.S. Customs and Border Protection, *Trade Statistics* (last visited July 21, 2025) ................................................................................................11

Wiseman, Paul, *U.S., China announce a trade agreement—again. Here's what it means*, AP NEWS (June (June 27, 2025).......................................9

York, Erica & Alex Durante, *Trump Tariffs: Tracking The Economic Impact of the Trump Trade War*, THE TAX FOUND. (July 16, 2025)............10, 12

## GLOSSARY

| | |
|---|---|
| CCPA | United States Court of Customs and Patent Appeals |
| CIT | United States Court of International Trade |
| HTSUS | Harmonized Tariff Schedule of the United States |
| IEEPA | International Emergency Economic Powers Act |
| TWEA | Trading with the Enemy Act |

## STATEMENT OF ISSUES

1.     Whether the district court lacked jurisdiction over a challenge to the President's imposition of tariffs under IEEPA.

2.     Whether IEEPA authorizes the President to impose tariffs.

3.     Whether the district court abused its discretion in entering a preliminary injunction limited to Plaintiffs alone.

## STATUTES AND REGULATIONS

Pertinent statutes are reproduced in the addendum.

## INTRODUCTION

Asserting authority under the International Emergency Economic Powers Act ("IEEPA"), the President with the stroke of a pen increased the Nation's effective tariff rate tenfold to the highest it has been in more than a century.  In the months since, he has raised and lowered, paused and resumed, and threatened and unthreatened tariffs at will, for reasons ranging from trade deficits to political whims.  No President in IEEPA's history has relied on that law to issue *any* tariff.  Yet the current President has used it to impose sweeping tariffs to reshape the national economy and global trade policy, raising taxes on Americans by hundreds of billions of dollars.

IEEPA does not give the President such unilateral power.  Indeed, it does not give the President any tariffing power whatsoever, as every presidential administration until this one has understood.  From its enactment in 1977 until this

1

year, Presidents invoked IEEPA 69 times—but never to levy tariffs.  Congress jealously guards the formidable Article I taxing powers it enjoys, so when it does delegate tariff authority to the Executive Branch, it does so expressly—as numerous laws in Title 19 of the United States Code (governing "Customs Duties") confirm—with clearly defined limits on the exercise of that power.

Yet Defendants concede the only possible textual basis for tariffs in IEEPA is a reference to the generic power to "regulate *** importation or exportation."  No President has ever before read those words as a grant of tariffing power.  For good reason:  the Constitution, the Supreme Court, and Congress have all treated the power to tariff as fundamentally distinct from the power to regulate.  Indeed, if "regulate *** importation or exportation" encompassed the power to tariff, it would run afoul of the Constitution's express prohibition on taxes on "export[s]."  U.S. CONST. art. I, § 9, cl. 5.

The district court thus correctly held that the text of IEEPA does not support the imposition of tariffs at all—much less the unprecedented and ever-shifting tariffs causing extraordinary harm to Plaintiffs' family-owned educational toy businesses.  For that reason, the district court plainly had jurisdiction over this case.  The Court of International Trade ("CIT") possesses jurisdiction only over civil actions that "arise[] out of" a law "providing for *** tariffs."  This case arises out of IEEPA, the substantive law underlying each of Plaintiffs' claims and the only law that must be

interpreted to decide Plaintiffs' claims.  Because IEEPA does not provide for tariffs, the CIT has no jurisdiction over this case.

For the same reason, and because all other preliminary injunction factors weigh in Plaintiffs' favor, the district court did not abuse its discretion in ordering limited injunctive relief.  That injunction, which applies to the two Plaintiffs alone, could hardly be more tailored to preventing "existential" harm to their small businesses.  As the district court found, based on unrefuted evidence, Plaintiffs' projected bill for the new tariffs is so high as to effectively prevent them from importing their products.  That means there are no after-the-fact tariff refunds available to Plaintiffs, and the resulting inadequate inventory, sales declines, and damage to hard-earned customer goodwill are all unrecoverable.  Defendants' reliance on declarations arguing that an adverse *legal ruling* will upset trade negotiations is both immaterial (as two courts have already held the IEEPA tariffs unlawful) and contradicted by the Administration's own public statements (including from one of its declarants).

This Court should affirm and stop the President's lawless tariff whiplash.

## STATEMENT OF THE CASE

### A.   The Constitution Grants Congress The Exclusive Power To Set Tariff Policy

The imposition of tariffs is a distinctly legislative power that the Constitution assigns to Congress.  U.S. CONST. art. I, § 8, cl. 1 (granting Congress the "[p]ower [t]o lay and collect Taxes, Duties, Imposts, and Excises"); *see* DOUGLAS A. IRWIN, CLASHING OVER COMMERCE: A HISTORY OF U.S. TRADE POLICY 2 (2017) (Congress is "the principal venue in which trade policy is determined").  The President's ability to impose or alter tariffs is thus limited to circumstances where Congress provides specific authorization.

Congress has done so in a series of statutory enactments (in Title 19) that carefully constrain the President's authority.  *See, e.g.*, 19 U.S.C. §§ 1323, 1332a(b), 1336, 1338, 1821, 1862(a), 1981, 1671-1671f, 1673-1673h, 1675, 2111, 2114d, 2132(a), 2134, 2135, 2251-2254, 2411-2419, 2492, 2902, 3521, 3803, 4031, 4032, 4063, 4082, 4513.  For example, section 122 of the Trade Act of 1974 authorizes the President to impose "duties" "not to exceed 15 percent ad valorem *** on articles imported into the United States" in order "to deal with large and serious United States balance-of-payments deficits"—but those tariffs expire after 150 days unless Congress enacts legislation to extend them.  19 U.S.C. § 2132(a).  Such discrete and delimited statutory authorizations illustrate the President's circumscribed role with respect to tariffs.  Absent congressional authorization, "the President [can]not

increase or decrease tariffs." *Consumers Union of U.S., Inc. v. Kissinger*, 506 F.2d 136, 142-143 (D.C. Cir. 1974).

### B.    The International Emergency Economic Powers Act

Under IEEPA, 50 U.S.C. § 1701(a), when the President declares a national emergency with respect to an "unusual and extraordinary threat," the President may use the powers granted in § 1702 to "deal with" that threat.  Section 1702 provides, in relevant part, that the President may

> investigate, block during the pendency of an investigation, *regulate*, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, *importation or exportation* of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States[.]

50 U.S.C. § 1702(a)(1)(B) (emphases added).

Since its enactment in 1977, Presidents have invoked IEEPA to address specific threats by specific foreign countries and persons by imposing different types of sanctions or remedies.  Certain IEEPA-based executive orders have targeted designated foreign governments with comprehensive sanctions prohibiting virtually all economic relations with U.S. persons.[1]  Presidents have also targeted foreign

---

[1] Currently, the Department of the Treasury's Office of Foreign Assets Control maintains comprehensive sanctions, in part based on IEEPA, against Cuba, Iran, North Korea, and the Crimea, Donetsk, and Luhansk Regions of Ukraine.

persons in identified geographical areas,[2] or foreign persons engaged in activities creating emergency conditions regardless of nationality or geographic location.[3] Such sanctions have blocked access to assets, prevented utilization of U.S. financial systems or credit, excluded designated persons from the United States, or prohibited U.S. persons from engaging in transactions with designated persons.

Before February 1, 2025, however, no President had ever invoked IEEPA to impose a single tariff or duty on goods.  JA108.

## C.    The President Bypasses Congress To Impose Tariffs Through IEEPA

President Trump, through a series of executive orders, has repeatedly bypassed Congress to impose tariffs unilaterally under IEEPA.  With the stroke of a pen, he has dramatically changed United States tariff policy.  Two sets of executive orders (the "Challenged Orders") are at issue in this case.

### 1.    The China Trafficking Orders

On February 1, 2025, the President issued an executive order imposing 10% tariffs on China pursuant to "section 1702(a)(1)(B) of IEEPA."  Exec. Order No. 14,195, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the*

---

[2] *E.g.*, Exec. Order No. 13,219, *Blocking Property of Persons Who Threaten International Stabilization Efforts in the Western Balkans*, 66 Fed. Reg. 34,777 (Jun. 26, 2001).

[3] *E.g.*, Exec. Order No. 13,581, *Blocking Property of Transnational Criminal Organizations*, 76 Fed. Reg. 44,757 (Jul. 24, 2011).

*People's Republic of China*, § 1, 90 Fed. Reg. 9,121, 9,122 (Feb. 1, 2025).  That order asserted that China had "fail[ed] to stem the ultimate source of many illicit drugs distributed in the United States."  *Id*. at 9,121.  One month later, the President raised the tariffs from 10% to 20% based on his determination that China "ha[d] not taken adequate steps to alleviate the illicit drug crisis through cooperative enforcement actions."  Exec. Order No. 14,228, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, § 1, 90 Fed. Reg. 11,463, 11,463 (Mar. 3, 2025).  Then, a month after that, he ordered the elimination of duty-free *de minimis* treatment for goods subject to these tariffs, ignoring a congressionally enacted statutory program that had permitted duty exemptions for imported goods valued at less than $800.  Exec. Order No. 14,256, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China as Applied to Low-Value Imports*, 90 Fed. Reg. 14,899 (Apr. 2, 2025).

The 20% trafficking tariff on goods from China remains in force.

### 2.    *The Reciprocal Tariff Orders*

On April 2, 2025, the President took an even more dramatic step under IEEPA, imposing on virtually all trading partners "reciprocal" tariffs consisting of (i) a 10% universal tariff and (ii) higher country-specific tariffs ranging from 11% to 50%.  Exec. Order No. 14,257, *Regulating Imports with a Reciprocal Tariff to Rectify*

*Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 2, 2025). Then, on April 8, 2025, the President responded to retaliatory tariffs from China by raising the reciprocal tariff rate on China by *50 percentage* points—from 34% to 84%. Exec. Order No. 14,259, *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports From the People's Republic of China*, 90 Fed. Reg. 15,509 (Apr. 8, 2025). The next day, the President suspended for 90 days the higher country-specific tariffs on all countries except for China, for which he raised the "reciprocal" tariff again— from 84% to 125%. Exec. Order No. 14,266, *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*, §§ 2, 3, 90 Fed. Reg. 15,625, 15,626 (Apr. 9, 2025). Meanwhile, the 20% trafficking tariff on imports from China remained in place, such that most imports from China faced a minimum 145% IEEPA tariff. *Id*.[4]

Starting May 14, 2025, President Trump paused the country-specific "reciprocal" tariff on China for a period of 90 days, until August 12, 2025. Exec. Order No. 14,298, *Modifying Reciprocal Tariff Rates To Reflect Discussions With the People's Republic of China*, 90 Fed. Reg. 21,831 (May 12, 2025). The universal

---

[4] Agnes Chang, et al., *How Much Are Tariffs on Chinese Goods? It's Trickier Than You Think*, N.Y. TIMES (Apr. 12, 2025), https://www.nytimes.com/interactive/2025/04/12/business/economy/china-tariff-product-costs.html.

