**ORAL ARGUMENT – SEPTEMBER 30, 2025**

No. 25-5202

========================

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

LEARNING RESOURCES, et al.,
*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, in his official capacity
as President of the United States, et al.
*Defendants-Appellants*.

————————————

On Appeal from the
U.S. District Court for the District of Columbia
(No. 1:25-cv-1248-RC)

————————————

**AMICUS CURIAE BRIEF OF
WASHINGTON LEGAL FOUNDATION
SUPPORTING PLAINTIFFS-APPELLEES AND AFFIRMANCE**

————————————

Cory L. Andrews
Zac Morgan
  *Counsel of Record*
WASHINGTON LEGAL FOUNDATION
2009 Massachusetts Ave., NW
Washington, DC 20036
(202) 588-0302
zmorgan@wlf.org

July 24, 2025

*Counsel for Amicus Curiae*

========================

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Under D.C. Circuit Rule 28(a)(1), the undersigned counsel of record certifies:

### A.   **Parties and Amici**

All known parties and amici are listed in certificates in the Defendants-Appellants' and Plaintiffs-Appellees' briefs.

### B.   **Ruling Under Review**

The ruling under review is the May 29, 2025 opinion and order of the U.S. District Court for the District of Columbia in *Learning Resources v. Trump*, Case No. 25-1248 (D.D.C.) (Contreas, J.).

### C.   **Related Cases**

*Learning Resources v. Trump*, Case No. 24-1287 (U.S. 2025).

<u>/s/ Zac Morgan</u>
Zac Morgan

## STATEMENT ON AUTHORSHIP,
## MONETARY CONTRIBUTIONS, AND SEPARATE BRIEFING

No party's counsel authored any part of this brief and no one, other than Washington Legal Foundation and its counsel, contributed money intended to fund the brief's preparation and submission. Fed. R. App. P. 29(a)(4)(E).

As an organization dedicated to both free markets and the rule of law, WLF's brief is necessary to provide the Court with the unique perspective that, among other things, the vast scale and scope of business uncertainty posed by the President's tariffs undermines his interpretation of IEEPA under the major questions canon. D.C. Cir. R. 29(d).

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ii

GLOSSARY ........................................................................................ vii

INTEREST OF AMICUS CURIAE ........................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 1

ARGUMENT ...................................................................................... 3

I.    IEEPA PROVIDES NO LEGAL AUTHORITY FOR THE PRESIDENT'S
       TARIFFS ....................................................................................  3

II.   CONGRESS WOULD NOT HAVE PAWNED OFF A MULTI-TRILLION-
       DOLLAR ECONOMIC QUESTION THIS WAY ........................................ 11

CONCLUSION ...................................................................... 14

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ala. Ass'n of Realtors v. U.S. Dep't of HHS*,
  594 U.S. 758 (2021) ....................................................... 2, 3, 12, 14

*Biden v. Neb.*,
  600 U.S. 477 (2023) ............................................................ 7, 12, 14

*FCC v. Consumers' Rsch.*,
  606 U.S. __ (2025) ................................................................... 4

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ........................................................... 4, 11, 14

*Gonzales v. Or.*,
  546 U.S. 243 (2006) ................................................................. 4, 6, 7

*Gundy v. United States*,
  588 U.S. 128 (2019) ................................................................... 4, 9

*Gustafson v. Alloyd Co.*,
  513 U.S. 561 (1995) ...................................................................... 7

*J.W. Hampton Jr. & Co. v. United States*,
  276 U.S. 394 (1928) ................................................................... 4, 9

*Learning Resources v. Trump*,
  Case No. 24-1287 (U.S. 2025) ........................................................ 1

*Lucia v. SEC*,
  585 U.S. 237 (2018) ...................................................................... 1

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*,
  512 U.S. 218 (1994) ...................................................................... 8

*NFIB v. Sebelius,*
    567 U.S. 519 (2012) ..................................................................6

*NFIB v. U.S. Dep't of Labor,*
*Occupational Safety & Health Admin.,*
    595 U.S. 109 (2022) ..................................................................3

*Sacks v. Office of Foreign Assets Control,*
    466 F.3d 764 (9th Cir. 2006) ..................................................10

