ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 30, 2025

Case No. 25-5202

In The

# United States Court of Appeals
# for the District of Columbia Circuit

————————

LEARNING RESOURCES, INC., AND HAND2MIND, INC.,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES, ET AL.

*Defendants-Appellants*.

————————

*On Appeal from the United States District Court
for the District of Columbia
(No. 1:25-cv-01248-RC)*

————————

**BRIEF OF THE CATO INSTITUTE AS *AMICUS CURIAE* IN SUPPORT OF APPELLEES AND AFFIRMANCE**

<div style="margin-left:40%">

Thomas A. Berry
Brent Skorup
Charles M. Brandt
CATO INSTITUTE
1000 Massachusetts Avenue, N.W.
Washington, D.C. 20001
(443) 254-6330
tberry@cato.org
*Counsel for Amicus Curiae*

</div>

Dated: July 30, 2025

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), counsel certifies:

**Parties and *Amici Curiae*:**

**a.**      The Plaintiffs below and Appellees here are Learning Resources, Inc. and Hand2Mind, Inc.

The Defendants below and Appellants here are Donald J. Trump, in his official capacity as President of the United States, Kristi Noem, Secretary of the Department of Homeland Security, in her official capacity; United States Department of Homeland Security; Scott Bessent, Secretary of the Treasury, in his official capacity; United States Department of the Treasury; Howard W. Lutnick, Secretary of Commerce, in his official capacity; United States Department of Commerce; Pete Flores, Acting Commissioner of Customs & Border Protection, in his official capacity; United States Customs and Border Protection; Jamieson Greer, U.S. Trade Representative, in his official capacity; and Office of the United States Trade Representative.

The following parties participated as *amici* before the district court: Alan O. Sykes, America First Legal Foundation, Bambola LLC, Charles T. Hagel, Emily Ley Paper, Inc., George F. Allen, Gerrard N. Magliocca, Harold Hongju Koh, John C. Danforth, John Daniel Tinder, Joshua A. Claybourn, Kilo Brava LLC, Kim's Clothes and Fashion LLC, Michael B. Mukasey, Michael W. McConnell, Peter J. Wallison,

Philip Zelikow, Richard A. Epstein, Rokland LLC, and Steven G. Calabresi.

The following parties have participated or intend to participate as *amici* before this Court: America First Legal Foundation, Coalition for a Prosperous America, Consumer Watchdog, Advancing American Freedom, Inc., Alan O. Sykes, Alexander Volokh, Brennan Center for Justice, Charles T. Hagel, Frontline Policy Council, George F. Allen, Gerard N. Magliocca, Harold Hongju Koh, Independent Institute, Institute for Policy Integrity, John C. Danforth, John Daniel Tinder, Joshua A. Claybourn, Michael B. Mukasey, Michael Munger, Mountain States Policy Center, Peter J. Wallison, Phillip Zelikow, Richard A. Epstein, Rio Grande Foundation, the State of California, Wentong Zheng  Taxpayers Protection Alliance, Washington Legal Foundation, Protect Democracy Project

**b.**     The Cato Institute is a not-for-profit corporation, exempt from income tax under section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3); it has no parent corporation; and no publicly held company has a 10% or greater ownership interest in the Cato Institute.

### **Rulings Under Review:**

The rulings under review are the following: (1) Order Denying Defendants' Motion to Transfer Venue; Granting Plaintiffs' Motion for a Preliminary Injunction, dated May 29, 2025 (JA87); (2) Memorandum Opinion Denying Defendants' Motion to Transfer Venue; Granting Plaintiffs' Motion for a Preliminary Injunction,

dated May 29, 2025 (JA89); and (3) Order Setting Preliminary Injunction Bond, dated May 29, 2025 (JA122), by the Honorable Rudolph Contreras, United States District Judge.

**<u>Related Cases</u>:**

This case was not previously before this Court. A Petition for a Writ of Certiorari Before Judgment is currently pending before the Supreme Court. *Learning Resources, Inc. v. Trump*, No. 24-1287 (Jun. 17, 2025). Counsel for Cato Institute is not aware of any other case related to these cases under Rule 28(a)(1)(C).

