**ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 30, 2025**

# United States Court of Appeals
# for the District of Columbia Circuit

### No. 25-5202

LEARNING RESOURCES, INC.; HAND2MIND, INC.,

*Plaintiffs-Appellees,*

*v.*

DONALD J. TRUMP, President of the United States, in his official capacity; KRISTI NOEM, Secretary of the Department of Homeland Security, in her official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY;

*(For Continuation of Caption See Inside Cover)*

*On Appeal from the United States District Court for the District of Columbia in No. 1:25-cv-01248-RC.*

**BRIEF OF ADVANCING AMERICAN FREEDOM, INC.; FRONTLINE POLICY COUNCIL; SAMUEL GREGG, FRIEDRICH HAYEK CHAIR IN ECONOMICS HISTORY AT THE AMERICAN INSTITUTE FOR ECONOMIC RESEARCH; INDEPENDENT INSTITUTE; JOHN LOCKE FOUNDATION; MICHAEL C. MUNGER, DIRECTOR, PHILOSOPHY, POLITICS, AND ECONOMICS PROGRAM, DUKE UNIVERSITY; MOUNTAIN STATES POLICY CENTER; MELISSA ORTIZ, PRINCIPAL & FOUNDER, CAPABILITY CONSULTING; BRYAN RILEY, DIRECTOR, NATIONAL TAXPAYERS UNION FREE TRADE INITIATIVE; RIO GRANDE FOUNDATION; TAXPAYERS PROTECTION ALLIANCE; AND TRENDMACRO AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES**

J. MARC WHEAT
Timothy Harper
ADVANCING AMERICAN FREEDOM, INC.
801 Pennsylvania Avenue, N.W., Suite 930
Washington, D.C. 20004
(202) 780-4848
MWheat@advancingamericanfreedom.com
*Counsel for Amici Curiae*

July 30, 2025



SCOTT BESSENT, Secretary of the Treasury, in his official capacity; UNITED STATES DEPARTMENT OF THE TREASURY; HOWARD W. LUTNICK, Secretary of Commerce, in his official capacity; UNITED STATES DEPARTMENT OF COMMERCE; RODNEY S. SCOTT, Commissioner of Customs & Border Protection, in his official capacity; UNITED STATES CUSTOMS AND BORDER PROTECTION; JAMIESON GREER, U.S. Trade Representative, in his official capacity; OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE,

*Defendants-Appellants.*

AMERICA FIRST LEGAL FOUNDATION, Amicus Curiae for Appellant WASHINGTON LEGAL FOUNDATION, Amicus Curiae for Appellee COALITION FOR A PROSPEROUS AMERICA, Amicus Curiae for Appellant GEORGE F. ALLEN; JOSHUA A. CLAYBOURN; JOHN C. DANFORTH; RICHARD A. EPSTEIN; CHARLES T. HAGEL; HAROLD HONGJU KOH, COUNSEL; GERARD N. MAGLIOCCA; MICHAEL B. MUKASEY; ALAN O. SYKES; JOHN DANIEL TINDER; ALEXANDER VOLOKH; PETER J. WALLISON; PHILIP ZELIKOW,

*Amici Curiae for Appellee.*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

**A. Parties and Amici**

*Plaintiffs-Appellees:* Learning Resources, Inc.; and hand2mind, inc.

*Defendants-Appellants*: Donald J. Trump, President of the United States, in his official capacity; Kristi Noem, Secretary of the Department of Homeland Security, in her official capacity; United States Department of Homeland Security; Scott Bessent, Secretary of the Treasury, in his official capacity; United States Department of the Treasury; Howard Lutnick, Secretary of Commerce, in his official capacity; United States Department of Commerce; Rodney S. Scott, Commissioner of United States Customs and Border Protection, in his official capacity (having been substituted for Pete R. Flores, Acting Commissioner of Customs & Border Protection when the suit was brought); United States Customs and Border Protection; Jamieson Greer, United States Trade Representative, in his official capacity; and Office of the United States Trade Representative.

*Amici*: America First Legal Foundation; Emily Ley Paper, Inc., doing business as Simplified; Kilo Brava LLC; Bambola LLC; Kim's Clothes and Fashion LLC; Rokland LLC; George F. Allen; Steven G. Calabresi; Joshua A. Claybourn; John C. Danforth; Richard A. Epstein; Charles T. Hagel; Harold Hongju Koh; Gerard N. Magliocca; Michael W. McConnell; Michael B. Mukasey; Alan O. Sykes; John Daniel Tinder; Peter J. Wallison; and Philip Zelikow participated before the district

court as amici curiae. In addition, Advancing American Freedom, Inc.; Frontline Policy Council; Samuel Gregg; Independent Institute; John Locke Foundation; Michael C. Munger; Mountain States Policy Center; Bryan Riley Rio Grande Foundation; Taxpayers Protection Alliance; TrendMacro; the Brennan Center for Justice at NYU; Cato Institute; Coalition for a Prosperous America; Consumer Watchdog; the Washington Legal Foundation, and Alexander "Sasha" Volokh, have expressed the intention to participate as amici curiae before this Court.

## B. Ruling Under Review

The rulings under review are the Order Denying Defendant's Motion to Transfer Venue, May 29, 2025 (JA87); the Memorandum Opinion Denying Defendant's Motion to Transfer Venue; Granting Plaintiff' Motion for a Preliminary Injunction, May 29, 2025 (JA89); and the Order Setting Preliminary Injunction Bond, May 29, 2025 (JA122) by the Honorable Rudolph Contreras, United States District Judge.

## C. Related Cases

This case has not been before this Court or any other court other than the district court. I am not aware of any related cases within the meaning of the Court's Rule 28(a)(1)(C). Challenges to the tariffs at issue in this case are pending before other courts, including the U.S. Court of Appeals for the Federal Circuit.

