No. 25-5202

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

LEARNING RESOURCES, INC., *et al.*,
*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, *et al.*,
*Defendants-Appellants*.

_____

**On Appeal from the United States District Court
for the District of Columbia**

_____

**AMICI CURIAE BRIEF OF THE STATE OF CALIFORNIA
AND GOVERNOR GAVIN NEWSOM IN SUPPORT OF
PLAINTIFFS-APPELLEES AND AFFIRMANCE**

_____

**SET FOR ORAL ARGUMENT ON SEPTEMBER 30, 2025**

_____

ROB BONTA
  *Attorney General of California*
THOMAS S. PATTERSON
  *Senior Assistant Attorney General*
LARA HADDAD
  *Supervising Deputy Attorney General*

SHIWON CHOE
ZELDA VASSAR
CAROLYN F. DOWNS
  *Deputy Attorneys General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-4400
Fax: (415) 703-5480
Shiwon.Choe@doj.ca.gov

*Attorneys for the State of California
and Governor Gavin Newsom*

July 30, 2025

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a), amici curiae the State of California and Governor Gavin Newsom (collectively, "California") submit the following certificate:

**A.  Parties and Amici:**  All parties and amici appearing before the district court, and all parties and amici appearing in this case through July 23, 2025, are listed in the Brief for Plaintiffs-Appellees.  Additionally, since that time, in addition to California, Advancing American Freedom, Inc., Independent Institute, Frontline Policy Council, Mountain States Center, Michael Munger, Rio Grande Foundation, and Taxpayers Protection Alliance; the Cato Institute; Wentong Zheng; and Protect Democracy Project have appeared as amici or prospective amici in this case.

**B.  Rulings Under Review:**  The rulings under review are listed in the Briefs for Defendants-Appellants and Plaintiffs-Appellees.

**C.  Related Cases:**  Related cases are listed in the Briefs for Defendants-Appellants and Plaintiffs-Appellees.

# TABLE OF CONTENTS

**Page**

INTEREST OF AMICI CURIAE ........................................................................1

SUMMARY OF ARGUMENT ..........................................................................2

BACKGROUND .................................................................................................4

ARGUMENT .......................................................................................................6

    I.     The District Court Correctly Exercised Jurisdiction ...........................6

          A.    19 U.S.C. § 3004(c) does not grant the CIT exclusive
               jurisdiction over this action ........................................................6

          B.    28 U.S.C. § 1581(i)(1)(C) does not grant CIT exclusive
               jurisdiction over this action ......................................................11

    II.    IEEPA Does Not Authorize Tariffs ..................................................13

          A.    "Regulate," read in the context of the other enumerated
               powers in IEEPA, does not mean tariff or tax .........................14

          B.    "Regulate ... importation," read in the context of other
               activities regulated in IEEPA, does not mean tariff or tax ......22

CONCLUSION ..................................................................................................27

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Ala. Ass'n of Realtors v. HHS*,
594 U.S. 758 (2021) ...................................................................23

*Barnes v. United States*,
No. 25-00043, 2025 WL 1483384 (Ct. Int'l Trade May 23, 2025) ......................7

*BP P.L.C. v. Mayor of Balt.*,
593 U.S. 230 (2021) ...................................................................21

*Brown v. Gardner*,
513 U.S. 115 (1994) ............................................................ 14, 23, 25

*California v. Trump*,
No. 25-cv-03372-JSC, 2025 WL 1569334 (N.D. Cal. June 2, 2025),
*appeal docketed*, No. 25-3493 (9th Cir. June 3, 2025) .........................................7

*Chen v. INS*,
95 F.3d 801 (9th Cir. 1996) ...............................................................11

*Cochise Consultancy, Inc. v. United States ex rel. Hunt*,
587 U.S. 262 (2019) ............................................................ 14, 23, 25

*Consumers Union of U.S., Inc. v. Kissinger*,
506 F.2d 136 (D.C. Cir. 1984) ...........................................................10

*Corus Staal BV v. United States*,
493 F. Supp. 2d 1276 (Ct. Int'l Trade 2007)...........................................................6

*Dir. of Revenue v. CoBank ACB*,
531 U.S. 316 (2001) ...................................................................20

*Earth Island Inst. v. Christopher*,
6 F.3d 648 (9th Cir. 1993) ...................................................................12

## TABLE OF AUTHORITIES
### (continued)

Page

*Emily Ley Paper, Inc. v. Trump*,
   No. 3:25cv464-TKW-ZCB, 2025 WL 1482771 (N.D. Fla. May 20, 2025) ..........7

*Fed. Energy Admin. v. Algonquin SNG, Inc.*,
   426 U.S. 548 (1976) ...................................................................................25

*Fischer v. United States*,
   603 U.S. 480 (2024) ................................................................................ 14, 15

*Gonzalez v. United States*,
   553 U.S. 242 (2008) ...................................................................................25

*Gustafson v. Alloyd Co., Inc.*,
   513 U.S. 561 (1995) ............................................................................ 13, 23, 25

*Int'l Lab. Rights Fund v. Bush*,
   357 F. Supp. 2d 204 (D.D.C. 2004) ........................................................6

*K Mart Corp. v. Cartier, Inc.*,
   485 U.S. 176 (1988) ...................................................................................11

*La. Pub. Serv. Comm'n v. FCC*,
   476 U.S. 355 (1986) ...................................................................................10

*Marbury v. Madison*,
   5 U.S. 137 (1803) .......................................................................................11

*Markham v. Cabell*,
   326 U.S. 404 (1945) ............................................................................... 16, 19

*Marshall Field & Co. v. Clark*,
   143 U.S. 649 (1892) ...................................................................................10

*Monsalvo v. Bondi*,
   145 S. Ct. 1232 (2025) ...............................................................................25

# TABLE OF AUTHORITIES
## (continued)

Page

*Moore v. United States*,
  602 U.S. 572 (2024) ...........................................................................24

*Orleans Int'l, Inc. v. United States*,
  334 F.3d 1375 (Fed. Cir. 2003) ..........................................................13

*Pulsifer v. United States*,
  601 U.S. 124 (2024) .............................................................................9

*Sierra Club v. U.S. Dep't of Energy*,
  134 F.4th 568 (D.C. Cir. 2025) ...........................................................11

*United States v. Jacobs*,
  306 U.S. 363 (1939) ...........................................................................19

*United States v. U.S. Shoe Corp*,
  523 U.S. 360 (1998) ...........................................................................24

*United States v. Yoshida Int'l, Inc.*,
  526 F.2d 560 (C.C.P.A. 1975)...................................................... 20-22

*V.O.S. Selections, Inc. v. United States*,
  772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025),
  *appeal docketed*, No. 25-1813 (Fed. Cir. May 28, 2025) .....................7

*Webber v. DHS*,
  No. CV 25-26-GF-DLC, 2025 WL 1207587 (D. Mont. April 25, 2025),
  *appeal docketed*, No. 25-2717 (9th Cir. Apr. 28, 2025) .......................7

*West Virginia v. EPA*,
  597 U.S. 697 (2022) ........................................................... 13, 19, 26

*Whitman v. Am. Trucking Ass'ns, Inc.*,
  531 U.S. 457 (2001) ...........................................................................19

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ...........................................................................10

## TABLE OF AUTHORITIES
### (continued)

Page

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
  576 U.S. 1 (2015) ...............................................................................10

**Statutes**

19 U.S.C. § 1862 ..................................................................................26

19 U.S.C. § 3004 ....................................................................... 2, 3, 7-10

28 U.S.C. § 1581 ...............................................................2-4, 6, 7, 11-13

50 U.S.C. § 1702 ..........................................4, 14-17, 20, 22, 23, 25, 26

Emergency Banking Relief Act.,
  Pub. L. No. 73-1, 48 Stat. 1 (1933) ..................................................17

