ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 30, 2025

No. 25-5202

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

LEARNING RESOURCES, INC. and HAND2MIND, INC.,
*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, President of the United States, in his official capacity, KRISTI NOEM, Secretary of the Department of Homeland Security, in her official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; SCOTT BESSENT, Secretary of the Treasury, in his official capacity; UNITED STATES DEPARTMENT OF THE TREASURY; HOWARD W. LUTNICK, Secretary of Commerce, in his official capacity; UNITED STATES DEPARTMENT OF COMMERCE; RODNEY S. SCOTT, Commissioner of Customs & Border Protection, in his official capacity; UNITED STATES CUSTOMS AND BORDER PROTECTION; JAMIESON GREER, U.S. Trade Representative, in his official capacity; OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE,
*Defendants-Appellants.*

---

On Appeal from the United States District Court for the District of Columbia, No. 1:25-cv-01248 (Hon. Rudolph Contreras)

---

## BRIEF OF AMICI CURIAE VIKRAM DAVID AMAR AND MICKEY EDWARDS IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

---

Tadhg Dooley
Emmett Gilles
Wiggin and Dana LLP
265 Church Street
New Haven, CT 06510
(203) 498-4400
tdooley@wiggin.com
egilles@wiggin.com

*Attorneys for Amici Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), amici curiae Vikram David Amar and Mickey Edwards hereby certify as follows:

### (A)    Parties and Amici

Except for the following, all parties, intervenors, and amici appearing before the district court and this Court are listed in the Brief of Appellees:

Amici Curiae: Vikram David Amar and Mickey Edwards have filed notices of intent to participate as amici curiae.

### (B)    Rulings under Review

References to the rulings under review appear in the Brief of Appellees.

### (C)    Related Cases

This case has not previously been before this Court or any other court other than the underlying district court. A Petition for a Writ of Certiorari Before Judgment is currently pending in the Supreme Court of the United States. *See Learning Res., Inc. v. Trump*, No. 24-1287. Amici are unaware of any other related case within the meaning of Circuit Rule 28(a)(1)(c).

i

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND  RELATED CASES ............................................................................................... i

TABLE OF AUTHORITIES ................................................................... iii

INTEREST OF AMICI CURIAE.............................................................. 1

CERTIFICATE OF COUNSEL .............................................................. 2

BACKGROUND ...................................................................................... 3

SUMMARY OF THE ARGUMENT ....................................................... 6

ARGUMENT ......................................................................................... 10

I.    Broad delegations of policymaking authority to the Executive Branch pose unique constitutional concerns because it is difficult for Congress to reclaim such authority............................ 10

   A.    The concentration of policymaking power in the Executive Branch implicates the heart of separation of powers..................... 10

   B.    Delegations of power pose the greatest constitutional concerns when they are difficult to reclaim. ...................................... 13

   C.    The President's veto power makes it difficult for Congress to reclaim policymaking power, once delegated. .................................... 18

II.   To minimize the costs of error, courts should consider constitutional retrieval concerns when construing statutes that purportedly confer broad powers to the President. ............... 21

III.  The district court correctly construed the IEEPA's delegation of power. ...................................................................................... 27

CONCLUSION ...................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amer. Power & Light Co. v. SEC*,
   329 U.S. 90 (1946)................................................................. 14

*Ashwander v. Tennessee Valley Auth.*,
   297 U.S. 288 (1936)............................................................... 26

*Biden v. Nebraska*,
   600 U.S. 477 (2023)............................................................... 25

*Currin v. Wallace*,
   306 U.S. 1 (1939).................................................................. 17

*Fed. Commc'ns Comm'n v. Consumers' Rsch.*,
   145 S. Ct. 2482 (2025)...................................................... 14, 22

*Field v. Clark*,
   143 U.S. 649 (1892)............................................................... 13

*Garcia v. San Antonio Metro. Transit Auth.*,
   469 U.S. 528 (1985)............................................................... 24

*Gregory v. Ashcroft*,
   501 U.S. 452 (1991)............................................................... 24

*INS v. Chadha*,
   462 U.S. 919 (1983)............................................................... 29

*J.W. Hampton, Jr., & Co. v. United States*,
   276 U.S. 394 (1928)................................................ 13, 16, 22, 24

*Learning Res., Inc. v. Trump*,
   2025 WL 1525376 (D.D.C. May 29, 2025) ...................... 5, 6, 7, 27, 28

*Mistretta v. United States*,
   488 U.S. 361 (1989)............................................................... 11

*Myers v. United States*,
    272 U.S. 52 (1926) ................................................................. 14

*Nat'l Cable Television Ass'n, Inc. v. United States*,
    415 U.S. 336 (1974) ............................................................... 24

*Panama Ref. Co. v. Ryan*,
    293 U.S. 388 (1935) ............................................................... 12

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) ................................................................. 11

*Schechter Poultry Corp. v. United States*,
    295 U.S. 495 (1935) .......................................................... 12, 24

*Seila L. LLC v. Consumer Fin. Prot. Bureau*,
    591 U.S. 197 (2020) ............................................................... 11

*United Steelworkers of America v. Weber*,
    443 U.S. 193 (1970) .......................................................... 10, 29

