ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 30, 2025
No. 25-5202

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

LEARNING RESOURCES, INC., and HAND2MIND, INC.,

*Plaintiffs- Appellees*,

v.

DONALD J. TRUMP, President of the United States, in his official capacity, *et al.*,

*Defendant-Appellants*.

On Appeal from the United States District Court for the District of Columbia
No. 1:25-cv-01248-RC

## BRIEF OF PROTECT DEMOCRACY PROJECT AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES URGING AFFIRMANCE

Amit Agarwal
Jane P. Bentrott*
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, Suite # 163
Washington DC 20006
(202) 579-4582
amit.agarwal@protectdemocracy.org
jane.bentrott@protectdemocracy.org

*Counsel for Amicus Curiae Protect Democracy Project*

*Admission pending

## STATEMENT REGARDING CONSENT TO FILE
## AND SEPARATE BRIEFING

Pursuant to D.C. Circuit Rule 29(b), undersigned counsel for amicus curiae Protect Democracy states that counsel for all parties have consented to the filing of this brief.

Pursuant to D.C. Circuit Rule 29(d), undersigned counsel for amicus curiae states that a separate brief is necessary. Counsel for amicus curiae certifies that he has conferred with relevant counsel and determined that the contents of this brief– which focuses on how the challenged emergency tariffs relate to jurisprudential and scholarly concerns about potential abuses of emergency authorities, and the risks that emergency authorities pose for democracy and the rule of law–are meaningfully different from the briefing submitted by Plaintiffs-Appellees and likely to be submitted by other amici curiae.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amicus curiae states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.


## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

A. *Parties and Amici*. As of July 30, 2025, the date on which this amicus brief was filed, amicus is not aware of any other parties, intervenors, or amici who have entered an appearance in this Court, other than those listed in the briefs of Defendants-Appellants and Plaintiffs-Appellees or disclosed by other amici to date.

B. *Ruling Under Review*.  Amicus curiae is aware of no rulings under review other than those listed in the briefs of Defendants-Appellants and Plaintiffs-Appellees or disclosed by other amici to date.

C. *Related Cases*.  Amicus curiae is aware of no pending related cases other than those listed in the briefs of Defendants-Appellants and Plaintiffs-Appellees or disclosed by other amici to date.


Dated: July 30, 2025                    /s/ *Amit Agarwal*
                                        Amit Agarwal
                                        Counsel for Amicus Curiae

## TABLE OF CONTENTS

STATEMENT REGARDING CONSENT TO FILE AND SEPARATE BRIEFING ......................................................................................i

CORPORATE DISCLOSURE STATEMENT ........................................ ii

CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES ................. ii

TABLE OF CONTENTS ........................................................ iii

TABLE OF AUTHORITIES ......................................................iv

INTEREST OF *AMICUS CURIAE* ..........................................1

INTRODUCTION & SUMMARY OF ARGUMENT ............................3

ARGUMENT ....................................................................6

  I.  Emergency Powers Pose a Unique Threat to Democracy, Civil Liberties, and the Rule of Law ..........................................6

  II.  The Unbounded Tariffing Authority Asserted Here Implicates the Full Range of Concerns About Executive Abuse of Emergency Powers................9

III.  IEEPA Does Not Give the President any "Emergency" Taxing Power...........19

    A.  Presidentially declared emergencies are not a "blank check."....................19

    B.  This case implicates the major questions doctrine. ....................................21

    C.  This case implicates the nondelegation doctrine and constitutional avoidance....................................................................24

CONCLUSION ..................................................................29

CERTIFICATE OF COMPLIANCE ..........................................30

CERTIFICATE OF SERVICE..................................................31

## TABLE OF AUTHORITIES

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States*,
295 U.S. 495 (1935) ..........................................................................27, 28

*Am. Power & Light Co. v. SEC*,
329 U.S. 90 (1946) ...................................................................................27

*Arizona v. Mayorkas*,
143 S. Ct. 1312 (2023) .........................................................3, 9, 10, 19

*Biden v. Nebraska*,
600 U.S 477 (2023) ...........................................8, 13, 17, 21, 22, 23

*Bond v. United States*,
572 U.S. 844 (2014) .................................................................................28

*Clinton v. City of New York*,
524 U.S. 417 (1998) .................................................................................22

*FCC v. Consumers' Rsch.*,
145 S. Ct. 2482, 2491 ...................................................................24, 27, 28

*Hamdi v. Rumsfeld*,
542 U.S. 507 (2004) .................................................................................19

*Holder v. Humanitarian L. Project*,
561 U.S. 1 (2010) .....................................................................................23

*Immigr. Naturalization Serv. v. Chadha*,
462 U.S. 919 (1983) .................................................................................10

*Korematsu v. United States*,
323 U.S. 214 (1944) ...................................................................................8

*Learning Res., Inc. v. Trump*, No. 25-1248 (RC),
  2025 WL 1525376 (D.D.C. May 29, 2025) .................................12, 13, 14, 22, 28

*M'Culloch v. Maryland*,
  17 U.S. 316 (1819) ........................................................................................14

*Marshall Field & Co. v. Clark*,
  143 U.S. 649 (1892) .......................................................................................24

*Sacks v. Off. of Foreign Assets Control*,
  466 F.3d 764 (9th Cir. 2006)...........................................................................20

*Touby v. United States*,
  500 U.S. 160 (1991) .......................................................................................25

*Trump v. Hawaii*,
  585 U.S. 667 (2018) .........................................................................................8

*V.O.S. Selection. Inc. v. United States*,
  772 F .Supp. 3d 1350 (Ct. Int'l Trade 2025)...........................................14, 19, 28

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ("*Steel Seizure*") .....................8, 9, 11, 12, 14, 17, 20, 21, 23

**Constitutional Provisions**

U.S. Const. art. I, § 1 ........................................................................................24

U.S. Const. art. I, § 8 ............................................................................11, 16, 24

