# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

LEARNING RESOURCES, INC.; HAND2MIND, INC.,
*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, IN HIS OFFICIAL CAPACITY; KRISTI NOEM, SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY, IN HER OFFICIAL CAPACITY; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; SCOTT BESSENT, SECRETARY OF THE TREASURY, IN HIS OFFICIAL CAPACITY; UNITED STATES DEPARTMENT OF THE TREASURY; HOWARD W. LUTNICK, SECRETARY OF COMMERCE, IN HIS OFFICIAL CAPACITY; UNITED STATES DEPARTMENT OF COMMERCE; RODNEY S. SCOTT, COMMISSIONER OF CUSTOMS & BORDER PROTECTION, IN HIS OFFICIAL CAPACITY; UNITED STATES CUSTOMS AND BORDER PROTECTION; JAMIESON GREER, U.S. TRADE REPRESENTATIVE, IN HIS OFFICIAL CAPACITY; OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE,
*Defendants-Appellants.*

On Appeal from the United States District Court for the
District of Columbia, No. 25-cv-01248-RC

## BRIEF OF AMICUS CURIAE WENTONG ZHENG
## IN SUPPORT OF PLAINTIFFS-APPELLEES

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

JUL 28 2025

RECEIVED

Wentong Zheng
University of Florida Research
Foundation Professor
UNIVERSITY OF FLORIDA LEVIN
COLLEGE OF LAW
309 Village Drive
Gainesville, FL 32611
(352) 273-0936
wtzheng@law.ufl.edu

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... iii
IDENTITY AND INTEREST OF *AMICUS CURIAE* ............................................. 1
SUMMARY OF ARGUMENT ......................................................................... 1
ARGUMENT .................................................................................................. 2
   1. Although Invoking IEEPA in Imposing the Reciprocal Tariffs, the President is Actually Proclaiming Tariff Modifications for the Purpose of Entering into Market-Opening Trade Agreements ................................................................. 2
   2. Congress Specifically Authorized the President to Proclaim Tariff Modifications When Entering into Market-Opening Trade Agreements, But That Authorization Last Expired on July 1, 2021 ........................................................... 3
   3. IEEPA Should Not be Interpreted to Allow the President to Do What Congress has Unambiguously Disallowed the President to Do When It Allowed the President's Tariff Proclamation Authority to Expire ........................................ 8
CONCLUSION ............................................................................................. 11

# TABLE OF AUTHORITIES

**CONSTITUTION AND STATUTES:**

U.S. CONST.
   art. I, § 8, cl. 1............................................................................................8

19 U.S.C.
   § 1351(a)(1) ...........................................................................................4
   § 1351(a)(1)(B) ..................................................................................... 4
   § 4202 ....................................................................................................7
   § 4202(a)(1)........................................................................................... 7
   § 4202(a)(3).......................................................................................... 8

Reciprocal Trade Agreements Act, Pub. L. No. 73-316, 48 Stat. 943, 943
(1934)..........................................................................................................4, 5

Trade Act of 1974, Pub. L. No. 93-618,

   §§ 101(a), 88 Stat. 1978, 1982 (1975) ........................................................ 6

   §§ 101-102, 88 Stat. 1978, 1982-84 (1975) ................................................ 6

   § 124(d), 88 Stat. 1978, 1990 (1975) ...........................................................6

Bipartisan Comprehensive Trade Priorities and Accountability Act of 2015,
Pub. L. No. 114-26,

   § 103, 129 Stat. 319, 333-37 (2015) .......................................................... 7

   § 103(a), 129 Stat. 319, 333 (2015) ............................................................6

Joint Resolution of March 1, 1937, Pub. Res. No. 75-10, 50 Stat. 24, 24
(1937)..............................................................................................................5

Joint Resolution of April 12, 1940, Pub. Res. No. 76-61, 54 Stat. 107, 107
(1940)..............................................................................................................5

Joint Resolution of June 7, 1943, Pub. L. 78-66, 57 Stat. 125, 125 (1943).......5

Act of July 5, 1945, Pub. L. 79-130, 59 Stat. 410, 410 (1945).....................5

Trade Agreements Extension Act of 1949, Pub. L. No. 81-307, § 3, 63 Stat.

