**[ORAL ARGUMENT SET FOR SEPTEMBER 30, 2025]**

**No. 25-5202**

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

LEARNING RESOURCES, INC., and HAND2MIND, INC.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,

Defendants-Appellants.

————————————

On Appeal from the United States District Court
for the District of Columbia

————————————

**REPLY BRIEF FOR APPELLANTS**

————————————

D. JOHN SAUER
  *Solicitor General*

BRETT A. SHUMATE
  *Assistant Attorney General*
  *Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2217*

# TABLE OF CONTENTS

**Page**

GLOSSARY ............................................................................................. ii

TABLE OF AUTHORITIES .................................................................. iii

INTRODUCTION ................................................................................... 1

ARGUMENT ........................................................................................... 4

I.   The District Court Lacked Jurisdiction ...................................... 4

    A.   This Case "Arises Out Of" The HTSUS ......................................5

    B.   The HTSUS Is A "Law … Providing For … Tariffs" Or For "Administration And Enforcement With Respect To" Tariffs..........................................................................................11

    C.   Deference To The CIT Is Appropriate .........................................12

II.  IEEPA Clearly Authorizes The Challenged Tariffs ............................. 13

III. The District Court Erred In Entering Injunctive Relief ....................... 28

CONCLUSION ...................................................................................... 32

CERTIFICATE OF COMPLIANCE

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| CIT | Court of International Trade |
| HTSUS | Harmonized Tariff Schedule of the United States |
| IEEPA | International Emergency Economic Powers Act |
| TWEA | Trading With the Enemy Act |

## TABLE OF AUTHORITIES

**Cases:**                                                                      **Page(s)**

*Alcan Sales, Div. of Alcan Aluminum Corp.  v. United States*,
   693 F.2d 1089 (Fed. Cir. 1982) ..........................................................................10

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*,
   63 F.4th 25 (Fed. Cir. 2023) ...............................................................................14

*Cuomo v. U.S. Nuclear Regulatory Comm'n*,
   772 F.2d 972 (D.C. Cir. 1985) ............................................................................31

*DSE, Inc. v. United States*,
   169 F.3d 21 (D.C. Cir. 1999) ..............................................................................32

*Eli Lilly & Co. v. Medtronic, Inc.*,
   496 U.S. 661 (1990) ....................................................................................... 9, 12

*FCC v. Consumers' Rsch.*,
   145 S. Ct. 1482 (2025) ............................................................................ 25, 27, 28

*Federal Energy Admin. v. Algonquin SNG, Inc.*,
   426 U.S. 548 (1976) ............................................................................... 14, 16

*Florsheim Shoe Co. v. United States*,
   744 F.2d 787 (Fed. Cir. 1984) ............................................................................27

*Garland v. Aleman Gonzalez*,
   596 U.S. 543 (2022) .............................................................................................10

*Gibbons v. Ogden*,
   22 U.S. (9 Wheat.) 1 (1824) .......................................................... 2, 14, 15, 17

*Hansson v. Norton*,
   411 F.3d 231 (D.C. Cir. 2005) ..............................................................................8

*Helsinn Healthcare S.A. v. Teva Pharm. USA, Inc.*,
   586 U.S. 123 (2019) .............................................................................................15

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
    333 F.3d 156 (D.C. Cir. 2003) ........................................................21

*International Labor Rights Fund v. Bush*,
    357 F. Supp. 2d 204 (D.D.C. 2004) ...................................................6

*Miami Free Zone Corp. v. Foreign Trade Zones Bd.*,
    220 F.3d 1110 (D.C. Cir. 1994) .......................................................12

*Real v. Simon*,
    510 F.2d 557 (5th Cir. 1975) ...........................................................21

*Regan v. Wald*,
    468 U.S. 222 (1984) ............................................................... 24, 26

*SCM Corp. v. U.S. Int'l Trade Comm'n*,
    549 F.2d 812 (D.C. Cir. 1977) .........................................................13

*United States v. Amirnazmi*,
    645 F.3d 564 (3d Cir. 2011) ............................................................23

*United States v. Curtiss-Wright Exp. Corp.*,
    299 U.S. 304 (1936) ........................................................................27

*United States v. Shih*,
    73 F.4th 1077 (9th Cir. 2023), *cert. denied*,
    144 S. Ct. 820 (2024) ......................................................................28

*United States v. Yoshida Int'l, Inc.*,
    526 F.2d 560 (C.C.P.A. 1975) ............................... 2, 14, 18, 22, 24, 25

*Utility Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014) ........................................................................26

*West Virginia Univ. Hosps., Inc. v. Casey*,
    499 U.S. 83 (1991) ..........................................................................17

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................................29

*Yoshida Int'l, Inc. v. United States*,
　　378 F. Supp. 1155 (Cust. Ct. 1974), *rev'd*,
　　526 F.2d 560 (C.C.P.A. 1975) ........................................................................22


**U.S. Constitution:**

Art. I, § 9, cl. 5 ........................................................................16


**Statutes:**

Administrative Procedure Act:
　　5 U.S.C. § 706 ........................................................................9

International Emergency Economic Powers Act (IEEPA):
　　50 U.S.C. § 1701(a) ........................................................................28
　　50 U.S.C. § 1702 ........................................................................23
　　50 U.S.C. § 1702(a)(1)(B) ........................................ 2, 10, 12, 14, 15, 16, 17, 20
　　50 U.S.C. § 1702(b) ........................................................................28

Trade Act of 1974:
　　19 U.S.C. § 2132(a) ........................................................................14
　　19 U.S.C. § 2483 ........................................................................12