10% tariff and 20% trafficking tariff on China were kept in place. In late June, the President announced that "[t]he United States and China ha[d] reached an agreement," "[b]ut details [we]re scarce" and "major issues between the world's two biggest economies" remain unresolved.[5] And August 12, the end of the 90-day pause on the severe country-specific "reciprocal" tariff on China, looms.

Meanwhile, the President has been threatening the unilateral imposition of an assortment of tariffs on various trading partners—including a 50% tariff on Brazil in retaliation for what the President perceives as the mistreatment of Brazil's former president, Jair Bolsonaro.[6]

### D.     IEEPA Tariffs Have Major Economic And Political Consequences

As the President himself declared, his executive orders reshape the trade and tariff policies developed by Congress over the last century. The President described

---

[5] Paul Wiseman, *U.S., China announce a trade agreement—again. Here's what it means*, AP NEWS (June 27, 2025), https://apnews.com/article/trump-china-trade-tariffs-rare-earth-minerals-cbd2482bd2b3a7ce8d47030c4ff1c3d4.

[6] Kevin Breuninger, *Trump's 50% Brazil tariff stretches emergency powers already facing court challenge*, CNBC (Jul. 10, 2025), https://www.cnbc.com/2025/07/10/trump-brazil-tariffs-ieepa-lawsuit.html.

the day he announced the IEEPA reciprocal tariffs orders as "one of the most important days in American history."[7]

It was indeed a consequential one. The United States imports trillions of dollars of goods every year, with imports in 2024 topping $3 trillion ($439 billion of which came from China alone).[8] Just a 10% across-the-board tariff thus imposes roughly $300 billion in new taxes. Administration officials (including the President) and outside experts alike estimate the IEEPA tariffs will raise hundreds of billions (if not trillions) of dollars in revenue.[9] Since the beginning of the year, the tariff onslaught has caused "the nation's overall average effective tariff rate" to jump from

---

[7]Aimee Picchi, *Trump reveals these 2 new types of tariffs on what he calls "Liberation Day,"* CBS NEWS (Apr. 2, 2025). https://www.cbsnews.com/news/liberation-day-trump-tariffs-explained/.

[8] Ana Swanson, *U.S. Trade Deficit Hit Record in 2024 as Imports Surged*, N.Y. TIMES (Feb. 5, 2025), https://www.nytimes.com/2025/02/05/business/economy/us-trade-deficit-2024-record.html; Ken Roberts, *2024 Trade Tops $5 Trillion, Exports Top $2 Trillion, Imports Above $3 Trillion*, FORBES (Feb. 5, 2025), https://www.forbes.com/sites/kenroberts/2025/02/05/2024-trade-tops-5-trillion-exports-top-2-trillion-imports-above-3-trillion/; *China Trade Summary*, OFF. OF THE U.S. TRADE REPRESENTATIVE, https://ustr.gov/countries-regions/china-mongolia-taiwan/peoples-republic-china (last visited July 22, 2025).

[9] Bailey Schulz, *Trump is rolling out more tariffs this month. Where does the tariff money go?*, USA TODAY (Apr. 4, 2025), https://www.usatoday.com/story/money/2025/04/03/trump-tariffs-where-will-money-go/82792578007/; Richard Rubin, *Bessent Says Tariff Revenue Could Reach $600 Billion Annually*, WALL ST. J. (Apr. 4, 2025), https://www.wsj.com/livecoverage/stock-market-tariffs-trade-war-04-04-2025/card/bessent-says-tariff-revenue-could-reach-600-billion-annually-QJfDGCPYDY1C72Ljg1pt; Erica York & Alex Durante, *Trump Tariffs: Tracking The Economic Impact of the Trump Trade War*, THE TAX FOUND. (July 16, 2025), https://taxfoundation.org/research/all/federal/trump-tariffs-trade-war/.

"2.5 percent" to "around 27 percent"—more than a tenfold increase and "the highest for the U.S. in more than a century."[10]  And by mid-July, U.S. customs duty collections had "topp[ed] $100 billion for the first time during a fiscal year," "as President Donald Trump's tariffs gained steam," though the President promised the "'big money' would start to flow in after he imposes higher 'reciprocal' tariffs" in August.[11]

The IEEPA tariffs therefore increase many times over what the United States would expect to collect in tariffs in their absence.  *See* U.S. Customs and Border Protection, *Trade Statistics* (in 2024, CBP collected $88 billion dollars in tariffs).[12]  Critically, this money is not paid by foreign governments; it is paid primarily by American businesses (and ultimately American consumers) and equates to the largest peacetime tax increase in U.S. history.[13]  All told, the newly imposed tariffs

---

[10] Sudeep Reddy, *Reality Check: What Trump's Supposed Retreat Really Means in a Historic Trade* War, POLITICO (Apr. 10, 2025), https://www.politico.com/news/magazine/2025/04/10/tariff-reality-check-trump-retreat-00285270.

[11] David Lawder, *US customs duties top $100 billion for first time in a fiscal year*, REUTERS (Jul. 11, 2025), https://www.reuters.com/business/trumps-tariff-collections-expected-grow-june-us-budget-data-2025-07-11/.

[12] https://perma.cc/D3HR-JD4Y (last visited July 21, 2025).

[13] Eric Boehm, *Peter Navarro Says Tariffs Will Be a $6 Trillion Tax Increase, but Also a Tax Cut*, REASON MAG. (Mar. 31, 2025), https://reason.com/2025/03/31/peter-navarro-says-tariffs-will-be-a-6-trillion-tax-increase-but-also-a-tax-cut/.

are projected to amount to an average tax increase of $1,200-$2,800 per American household in 2025.[14]

The IEEPA tariffs are causing enormous uncertainty and financial distress for American businesses. "[W]ith trade policy living on three-to-six-month cycles[,] *** business planning [is] a nightmare."[15] Middle market firms are seeing declines in gross revenue and net earnings, and a 20% drop in capital expenditures.[16] Smaller businesses are being pummeled to the brink of bankruptcy.[17] American consumers, in turn, suffer as well. The tariffs accelerated inflation in June, with the Consumer Price Index rising 2.7 percent from a year earlier.[18] Some consumer products will simply disappear from shelves.[19] In short, the IEEPA tariffs are fundamentally altering the American economic landscape.

---

[14] York & Durante, *supra* note 9; *State of U.S. Tariffs: May 12, 2025*, THE BUDGET LAB (May 12, 2025), https://budgetlab.yale.edu/research/state-us-tariffs-may-12-2025.

[15] Ben Berkowitz, *The only trade certainty is uncertainty*, AXIOS (June 13, 2025), https://www.axios.com/2025/06/13/trump-tariffs-uncertainty.

[16] Emily Peck, *Midsize businesses struggle with high tariff costs*, AXIOS (June 12, 2025), https://www.axios.com/2025/06/12/trump-tariffs-inflation-businesses.

[17] *E.g, 'A matter of survival': Small Businesses Speak Out on Tariffs*, U.S. CHAMBER OF COM. (last updated: July 15, 2025), https://www.uschamber.com/small-business/american-workers-businesses-consumers-trade-tariffs.

[18] Colby Smith, *U.S. Inflation Accelerated in June as Trump's Tariffs Pushed Up Prices*, N.Y. TIMES (July 15, 2025), https://www.nytimes.com/2025/07/15/business/cpi-report-inflation-june.html.

[19] Michael Collins, *'Two Dolls Instead of 30': Trump Acknowledges Prices Will Force Consumers to Cut Back*, USA TODAY (Apr. 30, 2025),

### E.     IEEPA Tariffs Are Severely Harming Plaintiffs

Plaintiffs are two family-owned businesses, now in their fourth generation, that have created and sold over 2,000 hands-on educational toys and products for children.  Their award-winning products are found in toy closets and classrooms across the country.  With the mission to "bring learning to life," Plaintiffs seek to help younger children develop verbal, counting, and fine motor skills, and introduce older children to science, technology, engineering, and math.

Although distinct legal entities, Plaintiffs are under common control and share certain employees, a single line of credit, and a single supply chain department. JA50.  Today, Plaintiffs employ over 500 people in the United States, with offices in Vernon Hills, Illinois; Torrance, California; and Amherst, New York.  JA50. Plaintiffs develop their products in the United States and perform some manufacturing and assembly domestically, but outsource most manufacturing to factories in other countries, including (but not limited to) China, Taiwan, Korea, Vietnam, Thailand, and India.  JA50.

Because Plaintiffs import directly from China (as well as other countries affected by the Challenged Orders), the district court found the IEEPA tariffs "pose an existential threat to [Plaintiffs'] businesses."  JA116.  The tariff rates "are so high

---

https://www.usatoday.com/story/news/politics/2025/04/30/trump-china-tariffs-toys/83372961007/.

as to effectively prevent importation" from China.  JA32.  Attempting to pay the tariffs in 2025 would cost Plaintiffs $100 million in cash expenditures, compared with just $2.3 million in 2024—a *44-fold* increase.  JA52-53.  Unsurprisingly, Plaintiffs are bracing for large year-over-year sales declines.  JA54.

### F.    Procedural History

On April 22, 2025, Plaintiffs sued over the President's authority to issue the IEEPA tariffs.  Defendants moved to transfer the case to the CIT pursuant to 28 U.S.C. § 1581(i)(1), which gives that court exclusive jurisdiction over "any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for *** tariffs[.]"  Plaintiffs moved for a preliminary injunction and opposed transfer on the ground that IEEPA is not a "law of the United States providing for *** tariffs."

On May 29, after a hearing, the district court granted Plaintiffs a preliminary injunction, finding they had shown both a likelihood of success and irreparable harm.  On the former, the district court held that IEEPA does not authorize the President "to unilaterally impose, revoke, pause, reinstate, and adjust tariffs to reorder the global economy," JA90—meaning both that the district court had jurisdiction and the challenged IEEPA tariffs were unlawful.  On the latter, the district court determined that not only were the tariffs irreparably harming Plaintiffs, but they posed "an existential threat to [Plaintiffs'] businesses."  JA116.  The court further

found that the balance of harms and public interest weighed in Plaintiffs' favor, especially considering that the tailored injunction applied only to Plaintiffs. JA120-121.

On May 30, Defendants filed a notice of appeal. On June 3, the district court stayed its injunction "pending disposition of the pending appeal" in this Court. JA126-127. Plaintiffs thereafter filed a petition for a writ of certiorari before judgment in the U.S. Supreme Court that remains pending. *Learning Resources, Inc. v. Trump*, No. 24-1287 (filed June 17, 2025).

### G.    The Court Of International Trade Actions

As litigation unfolded in the district court, the CIT concurrently considered challenges to the IEEPA tariffs. One day before the district court issued its decision in this case, the CIT accepted the parties' uncontested submission that it had exclusive jurisdiction over actions challenging the IEEPA tariffs. *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350, 1366 (Ct. Int'l Trade 2025). As to the merits, the CIT assumed IEEPA authorizes some tariffs but concluded that the challenged tariffs were unlawful, granted Plaintiffs summary judgment, and issued a nationwide injunction. *Id.* at 1383. The Federal Circuit subsequently stayed the injunction pending appeal and scheduled argument for July 31. Nos. 2025-1812, -1813 (Fed. Cir.).