*Seila Law LLC v. Consumer Fin. Prot. Bureau,*
    591 U.S. 197 (2020) ..................................................................1

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.,*
    605 U.S. __ (2025)....................................................................1

*W. Va. v. EPA,*
    597 U.S. 697 (2022) ...............................................2, 4, 7, 9, 11, 14

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ..................................................................4

## Constitutional Provisions

U.S. Const., art. I, § 8............................................................................3

U.S. Const., art. II ...........................................................................1, 4

## Statutory Provisions

19 U.S.C. § 1338 ..................................................................................3

19 U.S.C. § 1338(a) ..............................................................................8

19 U.S.C. § 1862 ..................................................................................3

19 U.S.C. § 1862(c)(1)(B) .....................................................................8

19 U.S.C. § 2132 ............................................................................ 3

19 U.S.C. § 2132(a) ....................................................................... 8

19 U.S.C. § 2411 ............................................................................ 3

19 U.S.C. § 2411(c)(1)(B) ............................................................. 8

50 U.S.C. § 1702(a)(1)(B).............................................. 2, 6, 7, 11

50 U.S.C. § 1702(b)(2-3) ............................................................. 7

**Executive Orders**

Executive Order 14193.................................................................. 5

Executive Order 14194.................................................................. 5

Executive Order 14195.................................................................. 5

Executive Order 14231.................................................................. 5

Executive Order 14232.................................................................. 5

Executive Order 14245.................................................................. 5

Executive Order 14257............................................................... 5, 7

Executive Order 14259.............................................................. 5, 13

Executive Order 14266.................................................................. 5

Executive Order 14298.............................................................. 5, 13

Executive Order 14316.............................................................. 5, 13

## Proposed Legislation

*A Bill to Authorize the President to Impose a Tariff Surcharge . . .*,
    H.R. 1740,
    98th Congress (1983)......................................................................11

*Balanced Trade Restoration Act*, S. 3899,
    109th Congress (2006)...................................................................10

*Neither Permanent Nor Normal Trade Relations Act*, S. 5264,
    118th Congress (2023)...................................................................10

*Restoring Trade Fairness Act*, H.R. 10127,
    118th Congress (2023)...................................................................10

*United States Reciprocal Trade Act*, H.R. 764,
    116th Congress (2019)...................................................................10

## Other Authorities

U.S Dep't of Commerce, Bureau of Economic Analysis,
    *U.S. International Trade in Goods and Services,*
    *Annual and December 2024,* (Feb. 5, 2025) ....................................2

Simon Constable,
    "Don't Conflate Tariffs With Sanctions: They're Quite
    Different,"
    *Forbes*, Apr. 9, 2018........................................................................6

Alan Greenspan & Adrian Wooldridge,
    *Capitalism in America: A History* (2018)......................................13

Scott Lincicome,
    "Toys, Pencils, and Poverty at the Margins,"
    *Cato Inst.*, May 7, 2025 ..................................................................13

Xuan-Thao Nguyen & Jeffrey A. Maine,
    *Attacking Innovation*,
    99 B.U. L. Rev. 1687 (2019) ........................................................ 13

Pub. L. No. 95-223, 91 Stat. 1625 (1977) .................................................. 6

Statement of President Carter on Signing H.R. 7738 Into Law
(Dec. 28, 1977) ........................................................................... 10

# GLOSSARY

| | |
|---|---|
| EPA | Environmental Protection Agency |
| FCC | Federal Communications Commission |
| FDA | Food and Drug Administration |
| HHS | Health and Human Services |
| IEEPA | International Emergency Economic Powers Act |
| NFIB | National Federation of Independent Business |
| SEC | Securities and Exchange Commission |
| WLF | Washington Legal Foundation |

## INTEREST OF AMICUS CURIAE

Washington Legal Foundation is a nonprofit, public-interest law firm and policy center with supporters nationwide. WLF promotes free markets, individual rights, and the rule of law. It often appears as amicus curiae in cases where one branch of the federal government has usurped the powers of another. *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197 (2020); *Lucia v. SEC*, 585 U.S. 237 (2018). WLF has also filed as amicus curiae before the U.S. Supreme Court in a related case. *Learning Resources v. Trump*, Case No. 24-1287 (U.S. June 18, 2025).