Dated: July 30, 2025

/s/Thomas A. Berry
Thomas A. Berry

*Counsel for Amicus Curiae*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

*Amicus Curiae* the Cato Institute is a nonprofit corporation. It has no parent companies, subsidiaries, or affiliates that have issued shares or debt securities to the public. Pursuant to D.C. Circuit Rule 26.1(b), the Cato Institute states that it is a 501(c)(3) nonprofit organization dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies helps restore the principles of constitutional government that are the foundation of liberty.

/s/Thomas A. Berry

Dated:  July 30, 2025                                    Thomas A. Berry

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

RULE 26.1 CORPORATE DISCLOSURE STATEMENT....................................iv

TABLE OF CONTENTS.......................................................................................v

TABLE OF AUTHORITIES ...............................................................................vi

INTEREST OF *AMICUS CURIAE*...................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................1

ARGUMENT ........................................................................................................4

    I.    HISTORICAL PRACTICE CONFIRMS THAT TARIFF-SETTING
        IS A NONDELEGABLE LEGISLATIVE POWER ...............................4

    II.   IEEPA DOES NOT AUTHORIZE THE PRESIDENT TO
        MODIFY TARIFF RATES. ......................................................................8

        A.  IEEPA Provides No Textual Support for Tariff Authority.................8

        B.  IEEPA's Origins Confirm That Tariff Authority Remains with
            Congress. ..........................................................................................11

CONCLUSION ...................................................................................................15

CERTIFICATE OF COMPLIANCE....................................................................16

CERTIFICATE OF SERVICE ...........................................................................17

# TABLE OF AUTHORITIES

## Cases

*Alcan Sales v. United States*, 534 F.2d 920 (Cust. & Pat. App. 1976)....................14

*J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394 (1922) ..........................7, 8

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ............................... 3, 8, 10

*Marsh v. Chambers*, 463 U.S. 783 (1983) .............................................................5, 7

*Stoehr v. Wallace*, 255 U.S. 239 (1921) ...................................................................12

*The Pocket Veto Case*, 279 U.S. 655 (1929) ..............................................................7

*United States v. Yoshida Int'l, Inc.*, 526 F.2d 560 (Ct. Cust. & Pat. App. 1975) ..................................................................................................................14

*Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014) .................................................10

*West Virginia v. EPA*, 597 U.S. 697 (2022) ..........................................................4, 9

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)...............................7

## Statutes

19 U.S.C. § 1821(a) ......................................................................................................9

19 U.S.C. § 2132 ........................................................................................................14

19 U.S.C. § 2411(c)(1)(B) ...........................................................................................9

50 U.S.C. § 1701 ................................................................................................... 2, 12

50 U.S.C. § 1701(a) .....................................................................................................2

50 U.S.C. § 1701(b) .....................................................................................................2

50 U.S.C. § 1702 ..........................................................................................................9

50 U.S.C. § 1702(a)(1)(B) ...........................................................................................2

50 U.S.C. § 4305 ........................................................................................................12

50 U.S.C. § 4305(b)(3)...............................................................................................12

Act of Dec. 18, 1941, 55 Stat. 839............................................................................12

Act of July 13, 1861, 12 Stat. 255...............................................................................6

Act of July 4, 1789, 1 Stat. 24.....................................................................................5

Act of March 9, 1933, 48 Stat. 1 ...................................................................12

Oct. 6, 1917, ch. 106, § 5, 40 Stat. 415 .....................................................12

Revenue Act of 1913, 30 Stat. 151 ...............................................................5

Tariff Act of 1816, 3 Stat. 310 .......................................................................5

Tariff Act of 1832, 4 Stat. 583 .......................................................................5

Tariff Act of 1861, 12 Stat. 178 .....................................................................6

Tariff Act of 1883, 22 Stat. 488 .....................................................................6

Tariff Act of 1890, 26 Stat. 567 .....................................................................6

## **Other Authorities**

Blocking Property of Certain Persons Contributing to the Conflict in Cote
    d'Ivoire, Exec. Order 13396 (Feb. 7, 2006) ...........................................9

Forbidding the Hoarding of Gold Coin, Gold Bullion and Gold Certificates,
    Exec. Order No. 6102 (1933).................................................................13

Governing Certain Capital Transfers Abroad, Exec. Order 11387 (1968)..............13

Imposition of Supplemental Duty for Balance of Payments Purposes,
    Proclamation 4074 (Aug. 15, 1971).....................................................13

Mary M.C. Bowman, *Presidential Emergency Powers related to
    International Economic Transactions*, 11 VAND. L. REV. 515 (1978).................14