Respectfully submitted,

<u>/s/ J. Marc Wheat</u>
J. Marc Wheat
Advancing American Freedom, Inc.
801 Pennsylvania Avenue, N.W.
Suite 930
Washington, D.C. 20004
(202) 780-4848
mwheat@advancingamericanfreedom.com

*Counsel for Amicus Curiae*

Dated: July 30, 2025

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

The amici curiae Advancing American Freedom, Inc.; Frontline Policy Council; Samuel Gregg, Friedrich Hayek Chair in Economics History at the American Institute for Economic Research; Independent Institute; John Locke Foundation; Michael C. Munger, Director, Philosophy, Politics, and Economics Program, Duke University; Mountain States Policy Center; Melissa Ortiz, Principal & Founder, Capability Consulting; Bryan Riley, Director, National Taxpayers Union Free Trade Initiative; Rio Grande Foundation; Taxpayers Protection Alliance; and TrendMacro are nonprofit corporations. They do not issue stock and are neither owned by nor are they owners of any other corporate entity, in part or in whole. They have no parent companies, subsidiaries, affiliates, or members that have issued shares or debt securities to the public. The corporations are operated by volunteer boards of directors.

Respectfully submitted,

/s/ J. Marc Wheat
J. Marc Wheat
Advancing American Freedom, Inc.
801 Pennsylvania Avenue, N.W.
Suite 930
Washington, D.C. 20004
(202) 780-4848
mwheat@advancingamericanfreedom.com

*Counsel for Amicus Curiae*

Dated: July 30, 2025

iv

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

    A.    Parties and Amici ..................................................................i

    B.    Ruling Under Review ..........................................................ii

    C.    Related Cases ......................................................................ii

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ....................................iv

TABLE OF AUTHORITIES ....................................................................vi

IDENTITY AND INTEREST OF *AMICI CURIAE* ....................................1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ..............................2

ARGUMENT ..........................................................................................6

    I.    The Taxing Power is a Core Legislative Power Reserved to Congress in the Constitution ................................................6

    II.    Congress Cannot Delegate Legislative Power to the President ..........10

    III.    If the President's Interpretation of IEEPA is Correct, the Statute Violates the Supreme Court's Nondelegation Doctrine ....................................................18

CONCLUSION ........................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*A.L.A. Schechter Poultry Corporation v. United States*,
   295 U.S. 495 ................................................................................ 21, 22

*American Power & Light Co. v. SEC*,
   329 U.S. 90 (1946) ........................................................................ 18, 19

*Cooper v. Telfair*,
   4 U.S. 14 (4 Dall.) ................................................................................14

*Dep't of Transp. v. Ass'n of Am. Railroads*,
   575 U.S. 43 (2015) .................................................................9, 10, 11, 12

*FCC v. Consumers' Research*,
   No. 24-354, slip op. (June 27, 2025) ........................................... 17, 18

*Gibbons v. Ogden*,
   22 U.S. 1 (1824) .....................................................................................6

*Gilchrist v. Collector of Charleston*,
   10 F. Cas. 355 (1808) ...........................................................................15

*Gundy v. United States*,
   588 U.S. 154 (2019) ................................... 3, 5, 8, 9, 18, 19, 20, 21, 22

*Hayburn's Case*,
   2 U.S. (2 Dall.) 409 (1792) ..................................................................13

*J.W. Hampton, Jr., & Co. v. United States*,
   276 U.S. 394 (1928) ..............................................................................18

*Marshall Field & Co. v. Clark*,
   143 U.S. 649 (1892) ..............................................................................20

*McCulloch v. Maryland*,
   17 U.S. 316 (1819) ..........................................................................5-6, 7

*Mistretta v. United States*,
   488 U.S. 361 (1989) ..............................................................................18

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012)....................................................................................6

*OPP Cotton Mills, Inc. v. Administrator of Wage and Hour Div., Dep't of Labor*,
  312 U.S. 126 (1941)..................................................................................19

*The Cargo of the Brig Aurora v. United States*,
  11 U.S. (7 Cranch) 382 (1813)............................................................ 16, 17

*United States v. Sears*,
  27 F. Cas. 1006 (1812)..............................................................................15

*Vanhorne's Lessee v. Dorance*,
  2 U.S. 304 (2 Dall.)...................................................................................14

*Whitman v. American Trucking*,
  531 U.S. 457 (2001)............................................................................ 17, 18

**Statutes and Other Authorities:**

U.S. Const. art. I, § 1.................................................................................6, 17

U.S. Const. art. I, § 7, cl. 1.............................................................................6

U.S. Const. art. I, § 8, cl. 1.........................................................................6, 7

U.S. Const. art. I, § 8, cl. 3.............................................................................7

50 U.S.C. § 1701(b).........................................................................................2

50 U.S.C. § 1702(a)(1)(A)...............................................................................2

18 Annals of Cong. 2084 (1808) (Statement of Rep. Campbell) ...........................16

18 Annals of Cong. 2125 (1808) (Statement of Representative Key)....................16

An Act in addition to the act intituled (sic) "An act laying an embargo on all
  ships and vessels in the ports and harbors of the United States," and the
  several acts supplementary thereto, and for other purposes, ch. 66, 2 Stat.
  499 (1808).............................................................................................15

An Act laying an Embargo on all ships and vessels in the ports and harbors
  of the United States, ch. 5, 2 Stat. 451 (1807).......................................14

An Act to provide for the settlement of the Claims of Widows and Orphans barred by the limitations heretofore established, and to regulate the Claims to Invalid Pensions, ch. 11, 1 Stat. 244 (1792)......................13