First War Powers Act,
  Pub. L. No. 77-354, 55 Stat. 838 (1941) ..........................................17

Omnibus Trade and Competitiveness Act of 1988,
  Pub. L. No. 100-418, 102 Stat. 1107 (1988) .......................................9

Reciprocal Tariff Act of 1934,
  Pub. L. No. 73-316, 48 Stat. 943 (1934) .............................................9

Tariff Act of 1930,
  Pub. L. No. 71-361, 46 Stat. 590 (1930) .............................................8

Tariff Classification Act of 1962,
  Pub. L. No. 87-456, 76 Stat. 72 (1962) ...............................................9

Trade Act of 1974,
  Pub. L. No. 93-618, 88 Stat. 1978 .....................................................21

Trade Expansion Act of 1962,
  Pub. L. No. 87-794, 76 Stat. 877 (1962) ...........................................26

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

Trading With the Enemy Act,
  Pub. L. No. 65-91, 40 Stat. 411 (1917) .................................................15

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 1 .................................................................19

U.S. Const. art. I, § 9, cl. 4 .................................................................24

U.S. Const. art. I, § 9, cl. 5 .................................................................24

**Legislative Materials**

Christopher A. Casey, Cong. Rsch. Serv., IF 11030,
  *U.S. Tariff Policy: Overview* (2025) .................................................8, 9

H. Comm. on Ways & Means, 111th Cong.,
  Overview and Compilation of U.S. Trade Statutes (Comm. Print 2010) .............9

H.R. Rep. No. 65-85 (1917).................................................................15, 16

H.R. Rep. No. 65-155 (1917) (Conf. Rep.) .............................................16

H.R. Rep. No. 77-1507 (1941).................................................................18, 19

H.R. Rep. No. 95-459 (1977).................................................................20, 21

S. Rep. No. 77-911 (1941) .................................................................19

S. Rep. No. 95-466 (1977) .................................................................20

**Executive Materials**

Exec. Order No. 14,195,
  90 Fed. Reg. 9121 (Feb. 1, 2025).......................................................12

Exec. Order No. 14,266,
  90 Fed. Reg. 15,625 (Apr. 9, 2025).....................................................10

## GLOSSARY

CIT                 Court of International Trade

FWPA                First War Powers Act

HTSUS               Harmonized Tariff Schedule of the United States

IEEPA               International Emergency Economic Powers Act

TEA                 Trade Expansion Act of 1962

TWEA                Trading With the Enemy Act

**INTEREST OF AMICI CURIAE**

Pursuant to Federal Rule of Appellate Procedure 29(a)(2) and Circuit Rule 29(b), amici curiae the State of California and Governor Gavin Newsom (collectively, "California") respectfully submit this brief in support of Plaintiffs-Appellees and affirmance.

California is the most populous State in the United States and is the fourth-largest economy in the world, behind only the United States as a whole, China, and Germany. California produced a gross state product ("GSP") of over $4 trillion in 2024, accounting for 13.7% of the entire U.S. gross domestic product. California is the largest importer and second-largest exporter among U.S. States. In 2024, California's total merchandise trade reached $675 billion, accounting for close to 16% of GSP. Much of this trade flows through California's eleven public ports, two of which are the largest and busiest container ports in North America. California's ports process one-third of all exports and 40% of all containerized imports for the entire world, generating an estimated $9 billion in state and local tax revenue annually.

Because of California's outsized economic footprint, it suffers outsized harms from the tariffs that President Trump has imposed and threatens to impose under the International Emergency Economic Powers Act ("IEEPA"). California thus has a strong interest in the question of whether federal district courts have

1

jurisdiction and whether IEEPA authorizes tariffs.  California has filed a lawsuit in

federal district court challenging IEEPA tariffs, taking the position that district

courts retain jurisdiction to decide that IEEPA does not authorize tariffs.

*California v. Trump*, No. 3:25-cv-03372-JSC (N.D. Cal.), *appeal docketed*, No. 25-

3493 (9th Cir.).  California submits this amicus brief to support Plaintiffs-

Appellees' jurisdictional and merits arguments.

## SUMMARY OF ARGUMENT

1.    The district court correctly rejected Defendants' argument that 28 U.S.C.

§ 1581(i) vests the Court of International Trade ("CIT") with exclusive jurisdiction

over challenges to tariffs imposed under the putative authority of IEEPA.  As

relevant here, Section 1581(i) confers the CIT with exclusive jurisdiction only over

actions "that arise[] out of any law of the United States providing for ... tariffs[.]"

Plaintiffs correctly establish that this action does not arise out of any law providing

for tariffs—it arises out of IEEPA, the statute that the President invoked as

authority for his tariffs and a statute that does not provide for tariffs.  Pls.'

Answering Br. ("AB") 19-30.

California submits this brief to address two jurisdictional arguments not

advanced by Defendants in the proceedings below.  First, Defendants advance a

new theory and cite a new statute, 19 U.S.C. § 3004(c), in support of their

argument that this challenge should be heard by the CIT.  Defendants' new theory

2

is that under Section 3004(c), modifications to the Harmonized Tariff Schedule of the United States ("HTSUS") are "statutory provisions of law for all purposes"; President Trump's executive orders modified the HTSUS to insert his IEEPA tariffs; and these HTSUS modifications thus are "law[s] of the United States" providing for tariffs that vest the CIT with jurisdiction under Section 1581(i).[1]  But this lawsuit does not "arise under" the HTSUS and, moreover, Defendants ignore the critical requirement in Section 3004(c) that only "modification[s] or change[s] made to the Harmonized Tariff Schedule by the President *under authority of law*" are laws of the United States.  President Trump's modifications to the HTSUS to insert IEEPA tariffs were not made "under authority of law," because IEEPA does not authorize tariffs.

Second, Amici America First Legal Foundation and Coalition for a Prosperous America (collectively, "America First") advance a separate theory that not even Defendants embrace, based on a separate subdivision of Section 1581(i), which vests the CIT with exclusive jurisdiction over actions arising out of laws providing for embargoes.  *See* 28 U.S.C. § 1581(i)(1)(C).  According to America First, because IEEPA broadly authorizes embargoes, CIT retains "categorical" jurisdiction over *every* action arising out of IEEPA, even if an action, like this one,

---

[1] As discussed below, *infra* pp. 8-9, the HTSUS is a tabular schedule that sets out the tariff rates for all goods imported into the United States.

is not about embargoes.  That is an unreasonable construction of the statute.  And in any event, Section 1581(i)(1)(C) is limited by its terms to laws providing for embargoes for reasons other than public health and safety.  President Trump specifically cited health-and-safety as a basis his tariffs.  America First's theory is also inconsistent with decades of practice, with district courts routinely exercising jurisdiction over cases arising out of IEEPA.

2.    On the merits, California submits this brief to supplement Plaintiffs' argument that IEEPA does not authorize tariffs.  AB 30-51.  Defendants cherry-pick two words out of one section of IEEPA, 50 U.S.C. § 1702(a)(1)(B), string them together with an ellipsis to read them as a single phrase, "regulate ... importation," and try to construe this ellipted phrase as authorizing tariffs.  But Defendants' approach of selecting isolated words from a statute and reading them out of context violates basic tenets of statutory construction.  It also contravenes Supreme Court precedent, which instruct that words must be read in context and with a view to their place in the overall statutory scheme.  IEEPA's text, statutory context, and legislative history all reflect here that the phrase "regulate ... importation" does not authorize tariffs.