*V.O.S. Selections, Inc. v. United States*,
    772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025) ........................ 7, 23, 28

*Virginia v. EPA*,
    597 U.S. 697 (2022) ............................................................... 24

*Wayman v. Southard*,
    10 Wheat. 1 (1925) ............................................................... 22

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ............................................................... 11

**Constitutional Provisions**

U.S. Const. art. I, § 7 ................................................................. 12

U.S. Const. art. I, § 7, cl. 2 ................................................... 18, 19

U.S. Const. art. I, § 8 .............................................................. 4, 6

**Statutes**

International Emergency Economic Powers Act,
   50 U.S.C. §§ 1701 *et seq.*............................................2-7, 10, 23, 27-29

**Executive Orders**

Executive Order 14193, 90 Fed. Reg. 9113, 9114 (Feb. 1, 2025)..............4

Executive Order 14194, 90 Fed. Reg. 9117, 9118 (Feb. 1, 2025)..............4

Executive Order 14195, 90 Fed. Reg. 9121, 9122 (Feb. 1, 2025)..............4

Executive Order 14228, 90 Fed. Reg. 11463, 11463 (Mar. 3, 2025).........4

Executive Order 14257, 90 Fed. Reg. 15041, 15045 (Apr. 2, 2025)..........4

Executive Order 14259, 90 Fed. Reg. 15509, 15509 (Apr. 8, 2025)..........4

Executive Order 14266, 90 Fed. Reg. 15625, 15626 (Apr. 9, 2025)..........4

Executive Order 14298, 90 Fed. Reg. 21831, 21831 (May 12, 2025)........4

**Other Authorities**

Officers of the U.S. Within the Meaning of the Appointments
   Clause, 31 Op. O.L.C. 73 (2007) ....................................................14, 16

Abner S. Greene, *Checks and Balances in an Era of
   Presidential Lawmaking*, 61 U. CHI. L. REV. 123, 126
   (1994)...............................................................................................20

Charles M. Cameron, *Bargaining and Presidential Power*, *in
   Presidential Power: Forging the Presidency for the
   Twenty-First Century* 47 (Robert Shapiro et al., eds.,
   2000)................................................................................................20

CRS Report RL30909, *The Pocket Veto: Its Current Status*
   (Mar. 30, 2001).................................................................................20

CRS Report RS21750, *The Presidential Veto and Congressional Procedure* (Feb. 27, 2004) *available at* https://www.archives.gov/files/legislative/resources/education/veto/veto-procedure.pdf ...................................... 19

Einer Elhauge, STATUTORY DEFAULT RULES (2008) ................................. 9

*The Federalist No. 51*, (Madison) ........................................................... 11

Julian Davis Mortenson & Nicholas Bagley, *Delegation at the Founding*, 121 COLUM. L. REV. 277, 307 (2021) ........................... 17

Keith E. Whittington & Jason Iuliano, *The Myth of the Nondelegation Doctrine,* 165 U. PENN. L. REV. 379 (2017) ................. 21

Patrick W. Duff & Horace E. Whiteside, *Delegata Potestas Non Potest Delegari: A Maxim of American Constitutional Law*, 14 CORNELL L. REV. 168 (1929) ................................................... 15

Steven G. Calabresi & Saikrishna B. Prakash, *The President's Power to Execute the Laws*, 104 YALE L.J. 541 (1994) ............................................................................................................ 15

United States Senate, *Summary of Bills Vetoed, 1789–Present*, at https://www.senate.gov/legislative/vetoes/vetoCounts.htm. ................................................................................. 19, 20

Vikram Amar, *Indirect Effect of Direct Election*: *A Structural Examination of the Seventeenth Amendment*, 49 VAND. L. REV. 1347, 1378 (1996) .............................................................. 16, 18

Brief for the United States in *Currin v. Wallace*, 306 U.S. 1 (1939), 1938 WL 63974, at 44–65 (1938) ........................................... 17

## INTEREST OF AMICI CURIAE[1]

Vikram David Amar is a legal scholar and historian who studies and writes about constitutional law, federal courts, and civil procedure. One branch of his scholarship has focused on the ways in which courts undermine constitutional values when they approve, especially in the absence of clear congressional authorization, broad delegations of policy-making power to the President, given that such delegations cannot easily be retrieved. Professor Amar has a general interest in assisting the courts in practicing principled constitutional decision-making and faithful originalism, and in minimizing the error costs of judicial decisions.

Mickey Edwards is a former member of Congress who served Oklahoma's 5th Congressional District from 1977 to 1993. As a member of Congress, Representative Edwards was committed to preserving the constitutional separation of powers and guarding against excessive concentration of power in the Oval Office, regardless of its occupant. After leaving Congress, Representative Edwards taught government and

---

[1]   Pursuant to Circuit Rule 29(b), all parties have given their consent to the submission of this brief. No counsel for any party authored this brief in whole or in part or made a monetary contribution toward its preparation and submission, nor did any other person contribute money intended to fund preparing or submitting this brief.