**Statutes**

19 U.S.C. § 2132(a)............................................................................................20

50 U.S.C. § 1622(d) ...........................................................................................10

50 U.S.C. § 1701 ......................................................................................18, 26, 28

50 U.S.C. § 1702(b) ............................................................26

50 U.S.C. § 1703 ...............................................................26

**Other Authorities**

Brian Bennett, *Doomsday and Democracy: Former Trump Aides Warn of Secret Presidential Crisis Powers*, Time (Oct. 15, 2024) ...............18, 19

Congressional Research Service, *Regular Vetoes and Pocket Vetoes: In Brief* (July 18, 2019)..................................................................10

Defs.' Resp. in Opp. to Mot. for Summ. J. at 35, *V.O.S. Selections, Inc. v. United States*, No. 25-cv-00066, (Ct. Int'l Trade April 29, 2025), ECF No. 32........................................................................26

Elizabeth Goitein, *Trump's Hidden Powers*, Brennan Ctr. for Just. (Sept. 4, 2019)............................................................................10

Emergency Mot. For Stay Pending Appeal and Admin. Stay at 5, *Slaughter v. Trump*, No. 25-5261 (D.C. Cir. filed July 21, 2025)........................23

Jack Nicas & Ana Ionova, *What to Know About the New U.S.-Brazil Trade War*, N.Y. Times (July 10, 2025).......................................15

James Madison, Letter to Thomas Jefferson (May 13, 1798) ..................6

Kat Lonsdorf, *President Trump is declaring national emergencies faster than any other president*, NPR (June 20, 2025)...................17

Lauren Irwin, *Homan on deportation flights: 'I don't care what the judges think,'* The Hill (March 17, 2025) ........................................17

Maggie Haberman, et al., *Trump Suggests No Laws Are Broken if He's 'Saving His Country,'* N.Y. Times (Feb. 15, 2025) .............................17

Peter Baker, *Trump Declares a National Emergency, and Provokes a Constitutional Clash*, N.Y. Times (Feb. 15, 2019) ................................8

S. Rep. No. 94-1168 (1976) ......................................................................21

S. Rep. No. 94-922 (1976) ..................................................................7, 11

Steven Levitsky & Daniel Ziblatt, *Why Autocrats Love Emergencies*, N.Y.
  Times (Jan. 12, 2019).........................................................................7

*Test. of Soren Dayton*, Before the H. Subcomm. on the Const., Civ., Rts.,
  and Civ. Liberties, H. Judiciary Comm. (May 17, 2022).......................................1

Wash. Post, *All the times Trump said the constitution lets him do whatever
  he wants*, YouTube (July 24, 2019) ....................................................16

Webster's New Collegiate Dictionary 372 (8th ed. 1976) .....................................15

## INTEREST OF *AMICUS CURIAE*[1]

Protect Democracy Project ("Protect Democracy") files this brief in support of Appellees out of concern over executive branch abuses of emergency powers.

Protect Democracy is a nonpartisan nonprofit organization whose mission is to prevent our democracy from declining into a more authoritarian form of government. As part of that mission, Protect Democracy engages in various forms of advocacy aimed at preventing abuses of executive power, including abuses of emergency powers. Protect Democracy has challenged abuses of emergency powers by presidents of both political parties.

Along with a cross-partisan co-counsel team, Protect Democracy filed a lawsuit on behalf of El Paso County and the Border Network for Human Rights to enjoin President Trump's first-term use of an emergency declaration to access federal funds to build a border wall in contravention of congressional appropriations decisions. It has also provided congressional testimony and otherwise advocated for reforms to the National Emergencies Act. *See Test. of Soren Dayton*, Before the H. Subcomm. on the Const., Civ., Rts., and Civ. Liberties, H. Judiciary Comm. (May 17, 2022).

---

[1] No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the brief's preparation or submission; and no person other than *amicus* contributed money to fund this brief's preparation or submission.

Protect Democracy previously filed briefs in support of the challengers to the student loan relief plan that relied on emergency authority contained in the HEROES Act of 2003 in *Biden v. Nebraska*, Br. of *Amicus Curiae* The Protect Democracy Project in Supp. of Resp'ts, 600 U.S. 477 (2023) (22–506), and *Dep't of Educ. v. Brown*, Br. of *Amicus Curiae* The Protect Democracy Project in Supp. of Resp'ts, 600 U.S. 551 (2023) (22–535). Protect Democracy also filed an amicus brief in *Arizona v. Mayorkas*, Br. of *Amicus Curiae* The Protect Democracy Project in Supp. of Resp'ts, 143 S. Ct. 1312 (2023) (22–592), in support of the Biden administration in seeking to terminate the use of emergency authorities. In those briefs, Protect Democracy argued that the purpose of the relevant statutory schemes, like the one here, is to give the executive branch the limited tools required to promptly put in place necessary short-term responses to unforeseeable emergencies, but not to supplant Congress's constitutional role in lawmaking to address long-term problems.

## INTRODUCTION & SUMMARY OF ARGUMENT

1. "[R]ule by indefinite emergency edict risks leaving all of us with a shell of a democracy and civil liberties just as hollow." *Arizona v. Mayorkas*, 143 S. Ct. 1312, 1314 (2023) (Statement of Gorsuch, J.). That risk looms large in this case. Indeed, the sweeping and unprecedented executive orders at issue here raise virtually all of the red flags that jurists and scholars have identified in warning about how emergency powers may be abused to undermine democracy and the rule of law.