697, 698 (1949)...................................................................................5

Trade Agreements Extension Act of 1951, Pub. L. No. 82-50, § 2, 65 Stat. 72, 72 (1951) ..................................................................................................5

Trade Agreements Extension Act of 1953, Pub. L. No. 83-215, § 101, 67 Stat. 472, 472 (1953) ......................................................................................5

Act of July 1, 1954, Pub. L. No. 83-464, 68 Stat. 360, 360 (1954) ...............5

Trade Agreements Extension Act of 1955, Pub. L. No. 84-86, § 2, 69 Stat. 162, 162 (1955) ..............................................................................................5

Trade Agreements Extension Act of 1958, Pub. L. No. 85-686, § 2, 72 Stat. 673, 673 (1958) ..............................................................................................5

Trade Expansion Act of 1962, Pub. L. No. 87-794, § 201(a), 76 Stat. 872, 872 (1962) ..................................................................................................5

Trade Agreements Act of 1979, Pub. L. No. 96-39, § 1101, 93 Stat. 144, 307 (1979) ..............................................................................................6

The Trade and Tariff Act of 1984, Pub. L. No. 98-573, § 401, 98 Stat. 2948, 3013-15 (1984) ..............................................................................................6

Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 1102(a), 102 Stat. 1107, 1126 (1988) .................................................6

Act of July 2, 1993, Pub. L. 103-49, § 1, 107 Stat. 239, 239 (1993) ..............6

Trade Act of 2002, Pub. L. 107-210, § 2103(a), 116 Stat. 933, 1004 (2002).....6

**OTHER AUTHORITIES:**

Post by Donald J. Trump, Truth Social (July 23, 2023, 9:36 AM).................3

Exec. Order No. 14,195, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,121 (Feb. 1, 2025) ...........................................................................................11

Exec. Order No. 14,228, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11,463 (Mar. 3, 2025) ...........................................................................................11

Exec. Order No. 14,257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 2, 2025).......................2-3

H.R. Rep. No. 98-1156 (1984) (Conf. Rep.) ……………………………………...9

Congressional Research Service, Trade Promotion Authority (TPA) and the Role of Congress in Trade Policy (2015) …………………………………………8

# IDENTITY AND INTEREST OF *AMICUS CURIAE*

*Amicus curiae* Wentong Zheng is a University of Florida Research Foundation Professor at the University of Florida Levin College of Law. *Amicus* has dedicated his life to teaching and research in international trade law, international business transactions, antitrust and competition policy, international intellectual property, and commercial law. As a legal scholar, *Amicus* has an interest in ensuring that the laws of the United States are accurately presented and analyzed in this case. *Amicus* does not appear in this case to support or oppose any particular trade policy. This brief is in support of Plaintiffs-Appellees only because the legal analyses presented in this brief lead to that outcome. The views expressed in this brief are *Amicus*'s own, and do not reflect the views of the University of Florida Levin College of Law or the University of Florida.

*Amicus* is filing this brief by a motion for leave of the Court. No parties' counsel authored the brief. Nor did any party or party's counsel or any other person contribute money that was intended to fund preparing or submitting the brief.

# SUMMARY OF ARGUMENT

When imposing the "reciprocal" tariffs set forth in Executive Order 14,257, the President is negotiating and entering foreign trade agreements for the purpose of

1

opening foreign markets for U.S. products. Since 1934, Congress specifically granted the President the authority to "proclaim" tariff modifications without congressional approval when entering into market-opening trade agreements, but that authority last expired on July 1, 2021. The power to set tariffs in the context of market-opening trade agreements was reverted to Congress after that date. Regardless of whether the power to "regulate" under the International Emergency Economic Powers Act of 1977 ("IEEPA") encompasses the power to set tariffs, that power, which is ambiguous, should not be interpreted to allow the President to do what Congress has unambiguously disallowed the President to do when it allowed the President's tariff proclamation authority to expire.

## ARGUMENT

### 1. Although Invoking IEEPA in Imposing the Reciprocal Tariffs, the President is Actually Proclaiming Tariff Modifications for the Purpose of Entering into Market-Opening Trade Agreements

When imposing the "reciprocal" or "Liberation Day" tariffs on April 2, 2025, the President declared a national emergency with respect to "large and persistent annual U.S. goods trade deficits," and identified the causes of that national emergency as "a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption." Exec. Order No. 14,257, Regulating

2

Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits, 90 Fed. Reg. 15,041, 15,041 (Apr. 2, 2025). The President made it clear that the purpose of the reciprocal tariffs was to "rectify" those unfair practices. Subsequently, the President has stated on various occasions that the reciprocal tariffs are about opening up foreign markets to U.S. goods. For example, on July 23, 2025, after announcing a trade deal with Japan, the President stated in a post on Truth Social that "I WILL ONLY LOWER TARIFFS IF A COUNTRY AGREES TO OPEN ITS MARKET. IF NOT, MUCH HIGHER TARIFFS! Japan's Markets are now OPEN (for the first time ever!) USA BUSINESS WILL BOOM!" President Donald J. Trump, Truth Social (Jul. 23, 2025, 9:36 AM) (caps original).