19 U.S.C. § 3004(c)(1) ........................................................................11

28 U.S.C. § 1581(i)(1) ........................................................................5, 7

28 U.S.C. § 1581(i)(1)(B) ........................................................ 1, 4-5, 11, 12

28 U.S.C. § 1581(i)(1)(D) ........................................................ 1, 4-5, 11

**Rule:**

Fed. R. Civ. P. 65(c) ...............................................................................31

**Legislative Material:**

S. Rep. No. 93-1298 (1974) ........................................................ 19, 22, 23

**Other Authorities:**

Ceramic Tile From India: Countervailing Duty Order,
     90 Fed. Reg. 25,234 (June 16, 2025) .................................................19

Order, *V.O.S. Selections, Inc. v. United States*,
     No. 25-cv-66, (Ct. Int'l Trade June 3, 2025), Dkt. 63 ....................................5

Proclamation No. 10,962,
     Adjusting Imports of Copper Into the United States,
     90 Fed. Reg. 37,727 (Aug. 5, 2025) .................................................19

*Regulate*, Black's Law Dictionary 1156 (5th ed. 1979) .....................................13

*Special Message to the Congress Proposing Trade Reform Legislation*,
     Pub. Papers 258 (Apr. 10, 1973),
     *available at* https://perma.cc/7DL3-6CEX ..................................................23

11A Wright & Miller's *Federal Practice & Procedure*
     § 2948.1 (3d. ed.), Westlaw (database updated May 21, 2025) ...................31

## INTRODUCTION

Plaintiffs here challenge tariffs embodied in the Harmonized Tariff Schedule of the United States (HTSUS) as a result of Presidential orders that either directly modified the HTSUS or directed modifications to the HTSUS. Plaintiffs' central contention is that the tariff rates reflected in the HTSUS are unlawfully high. That is precisely the sort of case "aris[ing] out of" a "law of the United States providing for … tariffs" or for "administration and enforcement with respect to" tariffs, 28 U.S.C. § 1581(i)(1)(B), (D), that Congress has routed to the exclusive jurisdiction of the Court of International Trade (CIT), a specialized court with exclusive national jurisdiction over tariff matters. The CIT has made clear that it, not the district court, has exclusive jurisdiction over challenges indistinguishable from plaintiffs' suit here. And plaintiffs' contrary arguments ignore the role of the HTSUS, depend on a misreading of the authorities on which they rely, and ultimately collapse the jurisdictional and merits inquiries in this case in ways the Supreme Court has warned against.

The district court's lack of jurisdiction alone is a basis to vacate the preliminary injunction. But even if plaintiffs were correct that the jurisdictional inquiry turns on whether the International Emergency Economic

Powers Act (IEEPA) allows the President to impose tariffs, plaintiffs fail to justify the district court's injunction.  That statute allows the President to "regulate . . . importation" in response to a national emergency.  50 U.S.C. § 1702(a)(1)(B).  Not only are tariffs a well-settled way of "regulat[ing] commerce," *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 202 (1824), but also Congress imported that language into IEEPA shortly after the Federal Circuit's predecessor court held that the same phrase in an earlier statute authorized the imposition of tariffs by President Nixon, *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 576 (C.C.P.A. 1975).  Plaintiffs' textual arguments fail to make sense of this history.  Nor do the major-questions and nondelegation doctrines aid plaintiffs.  Congress routinely delegates tariff authority to the President to augment his inherent powers over foreign affairs and national security, and the Supreme Court has recognized that broad delegations in that sphere are the norm, not the exception.  IEEPA falls well within that tradition.

Finally, the district court erred in entering a preliminary injunction in any event.  The emergencies declared here address the foreign practices that have contributed to America's exploding trade deficit and the implications of that deficit for our economy and national security, as well as a fentanyl

USCA Case #25-5202    Document #2130706    Filed: 08/18/2025    Page 10 of 40


crisis that has claimed thousands of American lives. Those tariffs have led to the adoption of general terms for a new trade agreement with the United Kingdom, as well as trade deals with the 27-nation European Union, Japan, Indonesia, and the Philippines. Many of these deals include provisions for economic benefits that go beyond tariffs—for example, the EU deal includes nearly $1.3 trillion of energy purchases and investment in the United States. The tariffs have also spurred ongoing, highly sensitive negotiations with numerous trading partners. The government has explained—and the district court itself recognized in granting a stay—the severe harms that would result from enjoining the tariffs at this sensitive juncture, and those same considerations tilt the balance against injunctive relief here, particularly given the availability of refunds of tariffs paid in the event plaintiffs ultimately prevail.

As the Solicitor General has emphasized in a related case, "[s]uddenly revoking the President's tariff authority under IEEPA would have catastrophic consequences for our national security, foreign policy, and economy." Doc. 154, *V.O.S. Selections v. Trump*, No. 25-1812 (Fed. Cir. filed Aug. 11, 2025). "Other tariff authorities that the President could potentially use are short-term, not nearly as powerful, and would render America captive

to the abuses that it has endured from far more aggressive countries." *Id.* "There is no substitute for the tariffs and deals that President Trump has made." *Id.* As President Trump has made clear, "because of the trillions of dollars being paid by countries that have so badly abused us, America is a strong, financially viable, respected country again." *Id.* "If the United States were forced to unwind these historic agreements, the President believes that a forced dissolution of the agreements could lead to a 1929-style result." *Id.* In the President's judgment, "the economic consequences would be ruinous, instead of unprecedented success." *Id.* In their response to this filing, the plaintiffs in that case did not dispute that they are likely to lose that USA-saving tariff case; that a negative ruling for the government would have destructive consequences for America; and that no court would want, or should have, that responsibility. Doc. 155, *V.O.S.*, *supra* (Fed. Cir. filed Aug. 12, 2025).