## SUMMARY OF ARGUMENT

**I.**  The district court had jurisdiction over Plaintiffs' case as a civil action arising under federal law unless it "arises out of any law of the United States providing for *** tariffs."  28 U.S.C. § 1581(i)(1)(B).  This action "arises out of" IEEPA, which is the only substantive law underlying each of Plaintiffs' claims and the only law a court must interpret to decide this case.  The jurisdictional analysis is thus straightforward:  Because IEEPA is not a law that provides for tariffs, the district court—not the CIT—has jurisdiction.

Defendants' newfound jurisdictional theory is both convoluted and wrong.  This case does not arise out of the Harmonized Tariff Schedule of the United States ("HTSUS") or out of the executive orders purporting to modify that schedule.  Neither the HTSUS nor the Challenged Orders (which lack "the authority of law") create Plaintiffs' cause of action or require interpretation to decide this case.  Indeed, neither the district court nor CIT decisions analyzed the HTSUS or the Challenged Orders at all.  Nor should the Court defer to the CIT's (uncontested) decision to exercise jurisdiction.  The CIT has no special expertise regarding IEEPA.  Quite the opposite: Until the present challenges, the CIT had never once cited IEEPA.

Because federal courts have an unflagging obligation to hear cases within their jurisdiction, this Court should decide jurisdiction for itself.

**II.**  IEEPA does not provide for tariffs.  Unlike every actual tariff statute, IEEPA nowhere mentions "tariffs," "duties," or other revenue-raising mechanisms. In the five decades since Congress enacted IEEPA, no President (until now) has used that law to impose tariffs.  The only conceivable textual hook in IEEPA for the power to tariff is the reference to "regulate *** importation or exportation."  50 U.S.C. § 1702(a)(1)(B).  But the power to "regulate" is distinct from the special revenue-raising power to "tax" or "tariff," as the Constitution, Supreme Court precedent, congressional activity, and presidential practice all confirm.  If the power to "regulate *** importation or exportation" did include the power to tariff, IEEPA would violate the Constitution's express prohibition on export taxes.  U.S CONST. art. I, § 9, cl. 5.  That is an impermissible construction.

Statutory context confirms that the power to "regulate *** importation or exportation" does not include the power to tax those activities.  None of the verbs surrounding "regulate" in section 1702(a)(1)(B)'s reticulated scheme suggests an ability to raise revenue.  Nor is there is any evidence in the relevant history of IEEPA that Congress—a body that jealously guards its taxation and tariffing power— believed it was granting the President unbounded power to impose tariffs.

If there were any doubt, the major questions and non-delegation doctrines should settle it. Congress does not (and could not) use such vague terminology to grant the Executive virtually unconstrained tariffing power of such staggering economic effect—hundreds of billions if not trillions of dollars—shouldered mainly by American businesses and consumers.

**III.** The district court did not abuse its discretion in issuing a preliminary injunction limited to Plaintiffs. Based on the record evidence, the court found the IEEPA tariffs would cause irreparable harm—and in fact posed an "existential threat"—to Plaintiffs' small businesses. Because Plaintiffs cannot afford the tariffs, they cannot import their goods and refunds are unavailable—and, in any case, refunds cannot compensate Plaintiffs for the resulting losses in sales, market share, and customer goodwill. The remaining factors also weigh in Plaintiffs' favor. The public has no interest in the perpetuation of unlawful executive action, and the district court's narrow plaintiff-specific (not nationwide) injunction hardly affects the government's purse or operation.

## STANDARD OF REVIEW

This Court "review[s] the district court's decision *** to grant the Plaintiffs' request for a preliminary injunction for abuse of discretion, its legal conclusions de

18

novo, and its findings of fact for clear error." *Hanson v. District of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024) (internal quotation marks and citation omitted).

## ARGUMENT

## I.    THE DISTRICT COURT PROPERLY EXERCISED JURISDICTION

Because this action arises under federal law, *see* 28 U.S.C. §§ 1331, 1346, the district court had jurisdiction to hear it unless it falls within the CIT's exclusive jurisdiction. The CIT has jurisdiction over this "civil action" only if it "arises out of any law of the United States providing for *** tariffs." 28 U.S.C. § 1581(i)(1)(B). Below, the parties mainly disputed whether IEEPA was a law "providing for" tariffs within the meaning of section 1581(i), and the district court resolved the jurisdictional question on that basis. On appeal, Defendants have changed tacks, now arguing that Plaintiffs' action arises out of different laws "providing for" tariffs. That new argument fares no better. It is no surprise that Defendants fall back on a plea to "defer" to the CIT's jurisdictional assessment, but this Court (affirmed by the Supreme Court) has declined such abdication with respect to section 1581(i).

### A.    Plaintiffs' Action Arises Out Of IEEPA, Which Is Not A "Law *** Providing For Tariffs"

1. The CIT has jurisdiction over this challenge "arising out of" IEEPA only if IEEPA is a law "providing for" tariffs (or the "administration and enforcement" thereof) within the meaning of 28 U.S.C. § 1581(i)(1). That is, the jurisdictional and merits questions merge. The district court thus exercised jurisdiction after

19

concluding that IEEPA does not provide for tariffs. JA116; *see* Part II, *infra*. That analysis was correct.

As the district court recognized, the phrase "arises out of" refers to the "substantive law" that gives rise to Plaintiffs' claims. JA101 & JA102 n.4; *see also International Lab. Rights Fund v. Bush*, 357 F. Supp. 2d 204, 208 (D.D.C. 2004) (analyzing CIT jurisdiction based on "substantive law giving rise to [plaintiffs'] claims"). The CIT agrees: To "determin[e] whether a cause of action might be embraced by [section 1581(i),] *** it is necessary that the *gravamen of the complaint* be determined." *Schaper Mfg. Co., a Div. of Kusan. Inc. v. Regan*, 566 F. Supp. 894, 896 (Ct. Int'l Trade 1983) (emphasis added); *see also Corus Staal BV v. United States*, 493 F. Supp. 2d 1276, 1285 (Ct. Int'l Trade 2007) (analyzing § 1581(i) jurisdiction by looking to the "true nature" of the underlying injury, rather than the technical vehicle by which the allegedly unlawful action was imposed).

That inquiry also mimics the analysis performed under 28 U.S.C. § 1331, from which section 1581 "was apparently drawn." *American Air Parcel Forwarding Co. v. United States*, 515 F. Supp. 47, 51 (Ct. Int'l Trade 1981). To determine whether a "civil action[] aris[es] under *** laws *** of the United States" pursuant to 28 U.S.C. § 1331, courts ask whether "federal law creates the cause of action asserted." *Gunn v. Minton*, 568 U.S. 251, 257 (2013). A shorthand for that inquiry is to ask which laws "require[] *** *interpretation* and application." *Hansson v. Norton*, 411

20

F.3d 231, 235 (D.C. Cir. 2005) (emphasis added); *see also Greenblatt v. Delta Plumbing & Heating Corp.*, 68 F.3d 561, 571 (2d Cir. 1995) (because "no construction of a federal statute is at issue *** no substantial federal question *** give[s] rise to jurisdiction under 28 U.S.C. § 1331").

Only one "substantive law" requires "interpretation and application" to decide this case:  IEEPA.  Each of Plaintiffs' counts centers on IEEPA:  The tariffs violate the law because IEEPA (a) does not authorize tariffs as a categorical matter, (b) does not authorize these specific tariffs, or (c) violates the Constitution.  *See* JA33 (Count I); JA36 (Count II); JA41 (Count III); JA43 (Count IV).  On that basis, the district court properly concluded that this "civil action *** arises out of" IEEPA (and IEEPA alone).  JA115.

The district court's conclusion, moreover, comports with the way *every* prior IEEPA case has been litigated.  Section 1581(i)'s text confers exclusive jurisdiction in the CIT based on whether the case arises out of "any law," not a particular challenged action, "providing for *** tariffs."  So if IEEPA is a law providing for tariffs, then *all* civil actions against the government arising out of IEEPA—whether involving tariffs or not—would have to be adjudicated in the CIT.  Yet every IEEPA case from 1977 until now has been adjudicated in a federal district court, not the CIT.  Defendants do not cite (and Plaintiffs have not found) a single CIT case citing IEEPA's provisions, much less substantively construing them.  By contrast, literally

21

hundreds of district courts have cited IEEPA, including over 300 citing 50 U.S.C. § 1701 and more than 150 citing 50 U.S.C. § 1702. *See* JA109.

Given the extensive expertise district and regional circuit courts have developed over the past several decades, a holding that the CIT was the "exclusive" home of every civil action against the United States arising out of IEEPA would mark a sea change. *E.g.*, *TikTok Inc. v. Garland*, 122 F.4th 930, 942 (D.C. Cir. 2024), *aff'd*, 145 S. Ct. 57 (2025); *Van Loon v. Department of the Treasury*, 122 F.4th 549, 571 (5th Cir. 2024). Presumably that is why Defendants duck the stark jurisdictional implications of their merits position that IEEPA "provides for" tariffs by focusing on other "laws" instead.

2. Defendants protest that it is "nonsensical" for the jurisdictional and merits inquiries to overlap. Br. 32. But it is in fact quite "common." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 554 n.5 (2022). As the Supreme Court has reiterated, courts may sometimes need to "decide some, *or all*, of the merits issues" to "answer the jurisdictional question." *Bolivarian Republic of Venez. v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 178 (2017) (emphasis added); *see, e.g., Brownback v. King*, 592 U.S. 209, 217 (2021) (where "the merits and jurisdiction *** come intertwined[] *** a court can decide *all of the merits issues* in resolving a jurisdictional question, or vice versa" (emphasis added) (internal quotation marks and ellipsis omitted)); *Lovitky v. Trump*, 949 F.3d 753, 759 (D.C. Cir. 2020)

(addressing merits to determine jurisdiction where jurisdiction "merge[d] with the merits"). Hence, "all elements of a meritorious claim" under the Federal Tort Claims Act "are also jurisdictional." *Brownback*, 592 U.S. at 217. And in any Foreign Sovereign Immunities Act case alleging that "'property' has been 'taken in violation of international law,'" the jurisdictional and merits questions turn on a common determination. *Helmerich & Payne Int'l Drilling Co.*, 581 U.S. at 178-179.