## INTRODUCTION AND SUMMARY OF ARGUMENT

"In deciding cases involving the American economy, courts should strive, where possible, for clarity and predictability." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.,* 605 U.S. __, 145 S. Ct. 1497, 1518 (2025). The President claims a virtually unlimited authority to tariff. He relies not on inherent Article II powers, but on the International Emergency Economic Powers Act (IEEPA). The President reads IEEPA as if it gives him the authority to "tax imports." But that's not what IEEPA says at all.

1

True, IEEPA contains a 76-word provision, 50 U.S.C. § 1702(a)(1)(B), that happens to contain the words "regulate" and "importation." Not next to each other, but sixteen (very different) words apart. On this basis, and this basis alone, the President asserts the right to control America's seven-trillion-dollar import-export market by himself. U.S. Dep't of Commerce, Bureau of Economic Analysis, *U.S. International Trade in Goods and Services, Annual and December 2024*, (Feb. 5, 2025); https://perma.cc/UQ2E-LDB4.

The President's contention that two "modest words," *W. Va. v. EPA*, 597 U.S. 697, 723 (2022) (internal quotation marks and citation omitted), so separated from each other in the text, grant him a global license to tariff is just wrong. "We expect Congress to speak clearly when authorizing [the Executive] . . . to exercise powers of vast economic and political significance." *Ala. Ass'n of Realtors v. U.S. Dep't of HHS*, 594 U.S. 758, 764 (2014) (internal quotation marks and citation omitted). Congress knows well how to delegate the ability to tariff to the President and those Executive Branch personnel he commands; it did not do so here. Congress has finely, even minutely, described the

circumstances under which the President may impose import taxes. *E.g.,* 19 U.S.C. §§ 1338, 1862, 2132, 2411.

Yet the President claims IEEPA as a "sweeping authority," *Ala. Ass'n of Realtors*, 594 U.S. at 760, to impose, reduce, hike, suspend, double, treble, quadruple, eliminate, and re-enact tariffs on any import, bounded only by the ministerial act of first announcing a national emergency. *Id.* at 766 (ending *ultra vires* executive action undertaken via emergency powers); *NFIB v. U.S. Dep't of Labor, Occupational Safety & Health Admin.*, 595 U.S. 109, 120-21 (2022) (same). It "strains credulity," *Ala. Ass'n of Realtors*, 594 U.S. at 760, that Congress, well-aware of the importance of regulatory and taxation certainty to America's business community, would have given the President unbridled whipsaw authority on such a major question.

## ARGUMENT

### I. IEEPA PROVIDES NO LEGAL AUTHORITY FOR THE PRESIDENT'S TARIFFS.

The Constitution unreservedly entrusts the tariff power to Congress, and only Congress may authorize the President to "lay and collect . . . Imposts and Excises." U.S. Const., art. I, § 8. If the President wishes to set tariff rates by executive order, his "power, if any, to issue"

3

such an "order must stem . . . from an act of Congress." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952); *J.W. Hampton Jr. & Co. v. United States*, 276 U.S. 394, 413 (1928) (Congress may delegate customs duty rates to the Executive).

Tariffs are taxes on international trade. As a result, they may well pose second-order "diplomatic challenges" and consequences "in the national security or foreign policy contexts" for the President. *FCC v. Consumers' Rsch.*, 606 U.S. __, 145 S. Ct. 2482, 2516 (2025) (Kavanaugh, J., concurring). But since there is no "independent Article II authority" or "power" to tariff, courts are not to presume "that Congress intend[ed] to give the President substantial authority and flexibility" to do so, *id.*, through open-ended, "oblique," *Gonzales v. Or.*, 546 U.S. 243, 267 (2006), "vague," *W. Va.*, 597 U.S. at 732, or "cryptic" terms. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000). Rather, any statutory authority for a freestanding presidential right to tariff must be unambiguous. *See Gundy v. United States*, 588 U.S. 128, 163 (2019) (Gorsuch, J., dissenting) ("To boost American competitiveness in international trade, the legislation directed the President to investigate the relative costs of production for American

companies and their foreign counterparts and impose tariffs or duties that would equalize those costs") (internal quotation marks and citations omitted).