Michael H. Salsbury, *Presidential Authority in Foreign Trade: Voluntary
    Steel Import Quotas from a Constitutional Perspective*, 15 VA. J. INT'L
    L. 179 (1974) ........................................................................................11

Note, *The International Emergency Economic Powers Act*: *A Congressional
    Attempt to Control Presidential Emergency Power*, 96 HARV. L. REV. 1102
    (1983)....................................................................................................11

Oral Argument, *V.O.S. Selections, Inc. v. Trump*, No. 1:25-cv-00066 (Ct.
    Intl. Trade May 13, 2025)....................................................................10

Regulation of Consumer Credit, Exec. Order No. 8843 (1941) ...........................13

Reopening Banks, Exec. Order No. 8773 (1933) ....................................................12

Termination of Additional Duty for Balance of Payments Purposes,
    Proclamation 4098 (Dec. 20, 1971)......................................................13

THE FEDERALIST NO. 23 (Alexander Hamilton) (Royal Classics ed. 2020) .............7

## Regulations

Off. of Censorship, U.S. Censorship Reguls., 8 Fed. Reg. 1644 (Feb. 5, 1943)
............................................................................................................13

## Constitutional Provisions

U.S. CONST. art. I, § 8 ..........................................................................3, 4

U.S. CONST. art. III, § 1 ............................................................................7

U.S. CONST., art. I, § 1 .............................................................................4

## INTEREST OF *AMICUS CURIAE*[1]

The Cato Institute is a nonpartisan public-policy research foundation established in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies was established in 1989 to help restore the principles of limited constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books and studies, conducts conferences, produces the annual *Cato Supreme Court Review*, and files *amicus* briefs.

Cato Institute scholars have published extensive research on regulation and constitutional law. This case interests the Cato Institute because it concerns the legality of a contested exercise of executive power that threatens the separation of powers and economic liberty.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Soon after taking office, President Trump issued a series of executive orders and proclamations imposing tariffs on imports from dozens of countries. These actions, interspersed with negotiations with and responses from some of those countries, resulted in rapid increases and (partial) decreases in tariff rates. The

---

[1] All parties have consented to the filing of this brief. No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the brief's preparation or submission; and no person other than *amicus* contributed money intended to fund the brief's preparation or submission.

1

President imposed a 10% tariff on most trading partners, and imports from China were singled out with a combined tariff rate of 145% (since reduced). Notably, the President's orders cite the International Emergency Economic Powers Act of 1977, 50 U.S.C. § 1701 *et seq.* ("IEEPA"), as a statutory basis for the President's unilateral imposition of additional—and fluctuating—tariffs.

IEEPA grants the President broad authority to block transactions involving Americans and foreign nationals, *see id.* § 1702(a)(1)(B), and the law is frequently used by Presidents to impose economic sanctions on nations and foreign citizens. But the statute explicitly limits this authority to situations involving "an unusual and extraordinary threat" for which "a national emergency has been declared for purposes of this chapter," and the law provides that these powers "may not be exercised for any other purpose." *Id.* § 1701(b). "[T]o deal with any [such] threat," IEEPA continues, the President may "regulate . . . importation." *Id.* § 1701(a); § 1702(a)(1)(B).

The President's novel tariffs, purportedly imposed to combat illegal drug operations and trade imbalances, have inflicted significant costs on thousands of American business owners who rely on imports. Learning Resources, Inc. and hand2mind, Inc.—family-owned businesses that import and sell educational toys for children—sued to enjoin the imposition of these tariffs, alleging violations of IEEPA and the Constitution. The court below agreed with the importers that IEEPA does

2

not authorize the President "to unilaterally impose, revoke, pause, reinstate, and adjust tariffs to reorder the global economy." *See* Resp. Br. 14 (internal quotation marks omitted). The court analyzed IEEPA's text and historical practice and concluded that the statute did not confer on the President the power to tariff. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 373 (2024) (instructing judges to "determine the best reading of the statute and resolve" ambiguities). This Court should affirm.

The Constitution vests the power to impose tariffs solely in Congress. *See* U.S. CONST. art. I, § 8. The Cato Institute writes separately to provide historical context regarding IEEPA's purposes and the original understanding of Congress's constitutional authority to impose tariffs. For over a century, Congress exercised that power directly and in exhaustive detail, even during times of war and economic crisis. When Congress has chosen to delegate limited authority to the Executive to vary tariffs, it has done so explicitly and with clear statutory limits.