Defendants' Response to Motion for Summary Judgment and Preliminary Injunction at 46, *V.O.S. Selections Inc. v. Trump*, No. 25-00066 (CIT, April 21, 2025)......................8, 22

The Federalist No. 45 at 241 (James Madison) (George Carey & James McClellan eds., The Liberty Fund 2001) ..............5

The Federalist No. 47, 250 (James Madison) ......................10

The Federalist No. 62, 321 (James Madison) (George Carey & James McClellan eds., The Liberty Fund 2001) ..............3

The Federalist No. 73, 381 (Alexander Hamilton) (George Carey & James McClellan eds., The Liberty Fund 2001) ..............4

Edwin J. Feulner, Jr., *Conservatives Stalk the House: The Story of the Republican Study Committee*, 212 (Green Hill Publishers, Inc. 1983).................1

"From Thomas Jefferson to Charles Pinckney, 18 July 1808," *Founders Online,* National Archives......................15

Philip Hamburger, *Is Administrative Law Unlawful*, 84 (2015)..............10

Independence Index: Measuring Life, Liberty and the Pursuit of Happiness ...........1

Thomas Jefferson, *Notes on the State of Virginia*, Query XIII, 136 (1853)............12

John Locke, *Second Treatise on Government*, § 141, 323 (Thomas Hollis ed., 1764) (1689) ......................12

James Madison, *Notes of Debates in the Federal Convention of 1787 (June 1)*, in 1 *The Records of the Federal Convention of 1787*, 65 (Max Farrand ed., Yale University Press 1911)......................12

James Madison, *Notes of Debates in the Federal Convention of 1787 (September 15)*, in 2 *The Records of the Federal Convention of 1787*, 627 (Max Farrand ed., Yale University Press 1911)...................... 12-13

James Madison, Preface to Debates in the Convention, *The Founders' Constitution*, Art. I, § 8, cl. 1......................7

Montesquieu, *The Spirit of the Laws* 156 (Cohler, Miller, & Stone eds.,
Cambridge University Press 1989) (1748)............................................................10

Opening Brief of Petitioners at 58, *V.O.S. Selections v. Trump*, No. 25-1812
(D.C. Circuit June 24, 2025) ..................................................................................20

Gabriel Sa Pessoa, Mauricio Savarese, *Trump's tariff threat pushes Lula's
popularity and worsens legal troubles for Brazil's ex-leader*,
Associated Press (July 19, 2025 1:00 AM) ............................................................4

Tariff War Timeline, Advancing American Freedom ................................................4

"To George Washington from James Iredell and John Sitgreaves,
8 June 1792," *Founders Online,* National Archives ...........................................14

Trade in Goods with Brazil, United States Census Bureau ......................................4

St. George Tucker, *View of the Constitution of the United States with
Selected Writings* at 46-47 (Clyde Wilson, ed., Liberty Fund 1999)
(1803)......................................................................................................................11

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

Advancing American Freedom (AAF) is a nonprofit organization that promotes and defends policies that elevate traditional American values, including freedom from arbitrary power. AAF "will continue to serve as a beacon for conservative ideas, a reminder to all branches of government of their responsibilities to the nation,"[2] and believes American prosperity depends on ordered liberty and self-government.[3] AAF files this brief on behalf of its 137,108 members nationwide.

Amici Frontline Policy Council; Samuel Gregg, Friedrich Hayek Chair in Economics History at the American Institute for Economic Research; Independent Institute; John Locke Foundation; Michael C. Munger, Director, Philosophy, Politics, and Economics Program, Duke University; Mountain States Policy Center; Melissa Ortiz, Principal & Founder, Capability Consulting; Bryan Riley, Director, National Taxpayers Union Free Trade Initiative; Rio Grande Foundation; Taxpayers Protection Alliance; and TrendMacro are organizations and individuals who believe

---

[1] All parties have consented to the filing of this amicus brief. No counsel for a party authored this brief in whole or in part.  No person other than *Amicus Curiae* and its counsel made any monetary contribution intended to fund the preparation or submission of this brief.

[2] Edwin J. Feulner, Jr., *Conservatives Stalk the House: The Story of the Republican Study Committee*, 212 (Green Hill Publishers, Inc. 1983).

[3] Independence Index: Measuring Life, Liberty and the Pursuit of Happiness, Advancing American Freedom available at https://advancingamericanfreedom.com/aaff-independence-index/.

1

that the government's compliance with the Constitution's limits on government power is essential to the preservation of American freedom.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Having just fought a war to end "taxation without representation," the framers of the Constitution granted Congress, the representative body in the new national government, sole authority to impose law that collects revenue from the people. Since February, the President has flouted that bulwark of liberty, claiming for himself unilateral taxing authority. The district court's injunction in this case was a small but important step toward restoring constitutional order and preserving Congress's power against executive overreach.

The International Emergency Economic Powers Act (IEEPA) provides that the President may "investigate, regulate, or prohibit" large swaths of international trade including "any transactions in foreign exchange." 50 U.S.C. § 1702(a)(1)(A). These powers, however, "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose." 50 U.S.C. § 1701(b). Claiming to exercise these powers, President Trump has issued changes to tariff rates worldwide and has repeatedly modified the rates and conditions of those tariffs unilaterally.

2

The powers asserted by the President in this case are not within the constitutional authority of the presidency. Rather, they belong to Congress, which cannot delegate them to the President. The President's exercise of power here is thus either outside the scope of the power granted by Congress through IEEPA or IEEPA is an unconstitutional delegation of power reserved exclusively to the legislative branch. For that reason, the district court was correct to find that Plaintiffs-Appellees are likely to succeed on the merits of their claim and that IEEPA does not convey tariff power.