## BACKGROUND

Over the past several months, President Trump—acting alone and without the consent of Congress—has issued a flurry of executive orders imposing sweeping

tariffs on nearly every trading partner of the United States under the purported authority of IEEPA. The hallmark of this regime has been unpredictability and volatility, as President Trump has repeatedly threatened, paused, reimposed, modified, and escalated these tariffs, changing tariff rates and dates seemingly from day to day.

As of the date of this filing, a majority of goods from Canada and Mexico are subject to a 25% tariff rate, although President Trump has threatened to raise those rates to 35% for Canada and 30% for Mexico on August 1; goods from China are subject to a 30% tariff rate, scheduled to nearly double on August 12, although another pause is rumored; and goods from nearly all other U.S. trading partners are subject to a 10% tariff rate, scheduled to rise for certain countries at rates ranging from 11% to 50% on August 1—rates and dates that President Trump has repeatedly whipsawed back and forth. President Trump has also issued a multitude of tariff threats, including: a 100% tariff "on any and all Movies coming into our Country that are produced in Foreign Lands"[2]; a 50% tariff on Brazil due to a perceived "Witch Hunt" against former President Jair Bolsonaro[3]; and a refusal to

---

[2] Donald J. Trump (@realDonaldTrump), Truth Social (May 4, 2025), https://truthsocial.com/@realDonaldTrump/posts/114452117143235155.

[3] Donald J. Trump (@realDonaldTrump), Truth Social (July 9, 2025), https://truthsocial.com/@realDonaldTrump/posts/114825119138468153.

engage in trade negotiations with Thailand and Cambodia regarding an impending

36% tariff unless the countries agree to a ceasefire.[4]  These tariffs are poised to

inflict significant and enduring economic harm.

## ARGUMENT

## I.    The District Court Correctly Exercised Jurisdiction

### A.  19 U.S.C. § 3004(c) does not grant the CIT exclusive jurisdiction over this action

As the district court correctly held, this action arises out of IEEPA, and

IEEPA is not a "law of the United States providing for ... tariffs" under 28 U.S.C.

§ 1581(i).  JA101-02 & n.4, JA115; AB 19-30.  Under 28 U.S.C. § 1581(i)(1)(B),

the CIT has exclusive jurisdiction over any action against the government that

"arises out of any law of the United States providing for ... tariffs."  The phrase

"arises out of" as used in Section 1581(i)(1) refers to the "substantive law giving

rise to [the] claims" alleged in the civil action—that is, the substantive law

pursuant to which the executive branch took the challenged action.  *Int'l Lab.*

*Rights Fund v. Bush*, 357 F. Supp. 2d 204, 208 (D.D.C. 2004); *see Corus Staal BV*

*v. United States*, 493 F. Supp. 2d 1276, 1284-85 (Ct. Int'l Trade 2007) (denying

CIT jurisdiction under Section 1581(i) and rejecting theory that plaintiffs were

---

[4] Donald J. Trump (@realDonaldTrump), Truth Social (July 26, 2025), https://truthsocial.com/@realDonaldTrump/posts/114920242180121128; Donald J. Trump (@realDonaldTrump), Truth Social (July 26, 2025), https://truthsocial.com/@realDonaldTrump/posts/114920456511077924.

challenging agency's liquidation instructions, because courts "must instead look to the 'true nature of the action' when determining jurisdiction" and "true nature" of challenge was to the underlying law, not the instructions to carry it out).  IEEPA is the substantive law under which the President acted and is therefore the basis for Plaintiffs' claims that the President's actions were ultra vires and violated the separation of powers.[5]

Defendants now advance a new jurisdictional theory that they did not present below: under 19 U.S.C. § 3004(c), Defendants' insertions of IEEPA tariffs into the HTSUS render them laws providing for tariffs within the meaning of Section 1581(i).[6]  Defendant's theory lacks merit.  It misunderstands the phrase "arises

---

[5] Several courts considering similar challenges to President Trump's tariffs have also held that actions challenging executive orders as unauthorized by IEEPA "arise[] out of" IEEPA.  *See Emily Ley Paper, Inc. v. Trump*, No. 3:25cv464-TKW-ZCB, 2025 WL 1482771, at *4 (N.D. Fla. May 20, 2025), *transferred to* No. 1:25-cv-00096-GSK-TMR-JAR (Ct. Int'l Trade); *Barnes v. United States*, No. 25-00043, 2025 WL 1483384, at *2-3 (Ct. Int'l Trade May 23, 2025); *Webber v. DHS*, No. CV 25-26-GF-DLC, 2025 WL 1207587, at *5 (D. Mont. April 25, 2025), *appeal docketed*, No. 25-2717 (9th Cir. Apr. 28, 2025).  *But see V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350, 1366-67 (Ct. Int'l Trade 2025) (holding that any "action involving a challenge to a presidential action that imposes tariffs ... is one that arises from a 'law providing for' those measures")*, appeal docketed*, No. 25-1813 (Fed. Cir. May 28, 2025); *California v. Trump*, No. 25-cv-03372-JSC, 2025 WL 1569334, at *4 (N.D. Cal. June 2, 2025) (holding that action arose out of the executive orders and that "[t]hose executive orders are laws of the United States"), *appeal docketed*, No. 25-3493 (9th Cir. June 3, 2025).

[6] Defendants have never advanced section 3004(c) as a basis for CIT's jurisdiction in the trial courts in any of their other IEEPA tariff lawsuits.  *See Emily*
(continued…)

under." JA102 & n.4; AB 20-22; *supra* pp. 6-7.  It also ignores the plain text of Section 3004(c), which provides that HTSUS modifications made only "*under authority of law*" are statutory laws.  *See* Defs.' Opening Br. ("OB") 3-4, 22, 31 (omitting "under authority of law" when quoting Section 3004(c)).  Defendants reference the "under authority of law" qualification just once, OB 27, and never address or confront the limitations contained in that text.

The HTSUS is a schedule of tables that list the tariff rates for goods imported into the United States.  Originally, when Congress enacted the Smoot-Hawley tariffs—which raised tariffs to their highest level since 1828—Congress wrote tariff rates directly into the statute.  Tariff Act of 1930, Pub. L. No. 71-361, 46 Stat. 590 (1930); Christopher A. Casey, Cong. Rsch. Serv., IF 11030, *U.S. Tariff Policy: Overview* 1-2 (2025), https://www.congress.gov/crs_external_products/IF/PDF/IF11030/IF11030.10.pdf.  As U.S. and global tariff rates increased during the Great Depression and U.S. exports correspondingly decreased, Congress reacted by authorizing the President to negotiate reciprocal trade agreements and proclaim

---

*Ley Paper, Inc. v. Trump*, No. 3:25-cv-00464-TKW-ZCB (N.D. Fla.), ECF Nos. 5, 35; *Webber v. DHS*, No. 4:25-cv-00026-DLC (D. Mont.), ECF Nos. 19, 21, 25, 30; *V.O.S. Selections, Inc. v. Trump*, No. 1:25-cv-00066-GSK-TMR-JAR (Ct. Int'l Trade), ECF Nos. 12, 32; *California v. Trump*, No. 3:25-cv-03372-JSC (N.D. Cal.), ECF Nos. 9, 14, 55; *Oregon v. Trump*, No. 1:25-cv-00077-GSK-TMR-JAR (Ct. Int'l Trade), ECF Nos. 27, 41, 46; *Princess Awesome, LLC v. U.S. Customs & Border Prot.*, No. 1:25-cv-00078-GSK-TMR-JAR (Ct. Int'l Trade), ECF Nos. 9, 16, 19 (never once mentioning Section 3004(c)).  Defendants' new Section 3004(c) theory thus was never briefed or subjected to opposition briefing.

reductions from the rates in the Tariff Act, up to a pre-set boundary.  Reciprocal

Tariff Act of 1934, Pub. L. No. 73-316, 48 Stat. 943 (1934); Casey 1.