1

public policy for over 20 years at Harvard's Kennedy School of Government and Princeton's Woodrow Wilson School of Public and International Affairs. He has also been affiliated with the Aspen Institute, where he created and directed a bipartisan leadership program for elected officials and directed an initiative to restore Congress's constitutional powers.

Based on their academic and practical experience, *Amici* have a shared interest in encouraging courts to exercise particular caution when construing capacious statutory delegations of power to the President. Caution is warranted because it is difficult for Congress to "retrieve" power that a court has erroneously concluded was conferred, and such difficulty directly implicates the Constitution's concern about delegations of legislative power. For this reason, the costs of an erroneous decision by the courts in this arena are not symmetrical. *Amici* therefore urge this Court to reject the President's broad reading of the International Emergency Economic Powers Act and affirm the judgment below.

## CERTIFICATE OF COUNSEL

Pursuant to Circuit Rule 29(d), counsel states that the filing of this separate *amicus* brief is necessary to present *Amici's* views in full for the

benefit of the Court as it considers how to resolve the important questions of statutory interpretation at issue in this case. This brief presents a distinct basis for the Court to conclude that the International Emergency Economic Powers Act should not be interpreted to authorize the tariffs at issue: A narrow construction will avoid the risk of an irretrievable delegation of broad policymaking power from Congress to the Executive Branch.

## BACKGROUND

Between February and May 2025, President Trump singlehandedly imposed tariffs on nearly every good imported into the United States. These duties include a 10% baseline tariff on all imports, higher "reciprocal" tariffs derived from various country-specific trade deficits, and additional "trafficking" tariffs on goods from Mexico, Canada, and China. The President imposed these tariffs—unilaterally overhauling decades of United States trade policy—through a series of executive orders (the "Tariff Orders"), without any involvement from Congress, the branch of government imbued with the power to "regulate Commerce with foreign Nations" and to "lay and collect Taxes, Duties, Imposts and

Excises." U.S. Const. art. I, § 8.[2]

The President claims authority for his Tariff Orders under the International Emergency Economic Powers Act ("IEEPA"), which confers on the President the power to "regulate … importation … of … any property in which any foreign country or a national thereof has any interest by any person … subject to the jurisdiction of the United States …." 50 U.S.C. § 1702(a)(1)(B). But the IEEPA expressly provides that this power "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared … and may not be exercised for any other purpose." *Id*. § 1701(b). The President claims to have satisfied this statutory limitation by declaring a national emergency based on purported threats to the nation's security and economy posed by cross-border drug dealing, gang violence, human

---

[2]     *See* Executive Order 14193, 90 Fed. Reg. 9113, 9114 (Feb. 1, 2025); Executive Order 14194, 90 Fed. Reg. 9117, 9118 (Feb. 1, 2025); Executive Order 14195, 90 Fed. Reg. 9121, 9122 (Feb. 1, 2025); Executive Order 14228, 90 Fed. Reg. 11463, 11463 (Mar. 3, 2025); Executive Order 14257, 90 Fed. Reg. 15041, 15045 (Apr. 2, 2025); Executive Order 14259, 90 Fed. Reg. 15509, 15509 (Apr. 8, 2025); Executive Order 14266, 90 Fed. Reg. 15625, 15626 (Apr. 9, 2025); Executive Order 14298, 90 Fed. Reg. 21831, 21831 (May 12, 2025).

trafficking, and money laundering.[3]

Plaintiffs–Appellees are small businesses that manufacture most of their products in countries subject to the new tariffs, and thus have been adversely impacted by the President's unilateral and abrupt overhaul of national trade policy. They challenged the Tariff Orders in the U.S. District Court for the District of Columbia, which granted their motion for a preliminary injunction. In particular, the court held that the IEEPA does not permit the President "to unilaterally impose, revoke, pause, reinstate, and adjust tariffs to reorder the global economy." *Learning Res., Inc. v. Trump*, 2025 WL 1525376, at *1 (D.D.C. May 29, 2025). The court noted that "[e]very time Congress delegated the President the authority to levy duties or tariffs in Title 19 of the U.S. Code, it established express procedural, substantive, and temporal limits on that authority." *Id.* at *9. Thus, absent a clear statement from Congress, the court refused to "assume that, in enacting IEEPA, Congress repealed by implication every extant limitation on the President's tariffing authority." *Id.* The court therefore concluded that "Congress did not intend for the language 'regulate ... importation' to delegate the authority

_____

[3] *See supra*, n.2.

to impose tariffs" to the President. *Id.* at \*12.[4]

On appeal, the President presses his expansive reading of the IEEPA's text, starting from the premise that Congress "delegated broad tariff authority to the President" by granting him the power to "regulate importation during national emergencies," even in "peacetime." Opening Br. at 1, 7-8. Claiming that the "IEEPA is on its face *all about* giving the President major powers to address major concerns," the President argues this Court should not "curtail Congress's conscious efforts to give the President broad and flexible tools to address the most major of questions." *Id.* at 46.