Of particular relevance, the President asserts an "emergency" *taxing* power that (1) is both vested in the President and unlocked by unilateral presidential action; (2) may be perpetuated indefinitely by executive fiat and may not ordinarily be terminated, even by majorities of both houses of Congress, without the President's approval; (3) seizes a quintessential legislative power without any express manifestation of legislative intent to delegate that authority; (4) circumvents procedural and substantive constraints established by law and intended to govern the precise authority asserted here; (5) has no basis in historical practice under the relevant statute, and has never before been asserted by any President; (6) would have staggering political and economic impact; (7) threatens individual rights and civil liberties; (8) may be invoked pretextually, by this or any future President, to achieve aims that have nothing to do with any arguable "emergency"; (9) has already been deployed, based on the undisputed facts of this case, in circumstances that do not

involve an "emergency" in any ordinary sense of that word; and (10) is advanced in the context of a broader repudiation of legal constraints, including some that the Executive has sought to jettison based on *other* presidentially declared "emergencies" not directly at issue here.

Any one of those red flags would be concerning. An action, like this one, that implicates all of them at the same time presents the paradigmatic example of an emergency power warranting close judicial scrutiny.

2. Applied here, such scrutiny compels the conclusion that IEEPA does not give the President *any* "emergency" taxing power. Still less does it provide for the "unbounded" and "unlimited" emergency authority the President posits.

Appellants' argument to the contrary relies heavily on the President's asserted authority to unilaterally (a) declare a "national emergency" and then (b) determine what measures are "necessary and appropriate to address" it. Those arguments are unpersuasive.

First, the President's unilateral declaration of a "national emergency" is not a blank check. Both of the statutes the President has invoked–the National Emergencies Act and IEEPA–were enacted to constrict rather than expand the Executive's emergency powers. More generally, Supreme Court jurisprudence confirms that even "grave," indisputable, and unforeseeable international crises– such as those sparked by the Korean War, the 9/11 terrorist attacks, and the COVID-

19 pandemic–require careful judicial review of asserted emergency authorities.  *A fortiori*, such review is appropriate where–as here–common sense, undisputed facts, and the President's own statements make clear that the asserted "emergencies" are both non-existent (e.g., intended to address a *decades-old* issue involving trade deficits) and being exploited for pretextual reasons (e.g., as with the 50% tariffs threatened against Brazil, a country with which the United States enjoys a trade surplus, for the avowed purpose of penalizing a foreign sovereign's prosecution of one of the President's political allies).

Second, Appellants' efforts to evade the major questions doctrine are unavailing.  As the Supreme Court has already made clear, that doctrine applies to major questions that arise in the context of presidentially declared emergencies, including an international health crisis with cross-border implications.  The government's claim that the doctrine should be jettisoned in this case because "IEEPA delegates power directly to the President" (Appellants' Br. at 24) makes no sense.  Whether IEEPA delegates Congress's taxing power to the President is the *question* in this case; the President can't assume a favorable *answer* to that question as justification for casting aside a doctrine that sheds light on how the pertinent legislative delegation should be construed in the first place.

In addition, the doctrine is animated by concerns about the separation of powers *between* the branches of government; concerns about Executive Branch

incursions on legislative authority do not turn on the location of an executive official *within* the Executive Branch.  Appellants' argument to the contrary does not just fail on its own terms; it cannot be reconciled with their position–including in other cases now pending before this Court–that the President is vested with "all" of the executive power and retains plenary control over all principal officers, including the heads of traditional independent agencies.

Third, Appellants' interpretation of IEEPA raises serious constitutional concerns under the nondelegation doctrine.  Under the canon of constitutional avoidance, however, these concerns can and should be avoided by construing IEEPA–consistent with its text and the broader statutory scheme–not to delegate to the President sweeping authority to impose emergency tariffs.

## ARGUMENT

### I.  Emergency Powers Pose a Unique Threat to Democracy, Civil Liberties, and the Rule of Law

History is replete with examples of ambitious, would-be authoritarians exploiting emergency authority.  Aspiring autocrats abroad have often opportunistically seized upon real or manufactured emergencies to consolidate and aggrandize their power. The drafters of the Constitution,[2] like the drafters of the

---

[2] Madison warned, "[p]erhaps it is a universal truth that the loss of liberty at home is to be charged to provisions against danger, real or pretended, from abroad." James Madison, Letter to Thomas Jefferson (May 13, 1798), available at https://founders.archives.gov/documents/Madison/01-17-02-0088.

NEA,[3] expressly warned of that danger, and today's democracy experts are again sounding the alarm.[4]

Democracy scholars Steven Levitsky and Daniel Ziblatt have detailed many recent examples:

> In Peru, a Maoist insurgency and economic crisis enabled [Alberto] Fujimori to dissolve the Constitution and Congress in 1992; in Russia, a series of deadly apartment bombings in 1999 – allegedly by Chechen terrorists – triggered a surge of public support for [Vladimir] Putin, who was then the prime minister, which allowed him to crack down on critics and consolidate his power; and in Turkey, a series of terrorist attacks in 2015, along with a failed 2016 coup attempt, allowed [Recep Tayyip] Erdogan to tighten his grip via a two-year state of emergency.[5]

American history provides its own examples of these dangers, often at the expense of civil liberties and in the interest of concentrating executive power. These examples also illustrate the critical role of courts in reining in any overreach—and the devastating consequences of overly deferring to executive discretion. The former is exemplified in President Truman's attempt to seize control of the steel industries during a strike in 1952, which the Supreme Court struck down in

---

[3] In urging passage of the NEA, the Senate Subcommittee report highlighted the relationship between emergency powers and fascism, referencing "the experience of Germany, where the Constitution had permitted the President to suspend individual rights, and Great Britain and France, where the parliaments had maintained strict control over emergency powers." S. Rep. No. 94-922 at 7 (1976).

[4] "Crises present such great opportunities for concentrating power that would-be autocrats often manufacture them . . ." Steven Levitsky & Daniel Ziblatt, *Why Autocrats Love Emergencies*, N.Y. Times (Jan. 12, 2019), https://tinyurl.com/9aez6cnb.

[5] *Id.*

*town Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952) ("*Steel Seizure*"). The latter is exemplified in a permanent stain on the American conscience: President Roosevelt used the Japanese attack on Pearl Harbor as justification to round up Japanese Americans and place them in internment camps, a move the Supreme Court upheld at the time, *Korematsu v. United States*, 323 U.S. 214 (1944). The Supreme Court has since repudiated this as "gravely wrong the day it was decided." *See Trump v. Hawaii*, 585 U.S. 667, 710 (2018).