It is clear, therefore, that the President is aiming to negotiate market-opening trade agreements with foreign trading partners through the reciprocal tariffs. Indeed, the President suspended most of the reciprocal tariffs for 90 days to allow for such negotiations. Such negotiations did lead to preliminary trade agreements with several countries, including the United Kingdom, Vietnam, Indonesia, and Japan. The President has also sent many countries "tariff letters," in which the United States unilaterally set the tariffs for imports from those countries.

**2.  Congress Specifically Authorized the President to Proclaim Tariff Modifications When Entering into Market-Opening Trade Agreements, But That Authorization Last Expired on July 1, 2021**

3

What the President is doing through the reciprocal tariffs is precisely what Congress contemplated when it authorized the President to "proclaim" modifications of tariffs when entering into market-opening foreign trade agreements. Congress granted this authorization for the vast majority of the years since 1934, but that authorization last expired in 2021.

Congress first granted the President the tariff proclamation authority under the Reciprocal Trade Agreements Act of 1934 ("RTAA"). The RTAA authorized the President to enter into foreign trade agreements "[f]or the purpose of expanding foreign markets for the products of the United States . . . by regulating the admission of foreign goods into the United States . . . ." Reciprocal Trade Agreements Act, Pub. L. No. 73-316, 48 Stat. 943, 943 (1934), 19 U.S.C. § 1351(a)(1). In entering into such foreign trade agreements, the President was authorized to "proclaim such modifications of existing duties and other import restrictions . . . as are required or appropriate to carry out any foreign trade agreement that the President has entered into hereunder." 48 Stat. at 943, 19 U.S.C. § 1351(a)(1)(B). The tariffs thus modified, however, had to stay within a predefined range, which, under the RTAA, was no more and no less than fifty percent of any rate of duty existing on June 12, 1934. See 48 Stat. at 943-44.

Since 1934, Congress renewed the President's tariff proclamation authority

4

almost continuously, except for several gap periods in which the authority was allowed to expire. The table below compiles a list of all congressional grants of the President's tariff proclamation authority.

**Table. The President's Tariff Proclamation Authority as Authorized by Congress**

(Source: compilation by *Amicus* from federal statutes at large)

| Time Period | Authorizing Statute |
|---|---|
| June 12, 1934 to June 12, 1937 | Act of June 12, 1934 (Reciprocal Trade Agreements Act of 1934), Pub. L. No. 73-316, 48 Stat. 943, 943 (1934) |
| June 12, 1937 to June 12, 1940 | Joint Resolution of March 1, 1937, Pub. Res. No. 75-10, 50 Stat. 24, 24 (1937) |
| June 12, 1940 to June 12, 1943 | Joint Resolution of April 12, 1940, Pub. Res. No. 76-61, 54 Stat. 107, 107 (1940) |
| June 12, 1943 to June 12, 1945 | Joint Resolution of June 7, 1943, Pub. L. 78-66, 57 Stat. 125, 125 (1943) |
| June 12, 1945 to June 12, 1948 | Act of July 5, 1945, Pub. L. 79-130, 59 Stat. 410, 410 (1945) |
| June 12, 1948 to June 12, 1951 | Trade Agreements Extension Act of 1949, Pub. L. No. 81-307, § 3, 63 Stat. 697, 698 (1949) |
| June 12, 1951 to June 12, 1953 | Trade Agreements Extension Act of 1951, Pub. L. No. 82-50, § 2, 65 Stat. 72, 72 (1951) |
| June 12, 1953 to June 12, 1954 | Trade Agreements Extension Act of 1953, Pub. L. No. 83-215, § 101, 67 Stat. 472, 472 (1953) |
| June 12, 1954 to June 12, 1955 | Act of July 1, 1954, Pub. L. No. 83-464, 68 Stat. 360, 360 (1954) |
| June 12, 1955 to June 30, 1958 | Trade Agreements Extension Act of 1955, Pub. L. No. 84-86, § 2, 69 Stat. 162, 162 (1955) |
| June 30, 1958 to June 30, 1962 | Trade Agreements Extension Act of 1958, Pub. L. No. 85-686, § 2, 72 Stat. 673, 673 (1958) |
| June 30, 1962 to July 1, 1967 | Trade Expansion Act of 1962, Pub. L. No. 87-794, § 201(a), 76 Stat. 872, 872 (1962) |
| July 1, 1967 to January 3, 1975 | **No authorization** |