## ARGUMENT

### I.    The District Court Lacked Jurisdiction

The CIT had and has exclusive jurisdiction over this case because plaintiffs' challenge "arises out of" a "law of the United States providing for … tariffs" or for "administration and enforcement with respect to" tariffs, 28

U.S.C. § 1581(i)(1)(B), (D), namely the HTSUS and the President's modifications to it in the challenged executive orders.

## A.    This Case "Arises Out Of" The HTSUS

1.    Plaintiffs assert (Br. 20) that "the phrase 'arises out of' refers to the 'substantive law' that gives rise to [their] claims."  We agree.  This case falls within the CIT's exclusive jurisdiction because the HTSUS *is* the substantive law that plaintiffs challenge.  The gravamen of plaintiffs' claim is that because of the "revisions to the HTSUS" effected by the President's executive orders, they "must pay additional tariffs" that they believe are unlawful.  JA19; *see* JA51-53.  And plaintiffs seek a declaration that those revisions "are unlawful," as well as an injunction against their enforcement, JA35-36; JA41; JA43, and an order "set[ting] aside" the revisions, JA41; JA43; JA45.  In short, this is a challenge to revisions to the HTSUS, and thus "arises out of," 28 U.S.C. § 1581(i)(1), the HTSUS.  That is what the CIT concluded in a parallel case.  *See* Order at 3, *V.O.S. Selections, Inc. v. United States*, No. 25-cv-66, (Ct. Int'l Trade June 3, 2025), Dkt. 63.

In a single sentence, plaintiffs offer three reasons why "this case does not 'arise[] out of' the HTSUS or any modification to it," contending that "[t]he HTSUS [1] does not provide the substantive law of this case, [2] does

not create Plaintiffs' causes of action, and [3] does not require any interpretation for a court to decide" this case.  Br. 25.  Those arguments all miss the mark.

Start with plaintiffs' theory that only IEEPA, and not the HTSUS, "provide[s] the substantive law of this case" (Br. 25).  As noted above, we agree that a case "'arises out of' … the 'substantive law' that gives rise to [the] claims" (Br. 20).  But plaintiffs misunderstand the meaning of the phrase "substantive law," as used in *International Labor Rights Fund v. Bush*, 357 F. Supp. 2d 204 (D.D.C. 2004), upon which plaintiffs rely.  There, the plaintiffs argued that a challenge to actions taken under Section 307 of the Tariff Act of 1930 fell within the district court's jurisdiction because it was "'not unlike countless [Administrative Procedure Act (APA)] cases brought … in the District Court.'"  *Id.* at 208.  The district court rejected that argument, explaining that "the substantive law giving rise to" the claims was "Section 307," not the APA.  *Id.*  Thus, by "substantive law," the court simply meant the law causing the plaintiffs' substantive injury, as opposed to a law—like the APA—that provides a general cause of action substantively unrelated to the subject matter of the litigation.

- 6 -

So understood, the phrase "substantive law" plainly encompasses the HTSUS and the challenged modifications to it. The HTSUS, as modified, is the substantive source of plaintiffs' asserted injury. IEEPA may *also* be "substantive law" from which this case arises, because IEEPA is the authority for the challenged modifications to the HTSUS. But a case need not arise from only one law, and the CIT's exclusive jurisdiction encompasses cases that "arise[] out of *any* law" of the relevant type. 28 U.S.C. § 1581(i)(1) (emphasis added).

Plaintiffs' next suggestion—that "this case does not 'arise[] out of' the HTSUS" because the HTSUS "does not create Plaintiffs' causes of action"—underscores the incoherence of their argument, because it directly contradicts their theory that cases "'arise[] out of' … the 'substantive law' that gives rise to [the] claims." As discussed, *International Labor Rights Fund* expressly contrasts the substantive law creating the plaintiffs' injury (Section 307) from the cause of action they were invoking (the APA). Moreover, we are unaware of *any* "law … providing for … tariffs" or for "administration and enforcement with respect to" tariffs that itself creates a cause of action to challenge the tariffs' legality—including IEEPA, from which plaintiffs seem to

think this case arises.  So if the HTSUS must supply a cause of action for this case to "arise[] out of" it, § 1581(i)(1) would be a dead letter.

Plaintiffs' final theory—that "this case does not 'arise[] out of' the HTSUS" because the HTSUS "does not require any interpretation" (Br. 25)—only compounds their confusion.  Plaintiffs describe the "requires … interpretation" standard, which they draw from *Hansson v. Norton*, 411 F.3d 231, 235 (D.C. Cir. 2005), as "shorthand for" the "inquiry" into "whether 'federal law creates the cause of action asserted'" in a case.  Br. 20.  But as discussed, plaintiffs' front-line theory that cases "'arise[] out of' … the 'substantive law' that gives rise to [the] claims" (Br. 20) conflicts with the premise that cases arise out of the law creating the cause of action.  And in any event, *Hansson*'s "requires … interpretation" language is not "[a] shorthand for" the "inquiry" into "whether 'federal law creates the cause of action asserted.'"  Br. 20.  Rather, *Hansson* parsed the line between district-court jurisdiction and Court of Federal Claims jurisdiction under the Tucker Act, explaining that actions to enforce settlement agreements generally belong in the Court of Federal Claims except when "enforcement of the agreement requires the interpretation and application of federal law."  411 F.3d at 235.  That holding is irrelevant here.

At bottom, the scattershot nature of plaintiffs' arguments reflects the flaws in introducing complexity into what should be an easy case:  This is a challenge to tariffs imposed under the HTSUS.  It follows that this case "arises out of" the HTSUS.  Any contrary conclusion strains the statutory text past the breaking point.