Despite touting it as providing a "cardinal principle" (Br. 23), Defendants' inapt authority (Br. 32) teaches the basic lesson that a statute's plain language governs its meaning. In *Aleman Gonzalez*, the respondents contended that a statute that stripped courts of jurisdiction to enjoin the "operation of" certain immigration provisions applied only to the "operation" of such provisions as "*properly* interpreted"—such that courts would retain jurisdiction to enjoin *unlawful* operation. 596 U.S. at 552. The Court rejected that argument on the basis of "the most natural interpretation of the term 'operation,'" which encompassed "unlawful" and not just lawful operations. *Id.* "Apart from ordinary meaning," the Court found (among other reasons) contextual support in the fact that respondents' "interpretation would make a court's jurisdiction to entertain a request for class-wide injunctive relief dependent upon the merits of the claim" (and even on the outcome of "a trial"). *Id.* at 554. But the Court expressly acknowledged that it was "of course true" "that it is common for jurisdictional inquiries and the merits to overlap," and noted only that

it was "unusual" to have a complete overlap—not that such an overlap should be avoided at all costs.  *Id.* at 554 n.5.

The government also justifies its position on the ground that the CIT's predecessor "granted judgment to plaintiffs on the merits" under a different law after holding that the "tariffs *** were not authorized by statute."  Br. 32-33.  But jurisdiction was uncontested in that case and would have been predicated on the entirely different jurisdictional statute in existence at the time—28 U.S.C. § 1582(a), which conferred jurisdiction over protest denials.  *See* 28 U.S.C. § 1582(a) (1970) ("The Customs Court shall have exclusive jurisdiction of civil actions instituted by any person whose protest *** has been denied," in enumerated circumstances.); *see also United States v. Yoshida Int'l, Inc.,* 526 F.2d 560, 566 (C.C.P.A. 1975) (*Yoshida II*) (referencing liquidations and protests at issue in case).  *Yoshida*'s unchallenged exercise of jurisdiction based on a protest denial cannot support jurisdiction here under the later-enacted section 1581(i).

## B. Plaintiffs' Action Does Not Arise Out Of The HTSUS Or Modifications Thereto

Wholly ignoring their merits argument that IEEPA "provides for" tariffs, Defendants contend this action actually "arises out of" the HTSUS—a schedule of rates for merchandise imported into the United States—and the executive orders purporting to modify it.  Br. 28.  That theory—just the latest Defendants have cycled through to avoid federal district court—is wrong for two independent reasons.

24

First, this case does not "arise[] out of" the HTSUS or any modification to it. The HTSUS does not provide the substantive law of this case, does not create Plaintiffs' causes of action, and does not require any interpretation for a court to decide challenges to the IEEPA tariffs. *See* pp. 20-21, *supra* (citing authorities for "arising out of" inquiry). Indeed, neither the district court nor the CIT substantively analyzed the HTSUS or the Challenged Orders. Modifying the HTSUS merely effectuates a technical implementation after a tariff rate is changed. 19 U.S.C. § 3004(c); *see* Br. 27 (explaining modifications to HTSUS include "inserting *** new headings" and "'temporarily suspend[ing]' certain tariffs" (ellipsis in original)). Any modification to the HTSUS is only the incidental, downstream effect of the President's (unlawful) assumption of tariffing authority under IEEPA—*i.e.*, the modification rises and falls on the scope of IEEPA alone.

Defendants understood this when they began litigating in the district court. In moving to transfer, Defendants argued that the district court should either (i) defer to the CIT on jurisdiction and transfer without adjudicating the matter, or (ii) hold that IEEPA provides for tariffs. *See* Defs.' Mot. to Transfer 11-13, *Learning Res., Inc. v. Trump*, No. 1:25-cv-01248-RC (D.D.C. Apr. 24, 2025), ECF No. 8. Despite criticizing the district court for addressing the HTSUS "only in a footnote" and for failing to reconcile "the statutory text defining the HTSUS itself," Br. 30-31, Defendants never quoted the language on which they now rely. In fact, it was not

25

until their reply brief that Defendants even suggested that the HTSUS might play a role, and even then they never argued this action "ar[ose] out of" the HTSUS or mentioned the executive orders in conjunction with the HTSUS. *See* Reply In Supp. of Defs.' Mot. to Transfer 3-4, *Learning Res., Inc. v. Trump*, No. 1:25-cv-01248-RC (D.D.C. May 12, 2025), ECF No. 21.[20]

The second problem is that Defendants' theory assumes that the modified HTSUS and related executive orders can be considered "law[s] of the United States" for purposes of § 1581(i). The statute establishing the HTSUS specifies that "modification[s] or change[s] made to the Harmonized Tariff Schedule by the President *under authority of law* *** shall be considered to be statutory provisions of law for all purposes." 19 U.S.C. § 3004(c)(1) (emphasis added). But "Executive Orders issued without statutory authority providing for presidential implementation are generally held not to be 'laws' of the United States." *Dreyfus v. Von Finck*, 534

---

[20] Neither the Montana nor Florida district court decisions granting transfer to the CIT embraced the HTSUS theory. *See Webber v. DHS,* 2025 WL 1207587 (D. Mont. Apr. 25, 2025), *appeal pending,* No. 25-2717 (9th Cir.); *Emily Ley Paper, Inc. v. Trump,* 2025 WL 1482771 (N.D. Fla. May 20, 2025). Nor did the CIT itself initially adopt the HTSUS theory; it instead assumed jurisdiction on the theory that "a presidential action that imposes tariffs, duties, or other import restrictions is one that arises from a 'law providing for' those measures." *V.O.S. Selections*, 772 F. Supp. 3d at 1366. Even the CIT's later unprompted articulation (in a stay order) failed to explain why a challenge that requires no substantive analysis of the HTSUS should be considered an action that "arises out of" the HTSUS or any modifications thereto. *See* Order 3, *V.O.S. Selections*, No. 25-cv-66-3JP (Ct. Int'l Trade June 3, 2025), ECF No. 63.

F.2d 24, 29 (2d Cir. 1976) (citing cases); *see also Chen v. I.N.S.*, 95 F.3d 801, 805 (9th Cir. 1996) ("Executive Order lacked the force and effect of law" because "Congress did not explicitly delegate the requisite authority"); *Local 1498, Am. Fed'n of Gov't Emp. v. American Fed'n of Gov't Emps.*, 522 F.2d 486, 491 (3d Cir. 1975) (executive order "not issued under statutory authority providing for presidential implementation or effectuation of statutory provisions" was not "law of the United States' within the meaning of s[ection] 1331"); *cf. Sierra Club v. United States Dep't of Energy*, 134 F.4th 568, 573 (D.C. Cir. 2025) ("[A]n executive order is not 'law' within the meaning of the Constitution" and "[is] not judicially enforceable").

Accordingly, the Challenged Orders on their own are not "law[s] of the United States" and the resulting modifications to the HTSUS cannot be considered "statutory provisions of law" unless *IEEPA* provides legal "authority" for them. *See Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 69 (D.D.C. 2002) (to determine whether executive order has "the force of law, *** the question that must be first resolved is 'whether or to what extent Congress did grant *** such authority' to the executive branch of the government." (second ellipsis in original)); *see also National Wildlife Fed'n v. Babbitt*, No. 88-cv-0301, 1993 WL 304008, at *8 (D.D.C. July 30, 1993) ("an Executive Order is to be 'accorded the force and effect of a statute' when it has a 'distinct statutory foundation'" (quoting *Association for Women in Sci. v.*

27

*Califano*, 566 F.2d 339, 344 (D.C. Cir. 1977)).  That query again rises and falls with IEEPA alone.

As the Supreme Court has admonished, "Congress did not commit to the Court of International Trade's exclusive jurisdiction *every* suit against the Government challenging customs-related laws and regulations." *K Mart Corp. v. Cartier, Inc.*, 485 U.S. 176, 188 (1988).  To the contrary, Congress explicitly considered—but rejected—language that would have granted the CIT expansive jurisdiction over any action involving a law or executive order that "involve[d] international trade," H.R. 6394, 96th Cong. § 201(a) (2d Sess. 1980), and limited its jurisdiction instead to instances where a case arises out of a law actually providing for, *e.g.*, tariffs.  *See K Mart*, 485 U.S. at 188 (interpreting section 1581(i) in light of Congress's decision to reject a broad jurisdictional grant); *Miami Free Zone Corp. v. Foreign Trade Zones Bd.*, 22 F.3d 1110, 1112 (D.C. Cir. 1994) (CIT has "exclusive jurisdiction over actions arising from laws *providing for*—not 'designed to deal with' or 'relating to'—revenue from imports").[21]

---

[21] The Federal Circuit cases cited by Defendants (Br. 31) in support of the CIT's expertise involved arguments that the President lacked authority to impose or modify tariffs *in a particular manner*, not that the relevant statute failed to authorize tariffs *altogether*.

## C.    The CIT Is Owed No Deference On The Jurisdictional Question

As a last-ditch effort, Defendants argue that the district court should have just ceded the jurisdictional inquiry to the CIT.  Br. 33.  But "a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Zukerman v. United States Postal Serv.*, 961 F.3d 431, 445 (D.C. Cir. 2020).  This Court therefore has not surrendered the jurisdictional question to the CIT in the past—even in the face of directly contrary Federal Circuit authority. *See Coalition to Pres. the Integrity of Am. Trademarks v. United States*, 790 F.2d 903, 906 (D.C. Cir. 1986).  Instead, this Court independently assessed the CIT's exclusive jurisdiction statute, concluded that it "w[ould] not bear the Federal Circuit's construction," and held that the federal district court—not the CIT—had jurisdiction over the case. *Id.*  The Supreme Court endorsed that approach, granting certiorari in the case "to resolve conflicts among the Courts of Appeals"—including between the D.C. Circuit and Federal Circuit—and "affirm[ing] *** that the *District Court* had jurisdiction." *K Mart*, 485 U.S. at 182 (emphasis added).  Neither this Court nor the Supreme Court abdicated the jurisdictional question to the CIT.

This Court's decisions in *SCM Corp. v. U.S. Int'l Trade Comm'n* and *Miami Free Zone* are not to the contrary. *Contra* Br. 33-34.  In *SCM Corp.*, this Court first determined for itself that the Customs Court had jurisdiction so long as that court could provide an adequate remedy.  549 F.2d 812, 815 (D.C. Cir. 1977).  But there

29

were knotty questions about whether the Customs Court could in fact do so. *See id.* at 820. That case is far afield from this one, where all that is required is an assessment of whether IEEPA—a law in which the federal district courts have all the expertise and the CIT has none, *see* pp. 21-22, *supra*—provides for tariffs. In *Miami Free Zone*, this Court conducted its own jurisdictional inquiry, considering various theories, acknowledging previous disagreements with the Federal Circuit over the CIT's jurisdiction, and finally settling on a theory that found "some support in [its] prior attempt to define the scope of paragraph 1581(i)(4)." 22 F.3d at 1112-1113. In any event, *K Mart* controls.

## II.    IEEPA DOES NOT PROVIDE FOR TARIFFS

The lone source of the President's professed authority to impose the challenged tariffs—IEEPA—does not grant the President any tariffing authority at all. IEEPA nowhere mentions "tariffs," "duties," or other revenue-raising mechanisms. In the five decades since Congress enacted IEEPA, no President before this one (including in his first term) has used that law to impose tariffs. The only conceivable textual hook in IEEPA for the power to tariff is the reference to "regulate *** importation or exportation." The key question, then, is whether those words—in light of plain meaning, context, history, and constitutional principles— should be construed to encompass the power to tariff. The answer is no.