The President reads IEEPA as such a clear authority. Trump Br. at 35 ("IEEPA's text, history, and precedent confirm that it *clearly* empowers the President to impose tariffs . . .") (emphasis supplied); *see*, *e.g.*, Executive Orders 14316, 14298, 14266, 14259, 14257, 14256, 14245, 14232, 14231, 14195, 14194, 14193. He has leaned on IEEPA to impose specific tariffs on some of the Nation's largest trading partners, *e.g.*, Executive Orders 14193 (Canada), 14194 (Mexico), 14195 (China), to impose reciprocal rates on other countries to improve America's balance-of-trade, Executive Order 14257, and to impose a more-or-less universal floor tariff of ten percent on all foreign goods sold in the United States. *Id.* Some of those tariffs have been altered or held in abeyance (for now), but not all. What certainly hasn't changed is the President's theory that IEEPA gives him a free hand.

But IEEPA doesn't say what the President says it does. As the district court noted, "IEEPA does not use the words 'tariffs' or 'duties,' their synonyms, or any other similar terms like 'customs,' 'taxes,' or

5

'imposts.'" JA 104. This is unsurprising given the Act's provenance—an economic sanctions statute enacted with wartime or near-wartime conditions in mind. Pub. L. No. 95-223, 91 Stat. 1625 (1977) (enacting IEEPA "[w]ith respect to the powers of the President in time of war or national emergency"). And "[t]ariffs aren't the same as sanctions. Not even close." Simon Constable, "Don't Conflate Tariffs With Sanctions: They're Quite Different," *Forbes*, Apr. 9, 2018.

Start with "the language of the delegation provision itself." *Gonzales*, 546 U.S. at 258. Section 1702(a)(1)(B) has 76 operative words. To be sure, two of those words are "regulate" and "importation," themselves separated by sixteen additional words. 50 U.S.C. § 1702(a)(1)(B). The President sharpshoots those two words and gives them extraordinary meaning—the power to regulate commerce is not typically understood as the power to tax, *see NFIB v. Sebelius*, 567 U.S. 519 (2012)—to justify his extraordinary claim. JA 105 ("To regulate is to establish rules governing conduct; to tariff is to raise revenue through taxes on imports or exports").

And the sixteen words in between also matter—"statutes 'should not be read as a series of unrelated and isolated provisions.'" *Gonzales*,

546 U.S. at 273 (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995)). The President's reading can be accepted only if "regulate" and "importation" are "shorn of all context," with each "word . . . an empty vessel" for an interpreter to fill. *W. Va.*, 597 U.S. at 732. But such "a vacuum is no home for a textualist." *Biden v. Neb.*, 600 U.S. 477, 517 (2023) (Barrett, J., concurring). Those sixteen words, "direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation," are far removed from the rote rate-setting of customs duties. 50 U.S.C. § 1702(a)(1)(B). Those words involve compellence, voidance, prevention—traditional national-security or wartime aims one would expect in a sanctions authority, not a taxing one.

Other provisions of IEEPA further militate against the President's strained construction. IEEPA contains carve-outs for American "donations" of "food, clothing, and medicine" and the exporting of American "informational materials." 50 U.S.C. § 1702(b)(2-3). That's unsurprising if IEEPA is about economic sanctions, but quite odd if it's an import-export-balancing power. *Cf.* Executive Order 14257 (imposing reciprocal tariffs and an import floor duty of ten percent). In short,

7

"[w]hat we have here, in" the President's preferred reading, "is a fundamental revision of the statute." *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231 (1994).