The government's reliance on IEEPA as a source of unilateral tariff authority breaks with this tradition and misreads the statute. IEEPA contains no reference to "tariffs" or "duties," and no President had cited it to impose tariffs in the nearly 50 years since its enactment—until now. Congress knows how to grant tariff authority when it chooses to, as it did in the Tariff Act of 1922, the Tariff Act of 1930, the Trade Expansion Act of 1962, and the Trade Act of 1974. IEEPA, by contrast, was

enacted to *limit* executive power, not expand it. Courts should not credit interpretations of vague statutory texts that, for the first time in decades, are "discovered" to confer vast economic powers on the President.

The government's reading of IEEPA not only stretches the text beyond recognition; it also undermines the Framers' designs for the separation of powers. Accepting the government's theory would mean that Congress, through ambiguous text and legislative silence, can transfer sweeping legislative power to the President—a result the Supreme Court has cautioned against. "Courts expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 716 (2022) (cleaned up).

The Constitution, IEEPA's text, and over two centuries of history point in the same direction: the tariff-setting power remains in the hands of Congress. The Court should reject the President's novel reading of IEEPA and affirm the decision below.

## ARGUMENT

## I.    HISTORICAL PRACTICE CONFIRMS THAT TARIFF-SETTING IS A NONDELEGABLE LEGISLATIVE POWER

The Constitution vests "[a]ll legislative powers" in the Congress. U.S. CONST., art. I, § 1. These legislative powers include the exclusive authority to set tariff rates. *Id.* § 8 (granting Congress the power "to lay and collect, taxes, duties, imposts and

excises"). While early congressional practice is not dispositive, the practice of the First Congress is probative of the original meaning of a constitutional provision. *See, e.g.*, *Marsh v. Chambers*, 463 U.S. 783, 790 (1983) ("An act passed by the first Congress assembled under the Constitution, many of whose members had taken part in framing that instrument, . . . is contemporaneous and weighty evidence of its true meaning.") (internal quotation marks omitted).

It is therefore notable that the second law ever enacted by Congress—and signed by President George Washington—was a statute establishing detailed rates of tariffs. *See* Act of July 4, 1789, 1 Stat. 24. That law set detailed and exhaustive duties, such as one cent per pound of brown sugars, fifty cents per pair of boots, and a 12.5% ad valorem tax on all goods (except teas) imported from China or India. *Id.*

For generations, Congress zealously guarded its authority to set tariffs. For more than a century after the Framing, tariff legislation followed a familiar pattern: Congress would repeal its previous duties and replace them with new, specific rates and schedules. *See, e.g.*, Tariff Act of 1816, 3 Stat. 310; Tariff Act of 1832, 4 Stat. 583; Revenue Act of 1913, 30 Stat. 151. These statutes gave the President no discretion to modify duties. Where Congress authorized the President to administer and enforce customs laws, it carefully withheld any power to revise or adjust Congress's detailed tariff schedules.

Even during the crisis of the Civil War, Congress retained exclusive control

5

over tariff rates. *See* Tariff Act of 1861, 12 Stat. 178 (detailed schedule of duties); Act of July 13, 1861, 12 Stat. 255–57 (delegating substantial wartime powers). While Congress granted the President considerable discretion to exercise his executive powers—like shutting down whole ports held by rebel forces—it did not authorize him to alter tariff rates. Even in wartime, when rebel forces controlled American territory, Congress did not concede its legislative tariff powers.

In the late 19th and early 20th centuries, Congress began empowering the Executive to negotiate trade agreements and selectively apply duties based on foreign governments' conduct. But even then, Congress retained the core legislative function: it prescribed detailed duty schedules and permitted the President to activate or suspend them only under certain conditions. For example, the Tariff Act of 1883, 22 Stat. 488, banned cattle imports unless the Secretary of the Treasury found them free from disease. The Tariff Act of 1890, 26 Stat. 567, allowed the President to suspend free trade agreements and impose statutory duties if another nation's duties on American goods were "unequal and unreasonable." In those cases, the President could not set new rates at will; he could only trigger duties Congress had already prescribed. *See id.*

In short, for at least the first century of the Republic, Congress consistently set duty schedules and never relinquished its duty-setting power to the President. Nor, as far as we can tell, did Presidents assert any inherent or emergency power to

set tariff rates,[2] even during wars, financial panics, and depressions. This unbroken practice is important in determining the original meaning of a constitutional provision and the best interpretation of IEEPA. *See Marsh*, 463 U.S. at 790*; The Pocket Veto Case*, 279 U.S. 655, 689 (1929) ("Long settled and established practice is a consideration of great weight in a proper interpretation of constitutional" issues of separation of powers.).