The Constitution grants the national government's legislative powers to Congress alone because the framers "believed the new federal government's most dangerous power was the power to enact laws restricting the people's liberty." *Gundy v. United States*, 588 U.S. 154 (2019) (Gorsuch, J., dissenting). As Madison explained, it was the "facility and excess of lawmaking" that "seem[ed] to be the diseases to which our governments are most liable."[4] As a cure to those "diseases," "the framers went to great lengths to make lawmaking difficult." *Id*. As Justice Gorsuch explains, "[s]ome occasionally complain about the arduous processes for new legislation, but to the framers these were bulwarks of liberty." *Id*.

---

[4] Federalist No. 62, 321-22 (James Madison) (George Carey & James McClellan eds., The Liberty Fund 2001).

These "arduous processes" "were also designed to promote deliberation," *id.*, because, "[t]he oftener a measure is brought under examination, the greater the diversity in the situations of those who are to examine it, the less must be the danger of those errors which flow from want of due deliberation, or of those missteps which proceed from the contagion of some common passion or interest."[5] Here, though, the deliberation, care, and accountability due before making decisions of such significance has been absent. The President has repeatedly added, removed, modified, or delayed tariffs on countries around the world and products of all kinds, often announcing changes through social media, making it unclear when and if certain tariff rates are effective.[6]

Recently, the President posted a letter to his Truth Social account expressing his intent to issue a 50% tariff against Brazil beginning August 1 largely motivated by the country's prosecution of former President Jair Bolsonaro.[7] The President's threat of tariffs against Brazil is even more surprising in light of the fact that America

---

[5] Federalist No. 73, 381-82 (Alexander Hamilton) (George Carey & James McClellan eds., The Liberty Fund 2001).

[6] Tariff War Timeline, Advancing American Freedom, https://advancingamericanfreedom.com/the-tariff-war-timeline/ (last visited July 22, 2025).

[7] Gabriel Sa Pessoa, Mauricio Savarese, *Trump's tariff threat pushes Lula's popularity and worsens legal troubles for Brazil's ex-leader*, Associated Press (July 19, 2025 1:00 AM) https://apnews.com/article/brazil-lula-trump-popularity-16a7cdc30ffd1812c43d9c84d0572520.

4

has had an annual trade surplus with Brazil every year since 2008.[8] Perhaps better than any other instance, this letter demonstrates that the President is willing to exercise claimed tariff power not merely to address "unusual and extraordinary" circumstances affecting American foreign affairs, but to address what strikes the President, personally, as important.

The major questions doctrine is one tool courts use to ensure that Congress and the President stay within their constitutional bounds and is relevant in this case. However, the nondelegation doctrine more directly addresses the constitutional malady here. "The nondelegation doctrine bars Congress from transferring its legislative power to another branch of Government," *Gundy*, 588 U.S. at 132 (plurality opinion), precisely because the founders understood that important policy decisions should be the result of a deliberative process and should pass only with the support of a legislative coalition representing a broad swath of the nation's population. Because the tariffs at issue in this case represent, instead, the whims of one man who is not constitutionally empowered to enact them, this Court should uphold the district court's preliminary injunction.

---

[8] Trade in Goods with Brazil, United States Census Bureau, https://www.census.gov/foreign-trade/balance/c3510.html (last visited July 22, 2025).

5

## ARGUMENT

## I. The Taxing Power is a Core Legislative Power Reserved to Congress in the Constitution.

At issue in this case is whether the President, under IEEPA, may unilaterally impose tariffs. Because the national government is one of enumerated powers,[9] and because enumeration implies limitation, *Gibbons v. Ogden*, 22 U.S. 1, 195 (1824), the question of this case is whether these powers are within the legitimate power of the Executive Branch. The answer is no. The powers the President seeks to exercise in this case are defined as legislative powers by the Constitution and are legislative in nature.

The Constitution vests "[a]ll legislative Powers" of the national government "in a Congress of the United States." U.S. Const. art. I, § 1. Congress's core legislative powers are enumerated in Article I, Section 8, of the Constitution. The

---

[9] The Federalist No. 45 at 241 (James Madison) (George Carey & James McClellan eds., The Liberty Fund 2001) ("The powers delegated by the proposed constitution to the federal government, are few and defined."). *McCulloch v. Maryland*, 17 U.S. 316, 405 (1819) (explaining that the federal "Government is acknowledged by all to be one of enumerated powers. The principle that it can exercise only the powers granted to it would seem too apparent to have required to be enforced by all those arguments which its enlightened friends, while it was depending before the people, found it necessary to urge."). The Constitution, "rather than granting general authority to perform all the conceivable functions of government," "lists, or enumerates, the Federal Government's powers." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 534 (2012). An "enumeration of powers is also a limitation of powers, because '[t]he enumeration presupposes something not enumerated.'" *Id.* at 534 (quoting *Gibbons v. Ogden*, 22 U.S. 1, 9 (1824)) (alteration in original).

first of those powers is "To lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defense and general welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Further, this power is limited by the requirement that "[a]ll bills for raising revenue shall originate in the House of Representatives." U.S. Const. art. I, § 7, cl. 1. The third power listed in Section 8 is "To regulate commerce with foreign nations, and among the several states, and with the Indian tribes." U.S. Const. art. I, § 8, cl. 3.

That the power to tax is listed first among Congress's powers is no accident. The inability of the national government under Articles of Confederation to raise revenue was the impetus for the constitutional convention.[10] But the Framers also knew, as the Supreme Court would later say, "[t]hat the power to tax involves the power to destroy." *McCulloch v. Maryland*, 17 U.S. 316, 431 (1819). Among the founding generation's complaints against British rule was that King George III had "impos[ed] taxes on us without our consent." The Declaration of Independence para.