As that approach to codifying tariff rates became unwieldly, Congress

replaced it first with the "Tariff Schedules of the United States," established by the

Tariff Classification Act of 1962, Pub. L. No. 87-456, 76 Stat. 72 (1962), and then

the successor "Harmonized Tariff Schedule of the United States," established by

the Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418,

§§ 1201-07, 102 Stat. 1107 (1988).  *See* H. Comm. on Ways & Means, 111th

Cong., Overview and Compilation of U.S. Trade Statutes 1-8 (Comm. Print 2010).

The HTSUS is deemed a statutory provision of law.  19 U.S.C. § 3004(c).

Section 3004(c) also provides that "[e]ach modification or change made to the

Harmonized Tariff Schedule by the President under authority of law" "shall be

considered to be statutory provisions of law[.]"  While modifications to the

HTSUS "under authority of law" are deemed statutory provisions of law,

modifications made without "authority of law" are *not* statutory provisions of law.

*See Pulsifer v. United States*, 601 U.S. 124, 141-43 (2024) (rejecting statutory

construction that would leave provision "without any operative significance").

Defendants have no persuasive argument to the contrary.

Textual requirements aside, Defendants' theory would also grant sweeping

power to the President to make law, in violation of bedrock constitutional

principles. It is well settled that "only Congress can rewrite [a] statute." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 376 (1986). It is likewise well settled that, absent an Act of Congress, "the President [can]not increase or decrease tariffs." *Consumers Union of U.S., Inc. v. Kissinger*, 506 F.2d 136, 142 (D.C. Cir. 1984). But under Defendants' theory, the President wields unilateral power to rewrite the statutory HTSUS and create new statutory provisions of law entirely on his own. That cannot be squared with separation-of-powers principles. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587-88 (1952) ("the Constitution is neither silent nor equivocal about who shall make laws[:] .... Congress"); *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015) ("[W]hether the realm is foreign or domestic, it is still the Legislative Branch, not the Executive Branch, that makes the law."); *Marshall Field & Co. v. Clark*, 143 U.S. 649, 669 (1892) (a bill "does not become a law of the United States if it ha[s] not in fact been passed by Congress.... There is no authority ... in the President to approve ... as a legislative act, any bill not passed by Congress.").

Through the challenged tariffs, President Trump has attempted to modify the HTSUS to insert tariffs as high as 145% by executive fiat, well beyond the rates Congress set by statute in the Tariff Act of 1930. *See* Exec. Order No. 14,266, § 3(b)-(c), 90 Fed. Reg. 15,625 (Apr. 9, 2025). Under Section 3004(c), he may modify the HTSUS only "under authority of law," which must come from an Act

10

of Congress, not his own executive orders or his own say-so. *See Marbury v. Madison*, 5 U.S. 137, 158 (1803) (contrasting between actions "under the authority of law," i.e., an Act of Congress, versus actions merely "by the instructions of the President"); *Sierra Club v. U.S. Dep't of Energy*, 134 F.4th 568, 573 (D.C. Cir. 2025) ("[A]n executive order is not 'law' within the meaning of the Constitution."); *Chen v. INS*, 95 F.3d 801, 805 (9th Cir. 1996) ("Executive Order lack[s] the force and effect of law [where] it was never grounded in a statutory mandate or congressional delegation of authority.").

### B. 28 U.S.C. § 1581(i)(1)(C) does not grant CIT exclusive jurisdiction over this action

America First advances an alternative jurisdictional theory based on 28 U.S.C. § 1581(i)(1)(C), which vests the CIT with jurisdiction over actions "that arise[] out of any law of the United States providing for ... embargoes ... for reasons other than the protection of the public health and safety[.]"

There are no embargoes at issue in this case. Embargoes *prohibit* trade, not tax it, and thus the IEEPA tariffs here are not embargoes. *K Mart Corp. v. Cartier, Inc.*, 485 U.S. 176, 185 (1988). America First nonetheless maintains that Section 1581(i)(1)(C) "imposes a form of categorical approach" wherein the CIT has exclusive jurisdiction over *every* action brought against the government arising out of IEEPA, simply because IEEPA as a general matter can provide for embargoes. Am. First. Br. 8-11.

11

Not even Defendants adopt this theory. For good reason—as America First's approach which would mean that hundreds of district-court cases acted without jurisdiction in considering IEEPA cases over the last several decades. The theory fails on its own terms for at least two additional reasons.

First, Section 1581(i)(1)(C) by its own terms applies only to laws providing for embargoes "for reasons other than the protection of the public health or safety." IEEPA authorizes embargoes for health-and-safety reasons. And while the challenged tariffs could never be considered embargoes, one of President Trump's asserted bases for imposing the tariffs was health-and-safety concerns. Exec. Order No. 14,195, 90 Fed. Reg. 9121 (Feb. 1, 2025) (claiming action under IEEPA was required to end "the public health crisis caused by opioid use and addiction").

Second, America First's "categorical" theory of jurisdiction would lead to absurd results. To take one example, the Endangered Species Act provides for restrictions that can be construed as "embargoes" under Section 1581(i)(1)(C). *See Earth Island Inst. v. Christopher*, 6 F.3d 648, 652 (9th Cir. 1993). Under America First's "categorical" theory, this would mean the CIT has exclusive jurisdiction over *every* action arising out of the Endangered Species Act. The Federal Circuit, which has appellate jurisdiction over the CIT, has rejected this approach. Instead, it holds that "[t]he district courts and the Court of International Trade can both have jurisdiction over actions arising out of the same act—it simply does not

12

matter that there will be similar legal issues litigated in different courts." *Orleans Int'l, Inc. v. United States*, 334 F.3d 1375 (Fed. Cir. 2003). Even if Section 1581(i)(1)(C) would confer CIT with jurisdiction over actions challenging non-health-and-safety embargoes, it does not provide the CIT with "categorical" jurisdiction over all actions arising out of IEEPA when no embargoes are involved.

## II.  IEEPA Does Not Authorize Tariffs

The plain language of IEEPA confirms that it does not authorize tariffs, and California agrees with Plaintiffs' view that the challenged tariffs are not permissible under the plain text of IEEPA or consistent with statutory context or basic statutory interpretation principles. AB 30-51. California writes to focus on historical and statutory-context arguments that support Plaintiffs' position.

"It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022). Where a statute contains a list of words, parties and courts must read the entire list in context and may not just select "but one word in a list, a word [a party] reads altogether out of context," "ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving 'unintended breadth to the Acts of Congress.'" *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 574-75 (1995). And, of course, "[i]n all but the most unusual situations, a single use of a statutory phrase must have a

13

fixed meaning." *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262, 268 (2019); *accord, e.g.*, *Brown v. Gardner*, 513 U.S. 115, 118 (1994) ("there is a presumption that a given term is used to mean the same thing throughout a statute"). Reading "regulate ... importation" in the context of the statutory lists in which "regulate" and "importation" appear in Section 1702(a)(1)(B), and in the context of IEEPA's overall statutory scheme and history, confirms that "regulate ... importation" does not authorize tariffs

### A. "Regulate," read in the context of the other enumerated powers in IEEPA, does not mean tariff or tax

The power to "regulate" is not the only emergency power listed in Section 1702(a)(1)(B). Rather, "regulate" is just one entry in a list of eight emergency powers set forth therein:

> [(1)] investigate, [(2)] block during the pendency of an investigation, [(3)] regulate, [(4)] direct and compel, [(5)] nullify, [(6)] void, [(7)] prevent or [(8)] prohibit[.]