## SUMMARY OF THE ARGUMENT

Because the Constitution expressly assigns to Congress the powers "[t]o lay and collect Taxes, Duties, Imposts and Excises," and "[t]o regulate Commerce with foreign Nations," U.S. Const. art. I, § 8, the President's unilateral Tariff Orders can withstand constitutional scrutiny only if they were issued pursuant to authority properly

---

[4]    Because the court found that the statute did not confer on the President the authority to impose tariffs, it did not reach Plaintiffs-Appellees' alternative argument that the "IEEPA does not authorize these specific tariffs or that, if it does authorize these tariffs, it violates the nondelegation doctrine." *Id.* at \*13.

conferred by Congress.[5] The President claims that Congress gave him the requisite authority in the IEEPA. But as the court below concluded, "the statute is not so capacious." *Learning Res.*, 2025 WL 1525376, at *13. On the contrary, the IEEPA's text and history show that it was enacted to *rein in* presidential overreach and *limit* the President's power to adjust tariffs. *See id.* at *8–12.

There are many reasons, grounded in ordinary principles of statutory construction, to support the holding below. *See, e.g., V.O.S. Selections, Inc. v. United States,* 772 F. Supp. 3d 1350, 1370–82 (Ct. Int'l Trade 2025). But even if this were a closer question—that is, even if there were genuine doubt about whether Congress intended to delegate such broad tariff power to the President—this Court should still err on the side of caution and read the IEEPA's delegation of power narrowly. The need for caution is grounded in both constitutional and related practical concerns.

---

[5]     The President does not, nor could he plausibly, claim any inherent authority to set tariffs. Instead, he argues that Congress's purported "delegation of power" should be read broadly "in the arena of foreign affairs and national security" because these areas "implicate the President's expertise and independent constitutional authority." Opening Br. at 47.

First, as a matter of constitutional law and theory, courts should construe purportedly broad statutory conferrals of power to the President narrowly, both to avoid unconstitutional delegations of concentrated power to the Executive Branch and, at a minimum, to ensure that permissibly conferred power is exercised consistent with the intent of the statutory creators. Courts must be especially vigilant when capacious policy-making power is purportedly delegated to the President and agencies he controls, because power given to the President cannot be easily retrieved on account of the President's ability to veto subsequent retrieval attempts by Congress. This difficulty in reclaiming presidential power once it has been judicially sanctioned lies at the heart of the so-called nondelegation principle.

Second, and related, history and practical experience have confirmed that, again because of the President's veto power and other impediments to retrieval, delegation does in fact tend to be a one-way ratchet. Because the President (any President) has an institutional interest in preserving executive power, a two-thirds vote of both Houses of Congress is generally required to override a veto of legislation seeking to retrieve that power. This is a historically rare feat. By contrast, if

Congress wants to confer *more* power to the President than courts have recognized, it may generally undo such judicial rulings by a simple majority, passing legislation that the President (any President) will almost certainly sign into law. *See infra* at 10–21.[6]

Given these constitutional concerns, grounded in theory and real-world practice, courts should generally construe purportedly ambitious statutory delegations of power to the President narrowly whenever reasonably possible, so as to reduce the chances of an irretrievable and therefore constitutionally offensive delegation of lawmaking powers, and thus limit the costs of an incorrect decision.[7] Here, a narrow reading of

---

[6]    Indeed, a plausible argument can be made that, as a prudential matter, all statutes conferring power onto the President should be construed narrowly so as to minimize the asymmetrical costs of error that are exacerbated by the President's veto power. *See generally* Einer Elhauge, STATUTORY DEFAULT RULES, at 154 (2008) (arguing that courts should follow a default rule of narrow construction in such cases because the President can more easily elicit, and sign into law, a legislative override of a construction that does not reflect intent of the enacting legislature). But this brief focuses on the *special* problems that arise when—as in this case—the President claims that a statute confers on him *broad, legislative* powers, and why the Constitution itself demands caution in such settings.

[7]    As used here, "incorrect" or "erroneous" decisions on the meaning of a statute include interpretations that risk crossing the line between permissible creation of executive authority versus constitutionally dubious conferral of irretrievable legislative powers, and not just

the IEEPA plainly shows that Congress did not delegate to the President the power he claims to unilaterally adjust foreign tariffs. The district court was therefore correct to hold that the Tariff Orders are *ultra vires* and invalid. This Court should affirm. If it turns out that the Court has "misperceived the political will," *Weber*, 443 U.S. at 215, then it will be far easier for Congress to "correct" the error by passing legislation clearly authorizing such broad tariff power to the President than it would be for Congress to claw back presidential power erroneously recognized by this Court via an overbroad construction of the existing delegation. *See infra* at 21–29.

## ARGUMENT

I. **Broad delegations of policymaking authority to the Executive Branch pose unique constitutional concerns because it is difficult for Congress to reclaim such authority.**

A. **The concentration of policymaking power in the Executive Branch implicates the heart of separation of powers.**

To prevent the concentration of power and preserve individual liberty, the Framers devised a constitutional system that divides power

---

interpretations that "misperceive the political will," *United Steelworkers of America v. Weber*, 443 U.S. 193, 216 (1970) (Blackmun, J., concurring).

among three distinct and coequal branches of government. As Justice Thomas has observed, "[t]o the framers, the separation of powers and checks and balances were more than just theories. They were the practical and real protections for individual liberty in the new Constitution." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 118 (2015) (Thomas, J., concurring).