The risk of abuse is inherent in broad delegations of sweeping authority subject to limited review—it is not limited to any one actor or political party. For instance, in 2019, President Trump declared a state of emergency at the Southern border to access funding Congress had refused to give him to build a border wall. He admitted he "didn't need to," but just wanted "to get it done faster." *See* Peter Baker, *Trump Declares a National Emergency, and Provokes a Constitutional Clash*, N.Y. Times (Feb. 15, 2019), https://tinyurl.com/3bn8xymy. In August 2022, President Biden invoked emergency powers under the HEROES Act, purportedly triggered by the COVID-19 emergency declared in 2020, to forgive about $430 billion in student loans, only weeks before declaring the emergency over. *Biden v. Nebraska*, 600 U.S 477, 488 (2023).

The risks of potential abuse are magnified when considering that, by declaring an "emergency" under the NEA, a president can unlock dozens of statutes that permit

significant intrusions upon fundamental liberties including, *inter alia*, powers to freeze bank accounts, control transportation and communication, seize property, and more—without Congressional action.[6] If, as Appellants argue, the president can take emergency actions such as these with limited statutory restraints and no meaningful judicial review, then there is little to prevent rule by fiat pursuant to any declared "emergency."

## II. The Unbounded Tariffing Authority Asserted Here Implicates the Full Range of Concerns About Executive Abuse of Emergency Powers

"[R]ule by indefinite emergency edict risks leaving all of us with a shell of a democracy and civil liberties just as hollow." *Arizona*, 143 S. Ct. at 1314 (Statement of Gorsuch, J.).   This case raises virtually every red flag that jurists and scholars have identified in warning about potential abuses of emergency powers.

**Unilateral trigger.**   Historical "experience … suggests that emergency powers are consistent with free government only when their control is lodged elsewhere than in the Executive who exercises them." *Steel Seizure*, 343 U.S. at 652 (Jackson, J., concurring); *see id.* at 651 (contrasting experience of Germany in the 1930s with that of parliamentary democracies in which "emergency powers could not be assumed at will by the Executive").   In line with that experience, American

---

[6] Brennan Center for Justice, *A Guide to Emergency Powers and Their Use*, Brennan Ctr. for Just. (last updated July 1, 2025), https://www.brennancenter.org/our-work/research-reports/guide-emergency-powers-and-their-use.

law provides for a broad range of "statutory powers [that] become available [to the executive] when a national emergency is declared by Congress."  Elizabeth Goitein, *Trump's Hidden Powers*, Brennan Ctr. for Just. (Sept. 4, 2019), https://www.brennancenter.org/our-work/analysis-opinion/trumps-hidden-powers.

The President has not invoked any such authority here.  Instead, he asserts sole, absolute, and unreviewable authority to unlock a vast "emergency" taxing power by unilaterally declaring a "national emergency."

**Indefinite duration.**  Emergency authorities trigger heightened concerns when they don't come with an expiration date.  *See, e.g.*, *Arizona*, 143 S. Ct. at 1314, 1316 (Statement of Gorsuch, J.).  Those concerns are particularly acute when the executive officer wielding emergency powers can block legislative attempts to terminate the emergency.

Both problems are present here:  The President may renew emergencies he himself declares under the NEA by simple executive fiat.  *See* 50 U.S.C. § 1622(d). And, as a result of the Supreme Court's ruling in *Immigr. Naturalization Serv. v. Chadha*, 462 U.S. 919, 954–55 (1983), Congress can only end an emergency by a veto-proof supermajority—an exceedingly high bar to clear.[7]  That's not how the

---

[7] Since the country's founding, Congress has overridden less than five percent of presidential vetoes. Congressional Research Service, *Regular Vetoes and Pocket Vetoes: In Brief* (July 18, 2019), https://www.congress.gov/crs-product/RS22188# :~:text=Since%20the%20founding%20of%20the,14.5%25)%20of%20these%20vet oes.

NEA was supposed to work: In drafting the statute, Congress intended to retain the power to veto executive abuse of emergency grants of statutory authority.  S. Rep. No. 94-922, at 15–16.

**Executive self-aggrandizement.**  Tariffs are taxes, and taxing is a quintessential legislative power.  *See* U.S. Const. art. I, § 8, cl.1; *Steel Seizure*, 343 U.S. at 643 (Jackson, J., concurring) (explaining that "Congress alone controls the raising of revenues").  Assuming *arguendo* that the vast legislative authority at issue here could have been delegated to the President, the Trump Administration points to no statutory text or legislative history evincing any congressional intent to create an emergency taxing power controlled by the President.

That silence speaks volumes.  As the district court recognized, Congress knows how to expressly delegate its exclusive power to levy taxes on imports; and, not surprisingly, the legislative history attending such express delegations of taxing authority is typically replete with equally explicit affirmations of Congress's intent to confer such authority.  Casting those *explicit* authorities aside, the Executive now asserts an *implied* power to tax under a law that says not a word about "tariffs," "Taxes, Duties, Imposts [or] Excises,"—the terms that have been used, since the founding of our republic, to denote Congress's authority to lay and collect taxes.  *See* U.S. Const., art. I, § 8, cl. 1.

**Wholesale evasion of procedural and substantive constraints.**  As the district court stressed, every statute that *expressly* delegates tariffing authority comes with procedural and substantive constraints, including limits on how high those tariffs can be, what kinds of goods they can target, how long they can last, and what must be shown to put them in place.  *See Learning Res., Inc. v. Trump*, No. 25-1248 (RC), 2025 WL 1525376, at *9 (D.D.C. May 29, 2025).  IEEPA, in contrast, does not impose any such limits on the President's taxing power.  (And for good reason: IEEPA does not give the President any power to tax in the first place, as every President has understood until now.)  By casting specific tariffing authorities aside and invoking an inapposite "emergency" taxing power purportedly conferred by IEEPA, however, the President has effectively eviscerated the carefully considered constraints Congress imposed on the President's authority to impose tariffs.