5

| January 3, 1975 to January 3, 1980 | Trade Act of 1974, Pub. L. No. 93-618, § 101(a), 88 Stat. 1978, 1982 (1975) |
|---|---|
| January 3, 1980 to January 3, 1982 | Trade Act of 1974, Pub. L. No. 93-618, § 124(d), 88 Stat. 1978, 1990 (1975) (residual authority) |
| January 3, 1982 to January 3, 1988 | **No authorization.** 1) The Trade Agreements Act of 1979, Pub. L. No. 96-39, § 1101, 93 Stat. 144, 307 (1979) only renewed the President's fast-track authority on nontariff agreements, but not the authority to proclaim tariff modifications. 2) The Trade and Tariff Act of 1984, Pub. L. No. 98-573, § 401, 98 Stat. 2948, 3013-15 (1984) authorized the President to submit tariff modifications to Congress for expedited approval under fast-track procedures. |
| January 3, 1988 to August 23, 1988 | **No authorization** |
| August 23, 1988 to June 1, 1993 | Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 1102(a), 102 Stat. 1107, 1126 (1988) |
| June 1, 1993 to April 16, 1994 | Act of July 2, 1993, Pub. L. 103-49, § 1, 107 Stat. 239, 239 (1993), but only for Uruguay Round agreements. |
| April 16, 1994 to August 6, 2002 | **No authorization** |
| August 6, 2002 to June 1, 2007 | Trade Act of 2002, Pub. L. 107-210, § 2103(a), 116 Stat. 933, 1004 (2002) |
| June 1, 2007 to June 29, 2015 | **No authorization** |
| June 29, 2015 to July 1, 2021 | Bipartisan Comprehensive Trade Priorities and Accountability Act of 2015, Pub. L. No. 114-26, § 103(a), 129 Stat. 319, 333 (2015) |
| July 1, 2021 to present | **No authorization** |

Starting with the Trade Act of 1974, Congress began granting the President not only the tariff proclamation authority, but also the authority to submit agreements on nontariff barriers for expedited approval under "Fast Track" procedures. See Trade Act of 1974, Pub. L. No. 93-618, §§ 101-102, 88 Stat. 1978, 1982-84 (1975).

6

The last time Congress granted the two authorities concurrently was in the Bipartisan Comprehensive Trade Priorities and Accountability Act of 2015 ("BCTPA"). Pub. L. No. 114-26, § 103, 129 Stat. 319, 333-37 (2015), 19 U.S.C. § 4202. As for the tariff proclamation authority, Section 103(a)(1) of the BCTPA provides, in relevant part:

> "Whenever the President determines that one or more existing duties or other import restrictions of any foreign country or the United States are unduly burdening and restricting the foreign trade of the United States and that the purposes, policies, priorities, and objectives of this chapter will be promoted thereby, the President—
> (A) may enter into trade agreements with foreign countries before—
> (i) July 1, 2018; or
> (ii) July 1, 2021, if trade authorities procedures are extended under subsection (c); and
> (B) may, subject to paragraphs (2) and (3), proclaim—
> (i) such modification or continuance of any existing duty,
> (ii) such continuance of existing duty free or excise treatment, or
> (iii) such additional duties,
> as the President determines to be required or appropriate to carry out any such trade agreement.
> . . ."
> 19 U.S.C. § 4202(a)(1).

As with previous authorizing statutes, the BTCPA authorized the President to proclaim tariff modifications only within a predefined range. Section 103(a)(3) of the BTCPA provides:

> "No proclamation may be made under paragraph (1) that—
> (A) reduces any rate of duty (other than a rate of duty that does not exceed 5 percent ad valorem on June 29, 2015) to a rate of duty which is

7

less than 50 percent of the rate of such duty that applies on June 29, 2015;

(B) reduces the rate of duty below that applicable under the Uruguay Round Agreements or a successor agreement, on any import sensitive agricultural product; or

(C) Increases any rate of duty above the rate that applied on June 29, 2015.