2.    Because this case "arises out of" the HTSUS, the Court need not address plaintiffs' argument that the CIT has exclusive jurisdiction because this case also "arises out of" IEEPA.  But plaintiffs' arguments on that point are also unpersuasive.

Plaintiffs suggest (Br. 21) that "if IEEPA is a law providing for tariffs, then *all* civil actions against the government arising out of IEEPA—whether involving tariffs or not—would have to be adjudicated in the CIT."  Plaintiffs' argument hinges on the incorrect premise that because § 1581(i)(1) refers to a "law of the United States," it must refer to IEEPA as a whole.  As the Supreme Court has explained, the "phrase 'a Federal law' can be used to refer" not just "to an entire Act" but "to an isolated statutory section," such as "the judicial review provision of the Administrative Procedure Act, 5 U.S.C. § 706."  *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 666 (1990).  The same goes for "a law of the United States."  For purposes of § 1581(i)(1), the

"law providing for tariffs" is not IEEPA as a whole but its provision for the President to "regulate … importation," 50 U.S.C. § 1702(a)(1)(B).  District courts have jurisdiction over challenges to non-tariff actions under other parts of IEEPA.  *See Alcan Sales, Div. of Alcan Aluminum Corp.  v. United States*, 693 F.2d 1089, 1093 (Fed. Cir. 1982) (holding that only some challenges to actions under the Trading With the Enemy Act (TWEA) fell within the CIT's exclusive jurisdiction).

Plaintiffs' argument that it is "'common'" "for the jurisdictional and merits inquiries to overlap" (Br. 22) is likewise beside the point.  The Supreme Court acknowledged as much in *Garland v. Aleman Gonzalez*, 596 U.S. 543, 554 n.5 (2022), but still recognized that the "*complete*" conflation of jurisdiction and the merits under one interpretation of the relevant statute, *id.*, warrants avoiding that interpretation, *id.* at 554.  The same is true here.  Unlike the other statutes plaintiffs invoke (Br. 23), § 1581(i)(1) need not—and thus should not—be read to make the CIT's jurisdiction over a challenge to tariffs turn on the merits of that challenge.

**B.    The HTSUS Is A "Law … Providing For … Tariffs" Or For "Administration And Enforcement With Respect To" Tariffs**

Because this challenge to tariffs imposed by the HTSUS "arises out of" the HTSUS, the only remaining question for jurisdictional purposes is whether the HTSUS is a "law of the United States providing for … tariffs" or for "administration and enforcement with respect to" tariffs.  28 U.S.C. § 1581(i)(1)(B), (D).  The HTSUS, which prescribes tariffs on goods entering the country—and the President's modifications to which are "considered to be … law for all purposes," 19 U.S.C. § 3004(c)(1)—is a law providing for tariffs, as well as for administration and enforcement with respect to tariffs.

Plaintiffs emphasize that presidential modifications to the HTSUS are "considered to be statutory provisions of law" only if they are made "under authority of law (including section 604 of the Trade Act of 1974)," 19 U.S.C. § 3004(c)(1), and they suggest that the modifications here were not made "under authority of law" because (they contend) IEEPA does not authorize them.

Plaintiffs overlook Section 604, which authorizes the President to "embody in the [HTSUS] the substance of the relevant" statutory provisions governing tariffs "and of other *Acts affecting import treatment, and actions*

- 11 -

*thereunder*, including removal, modification, continuance, or imposition of any rate of duty or other import restriction." 19 U.S.C. § 2483 (emphasis added). Regardless of whether IEEPA is a law "providing for … tariffs," 28 U.S.C. § 1581(i)(1)(B), it is an "Act[] affecting import treatment." The use of the word "Act" is most naturally read to refer to the entire statute—as opposed to "law," which, as noted above, can also "refer to an isolated statutory section." *Eli Lilly*, 496 U.S. at 666-667 (contrasting "an isolated statutory section" with "an entire Act"). IEEPA as a whole certainly "affect[s] import treatment," 19 U.S.C. § 2483, because it allows the President to "prevent or prohibit … importation," 50 U.S.C. § 1702(a)(1)(B). And the challenged HTSUS modifications are "actions []under" IEEPA, 19 U.S.C. § 2483. The challenged HTSUS modifications are thus "considered to be statutory provisions of law" under § 3004(c)(1).

## C.    Deference To The CIT Is Appropriate

Finally, even if the CIT's exclusive jurisdiction here were less apparent, the district court erred in asserting jurisdiction rather than either deferring to the CIT's contrary determination or, at a minimum, transferring this case to the CIT for a determination of jurisdiction. *See Miami Free Zone Corp. v. Foreign Trade Zones Bd.*, 220 F.3d 1110, 1113 (D.C. Cir. 1994) (deferring to

- 12 -

Federal Circuit's determination of jurisdictional issue); *SCM Corp. v. U.S. Int'l Trade Comm'n*, 549 F.2d 812, 821 (D.C. Cir. 1977) ("[T]he Customs Court itself should be given the opportunity to … determine whether or not it has jurisdiction … .").

Plaintiffs' respond (Br. 29-30) that this Court need not defer to the CIT or the Federal Circuit when it thinks the law clearly favors district-court jurisdiction. But for all the reasons discussed above, it is at least plausible that the CIT, rather than the district court, has jurisdiction over this case. And in that circumstance, precedent prescribes that the prudent course is to allow the CIT to determine its jurisdiction.

## II.    IEEPA Clearly Authorizes The Challenged Tariffs

Plaintiffs offer no more compelling defense of the district court's merits ruling that IEEPA does not authorize the President to impose tariffs. That argument conflicts with the statute's text and history and with judicial precedents, as well as Congress's ratification of those precedents in enacting IEEPA.