30

### A.    IEEPA's Text And Structure Show That Congress Did Not Authorize Tariffs

#### 1.    The Power To Tariff Or Tax Is Fundamentally Different From The Power To Regulate

The Constitution separates the "[p]ower [t]o lay and collect Taxes, Duties, Imposts, and Excises" and the power to "regulate" foreign commerce into different clauses.  U.S. CONST. art. I, § 8, cls. 1 and 3.  Chief Justice Marshall early on described the two powers as "not *** similar in their terms or their nature." *Gibbons v. Ogden*, 22 U.S. (9 Wheat) 1, 198-199 (1824).  Hence, when Congress has delegated the power to impose tariffs to the Executive Branch, it always has done so expressly—as codified throughout Title 19 of the United States Code (governing "Customs Duties").  And when Congress has given the Executive Branch the generic power to "regulate" (including to regulate foreign commerce), it has never thereby delegated the power to tax.  Until now, no President has ever relied on a power to "regulate *** importation or exportation" to impose tariffs.  All prior Presidents rightly understood that Congress does not hide vast tariffing power in language the Constitution, the Supreme Court, and Congress have all considered definitionally distinct.

Plain meaning, consistent with the Constitution's express delineation, supports the distinction between "regulate" and "tariff."  To regulate something means to "'[c]ontrol by rule' or 'subject to restrictions.'"  *Regulate*, THE CONCISE

31

OXFORD DICTIONARY OF CURRENT ENGLISH 943 (6th ed. 1976); *see also Ysleta del Sur Pueblo v. Texas*, 596 U.S. 685, 697 (2022) ("[T]o regulate something is usually understood to mean to 'fix the time, amount, degree, or rate' of an activity 'according to the rule[s].'" (quoting *Regulate*, WEBSTER'S THIRD INTERNATIONAL DICTIONARY 1913 (1986))) (second alteration in original).  By contrast, to tariff means to impose "duties or customs *** on imports or exports." *Tariff*, RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 1454 (1973).  In other words, "[a] tariff is a tax levied on imported goods and services."  CHRISTOPHER A. CASEY, CONG. RSCH. SERV., IF11030, U.S. TARIFF POLICY: OVERVIEW 1 (2025)[22]; *see also Gibbons*, 22 U.S. (9 Wheat) at 201 ("the act of laying 'duties or imposts on imports' *** is considered as a branch of the taxing power").  And, regardless of its purpose, "the essential feature of any tax" is that "[i]t produces at least some revenue[.]" *National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 564 (2012).

To be sure, the distinction between the power to regulate and the power to tax does not stop the President from using the taxing power—when he has it—for regulatory purposes.  *Cf. Sebelius*, 567 U.S. at 564 (individual mandate constitutional under power to tax but not regulate commerce).  Taxation self-evidently influences behavior.  Yet precisely because taxation operates by "rais[ing] revenue," *FCC v. Consumers' Rsch.*, Nos. 24-354, 24-442, 2025 WL 1773630, at *9

---

[22] https://www.congress.gov/crs-product/IF11030.

(U.S. June 27, 2025), it is a categorically different power from regulation generally. *Contra* Br. 38-39.

In sum, "[t]o regulate is to establish rules governing conduct; to tariff is to raise revenue through taxes on imports or exports." JA105. IEEPA's power to "regulate *** importation or exportation" thus gives the President the power to control the flow of goods coming into and leaving the country, such as by restricting the quantity or quality of such goods and requiring inspections or quarantines. *E.g.*, CHRISTOPHER A. CASEY & PAUL K. KERR, R46814, CONG. RSCH. SERV., THE U.S. EXPORT CONTROL SYSTEM AND THE EXPORT CONTROL REFORM ACT OF 2018 (2021).[23] It also gives the President the power to establish licensing regimes, as supported by IEEPA's express reference to the President's power to act "by means of *** licenses," to implement such import or export controls. 50 U.S.C. § 1702(a); *e.g.*, CASEY & KERR, *supra* (Export Administration Regulations, authorized for a time by IEEPA, establish licensing policies and conditions for dual-use and certain defense articles). But without more, such a grant does not authorize the President to tax—whether the purpose is to raise revenue or do something else. *Cf. Diginet, Inc. v. Western Union ATS, Inc.*, 958 F.2d 1388, 1392, 1399 (7th Cir. 1992) (municipality's "power to regulate" did not include the power to "generate revenues" through taxation "without explicit authority from the state").

---

[23] https://www.congress.gov/crs-product/R46814.

Even more so here:  Given that IEEPA delegates the power to "regulate" both "importation *or exportation*"—within the same clause no less—Congress could not have intended "regulate" to encompass the imposition of tariffs.  That is because the Constitution expressly prohibits taxes on exports.  U.S. CONST. art. I, § 9, cl. 5.  "In all but the most unusual situations, a single use of a statutory phrase must have a fixed meaning."  *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262, 268 (2019).  Defendants contend that Congress must have simply expected courts to construe "regulate *** importation or exportation" to allow taxation on the former but not the latter.  Br. 55.  But the far more straightforward explanation is that Congress did not think "regulate" granted taxing power at all.  Indeed, this Court must adopt that interpretation to avoid an obvious constitutional defect.  *See* pp. 46-47, *infra*.

That is not the only textual problem with Defendants' reading of IEEPA:  It would enable the President to impose taxes on a vast array of other property.  After all, section 1702(a)(1)(B) grants the President authority to "regulate" (without limit on rate or duration) not only "importation or exportation" of any property in which a foreign national has any "interest," but also "*any* acquisition, holding, withholding, use, transfer, withdrawal, [or] transportation" of such property.   50 U.S.C. § 1702(a)(1)(B) (emphasis added); *see also id.* § 1702(a)(1)(A) (further authorizing President, in neighboring provision, to "regulate" "any transactions in foreign

exchange," "the importing or exporting of currency or securities," and "transfers of credit or payments" through any banking institution involving a foreign interest). Thus, if Defendants are correct about what "regulate" means, the President has the unilateral power to impose taxes on American banks for the holding or transferring of foreign funds—indeed, to tax the mere possession of *any* property in which *any* foreign national has *any* "interest," even in the United States. There is zero indication that Congress intended to delegate such a sweeping taxing power to the President when it enacted IEEPA.

Unsurprisingly, Defendants cannot cite a single other statute where the power to "regulate" has been understood as authority to tax or tariff. Although Defendants contend that "regulate" may carry different connotations in different contexts, *see* Br. 39, they cannot explain why IEEPA would be the *only* place in the entire U.S. Code where the power to "regulate" encompasses the power to "tax." After all, "transactions on a national securities exchange" would seem just as ripe for taxation as tariffs, yet the SEC has never claimed the power to tax based on its power to "regulate" those transactions. *See* 15 U.S.C. § 78k(a)(2). Likewise, the Consumer Financial Protection Bureau has never claimed the authority to tax based on its power to "regulate the offering and provision of consumer financial products or services." 12 U.S.C. § 5491(a).

When Congress *does* seek to confer both the authority to regulate and the authority to tax in a single statute, it conspicuously names the two as individually distinct powers. *See, e.g.*, 49 U.S.C. § 40117(j) (state actors may not "*tax*, *regulate*, *or prohibit* \*\*\* the imposition or collection of a passenger facility charge or the use of the revenue from the passenger facility charge" (emphasis added)); 16 U.S.C. § 460bbb-9(a) (specifying state still had power "to *tax* \*\*\* private property on the lands and waters included in the recreation area, or to *regulate* the private lands within the recreation area" (emphases added)); *see also* 2 U.S.C. § 622(8)(B)(1) ("government-sponsored enterprise" does not have "power to tax *or* to regulate interstate commerce" (emphasis added)). For instance, the Communications Act of 1934 gives the FCC the power to "regulat[e]" communication carriers, on the one hand, and impose taxes on such carriers in support of a "universal service" fund, on the other. *Compare* 47 U.S.C. § 201(b), *with* 47 U.S.C. § 254(d). If the power to "regulat[e]" were to encompass the power to tax, the FCC would be able to ignore key "limiting principles" found solely in the latter provision that circumscribe its power to raise revenue—principles the Supreme Court just last month considered crucial to uphold the Act. *Consumers' Rsch.*, 2025 WL 1773630, at \*16; *see* 47 U.S.C. § 254(b)(5), (d), (e).

Moreover, Congress is jealously protective of its "power over the purse"—"the most complete and effectual weapon with which any constitution can arm the

immediate representatives of the people"—as the Founders were wary of its use by the President given the history of colonial resistance to Crown-imposed duties levied without consent. THE FEDERALIST NO. 58 (James Madison); *see Biden v. Nebraska*, 600 U.S. 477, 505 (2023) ("Among Congress's most important authorities is its control of the purse."). Congress does not silently and expansively delegate away this most important of powers, particularly given its "power to destroy." *Consumers' Rsch.*, 2025 WL 1773630, at *30 (Gorsuch, J., dissenting) (quoting *McCulloch v. State*, 17 U.S. (4 Wheat) 316, 431 (1819)).

Accordingly, when Congress has authorized the President or an agency to exercise tariff power, it has used unmistakable language to grant that authority (in Title 19) accompanied by specified limitations—not by the bare power to "regulate." *See* p. 4, *supra* (collecting citations). Case in point: After "President Nixon declared a national emergency with respect to the balance-of-payments crisis and under that emergency imposed a surcharge on imports," Br. 8 (internal citations and quotation omitted), Congress (at his request) enacted a new statute authorizing the President to impose an "import surcharge *** in the form of *duties* *** on articles imported into the United States" to "deal with large and serious United States balance-of-payments deficits," 19 U.S.C. § 2132(a) (emphasis added). But those "duties" may not "exceed 15 percent ad valorem," and they expire after 150 days unless Congress enacts legislation to extend them. *Id.* If Defendants are correct, a President could

37

freely bypass those congressional limitations on dealing with a trade-imbalance "emergency" such as the one President Nixon faced—and the one President Trump now purports to address—by invoking IEEPA instead.  The same goes for the congressionally prescribed limits in every other tariff statute.

>    2.    *Statutory Context Confirms The Power To "Regulate" Does Not Encompass The Power To "Tariff"*

Statutory context confirms that the power to "regulate *** importation or exportation" cannot be read to encompass the power to tax.  *See West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 721 (2022) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.").

Begin with the fact that IEEPA is a carefully reticulated scheme that identifies eight enumerated actions—(1) "investigate," (2) "block during the pendency of an investigation,"  (3) "regulate," (4) "direct  and  compel," (5) "nullify,"  (6) "void," (7) "prevent," and (8) "prohibit"—that apply to the "importation or exportation" of certain property.  50 U.S.C. § 1702(a)(1)(B).  That "not one of those [surrounding] words deals with the power to raise revenue" confirms that "regulate" should not be stretched to include that distinct activity.  JA106; *see Yates v. United States*, 574 U.S. 528, 543 (2015) ("[W]e rely on the principle of *noscitur a sociis*—a word is known by the company it keeps—to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth

to the Acts of Congress." (internal quotation marks omitted)); *United States v. Hillie*, 14 F.4th 677, 688 (D.C. Cir. 2021) (under *noscitur a sociis* canon, "a word is given more precise content by the neighboring words with which it is associated").