Yet other, uncontested, delegations of the tariff power by Congress to the President—housed in Title 19 (customs duties) and not Title 50 (war and national defense)—do not require the reader to squint or delete. Section 1338 gives the President the power to "specify and declare new or additional duties." 19 U.S.C. § 1338(a). Section 1862 enumerates the circumstances under which the President may "adjust imposts of an article and its derivatives" for national security reasons. 19 U.S.C. § 1862(c)(1)(B). Section 2132 authorizes him to correct the Nation's balance-of-payments through "a temporary import surcharge" or "temporary limitations through the use of quotas." 19 U.S.C. § 2132(a). And section 2411 allows the President, through the U.S. Trade Representative he controls, to "impose duties or other import restrictions on the goods of, and, notwithstanding any other provision of law, fees or restrictions on the services of, such foreign country for such time as [is] . . . appropriate." 19 U.S.C. § 2411(c)(1)(B).

Contrast IEEPA with the Tariff Act of 1922, which the Supreme Court blessed against a separation-of-powers challenge. *J.W. Hampton*, 276 U.S. at 413. Congress enacted that statute "[t]o boost American competitiveness in international trade," not provide for near-wartime exigencies. *Gundy*, 588 U.S. at 163 (Gorsuch, J., dissenting). It "directed the President to investigate the relative costs of production for American companies and their foreign counterparts and impose tariffs or duties that would equalize their costs," all while providing "guidance on how to determine costs of production, listing several relevant factors and establishing a process for interested parties to submit evidence." *Id.* (internal quotation marks and citations omitted). The Tariff Act did all this expressly, not with blink-and-you-miss-it verbiage. *Id.* (It also bears some textualist weight that the Tariff Act was called the *Tariff* Act.)

Lacking similarly explicit authorization, the President's brief focuses on President Nixon's aberrant and deeply contested *post hoc* rationalization that IEEPA's predecessor statute (not even IEEPA) provided a legal basis to (briefly) impose tariffs. The President contends that IEEPA's "modest words," *W. Va.*, 597 U.S. at 723 (internal quotation marks and citation omitted), constitute a ratification of the

9

Nixon administration's conduct. Trump Br. at 37-38, 43-44. This blinks reality—IEEPA was a post-Watergate reform "passed by Congress to counter the perceived abuse of emergency controls by presidents to . . . interfere with international trade in non-emergency, peacetime situations." *Sacks v. Office of Foreign Assets Control*, 466 F.3d 764, 776 (9th Cir. 2006). President Carter, who signed IEEPA, confirmed that the statute was a "largely procedural" one, but one that "place[d] additional constraints on use of the President's emergency economic powers." Statement of President Carter on Signing H.R. 7738 Into Law (Dec. 28, 1977); https://perma.cc/BX8M-4J23.

In fact, over the past several decades, repeated Congressional efforts have tried and failed to confer upon the Executive Branch the power to do what the President now insists IEEPA already licenses him to do. *E.g.*, *Restoring Trade Fairness Act*, H.R. 10127, 118th Congress (2024) (authority for the President to impose tariffs on China); *Neither Permanent Nor Normal Trade Relations Act*, S. 5264, 118th Congress (2024) (same); *United States Reciprocal Trade Act*, H.R. 764, 116th Congress (2019) (vesting a reciprocal tariff power in the President); *Balanced Trade Restoration Act*, S. 3899, 109th Congress (2006)

(granting authority to the Commerce Secretary "[t]o achieve balance in the foreign trade of the United States, through a market-based system of tradable certificates"); *A Bill to Authorize the President to Impose a Tariff Surcharge . . .*, H.R. 1740, 98th Congress (1983) ("authoriz[ing] the President to impose a tariff surcharge on the products of certain countries in order to offset the expense of providing United States defense assistance to such countries"). None has succeeded. These failures further counsel against reading IEEPA as an unrestrained grant to the President. *See W. Va.*, 597 U.S. at 724 ("And the Agency's discovery allowed it to adopt a regulatory program that Congress had conspicuously and repeatedly declined to enact itself"); *Brown & Williamson*, 529 U.S. at 159-60 (stating similar).