The reason for this longstanding practice is clear: Congress cannot vest duty-setting power—a legislative power—with the President, just as Congress cannot vest judicial power with the President or the Speaker of the House. *See* U.S. CONST. art. III, § 1 (vesting the judicial power "in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish"); *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 406 (1922) ("[I]t is a breach of the National fundamental law if Congress gives up its legislative power and transfers it to the President, or to the Judicial branch, or if by law it attempts to invest itself or its

---

[2] Strictly speaking, the government has no special "emergency powers"; it has only those powers enumerated in the Constitution. The Framers "knew what emergencies were, knew the pressures they engender for authoritative action, [and] knew, too, how they afford a ready pretext for usurpation." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 650 (1952) (Jackson, J., concurring). While it was "impossible to foresee or define the extent and variety of national exigencies" that might beset the country, THE FEDERALIST NO. 23, at 132–33 (Alexander Hamilton) (Royal Classics ed. 2020) (capitalization normalized), the Framers equipped the three branches with enumerated powers to handle those emergencies.

members with either executive power or judicial power.").[3]

## II.    IEEPA DOES NOT AUTHORIZE THE PRESIDENT TO MODIFY TARIFF RATES.

The Supreme Court recently reaffirmed a "judicial practice dating back to Marbury: that courts decide legal questions by applying their own judgment." *Loper Bright*, 603 U.S. at 391. The President's interpretation of IEEPA is not entitled to deference—rather, it is the duty of the courts to "determine the best reading" of a contested statute. *Id.* at 400. The best reading of IEEPA is that it provides the President no authority to unilaterally modify tariff schedules.

### A.    IEEPA Provides No Textual Support for Tariff Authority.

As this brief's historical survey, *supra*, demonstrates, Congress knows how to give the President discretion—within limits—to modify tariff rates. And Congress did so, for instance, in the Tariff Act of 1922, the Trade Act of 1974, and the Trade Expansion Act of 1962, the latter of which President Trump used in his first term

---

[3] While modern practices are less probative in determining the original meaning of Congress's duty-setting power, recent practice does not aid the President much. Even in the early- and mid-20th century, when Congress authorized the President to function as the principal actor in the formulation of trade policy, Congress constrained his discretion by referencing objective—if sometimes vague or contested—standards. *See J.W. Hampton*, 276 U.S. at 409–11 (affirming the constitutionality of the Tariff Act of 1922, which authorized the Executive to vary tariffs to "equalize the . . . differences in costs of production" between the United States and another nation, but limited rate increases to 50% of existing rates). In its telling of *J.W. Hampton*, the government does not mention this 50% cap. *See* Opening Br. 6.

when modifying tariffs. It is notable that in those statutes, Congress expressly identified "duty" or "duties" modification as a permissible policy tool for the President. *See* 19 U.S.C. § 2411(c)(1)(B) (permitting the U.S. Trade Representative to "give preference to the imposition of duties over the imposition of other import restrictions"); 19 U.S.C. § 1821(a) (permitting the President to "enter into trade agreements" and "modif[y] . . . any existing duty"). In contrast, the relevant provisions in IEEPA make no mention of "duty," "duties," or "tariffs." *See* 50 U.S.C. § 1702. This omission is fatal to the government's strained interpretation. "Courts expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *West Virginia v. EPA*, 597 U.S. at 716 (cleaned up). Careful textual analysis is especially important in emergency power cases, as presidents often adopt an expansive view of what qualifies as an "unusual and extraordinary threat"—including domestic issues in countries halfway around the world.[4] Notably, this administration has declined to offer any limiting principle for its emergency declarations.[5]

---

[4] *See, e.g.*, Blocking Property of Certain Persons Contributing to the Conflict in Cote d'Ivoire, Exec. Order 13396 (Feb. 7, 2006) (declaring that violence in Cote d'Ivoire "constitutes an unusual and extraordinary threat to the national security and foreign policy of the United States").