---

[10] *See, e.g.*, James Madison, Preface to Debates in the Convention, *The Founders' Constitution*, Art. I, § 8, cl. 1, https://press-pubs.uchicago.edu/founders/documents/a1_8_1s2.html (last visited July 7, 2025) ("At the date of the Convention, the aspect & retrospect of the pol: condition of the U.S. could not but fill the pub. mind with a gloom which was relieved only by a hope that so select a Body would devise an adequate remedy for the existing and prospective evils so impressively demanding it. It was seen that the public debt rendered so sacred by the cause in which it had been incurred remained without provision for its payment. The reiterated and elaborate efforts of Cong. to procure from the States a more adequate power to raise the means of payment had failed.").

19 (U.S. 1776). When the framers designed America's system of government, they consciously kept the taxing power close to the people and far from unilateral control.

Further, the powers of taxation and regulation of commerce are legislative not just because they are listed among the legislature's powers but because they are legislative in nature. Legislative power is "the power to adopt generally applicable rules of conduct governing future actions by private persons—the power to 'prescribe the rules by which the duties and rights of every citizen are to be regulated,' or the power to 'prescribe general rules for the government of society.'" *Gundy*, 588 U.S. at 153 (Gorsuch, J., dissenting) (citing The Federalist No. 78, p. 465 (C. Rossiter ed. 1961) (A. Hamilton)).

The government effectively acknowledged in its brief before the Court of International Trade in *V.O.S. Selections v. Trump* that the tariff power the President is exercising is legislative in nature. There, the government quoted the *Gundy* plurality opinion as follows: "'The nondelegation doctrine bars Congress from *transferring its legislative power* to another branch of Government' *without supplying* 'an intelligible principle to guide the delegee's use of discretion.'"[11] However, this quotation combines two different lines several pages apart. Those two

---

[11] Defendants' Response to Motion for Summary Judgment and Preliminary Injunction at 46, *V.O.S. Selections Inc. v. Trump*, No. 25-00066 (CIT, April 21, 2025) (emphasis added) (quoting *Gundy*, 588 U.S. at 132, 135 (plurality opinion)).

sentences, quoted in full, harm rather than support the government's argument. In full, the first sentence quoted reads, "The nondelegation doctrine bars Congress from transferring its legislative power to another branch of Government." *Gundy*, 588 U.S. at 132 (plurality opinion). The second sentence reads, "The constitutional question is whether Congress has supplied an intelligible principle to guide the delegee's use of discretion." *Gundy*, 588 U.S. at 135 (plurality).

By combining these two lines as it did, the government effectively admitted that it was defending a supposed delegation of *legislative* power, a state of affairs explicitly rejected by the language quoted when quoted in full. More fundamentally, the government's claim that Congress delegated legislative power in IEEPA is inconsistent with the constitution's structure, history, and language.

If the President's interpretation of IEEPA is correct and the statute does grant him the power to impose tariffs unilaterally, then IEEPA grants him authority to exercise core legislative power granted to Congress in Article I. Because Congress cannot delegate legislative power to the President, the President's interpretation of IEEPA would render the statute an unconstitutional delegation of legislative power to the Executive Branch. This Court should, therefore, uphold the district court's finding that IEEPA does not delegate tariff power to the President.

## II. Congress Cannot Delegate Legislative Power to the President.

Taxation and regulation of international commerce are core legislative powers. "It would dash the whole [constitutional] scheme" if Congress could pass those powers off to other entities that lack the carefully crafted constraints imposed on congressional power. *Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43, 61 (2015) (Alito, J., concurring). This fundamental nondelegation principle that is built into the Constitution is part of the larger separation of powers that the Founders believed was essential to the preservation of freedom.

For the Founders, the most influential proponent of the separation of powers was Montesquieu.[12] According to Montesquieu, legislators are those who "make laws for a time, or for always, and *corrects* or *abrogates* those that have been made."[13] He distinguished this from executive powers which were held by he who "makes war or peace, sends or receives embassies, establishes security, or prevents invasions," and was engaged in "the execution of the general will of the state."[14] According to John Locke, "the 'legislative authority' is that by which laws 'are in

---

[12] *See*, Federalist No. 47, 250-51 (James Madison) ("The oracle who is always consulted and cited on this subject is the celebrated Montesquieu. If he be not the author of this invaluable precept in the science of politics, he has the merit at least of displaying and recommending it most effectually to the attention of mankind.").

[13] Montesquieu, *The Spirit of the Laws* 156 (Cohler, Miller, & Stone eds., Cambridge University Press 1989) (1748).

[14] *Id*. at 194.

force over the subjects of the commonwealth.'"[15] Similarly, Blackstone wrote, "Legislators and their laws are said to compel and oblige."[16] As Professor Philip Hamburger explains:

> [T]he natural dividing line between legislative and nonlegislative power was between rules that bound subjects and those that did not . . . It therefore was assumed that the enactment of legally binding rules could come only from a representative legislature and that the resulting rules could bind only subjects, not other peoples . . . [T]he executive could not make rules or duties that bound subjects, for these were legislative.[17]

This distinction between legislative and executive powers was widely recognized by the Founding generation.[18]

---

[15] Philip Hamburger, *Is Administrative Law Unlawful*, 84 (2015).

[16] *Id.* (internal quotation marks omitted).