50 U.S.C. § 1702(a)(1)(B).

The meaning of "regulate" must be consistent with the other entries in the list of emergency powers in which it appears. *See Fischer v. United States*, 603 U.S. 480, 487-88 (2024) (reading lists of statutory terms under the "the canon of *noscitur a sociis*[, which] teaches that a word is 'given more precise content by the neighboring words with which it is associated'" because "a general phrase can be given a more focused meaning by the terms linked to it"). That meaning does not

include imposing tariffs or taxes.  The other emergency powers (investigate, block, direct and compel, nullify, void, prevent, and prohibit) reflect an overall statutory scheme to *control or restrict* activities, not to *tariff or tax* them, which is an activity that is "simply not of that kind" as the other powers in the statutory list. *Cf. id.* at 488.

This commonsense textual reading is supported by the legislative history and statutory evolution of IEEPA.  *See id.* at 491-92 (interpreting statute in light of its legislative history).

The language in Section 1702(a) traces back to a predecessor statute, the Trading With the Enemy Act ("TWEA"), first enacted in 1917 shortly after the United States's entry into World War I.  Trading With the Enemy Act, Pub. L. No. 65-91, 40 Stat. 411 (1917).  TWEA's purpose was to (1) "interdict[]," i.e., prohibit, "trade in time of war" with the enemy and (2) "conserve and utilize ... enemy property found within the jurisdiction of the United States."  H.R. Rep. No. 65-85, at 1 (1917).  To serve its first purpose—interdiction—TWEA § 3 prohibited outright any trade by individuals in the United States with the "enemy" (residents of nations with which the United States was at war and certain other categories) or any "ally of [the] enemy," unless licensed by the President.  TWEA § 11 further authorized the President to bar other imports upon a finding that public safety so required.  To serve its second purpose—conserving and utilizing enemy property—

TWEA § 6 provided for the appointment of a new official, the "alien property custodian," to hold money or property belonging to the "enemy" or any "ally of [the] enemy" during the pendency of the war. The word "regulate" did not appear anywhere in these sections.

Separately, TWEA contained another section—Section 5(b), the predecessor to what is now 50 U.S.C. § 1702(a)(1)(A)—that did not involve imports or goods for import. Instead, it addressed "a new subject matter" apart from the rest of TWEA: financial transactions. H.R. Rep. No. 65-155, at 10 (1917) (Conf. Rep.).[7] It was only in this financial-transactions section that the word "regulate" first appeared. "Regulate" did not mean to impose tariffs, as Section 5(b) contained no mention of imports or goods for import or any context in which "regulate" could be linked to or construed as authorizing tariffs.

The context in which the Section 5(b) powers to "investigate, regulate, or prohibit" were listed demonstrates an intent to restrict (not tax) financial transactions (not imports). This makes sense given the context in which TWEA was enacted—shortly after the United States had entered World War I, when the United States was looking to *restrict* trade with the enemy, not allow trade to continue under tariffs. *See* H.R. Rep. No. 65-85, at 1-2; *accord Markham v.*

---

[7] Specifically, Section 5(b) addressed transactions in foreign exchange, gold, and silver, and transfers of credit and evidences of indebtedness (e.g., bonds or promissory notes) or ownership (e.g., deeds or stock certificates).

*Cabell*, 326 U.S. 404, 414 n.1 (1945) (Burton, J., concurring). "Regulate" could not have encompassed the power to impose tariffs, because Congress did not include imports as one of the enumerated things that the President could "regulate."[8]

The sentence that contains the phrase "regulate ... importation" was not added until 24 years later, in 1941, in the first few weeks after the attack on Pearl Harbor and the United States's entry into World War II. In the First War Powers Act ("FWPA"), Congress amended (among other things) TWEA § 5(b). First War Powers Act, Pub. L. No. 77-354, § 301, 55 Stat. 838 (1941). That amendment redesignated the prior TWEA § 5(b) as Section 5(b)(1)(A) and added a new Section 5(b)(1)(B)—the predecessor to what is now 50 U.S.C. § 1702(a)(1)(B). Section 5(b)(1)(B) included the three powers originally listed in Section 5(b)(1)(A)—"investigate," "regulate," and "prohibit"—and added four more: "direct and compel," "nullify," "void," and "prevent."[9] Section 5(b)(1)(B) also added twelve activities to which these enumerated powers could be applied, including "acquisition," "holding," "withholding," "use," "transfer,"

---

[8] During the Great Depression, Congress expanded TWEA to permit the use of Section 5(b) powers during national emergencies, in addition to wartime. Emergency Banking Relief Act., Pub. L. No. 73-1, § 2, 48 Stat. 1 (1933).

[9] The eighth power currently listed in Section 1702(a)(1)(B)—"block during the pendency of an investigation"—would not be added until IEEPA was promulgated in 1977.

17

"importation," and "exportation" of foreign property.  This amendment marked the first time that "regulate" and "importation" were placed in the same sentence (or, for that matter, in the same section).

As discussed above, "regulate" did not mean to impose tariffs or taxes in the original TWEA § 5(b), redesignated as Section 5(b)(1)(A).  And nothing in FWPA or its accompanying legislative history suggested that FWPA was expanding or redefining "regulate" to include the power to impose tariffs or taxes when it added "regulate" to Section 5(b)(1)(B) alongside Section 5(b)(1)(A).

The congressional reports for FWPA discussed Congress's purpose behind amending TWEA § 5(b).  Under the old Section 5(b), "the Government [had] exercise[d] supervision over transactions in foreign property, either by prohibiting such transactions or by permitting them on condition and under license."  H.R. Rep. No. 77-1507, at 3 (1941).  FWPA amended Section 5(b) to give the government the power to *seize* (take, control, use, etc.) foreign property, in addition to simply freezing it.  *See id.*  And the context of the other powers and activities with which "regulate" and "importation," respectively, were listed, collectively reflected that design to restrict transactions and seize enemy property for the benefit of the United States's war effort.  This, again, makes sense given the context in which FWPA was enacted: just weeks after the attack on Pearl Harbor and the United States's entry into World War II, where the United States was

18

looking to *restrict* trade with the enemy and seize enemy property, not allow trade to continue under tariffs. *See* H.R. Rep. No. 77-1507, at 3; S. Rep. No. 77-911, at 2 (1941); *accord Markham*, 326 U.S. at 411 & n.5 (same).

The power to impose tariffs—which the Constitution vests in Congress, not the President—is so fundamental that the Constitution lists it first among Congress's powers and sets it out separately and above Congress's general power to regulate commerce. U.S. Const. art. I, § 8, cl. 1; *see United States v. Jacobs*, 306 U.S. 363, 370 (1939) ("No more essential or important power has been conferred upon the Congress" than "the 'Power To lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the common Defence and general Welfare.'"). Given that nothing in TWEA or its legislative history, or FWPA or its legislative history, contains any mention whatsoever of tariffs, taxes, or revenue generation, Defendants lack any support for their argument that Congress delegated sweeping power to tax and tariff when it included the "regulate ... importation" language in TWEA—without a word from Congress that it was doing so. *Cf., e.g.*, *West Virginia*, 597 U.S. at 723 ("Extraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle devices.") (quotation marks and brackets omitted); *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary

19

provisions—it does not, one might say, hide elephants in mouseholes."); *Dir. of Revenue v. CoBank ACB*, 531 U.S. 316, 323-24 (2001) (rejecting construction of statute that "would mean that Congress made a radical—but entirely implicit—change in the taxation of banks" in statutory amendment where "there [wa]s no indication that Congress intended to change the taxation," because Congress would not have made such a significant change "sub silentio").