While the design of the Constitution permits a practical degree of interdependence and power-sharing among the political branches, *see generally Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring), the Supreme Court has nevertheless cautioned against the "gradual concentration of the several powers in the same department." *Mistretta v. United States*, 488 U.S. 361, 381 (1989) (quoting *The Federalist No. 51*, at 321 (Madison)). The concentration of power in the Executive Branch is accelerated by broad statutory conferrals of power, which pose two distinct but related dangers.

First, the concentration of too much authority in the hands of a single person—and the Supreme Court has increasingly recognized that the Executive Branch is controlled by a single person, the President, *see, e.g., Seila L. LLC v. Consumer Fin. Prot. Bureau,* 591 U.S. 197 (2020)—

11

risks converting constitutional democracy into soft dictatorship. A wholesale statutory conferral of "the judicial power" of the United States to the President, for example, would impermissibly concentrate governmental powers. The Supreme Court's decisions striking down New Deal programs under the so-called nondelegation doctrine were rooted in this concern, which of course was anything but abstract in the years leading up to World War II. *See, e.g., Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Panama Ref. Co. v. Ryan*, 293 U.S. 388 (1935).

The second danger is both more insidious and more common: It is all too easy for a statutory conferral of policy-making power to the Executive Branch to be exercised by subsequent presidential administrations in a manner inconsistent with the intent of the original actors—House, Senate, and signing President—who combined to confer the power in the first place. Our Constitution contemplates that federal law and policy can be changed only by a process involving both chambers of the legislature and the President (or, in the absence of presidential assent, a supermajority of the legislature). *See* U.S. Const. art. I, § 7. In this way, the separation of powers is not merely a negative check on the

concentration of power in one department but also a positive requirement that lawmaking involve both political branches. Once policy-making power is conferred to the President, however, there is little Congress can do to prevent that power from being exercised in ways not contemplated by the original delegators. Future presidential administrations may test whatever boundaries the lawmakers attempted to set, resulting in the Executive Branch unilaterally shaping federal law and policy without the involvement of the Legislative Branch.

### B. Delegations of power pose the greatest constitutional concerns when they are difficult to reclaim.

The nondelegation doctrine has long been invoked to address these concerns. *See, e.g.*, *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928) ("[I]n carrying out that constitutional division into three branches it is a breach of the national fundamental law if Congress gives up its legislative power and transfers it to the President…."); *Field v. Clark*, 143 U.S. 649, 692 (1892) (Harlan, *J.*) ("That Congress cannot delegate legislative power to the President is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution."). Under this doctrine, Congress may confer authority to the President, or an executive agency,

13

but only if the conferral is accompanied by a sufficiently "intelligible principle" to guide and constrain the exercise of that authority. *See, e.g.*, *Fed. Commc'ns Comm'n v. Consumers' Rsch.*, 145 S. Ct. 2482, 2497 (2025); *Amer. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946) (authorization of executive action permissible where Congress "clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority").

The nondelegation principle embodied in the Constitution obviously cannot be understood as forbidding *all* delegations of vested power. After all, Article II provides that "[t]he executive Power shall be vested *in a President* of the United States of America" (emphasis added), yet no one finds it constitutionally problematic for the President to transfer substantial executive authority to his subordinates in the Executive Branch. *See Myers v. United States*, 272 U.S. 52, 117 (1926) ("[T]he President alone and unaided could not execute the laws. He must execute them by the assistance of subordinates."); Officers of the U.S. Within the Meaning of the Appointments Clause, 31 Op. O.L.C. 73, 81 (2007) ("The earliest commentators shared and perpetuated the Federalist's

understanding of a federal office as involving the wielding of delegated sovereign authority.").[8]

But the primary reason the Constitution so readily permits broad delegations of power *within* the Executive Branch is that the President is generally (under unitary-executive notions) free to oversee, override, and reclaim any authority he has delegated. *See generally* Steven G. Calabresi & Saikrishna B. Prakash, *The President's Power to Execute the Laws*, 104 YALE L.J. 541 (1994). This key feature of intra-branch delegation helps illuminate what is deeply problematic about broad inter-branch delegations of power from Congress to the President: Once delegated, that legislative power cannot readily be reclaimed by Congress. In other words, under the Constitution, delegations of power are not problematic *per se*, but instead are constitutionally offensive when delegated power is *hard to reclaim* after it has been delegated.

This understanding of the nondelegation principle finds support in the originalist scholarship done at the beginning of the last century by Professors Patrick W. Duff and Horace E. Whiteside. *See* Patrick W. Duff

---

[8]    For example, a President doesn't criminally prosecute defendants himself; he relies on officers in the Department of Justice to discharge this core executive power.