**Absence of historical precedent.**  Although claims of implied emergency powers are disfavored, at least some jurists have evinced greater willingness to entertain such claims if they find clear support in longstanding historical practice.  *See Steel Seizure*, 343 U.S. at 610–11 (Frankfurter, J., concurring) ("Deeply embedded traditional ways of conducting government cannot supplant the Constitution or legislation, but they give meaning to the words of a text or supply them.").  Here, historical practice confirms that IEEPA does *not* give the President an emergency taxing power:  "In the five decades since IEEPA was enacted, no

12

President until now has ever invoked the statute—or its predecessor, TWEA—to impose tariffs." *Learning Res., Inc.*, 2025 WL 1525376, at *10.

**Massive political and economic impact.**  Consistent with common sense, judicial review of asserted emergency authorities is more stringent when the "economic and political significance" of the challenged governmental action "is staggering by any measure." *Nebraska*, 600 U.S. at 502.  Qualitatively and quantitatively, in both absolute and relative terms, President Trump's worldwide tariffs will have enormous political and economic impact. *See* Appellees' Br. at 10-12, 47-48.

**Threat to individual rights and civil liberties.**  Emergency powers warrant closer scrutiny if the power at issue directly burdens, or can be leveraged to curtail, individual rights.   In *Biden v. Nebraska*, for example, the Solicitor General unsuccessfully sought to defend the administration's student-loan forgiveness program by arguing that "there are fewer reasons to be concerned" about "exercises of emergency powers" in cases involving the provision of "benefits, which do not impose 'profound burdens' on individual rights or cause "regulatory effects that might prompt a note of caution in other contexts involving exercises of emergency powers."  600 U.S. at 505.  As the Executive thereby conceded, common sense dictates that there is more reason to be concerned about emergency powers that

13

burden individual rights or impose significant regulatory effects on private businesses.

The emergency powers asserted here do both. President Trump posits "unbounded authority" "to impose unlimited tariffs on goods from nearly every country in the world." *V.O.S. Selection. Inc. v. United States*, 772 F .Supp. 3d 1350, 1358 (Ct. Int'l Trade 2025). "An unlimited power to tax involves, necessarily, a power to destroy; because there is a limit beyond which no institution and no property can bear taxation." *M'Culloch v. Maryland*, 17 U.S. 316, 327 (1819). For plaintiffs here, that limit has already been reached: The challenged tariffs, the district court found, "pose an existential threat to their businesses." *Learning Res., Inc.*, 2025 WL 1525376, at *13.

Countless others now face a like threat. If the President's view of IEEPA is right, the President could target individual businesses, sectors, industries, and entire countries for a good reason, a bad reason, or no reason at all–rewarding friends, punishing enemies, and leveraging his unbounded taxing power in such a way as to render nominally protected rights nugatory in practice.

**High risk of pretextual resort to "emergency" powers.** Emergencies, real and manufactured, "afford a ready pretext for usurpation." *Steel Seizure*, 343 U.S. at 650 (Jackson, J., concurring). The risk here is sky-high. Indeed, by his own

admission, the President is already seeking to use his "emergency" taxing power to achieve aims that have nothing to do with any declared "emergency."

A few weeks ago, for example, President Trump threatened to ignite "a full-blown trade war" by imposing 50% tariffs on Brazilian imports.[8] Jack Nicas & Ana Ionova, *What to Know About the New U.S.-Brazil Trade War*, N.Y. Times (July 10, 2025). In litigation, the government seeks to justify its tariffs as addressing a "national emergency" involving decades-old "trade *deficits*." Appellants' Br. at 2 (emphasis added). But "the United States has a trade *surplus* with Brazil." Nicas & Ionova, *supra* (emphasis added). And the President says he wants to impose tariffs on Brazil–not because of a trade deficit–but rather because it is "carrying out a 'witch hunt' against his political ally, former President Jair Bolsonaro, who is facing trial for attempting a coup." *Id.* (explaining that the incident "shows how Mr. Trump is using tariffs to settle scores against his political enemies").

**Absence of an "emergency."**  An emergency, by common understanding, is an "*unforeseen* combination of circumstances or the resulting state that calls for immediate action." Webster's New Collegiate Dictionary 372 (8th ed. 1976) (emphasis added). By the government's own admission, the worldwide tariffs seek to address a "*decades*"-old issue involving persistent "trade imbalances."

---

[8] https://www.nytimes.com/2025/07/10/world/americas/trump-bolsonaro-brazil-tariffs.html

Appellants' Br. at 2 (emphasis added).  Even assuming trade deficits are a "major concern," Appellants' Br. at 46, any such long-term issue could be addressed by the branch of government constitutionally authorized to "lay and collect taxes" and "regulate commerce with foreign nations," U.S. Const., Art. I, § 8, cls. 1, 3.  At a minimum, Congress has had ample time to pass a law expressly authorizing the President to impose tariffs as "emergency" measures–and to clarify that any such authority need not be subject to the procedural and substantive constraints Congress has incorporated into statutes expressly authorizing the President to impose tariffs on a non-emergency basis.

**Broader repudiation of legal constraints.** Courts considering novel assertions of emergency authority need not ignore common sense or turn a blind eye to the wider context in which such authority is asserted.  The context here includes a broader–and altogether alarming–effort to repudiate longstanding constraints on the exercise of executive power, combined with the administration's unparalleled efforts to expand emergency powers.

For example, in recent months, the President and other high-level officers in the Executive Branch have publicly claimed to possess limitless executive power:

- "I have an Article II, where I have the right to do whatever I want as President."–President Trump[9]

---

[9] Wash. Post, *All the times Trump said the constitution lets him do whatever he wants*, YouTube (July 24, 2019), https://www.youtube.com/watch?v=sl_gO3uOds8.