19 U.S.C. § 4202(a)(3).

By its terms, the BCTPA expired on July 1, 2021. While much attention has been paid to the expiration of the President's fast-track authority on nontariff agreements, the expiration of the President's proclamation authority on tariffs is equally important from a legal perspective. However, the expiration of the President's tariff proclamation authority has been practically overlooked, in large part because trade negotiations since the conclusion of the GATT Kennedy Round (1963-1967) have been predominantly focused on nontariff barriers, rather than tariffs. See Congressional Research Service, Trade Promotion Authority (TPA) and the Role of Congress in Trade Policy (2015), at 3-4 ("[The GATT Kennedy Round was] the last round in which tariff reduction was the primary focus of trade negotiations.").

### 3. IEEPA Should Not be Interpreted to Allow the President to Do What Congress has Unambiguously Disallowed the President to Do When It Allowed the President's Tariff Proclamation Authority to Expire

The Constitution of the United States grants the power to set tariffs exclusively to Congress. U.S. CONST. art. I, § 8, cl. 1. For numerous times,

8

Congress delegated an authority to the President to proclaim changes to tariffs without congressional approval when entering into market-opening trade agreements. When this authority last expired on July 1, 2021, the power to set tariffs in such contexts was reverted to Congress. Any modifications of tariffs made by the President for the purpose of entering into market-opening trade agreements will need to be approved by Congress before taking effect.

Congress itself agreed with the above conclusion. In 1984, for example, when Congress was considering extending the President's tariff proclamation authority after such authority last expired in 1982 (see the above Table), the conference committee for the legislation described the "present law" as follows:

> "The President has no authority to proclaim tariff reductions, increases, or modifications. The President's basic tariff negotiating authority, set forth in section 101 of the Trade Act of 1974 expired in 1979; more limited "residual" authority, contained in section 124 of the Act expired in 1982."

H.R. Rep. No. 98-1156 (1984) (Conf. Rep.), at 151.

Therefore, unless the President could invoke an alternative authority, the President is without legal authority to impose the reciprocal tariffs set forth in Executive Order 14,257. Much of the current case is about the question of whether IEEPA supplies such an alternative authority. The district court below, as well as parties and other Amici in this appeal, have extensively discussed whether the power

9

to "regulate" under IEEPA encompasses the power to set tariffs. There are plausible arguments on both sides on this question, on which *Amicus* does not attempt to opine.

However, what is clear is that IEEPA is an ambiguous statute. An ambiguous statute should not be interpreted to allow the President to do what Congress has unambiguously disallowed the President to do under other statutes regulating the very same presidential action. If the President were allowed to use IEEPA to set tariffs without congressional approval for the purpose of entering into market-opening trade agreements, it would deny any legal effect to the fact that Congress allowed precisely the same authority to expire on July 1, 2021.

One remaining question is whether the fact that the reciprocal tariffs for some countries have yet to result in a trade agreement carries any legal significance. It could be argued that when the President send "tariff letters" that unilaterally set the tariffs, the tariff proclamation authority—and its expiration—would be inapplicable because the President is not "entering into" a trade agreement. Such a distinction, however, is artificial. The recipient countries of the tariff letters will have "agreed" to the tariffs set in the letters, unless they take retaliatory action. But it makes no sense to judge the legality of the reciprocal tariffs solely based on whether a foreign nation retaliates. A better approach, therefore, is to treat all reciprocal tariffs the same way as long as they are imposed for the purpose of entering into a trade agreement, whether or not they indeed result in a trade agreement.

## CONCLUSION

Regardless of whether the power to "regulate" under IEEPA encompasses the power to impose tariffs, that power should not be interpreted to allow the President to impose the reciprocal tariffs set forth in Executive Order 14,257 for the purpose of entering into market-opening trade agreements.

*Amicus* acknowledges that the analyses presented in this brief are inapplicable to the "trafficking" or "fentanyl" tariffs set forth in Executive Orders 14,195 and 14,228, whereby any trade agreements that might result from such tariffs would allegedly not be for the purpose of opening foreign markets for U.S. products.

Respectfully submitted,

/s/ Wentong Zheng

Wentong Zheng
University of Florida Research
Foundation Professor
UNIVERSITY OF FLORIDA LEVIN
COLLEGE OF LAW
309 Village Drive
Gainesville, FL 32611
(352) 273-0936
wtzheng@law.ufl.edu

Dated: July 25, 2025

## CERTIFICATE OF COMPLIANCE

The foregoing brief is in 14-point Times New Roman proportional font and contains 2,618 words (excluding exempt content), and thus complies with Federal Rule of Appellate Procedure 32(a) and Circuit Rule 32(e)(1).

Dated: July 25, 2025

Wentong Zheng

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing brief with the Clerk of the Court, who will serve all parties using the CM/ECF system.

Wentong Zheng