Tariffs are a way of "control[ling]" imports, "adjust[ing]" them "by rule, method, or established mode," or "subject[ing]" them "to governing principles or laws," *Regulate*, Black's Law Dictionary 1156 (5th ed. 1979). The

Supreme Court has long described "[t]he right to regulate commerce … by the imposition of duties," *Gibbons*, 22 U.S. (9 Wheat.) at 202, and held more recently that license fees are a means of "'adjust[ing] … imports,'" *Federal Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 561 (1976)—which the Federal Circuit has applied to "duties," *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 63 F.4th 25, 34 (Fed. Cir. 2023). Congress was well aware in enacting IEEPA that the Federal Circuit's predecessor had construed the relevant language as encompassing the power to "impos[e] an import duty surcharge," *Yoshida*, 526 F.2d at 576. And Section 122 of the Trade Act of 1974—a provision all agree allows tariffs—refers to such tariffs as a means of "restrict[ing] imports," 19 U.S.C. § 2132(a), a phrase closely related to "regulat[ing] … importation," 50 U.S.C. § 1702(a)(1)(B). All that overwhelmingly shows the power to "regulate … importation" includes the power to impose tariffs.

Plaintiffs cannot avoid the clear implication of Congress's choice to incorporate in IEEPA exactly the language the *Yoshida* court had construed broadly in TWEA. Plaintiffs' criticism of *Yoshida*'s reasoning (Br. 44) is beside the point. What matters—at least in this Court, where *Yoshida* is not binding precedent—is that Congress was aware of *Yoshida* when it chose to

use in IEEPA the identical language that *Yoshida* had held to authorize tariffs.

Plaintiffs suggest (Br. 46) that *Yoshida* was "not the type of 'settled precedent' that gives rise to a presumption of ratification" because it "conflict[ed] with the only other decision on the statutory language" — the lower-court decision that *Yoshida* reversed.  But the fact that the *lower* court in *Yoshida* reached a different conclusion is irrelevant.  *Yoshida* was a precedential decision of the court with exclusive appellate jurisdiction over the subject matter, which is all the consensus needed for ratification purposes.  *See Helsinn Healthcare S.A. v. Teva Pharm. USA, Inc.*, 586 U.S. 123, 131 (2019) (identifying ratification of Federal Circuit precedent within its "'exclusive jurisdiction'").

Plaintiffs' other arguments likewise fail.

1.    Plaintiffs first offer a series of arguments (Br. 31-38) resting on the premise that there is a sharp distinction between "regulation" and the imposition of taxes or tariffs.  But IEEPA does not authorize the President to "regulate" in the abstract; it authorizes him to "regulate … importation," 50 U.S.C. § 1702(a)(1)(B).  And tariffs are a long-established, standard way of "regulat[ing] commerce" in international trade.  *Gibbons*, 22 U.S. (9 Wheat.) at 202.  Plaintiffs offer no principled reason why the President's authority to "regulate … importation" would include "the power to control the flow of

goods coming into and leaving the country … by restricting the quantity or quality of such goods and requiring inspections or quarantines" (Br. 33) but not the power to affect the flow of goods by increasing the cost of importing them.  After all, tariffs "as much as a quota" have an "initial and direct impact on imports."  *Algonquin*, 426 U.S. at 571.

Plaintiffs' failure to focus on the statutory phrase "regulate … importation," as opposed to the word "regulate" in isolation, similarly undercuts their related arguments.  First, plaintiffs wrongly suggest (Br. 34-35) that our reading of the phrase "regulate … importation" would allow the President "to tax the mere possession of" property in which a foreign national has an interest.  Tariffs are *not* a well-established way of "regulat[ing]" the "acquisition, holding, withholding, use, transfer, withdrawal, [or] transportation" of property, 50 U.S.C. § 1702(a)(1)(B); rather, they *are* a well-established way of "regulat[ing] … importation."

Plaintiffs are likewise wrong to suggest that the phrase "regulate … importation" cannot be read to allow tariffs on imports because IEEPA also authorizes the President to "regulate … exportation," 50 U.S.C. § 1702(a)(1)(B), and the Constitution forbids export duties, U.S. Const. art. I, § 9, cl. 5.  It is natural to read the President's power to

"regulate … importation" as encompassing the power to impose tariffs, while reading the power to "regulate … exportation" as excluding that power.  Plaintiffs' formalistic argument that the word "regulate" must have a single meaning as applied to each of its objects in § 1702(a)(1)(B) flunks the basic requirement of making "sense rather than nonsense out of the *corpus juris*," *West Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 100-101 (1991).  Rather, the President can "regulate … importation" by somewhat different means than he can "regulate … exportation" or the "acquisition, holding, withholding, use, transfer, withdrawal, [or] transportation" of property.  50 U.S.C. § 1702(a)(1)(B).  And that conclusion makes particular sense in a statute designed to give the President expansive authority to address international emergencies that threaten foreign policy and national security.

For the same reason, plaintiffs do not advance their argument by citing statutes allowing agencies to "regulate" matters that all agree the agencies do not have the power to tax (Br. 35), or statutes distinctly conferring authorities to "regulate" and to "tax" (Br. 36).  Again, tariffs are a long-established, standard way of "regulat[ing] commerce," *Gibbons*, 22 U.S. (9 Wheat.) at 202; taxes are not a long-established, standard way of "regulat[ing]," say, securities transactions or communications carriers.

- 17 -

Plaintiffs next argue (Br. 37) that "when Congress has authorized the President or an agency to exercise tariff power, it has used unmistakable language to grant that authority (in Title 19) accompanied by specified limitations." But imposing such a magic-words requirement would defy the Supreme Court's decision in *Algonquin* and the principle that courts broadly construe powers that Congress has delegated to the President in the arena of foreign affairs and national security. *See* Opening Br. 47-48.