Interpreting "regulate" to include the power to tariff also cannot be squared with IEEPA's limitation to "property in which any *foreign* country or a national thereof *has* any interest." 50 U.S.C. § 1702(a)(1)(B) (emphasis added); *see* JA110. No matter how broadly "interest" is construed, the present tense "has" indicates the foreign national's property interest cannot be in the past. *See Real v. Simon*, 510 F.2d 557, 562 (5th Cir. 1975) (concluding the Trading with the Enemy Act ("TWEA") did not apply because no foreign national "retains an interest" in the relevant property). But tariffs are frequently imposed on property wholly owned by American nationals, like Plaintiffs, with no present foreign interest. *See* JA50-JA51 ("When [Plaintiffs] import, [they] purchase and take title to the products in the foreign country and thus own the merchandise at the time of importation."); *see also* 19 U.S.C. § 1484(a)(2)(B) (defining "importer of record" as the "owner or purchaser of the merchandise").

Defendants do not even try to explain what interest a foreign national maintains in property *after* an American importer has taken full control and ownership of the property. *See* Br. 41. It is nonsensical to suggest that a completely divested foreign interest in American property persists in perpetuity. On that theory,

39

the President could use IEEPA to unilaterally tax any American's foreign-assembled car—years after arrival in the United States—just because a foreign national once held legal or beneficial interest in it.  Defendants' citation to *Holy Land Found. for Relief & Dev. v. Ashcroft,* 333 F.3d 156, 162-163 (D.C. Cir. 2003), which involved funds raised specifically to benefit Hamas, lends no support to that untenable position.

Had Congress wished to include property in which a foreign country or national *previously* had an interest, Congress could easily have done so—just as it did when it specified, in the same subsection, that the President can require individuals to keep records of property in which a foreign country or national "has or *has had* any interest."  50 U.S.C. § 1702(a)(2) (emphasis added); *see Lackey v. Stinnie*, 145 S. Ct. 659, 669-670 (2025) ("Atextual judicial supplementation is particularly inappropriate when *** Congress has shown that it knows how to adopt the omitted language or provision." (ellipsis in original)).  Absent such text, there is no reason to believe that Congress intended the *International* Economic Emergency Powers Act—which has always been used to sanction *foreigners*—to allow the President to tax *Americans* that move their own property into the United States.

In the face of so many textual and contextual indications that Defendants' interpretation of "regulate *** importation or exportation" is wrong, Defendants lean on the Supreme Court's decision in *Federal Energy Administration v.*

*Algonquin SNG, Inc.*, 426 U.S. 548 (1976).  Br. 36-37.  But that case addressed a different statute (section 232 of the Trade Expansion Act of 1962), different language (the President's power to "take such \*\*\* actions as [he] deems necessary to adjust the imports," 19 U.S.C. § 1862(c)), and a different activity ("license fees").  Unlike IEEPA, which makes no reference to tariffs or duties, section 232 expressly addresses presidential changes to an import "duty."  19 U.S.C. § 1862(a).  Unlike IEEPA, section 232 refers only to adjusting "imports"—not "imports and exports"— so the Court's interpretation posed no constitutional impediment.  *See* p. 34, *supra* (discussing U.S. CONST. art. I, § 9, cl. 5).  And unlike IEEPA, section 232's more expansive phrasing does not enumerate the precise actions the President can take with respect to imports and exports—none of which includes the power to tariff.  *See* pp. 38-39, *supra*.

Beyond that, the Supreme Court's analysis from 1976 focused almost entirely on legislative history and purpose.  *See Algonquin*, 426 U.S. at 561-564.  That method of analysis has been "largely rejected in favor of a stricter focus on a statute's text."  *American Fed'n of Gov't Emps., Nat'l Council of HUD Locs. Council 222, AFL-CIO v. Federal Lab. Rels. Auth.*, 99 F.4th 585, 590 (D.C. Cir. 2024).  In any event, the difference in respective histories is stark.  Section 232's legislative history is replete with references to "duties," "tariffs," "import taxes," and "fees" on

41

imports, 426 U.S. at 562-569, while IEEPA's is silent: Defendants cannot locate a single reference in IEEPA's history to any monetary exactions whatsoever.

## B. Historical Practice Confirms That IEEPA Does Not Authorize Tariffs

Historical context and practice confirm IEEPA does not delegate the power to tariff. "In the five decades since IEEPA was enacted, no President until now has *ever* invoked the statute—or its predecessor, TWEA—to impose tariffs." JA108 (emphasis added); *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) ("[T]he longstanding practice of [Defendants] *** can inform a court's determination of what the law is." (internal quotation marks and alteration omitted)). Administration after administration has relied on other statutes—actual tariff statutes—to do so.

### 1. *Trading With The Enemy Act And Trade Act Of 1974*

The relevant language in IEEPA originated in amendments made to TWEA mere days after the attack on Pearl Harbor. Although those wartime amendments were broad in many ways, they were never invoked by any President to impose tariffs. Notably, when President Nixon in 1971 declared a national emergency to "strengthen the international economic position of the United States" and imposed a surcharge on imports to address a balance-of-payments issue, he relied upon the

42

Tariff Act of 1930 and the Trade Expansion Act of 1962, *not* TWEA. *See* Proclamation No. 4074, 36 Fed. Reg. 15,724, 15,724 (Aug. 17, 1971).

Recognizing the limits of his power to impose tariffs, President Nixon subsequently asked Congress to give him more authority to negotiate tariffs to address "deficits in our trading balance" and to "raise or lower import restrictions on a temporary basis to help correct deficits or surpluses in our payments position." Special Message to the Congress Proposing Trade Reform Legislation, 1973 PUB. PAPERS 258, 261, 266 (Apr. 10, 1973). That request led to the passage of the Trade Act of 1974. Pub. L. No. 93-618, 88 Stat. 1978 (1975). Section 122 of the Act gave the President the requested authority to impose tariffs to address "balance-of-payments deficits." *Id.* § 122 (codified at 19 U.S.C. § 2132(a)).

None of those developments suggests that Congress—or, for that matter, President Nixon—thought the President already had the unilateral and unconstrained power to adjust tariffs under TWEA. If President Nixon did, there is little reason that he would have asked Congress for that provision of the Trade Act or that Congress would have gone to the trouble of passing it.

In arguing otherwise, Defendants highlight a decades-old decision from the United States Court of Customs and Patent Appeals ("CCPA") that reversed a decision from a three-judge panel of the U.S. Customs Court concluding that "regulate" as used in section 5(b) of TWEA did *not* authorize the imposition of tariffs

43

at all (including President Nixon's 1971 action).  Br. 37 (discussing *Yoshida II*, 526 F.2d 560); *see also Yoshida Int'l, Inc. v. United States,* 378 F. Supp. 1155, 1172 (Cust. Ct. 1974).  The CCPA's decision holds no precedential value for this Court and was wrongly decided.

In reversing the Customs Court, the CCPA took an explicitly purposive rather than textualist approach.  The CCPA acknowledged that "no undelegated power to regulate commerce, or to set tariffs, inheres in the Presidency," *Yoshida II*, 526 F.2d at 572; that "nothing in the TWEA or in its history *** specifically either authorizes or prohibits the imposition of a surcharge," *id*. at 572-573; and that "Congress did not specify that the President could use a surcharge in a national emergency," *id*. at 576.  Yet the court concluded that because nothing in the legislative history of section 5(b) indicated an intent to *prohibit* tariffs, section 5(b) authorized the imposition of tariffs.  *Id*.  The CCPA reasoned that "the primary implication of an emergency power is that it should be effective to deal with a national emergency successfully."  *Id*. at 573.  Though it purported to agree with the Customs Court about the "necessity of determining the scope and extent of delegated regulatory power," *id*. at 574, the CCPA placed no parameters on the meaning of "regulate" at all—including vis-à-vis tariffs, *id*. at 578-579.  The district court below correctly rejected that reasoning as unpersuasive:  "That is no longer how courts approach statutory interpretation."  JA113.

2.    *Congress Enacts IEEPA To Limit Emergency Authority*

Three years after enacting the Trade Act of 1974, Congress amended TWEA to limit its application to times of war and adopted IEEPA to apply in the case of peacetime emergencies.  The emergency powers set out in section 1702(a)(1)(B) of IEEPA are largely those previously set out in section 5(b) of TWEA, but limited to transactions involving foreign countries and nationals.  50 U.S.C. § 1702(a)(1)(B); *see* H.R. REP. NO. 95-459, at 2 (1977) (describing the President's powers under section 1702(a)(1)(B) as "more limited in scope than those of [TWEA] and subject to various procedural limitations").  The Senate and House Reports described the enumerated powers as the ability to regulate foreign exchange and banking transactions, "to control or freeze property transactions where a foreign interest is involved," and to require recordkeeping.  S. REP. NO. 95-466, at 5 (1977); *see also* H.R. REP. NO. 95-459, at 14-15 (similar).  But Congress never suggested that, through IEEPA, it was delegating its essential authority to impose taxes, tariffs, or otherwise generate revenue.

Defendants nonetheless insist Congress must have intended to ratify *Yoshida II* because Congress was aware of the decision when it carried over TWEA's operative language—including "regulate *** importation or exportation"—into IEEPA.  *See* Br. 37-38, 42-44.  But ratification is an especially thin reed here. *Yoshida II* itself noted Congress's intervening enactment of the Trade Act of 1974,

45

conferring actual tariff authority on the President, such that a future tariff action "must, of course, comply with" that Act's terms. 526 F.2d at 582 n.33. In addition, only a single passing reference to *Yoshida II* appears in IEEPA's legislative history—in a background section of a House Committee markup drawn from a memorandum drafted by the Department of Justice—along with a reference to *Yoshida I*'s contrary holding and the fact that President Nixon had never invoked TWEA. *See* H.R. REP. NO. 95-459, at 3 & n.6, 5 (1977). That is no indication that Congress intended to adopt *Yoshida II*'s obsolete holding, and a single decision by a lower court that conflicts with the only other decision on the statutory language is not the type of "settled precedent" that gives rise to a presumption of ratification. *BP P.L.C. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532, 1541 (2021) ("It seems most unlikely to us that a smattering of lower court opinions could ever represent the sort of judicial consensus so broad and unquestioned that we must presume Congress *** endorsed it." (internal quotation marks omitted)).

### C.    Constitutional Principles Reinforce That IEEPA Does Not Authorize Tariffs.

To the extent any doubt remains regarding whether IEEPA authorizes tariffs, principles of constitutional avoidance should eliminate it. *See Gonzalez v. United States*, 553 U.S. 242, 251 (2008) ("[W]hen 'a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided,'" the court's "duty is to adopt the

46

latter." (citations omitted)).   Defendants' interpretation raises far more than a "serious doubt" about its constitutionality.