## II. CONGRESS WOULD NOT HAVE PAWNED OFF A MULTI-TRILLION-DOLLAR ECONOMIC QUESTION THIS WAY.

"In arguing that Section [1702(a)(1)(B)] empowers [him] to substantially restructure the American [import-export] market," the President has "claimed to discover in a long-extant statute an unheralded power representing a transformative expansion in [his] . . . authority." *W. Va.*, 597 U.S. at 724 (cleaned up, brackets supplied). This action's "economic and political significance" is "staggering by any

11

measure." *Biden*, 600 U.S. at 502 (internal quotation marks and citations omitted). Whether IEEPA vests the President with unilateral tariff authority is a major question affecting trillions of dollars in purchasing, production, and pricing decisions for every business in America that engages, even in an ancillary fashion, in the international marketplace. JA 93 ("President Trump announced sweeping tariffs on virtually every U.S. trading partner"). Thus, "[e]ven if the text were ambiguous, the sheer scope of the [President's] claimed authority under [IEEPA] would counsel against the Government's interpretation." *Ala. Ass'n of Realtors*, 594 U.S. at 764.

A nearly 50-year-old statute, IEEPA has never been picked up by any other President to justify tariffs. Until now, the business community could rest assured that presidential tariffs would arrive only through established means with "express procedural, substantive, and temporal limits." JA 106. And under those provisions, the Executive's tariff authorities are either strictly time-limited, require a pre-tariff investigation, or have a notice period before taking effect. *Id.* at 106-07. Time limits give market actors a date certain for executive-only tariffs to expire. Time lags give market actors lead time to adjust (or petition

12

for change). This well-planned course gives the Nation's businesses legal certainty they can count on.

Businesses "crave certainty as much as almost anything: certainty is what allows them to make long-term plans and long-term investments." Alan Greenspan & Adrian Wooldridge, *Capitalism in America: A History* 258 (2018). Certainty is especially crucial in the context of tariffs. Tariffs are taxes, and "frequent tax changes [are] the greatest factor in business uncertainty affecting investment and growth." Xuan-Thao Nguyen & Jeffrey A. Maine, *Attacking Innovation*, 99 B.U. L. Rev. 1687, 1738 (2019).

But if IEEPA is a freestanding grant to the President, certainty crumbles. Rates can be (and have been) immediately and significantly changed day to day based on the Executive's policy whims. *E.g.*, Executive Orders 14316, 14298, 14259. Figuring out how to, say, fill shelves with enough inventory by Christmas in such circumstances is a heavy lift. Scott Lincicome, "Toys, Pencils, and Poverty at the Margins," *Cato Inst.*, May 7, 2025, http://perma.cc/9Z2Y-UBP2 (observing that "97 percent of toys purchased in the United States are imported").

13

So risking the legal certainty on which America's global supply chain depends is exactly the sort of "big-time policy call[]" that "a reasonable interpreter" would find unlikely to be "pawn[ed] . . . off to another branch" by the Congress. *Biden*, 600 U.S. at 515 (Barrett, J., concurring) (*see* citing to *W. Va.*, 597 U.S. at 722). "Regulate" no more grants the Executive a tariff power than "waive or modify" granted a power to cancel debt, *Biden*, 600 U.S. at 506, "necessary" granted a power to freeze evictions nationwide, *Ala. Ass'n of Realtors*, 594 U.S. at 765, or "drug" afforded carte blanche to regulate tobacco products. *Brown & Williamson*, 529 U.S. at 125.

## CONCLUSION

The President's claimed authority to tariff under IEEPA doesn't exist. This Court should affirm.

Respectfully submitted,

/s/ Zac Morgan
Cory Andrews
Zac Morgan
 *Counsel of Record*
WASHINGTON LEGAL FOUNDATION
2009 Massachusetts Ave. NW
Washington, DC 20036
(202) 588-0302
zmorgan@wlf.org

July 24, 2025

14

## CERTIFICATE OF COMPLIANCE AND SERVICE

I certify:

(i)     That this brief complies with the relevant length limitations set forth in the Rules. It contains 2,636 words.

(ii)    That this brief complies with the format, typeface, and type-style requirements of Fed. R. App. P. 32(a)(4)-(6) because it has been prepared using Microsoft Office Word and is set in 14-point Century Schoolbook font.

(iii)   That I electronically filed this brief with the Clerk via the CM/ECF system, which will serve all parties automatically.

<u>/s/ Zac Morgan</u>
Zac Morgan
*Counsel for Amicus Curiae*

July 24, 2025