[5] The government at times treats IEEPA's emergency requirement as a meaningful constraint on presidential power. *E.g.*, Opening Br. 49 (discussing the NEA's procedural and temporal limits). But elsewhere, the government appears to take the position that the President has unviewable discretion to declare

The Supreme Court has also emphasized that Executive Branch interpretations "issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning." *Loper Bright*, 600 U.S. at 394. A telling signal that the government's interpretation is unsound is that, nearly 50 years after IEEPA's enactment, no President invoked it to impose tariffs—until now. It appears the government would have this Court believe that the President and his trade advisers, like Indiana Jones in the *Raiders of the Lost Ark*, found a valuable artifact—an unconditional delegation of legislative power—gathering dust in the depths of the U.S. Code. The Supreme Court has warned courts against rubber-stamping such Executive branch "discoveries" of new authority in decades-old statutes. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("When an agency claims to discover in a long extant statute an unheralded power to regulate a significant portion of the American economy, . . . we typically greet its announcement with a measure of skepticism.") (internal quotation marks omitted).

---

emergencies—including in rather dubious circumstances. Asked by a judge in a parallel case whether, hypothetically, a national peanut butter shortage might constitute an "unusual and extraordinary threat," the administration attorney replied, "it probably depends." Oral Argument at 1:09:25, *V.O.S. Selections, Inc. v. Trump*, No. 1:25-cv-00066 (Ct. Intl. Trade May 13, 2025).

This Court should reject the government's argument that, after 150 years, Congress silently transferred to the President most of its immense duty-making powers through IEEPA's ambiguous language.

## B.  IEEPA's Origins Confirm That Tariff Authority Remains with Congress.

Finally, the government's position runs contrary to the purposes of IEEPA. In the 1970s, Congress undertook a long-overdue effort to rein in Presidents' unilateral actions in foreign trade and transactions. *See* Michael H. Salsbury, *Presidential Authority in Foreign Trade: Voluntary Steel Import Quotas from a Constitutional Perspective*, 15 Va. J. Int'l L. 179, 186 (1974) ("Since 1934, the President's authority to impose restrictions on foreign trade has been significantly curtailed by statute."). Congress codified IEEPA in 1977 to clarify and limit the executive branch powers that had metastasized under IEEPA's predecessor, the Trading with the Enemy Act of 1917. *See* Note, *The International Emergency Economic Powers Act*: *A Congressional Attempt to Control Presidential Emergency Power*, 96 Harv. L. Rev. 1102, 1102 (1983).

Originally, Section 5(b) of the Trading with the Enemy Act of 1917 granted the President authority over Americans' transactions with foreign nationals only

11

during wartime.[6] But within days of taking office, President Franklin Roosevelt unilaterally invoked Section 5(b) in peacetime to respond to bank failures and the Depression.[7] A few days later, Congress ratified those actions and greatly expanded the scope of the President's powers under Section 5(b) to peacetime "emergencies" and transactions with any foreign citizen, ally or enemy. *See* Act of March 9, 1933, 48 Stat. 1, 1–2. Congress amended the Act again in the early days of war in December 1941, going so far as to confer authority to the President to prescribe the operative definitions within the Act. *See* Act of Dec. 18, 1941, 55 Stat. 839, 839–40 (codified at 50 U.S.C. § 4305(b)(3)).

The Trading with the Enemy Act became (and, though amended, still is) an immensely powerful law, enabling Presidents to exercise sweeping, and at times authoritarian, powers. In the 1930s, the law was used to place banks under the supervision of the federal government and prohibit them from paying out gold to bank customers (the so-called "bank holiday"),[8] to compel all Americans to

---

[6] *See Stoehr v. Wallace*, 255 U.S. 239, 242 (1921) ("The Trading with the Enemy Act . . . is strictly a war measure, and finds its sanction in the constitutional provision, Art. I, § 8, cl. 11, empowering Congress 'to declare war, grant letters of marque and reprisal, and make rules concerning captures on land and water.'").

[7] Oct. 6, 1917, ch. 106, § 5, 40 Stat. 415 (codified, as amended, at 50 U.S.C. § 4305). *See also The International Emergency Economic Powers Act*, *supra*, at 1102.