[17] *Id.*

[18] St. George Tucker, *View of the Constitution of the United States with Selected Writings* at 46-47 (Clyde Wilson, ed., Liberty Fund 1999) (1803) ("First, the power of directing the actions of the citizens by laws requiring whatever is requisite for this end, and prohibiting the contrary by penalties: determining and limiting more precisely the several rights of men, appointing the proper methods for securing, transferring, or conveying them, as the general interest may require, and even limiting their use of them, in certain cases, for the same general purpose. Secondly, another power of the same class is that of appointing in what manner, and what proportion each one shall contribute towards the public expenses out of his private fortune, or private gains, by paying taxes, as the state of the people will admit. These two branches of power are commonly called legislative [...] The power of

11

The founders, the thinkers and writers who influenced them, and lawyers in the early republic all understood that an essential part of the separation of powers, an essential protection of liberty, was that the legislative authority could not delegate legislative power to any other entity. Writing about the delegation of legislative powers, Locke explained, "[t]he legislative cannot transfer the power of making laws to any other hands: for it being but a delegated power from the people, they who have it cannot pass it over to others."[19] Locke, similarly, argued that, "[t]he legislative power neither must nor can transfer the power of making laws to anyone else."[20]

At the constitutional convention, Madison explained that certain powers were "in their nature Executive, and must be given" to that branch.[21] He then presented a

---

appointing inferior magistrates (that of appointing the judges of the superior courts being by the constitution of this state vested in the legislature) and ministerial officers to take care of the execution both of the ordinary laws, and of the special orders of the state, given by the proper departments, and of collecting the public revenue; paying the public creditors, defraying the public charges; and commanding, and directing the public force, pursuant to the law and constitution of the state, is ordinarily called the executive department.").

[19] John Locke, *Second Treatise on Government*, § 141, 323 (Thomas Hollis ed., 1764) (1689) (emphasis in original). *See also*, Thomas Jefferson, *Notes on the State of Virginia*, Query XIII, 136 (1853) ("Our ancient laws expressly declare that those who are but delegates themselves shall not delegate to others powers which require judgment and integrity in their exercise.").

[20] *Id*. at 324-325.

[21] James Madison, *Notes of Debates in the Federal Convention of 1787 (June 1)*, in 1 *The Records of the Federal Convention of 1787*, 65 (Max Farrand ed., Yale University Press 1911).

motion to prohibit Congress from delegating additional power to either the executive or judiciary in order to prevent "misconstructions."[22] Charles Pinckney successfully moved to strike out Madison's motion because it was "unnecessary" since the executive inherently lacks the power to make laws.[23] Throughout the Convention, delegates demonstrated a distinct understanding of powers as legislative or executive in nature.[24]

In 1792, Congress passed, and President Washington signed into law, an Act to Regulate Invalid Pensions.[25] That law required circuit court justices to judge the pension applications of disabled soldiers, subject to revision by the Attorney General or an act of the legislature. The early Supreme Court justices riding circuit refused to exercise the powers the law supposedly granted to them because they determined that the mix of legislative and executive duties delegated to the courts by the act

---

[22] *Id.*

[23] *Id.*

[24] James Madison, *Notes of Debates in the Federal Convention of 1787 (September 15)*, in 2 *The Records of the Federal Convention of 1787*, 627 (Max Farrand ed., Yale University Press 1911) ("Mr. King thought it would be inconsistent with the Constitutional separation of the Executive & Legislative powers to let the prerogative be exercised by the latter — A Legislative body is utterly unfit for the purpose. They are governed too much by the passions of the moment. In Massachusetts, one assembly would have hung all the insurgents in that State: the next was equally disposed to pardon them all. He suggested the expedient of requiring the concurrence of the Senate in Acts of Pardon.").

[25] An Act to provide for the settlement of the Claims of Widows and Orphans barred by the limitations heretofore established, and to regulate the Claims to Invalid Pensions, ch. 11, 1 Stat. 244 (1792).

were unconstitutional. Chief Justice Jay, in his written opinion to Washington on behalf of himself, Justice Cushing, and Judge Duane, wrote "neither the legislative nor the executive branches, can constitutionally assign to the judicial any duties, but such as are properly judicial, and to be performed in a judicial manner." *Hayburn's Case*, 2 U.S. (2 Dall.) 409, 410 (1792). Justice Iredell, also riding circuit, came to the same conclusion, writing that the courts could "not be warranted" in exercising the power delegated by the act because for the judiciary to exercise "any power not in its nature judicial, or, if judicial, not provided for upon the terms the constitution requires" was unconstitutional.[26]

Similarly, in *Vanhorne's Lessee v. Dorance*, 2 U.S. 304 (2 Dall.), 308, 311 (1795), Justice Paterson explained that law can only be "the work or will of the legislature in their derivative or subordinate capacity." American constitutions acted as the "sun of the political system" and laid out the exact "orbit in which [law] must move." *Id*. Certain powers can only be exercised by the legislative body, such as "the despotic power […] of taking property," and legislatures cannot delegate that power. *Id*. The idea of core nondelegable powers was also recognized in the case of *Cooper v. Telfair*.[27]

---

[26] "To George Washington from James Iredell and John Sitgreaves, 8 June 1792," *Founders Online,* National Archives, https://founders.archives.gov/documents/Washington/05-10-02-0290.
[27] *Cooper v. Telfair*, 4 U.S. 14 (4 Dall.), 19 (1800) (Paterson, J.) ( "But the power of

The nondelegation principle was reiterated during the Jefferson Administration. The Embargo Act of 1807 empowered the President "to give such instructions" to executive officers "as shall appear best adapted for carrying the same into effect."[28] The Supplementary Act passed soon after appeared to further augment this power by giving the President authority to individually decide the detainment of ships he considered suspicious.[29] Jefferson interpreted this as a broad grant of authority, writing the "legislature having found, after repeated trials, that no general rules could be formed," decided to delegate to the President "discretionary power paramount to all their general rules."[30] Justice Johnson, riding circuit, disagreed that Congress could have ever delegated such broad power to the President. In *Gilchrist v. Collector of Charleston*, 10 F. Cas. 355, 358 (1808), he found that if the law did what the President claimed, it would "necessarily have the effect of transferring the powers vested in one department to another department."