Congress largely adopted the language from TWEA § 5(b) into 50 U.S.C. § 1702(a) when it promulgated IEEPA in 1977, although it limited the powers to transactions involving foreign countries and nationals. *See* H.R. Rep. No. 95-459, at 2 (1977) (describing the President's powers under IEEPA as "more limited in scope than those of [TWEA] and subject to various procedural limitations"). In doing so, Congress described the powers it was transferring from TWEA to IEEPA as being the powers to regulate foreign financial transactions and to freeze foreign property transactions. H.R. Rep. No. 95-459, at 14-15; S. Rep. No. 95-466, at 5 (1977). At no point did Congress state that IEEPA or its use of the word "regulate" included the power to impose tariffs.

Defendants contend that when Congress adopted the language from TWEA § 5(b) into IEEPA in 1977, it necessarily adopted a decision from the Court of Customs and Patent Appeals, *United States v. Yoshida International, Inc.*, 526 F.2d 560 (C.C.P.A. 1975), that Section 5(b) authorizes tariffs, and thus IEEPA must

20

authorize tariffs as well.  OB 37-38, 43.  There is no indication, however, that Congress adopted *Yoshida*'s interpretation of TWEA § 5(b) in IEEPA.  *Cf.* H.R. Rep. No. 95-459, at 5, 10 (noting the existence of *Yoshida* but not adopting its holding and not "either endorsing or disclaiming" past uses of Section 5(b) powers).  A single lower-court decision does not "represent the sort of 'judicial consensus so broad and unquestioned that [courts] must presume Congress knew of and endorsed it.'"  *BP P.L.C. v. Mayor of Balt.*, 593 U.S. 230, 244 (2021).  "And it certainly cannot do so where, as here, 'the text and structure of the statute are to the contrary.'"  *Id.*

Additionally, even if one were to credit Defendants' theory that Congress adopted *Yoshida*'s holding, *Yoshida* recognized limits on the power of Presidents to use TWEA § 5(b) to impose tariffs going forward.  While *Yoshida* was pending, Congress enacted a new statute—the Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1978—that (among other things) imposed statutory procedures and limitations that Presidents would be required to follow before imposing similar tariffs in the future.  *Yoshida*, 526 F.2d at 582 n.33.  *Yoshida* held that, going forward, any new tariffs "must, of course, comply with the statute now governing such action," i.e., "§ 122(a) of the Trade Act of 1974."  *Id.*  Even if, as Defendants maintain, Congress adopted *Yoshida*, Congress also could have understood *Yoshida* as holding that Section 5(b) no longer authorized tariffs after being

21

superseded by the 1974 Act, and thus, in enacting IEEPA (which did not revise the 1974 Act), understood that IEEPA did not authorize tariffs either.[10]

Reading "regulate" in the full context of the list of emergency powers in which it appears, and in the context of TWEA's and IEEPA's legislative history, confirms that "regulate" as used in IEEPA does not mean the power to impose tariffs.

**B.   "Regulate ... importation," read in the context of other activities regulated in IEEPA, does not mean tariff or tax**

Just as "regulate" is not the only emergency power listed in Section 1702(a)(1)(B), "importation" is not the only activity listed to which those powers can be applied.  Rather, "importation" is just one entry in a list of twelve activities set forth therein:

> any [(1)] acquisition, [(2)] holding, [(3)] withholding,
> [(4)] use, [(5)] transfer, [(6)] withdrawal, [(7)] transportation,
> [(8)] importation or [(9)] exportation of, or [(10)] dealing in,
> or [(11)] exercising any right, power, or privilege with respect
> to, or [(12)] transactions involving,

---

[10] Even if Defendants argue that *Yoshida* did not hold that TWEA § 5(b) no longer authorized tariffs after the 1974 Act, that would not establish that Congress did not *understand* that Section 5(b) no longer authorized tariffs and adopted that understanding into IEEPA.

Separately, *Yoshida* also involved only the removal of certain tariff *concessions* and a rise in rates up to—*but not above*—the statutory rates set by Congress in the Tariff Act of 1930.  *Yoshida*, 526 F.2d at 577-78.  Nothing in *Yoshida* supports President Trump's attempt to wield IEEPA here to impose tariffs above Congress's statutory rates.  *See id.* at 578 (rejecting theory that President can "impos[e] whatever tariff rates he deems desirable").

> any property in which any foreign country or a national
> thereof has any interest[.]

50 U.S.C. § 1702(a)(1)(B) (line break inserted for readability).

If, as Defendants contend, "regulate" means the power to tariff or tax when applied to "importation," "regulate" must also mean the power to tariff or tax when applied to the other activities in that same list, including "acquisition," "holding," "withholding," "use," and so on, all of which are as much a part of Section 1702(a)(1)(B) as "importation" is.  *See Cochise*, 587 U.S. at 268 (single use of statutory phrase must have "fixed meaning"); *Brown*, 513 U.S. at 118 (given term "mean[s] the same thing throughout a statute"); *Gustafson*, 513 U.S. at 574-75 (words in statutory lists must be read in context of full list).  Under that construction of "regulate," IEEPA would authorize the President to impose not just a 145% tax on "importation" from China, but also to impose, e.g., a 145% tax on any "acquisition" by a U.S. company of a foreign business, or a 145% tax on any "holding" or "withdrawal" from retirement or pension funds that senior citizens might be depending on after a lifetime of work if any noncitizen is also participating and has "any interest" in the fund, and so on.  The vast economic and political significance of such a taxing power would be unprecedented.  The President may not exercise so tremendous and unheralded a power through such a "wafer-thin reed" as the lone word "regulate" in Section 1702(a)(1)(B).  *See Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764-65 (2021).

Defendants' construction of "regulate" as meaning the power to tariff or tax would also render IEEPA unconstitutional in several respects. For example, IEEPA grants the President authority to "regulate ... importation or exportation" of property. If, as Defendants contend, "regulate" includes the power to tariff or tax, IEEPA would authorize the President to impose tariffs on exportation. But the Constitution expressly bars tariffs on exports. U.S. Const. art. I, § 9, cl. 5; *United States v. U.S. Shoe Corp*, 523 U.S. 360, 363 (1998). Likewise, IEEPA grants the President authority to "regulate ... holding" of property. If, as Defendants contend, "regulate" includes the power to tariff or tax, IEEPA would authorize the President to impose taxes on holding property. But the Constitution bars the federal government from imposing property taxes that are not apportioned among the States according to each State's population. U.S. Const. art. I, § 9, cl. 4; *Moore v. United States*, 602 U.S. 572, 582 (2024).

Defendants have never offered any cogent response in any of the IEEPA tariff lawsuits they have been litigating. Their only response is to argue that the term regulate can mean different things when applied to different activities. *See, e.g.*, OB 55; Defs.' Reply Br. 9, *V.O.S. Selections, Inc. v. Trump*, No. 25-1812 (Fed. Cir.), ECF No. 147; Defs.' Answering Br. 61, *California v. Trump*, No. 25-3493 (9th Cir.), ECF No. 49. But that defies elementary principles of statutory construction, which generally requires "fixed meaning" of statutory terms.

*Cochise*, 587 U.S. at 268 (single use of statutory phrase must have "fixed meaning"); *Brown*, 513 U.S. at 118 (a given term "mean[s] the same thing throughout a statute"); *Gustafson*, 513 U.S. at 575 (party may not "ascrib[e] to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving 'unintended breadth to the Acts of Congress'").  The fixed meaning of "regulate" applied across all of the twelve activities listed in Section 1702(a)(1)(B) does not include the power to impose tariffs or taxes.  *See Gonzalez v. United States*, 553 U.S. 242, 251 (2008) (under doctrine of constitutional avoidance, when "a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter").