& Horace E. Whiteside, *Delegata Potestas Non Potest Delegari: A Maxim of American Constitutional Law*, 14 CORNELL L. REV. 168 (1929). Duff and Whiteside set out to uncover the origins of the Latin nondelegation maxim, "delegata potestas non potest delegari," generally translated as "delegated power may not be redelegated." Their groundbreaking historical research established that the earliest forms of this common-law maxim—which has informed constitutional nondelegation concerns[9]—were framed in anti-alienation terms. Namely, power cannot "be so delegated, *that the primary (or regulating) power does not remain with the King himself*." *Id.* at 173 (emphasis added). As Professors Duff and Whiteside concluded, the original concern was that the "King's power not [be] *diminished* by its delegation to others." *Id.* (emphasis added). This historically accurate reformulation focuses attention on a key aspect of the delegation problem: "that delegation is more problematic *when it is harder to reclaim*." Vikram Amar, *Indirect Effect of Direct Election*: *A Structural Examination of the Seventeenth Amendment*, 49 VAND. L. REV. 1347, 1378 (1996) (emphasis added).

---

[9]     As Chief Justice Taft observed, this maxim of agency law "has had wider application in the construction of our federal and state Constitutions than it has in private law." *Hampton*, 276 U.S. at 405–06.

Even scholars who have suggested the Framers were generally untroubled by the delegation of legislative power have acknowledged the concerns created by "legislatures' *permanent alienation* of legislative power *without right of reversion or control*." Julian Davis Mortenson & Nicholas Bagley, *Delegation at the Founding*, 121 COLUM. L. REV. 277, 307 (2021) (emphasis added). Alienation—permanent dispossession—is another way of describing something that has been given in such a way that it can't be controlled or retrieved. Then-Solicitor General Robert Jackson invoked that very distinction in a brief the United States filed in *Currin v. Wallace*, 306 U.S. 1 (1939), writing: "It would appear elementary that no department can divest itself of the power thus vested in it. In other words, there can be no alienation of power. [But] [d]elegation . . . that is *at all times subject to recall and supervision by Congress* . . . is in no sense a divesting or alienation of its power." Brief for the United States, 1938 WL 63974, at 44–65 (1938) (emphasis added).

The upshot of all this is that delegation of broad policymaking power *to the President* poses particularly vexing problems. When a President (as opposed to a State, for example) exercises delegated power in a way that diverges from the understandings and expectations of the

17

empowering Congress, and thus essentially embarks on new unilateral lawmaking, the House and Senate cannot easily retrieve the delegated power. *See* Amar, *Indirect Effect of Direct Election, supra*, at 1380–1385. That is because when Congress tries to reclaim broad delegations to the President (or agencies over which he exercises complete dominion), the President enjoying that delegated power can veto the proposed repeal law, requiring a supermajority of both houses to overcome.

### C. The President's veto power makes it difficult for Congress to reclaim policymaking power, once delegated.

The Presentment Clause of the Constitution explicitly gives the President authority to veto legislation, subject to override by two-thirds vote of both houses of Congress:

> Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States: If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise by reconsidered, and if approved by two thirds of that House, it shall become a Law.

U.S. Const. art. I, § 7, cl. 2. Today, that means at least 67 Senators and

18

290 Representatives must agree to override a veto.

It should go without saying that getting 357 members of Congress to agree on something is no small feat. What's more, by convention if one house fails to override a veto, the other will not take a vote, even if more than two-thirds of its members wish to override. *See* CRS Report RS21750, *The Presidential Veto and Congressional Procedure* at 2 (Feb. 27, 2004), *available at* https://www.archives.gov/files/legislative/resources/education/veto/veto-procedure.pdf. Therefore, if the legislation originated in the Senate, it is theoretically possible that just 34 Senators could prevent a veto override favored by the other 501 members of Congress, frustrating the will of the people as expressed by 93% of their representatives.

It is no surprise, then, that veto overrides have been historically rare. Since 1789, there have only been 112 veto overrides, compared to 1531 "regular" vetoes (about 7%). *See* United States Senate, *Summary of Bills Vetoed, 1789–Present*, at https://www.senate.gov/legislative/vetoes/vetoCounts.htm. The problem is compounded by the President's (contested) ability to issue a "pocket veto" by returning a bill to Congress while it is adjourned. *See* U.S. Const. art. I, § 7, cl. 2 ("If any Bill shall

19

not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a law, in like Manner as if he had signed it, *unless the Congress by their Adjournment prevent its Return, in which case it shall not be a Law.*") (emphasis added); *see generally* CRS Report RL30909, *The Pocket Veto: Its Current Status* (Mar. 30, 2001). When pocket vetoes are included, Congress has overridden less than 5% of presidential vetoes since 1789. *See* United States Senate, *Summary of Bills Vetoed,* 1789–Present, *supra*.[10]

The Presentment Clause, while an important safeguard against congressional encroachment on executive power, has tended to exacerbate the "one-way ratchet" effect of the expansion of presidential power over time. *See generally* Abner S. Greene, *Checks and Balances in an Era of Presidential Lawmaking*, 61 U. Chi. L. Rev. 123, 126 (1994) ("[T]he presidential veto has served not only to prevent legislation the

---

[10]    Even this figure does not fully account for the scope of the veto power, for the mere threat of a veto can often have the same effect as a veto itself. *See, e.g.*, Charles M. Cameron, Bargaining and Presidential Power, in Presidential Power: Forging the Presidency for the Twenty-First Century 47, 61 (Robert Shapiro et al., eds., 2000) ("Broadly speaking, veto threats often enhance presidential power … because they help the president and Congress strike bargains that they might not otherwise forge, for want of congressional concessions.").