- "He who saves his Country does not violate any Law."–President Trump[10]

- "I don't care what the judges think."–"Border Czar" Tom Homan[11]

These statements provide critical context as courts weigh reasonable judicial concerns about potential abuse of emergency authorities. *See, e.g.*, *Nebraska*, 600 U.S. at 512 (Barrett, J., concurring) (considering context beyond the four corners of the operative statute, and stressing that "[c]ontext also includes common sense"); *Steel Seizure Case*, 343 U.S. at 637 (Jackson, J., concurring) (explaining that, in certain areas of law, "any actual test of power is likely to depend on the imperatives of events and contemporary imponderables rather than on abstract theories of law").

Coterminus to this pattern of repudiating checks on executive authority, the current presidential term has also brought an unparalleled expansion of presidential use of emergency powers in pace, number, and scope. In the first 100 days alone, President Trump declared eight national emergencies—more than any modern president in the same period.[12] In scope, Appellants have interpreted IEEPA's grant

---

[10] Maggie Haberman, et al., *Trump Suggests No Laws Are Broken if He's 'Saving His Country,'* N.Y. Times (Feb. 15, 2025), https://www.nytimes.com/2025/02/15/us/politics/trump-saves-country-quote.html.
[11] Lauren Irwin, *Homan on deportation flights: 'I don't care what the judges think,'* The Hill (March 17, 2025), https://thehill.com/homenews/administration/5198604-border-czar-trump-deportation/.
[12] Kat Lonsdorf, *President Trump is declaring national emergencies faster than any other president*, NPR (June 20, 2025), https://www.npr.org/2025/06/20/nx-s1-5439550/president-trump-is-declaring-national-emergencies-faster-than-any-other-president.

of emergency authority more expansively than ever before, suggesting it delegates the president unilateral authority to deal with "major concerns" rather than true emergencies or unexpected threats. *Compare* Appellants' Opening Brief at 46 ("IEEPA is on its face *all about* giving the President major powers to address major concerns.") (emphasis in original) *with* 50 U.S.C. § 1701 (authority under IEEPA "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared.").

Although recent context heightens concerns about abuse of emergency powers, such concerns are not limited to the current administration. Reporting in the last few years has revealed the existence of classified documents available only to a small group within the executive branch—updated by White House occupants of both parties—including pre-drafted emergency orders, known as the Doomsday Book.[13] Senator Rand Paul, who was denied permission to review this document, observed: "The idea that we would have emergency orders written up to replace the constitutional republic in times of emergencies, *that would alarm anybody*." *Id.* (emphasis added). Most relevant here, however, President Trump's former aides

---

[13] Brian Bennett, *Doomsday and Democracy: Former Trump Aides Warn of Secret Presidential Crisis Powers*, Time (Oct. 15, 2024), https://time.com/7086057/donald-trump-second-term-emergency-aides/.

have warned of the likelihood that he would use the Doomsday Book in non-emergency situations to accomplish his policy goals and consolidate his power.  *Id.*

In short, this case implicates the full gamut of concerns that jurists and scholars have identified in cautioning against "rule by indefinite emergency edict," *Arizona*, 143 S. Ct. at 1314 (Statement of Gorsuch, J.), warranting careful judicial review of the challenged emergency measures.

## III.  IEEPA Does Not Give the President any "Emergency" Taxing Power.

Applying established legal principles to the challenged executive orders, IEEPA does not give the President any power to impose tariffs.  Still less does it give him "unbounded authority" to "impose unlimited tariffs on goods from nearly every country in the world."  *See V.O.S. Selections, Inc.*, 772 F. Supp. 3d at 1358. Appellants' arguments to the contrary are unpersuasive.

### A.  Presidentially declared emergencies are not a "blank check."

Appellants claim that the President's unprecedented worldwide tariffs are justified because the President found they "were necessary and appropriate to address" a "national emergency" that the President himself declared. Appellants' Br. at 17.  But a state of emergency–even one occasioned by an ongoing war–is not a "blank check."  *See, e.g.*, *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004).  Nor is it a trump card that overcomes ordinary principles of statutory interpretation.

In this case, for example, the President opted not to invoke any of the multiple statutory authorities that Congress created to deal with the purported exigencies asserted here. *See, e.g.*, 19 U.S.C. § 2132(a) (authorizing the President to impose "duties" "not to exceed 15 percent ad valorem … on articles imported into the United States" in order "to deal with large and serious United States balance-of-payments deficits," but subject to the limitation that such tariffs expire after 150 days unless Congress enacts legislation to extend them). "In choosing a different and inconsistent way of his own, the President cannot claim that it is necessitated or invited by failure of Congress to legislate on the occasions, grounds and methods" governing the imposition of taxes on imports. *See Steel Seizure*, 343 U.S. at 639 (Jackson, J., concurring) (emphasizing that "Congress has not left" use of the power at issue "an open field but has covered it by" multiple "statutory policies inconsistent with" the President's asserted emergency authority).

As in non-emergency cases, statutory context and purpose matter. The President has invoked two laws as support for his emergency taxes. Both were intended to constrict rather than expand the Executive's emergency powers. "The IEEPA was passed by Congress to counter the perceived abuse of emergency controls by presidents to unilaterally sanction foreign governments or interfere with international trade in non-emergency, peacetime situations." *Sacks v. Off. of Foreign Assets Control*, 466 F.3d 764, 776 (9th Cir. 2006). Similarly, Congress

enacted the NEA to limit the use of emergency powers to only those situations "when emergencies actually exist, and then only under safeguards of congressional review." S. Rep. No. 94-1168, at 2 (1976).