Relatedly, plaintiffs suggest (Br. 37-38) that if IEEPA includes the power to impose tariffs, then the President could "freely bypass" the limitations imposed by Section 122 of the Trade Act of 1974 on tariffs imposed to "deal[] with a trade-imbalance 'emergency'" of the sort that led President Nixon to impose the tariffs sustained in *Yoshida*. But as *Yoshida* explains, Section 122 plays a fundamentally different role in the President's arsenal of trade authorities than do the emergency powers set forth first in TWEA and now in IEEPA. Congress "said what may be done with respect to *foreseeable* events" in statutes including Section 122, and "what may be done with respect to *unforeseeable* events in" TWEA, 526 F.2d at 578, and now IEEPA. That is, while Section 122 empowers the President to address non-emergency balance-of-payments concerns, IEEPA supplies a distinct,

complementary authority to address emergencies, including but not limited to balance-of-payments concerns. And more generally, the President's actions here do not identify or focus on balance-of-payments concerns of the type addressed by Section 122. Instead, the concerns the President identified in declaring an emergency arise from trade deficits, which are conceptually distinct from balance-of-payments deficits. *See, e.g.*, S. Rep. No. 93-1298, at 89 (1974) (Senate report on Section 122, recognizing the possibility of "a large *payments* surplus" at the same time as "a large *trade* deficit").

Recent actions demonstrate, moreover, that IEEPA is not being employed as a catch-all tariff authority entirely displacing other powers. On several occasions since imposing the challenged tariffs, the President and his administration have imposed other tariffs under distinct non-emergency authorities. *E.g.*, Proclamation No. 10,962, Adjusting Imports of Copper Into the United States, 90 Fed. Reg. 37727 (Aug. 5, 2025); Ceramic Tile From India: Countervailing Duty Order, 90 Fed. Reg. 25,234 (June 16, 2025).

2.    Plaintiffs next turn to a series of arguments (Br. 38-42) based on what they call "[s]tatutory context." Those are no more persuasive.

Plaintiffs invoke the *noscitur a sociis* canon for the proposition that because the other powers specified in § 1702(a)(1)(B) — "investigate," "nullify,"

- 19 -

"prevent," and so on—do not entail the raising of revenue, then neither must the power to "regulate … importation."  But the fact that none of the other actions authorized by § 1702(a)(1)(B) involves the raising of revenue does not naturally suggest the phrase "regulate … importation" should be understood to exclude tariffs.  It is hardly surprising for Congress to have given the President, in the same provision, both the power to take certain actions (like "block[ing]" or "prevent[ing]" imports) that do not entail the raising of revenue and the power to impose tariffs that do incidentally raise revenue. In any event, even if the *noscitur* canon implied that the power to "regulate … importation" should be understood not to authorize tariffs for the *purpose* of raising revenue, there is no reason the canon would imply that the President lacks the power to impose tariffs—like those here—with the *incidental effect* of raising revenue.

Plaintiffs also contend that the power to "regulate … importation" cannot include the power to impose tariffs because the IEEPA authority is limited to "property in which any foreign country or a national thereof has any interest," 50 U.S.C. § 1702(a)(1)(B), and imported property is often "owned by American nationals" (Br. 39) at the time when tariffs are imposed.  But as our opening brief explains (at 41), this Court has already held that the

- 20 -

statutory reference to "'any interest'" extends well beyond ownership interests. *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 162-163 (D.C. Cir. 2003). Plaintiffs' sole response is to say that we do not "try to explain what interest a foreign national maintains in property *after* an American importer has taken full control and ownership of the property" (Br. 39). But that is hardly a point requiring much explanation. Foreign firms that sell merchandise to domestic importers have an evident interest in the merchandise they are selling, regardless of whether they own a particular item at the point when tariffs are collected on it, because the treatment of the merchandise as it enters the American marketplace affects the price that the foreign firm can command for its sale to American importers. The case that plaintiffs cite, *Real v. Simon*, 510 F.2d 557 (5th Cir. 1975), is inapposite because it had nothing to do with importation. So is plaintiffs' hypothetical about taxing a "foreign-assembled car" "years after" its "arrival in the United States" (Br. 40).

3. Plaintiffs next offer two arguments based on "[h]istorical context and practice" (Br. 42-46). Neither is persuasive.

First, plaintiffs suggest that Congress enacted Section 122 of the Trade Act of 1974 to supply a tariff power that was missing from TWEA. But

- 21 -

plaintiffs' history is incomplete.  Plaintiffs emphasize that President Nixon did not cite TWEA in the 1971 proclamation imposing a surcharge on imports.  But as our opening brief explains (at 43), *Yoshida* recognized that TWEA was impliedly "incorporated" as an authority for the proclamation, which invoked statutory powers "'not limited to'" those it expressly cited, and that "TWEA was not cited … by name" because of concern that doing so "would be inappropriate in a proclamation affecting 'friendly' or 'neutral' nations."  526 F.2d at 575 n.22.  Plaintiffs fail to acknowledge any of that.