*First*, IEEPA authorizes the president to "regulate *** importation or *exportation*"—even though the Constitution explicitly prohibits taxing "exportation."  *See* p. 34, *supra*.

*Second*, the President's interpretation implicates the major questions doctrine. Where the Executive asserts statutory authority for "never previously claimed powers" of "staggering" "economic and political significance," it must point to "clear congressional authorization" for those powers.  *Nebraska*, 600 U.S. at 501, 505-506.  It cannot do so here.

As explained, "an Executive Branch interpretation" from the time of "enactment of the statute," *Loper Bright*, 603 U.S. at 386, has never been that IEEPA authorizes tariffs.  That "lack of historical precedent, coupled with the breadth of authority that the [President] now claims, is a telling indication that the [tariffs] extend[] beyond the [President's] legitimate reach."  *National Fed'n of Indep. Bus. v. Department of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 119 (2022) (internal quotation marks omitted).   "The 'economic and political significance' of the" President's newfound tariff authority is also "staggering by any measure."  *Nebraska*, 600 U.S. at 502 (citation omitted).  The IEEPA tariffs will affect trillions of dollars of imports, drive small businesses into bankruptcy, and cost

the average American well over $1,000 per year. *See* pp. 10-12, *supra*. If not enjoined, the tariffs could continue *for years*. Or, alternatively, they could be paused, reinstated, or substantially increased on a moment's notice—which the President has already done multiple times. This represents an unprecedented and "unheralded power," *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014), to inflict billions (if not trillions) of dollars of cumulative economic costs on Americans and to inject (repeatedly) massive uncertainty and volatility in domestic and global markets. If the Challenged Orders are upheld, the President would "enjoy virtually unlimited power to rewrite" U.S. trade policy—by adding, increasing, or decreasing taxes on imports—whenever and however he chooses. *Nebraska*, 600 U.S. at 502.

The assertion of such a "transformative expansion in" the President's "authority" constitutes a "major question[]." *West Virginia*, 597 U.S. at 724 (citation omitted). The Supreme Court has held that the CDC's claim of authority to impose an eviction moratorium with an "economic impact" of approximately "$50 billion" was a major question. *Alabama Ass'n of Realtors v. DHS*, 594 U.S. 758, 764 (2021). In *Nebraska*, the Court found that "a new program affecting 43 million Americans and $430 billion in federal debt" "triggered analysis under the major questions doctrine." 600 U.S. at 496, 502-503. And the challenged EPA rule in *West Virginia* would have imposed "billions of dollars in compliance costs" and "reduce[d] GDP by at least a trillion 2009 dollars by 2040." 597 U.S. at 714-715, 724. The

48

Challenged Orders, which are projected to increase federal tax revenues by more than $2 *trillion* over the next decade, fall comfortably within those precedents.

Defendants hardly dispute the unprecedented nature of the IEEPA tariffs or their staggering economic consequences.  Instead, they contend that presidential action is exempt from the major questions doctrine.  Br. 45.  In the doctrine's short contemporary history, all three appellate decisions on the books have said otherwise.  *See Kentucky v. Biden*, 23 F.4th 585, 606-608 (6th Cir. 2022); *Louisiana v. Biden*, 55 F.4th 1017, 1029 (5th Cir. 2022); *Georgia v. President of the U.S.*, 46 F.4th 1283, 1295-1296 (11th Cir. 2022); *see also Nebraska v. Su*, 121 F.4th 1, 17-22 (9th Cir. 2024) (Nelson, J., concurring) (closely analyzing whether "major questions doctrine" applies to presidential delegations and concluding that "nothing excuses the President from its commands").  That is no surprise.  After all, the major questions doctrine is fundamentally concerned with the delegation of legislative powers to the executive branch, which is controlled by the President.  *See West Virginia*, 597 U.S. at 737 (Gorsuch, J., concurring) ("The major questions doctrine works *** to protect the Constitution's separation of powers.").  Absent vigilance over the extent of delegated authority, legislation risks "becoming nothing more than the will of the current President[.]"  *Id*. at 739 (Gorsuch, J., concurring); *see also Consumers' Rsch.*, 2025 WL 1773630, at *22 (Kavanaugh, J., concurring) ("Th[e] major questions canon reflects both background separation of powers

49

understandings and the commonsense interpretive maxim that Congress does not usually 'hide elephants in mouseholes' when granting authority to the *President*." (emphasis added)).

Defendants also argue that the doctrine does not apply to national-security and foreign-policy matters, where presidents are typically afforded deference. Br. 47-48. But at issue here is the distinctly Article *I* (not Article *II*) tariffing power as imposed on Americans. When the President assumes powers "the Constitution has expressly confided to the Congress and not to the President," *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952), deference is afforded only so long as the President acts pursuant to the "authorization of Congress," *id.* at 635-636 (Jackson, J., concurring). The major questions doctrine is a tool to determine the extent of such authorization. In *Youngstown*, the majority and four separate opinions all recognized that presidential orders must be invalidated if "not rooted in" statutory authority, *id.* at 586, and so they proceeded to invalidate the President's seizure of steel mills during the Korean War—despite the obvious foreign-policy implications.

*Finally*, the President's interpretation implicates the non-delegation doctrine. Had Congress granted the President the authority to unilaterally impose tariffs that remake the global economy, without any restrictions other than the President's (assertedly unreviewable) power to declare an "emergency," then that grant of authority would amount to an unconstitutional delegation of legislative power.

50

Under Supreme Court precedent, any grant of legislative authority to the Executive must be accompanied by an "intelligible principle" to guide the Executive's discretion. *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)). "The guidance needed is greater *** when an [executive] action will affect the entire national economy." *Consumers' Rsch.*, 2025 WL 1773630, at *8 (internal quotation marks omitted).

Under the Executive Branch's view of IEEPA, however, there is no limiting guidance, instruction, or restriction from Congress about the products on which the President may impose tariffs; which country or countries the President may target; the permissible amount or range of the tariff; the duration of the tariff; the amount of notice the President must provide; or the relationship between the tariff action and the emergency declared. Everything is at the President's discretion. Indeed, Defendants claim in the parallel CIT cases that such issues are essentially non-justiciable. *E.g.*, Opening Br. 58-59, *V.O.S. Selections v. Trump*, Nos. 2025-1812, -1813 (Fed. Cir. June 24, 2025), ECF No. 61 (deeming measures President takes to deal with declared emergency "not susceptible to meaningful judicial review").[24]

---

[24] The government protests that its "interpretation does not embrace the boundless power the district court posited," Br. 44, but conspicuously offers no limitations beyond the President's ostensibly unreviewable declaration of an "emergency" (one of which, it notes, has been "renewed continuously" since 1979, *id.* at 12).

### III.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ISSUING A PRELIMINARY INJUNCTION LIMITED TO PLAINTIFFS

A party seeking a preliminary injunction must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016).

*First*, the district court correctly held that Plaintiffs were likely to succeed on the merits of their claim that the IEEPA tariffs are unlawful because IEEPA does not authorize any tariffs at all.  *See* Part II, *supra*; JA115.

*Second*, the district court did not clearly err in finding that Plaintiffs would likely suffer irreparable harm absent an injunction—and that the IEEPA tariffs in fact posed "an existential threat to [Plaintiffs'] businesses." JA116.  The court found that Plaintiffs' "customers ha[d] already canceled over $1 million in orders" and that Plaintiffs "face[d] an immediate 40 or 50 percent decline in sales, year-over-year." JA116.  It also found that "[w]ithout an injunction, Plaintiffs may have to refinance loans on unfavorable terms; significantly scale back operations and product offerings; close facilities; lay off employees; or possibly sell their businesses." *Id.*

Defendants contend that Plaintiffs can get refunds on "duties deposited" that are ultimately declared unlawful.  Br. 59.  But because Plaintiffs have "no realistic

way to cover" the IEEPA tariffs upfront, "the tariffs act as an immediate *ban* on the products [Plaintiffs] import."  JA55 (emphasis added).  If Plaintiffs cannot import, they cannot receive refunds on unlawful duties or stem the loss of "sales, business, opportunities, market share, or customer goodwill."  JA117-118.  Defendants nowhere suggest "that adequate compensatory or other corrective relief will be available at a later date" for those losses.  *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (citation omitted); *see, e.g.*, *Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962) (loss of goodwill and "loss of profits which could never be recaptured" constituted irreparable harm); *Nalco Co. v. U.S. E.P.A.*, 786 F. Supp. 2d 177, 188 (D.D.C. 2011) ("loss of [l]ong-standing clients" was irreparable harm (internal quotation marks omitted) (alteration in original)).

Plaintiffs' harms are not speculative.  As their sworn declaration chronicles in detail, they are based on the direct fallout of the IEEPA tariffs and Plaintiffs' previous experiences with their customer base.  *See* JA53-JA54, JA57-JA60; *compare Wisconsin Gas Co.*, 758 F.2d at 676 ("totally unsubstantiated" claims of injury).  Nor will the district court's conclusions "require a finding of irreparable harm to every plaintiff challenging a policy with potential effects on their business." Br. 60.  As the court found, "Plaintiffs are not massive entities that can withstand such losses in their core businesses."  JA116 (internal quotation marks and alteration

omitted). They are family-owned businesses facing extraordinary and unrecoverable losses from the IEEPA tariffs.

*Third*, the District Court did not abuse its discretion in concluding that the remaining equitable factors favor a preliminary injunction. Because a "high likelihood of success on the merits is a strong indicator that a preliminary injunction would serve the public interest," that factor weighs in Plaintiffs' favor. *League of Women Voters*, 838 F.3d at 12; *id.* ("There is generally no public interest in the perpetuation of unlawful agency action."). Moreover, the preliminary injunction at issue applies narrowly to Plaintiffs alone. Defendants cannot explain how a temporary injunction on two small businesses—not the nationwide injunction at issue in the CIT cases— could possibly impact the conduct of the President's foreign policy in the extreme manner Defendants allege. *See* Br. 56. Defendants claim that trading partners may "feel emboldened" if they believe the President "lacks power to promptly respond to future emergencies." Br. 57 (emphasis omitted). But that is a concern about "any ruling," Br. 58, not an injunction. Anyway, the proverbial horse has left the barn: Nothing can undo the fact that all four judges across the two courts to have adjudicated the merits have *already* ruled the IEEPA tariffs unlawful.