[8] Reopening Banks, Exec. Order No. 8773 (1933).

surrender all of their gold and gold certificates to their nearest bank,[9] and to impose

national regulation of consumer credit in order to curb inflation.[10] The Roosevelt

administration even invoked the Trading with the Enemy Act in wartime to censor

all news, mail, and communications from abroad—including "[r]umors which might

render aid and comfort to the enemy" and "[a]ny other matter whose dissemination

might directly or indirectly . . . disparage the foreign relations of the United States

or the United Nations." Off. of Censorship, U.S. Censorship Reguls., 8 Fed. Reg.

1644–46 (Feb. 5, 1943).

Later Presidents used the Trading with the Enemy Act in trade policy. In his

final days in office in 1968, President Lyndon Johnson issued an executive order to

halt and supervise capital transfers abroad in order to improve the nation's "balance

of payments position." Governing Certain Capital Transfers Abroad, Exec. Order

11387 (1968). His successor, President Nixon, relied on the Act in August 1971 to

impose a 10% tariff on imports to improve America's balance of payments as the

U.S. withdrew from the gold standard. Imposition of Supplemental Duty for Balance

of Payments Purposes, Proclamation 4074 (Aug. 15, 1971).[11]

---

[9] Forbidding the Hoarding of Gold Coin, Gold Bullion and Gold Certificates, Exec. Order No. 6102 (1933).

[10] Regulation of Consumer Credit, Exec. Order No. 8843 (1941).

[11] Those tariffs were terminated by proclamation three months later. *See* Termination of Additional Duty for Balance of Payments Purposes, Proclamation 4098 (Dec. 20, 1971). The United States Court of Customs and Patent Appeals held

In response to these unilateral actions in trade policy, Congress moved to clarify and restrict presidential authority. In the Trade Act of 1974, Congress provided express and narrow authority to address balance-of-payments issues in trade. *See* 19 U.S.C. § 2132. Three years later, Congress passed IEEPA to constrain the President even further. As one contemporaneous account explained, IEEPA's "primary purpose . . . [was] to revise the Trading With the Enemy Act of 1917 (TWEA), and thus to restrict presidential authority to respond to emergencies related to international economic transactions." Mary M.C. Bowman, *Presidential Emergency Powers related to International Economic Transactions*, 11 VAND. L. REV. 515, 515 (1978).

It is thus ironic—and legally untenable—for a President to invoke IEEPA for tariff-setting authority that no President has ever exercised. Even President Franklin Roosevelt—who had an expansive theory of presidential power and was President during economic depression and a global war—never used IEEPA's more powerful predecessor, the Trading with the Enemy Act, to modify tariffs. Courts should not

---

that the imposition of duties was a valid exercise of the authority delegated to the President by section 5(b) of the Trading with the Enemy Act (TWEA). *See United States v. Yoshida Int'l, Inc.*, 526 F.2d 560 (Ct. Cust. & Pat. App. 1975); *Alcan Sales v. United States*, 534 F.2d 920 (Cust. & Pat. App. 1976), *cert. denied*, 429 U.S. 986 (1976). The government cites *Yoshida* approvingly throughout its brief. Opening Br. 24, 37, 40, 43–44. But IEEPA's statutory context suggests a more limited delegation than the TWEA, *see* Bowman, *infra*, and President Trump's tariffs are much larger than the surcharge sustained in *Yoshida*, which had an "effective rate" of 4.8%. 526 F.2d at 577 n.25.

require Congress to play legislative whack-a-mole and respond specifically to every claimed emergency a President might cite to usurp Congress's powers. The text of the Constitution is clear that duty-setting is a legislative power, and the history of tariffs and "emergency power" legislation like IEEPA shows that Congress provided no authority to the President to unilaterally impose tariffs.

## CONCLUSION

For the reasons in this brief and those described by Plaintiffs-Appellees, this Court should affirm the decision below.

Respectfully submitted,

/s/ Thomas A. Berry
Thomas A. Berry
Brent Skorup
Charles A. Brandt
CATO INSTITUTE
1000 Massachusetts Avenue, N.W.
Washington, D.C. 20001
(443) 254-6330
tberry@cato.org

*Counsel for Amicus Curiae*

Dated: July 30, 2025

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limits of Fed. R. App. P. 32(a)(7) and Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 3,564 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

                                                    /s/Thomas A. Berry
                                                    Thomas A. Berry

Dated: July 30, 2025                      *Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on July 30, 2025 I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by CM/ECF.

/s/Thomas A. Berry
Thomas A. Berry

Dated: July 30, 2025                                    *Counsel for Amicus Curiae*

17