---

confiscation and banishment does not belong to the judicial authority, whose process could not reach the offenders: and yet, it is a power, that grows out of the very nature of the social compact, which must reside somewhere, and which is so inherent in the legislature, that it *cannot be divested, or transferred*, without an express provision of the constitution.") (Emphasis added).

[28] An Act laying an Embargo on all ships and vessels in the ports and harbors of the United States, ch. 5, 2 Stat. 451 (1807).

[29] An Act in addition to the act intituled (sic) "An act laying an embargo on all ships and vessels in the ports and harbors of the United States," and the several acts supplementary thereto, and for other purposes, ch. 66, 2 Stat. 499 (1808).

[30] "From Thomas Jefferson to Charles Pinckney, 18 July 1808," *Founders Online,* National Archives, https://founders.archives.gov/documents/Jefferson/99-01-02-8354.

15

In *United States v. Sears*, Justice Story, writing for the circuit court, found that the apparent delegation of power to issue instructions for officers was narrow because it "presupposes that the law had already devolved these duties upon them." 27 F. Cas. 1006, 1011 (1812). Congress could not have intended to delegate "an unlimited authority over the commercial property of the citizens." *Id*.

The provision which loomed largest over the Embargo Act controversy was the empowerment of the President to lift the embargo if he received intelligence justifying such an act. The House of Representatives vigorously debated whether this was a delegation of legislative power. The key takeaway is that *both* proponents and opponents of the measure recognized there existed a principle of nondelegation. Representative Campbell, the motion's sponsor, declared that the bill did not vest commercial regulation, a law-making power, in the President, but only typical executive fact finding.[31] Representative Key opposed the measure as he saw in it the power to "repeal a Legislative act, and we cannot transfer the power of legislating from us to the President."[32]

---

[31] 18 Annals of Cong. 2084 (1808) (Statement of Rep. Campbell) ("For myself I cannot see what objections can be made to this measure. It is not vesting a power in the President to oppress or embarrass the commercial interest; it only invests in him a power, under certain restrictions, a pressure which our fellow-citizens feel from the measure we have been forced to adopt.")

[32] 18 Annals of Cong. 2125 (1808) (Statement of Representative Key).

When the Embargo Act challenge reached the Supreme Court, Joseph Ingersoll, son of signer of the Constitution Jared Ingersoll, representing the appellant owner of the ship Aurora, argued, "Congress could not transfer the legislative power to the President. To make the revival of a law depend upon the President's proclamation, is to give to that proclamation the force of a law. Congress meant to reserve to themselves the power of ascertaining when the condition should have been performed." *The Cargo of the Brig Aurora v. United States*, 11 U.S. (7 Cranch) 382, 386 (1813). The Court acknowledged the Congress could not transfer any legislative power to the President, but found that, in this case, Congress had not delegated legislative power. Instead, it held that Congress had "only prescribed the evidence which should be admitted of a fact, upon which the law should go into effect." *Id*. at 387.

The nondelegation principle is well established in early American legal thought and jurisprudence, growing out of hard-won wisdom about the dangers of the executive exercise of legislative power. The founders incorporated that wisdom into the Constitution to ensure that the legislative power of the United States, all of it, would be exercised by Congress, and by Congress alone.

Congress, therefore, has no authority to rearrange the government's powers by vesting its core legislative powers in another branch or entity, a fact actualized in the Supreme Court's nondelegation doctrine.

17

**III. If the President's Interpretation of IEEPA is Correct, the Statute Violates the Supreme Court's Nondelegation Doctrine.**

The Constitution vests "[a]ll legislative Powers" of the national government "in a Congress of the United States." U.S. Const. art. I, § 1. Further, "that assignment of power to Congress is a bar on its further delegation." *FCC v. Consumers' Research*, No. 24-354, slip op. at 10 (June 27, 2025) (citing *Whitman v. American Trucking*, 531 U.S. 457, 472 (2001). The nondelegation doctrine, the Supreme Court's rule for enforcing this constitutional principle, "bars Congress from transferring its legislative power to another branch of Government." *Gundy*, 588 U.S. at 132 (plurality opinion).

To avoid improperly delegating legislative power to the executive, Congress must "lay down . . . an intelligible principle to which the person or body authorized" to exercise the power in question must "conform." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928). While the intelligible principle test has, at times, been used to allow Congress to empower the President through "extraordinarily capacious standards," *Gundy*, 588 U.S. at 149 (Alito, J., concurring), the fundamental prohibition remains clear: "No one, not even Congress, ha[s] the right to alter [the constitutional] arrangement" of powers. *Id.* 588 U.S. at 153 (Gorsuch, J., dissenting). As Justice Scalia explained, "Our Members of Congress could not, even if they wished, vote all power to the President and adjourn *sine die.*" *Mistretta v. United States*, 488 U.S. 361, 415 (1989) (Scalia, J., dissenting).

18

As the Court recently explained, "[t]he 'guidance' needed [from Congress] is greater . . . when an agency action will 'affect the entire national economy' than when it addresses a narrow, technical issue." *Consumers' Research*, No. 24-354, slip op. at 11 (June 27, 2025), (quoting *Whitman*, 531 U.S. at 475). Congress must make clear "both 'the general policy' that the agency must pursue and 'the boundaries of [its] delegated authority.'" *Id*. (alteration in original) (quoting *American Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)). The Court also considers whether "Congress has provided sufficient standards to enable both 'the courts and the public [to] ascertain whether the agency' has followed the law." *Id*. (alteration in original) (quoting *OPP Cotton Mills, Inc. v. Administrator of Wage and Hour Div., Dep't of Labor*, 312 U.S. 126, 144 (1941)). Under the government's interpretation of IEEPA, the President's tariff power affects the "entire national economy," *id*., the supposedly delegated authority is unbounded, and neither the courts nor the public can effectively determine whether the tariffs are within the scope of IEEPA's delegation.