Defendants attempt to analogize the "regulate ... importation" phrase in IEEPA to other phrases from other statutes, such as "adjust ... imports" as used in Section 232(c) of the Trade Expansion Act of 1962 ("TEA").  OB 23, 36 (citing *Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548 (1976)).  That argument is unpersuasive on its own terms.  *See Monsalvo v. Bondi*, 145 S. Ct. 1232, 1245 n.5 (2025) ("different statutes passed at different times against different regulatory backdrops may bear different meanings").  First and foremost among the differences between TEA and IEEPA is that TEA contains dozens of sections that expressly discuss tariffs and duties, whereas IEEPA contains no mention of tariffs

and duties at all.  Trade Expansion Act of 1962, Pub. L. No. 87-794, §§ 201-02, 211, 213, 221, 224-25, 231-32, 241, 251-54, 256-58, 301-02, 351-52, 402-03, 405, 76 Stat. 877 (1962); *see West Virginia*, 597 U.S. at 721 (words of a statute must be read in their context and with a view to the overall statutory scheme). Additionally, the Supreme Court held that the legislative history of TEA was full of express references to tariffs and thus revealed a congressional intent to have the "adjust ... imports" phrase include the power to impose tariffs.  *See Algonquin*, 426 U.S. at 562-67.  There is nothing comparable in IEEPA's legislative history. Further, the "adjust ... imports" language from TEA § 232(c) comes from a provision that contains only *one* verb, "adjust," and only *one* object for that verb, "imports."  19 U.S.C. § 1862(c).  By contrast, the "regulate ... importation" language from IEEPA that Defendants cite comes from a provision that lists *eight* emergency powers paired with *twelve* activities, and the meanings of those various powers and activities must be consistent when paired with each other across the statute.  There is no consistent way to construe "regulate" in that context so as to include the power to impose tariffs.

Instead of looking to *other* statutes, Defendants and the Court must first read "regulate ... importation" in the full context of its *own* statute, i.e., IEEPA, and in the context of (1) the full list of emergency powers and (2) the full list of activities subject to those emergency powers, that IEEPA sets forth in Section 1702(a)(1)(B).

Read in full context, "regulate" and "regulate ... importation" cannot be construed to mean the power to impose tariffs.

## CONCLUSION

The judgment of the district court should be affirmed.

Dated:  July 30, 2025

Respectfully submitted,

ROB BONTA
  *Attorney General of California*
THOMAS S. PATTERSON
  *Senior Assistant Attorney General*
LARA HADDAD
  *Supervising Deputy Attorney General*

*s/Shiwon Choe*
SHIWON CHOE
ZELDA VASSAR
CAROLYN F. DOWNS
  *Deputy Attorneys General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone: (415) 510-4400
Fax: (415) 703-5480
Shiwon.Choe@doj.ca.gov

*Attorneys for the State of California and Governor Gavin Newsom*

27

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), I certify that:

1.     This document complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5) because, excluding parts of the document exempted by Federal Rule of Appellate Procedure 32(f), the brief contains 6,476 words and thus does not exceed the 6,500 word limit.

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because the brief has been prepared in proportionally spaced typeface using Microsoft Word word-processing system in Times New Roman that is at least 14 points.


Dated:  July 30, 2025

                                          *s/Shiwon Choe*
                                          SHIWON CHOE

28

## CERTIFICATE OF SERVICE

I hereby certify that on this July 30, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit using the appellate CM/ECF system.  Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated:  July 30, 2025

*s/Shiwon Choe*
SHIWON CHOE

# STATUTORY ADDENDUM TABLE OF CONTENTS

**Page**

19 U.S.C. § 3004 ................................................................................ A-1

28 U.S.C. § 1581 .............................................................................. A-2

50 U.S.C. § 1702 .............................................................................. A-3

Trading With the Enemy Act,
    Pub. L. No. 65-91, § 3, 40 Stat. 411, 412-13 (1917) .................................. A-4

Trading With the Enemy Act,
    Pub. L. No. 65-91, § 5, 40 Stat. 411, 415 (1917) ........................................ A-6

Trading With the Enemy Act,
    Pub. L. No. 65-91, § 6, 40 Stat. 411, 415-16 (1917) .................................. A-7

Trading With the Enemy Act,
    Pub. L. No. 65-91, § 11, 40 Stat. 411, 422-23 (1917) ................................ A-8

First War Powers Act,
    Pub. L. No. 77-354, § 301, 55 Stat. 838, 839-40 (1941) ............................ A-9

**19 U.S.C. § 3004**

. . . .

(c) Status of Harmonized Tariff Schedule

    (1) The following shall be considered to be statutory provisions of law for all purposes:

        (A) The provisions of the Harmonized Tariff Schedule as enacted by this chapter.

        (B) Each statutory amendment to the Harmonized Tariff Schedule.

        (C) Each modification or change made to the Harmonized Tariff Schedule by the President under authority of law (including section 604 of the Trade Act of 1974).

. . . .

**28 U.S.C. § 1581**

. . . .

(i)(1) In addition to the jurisdiction conferred upon the Court of International Trade by subsections (a)-(h) of this section and subject to the exception set forth in subsection (j) of this section, the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for—

    (A) revenue from imports or tonnage;

    (B) tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue;

    (C) embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety; or

    (D) administration and enforcement with respect to the matters referred to in subparagraphs (A) through (C) of this paragraph and subsections (a)-(h) of this section.

. . . .

**50 U.S.C. § 1702**

(a) In general

(1) At the times and to the extent specified in section 1701 of this title, the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise—

(A) investigate, regulate, or prohibit—

(i) any transactions in foreign exchange,

(ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

(iii) the importing or exporting of currency or securities, by any person, or with respect to any property, subject to the jurisdiction of the United States;

(B) investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit,

any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving,

any property in which any foreign country or a national thereof has any interest

by any person, or with respect to any property, subject to the jurisdiction of the United States[.]

. . . .

(line breaks inserted in § 1702(a)(1)(B) for readability)

A-3

**Trading With the Enemy Act,**
**Pub. L. No. 65-91, § 3, 40 Stat. 411, 412-13 (1917)**

That it shall be unlawful—

(a) For any person in the United States, except with the license of the President, granted to such person, or to the enemy, or ally of enemy, as provided in this Act, to trade, or attempt to trade, either directly or indirectly, with, to, or from, or for, or on account of, or on behalf of, or for the benefit of, any other person, with knowledge or reasonable cause to believe that such other person is an enemy or ally of enemy, or is conducting or taking part in such trade, directly or indirectly, for, or on account of, or on behalf of, or for the benefit of, an enemy or ally of enemy.

(b) For any person, except with the license of the President, to transport or attempt to transport into or from the United States, or for any owner, master, or other person in charge of a vessel of American registry to transport or attempt to transport from any place to any other place, any subject or citizen of an enemy or ally of enemy nation, with knowledge or reasonable cause to believe that the person transported or attempted to be transported is such subject or citizen.

(c) For any person (other than a person in the service of the United States Government or of the Government of any nation, except that of an enemy or ally of enemy nation, and other than such persons or classes of persons as may be exempted hereunder by the President or by such person as he may direct), to send, or take out of, or bring into, or attempt to send, or take out of, or bring into the United States, any letter or other writing or tangible form of communication, except in the regular course of the mail; and it shall be unlawful for any person to send, take, or transmit, or attempt to send, take, or transmit out of the United States, any letter or other writing, book, map, plan, or other paper, picture, or any telegram, cablegram, or wireless message, or other form of communication intended for or to be delivered, directly or indirectly, to an enemy or ally of enemy: *Provided, however*, That any person may send, take, or transmit out of the United States anything herein forbidden if he shall first submit the same to the President, or to such officer as the President may direct, and shall obtain the license or consent of the President, under such rules and regulations, and with such exemptions, as shall be prescribed by the President.