President deems unconstitutional or unwise, but also to entrench the President's own acts of lawmaking."). Simply put, a majority of Congress can (within broad constitutional limitations) easily give the President *more* power (because he will generally be glad to sign laws conferring it), but it requires an historically rare supermajority to retract any of that power, once given.

For these reasons, delegated power that required only a bare majority of both houses of Congress to create in theory and in practice will usually require a supermajority to reclaim. The fact that the President wears two hats—as recipient of delegated power and as decisionmaker (via the veto) in attempts to rein in that power—means that legislative delegations of power to the President are particularly troublesome.

## II. To minimize the costs of error, courts should consider constitutional retrieval concerns when construing statutes that purportedly confer broad powers to the President.

The Supreme Court has not invoked nondelegation principles directly to invalidate conferrals of power to the Executive Branch very often, or very recently—in large part due to practical line-drawing problems. *See generally* Keith E. Whittington & Jason Iuliano, *The Myth*

21

*of the Nondelegation Doctrine*, 165 U. PENN. L. REV. 379 (2017). Drawing substantive lines between permissible conferral of executive implementation power and impermissible delegation of legislative power is obviously hard, if not impossible, for courts to do without appearing to be *ad hoc* and result-oriented, especially because permissible executive implementation power will almost always need to involve some discretion. As the Court explained in its most recent discussion on the subject, "we have recognized that Congress may 'seek assistance' from its coordinate branches to secure the 'effect intended by its acts of legislation,'" and that it "may 'vest[] discretion' in executive agencies to implement and apply the laws it has enacted—for example, by deciding on 'the details of their execution.'" *Consumers' Rsch.*, 145 S. Ct. at 2496–97 (quoting *Hampton,* 276 U.S. at 406 and *Wayman v. Southard*, 10 Wheat. 1, 46 (1925)).

But no one in this appeal is asking the courts to invoke the nondelegation doctrine to invalidate a statute delegating power to the President. Instead, *Amici* contend that the genuine constitutional concerns undergirding the nondelegation principle counsel against reading statutes to confer upon the Executive broad powers that

Congress may not have intended, because once a court deems power to have been so delegated, it is nearly impossible for Congress to retrieve that power. In other words, when interpreting the IEEPA's conferral on the President of the limited power to "regulate" the "importation" of "any property in which any foreign country or a national thereof has any interest" only "to deal with an unusual and extraordinary threat," 50 U.S.C. § 1702(a)(1)(B), the Court should be cognizant of the constitutional peril of stamping its imprimatur on a broad and irretrievable delegation of policymaking power.

Thus, while the separation-of-powers principles animating the nondelegation doctrine ought to be in the forefront of the judicial mind, those principles do not require the *direct* application of the nondelegation doctrine, as generally discussed, so much as they call for a narrow reading of the IEEPA. As the Court of International Trade put it in its construction of the IEEPA:

> Both the nondelegation and the major questions doctrines, even if not directly applied to strike down a statute as unconstitutional, provide useful tools for the court to interpret statutes so as to avoid constitutional problems.

*V.O.S. Selections*, 772 F. Supp. 3d at 1371–72.

The Supreme Court has, itself, invoked the nondelegation doctrine in just this manner, as a reason to read a statute narrowly so as to avoid constitutional concerns. *See Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 342 (1974) ("Whether the present Act meets the requirement of *Schechter* and *Hampton* is a question we do not reach. But the hurdles revealed in those decisions lead us to read the Act narrowly to avoid constitutional problems.").[11] As the Court of International Trade observed, the "major questions" doctrine that the Supreme Court has discussed in recent terms can likewise be seen as a variation on this practice—*i.e.*, requiring a clear statement before assuming that Congress intended to delegate matters of enormous economic and political significance to executive agencies. *See Virginia v.*

---

[11]     The Court has similarly invoked federalism concerns as a reason to read statutes narrowly. *E.g. Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) ("[I]f Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute.") This plain-statement rule was adopted even after (and in a real sense because) the Court determined that, like a substantive nondelegation line, a substantive line between state "traditional government functions" into which the federal government could interfere, on the one hand, and state activities the federal government could regulate, on the other, was "unworkable in practice." *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 546–47 (1985).

*EPA*, 597 U.S. 697, 721 (2022) (stating that the "the breadth of the authority that the executive branch has asserted" and the "economic and political significance" of that assertion provide "reason to hesitate before concluding that Congress meant to confer such authority"); *Biden v. Nebraska,* 600 U.S. 477, 504 (2023) ("A decision of such magnitude and consequence on a matter of earnest and profound debate across the country must rest with Congress itself. Or an agency acting pursuant to a clear delegation from that representative body.").