More generally, even genuine and unforeseeable crises require careful judicial review of asserted emergency authorities. *See, e.g.*, *Steel Seizure*, 343 U.S. at 582, 589 (rejecting the "Government's position" that the President's seizure of steel mills during a time of war "was necessary to avert a national catastrophe which would inevitably result from a stoppage of steel production" in the context of a "grave emergency," and concluding that "[t]he Founders of this Nation entrusted the law making power to the Congress alone in both good and bad times"). Such review is doubly appropriate where–as here–common sense, undisputed facts, and the President's own statements make clear that the asserted "emergency" is both non-existent and being exploited for pretextual reasons.

**B.  This case implicates the major questions doctrine.**

Under the "major questions" doctrine, courts will not read a law to give the executive branch enormous power involving a "question of 'deep economic and political significance'" without "*'clear* congressional authorization' to justify the challenged program." *See Nebraska*, 600 U.S. at 505–06 (emphasis added).  Hence, such caution is also required when, as here, the law at issue includes *no* such authorization. *See id.* (applying the major question doctrine to a law that "provide[d]

no authorization for the [challenged] plan even when examined using the ordinary tools of statutory interpretation"); *Learning Res., Inc.*, 2025 WL 1525376, at *8 ("If Congress had intended to delegate to the President the power of taxing ordinary commerce from any country at any rate for virtually any reason, it would have had to say so.").

As the Supreme Court has already clarified, the logic of the major questions doctrine applies with full force when the challenged program is based on a presidentially declared "national emergency." *See Nebraska*, 600 U.S. at 485-87. If searching judicial review is proper in assessing an emergency measure "deem[ed] necessary" in light of the Covid pandemic–perhaps the paradigmatic example of a *bona fide* national emergency–it is no less appropriate in considering a purported emergency measure aimed at combating comparatively workaday and long-term issues such as "decades of trade imbalances." Appellants' Br. at 2.

The government errs in asserting that "the major-questions doctrine is inapplicable here … because IEEPA delegates power directly to the President." Appellants' Opening Br. at 24. The logic of that doctrine is rooted in "separation of powers concerns," *Nebraska,* 600 U.S. at 505, and the concerns raised by executive incursions on legislative authority do not evaporate when the President acts directly or orders subordinates to take the action at issue. *See, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 421 (1998) (invalidating direct presidential exercise of authority

22

under the Line Item Veto Act); *Steel Seizure*, 343 U.S. at 582 (assessing "whether the President was acting within his constitutional power when he issued an order directing the Secretary of Commerce to take possession of and operate most of the Nation's steel mills"). It's particularly inconsistent for the incumbent President to distinguish, for purposes of separation-of-powers doctrine, between statutory authorities delegated "directly to the President" and those delegated to "agencies," Appellants' Br. at 45; in other litigation, including cases now pending before this Court, the President takes the view that he must enjoy plenary control over officers exercising all such statutory authorities because the vesting clause of Article II gives him "all of" the executive power. *E.g.*, Emergency Mot. For Stay Pending Appeal and Admin. Stay at 5, *Slaughter v. Trump*, No. 25-5261 (D.C. Cir. filed July 21, 2025).

Finally, the logic of the major questions doctrine applies when major questions have foreign as well as domestic implications. The doctrine applies when the "'economic and political significance'" of the challenged executive action is "staggering," *Nebraska*, 600 U.S. at 502; and measures that have "staggering" economic and political significance will often have implications for foreign as well as domestic interests. *See also Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010) ("Our precedents, old and new, make clear that concerns of national security and foreign relations do not warrant abdication of the judicial role."). Indeed,

Appellants' approach would have the perverse consequence of subjecting more consequential measures to less judicial scrutiny–turning the "major questions" doctrine on its head.

In any event, Appellants are wrong to say that tariffs implicate the President's "independent constitutional authority" "in the arena of foreign affairs and national security." Appellants' Br. at 47.  Tariffs are *taxes* imposed on, and collected from, the American people; and the taxing power is quintessentially legislative.  *See* U.S. Const. art. I, § 8, cl.1; *Steel Seizure*, 343 U.S. at 643 (Jackson, J., concurring) (explaining that "Congress alone controls the raising of revenues").

**C.  This case implicates the nondelegation doctrine and constitutional avoidance.**

"That Congress cannot delegate legislative power . . . is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution." *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692-94 (1892). The Supreme Court has adopted this doctrine "*to enforce limits* on the 'degree of policy judgment that can be left to those executing or applying the law.'" *FCC v. Consumers' Rsch.*, 145 S. Ct. 2482, 2491 (2025) (emphasis added) (citation omitted). Here, the President asserts he has been delegated exclusive policy judgment to impose tariffs on virtually every trading partner – a virtually limitless delegation of a core legislative power. *See* U.S. Const. art. I, §§ 1, 8 (vesting "[a]ll legislative Powers herein granted . . . in a Congress of the United States," the first of

which is the "Power To lay and collect Taxes, Duties, Imposts and Excises"). Although lenient, Appellants concede the nondelegation doctrine is "not … toothless." Appellants' Br. at 52.  If the doctrine is to have any teeth at all, the Challenged Tariffs would constitute the paradigmatic example of a delegation of legislative authority that fails even this lenient test.

The nondelegation doctrine holds that any congressional delegation of authority to the executive must set forth an "intelligible principle" that "*meaningfully* constrains" the president's authority.  *Touby v. United States*, 500 U.S. 160, 166 (1991) (emphasis added).  The government has identified three such principles that purportedly constrain the President in his ability to unilaterally reshape the global economy and impose hundreds of billions of dollars of taxes on Americans[14]  upon his own determination and declaration of various "emergencies."  To the extent they operate as "constraints" at all, they fall far short of "meaningful."