Nor do plaintiffs address the fact that Congress's enactment of Section 122 followed the Customs Court's decision holding the Nixon tariffs invalid (a ruling ultimately reversed, after Section 122's enactment, by the Federal Circuit's predecessor).  *Yoshida Int'l, Inc. v. United States*, 378 F. Supp. 1155 (Cust. Ct. 1974), *rev'd*, 526 F.2d 560 (C.C.P.A. 1975).  Plaintiffs correctly note (Br. 43) that President Nixon proposed trade reform legislation in 1973, before the Customs Court decision, but the legislative history of the Trade Act of 1974 makes clear that Congress viewed the Customs Court as the particular impetus for Section 122.  S. Rep. No. 93-1298, at 88 (describing "[t]he importance" of Section 122 as "manifest in light of the recent decision by the … Customs Court").  Both the President's 1973 proposal and the 1974

legislative history suggest that it was useful for the President to have more "explicit" legislative authorization for balance-of-payments surcharges than TWEA provided, *id.* at 88, but neither of them casts doubt on TWEA's provision of authority for such surcharges. *See id.* at 87-89; *Special Message to the Congress Proposing Trade Reform Legislation*, Pub. Papers 258 (Apr. 10, 1973), *available at* https://perma.cc/7DL3-6CEX. To the contrary, the Senate committee considering Section 122 specifically declined to "take a position one way or the other on" whether there was statutory authority for "the 1971 surcharge." S. Rep. No. 93-1298, at 88. And the natural inference from the report is that, had Congress known the Nixon tariffs would ultimately be sustained under TWEA, Congress might never have enacted Section 122.

Plaintiffs' second argument is that, in enacting IEEPA, Congress "limit[ed]" the authority previously provided by TWEA. Br. 45. IEEPA— and its counterpart, the National Emergencies Act—did add some constraints on peacetime emergency powers that TWEA lacked. *See United States v. Amirnazmi*, 645 F.3d 564, 577 (3d Cir. 2011); Opening Br. 8-10, 42-43. But IEEPA's operative provision, 50 U.S.C. § 1702, provides "essentially the same" powers as TWEA had; IEEPA simply specifies different "conditions

and procedures for [the] exercise" of those powers.  *Regan v. Wald*, 468 U.S. 222, 228 (1984).

In passing, plaintiffs mention a footnote in *Yoshida* stating that surcharges "in response to balance of payments problems" after Section 122's enactment "must, of course, comply with" that provision.  526 F.2d at 582 n.33.  But the footnote's context is critical.  The footnote (which is dicta) followed a sentence stating that "emergencies are expected to be shortlived." *Id.* at 582.  The footnote observed that "[t]hough the surcharge itself was described by the President as a temporary measure, and … was in effect less than five months," the "declared emergency" that precipitated the surcharge had not yet been terminated.  *Id.* at 582 n.33.  The court then described "the failure to terminate the emergency" as "rendered moot by" Section 122's enactment.  *Id.*  The statement that further surcharges "must … comply with" Section 122 thus reflects the understanding that, given the passage of time, such surcharges would no longer be in the context of a true emergency.  Otherwise, it would have made no sense for the court to recognize that if the President were "faced with … an emergency," he would not need to "follow limiting procedures prescribed in other" provisions, like Section 122, "designed for continuing use during normal times."  *Id.* at 578.

In any event, even if the footnote suggested (incorrectly) that the TWEA authority had impliedly been limited by the later enactment of Section 122, that is now irrelevant because Congress enacted IEEPA *after* Section 122 (and *Yoshida*). There is no basis to believe that when Congress enacted IEEPA, using identical language that had been construed to authorize tariffs to address a balance-of-payments crisis in *Yoshida*, Congress meant to exclude tariff authority from IEEPA.

4.    Finally, plaintiffs' invocation of "principles of constitutional avoidance" (Br. 46-51) likewise cannot justify the district court's ruling.

a.    The major-questions doctrine (Br. 47-50) is inapposite. The delegation here is to the President, not an agency; the President's exercise of power under IEEPA is not a novel invocation of an apparently narrow statute; and it is particularly inappropriate to construe narrowly a delegation in the arena of foreign affairs and national security, where the President's expertise and independent constitutional authority are at their apex, *see FCC v. Consumers' Rsch.*, 145 S. Ct. 1482, 2515-16 (2025) (Kavanaugh, J., concurring).

Plaintiffs focus their major-questions objections (Br. 47-49) on the tariffs' economic effects. But economic effects alone are no reason to cabin statutory authority. What matters is whether there is some basis for

- 25 -

"skepticism," *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014), that Congress meant for the Executive to make the relevant policy choices. Here, there is not.

Plaintiffs observe (Br. 47) that no President has invoked IEEPA to impose tariffs. But the Nixon tariffs were sustained under the identical language of a provision affording "essentially the same" power, *Wald*, 468 U.S. at 228. And these tariffs fall within a long tradition: Congress has granted the President broad powers in the international trade context, and Presidents have exercised those powers in significant ways to bolster the Nation's position in international diplomacy, the global economy, and even international conflicts. *See* Opening Br. 12-13.

Finally, plaintiffs misunderstand why it matters that IEEPA affords the President authority in the foreign-affairs and national-security domains. The point is not that these tariffs fall within the President's inherent Article II powers, but that Congress routinely delegates power broadly within these domains, because it "intends to give the President substantial authority and flexibility" in areas within the Executive's core competence. *Consumers' Rsch.*, 145 S. Ct. at 2516 (Kavanaugh, J., concurring); *see Florsheim Shoe Co. v. United States*, 744 F.2d 787, 792-793 (Fed. Cir. 1984) (trade issue "intimately

involved with foreign affairs, an area in which congressional authorizations of presidential power should be given a broad construction").

b.     The nondelegation doctrine likewise provides no basis to doubt that IEEPA authorizes tariffs.  The Supreme Court has long recognized that when Congress enacts "legislation which is to be made effective through negotiation and inquiry within the international field," it must afford the President "a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved," *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936).  Thus, Justice Kavanaugh recently observed that "in the national security and foreign policy realms, the nondelegation doctrine (whatever its scope with respect to domestic legislation) appropriately has played an even more limited role in light of the President's constitutional responsibilities and independent Article II authority." *Consumers' Rsch.*, 145 S. Ct. at 2516 (Kavanaugh, J., concurring).