There is also good reason to doubt the extent of harm Defendants claim. In the district court, Defendants submitted declarations from members of the President's Cabinet claiming that "[a]n adverse ruling" would threaten the

President's "foreign-policy accomplishments and objectives." *E.g.*, JA79; *see* Br. 58-59. But in the aftermath of the two "adverse ruling[s]" handed down at the end of May, the White House and at least one of the declarants (Secretary of Commerce Howard Lutnick) flatly denied the rulings would have *any* effect on trade negotiations. According to Secretary Lutnick, for example, the adverse rulings had "cost [the Administration] a week, maybe, *** but then everybody came right back to the table"; "[e]verybody is talking to us"; the President had "many other authorities" to impose tariffs even if the IEEPA tariffs were found unlawful; and if China could not "get a deal done," President Trump will simply "determine what deal there is going to be."[25]

*Finally*, the district court did not abuse its discretion in setting a nominal bond amount. Federal Rule of Civil Procedure 65(c) "vest[s] broad discretion in the district court to determine the appropriate amount of an injunction bond." *DSE, Inc., v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999). Courts frequently require only a nominal bond where anything more "would have the effect of denying the plaintiffs their right to judicial review of administrative action." *Natural Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases). Defendants asked the district court to "order Plaintiffs to post a bond in the amount of the tariffs

---

[25] Interview with Howard Lutnick, Secretary of Commerce, Fox News (June 1, 2025), https://www.foxnews.com/video/6373741455112.

they would pay but for the preliminary injunction." JA122. The district court determined that such bonding conditions would "effectively defeat the purpose of the preliminary relief," leaving Plaintiffs just as financially burdened as if they were paying the full amount of unlawful duties. JA122. At the same time, forgoing duties on Plaintiffs' imports alone will have essentially no impact on the government.

## CONCLUSION

This Court should affirm the district court's grant of a preliminary injunction.

Respectfully submitted,

*/s/ Pratik A. Shah*
Pratik A. Shah
James E. Tysse
Matthew R. Nicely
Daniel M. Witkowski
Kristen E. Loveland
AKIN GUMP STRAUSS HAUER
  & FELD LLP
2001 K Street, N.W.
Washington, D.C. 20006
Tel: (202) 887-4000
Fax: (202) 887-4288
pshah@akingump.com

*Counsel for Plaintiffs-Appellees*

Dated: July 23, 2025

## CERTIFICATE OF COMPLIANCE

The foregoing brief is in 14-point Times New Roman proportional font and contains 12,969 words, and thus complies with Federal Rule of Appellate Procedure 32(a) and Circuit Rule 32(e)(1).

Dated:      July 23, 2025

/s/ Pratik A. Shah
Pratik A. Shah

## CERTIFICATE OF SERVICE

I hereby certify that, on July 23, 2025, I served the foregoing brief upon counsel of record by filing a copy of the document with the Clerk through the Court's electronic docketing system.


*/s/ Pratik A. Shah*
Pratik A. Shah

**ADDENDUM**

**ADDENDUM**

**TABLE OF CONTENTS**

28 U.S.C. § 1581 ................................................................................................Add. 1

50 U.S.C. § 1701 ................................................................................................Add. 4

50 U.S.C. § 1702 ................................................................................................Add. 5

U.S. Const. art. I, § 8, cl. 1 ..............................................................................Add. 8

U.S. Const. art. I, § 8, cl. 3 ..............................................................................Add. 9

U.S. Const. art. I, § 9, cl. 5 ..............................................................................Add. 10

**United States Code**

**Title 28. Judiciary and Judicial Procedure**

**Part IV. Jurisdiction and Venue**

**Chapter 95. Court of International Trade**

**§ 1581. Civil actions against the United States and agencies and officers thereof**

**(a)** The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to contest the denial of a protest, in whole or in part, under section 515 of the Tariff Act of 1930.

**(b)** The Court of International Trade shall have exclusive jurisdiction of any civil action commenced under section 516 of the Tariff Act of 1930.

**(c)** The Court of International Trade shall have exclusive jurisdiction of any civil action commenced under section 516A or 517 of the Tariff Act of 1930.

**(d)** The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to review--

   **(1)** any final determination of the Secretary of Labor under section 223 of the Trade Act of 1974 with respect to the eligibility of workers for adjustment assistance under such Act;

   **(2)** any final determination of the Secretary of Commerce under section 251 of the Trade Act of 1974 with respect to the eligibility of a firm for adjustment assistance under such Act;

   **(3)** any final determination of the Secretary of Commerce under section 2731 of the Trade Act of 1974 with respect to the eligibility of a community for adjustment assistance under such Act; and

   **(4)** any final determination of the Secretary of Agriculture under section 293 or 296 of the Trade Act of 1974 (19 U.S.C. 2401b) with respect to the eligibility of a group of agricultural commodity producers for adjustment assistance under such Act.

**(e)** The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to review any final determination of the Secretary of the Treasury under section 305(b)(1) of the Trade Agreements Act of 1979.

**(f)** The Court of International Trade shall have exclusive jurisdiction of any civil action involving an application for an order directing the administering authority or the International Trade Commission to make confidential information available under section 777(c)(2) of the Tariff Act of 1930.

**(g)** The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to review--

> **(1)** any decision of the Secretary of the Treasury to deny a customs broker's license under section 641(b)(2) or (3) of the Tariff Act of 1930, or to deny a customs broker's permit under section 641(c)(1) of such Act, or to revoke a license or permit under section 641(b)(5) or (c)(2) of such Act;

> **(2)** any decision of the Secretary of the Treasury to revoke or suspend a customs broker's license or permit, or impose a monetary penalty in lieu thereof, under section 641(d)(2)(B) of the Tariff Act of 1930; and

> **(3)** any decision or order of the Customs Service to deny, suspend, or revoke accreditation of a private laboratory under section 499(b) of the Tariff Act of 1930.

**(h)** The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to review, prior to the importation of the goods involved, a ruling issued by the Secretary of the Treasury, or a refusal to issue or change such a ruling, relating to classification, valuation, rate of duty, marking, restricted merchandise, entry requirements, drawbacks, vessel repairs, or similar matters, but only if the party commencing the civil action demonstrates to the court that he would be irreparably harmed unless given an opportunity to obtain judicial review prior to such importation.

**(i)(1)** In addition to the jurisdiction conferred upon the Court of International Trade by subsections (a)-(h) of this section and subject to the exception set forth in subsection (j) of this section, the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for--

> **(A)** revenue from imports or tonnage;

> **(B)** tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue;

Add. 2

**(C)** embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety; or

**(D)** administration and enforcement with respect to the matters referred to in subparagraphs (A) through (C) of this paragraph and subsections (a)-(h) of this section.

**(2)** This subsection shall not confer jurisdiction over an antidumping or countervailing duty determination which is reviewable by--

**(A)** the Court of International Trade under section 516A(a) of the Tariff Act of 1930 (19 U.S.C. 1516a(a)); or

**(B)** a binational panel under section 516A(g) of the Tariff Act of 1930 (19 U.S.C. 1516a(g)).

**(j)** The Court of International Trade shall not have jurisdiction of any civil action arising under section 305 of the Tariff Act of 1930.

**United States Code**

**Title 50. War and National Defense**

**Chapter 35. International Emergency Economic Powers**

**§ 1701. Unusual and extraordinary threat; declaration of national emergency; exercise of Presidential authorities**

**(a)** Any authority granted to the President by section 1702 of this title may be exercised to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat.

**(b)** The authorities granted to the President by section 1702 of this title may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose. Any exercise of such authorities to deal with any new threat shall be based on a new declaration of national emergency which must be with respect to such threat.

**United States Code**

**Title 50. War and National Defense**

**Chapter 35. International Emergency Economic Powers**

**§ 1702. Presidential authorities**

**(a) In general**

**(1)** At the times and to the extent specified in section 1701 of this title, the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise--

**(A)** investigate, regulate, or prohibit--

**(i)** any transactions in foreign exchange,

**(ii)** transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

**(iii)** the importing or exporting of currency or securities,

by any person, or with respect to any property, subject to the jurisdiction of the United States;

**(B)** investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States; and.

**(C)** when the United States is engaged in armed hostilities or has been attacked by a foreign country or foreign nationals, confiscate any property, subject to the jurisdiction of the United States, of any foreign person, foreign organization, or foreign country that he determines has planned, authorized, aided, or engaged in such hostilities or attacks against the United States; and all right, title, and interest in any property so confiscated shall vest, when, as, and upon the terms directed by the President, in such agency or person as the President may designate from time to time, and upon such terms and

Add. 5

conditions as the President may prescribe, such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States, and such designated agency or person may perform any and all acts incident to the accomplishment or furtherance of these purposes.

**(2)** In exercising the authorities granted by paragraph (1), the President may require any person to keep a full record of, and to furnish under oath, in the form of reports or otherwise, complete information relative to any act or transaction referred to in paragraph (1) either before, during, or after the completion thereof, or relative to any interest in foreign property, or relative to any property in which any foreign country or any national thereof has or has had any interest, or as may be otherwise necessary to enforce the provisions of such paragraph. In any case in which a report by a person could be required under this paragraph, the President may require the production of any books of account, records, contracts, letters, memoranda, or other papers, in the custody or control of such person.

**(3)** Compliance with any regulation, instruction, or direction issued under this chapter shall to the extent thereof be a full acquittance and discharge for all purposes of the obligation of the person making the same. No person shall be held liable in any court for or with respect to anything done or omitted in good faith in connection with the administration of, or pursuant to and in reliance on, this chapter, or any regulation, instruction, or direction issued under this chapter.

**(b)** Exceptions to grant of authority

The authority granted to the President by this section does not include the authority to regulate or prohibit, directly or indirectly--

**(1)** any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value;

**(2)** donations, by persons subject to the jurisdiction of the United States, of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering, except to the extent that the President determines that such donations (A) would seriously impair his ability to deal with any national emergency declared under section 1701 of this title, (B) are in response to coercion against the proposed recipient or donor, or (C) would endanger Armed Forces of the United States which are engaged in hostilities or are in a situation where imminent involvement in hostilities is clearly indicated by the circumstances; or

Add. 6

**(3)** the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds. The exports exempted from regulation or prohibition by this paragraph do not include those which are otherwise controlled for export under section 4604 of this title, or under section 46053 of this title to the extent that such controls promote the nonproliferation or antiterrorism policies of the United States, or with respect to which acts are prohibited by chapter 37 of Title 18;

**(4)** any transactions ordinarily incident to travel to or from any country, including importation of accompanied baggage for personal use, maintenance within any country including payment of living expenses and acquisition of goods or services for personal use, and arrangement or facilitation of such travel including nonscheduled air, sea, or land voyages.

**(c)** Classified information.--In any judicial review of a determination made under this section, if the determination was based on classified information (as defined in section 1(a) of the Classified Information Procedures Act) such information may be submitted to the reviewing court ex parte and in camera. This subsection does not confer or imply any right to judicial review.

**United States Constitution**

**Article I. The Congress**

**Section 8, Clause 1. Powers of Congress; Levy of Taxes for Common Defense and General Welfare; Uniformity of Taxation**

The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States;

**United States Constitution**

**Article I. The Congress**

**Section 8, Clause 3. Regulation of Commerce**

The Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes;

**United States Constitution**

**Article I. The Congress**

**Section 9, Clause 5. Taxes or Duties on Exports From States**

No Tax or Duty shall be laid on Articles exported from any State.