The President's unilateral tariffs fail even the Supreme Court's sometimes permissive interpretation of the nondelegation doctrine. *Gundy*, 588 U.S. at 146 (plurality opinion) ("Those standards, the Court has made clear, are not demanding."). A statute empowering the executive "is permissible" under the broader reading of the intelligible principle test "if Congress has made clear to the delegee 'the general policy' he must pursue and the 'boundaries of his authority.'"

19

*Id.* at 146 (quoting *American Power & Light Co. v. Securities and Exchange Committee*, 329 U.S. 90, 105 (1946)).

The government's arguments fail this test. The government elsewhere effectively concedes that IEEPA does not provide an intelligible principle guiding the implementation of tariffs. The government argues that "what constitutes an 'extraordinary and unusual threat' and whether a particular action will effectively 'deal with' that threat" contains "no basis for meaningful judicial review of President Trump's findings."[33] The government, then, is arguing that while IEEPA's "unusual and extraordinary circumstances" requirement does provide an intelligible principle guiding the President's actions, that standard is only intelligible to the President, not to the Courts.

Further, the Supreme Court's sometimes undemanding reading of the intelligible principle test is a misreading. As Justice Gorsuch explained, when the Court first used the phrase in 1928, "No one . . . thought the phrase meant to effect some revolution in this Court's understanding of the Constitution." *Gundy*, 588 U.S. at 162 (Gorsuch, J., dissenting). The difficulty in some cases of determining "the exact line between policy and details, law-making and fact-finding, and legislative and non-legislative functions" does not undermine the fact that "everyone agreed

---

[33] Opening Brief of Petitioners at 58, *V.O.S. Selections v. Trump*, No. 25-1812 (D.C. Circuit June 24, 2025).

these were the relevant inquiries." *Id*. As the Court had said a few decades earlier, "[t]hat Congress cannot delegate its legislative power to the President is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution." *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892). The Court echoed this sentiment in 1935, writing, "The Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corporation v. United States*, 295 U.S. 495, 529-30.

Justice Gorsuch, in his dissent in *Gundy*, lays out a test more faithful to the Constitution's separation of powers:

> To determine whether a statute provides an intelligible principle, [courts] must ask: Does the statute assign to the executive only the responsibility to make factual findings? Does it set forth the facts that the executive must consider and the criteria against which to measure them? And most importantly, did Congress, and not the Executive Branch, make the policy judgments? Only then can we fairly say that a statute contains the kind of intelligible principle the Constitution demands.

21

*Gundy*, 588 U.S. at 166 (Gorsuch, J., dissenting). The government's interpretation of IEEPA fails this test.

First, the government's interpretation of IEEPA allows the President to do far more than determine facts. The President must begin by determining whether the situation in question amounts to "unusual and extraordinary circumstances" justifying the declaration of a national emergency. As argued above, if that question is nonjusticiable, then it is a policy question and thus entails legislation by the executive.

Second, and most importantly, IEEPA, under the government's interpretation, allows the Executive to make policy judgments of massive import with only *de jure,* not *de facto,* meaningful congressional oversight. The President's determination that there is a national emergency unlocks, according to the government, vast powers that the Court of International Trade rightly called "unbounded." *V.O.S. Selections, Inc. v. United States*, No. 25-00066 (CIT, May 28, 2025). There appears to be no principle in the government's interpretation that would prevent the President from banning all international trade, indefinitely. Such decisions are legislative policy decisions reserved to Congress in Article I.

The government's interpretation of IEEPA violates the nondelegation doctrine's intelligible principle test, whether read more or less permissively. The President asserts for himself apparently unlimited authority to make policy decisions

22

about international commerce on the grounds of a statute so supposedly vague that courts would not have sufficient guidance to question the President's decision making. "This is delegation running riot." *Gundy*, 588 U.S. at 161 (Gorsuch, J., dissenting) (internal quotation marks omitted) (quoting *Schechter Poultry*, 295 U.S. at 553 (Cardozo, J., concurring).

## CONCLUSION

For the foregoing reasons, the Court should rule for Plaintiffs-Appellees.

Dated: July 30, 2025

Respectfully submitted,

/s/ J. Marc Wheat
J. Marc Wheat
Advancing American Freedom, Inc.
801 Pennsylvania Avenue, N.W.
Suite 930
Washington, D.C. 20004
(202) 780-4848
mwheat@advancingamericanfreedom.com

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains <u>5461</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using MS Word 2016 in <u>Times New Roman 14-point font</u>.

Dated: July 30, 2025

Respectfully submitted,

<u>/s/ J. Marc Wheat</u>
J. Marc Wheat
Advancing American Freedom, Inc.
801 Pennsylvania Avenue, N.W.
Suite 930
Washington, D.C. 20004
(202) 780-4848
mwheat@advancingamericanfreedom.com

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that on July 30, 2025, I am causing this document to be filed electronically with this Court's CM/ECF system. All participants are registered CM/ECF users and will be served by the Appellate CM/ECF system.

Dated: July 30, 2025

Respectfully submitted,

/s/ J. Marc Wheat
J. Marc Wheat
Advancing American Freedom, Inc.
801 Pennsylvania Avenue, N.W.
Suite 930
Washington, D.C. 20004
(202) 780-4848
mwheat@advancingamericanfreedom.com

*Counsel for Amici Curiae*