(d) Whenever, during the present war, the President shall deem that the public safety demands it, he may cause to be censored under such rules and regulations as he may from time to time establish, communications by mail, cable, radio, or other

A-4

means of transmission passing between the United States and any foreign country he may from time to time specify, or which may be carried by any vessel or other means of transportation touching at any port, place, or territory of the United States and bound to or from any foreign country. Any person who willfully evades or attempts to evade the submission of any such communication to such censorship or willfully uses or attempts to use any code or other device for the purpose of concealing from such censorship the intended meaning of such communication shall be punished as provided in section sixteen of this Act.

**Trading With the Enemy Act,**
**Pub. L. No. 65-91, § 5, 40 Stat. 411, 415 (1917)**

(a) That the President, if he shall find it compatible with the safety of the United
States and with the successful prosecution of the war, may, by proclamation,
suspend the provisions of this Act so far as they apply to an ally of enemy, and he
may revoke or renew such Licenses suspension from time to time; and the
President may grant licenses, special or general, temporary or otherwise, and for
such period of time and containing such provisions and conditions as he shall
prescribe, to any person or class of persons to do business as provided in
subsection (a) of section four hereof, and to perform any act made unlawful
without such license in section three hereof, and to file and prosecute applications
under subsection (b) of section ten hereof; and he may revoke or renew such
licenses from time to time, if he shall be of opinion that such grant or revocation or
renewal shall be compatible with the safety of the United States and with the
successful prosecution of the war; and he may make such rules and regulations, not
inconsistent with law, as may be necessary and proper to carry out the provisions
of this Act; and the President may exercise any power or authority conferred by
this Act through such officer or officers as he shall direct.

If the President shall have reasonable cause to believe that any act is about to be
performed in violation of section three hereof he is shall have authority to order the
postponement of the performance of such act for a period not exceeding ninety
days, pending investigation of the facts by him.

(b) That the President may investigate, regulate, or prohibit, under such rules and
regulations as he may prescribe, by means of licenses or otherwise, any
transactions in foreign exchange, export or earmarkings of gold or silver coin or
bullion or currency, transfers of credit in any form (other than credits relating
solely to transactions to be executed wholly within the United States), and,
transfers of evidences of indebtedness or of the ownership of property between the
United States and any foreign country, whether enemy, ally of enemy or otherwise,
or between residents of one or more foreign countries, by any person within the
United States; and he may require any such person engaged in any such transaction
to furnish, under oath, complete information relative thereto, including the
production of any books of account, contracts, letters or other papers, in connection
therewith in the custody or control of such person, either before or after such
transaction is completed.

**Trading With the Enemy Act,**
**Pub. L. No. 65-91, § 6, 40 Stat. 411, 415-16 (1917)**

That the President is authorized to appoint, prescribe the duties of, and fix the salary (not to exceed $5,000 per annum) of an official to be known as the alien property custodian, who shall be empowered to receive all money and property in the United States due or belonging to an enemy, or ally of enemy, which may be paid, conveyed, transferred, assigned, or delivered to said custodian under the provisions of this Act; and to hold, administer, and account for the same under the general direction of the President and as provided in this Act. The alien property custodian shall give such bond or bonds, and in such form and amount, and with such security as the President shall prescribe. The President may further employ in District of Columbia and elsewhere and fix the compensation of such clerks, attorneys, investigators, accountants, and other employees as he may find necessary for the due administration of the provisions of this Act: *Provided*, That such clerks, investigators, accountants, and other employees shall be appointed from lists of eligibles to be to be supplied by the Civil Service Commission and in accordance with the civil-service law: *Provided further*, That the President shall cause a detailed report to be made to Congress on the first day of January of each year of all proceedings had under this Act during the year preceding. Such report shall contain a list of all persons appointed or employed, with the salary or compensation paid to each, and a statement of the different kinds of property taken into custody and the disposition made thereof.

**Trading With the Enemy Act,**
**Pub. L. No. 65-91, § 11, 40 Stat. 411, 422-23 (1917)**

Whenever during the present war the President shall find that the public safety so requires and shall make proclamation thereof it shall be unlawful to import into the United States from any country named in such proclamation any article or articles mentioned in such proclamation except at such time or times, and under such regulations or orders, and subject to such limitations and exceptions as the President shall prescribe, until otherwise ordered by the President or by Congress: *Provided, however*, That no preference shall be given to the ports of one State over those of another.

**First War Powers Act,**
**Pub. L. No. 77-354, § 301, 55 Stat. 838, 839-40 (1941)**

The first sentence of subdivision (b) of section 5 of the Trading With the Enemy Act of October 6, 1917 (40 Stat. 411), as amended, is hereby amended to read as follows:

"(1) During the time of war or during any other period of national emergency declared by the President, the President may, through any agency that he may designate, or otherwise, and under such rules and regulations as he may prescribe, by means of instructions, licenses, or otherwise—

"(A) investigate, regulate, or prohibit, any transactions in foreign exchange, transfers of credit or payments between, by, through, or to any banking institution, and the importing, exporting, hoarding, melting, or earmarking of gold or silver coin or bullion, currency or securities, and

"(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit any acquisition holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest, by any person, or with respect to any property, subject to the jurisdiction of the United States; and any property or interest of any foreign country or national thereof shall vest, when, as, and upon the terms, directed by the President, in such agency or person as may be designated from time to time by the President, and upon such terms and conditions as the President may prescribe such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States, and such designated agency or person may perform any and all acts incident to the accomplishment or furtherance of these purposes; and the President shall, in the manner hereinabove provided, require any person to keep a full record of, and to furnish under oath, in the form of reports or otherwise, complete information relative to any act or transaction referred to in this subdivision either before, during, or after the completion thereof, or relative to any interest in foreign property, or relative to any property in which any foreign country or any national thereof has or has had any interest, or as may be otherwise necessary to enforce the provisions of this subdivision, and in any case in which a report could be required, the President may, in the manner hereinabove provided, require the production, or if necessary to the national security or defense, the seizure, of any books

of account, records, contracts letters, memoranda, or other papers, in the custody or control of such person; and the President may, in the manner hereinabove provided, take other and further measures not inconsistent herewith for the enforcement of this subdivision.

"(2) Any payment, conveyance, transfer, assignment, or delivery of property or interest therein, made to or for the account of the United States, or as otherwise directed, pursuant to this subdivision or any rule, regulation, instruction, or direction issued hereunder shall to the extent thereof be a full acquittance and discharge for all purposes of the obligation of the person making the same; and no person shall be held liable in any court for or in respect to anything done or omitted in good faith in connection with the administration of, or in pursuance of and in reliance on, this subdivision, or any rule, regulation, instruction, or direction issued hereunder.

"(3) As used in this subdivision the term 'United States' means the United States and any place subject to the jurisdiction thereof, including the Philippine Islands, and the several courts of first instance of the Commonwealth of the Philippine Islands shall have jurisdiction in all cases, civil or criminal, arising under this subdivision in the Philippine Islands and concurrent jurisdiction with the district courts of the United States of all cases, civil or criminal, arising upon the high seas: *Provided, however*, That the foregoing shall not be construed as a limitation upon the power of the President, which is hereby conferred, to prescribe from time to time, definitions, not inconsistent with the purposes of this subdivision, for any or all of the terms used in this subdivision."