This prudential practice of construing statutory conferrals of power to the President narrowly—notwithstanding the President's insistence that broad power has been delegated—has the constitutionally salutary effect of minimizing the risks of irretrievable error. *See supra* n.7. As discussed above, in cases involving statutory delegations of power, the President is unlikely to cooperate in overriding a judicial decision that erroneously grants him *more* power than Congress desires (and more power than nondelegation principles would permit). The costs of an erroneous decision approving the President's assumption and exercise of legislative power are thus greater than the costs of an erroneous decision finding that the President has exceeded his delegated authority. If the

25

Court "misperceive[s] the political will" by construing a statute to confer *less* power on the President than Congress desires, there is a relatively easy fix: Congress can pass a new bill by simple majority and the President will almost certainly sign it into law.[12] But if the Court errs by construing a statutory delegation to give *more* power to the President than Congress intended (or more powers than the Constitution tolerates), such an error is nigh-impossible to fix, because the President has the ability and incentive to veto any legislation seeking to retrieve that power, and thereby diminish his own.

Given these asymmetrical costs of error, courts should generally resolve any doubts about the scope of a delegation of power against the President. That way, the risk of creating an unintentionally delegated

---

[12]    If Congress insists on conferring to the President broad policymaking powers that actually run afoul of the rule that legislative power should not be alienated, there is no way to redress that without courts drawing the difficult, if not impossible, substantive lines discussed above. *See supra* at 21–22. But the canon of constitutional avoidance— and common sense—dictate that a court should not cross that constitutional bridge unless and until Congress makes it unavoidable. *See Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 348 (1936) (Brandeis, J., concurring) ("When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.").

and irretrievable new presidential power in violation of nondelegation principles is reduced, and the opportunity for Congress to correct any "error" of statutory construction is facilitated. To be clear, this is not an argument forbidding all conferrals of power to the President, or even broad conferrals of power. It is an argument in favor of ensuring that broad delegations of power are in fact intended and guided by Congress before they are assumed and exercised by the President.

Because of the retrieval problems and asymmetrical error costs that arise in cases of statutory delegations to the President, courts should generally require explicit language demonstrating both Congress's intent to delegate broad authority and the intelligible principles that will guide and constrain the President's exercise of such delegated power. As the court below correctly observed, that sort of language is lacking in the IEEPA. *See Learning Res.*, 2025 WL 1525376, at *8–9 (noting that the IEEPA does not include "the words 'tariffs' or 'duties,' their synonyms, or any other similar terms," nor does it contain "language setting limits on any potential tariff-setting power").

## III.  The district court correctly construed the IEEPA's delegation of power.

Truth be told, the question of statutory interpretation in this case

27

likely cuts against the President in any event. As ably explained by Plaintiffs-Appellees, and multiple lower courts, the IEEPA does not by any fair reading of its terms provide the President with the expansive breadth of authority he claimed in issuing the Tariff Orders. *See Learning Res.*, 2025 WL 1525376, at *13 ("[H]istorical practice, as well as Congress's actions … confirm that the statute is not so capacious."); *V.O.S. Selections*, 772 F. Supp. 3d at 1370 ("Because of the Constitution's express allocation of the tariff power to Congress, we do not read IEEPA to delegate an unbounded tariff authority to the President."). But even if it were a close call, the district court here took the constitutionally proper and responsible course in interpreting the IEEPA narrowly, in light of the constitutional concerns and asymmetrical costs of error described above.

On appeal, this Court is presented with two competing interpretations of the IEEPA—one that would dramatically expand the President's power over tariffs, as understood for decades, and one that would not. To the extent the statute's text and history does not decisively resolve which interpretation is superior, *but see supra* at 7, the Court should adopt the narrower interpretation, as that is the one less likely to

run afoul of constitutional principles and the one that Congress could more easily correct in the event that "the Court has misperceived the political will." *Weber*, 443 U.S. at 216.

## CONCLUSION

The Court should adopt the district court's narrow reading of the IEEPA not only because it is the most natural reading, but because, in the absence of explicit direction from Congress, it is the reading that best respects the Framers' concerns about irretrievable delegations of broad policymaking power. If Congress disagrees, it can easily pass a new law— which the President would undoubtedly sign—expressly delegating to the President the expansive power over federal trade policy that he seeks to exercise. But, if Congress instead believes that the Framers were wise to reserve basic decisions about international trade to the legislative branch, rather than to the "final arbitrary action of one person," *INS v. Chadha*, 462 U.S. 919, 951 (1983), it won't be hamstrung in its constitutionally protected ability to claim that power for itself.

29

Dated: July 30, 2025                    Respectfully submitted,

                                        /s/ *Tadhg Dooley*
                                        Tadhg Dooley
                                        Emmett Gilles
                                        WIGGIN AND DANA LLP
                                        265 Church Street
                                        New Haven, CT 06510
                                        (203) 498-4400
                                        tdooley@wiggin.com
                                        egilles@wiggin.com

                                        *Attorneys for Amici Curiae*
                                        *Vikram David Amar and*
                                        *Mickey Edwards*

# CERTIFICATE OF COMPLIANCE

### Federal Rules of Appellate Procedure Form 6.
### Certificate of Compliance With Rule 32(a)

### Certificate of Compliance With Type-Volume Limitation,
### Typeface Requirements and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

☒ This brief contains 6,028 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) **or**

☐ This brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☒ This brief has been prepared in a proportionally spaced typeface using Microsoft Office 365 in 14 point type Century Schoolbook type style, **or**

☐ This brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: July 30, 2025          By:   /s/ *Tadhg Dooley*
                                    Tadhg Dooley