*First*, Appellants point to four trivial statutory exceptions to what the President claims is otherwise limitless tariff authority. These exceptions prohibit the president from imposing tariffs on: personal communications that "do[] not involve a transfer of value;" informational materials; humanitarian donations (unless the president determines they would interfere with the "emergency" response); and

---

[14] Erica York & Alex Durante, *Trump Tariffs: Tracking The Economic Impact of the Trump Trade War,* The Tax Found.. (July 29, 2025), https://taxfoundation.org/research/all/federal/trump-tariffs-trade-war/.

transactions related to personal travel for personal use. 50 U.S.C. § 1702(b). Excepting only these four categories (one of which applies to valueless goods and another the President can unilaterally override) from the President's purported unfettered ability to tariff *all other global trade* is no constraint at all.

*Second*, Appellants point to Congressional oversight. This is a red herring. Appellants cite the IEEPA provision requiring the President to "consult with" and provide reports to Congress. 50 U.S.C. § 1703. Such *post hoc* reporting does nothing to *constrain* any previously granted statutory delegation of authority, to the extent it exists.

*Third*, Appellants assert the President is restrained because he cannot invoke IEEPA for any purpose other than "to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared." 50 U.S.C. § 1701(b). However, Appellants elsewhere argue that this constraint is effectively meaningless. Appellants' Br. at 47 ("it is particularly inappropriate to construe narrowly a delegation of power in the arena of foreign affairs and national security…. Exactly the opposite is true[.]"); Defs.' Resp. in Opp. to Mot. for Summ. J. at 35, *V.O.S. Selections, Inc. v. United States*, No. 25-cv-00066, (Ct. Int'l Trade April 29, 2025), ECF No. 32 (arguing that determining whether a situation poses "more than an ordinary or unusual threat" "is not fit for judicial resolution"). If Appellants argue– as they have elsewhere–that this statutory language does not *practically* constrain

the President's purportedly boundless tariffing power under IEEPA, then there are no "'boundaries' [the President] cannot cross." *Consumers' Rsch.*, 145 S. Ct. at 2501 (2025) (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)).

Together, Appellants offer a reading of IEEPA that provides no meaningful constraints on the delegation of legislative power to the Executive. This position undermines the separation of powers and is "divorced from any … constitutional values." *Consumers' Rsch.*, 145 S. Ct. at 2501. If ever there were a case to affirm that the nondelegation doctrine retains any meaning, this is that case.

This conclusion is bolstered by the Supreme Court's recent discussion of an analogous case that also failed the nondelegation test. In that case, "[the statute] authorized the President to approve 'codes of fair competition' for 'the government of trade and industry throughout the country,' yet imposed 'few restrictions' and 'set[ ] up no standards' aside from a 'statement of the general aims of rehabilitat[ing], correct[ing,] and expand[ing]' the economy." *Consumers' Rsch.*, 145 S. Ct. at 2503 (quoting *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 521–522, 541–542 (1935)). "The law thus gave the President 'virtually unfettered' authority to govern the Nation's trades and industries." *Consumers' Rsch.*, 145 S. Ct. at 2503 (quoting *A.L.A. Schechter,* 295 U.S. at 542). Here, to the extent Congress intended to delegate near boundless authority to impose global tariffs by executive fiat, then it too "imposed 'few restrictions' and 'set[ ] up no standards' aside from" the general

goals of "deal[ing]with any unusual and extraordinary [foreign threat]" to "national security, foreign policy, or [the U.S.] economy." *Consumers' Rsch.*, 145 S. Ct. at 2503; 50 U.S.C. § 1701. Like the delegation found unconstitutional in *A.L.A. Schechter*, the President's view of IEEPA's delegation of authority would give him "virtually unfettered authority to govern" global "trade and industries."[15] *Consumers' Rsch.*, 145 S. Ct. at 2503 (quoting *A.L.A. Schecter*, 295 U.S. at 542. As in *A.L.A. Schechter*, a delegation of near boundless authority to the President to impose tariffs must be unconstitutional as well. Again, if this would not suffice to trigger the nondelegation doctrine, no other example could.

However, "it is 'a well-established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case.'" *Bond v. United States*, 572 U.S. 844, 855 (2014). This is easily achieved here. Consistent with the determinations of all other courts to reach the merits of this question, the Court should determine that IEEPA does not delegate authority to the President to impose the Challenged Tariffs. *V.O.S. Selections, Inc.,* 772 F. Supp. 3d 1350; *Learning Res., Inc.*, 2025 WL 1525376. In addition to being well-supported, this

---

[15] Compare this asserted limitless delegation with the detailed restrictions and standards Congress set forth in the many statutes that *expressly* delegate tariffing authority to the President. Appellees' Br. at 4.

would avoid a broader holding that the authority the President claims IEEPA confers

is an unconstitutional delegation of legislative authority to the executive branch.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be

affirmed.

Dated: July 30, 2025                         Respectfully submitted,


                                             */s/ Amit Agarwal*
                                             Amit Agarwal (D.C. Bar No. 90002013)
                                             Jane P. Bentrott* (D.C. Bar No. 1029681)
                                             PROTECT DEMOCRACY PROJECT
                                             2020 Pennsylvania Ave NW #163
                                             Washington, DC 20006
                                             Telephone: (202) 579-4582
                                             amit.agarwal@protectdemocracy.org
                                             jane.bentrott@protectdemocracy.org

                                             *Counsel for Amicus Curiae*

                                             *Admission pending

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rule of Appellate Procedure 32(g), that the attached amicus brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,450 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

I further certify, pursuant to Federal Rule of Appellate Procedure 32(g), that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point Times New Roman font.

Dated: July 30, 2025                    Respectfully submitted,

                                        */s/ Amit Agarwal*
                                        Amit Agarwal
                                        PROTECT DEMOCRACY PROJECT
                                        2020 Pennsylvania Ave NW #163
                                        Washington, DC 20006
                                        Telephone: (202) 579-4582
                                        amit.agarwal@protectdemocracy.org

                                        *Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on July 30, 2025, I caused the foregoing document to be electronically filed using the Court's CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the Court's CM/ECF system.

Dated: July 30, 2025                    Respectfully submitted,


*/s/ Amit Agarwal*
Amit Agarwal
*Counsel for Amicus Curiae*