Regardless, IEEPA would satisfy even plaintiffs' version of the operative nondelegation test.  As the Supreme Court recently reiterated, even domestic delegations pass muster so long as Congress "ma[k]e[s] clear both 'the general policy' that the [Executive] must pursue and 'the boundaries of

[its] delegated authority,'" and "provide[s] sufficient standards to enable both 'the courts and the public [to] ascertain whether the [Executive]' has followed the law." *Consumers' Rsch.*, 145 S. Ct. at 2497 (majority opinion). IEEPA clears those bars: It allows the President to exercise certain powers for the specified purpose of "deal[ing] with" "unusual and extraordinary threat[s]" from abroad, 50 U.S.C. § 1701(a), and not other purposes, *id.* § 1701(b), while delimiting exceptions, *id.* § 1702(b), and providing for congressional oversight of both IEEPA actions and the declaration of national emergencies, *see* Opening Br. 9-10, 11-12. To the extent judicial review is appropriate where Congress vests the President with broad discretion in the foreign-affairs and national-security context, IEEPA allows that as well. Court of appeals have thus uniformly upheld IEEPA against nondelegation challenges. *See United States v. Shih*, 73 F.4th 1077, 1092 (9th Cir. 2023) (collecting cases), *cert. denied*, 144 S. Ct. 820 (2024).

## III.    The District Court Erred In Entering Injunctive Relief

The district court in any event erred in its weighing of the remaining equitable factors and in entering a preliminary injunction. Plaintiffs try to collapse the merits with the equitable factors, tying likelihood of success to the public interest. Br. 52. But "[a]n injunction is a matter of equitable

discretion; it does not follow from success on the merits as a matter of course." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008). Thus, a court must separately consider not only any irreparable injury to a plaintiff, but also "the balance of equities" between the parties and "the public interest." *Id.* at 20.

Those factors decisively favor the government. As our opening brief explained (at 56-57), the government has provided declarations from four Cabinet officials explaining the effects that an injunction would have on on-going trade negotiations and, by extension, on foreign policy and national security. Plaintiffs try to cast doubt on those declarations by selectively quoting public comments by various administration officials that negotiations have continued and that other statutory tariff authorities remain available. Br. 54-55. But that mischaracterizes the statements and largely ignores that each injunction entered against the IEEPA tariffs was stayed almost immediately thereafter. Moreover, although plaintiffs note the availability of other tariff authorities (Br. 55), IEEPA provides the most flexible, effective means for addressing the emergencies the President has declared. JA79-80; *accord* JA67; JA84. The possibility of tariffs under alternative statutory

authorities would not offset the effects of an injunction against the exercise of the President's IEEPA powers.

For this reason, plaintiffs are wrong that the "proverbial horse has left the barn."  Br. 54.  Although serious harms were avoided by swift action staying injunctions, those harms would actualize should the stay be lifted and the injunctions go into effect.  Plaintiffs try to minimize the harm of an injunction in this case on the basis that it applies narrowly.  But an injunction instills uncertainty surrounding "the credible threat of enforcement of the IEEPA tariffs" upon which trade negotiations are premised.  JA80.  Indeed, the district court itself recognized the import of these harms when it subsequently stayed its own preliminary injunction, explaining that a stay was warranted "to protect the President's ability to identify and respond to threats to the U.S. economy and national security."  JA126.  Plaintiffs ignore that fact entirely.

Plaintiffs' alleged harms, in contrast, are both less substantial and remediable.  Should plaintiffs ultimately prevail, they can seek refunds for any unlawful duties—a point plaintiffs do not dispute.  Plaintiffs argue that these refunds are inadequate because they will not cover the potential losses should plaintiffs choose to no longer import covered goods.  Br. 53.  But such

self-inflicted harms are not a basis for irreparable injury. *See* 11A Wright & Miller's *Federal Practice & Procedure* § 2948.1 (3d. ed.), Westlaw (database updated May 21, 2025); *see also Cuomo v. U.S. Nuclear Regulatory Com'n*, 772 F.2d 972, 977 (D.C. Cir. 1985) (per curiam) (explaining that litigants' self-imposed injuries cannot support a stay). And more generally, plaintiffs' asserted harms depend on speculation about the reaction of third parties to price increases plaintiffs assert they would implement, undermining the certainty of any such injury.

At minimum, the district court erred in fixing only nominal bond. A bond must be "proper to pay the costs and damages" a wrongfully enjoined party sustains. Fed. R. Civ. P. 65(c). The $100 bond bears no relationship to this standard. And plaintiffs miss the point in objecting to a bond for "the full amount of unlawful duties." Br. 56. Even assuming the court could impose a bond less than necessary to repay the government, that does not justify the district court's decision to disregard entirely any proportionality between the irrecoverable lost duties and plaintiffs' ability to pay. *See DSE, Inc. v. United States*, 169 F.3d 21, 33-34 (D.C. Cir. 1999).

## CONCLUSION

The preliminary injunction should be vacated, and this case remanded

with instructions to dismiss it or transfer it to the CIT, for lack of jurisdiction.

Alternatively, the preliminary injunction should be reversed.

Respectfully submitted,


D. JOHN SAUER
  *Solicitor General*


 */s/ Brett A. Shumate*
BRETT A. SHUMATE
  *Assistant Attorney General*
  *Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2217*
  *Brett.A.Shumate@usdoj.gov*

- 32 -

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,481 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Book Antiqua, a proportionally spaced typeface.

*/s/ Brett A. Shumate*
Brett A. Shumate